*SOLICITATION VERSION*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **MOBILEUM, INC.,** *et al.,* | § | **Case No. 24-90414 (CLM)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |
| | § | |

## DISCLOSURE STATEMENT FOR JOINT CHAPTER 11
## PLAN OF MOBILEUM, INC. AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

*Proposed Attorneys for Debtors
and Debtors in Possession*

July 23, 2024
Houston, Texas

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (*pro hac vice* pending)
Alexander W. Welch (*pro hac vice* pending)
Daphne Papadatos (*pro hac vice* pending)
Eric L. Einhorn (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Mobileum, Inc. (7417); Matrix Intermediate, Inc. (7287); Matrix Holdco, LLC (0039); Matrix Parent, Inc. (9085); Mobile Acquisition Corp. (9591); SIGOS LLC (1763); UnwiredSoft, Inc. (2064); We Do Technologies Americas, Inc. (9338); Convene Networks LLC (2820); Developing Solutions Inc. (6177); and Phase 3 Innovations Holdings, Inc. (1899).  The Debtors' mailing address is 20813 Stevens Creek Boulevard, Suite 200, Cupertino, CA 95014.

**DISCLOSURE STATEMENT, DATED JULY 23, 2024**

**MOBILEUM, INC., *ET AL.***

THIS SOLICITATION OF VOTES (THE "*SOLICITATION*") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE JOINT CHAPTER 11 PLAN OF MOBILEUM, INC. AND ITS AFFILIATED DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (COLLECTIVELY, THE "*DEBTORS*"), ATTACHED HERETO AS EXHIBIT A (THE "*PLAN*").

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (PREVAILING CENTRAL TIME) ON AUGUST 23, 2024,

UNLESS EXTENDED BY THE DEBTORS. THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS JULY 19, 2024 (THE "*RECORD DATE*").

An opt-out election form (the "**Opt-Out Election Form**") or a Ballot (as defined herein) containing an opt-out election will be provided to you.  The Opt-Out Election Form or Ballot, as applicable, will provide you with the option to not grant the releases contained in section 10.6(b) of the Plan.  You must complete and timely return the Opt-Out Election Form or Ballot, as applicable, to the Voting Agent by August 23, 2024 (the "**Voting Deadline**") at 5:00 p.m. (Prevailing Central Time) in accordance with the instructions set forth in the Opt-Out Election Form or Ballot, as applicable, for your opt-out to be valid; OTHERWISE, YOU WILL BE DEEMED TO CONSENT TO AND BE BOUND BY THE RELEASES SET FORTH IN THE PLAN.  Please review the additional information set forth in this Disclosure Statement, the Opt-Out Election Form or Ballot, as applicable, the Plan, and any other documents related to the Chapter 11 Cases that you may receive from time to time.  Please be advised that your decision to opt out of the releases in section 10.6(b) does not affect the amount of distribution you will receive under the Plan.

**RECOMMENDATION BY THE DEBTORS**

The Board of Managers of Matrix Holdco, LLC and the board of directors or managers, as applicable, of each of its affiliated Debtors  (as of the date hereof) have approved the transactions contemplated by the Solicitation and the Plan and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.  Holders of 88% of First Lien Claims and 77% of Second Lien Debt Claims (each as defined herein) entitled to vote on the Plan have already agreed, subject to the terms and conditions  of  the Restructuring Support Agreement, to vote in favor of the Plan.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT (THE "*DISCLOSURE STATEMENT*") AS

PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  IN PARTICULAR, ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CAREFULLY READ AND CONSIDER THE RISK FACTORS SET FORTH IN SECTION VIII OF THIS DISCLOSURE STATEMENT – "CERTAIN RISK FACTORS TO BE CONSIDERED" – BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE PLAN SUMMARY AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN ITSELF AND ANY EXHIBITS ATTACHED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  IN THE EVENT OF ANY CONFLICT BETWEEN ANY DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

UPON CONFIRMATION OF THE PLAN, THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE OFFERED AND SOLD WITHOUT REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "*SECURITIES ACT*"), OR SIMILAR U.S. FEDERAL, STATE, OR LOCAL LAWS IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145(A) OF THE BANKRUPTCY CODE AND/OR ANOTHER AVAILABLE EXEMPTION UNDER THE SECURITIES LAWS OF THE UNITED STATES.  THE ABILITY TO OFFER AND SELL SECURITIES WITHOUT REGISTRATION IN RELIANCE ON SECTION 1145(A) OF THE BANKRUPTCY CODE AND/OR APPLICABLE SECURITIES LAWS, WHETHER FEDERAL, STATE, OR TERRITORIAL, SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.  WITH RESPECT TO THE SECURITIES OFFERED AND SOLD PURSUANT TO THE EXEMPTION UNDER SECTION 1145(A) OF THE BANKRUPTCY CODE, SUCH SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE.  IN ADDITION, SUCH SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.

NO SECURITIES TO BE ISSUED PURSUANT TO THE PLAN HAVE BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY.   THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED FOR APPROVAL WITH THE SEC OR ANY STATE AUTHORITY AND NEITHER THE SEC NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE IN THE UNITED STATES.  NEITHER THE SOLICITATION OF VOTES ON THE PLAN NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR RULE 506 OF REGULATION D PROMULGATED THEREUNDER.

ALL SECURITIES DESCRIBED HEREIN ARE EXPECTED TO BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR ANY STATE SECURITIES LAWS ("*BLUE SKY LAWS*").

CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED," AS WELL AS THE ABILITY OF MANAGEMENT TO EXECUTE ITS PLANS TO MEET ITS GOALS AND OTHER RISKS INHERENT IN THE DEBTORS' BUSINESSES. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED

THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS. THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT OR REQUIRED BY APPLICABLE LAW.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS PROVIDED HEREIN.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THE DISCLOSURE STATEMENT.

THE INFORMATION IN THE DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THE DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF, THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

**TABLE OF CONTENTS**

I.

    INTRODUCTION ...........................................................................................................1

    A.      Overview of Restructuring Transactions .........................................................1

    B.      Summary of Plan Classification and Treatment of Claims...............................4

    C.      Inquiries ...........................................................................................................8

II.

    OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS .....................................8

    A.      History and Formation ......................................................................................8

    B.      Current Business Operations.............................................................................9

    1.      Products & Services ..........................................................................................9

    2.      Revenue Breakdown .......................................................................................11

III.

    CORPORATE AND CAPITAL STRUCTURE.............................................................11

    A.      Corporate Structure ........................................................................................11

    B.      Equity Ownership ...........................................................................................12

    C.      Corporate Governance ....................................................................................12

    D.      Capital Structure ............................................................................................14

IV.

    KEY EVENTS LEADING TO
    COMMENCEMENT OF CHAPTER 11 CASES ..........................................................17

    A.      Challenges Facing Debtors' Business.............................................................17

    B.      Formation of Special Committee and Special Committee Investigation...............18

    C.      Litigation........................................................................................................19

    D.      Prepetition Restructuring Efforts ...................................................................20

    E.      Restructuring Support Agreement and Plan ...................................................22

    F.      DIP Financing .................................................................................................25

V.

    ANTICIPATED EVENTS
    DURING CHAPTER 11 CASES ..................................................................................26

    A.      Commencement of Chapter 11 Cases .............................................................26

    B.      First-Day Motions...........................................................................................27

    C.      Procedural Motions.........................................................................................27

    D.      Confirmation Hearing .....................................................................................27

    E.      Timetable for The Chapter 11 Cases ..............................................................27

VI.    TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS ..................................28

A.    Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers ..................................................................................................29

VII.    CERTAIN U.S FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..........30

A.    Consequences Depend Upon Restructuring Transactions ...................................32

B.    Consequences to Debtors....................................................................................33

C.    Consequences to U.S. Holders of Certain Claims .............................................38

D.    Consequences to Non-U.S. Holders of Certain Claims ........................................41

E.    Withholding on Distributions .............................................................................43

VIII.    CERTAIN RISK FACTORS TO BE CONSIDERED ....................................................44

A.    Certain Bankruptcy Law Considerations...........................................................44

B.    Additional Factors Affecting the Value of Reorganized Debtors........................47

C.    Factors Relating to Securities to Be Issued Under Plan ....................................52

D.    Additional Factors..............................................................................................54

IX.    VOTING PROCEDURES AND REQUIREMENTS.......................................................55

A.    Voting Procedures..............................................................................................55

B.    Parties Entitled to Vote ......................................................................................56

C.    Waivers of Defects, Irregularities, etc. ..............................................................60

X.    CONFIRMATION OF PLAN ........................................................................................61

A.    Confirmation Hearing ........................................................................................61

B.    Objections to Confirmation.................................................................................61

C.    Requirements for Confirmation of Plan..............................................................63

XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN ..................................................................................67

A.    Alternative Plan of Reorganization.....................................................................67

B.    Sale Under Section 363 of the Bankruptcy Code ................................................67

C.    Liquidation under Chapter 7 of Bankruptcy Code...............................................68

XII.    CONCLUSION AND RECOMMENDATION................................................................69

ii

## **EXHIBITS**

**EXHIBIT A**        Plan

**EXHIBIT B**        Restructuring Support Agreement

**EXHIBIT C**        Organizational Structure

**EXHIBIT D**        Liquidation Analysis

**EXHIBIT E**        Financial Projections

**EXHIBIT F**        Valuation Analysis

WEIL:\99859079\1\63808.0003

# I.
# INTRODUCTION

A.      Overview of Restructuring Transactions

Mobileum, Inc. ("**Mobileum**") and its debtor affiliates (collectively, the "**Debtors**" and, together with certain of their non-debtor affiliates, the "**Company**") submit this Disclosure Statement in connection with the solicitation of votes (the "**Solicitation**") on the *Joint Chapter 11 Plan of Mobileum, Inc. and its Affiliated Debtors*, dated July 23, 2024, a copy of which is annexed to this Disclosure Statement as **Exhibit A** (the "**Plan**").[1]

With the approval of the board of managers of Matrix Holdco, LLC ("**Holdings**", and the board of Holdings, the "**Holdings Board**"), the Debtors intend to commence voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on July 23, 2024 (the "**Petition Date**"), which is during the Solicitation period.  The Debtors intend to seek confirmation of the Plan consistent with the timeline set forth herein and, to the extent necessary, will file a motion seeking to shorten applicable notice periods.

During the Chapter 11 Cases, the Debtors intend to operate their businesses in the ordinary course and will seek authorization from the Bankruptcy Court to make payment in full on a timely basis to trade creditors, taxing authorities, customers, insurance providers, and employees of amounts due prior to and during the Chapter 11 Cases.

The Debtors commenced Solicitation to implement a comprehensive financial restructuring to deleverage the Company's balance sheet to ensure the long-term viability of the Company's enterprise.  As a result of extensive negotiations with their secured creditors, the Debtors entered into a restructuring support agreement (including any amendments, modifications and joinders thereto, the "**Restructuring Support Agreement**"), a copy of which is attached hereto as **Exhibit B** (attachments omitted), with the Consenting Creditors party thereto, who hold, in the aggregate, approximately (i) 88% of the aggregate outstanding principal amount of Prepetition First Lien Loans; (ii) 100% of the aggregate outstanding principal amount of Prepetition First Lien Notes; and (iii) 77% of the aggregate outstanding principal amount of Prepetition Second Lien Loans, and Matrix Topco, L.P., H.I.G Technology Partners A, L.P., H.I.G. Technology Partners B, L.P., H.I.G. Europe Middle Market LBO Fund III, L.P., H.I.G. Middle Market LBO Fund III, L.P., H.I.G. Matrix Co-Investors, L.P., and H.I.G. Mobile, L.P., on behalf of H.I.G. Capital, LLC,(collectively, in their capacity as direct or indirect record or beneficial holders of Interests in Matrix Topco, L.P., the "**Consenting Sponsor**" and, together with the Consenting Creditors, the "**Consenting Parties**"), who through its ownership of approximately 60% of the outstanding common stock Interests (on a fully diluted basis) in Matrix Topco, L.P. controls its direct and indirect subsidiaries, including Matrix Intermediate, Inc. ("**Intermediate**").   The Debtors have worked closely and in coordination with their key stakeholders, including the Consenting Parties.

---

[1]   Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

Indeed, the Consenting Parties have played a critical role in formulating the proposed restructuring described in this Disclosure Statement.

Given the overwhelming support for the Debtors' restructuring by their major stakeholders, in the weeks leading up to the solicitation period the Debtors elected to pursue a restructuring that leaves its trade creditors unimpaired to maximize value for their stakeholders by minimizing both the costs of restructuring and the impact on the Debtors' businesses.  Among other things, the Debtors intend to file motions to avoid the need for schedules of assets and liabilities and statements of financial affairs, which will provide them with significant cost savings. In addition, implementing the restructuring contemplated by the Plan in an expedited manner will obviate the need for an unsecured creditors' committee and the expenses associated therewith that would otherwise be borne by the Debtors' estates.  The Debtors believe that the Plan represents the most efficient route to consummate their restructuring and best positions the Debtors, their trade partners, and other stakeholders going forward.

Pursuant to the Restructuring Support Agreement, the parties agreed to support a deleveraging transaction to restructure the Company's balance sheet, to be effectuated in chapter 11 through the Plan (the "**Restructuring**").  Specifically, the Restructuring will include, among other things, the following agreements:

- Certain holders of First Lien Claims (as defined below) ("the **DIP Lenders**") will provide a new superpriority, senior-secured, priming debtor-in-possession term-loan facility (the "**DIP Facility**" or "**DIP Financing**"), consisting of (i) $60,000,000 of new money DIP Loans (the "**New Money DIP Term Loans**"), (ii) subject to the DIP Term Sheet and the "roll down" terms of paragraph 2(c) of the Interim DIP Order, a roll up of $100,000,000 in principal amount of First Lien Claims held by DIP Lenders (as defined below) (the "**DIP Roll-Up Loans**" and, together with the New Money DIP Loans, the "**DIP Loans**"), and (iii) the Backstop Premium, which shall be paid in the form of Tranche B Loans (as defined in the DIP Term Sheet).

- On the Effective Date, the Debtors and DIP Lenders will enter into a senior-secured, first-lien term-loan facility (the "**Exit Term Loan Facility**" and the loans thereunder, the "**Exit Term Loans**") comprised of the DIP Loans in an aggregate principal amount of up to $160,000,000, on the terms set forth in the Exit Facility Term Sheet.

The Restructuring will be effectuated pursuant to the Plan, which provides for, among other things, (i) a comprehensive restructuring of the Debtors' prepetition obligations or sale of substantially all of their assets, (ii) the provision of the going-concern value of the Debtors' businesses, (iii) maximization of creditor recoveries, (iv) an equitable distribution to certain stakeholders, and (v) continuation of high-quality technology services.

A summary of the key terms of the restructuring transactions as contemplated by the Plan and the Restructuring Support Agreement is as follows:

- Holders of an Allowed Other Secured Claim and an Allowed Priority Non-Tax Claim will be unimpaired under the Plan.

2

- Holders of an Allowed First Lien Claim shall receive, in full and final satisfaction of such Claim, in accordance with the Restructuring Transactions, its Pro Rata Share of 96.5% of the New Equity Interests subject to dilution by the Management Incentive Plan and New Equity Interests issued on account of the Tranche B Loans.

- Holders of an Allowed Second Lien Debt Claim shall receive, in full and final satisfaction of such Claim in accordance with the Restructuring Transactions, its Pro Rata Share of 3.5% of the New Equity Interests subject to dilution by the Management Incentive Plan and New Equity Interests issued on account of the Tranche B Loans.

- Holders of an Allowed General Unsecured Claim will be unimpaired under the Plan.

- Holders of an Allowed Intercompany Claim and Allowed Intercompany Interest will be [unimpaired and presumed to accept / impaired and deemed to reject] the Plan.

- Holders of Existing Parent Equity Interests will be impaired and deemed to reject the Plan.

All holders of Allowed First Lien Claims will have the right to participate in the provision of the DIP Facility. In exchange for providing the DIP Facility, holders of Allowed DIP Claims will receive (a)(i) Exit Term Loans in a principal amount equal to the amount of such Allowed DIP Claim on account of such holder's principal amount of DIP Loans (excluding any such principal amount on account of the Tranche B Loans), (ii) New Equity Interests in exchange for the amount of such holder's Allowed DIP Claim on account of such holder's principal amount of Tranche B Loans, subject to dilution by the Management Incentive Plan, and (iii) payment in full in cash of all accrued and unpaid interest and other obligations on account of the DIP Loans (excluding obligations to pay the principal amount of the DIP Loans paid pursuant to clauses (i) and (ii) above) or (b) such other treatment as agreed to by the Debtors and such DIP Lender.

The Plan also provides for the establishment of a Litigation Trust and the contribution by each of H.I.G. Capital, LLC ("**H.I.G.**"), the Company, the First Lien Ad Hoc Group, and any Consenting Creditor (each as defined in the Restructuring Support Agreement) of their respective claims that relate to or arise from the facts underlying the allegations in the litigation styled as *Matrix Parent, Inc. v. Audax Management Co.*, Case No. N23C-10-212 MAA CCLD (Del. Super.), and any appeals therefrom (the "**Superior Court Litigation**") to the Litigation Trust. Proceeds of (i) the Superior Court Litigation and any other proceeds of claims transferred to the Litigation Trust and (ii) recovered under the representations and warranties policy no. ET111-003-478 issued to Matrix Parent, Inc. ("**Matrix Parent**") with a policy term of March 1, 2022 to March 1, 2025 shall be allocated pursuant to a proceeds waterfall set forth herein and in the Plan.

Cash on the balance sheet of the reorganized Debtors as reorganized from the Effective Date (the "**Reorganized Debtors**") and, to the extent necessary, the proceeds issued or deemed issued under the Exit Term Loan Facility shall be used to (i) pay the Professional Fee Claims, in full in accordance with section 2.2 of the Plan, (ii) fund other distributions, costs, and expenses contemplated by the Plan, and (iii) fund general working capital and for general corporate purposes of the Reorganized Debtors.

WEIL:\99859079\1\63808.0003

There are two (2) creditor groups whose votes for acceptance of the Plan are being solicited: (i) holders of First Lien Claims, and (ii) holders of Second Lien Debt Claims.  An overview of the voting procedures and related requirements are detailed below in section IX.

The proposed Restructuring will leave the Company's businesses intact and substantially deleverage the Debtors' capital structure, as its total funded indebtedness (including accrued but unpaid interest) will be reduced from $690.5 million to approximately $160 million inclusive of principal and accrued interest—an approximately 76.8% debt reduction relative to the Petition Date.  This deleveraging will enhance the Company's long-term growth prospects and competitive position and allow the Debtors to emerge from the Chapter 11 Cases as a stronger, reorganized group of entities better able to invest in the business, drive innovation, deliver value to customers, and withstand a challenging market environment.

This Disclosure Statement provides holders of Claims and Interests entitled to vote to accept or reject the Plan with adequate information about (i) the Debtors' business and certain historical events, (ii) the Chapter 11 Cases, (iii) the Plan, (iv) the rights of holders of Claims and Interests under the Plan, and (v) other information necessary to enable each holder of a Claim and Interest entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan.  This Disclosure Statement also assists the Bankruptcy Court in determining whether the Plan complies with the provisions of the Bankruptcy Code and should be confirmed.

Section II hereof contains a summary of the treatment of various creditor groups under the Plan.

       B.     <u>Summary of Plan Classification and Treatment of Claims</u>

**WHO IS ENTITLED TO VOTE:**  Under the Bankruptcy Code, only "impaired" holders of Claims or Interests are entitled to vote on the Plan (unless, for reasons discussed in more detail below such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is deemed to be "impaired" under the Plan **unless**: (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Holders of Claims in the following Classes are being solicited under, and are entitled to vote on, the Plan:

- Class 3 — First Lien Claims; and

- Class 4 — Second Lien Debt Claims;

The following table summarizes:  (i) the treatment of Claims and Interests under the Plan; (ii) which Classes are impaired by the Plan; (iii) which Classes are entitled to vote on the Plan; and (iv) the estimated recoveries for holders of Claims and Interests.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, *see* section VI – Summary of Plan below.  A detailed discussion of the

analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the valuation analysis in Exhibit F – Valuation Analysis.

WEIL:\99859079\1\63808.0003

| Class and Designation | Treatment under Plan | Impairment and Entitlement to Vote | Approx. Percentage Recovery |
|---|---|---|---|
| **Class 1: Other Secured Claims** | On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the sole option of the Debtors, with the consent of the Requisite Consenting First Lien Lenders, or the Reorganized Debtors, each such holder shall receive (i) payment in full in Cash, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code (iii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired (**Not entitled to vote** – presumed to accept) | 100% |
| **Class 2: Priority Non-Tax Claims** | On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors, with the consent of the Requisite Consenting First Lien Lenders, or the Reorganized Debtors, each such holder shall receive (i) payment in full in Cash, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired (**Not entitled to vote** – presumed to accept) | 100% |
| **Class 3: First Lien Claims** | On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed First Lien Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed First Lien Claim, each such holder shall receive, in accordance with the Restructuring Transactions, its Pro Rata Share of 96.5% of the New Equity Interests subject to dilution by the Management Incentive Plan and New Equity Interests issued on account of the Tranche B Loans. | Impaired (**Entitled to vote**) | 43% |

WEIL:\99859079\1\63808.0003

| | | | |
|---|---|---|---|
| **Class 4: Second Lien Debt Claims** | On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed Second Lien Debt Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Second Lien Debt Claim, each such holder shall receive in accordance with the Restructuring Transactions, its Pro Rata Share of 3.5% of the New Equity Interests subject to dilution by the Management Incentive Plan and New Equity Interests issued on account of the Tranche B Loans. | Impaired **(Entitled to vote)** | 3% |
| **Class 5: General Unsecured Claims** | The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on and after the Effective Date, the Reorganized Debtors shall continue to pay each Allowed General Unsecured Claim or dispute each General Unsecured Claim in the ordinary course of business. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| **Class 6: Intercompany Claims** | On or as soon as reasonably practicable after the Effective Date, all Intercompany Claims will be adjusted, Reinstated, or discharged, in each case, to the extent determined to be appropriate by the Reorganized Debtors, in their sole discretion. | Unimpaired / Impaired **(Not entitled to vote** – presumed to accept / deemed to reject) | 0% / 100% |
| **Class 7: Intercompany Interests** | On or as soon as reasonably practicable after the Effective Date, all Intercompany Interests will be adjusted, Reinstated, or discharged as determined by the Reorganized Debtors, in their sole discretion. | Unimpaired / Impaired **(Not entitled to vote** – presumed to accept / deemed to reject) | 0% / 100% |
| **Class 8: Existing Parent Equity Interests** | On the Effective Date, Existing Parent Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect. | Impaired **(Not entitled to vote** – deemed to reject) | 0% |

WEIL:\99859079\1\63808.0003

C.    Inquiries

If you have any questions regarding the packet of materials you have received, please reach out to Kroll Restructuring Administration LLC, the Debtors' voting agent (the "**Voting Agent**" or "**Kroll**") at Toll Free in the U.S. and Canada at (844) 712-2239 or Non U.S./Canada at +1 (646) 777-2539 or by sending an electronic mail message to:

**MobileumInfo@ra.kroll.com**

Copies of this Disclosure Statement, which includes the Plan and the Plan Supplement (when filed) are also available on the Voting Agent's website, https://cases.ra.kroll.com/Mobileum.  PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

**II.**
**OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS**

The Debtors, together with certain of their non-debtor affiliates, are the leading global provider of integrated analytics solutions for roaming and network services, security, risk management, customer engagement and experience, and testing and monitoring for global Communication Service Providers ("**CSPs**").  The Company's integrated analytics solutions are provided through a combination of hardware, software, and cloud-based products, as well as maintenance, subscription, implementation services, and managed services for those products.  Through this suite of innovative products and solutions, the Company is able to drive customer revenues, improve network security, minimize risk, and ensure active testing and monitoring.

A.    History and Formation

The Company was founded in 2001 through the merger of Mobileum and UnwiredSoft. Headquartered in Cupertino, California, the Company originally focused primarily on the roaming and network services market.   Throughout its history, the Company has acquired various businesses, including Macalla Software in 2009; ADECEF, Unify, and IPCom in 2012; Evolved Intelligence in 2018; WeDo Technologies in 2019; SIGOS in 2020; Niometrics and Developing Solutions in 2021; and certain Guavus assets in 2023.

The Company's trajectory has also been a function of its historical ownership.  In 2016, the Company was acquired by Audax Management Co. ("**Audax**"), which was responsible for leading many of the above-described acquisitions.  Under Audax, the Company significantly broadened its solution set and product portfolio.  In March 2022, H.I.G. acquired a majority stake in the Company for a purchase price of $915 million through an affiliate of H.I.G. Technology Partners ("**H.I.G. Technology Partners**"), with Company management and Audax each retaining a minority equity stake and representation on the Board.  The acquisition was partially financed through Mobileum's incurrence of significant debt.

8

B.    Current Business Operations

## 1. Products & Services

As stated above, the Company is the leading provider of integrated analytics solutions for roaming and network services, security, risk management, customer engagement and experience, and testing and monitoring solutions for global CSPs.  The Company's integrated analytics solutions are provided through a combination of hardware, software, and cloud-based products, as well as maintenance, subscription, implementation services, and managed services for those products.

The Company serves telecommunications operators worldwide.  As described in greater detail below, the Company provides various solutions including, but not limited to, the following: (i) analyzing roaming data; (ii) directing roaming subscribers to partner networks when subscribers are traveling internationally; (iii) blocking the delivery of malicious messages to subscribers; (iv) testing mobile service in various locations without physically being present in such locations, including attaching to the network, placing calls, sending an SMS, and downloading/uploading a file; (v) reconciling revenue and expenses to ensure mobile operators do not experience revenue leakage due to system or process weakness; (vi) identifying and blocking fraud; (vii) providing insights regarding customer experience on network across data, voice, messaging, and application usage; and (viii) identifying application usage and aggregating insights to monetize with third parties.

The Company has four main business segments:  (i) Roaming and Network Services; (ii) Fraud, Security, and Business Assurance; (iii) Testing and Service Assurance; and (iv) Engagement and Experience.  The key capabilities under each segment are set forth in the graphic below and described in greater detail herein:



9

###### i.          *Roaming and Network Services*

Through the Company's Roaming and Network Services offering, telecom customers are able to control and optimize their subscribers' experiences when roaming internationally by automatically directing roaming customers to preferred networks based on analytics-driven insight into technology, quality of service, business targets, and wholesale costs, including by placing customers on partner networks that offer attractive wholesale rates while optimizing network quality.  This allows customers to effectively manage roaming agreements with other mobile operators to maximize revenue capture and alleviate quality concerns.  Mobileum is one of the leading players in the steering of roaming market, which competitive positioning is attributable to its range of steering of roaming options, advanced 5G and VoLTE services, and superior roaming quality management on account of leveraging AI and machine learning.

This business segment also includes additional products which enable customers to, among other things: (i) manage campaigns and communications through an analytics-driven marketing platform, (ii) monitor roaming customer experience, (iii) ensure uninterrupted roaming services during 2G/3G sunset (i.e., as the industry transitions from 2G and 3G to newer 4G/LTE and 5G networks), and (iv) route and distinguish between data traffic.

###### ii.          *Fraud, Security, and Business Assurance.*

The Fraud, Security, and Business Assurance segment detects fraud, spoofing, and other illegal network utilization and provides customers with solutions to manage threats in real time, including, for example, by swiftly identifying and automatically blocking various kinds of fraud.  The software also works to recapture lost revenue by identifying tariff and billing errors.

This segment also includes (i) a Revenue and Business Assurance platform, which provides an end-to-end approach for monitoring and controlling revenue leakage in telecom environments due to misaligned usage records and (ii) a Proactive Risk Management program that provides customers with proactive fraud detection for preventing revenue losses.

###### iii.          *Testing and Service Assurance.*

The Testing and Service Assurance segment provides the world's leading end-to-end active testing platform to help telecom operators across the globe configure, schedule, edit, and analyze tests according to their preferences in order to quickly and reliably ensure the successful launch of new services and technologies, including by virtualizing customers' SIM cards in any location to perform tests without incurring the expense of sending personnel to different countries.  Mobileum offers an enhanced set of tools for continuous testing and operational process automation, which improves efficiency, reduces costs, and enables customers to roll out highly reliable services within their domestic markets.  Through these products, Mobileum is the leading provider of roaming test solutions.

###### iv.          *Engagement and Experience.*

Finally, the Engagement and Experience segment, which is a relatively new offering arising out of Mobileum's 2021 acquisition of Niometrics (Pte.) Ltd, analyzes subscriber experience to enhance

10

services, reduce costs, and minimize churn. This segment includes Mobileum's "Home Analytics" solution, which provides customers with a consolidated view of their customers across both their fixed and mobile networks at the household level to identify which households present the greater opportunities for up-selling, cross-selling or new acquisition campaigns, including, for example, identifying broadband households that have mobile devices from other competitors.

### 2. Revenue Breakdown

The Company's revenues streams are well diversified from both a geographic and segment perspective, as shown below:



The Company also benefits from a mix of both recurring and non-recurring revenue streams. The Company's recurring revenues include (i) maintenance services in the form of technical support for installed solutions, software updates and third-party hardware support, (ii) management of Mobileum-installed solutions, and (iii) testing subscriptions, pursuant to which customers purchase test units to be utilized over a certain time period (typically 12 months). The balance of the Company's revenues are comprised of its non-recurring sources of revenue, including (i) perpetual licenses to use Mobileum's software solutions, (ii) one-time software installation and integration performed by Mobileum delivery services teams, and (iii) third-party hardware and software to support the sale of Mobileum's software solutions. Despite current internal and external challenges facing the business, the Company's revenues through the first half of 2024 remain strong. Based on financial performance to date, the Company anticipates that recurring revenues will continue to steadily increase from 2024 through 2026 due to the diversified and loyal customer base. Concurrently, non-recurring revenues are projected to undergo a rebound throughout the remainder of 2024, followed by a transition to more consistent growth in 2025 and 2026.

### III.
### CORPORATE AND CAPITAL STRUCTURE

#### A.    Corporate Structure

The Debtors consist of Intermediate and certain of its wholly-owned subsidiaries, totaling 11 entities formed under the laws of Delaware and Texas. With the exception of Intermediate, each

WEIL:\99859079\1\63808.0003

of the Debtors is an obligor of the Debtors' prepetition funded debt. A chart illustrating the Company's organizational structure as of the Petition Date is attached hereto as **Exhibit C**. The following chart depicts the Company's abridged corporate structure:



B.     Equity Ownership

As shown above, non-Debtor Matrix Topco, L.P. ("**Topco**") is the Company's ultimate parent, and all of the Debtors are wholly-owned direct or indirect subsidiaries of Topco. H.I.G. maintains a majority ownership stake in the Company through Topco. Mobileum, Inc. is the Company's main operating entity, entering into lease, vendor, and other agreements on behalf of the Company, and funding payroll enterprise-wide. Matrix Parent is the primary obligor under the Company's Prepetition Loan Agreements (as defined herein).

C.     Corporate Governance

In February 2023, a new board of managers was appointed at Holdings. In order to implement this governance change, on February 24, 2023, Holdings was converted from a corporation to a limited liability company, and on December 20, 2023, Holdings' organizational documents were further amended to change it from a member-managed entity to a board-managed entity, including a requirement for two additional independent managers. Pursuant to this amendment, two independent managers and the existing Topco board members were appointed to the Holdings Board.

The current Holdings Board consists of eight (8) members, as shown below:

12

| Name | Position |
| --- | --- |
| Nishant Nayyar | Manager |
| Alexander Thorn | Manager |
| Iveshu Bhatia | Manager |
| Tim Mack | Manager |
| Mike Salfity | Manager and CEO, Mobileum, Inc. |
| Gavin Patterson | Manager |
| Carol Flaton | Manager |
| Nathan Lane | Manager |

On December 20, 2023, in connection with its review and development of potential strategic alternatives, the Holdings Board formed a restructuring committee that includes three independent and disinterested managers (the "**Restructuring Committee**"): (i) Carol Flaton, (ii) Nathan Lane, and (iii) Gavin Patterson.[2]  The Holdings Board granted the Restructuring Committee the power and authority, *inter alia*, to take the following actions:

- Consider, evaluate, and recommend to the Holdings Board (if board approval is required under Delaware law) entry into a Transaction (as such term is defined in the Resolutions);

- Oversee the provision of confidential information by or on behalf of the Company and its subsidiaries to third parties under cover of appropriate confidentiality arrangements in respect of a Transaction;

- Oversee and conduct discussions and negotiations with the Company's stakeholders in respect of a Transaction;

- Determine in its discretion whether a Transaction involves the participation of an insider or related party of the Company (a "**Potential Related Party Transaction**"), and whether to proceed or enter into a Potential Related Party Transaction;

- Oversee the implementation and execution of a Transaction by the Company;

- Engage advisors on behalf of the Company and instruct such advisors in respect of a Transaction; and

- Take such other actions as the Restructuring Committee deems necessary or desirable in order to carry out its mandate.

The Debtors' current senior management team consists of the following individuals:

---

[2]   See Written Consent of the Board of Managers of Matrix Holdco, LLC, dated December 20, 2023 (the "**Resolutions**").

13

| Name | Position |
|------|----------|
| Mike Salfity | Chief Executive Officer |
| Ripu Singh | Chief Operating Officer and Chief Financial Officer |
| Raja Hussain | Chief Revenue Officer |
| Avnish Chauhan | Chief Technology Officer |
| Miguel Carames | Chief Product Officer |
| Bernardo Lucas | Chief Marketing Officer |
| Candice Ciresi | Chief Compliance Officer |
| Keith Green | Chief Human Resources Officer |
| Rui Paiva | SVP, Head of Risk BU |
| Ashwin Chalapathy | SVP, Global Head of Engineering |
| Nitesh Ranjan | General Counsel |
| Robert Kelly | SVP, Global Head of Delivery |

D.    Capital Structure

As of the date hereof, the Debtors' prepetition capital structure includes approximately $690.5 million in funded debt and accrued but unpaid interest.  The Debtors' funded debt obligations are summarized below:

| As of Petition Date: Debt Instrument (Aggregate Principal) | Funded Debt ($ millions) | Total Claim ($ millions) |
|---|---|---|
| Prepetition First Lien Facility | | |
| *Prepetition Revolving Credit Facility (drawn amounts)* | $    52.5 | $    57.1 |
| *Prepetition First Lien Term Loan Facility* | 380.8 | 414.8 |
| Prepetition First Lien Notes Facility | 31.7 | 34.7 |
| Prepetition Second Lien Facility | 163.2 | 183.9 |
| **Total Secured Debt** | 628.3 | 690.5 |

i.    *Prepetition First Lien Facility*

With the exception of Intermediate, each of the Debtors is an obligor under the Prepetition First Lien Facility (as defined below) pursuant to that certain *First Lien Credit Agreement*, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Prepetition First Lien Credit Agreement**"), by and among, Holdings, Matrix Parent (the "**Borrower**"), the lenders from time to time party thereto (the "**Prepetition First Lien Lenders**") and Jefferies Finance LLC ("**Jefferies**"), in its capacities

14

as administrative agent and as collateral agent for the Prepetition First Lien Lenders (in such capacities, the "**Prepetition First Lien Loan Agent**"). Pursuant to the Prepetition First Lien Credit Agreement, the Prepetition First Lien Lenders made available to the Borrower (i) term loans in an aggregate principal amount of $380.8 million (the "**Prepetition First Lien Term Loan Facility**") and (ii) a revolving credit facility in an aggregate principal amount of $52.5 million with a $10 million letter of credit sub-facility (the "**Prepetition Revolving Credit Facility**" and together with the Prepetition First Lien Term Loan Facility, the "**Prepetition First Lien Facility**"). The Prepetition First Lien Facility is guaranteed by each of the Debtors, other than Intermediate and the Borrower, and the obligations thereunder are secured by the same collateral (which includes all or substantially all of the assets of the Debtors (other than Intermediate), subject to certain exceptions and permitted liens) as, and on a *pari passu* basis with, the obligations under the Prepetition First Lien Note Purchase Agreement (as defined below).

As of the Petition Date, the aggregate claim amount outstanding under the Prepetition First Lien Term Loan Facility is approximately $414.8 million. As of the Petition Date, the aggregate claim amount outstanding under the Prepetition Revolving Credit Facility is approximately $57.1 million. Additionally, as of the Petition Date, there are less than $1 million in issued and outstanding letters of credit (the "**Letters of Credit**") under the Prepetition Revolving Credit Facility.

> ii.     *Prepetition First Lien Note Purchase Agreement*

With the exception of Intermediate, each of the Debtors is an obligor under that certain *Note Purchase Agreement*, dated as of March 15, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Prepetition First Lien Note Purchase Agreement**"), by and among Holdings, the Borrower, as issuer, the other Debtors party thereto as guarantors, the holders from time to time party thereto (the "**Prepetition First Lien Noteholders**") and Wilmington Trust, National Association, in its capacity as notes agent for the Prepetition First Lien Noteholders (in such capacity, the "**Prepetition First Lien Notes Agent**"). The Prepetition First Lien Note Purchase Agreement is guaranteed by each of the Debtors, other than Intermediate and the Borrower, and the obligations thereunder are secured by the same collateral (which includes all or substantially all of the assets of the Debtors (other than Intermediate), subject to certain exceptions and permitted liens) as, and on a *pari passu* basis with, the obligations under the Prepetition First Lien Facility. As of the Petition Date, the Debtors had outstanding indebtedness (including accrued but unpaid interest) of approximately $34.7 million under the Prepetition First Lien Note Purchase Agreement.

> iii.     *Prepetition Second Lien Facility*

With the exception of Intermediate, each of the Debtors is an obligor under the Prepetition Second Lien Facility (as defined below) pursuant to that certain *Second Lien Credit Agreement*, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Prepetition Second Lien Credit Agreement**" and together with the Prepetition First Lien Credit Facility and the Prepetition First Lien Note Purchase Agreement, the "**Prepetition Loan Agreements**"), by and among, Holdings, the Borrower, the lenders from time to time party thereto (the "**Prepetition Second Lien Lenders**") and Jefferies, in its capacities as administrative agent and as collateral agent for the Prepetition Second Lien Lenders (in such capacities, the "**Prepetition Second Lien Agent**"). Pursuant to the

Prepetition Second Lien Credit Agreement, the Prepetition Second Lien Lenders made available to the Borrower term loans in an aggregate principal amount of $163.2 million (the "**Prepetition Second Lien Facility**").  The Prepetition Second Lien Facility is guaranteed by each of the Debtors, other than Intermediate and the Borrower, and the obligations thereunder are secured by the same collateral (which includes all or substantially all of the assets of the Debtors (other than Intermediate), subject to certain exceptions and permitted liens) as, and on a *second lien* basis with, the obligations under the Prepetition First Lien Facility and the Prepetition First Lien Note Purchase Agreement.  As of the Petition Date, the aggregate claim amount outstanding under the Prepetition Second Lien Facility is approximately $183.9 million.

### iv. *Intercreditor Agreements*

The relative rights and priorities of the Prepetition First Lien Lenders and the Prepetition First Lien Noteholders in the collateral securing the obligations under the Prepetition First Lien Facility and the Prepetition First Lien Note Purchase Agreement are governed by that certain *Pari Passu Intercreditor Agreement*, dated as of March 15, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Pari Passu Intercreditor Agreement**"), by and among each of the Debtors (other than Intermediate), the Prepetition First Lien Loan Agent, the Prepetition First Lien Notes Agent, and each other person party thereto from time to time.

The relative priorities and rights in the collateral of the Prepetition First Lien Lenders and the Prepetition First Lien Noteholders, on the one hand, and the Prepetition Second Lien Lenders, on the other, are governed by that certain *Intercreditor Agreement*, dated as of March 1, 2022 (as supplemented by that certain Intercreditor Agreement Joinder, dated as of March 15, 2023, by the Prepetition First Lien Notes Agent and accepted and agreed by the Prepetition First Lien Loan Agent and the Prepetition Second Lien Agent and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**" and, together with the Pari Passu Intercreditor Agreement, the "**Intercreditor Agreements**"), by and among each of the Debtors (other than Intermediate), the Prepetition First Lien Loan Agent, the Prepetition Second Lien Agent, the Prepetition First Lien Notes Agent, and each other person party thereto from time to time.

The Intercreditor Agreements govern the lenders' rights and obligations with respect to, among other things, priority of interests in the collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

### v. *Other Non-Funded Debtor Obligations*

#### 1. Trade Claims

In the ordinary course of business, the Debtors utilize certain vendors and service providers who supply goods and services, including: (i) suppliers of cloud services, data center services, and software; (ii) consulting service providers; (iii) suppliers of network hardware and equipment; and (iv) marketing and event service providers (the "**Trade Creditors**").  The Trade Creditors are a vital part of the Debtors' ongoing business, and an interruption in the flow of goods and services from such creditors would have an immediate impact on the Debtors' ability to continue operating.

16

As discussed in greater details in the Vendors Motion (as defined below), certain of the trade claims (a) are entitled to statutory priority, such as under section 503(b)(9) of the Bankruptcy Code, or (b) may give rise to shippers liens against the Debtors' property if unpaid.  As of the Petition Date, the Debtors estimate that the aggregate amount of trade claims outstanding is approximately $1.4 million in respect of trade debt and other potential liabilities.

### 2.  Other General Unsecured Claims

As of the Petition Date, the Debtors anticipate approximately $4.8 million on account of claims against the Debtors (other than intercompany claims and claims of Trade Creditors described herein) as of the Petition Date that are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Court.

## IV.
## KEY EVENTS LEADING TO
## COMMENCEMENT OF CHAPTER 11 CASES

### A.    Challenges Facing Debtors' Business

As described above, while the Company continues to be operationally sound, the Debtors face certain challenges that have resulted in a drain on liquidity and cash flows.  Despite recent efforts to weather such challenges and maintain profitability, which have begun to yield positive momentum and growth for the Company, the Debtors ultimately determined that the commencement of the Chapter 11 Cases was a necessary step to reconfigure their balance sheet in order to emerge as a stronger company with a healthier balance sheet.

### i.    *Operational Challenges*

Beginning in the latter half of 2022, the Company began to experience a deceleration in customer spend due, in part, to near-term macro uncertainty.  Such uncertainty led customers to slow their rollout of 5G operations and postpone related investment in new technological infrastructure, which resulted in longer than normal sale cycles for the Company.  Moreover, Company-wide integration of products, processes, and systems from the Company's then-recent acquisitions has been impeded by, among other things, the Company's lack of sophisticated enterprise resource and financial planning systems, and liquidity challenges which have prevented the Company from making necessary investment in integration.  The Company's integration issues were further compounded by the Company's geographic footprint, which the acquisitions had caused to expand to more than 45 entities and over 1,800 personnel spread across approximately 60 countries.  Simultaneously, the Company continues to be affected by the tight labor market, which has resulted in difficulty attracting and retaining talent contributing to considerable management turnover and talent churn.  The Company also experienced delayed cost controls as the Company worked to overcome operational obstacles resulting from old processes and legacy organizational structures and practices preceding the H.I.G. Acquisition.  As set forth herein, the Restructuring will position the Company to further its integration efforts, allowing for stronger organizational alignment, cross-pollination, and efficiencies.

17

Finally, as described in greater detail below, in late May of 2023, the Company was alerted to certain internal historical accounting irregularities and associated practices, which have had material knock-on effects for the Company's reputation, operations, and growth. Specifically, the internal practices described below resulted in a material impact to historical revenue recognition and EBITDA. Improper acceleration of the Company's revenue through falsified time records and understated forecasted total level of effort required for a project led to a backlog of overdue projects for which revenue was recognized but projects were not completed, many of which are with the Company's key customers, such that the Company cannot reject or abandon such projects without further jeopardizing future business with those customers. The Company's efforts to clear the backlog of overdue projects through increasing its workforce have been further complicated by the Company's tightening liquidity, the current labor market, and employee retention issues facing the Company, as described above. These challenges also resulted in financial performance substantially lower than budget, and, in the case of the accounting irregularities, the incurrence of unsustainable levels of debt in connection with the H.I.G. Acquisition, based on inflated EBITDA figures and, by extension, an inflated enterprise valuation. In October 2023, the Company delivered notices of default to the Prepetition First Lien Loan Agent, the Prepetition Second Lien Agent and the Prepetition First Lien Notes Agent on account of certain specified defaults arising out of the accounting irregularities described herein, and the H.I.G. Plaintiffs (as defined below) commenced litigation, as described in more detail herein.

> ## ii. *Financial Challenges*

As of December 31, 2023, the Company is levered approximately 16.5x, which the Debtors do not believe is sustainable over the long term. The Debtors' current balance sheet has had a corresponding negative and restrictive impact on the Debtors' liquidity and growth. The Debtors' unhedged annual cash interest expense for 2023 under the prepetition capital structure would be approximately $70 million at current interest rates. Accordingly, the Debtors intend to file the Chapter 11 Cases to implement a comprehensive financial restructuring that will result in a reduction of the Company's funded debt (including accrued but unpaid interest) by approximately $530 million, preserve run rate cash interest expense by approximately $52 million on an annual basis, and allow it to continue operating as a going concern with a substantially healthier balance sheet.

> ## B.   Formation of Special Committee and Special Committee Investigation

On or about May 29, 2023, a member of the board of managers of Topco (the "**Topco Board**") received an unsolicited email from an individual claiming that he/she had observed widespread irregularities at the Company relating to manipulation of revenue. On June 14, 2023, after determining the source of the complaint to be credible, the Topco Board formed a special committee (the "**Special Committee**") comprised of: (i) Nishant Nayyar, (ii) Alexander Thorn, and (iii) independent manager Gavin Patterson to, among other things, conduct and direct an investigation, review, and analysis of the allegations. The Topco Board authorized the Special Committee to take any and all actions it deemed proper or necessary under the circumstances.

The Special Committee engaged outside counsel to conduct an independent, privileged investigation (the "**Investigation**"). The Investigation concluded on February 19, 2024, when a

final report was delivered to the Special Committee. On March 19, 2024, a summary of the final report on the Investigation was delivered to the Lender Groups.

As a result of the Special Committee's review, Mobileum's then-CEO, Orathi "Bobby" Srinivasan was terminated on December 12, 2023. In addition to Mr. Srinivasan, the Company terminated certain other employees determined to be involved in the activities giving rise to the Investigation in addition to requiring remediation training for other employees. On February 27, 2024 and March 5, 2024, Mobileum was served with Grand Jury subpoenas from the Department of Justice and Securities and Exchange Commission seeking information related to the Investigation. The Company has fully complied with all document requests and continues to fully cooperate with the government investigation.

### C.   Litigation

Certain Debtor affiliates are engaged in prepetition lawsuits, including, among others:

***Superior Court Litigation***. Debtor Matrix Parent is a plaintiff alongside Mobileum majority owner H.I.G. (and certain of its affiliates and affiliated funds) (collectively, the "**Superior Court Plaintiffs**") in litigation currently pending against Audax (and certain of its affiliates and affiliated funds) in the Delaware Superior Court; the plaintiffs allege that Audax and former Company management fraudulently inflated Mobileum's earnings prior to the H.I.G. Acquisition (the complaint, the "**Superior Court Complaint**" and, the litigation, the "**Superior Court Litigation**").[3] The Superior Court Plaintiffs claim that Mobileum's EBITDA for 2021 was overstated by at least $20 million.[4] In December 2023, Audax moved to dismiss the Superior Court Complaint. In June 2024, Judge Meghan Adams denied in part Audax's motion, allowing the Superior Court Complaint's central claim—that Audax knowingly helped artificially inflate the finances of Mobileum before selling it to H.I.G.—to proceed. The Court held that H.I.G. successfully alleged facts from which a factfinder could reasonably infer that Audax knew of the fraud. The Superior Court Litigation, styled *Matrix Parent, Inc. v. Audax Management Co.*, Case No. N23C-10-212 MAA CCLD (Del. Super.), is pending in the Delaware Superior Court and is unaffected by the implementation of the automatic stay pursuant to the Chapter 11 Cases.

***Chancery Court Litigation***. Mobileum majority owner H.I.G. (and certain of its affiliates and affiliated funds), Topco (and its general partner), and Nishant Nayyar, Alexander Thorn, and Gavin Patterson (the "**Chancery Defendants**") are defendants in litigation brought by Audax in the Delaware Court of Chancery, alleging that, following H.I.G.'s acquisition of Mobileum, the Chancery Defendants mismanaged Mobileum and destroyed Audax's $100 million minority stake (the complaint, the "**Chancery Court Complaint**" and, the litigation, the "**Chancery Court Litigation**").[5] The Chancery Court Complaint seeks declaratory, injunctive, and monetary relief on account of alleged breaches of the Limited Partnership Agreement between, among others, Audax and defendant H.I.G. Mobile, L.P. as well as alleged breaches of the implied covenant of

---

[3]   Superior Court Compl. at ¶ 1.

[4]   Superior Court Compl. at ¶ 2.

[5]   Chancery Court Compl. at ¶ 1.

WEIL:\99859079\1\63808.0003

good faith and fair dealing.[6]   In March 2024, the Chancery Defendants moved to dismiss the Chancery Court Complaint.  The Chancery Court Litigation, styled *AG Mobile Holdings, L.P. v. H.I.G. Mobile, L.P.*, Case No. 2023-1103-MTZ (Del. Ch.), is pending in the Delaware Chancery Court.

### D.   Prepetition Restructuring Efforts

Prior to filing the Chapter 11 Cases, the Debtors also attempted to address their capital structure and liquidity needs without the need to pursue an in-court restructuring.  Beginning in the first quarter of 2023, the Company's management dedicated significant effort to evaluating the business and developing an integrated business plan that identified strengths and key opportunities, and sought to address operational issues and maintain profitability.  The plan included initiatives to optimize operations and accountability, reduce costs, and grow revenue by capitalizing on the Debtors' commercial strengths.

Among other initiatives, the Company's management team identified a new professional services delivery system to better monitor active projects and enhance internal project management, forecasting, invoice capabilities, revenue recognition, cost allocation, financial reporting, and systems integrations.  Further, the Company (i) reconfigured its accounting personnel to ensure tighter alignment between the accounting and delivery teams to further enhance internal tracking and reporting; (ii) made various talent upgrades, including the integration of H.I.G. operating partners in key interim roles at the Company to lead business initiatives; (iii) invested in additional resources to clear the backlog of late projects and improve customer satisfaction; (iv) identified and worked to remedy practices and processes that facilitated irregular historical accounting policies and practices; and (v) instituted critical improvements in product quality and productivity, introduced a new compensation structure, reorganized its business units, hired a new Chief Compliance Officer, and overhauled its go-to-market process.

Notwithstanding the Debtors' recent success with many of these initiatives, the Debtors' highly levered capital structure coupled with the drag from certain uncontrollable factors and the accounting irregularities described above forced the Debtors to focus on a more comprehensive restructuring.

Following good faith, arm's-length discussions with its key stakeholders prior to the Petition Date, however, the Debtors were ultimately unable to garner sufficient support for an out-of-court restructuring.

#### i.   *Stakeholder Engagement*

Recognizing the need to deleverage its balance sheet in light of the aforementioned challenges and increasing liquidity issues, the Debtors began the process of evaluating strategic alternatives.  In June 2023, the Debtors retained Weil, as counsel, and in October 2023, the Debtors retained Evercore, as investment banker, and FTI, as financial advisor, to explore strategic alternatives and assist them in developing and implementing a comprehensive plan to access additional financing.

---

[6]   Chancery Court Compl. at ¶ 1.

WEIL:\99859079\1\63808.0003

In December 2023, with the oversight of the Restructuring Committee, the Company and its Advisors began actively engaging in discussions regarding restructuring alternatives with (i) an ad hoc group of Prepetition First Lien Lenders (the "**First Lien Ad Hoc Group**"), represented by Milbank LLP, as legal counsel, Porter Hedges LLP, as local Texas legal counsel, and Houlihan Lokey, Inc., as investment banker (the "**First Lien Advisors**"), and (ii) an ad hoc group of Prepetition Second Lien Lenders and Prepetition First Lien Noteholders (the "**Crossholder Ad Hoc Group**" and, together with the First Lien Ad Hoc Group, the "**Lender Groups**"), represented by Akin Gump Strauss Hauer & Feld LLP, as legal counsel, and Greenhill & Co., LLC, as investment banker (the "**Crossholder Advisors**" and, together with the First Lien Advisors, the "**Lender Advisors**").  The Debtors engaged the Lender Groups with the goal of developing a competitive, good faith negotiation culminating in the achievement of a consensual, prepackaged plan of reorganization.

In November 2023, the Lender Advisors executed non-disclosure agreements and received access to a virtual data room maintained by the Company to further streamline diligence for the benefit of the Lender Groups in connection with their assessment of a potential restructuring transaction.

As negotiations progressed, the Debtors determined that it would be in the best interests of the Company to forego payment of certain amounts due under the Prepetition Loan Agreements in order to preserve their liquidity.  On December 14, 2023, the Debtors entered into (i) that certain *Waiver Agreement and First Amendment to First Lien Credit Agreement*, (ii) that certain *Waiver Agreement and First Amendment to Second Lien Credit Agreement*, and (iii) that certain *Waiver Agreement and First Amendment to Note Purchase Agreement* (together the "**Waiver Agreements**") with the Prepetition First Lien Lenders, the Prepetition Second Lien Lenders, and the Prepetition First Lien Noteholders, respectively, to waive certain defaults, including defaults related to the nonpayment of certain amounts due under the Prepetition First Lien Facility, the Prepetition Second Lien Facility and the Prepetition First Lien Note Purchase Agreement, and to modify certain provisions of the Prepetition Loan Agreements.

In December 2023, the Advisors began participating in weekly diligence and business plan calls with the Lender Advisors.  On January 19, 2024, the Company delivered an initial restructuring proposal to the First Lien Advisors and the Crossholder Advisors (the "**Initial Proposal**").  The Initial Proposal, which was delivered in accordance with the Company's obligations under the Waiver Agreements, served as a catalyst for additional discussions.  On February 1st and February 5th, respectively, principals from the First Lien Ad Hoc Group and the Crossholder Ad Hoc Group met with the Company's Advisors and management to discuss the Company overview and business plan (the "**Initial Meetings**").  Following such Initial Meetings, both Lender Groups were presented with preliminary debtor-in-possession financing budgets, analysis of anticipated general unsecured claims against Matrix Parent and any of its restricted subsidiaries, analysis of the Company's existing material contracts, and a summary of the Investigation.  Both before and after the Initial Meetings, while parties were engaging in good faith diligence and negotiations, the process involved substantial effort at a significant cost to the Debtors, with such advisors' fees and expenses having been paid by the Debtors prior to the Petition Date.

Beginning in February 2024, the Advisors and management held periodic calls with principals from each Lender Group and hosted in-person meetings to discuss potential restructuring solutions. Over the course of the ensuing months, the Debtors, the First Lien Ad Hoc Group, the Crossholder

21

Ad Hoc Group, and their respective advisors worked constructively to achieve a global resolution. In that time, the Debtors:

- provided the First Lien Ad Hoc Group and the Crossholder Ad Hoc Group each with approximately 433 documents;

- participated on approximately 30 diligence calls in addition to weekly meetings with each the First Lien Advisors and the Crossholder Advisors;

- held principal to principal calls directly with each the First Lien Advisors and the Crossholder Advisors;

- extended Waiver Agreements five times to provide additional time for negotiations pertaining to a potential global resolution; and

- paid approximately $3.7 million in advisor fees to the First Lien Advisors, and approximately $2.7 million in advisors fees to the Crossholder Advisors.

Against this backdrop, the Debtors and the Lender Groups continued to extend the Waiver Agreements with a view to reaching consensus around a restructuring transaction. The Waiver Agreements were initially set to terminate on January 31, 2024, but were subsequently extended to March 1, 2024, then solely in the case of the Prepetition First Lien Credit Facility, to April 30, 2024, then to May 31, 2024, then, solely in the case of the Prepetition First Lien Credit Facility, to June 7, 2024, then to June 30, 2024, to afford the Debtors and the Consenting Parties time to reach a consensus on a global restructuring.

At the same time, the Debtors engaged with the Consenting Sponsor and the First Lien Advisors around the terms of the Litigation Proceeds Term Sheet and related compromises described herein.

On June 29, 2024, following months of negotiations between the Debtors and Lender Groups on the terms of a potential restructuring transaction, the Debtors received a transaction proposal from Audax (the "**Audax Proposal**"). Following a meeting between Audax and management to discuss the Audax Proposal, Audax submitted a revised proposal on July 11, 2024 (the "**Revised Audax Proposal**" and together with the Audax Proposal, the "**Audax Proposals**"). The Debtors, after analyzing the Audax Proposals, and following the guidance of the Restructuring Committee and their Advisors, ultimately reached the conclusion that the proposals were not actionable for a number of reasons, including that the First Lien Ad Hoc Group did not believe the Audax Proposals were actionable for a number of reasons.

Although the parties sought to effectuate an out-of-court restructuring, the parties ultimately agreed to pursue a consensual in-court transaction to deleverage the Company's balance sheet in the best interests of the Debtors, their estates, and all stakeholders without materially interrupting the Debtors' business operations.

E.    Restructuring Support Agreement and Plan

As noted above, following months of extensive, good faith, arms-length negotiations, the Debtors reached a global resolution with the Consenting Parties and memorialized their support for the

Restructuring in the Restructuring Support Agreement.[7]  The entities party to the Restructuring Support Agreement are:

- certain Prepetition First Lien Lenders (together with their respective successors and permitted assigns, and any subsequent holders of First Lien Debt Claims (as defined below) that become party to the Restructuring Support Agreement by executing a Joinder Agreement (as defined in the Restructuring Support Agreement) in accordance with the terms of the Restructuring Support Agreement, the "**Consenting First Lien Lenders**") holding first lien term loans in an aggregate claim amount of $414.8 million and a revolving credit facility in an aggregate claim amount of $57.1 million (the loans thereunder, "**Prepetition First Lien Term Loans**" and the claims arising thereunder, the "**First Lien Debt Claims**") under the Prepetition First Lien Credit Agreement;

- certain Prepetition First Lien Noteholders (each, on behalf of itself and/or certain funds managed by it or its affiliates, together with their respective successors and permitted assigns, and any subsequent Prepetition First Lien Noteholder that becomes party the Restructuring Support Agreement by executing a Joinder Agreement (as defined in the Restructuring Support Agreement) in accordance with the terms of the Restructuring Support Agreement, the "**Consenting First Lien Noteholders**" and, together with the Consenting First Lien Debtor Holders, the "**Consenting Creditors**") holding senior secured notes in an aggregate claim amount of $34.7 million (the notes thereunder, "**Prepetition First Lien Notes**", the holders thereof, the "**Prepetition First Lien Noteholders**", the claims arising thereunder, the "**First Lien Notes Claims**", and with the First Lien Debt Claims, the "**First Lien Claims**") under the Prepetition First Lien Note Purchase Agreement;

- certain Prepetition Second Lien Lenders (together with their respective successors and permitted assigns, and any subsequent holders of Second Lien Debt Claims (as defined below) that become party to the Restructuring Support Agreement by executing a Joinder Agreement (as defined in the Restructuring Support Agreement) in accordance with the terms of the Restructuring Support Agreement, the "**Consenting Second Lien Lenders**") holding second lien term loans in an aggregate claim amount of $183.9 million (the loans thereunder, "**Prepetition Second Lien Term Loans**" and the claims arising thereunder, the "**Second Lien Debt Claims**") under the Prepetition Second Lien Credit Agreement; and

- the Consenting Sponsor.

Notably, Intermediate is a party to the Restructuring Support Agreement.  While Intermediate is not a guarantor or obligor on the Debtors' prepetition debt, the DIP Lenders required Intermediate to sign the Restructuring Support Agreement and serve as an obligor of the Debtors' obligations under the DIP Credit Agreement to (i) maintain the Debtors' existing corporate structure and (ii) contribute additional security to the DIP Lenders under the DIP Facility.

---

[7]    The Restructuring Support Agreement is attached hereto as **Exhibit B**.

WEIL:\99859079\1\63808.0003

The terms of the Restructuring are reflected in the Plan.  Upon its full implementation, the Plan will effect a significant deleveraging of the Debtors' capital structure by reducing the Company's total debt (including accrued but unpaid interest) by approximately $530 million.  The reduced debt burden and exit financing anticipated under the Plan will provide the Debtors with sufficient liquidity, not only to continue funding their operations, but to make the necessary capital expenditures and investments to ensure that the Company will remain the industry leader in telecom analytics solutions.

Upon the Effective Date, the provisions of the Plan, including the settlement of all Claims, Interests, and controversies among the Debtors and the Consenting Parties given in consideration of the value provided to the Estates by the Consenting Parties (the terms of which are set out in the Restructuring Support Agreement and incorporated by reference in the Plan), shall constitute an integrated and global, good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest, including pursuant to the transactions set forth in the Restructurings Transactions Exhibit.  Specifically, in relation to matters relating to the Consenting Sponsor, the Restructuring Support Agreement and Plan provide for certain treatment and consideration in exchange for its support for the Restructuring, as part of a global settlement and waiver of its claims or interests.  Specifically, in exchange for the Consenting Sponsor's support for the Restructuring, the Company and Consenting Sponsor have agreed to split any proceeds arising from (i) the Superior Court Litigation and any other proceeds of claims transferred to the Litigation Trust and (ii) recovered under the representations and warranties policy no. ET111-003-478 issued to Matrix Parent with a policy term of March 1, 2022 to March 1, 2025 as follows:

- First, to repay in full on a pro rata basis:

    i.   all of H.I.G.'s litigation costs and expenses in connection with (a) pursuing recoveries from the Audax Proceeds based on affirmative claims of the plaintiffs in the Superior Court Litigation; *provided* that proceeds from only the RWI Policy recovered to pay for expenses pursuant to this clause (a) shall not exceed $8 million; (b) pursuing recoveries under the RWI Policy, including all costs and expenses of Hunton Andrews Kurth LLP as insurance counsel and recovery for any deductible under the RWI Insurance paid for or payable by H.I.G.; and (c) defending the Chancery Court Litigation, including all legal fees and expenses related thereto to the extent not otherwise previously indemnified by the Company or else reimbursed under the Policies.

    ii.  all of the Company's litigation costs and expenses in connection with (a) pursuing recoveries from the Audax Proceeds based on affirmative claims of the plaintiffs in the Superior Court Litigation; and (b) defending the Chancery Court Litigation, including all legal fees and expenses related thereto to the extent not otherwise reimbursed under the Policies.

24

      iii.    any fees and expenses of Milbank LLP incurred in connection with H.I.G.'s prosecution of the Superior Court Litigation following consummation of the Restructuring (as defined below) as counsel to the First Lien Ad Hoc Group.

- Second, allocated amongst H.I.G. and the Company at a ratio of 50% in favor of H.I.G. and 50% in favor of the Company until the Company has recovered $200 million of the Proceeds, net of any tax obligations arising in connection with any such Proceeds, including any tax obligations of or payable by the Company; *provided, that*, to the maximum extent permitted by applicable Law, the receipt of Proceeds shall be reported for U.S. federal and state tax purposes as a non-taxable adjustment to purchase price.

- Third, additional proceeds shall be payable solely to H.I.G. until H.I.G. has recovered an additional $65 million, net of any tax obligations, in excess of its recoveries in the first and second clauses herein.

- Fourth, all remaining proceeds to be allocated amongst H.I.G. and the Company at a ratio of 50% in favor of H.I.G. and 50% in favor of the Company.

In furtherance of the foregoing, the Consenting Parties have agreed to H.I.G.'s continued prosecution of the Superior Court Litigation and continued pursuit of recoveries under the RWI Policy, in each case in accordance with the Litigation Proceeds Term Sheet

      F.    <u>DIP Financing</u>

In parallel with the restructuring transaction negotiations, and as further detailed in the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Claims with Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**DIP Motion**"), in June 2024, the Debtors launched a solicitation process to obtain debtor-in-possession financing and the consensual use of cash collateral to fund the Chapter 11 Cases.

As set forth more fully in the *Declaration of Bo Yi in Support of Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Claims with Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, the Debtors, under the guidance of the Restructuring Committee and their Advisors, determined to enter into the DIP Facility following an extensive prepetition marketing process during which Evercore contacted existing lenders, traditional lenders, and alternative lenders. In total, Evercore contacted nineteen (19) parties in addition to the DIP Lenders, of which two (2) parties executed non-disclosure agreements. Ultimately, the DIP Lenders were the only parties that put forth a proposal.

The Debtors have secured the DIP Facility, consisting of (i) $60,000,000 of the New Money DIP Loans, (ii) the DIP Roll-Up Loans in the aggregate principal amount of $100,000,000, and (iii) the

<div align="center">25</div>

Backstop Premium, which shall be paid in the form of Tranche B Loans (as defined in the DIP Term Sheet). The terms of the DIP Facility shall otherwise be in accordance with the DIP Term Sheet.

Additionally, certain Prepetition First Lien Lenders on account of their First Lien Claims (collectively, in their capacity as such, the "**DIP Backstop Parties**" have committed to backstop the New Money DIP Loans, severally and not jointly, on terms and in the amount(s) set forth in the Backstop Commitment Letter (the "**Backstop Commitments**"), in exchange for the Backstop Premium, which Backstop Premium shall be paid in kind in the form of Tranche B Loans (as defined in the DIP Term Sheet).

On the Effective Date, in full and final satisfaction and discharge of any DIP Claims, the Debtors and the DIP Lenders will enter into the Exit Term Loan Facility in an aggregate principal amount of $160,000,000, comprised of a roll-up of the DIP Loans on a dollar-for-dollar basis on the terms set forth in the Exit Facility Term Sheet.

Without such relief, the Debtors would be unable to fund ongoing operations even for the short projected duration of the Chapter 11 Cases. Thus, the Debtors require immediate relief requested in the DIP Motion to ensure that they have sufficient liquidity to operate their business and pursue a restructuring transaction.

Together, the Restructuring Support Agreement, the Plan, and the transactions and agreements contemplated under the foregoing will accomplish a fully consensual restructuring of the Debtors' balance sheet. As a result of the diligent negotiations and hard work by the various constituents, including the Debtors, the Consenting Creditors, the Consenting Sponsor, and the advisors to each, the Debtors have preserved the going-concern value of the business, maximized creditor and stakeholder recovery, and minimized disruption to the day-to-day operations. Accordingly, these expedited Chapter 11 Cases will best position the Debtors for future success while providing the most value for the Debtors' estates and stakeholders.

<div align="center">

**V.**
**ANTICIPATED EVENTS**
**DURING CHAPTER 11 CASES**

</div>

A.    Commencement of Chapter 11 Cases

As discussed above, on July 23, 2024, the Debtors intend to commence Chapter 11 Cases. The filing of the petitions will commence the Chapter 11 Cases, at which time the Debtors will be afforded the benefits and become subject to the limitations of the Bankruptcy Code.

The Debtors intend to continue their operations in the ordinary course during the pendency of the Chapter 11 Cases. To facilitate the efficient and expeditious implementation of the Plan through the Chapter 11 Cases, and to minimize disruptions to the Debtors' operations on the Petition Date, the Debtors will seek to have these Chapter 11 Cases assigned to the same bankruptcy judge and administered jointly. Also on the Petition Date, the Debtors will file various motions seeking important and urgent relief from the Bankruptcy Court. Such relief, as further described below, will assist in the administration of the Chapter 11 Cases.

B.      First-Day Motions

On the Petition Date, the Debtors will file multiple motions seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course. Such relief is designed to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations.  The Debtors will seek the following relief on the Petition Date to maintain their operations in the ordinary course:

- continue paying employee wages and benefits;

- continue the use of the Debtors' cash management system, bank accounts, and business forms;

- continue insurance programs and the processing of workers' compensation Claims;

- pay certain prepetition taxes, fees, and assessments;

- pay critical vendor claims;

- continue customer programs;

- establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service; and

- use cash collateral and obtain approval of debtor-in-possession financing.

C.      Procedural Motions

The Debtors intend to file various motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases.

D.      Confirmation Hearing

The Debtors intend to ask the Bankruptcy Court to schedule the Confirmation Hearing to be held on or about September 11, 2024, as may be adjourned by the Bankruptcy Court, to consider (i) the adequacy of this Disclosure Statement and the Solicitation in connection herewith and (ii) confirmation of the Plan.  The Debtors anticipate that notice of these hearings will be published and mailed to all known holders of Claims and Interests at least 28 calendar days before the date by which objections must be filed with the Bankruptcy Court.

E.      Timetable for The Chapter 11 Cases

In accordance with the Restructuring Support Agreement, the Debtors have agreed to proceed with the implementation of the Plan through the Chapter 11 Cases.

- Among the milestones contained in the Restructuring Support Agreement is the requirement that the Company shall commence solicitation no later than 11:59 p.m. prevailing Central Time on July 23, 2024.
- The Restructuring Support Agreement also requires that the Bankruptcy Court enter the order confirming the Plan at or prior to 11:59 p.m. prevailing Central Time on September 11, 2024.
- The Restructuring Support Agreement also requires that the Effective Date shall have occurred at or prior to 11:59 p.m. prevailing Central Time on September 26, 2024.
- The Debtors believe they can achieve the various milestones under the Restructuring Support Agreement, the occurrence of which is crucial to reorganizing the Debtors successfully.

## VI.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

The Solicitation is being made before the Petition Date only to holders of First Lien Claims and Second Lien Debt Claims who are "accredited investors" within the meaning of Rule 501(a) of Regulation D of the Securities Act under Section 4(a)(2) of the Securities Act.

The offer and sale by the Reorganized Debtors under the Plan to holders of Allowed First Lien Claims and Allowed Second Lien Debt Claims of New Equity Interests (including New Equity Interests issued on account of the Tranche B Loans) (collectively, the "**1145 Securities**") shall be exempt, pursuant to section 1145(a) of the Bankruptcy Code, without further act or action by any Entity, from registration under (x) section 5 of the Securities Act, and all rules and regulations promulgated thereunder and (y) any state or local law requiring registration for the offer or sale of securities. To the extent section 1145(a) of the Bankruptcy Code is not applicable, the Reorganized Debtors may rely upon other applicable exemptions from registration.

The 1145 Securities offered or sold by the Reorganized Debtors under the Plan pursuant to section 1145(a) of the Bankruptcy Code will be unrestricted securities as set forth in section 1145(c) of the Bankruptcy Code and, generally, may be sold without registration under the Securities Act by the recipients thereof, subject to: (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 2(a)(11) of the Securities Act, (ii) compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the U.S. Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iii) the restrictions, if any, on the transferability of such 1145 Securities, including any restrictions on the transferability under the terms of the Reorganized Debtors' organizational documents; (iv) any applicable procedures of DTC and (v) any other applicable regulatory approvals and requirements.

Should the applicable Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Equity Interests (including New Equity Interests issued on account of the Backstop Premium) through the facilities of DTC, the applicable Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment under the Plan of such applicable portion of the New Equity Interests.

<div align="center">28</div>

A.   Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers

Section 1145(a) of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim (including a claim for an administrative expense) against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145(a) of the Bankruptcy Code also exempts from registration (i) the offer of a security through any right to subscribe that is sold in the manner provided in the prior sentence, and (ii) the sale of a security upon the exercise of such right. Pursuant to section 1145(a) of the Bankruptcy Code, without further act or action by any Entity, the 1145 Securities shall be exempt from the registration requirements under (i) the Securities Act, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer or sale of securities. These securities generally may be resold without registration under the Securities Act unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, these securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (i) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (ii) offers to sell securities issued under a plan for the holder of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (iv) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, "controlling person" underwriters may be able to sell securities without registration subject to the resale limitations of Rule 144 of the Securities Act, which permits the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code and/or "affiliates" as defined in Rule 405 under the Securities Act are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

Each book entry position or certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 1145 Security, as well as certificates evidencing the New Equity Interests held by holders of 10% or more of the New Equity Interests, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy code, shall, upon issuance, be deemed

29

to contain or be stamped or otherwise imprinted, as applicable, with a restrictive legend in substantially the following form:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD, OFFERED FOR SALE, OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Reorganized Debtors will reserve the right to require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of any 1145 Securities. The Reorganized Debtors will also reserve the right to stop the transfer of any such securities if such transfer is not in compliance with Rule 144, pursuant to an effective resale registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration requirements under state law in any given instance and as to any applicable requirements or conditions to such availability.

DTC, any transfer agent, warrant agent or other similarly situated agent, trustee or other non-governmental Person or Entity shall accept and rely upon the Plan and Confirmation Order in lieu of a legal opinion for purposes of determining whether the initial offer and sale of the New Equity Interests (including New Equity Interests issued on account of the Backstop Premium) are exempt from registration under Section 1145(a), and whether the New Equity Interests (including New Equity Interests issued on account of the Backstop Premium) were, under the Plan, validly issued, fully paid and non-assessable.

Subject to the occurrence of the Effective Date, the Plan and the Confirmation Order shall be deemed to be legal and binding obligations of the applicable Reorganized Debtors in all respects. Following the Effective Date, the Reorganized Debtors and any Person or Entity receiving securities under the Plan shall comply with all applicable provisions of the securities laws.

## VII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims.  This discussion does not address the U.S. federal income tax consequences to holders of Claims who are unimpaired or deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations (the "**Treasury**

**Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, non-U.S. taxpayers, controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations, governmental authorities or agencies, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes.

This discussion assumes (unless otherwise indicated) that all Claims and New Equity Interests are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

As used herein, the term "**U.S. holder**" means a beneficial owner of a Claim or New Equity Interest that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

31

As used herein, a "**Non-U.S. holder**" means a beneficial owner of a Claim or New Equity Interest that is not a U.S. holder or a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds a Claim or New Equity Interest, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership.  Partners in a partnership holding any such instruments are urged to consult their own tax advisors.

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon individual circumstances.  All holders of Claims and Interests are urged to consult their own tax advisors for the U.S. federal, state, local and other tax consequences applicable under the Plan.**

      A.      <u>Consequences Depend Upon Restructuring Transactions</u>

The U.S. federal income tax consequences of the Plan are dependent upon the Restructuring Transactions.  Pursuant to the Plan, either (a) Intermediate as reorganized pursuant to the Plan, (b) another Reorganized Debtor, or (c) the corporation (or limited liability company or other entity taxed as a corporation for U.S. federal income tax purposes) that is the parent of the Entities holding, owning or acquiring all, or substantially all, of the assets of the Debtors pursuant to the Purchase Transaction will be the Reorganized Parent.  Accordingly, the Restructuring Transactions may be structured, for example, as either:

      (a)      a transaction in which the New Equity Interests would be issued by Intermediate, (with Intermediate being the Reorganized Parent), in which event the New Equity Interests would be contributed to Matrix Parent (the primary obligor with respect to the obligations underlying the First Lien Claims and the Second Lien Claims) and distributed pursuant to the Plan (a "**Restructure-in-Place Transaction**");

      (b)      a transaction in which the New Equity Interests are equity interests in reorganized Mobile Acquisition Corp. or a successor entity (with Mobile Acquisition Corp. or such successor entity becoming the Reorganized Parent), in which event Matrix Parent would distribute the New Equity Interests directly to holders of Allowed First Lien Claims and Allowed Second Lien Debt Claims pursuant to the Plan (a "**Deconsolidation Transaction**"), following which Matrix Parent, Holdings, and Intermediate (the "**Old Holding Companies**") would dissolve; or

      (c)      a Purchase Transaction, in which holders of Allowed First Lien Claims and Allowed Second Lien Debt Claims would receive in accordance with the Plan and other applicable agreements New Equity Interests in the holding company (which will be taxed as a corporation for U.S. federal income tax purposes) of the purchasing chain of entities (with such holding company becoming the Reorganized Parent).

It is currently contemplated, and the following discussion assumes, that the Plan will be implemented through one of these structures.  The Reorganized Parent entity is expected to be a limited liability company taxable as a corporation.  These structures are expected to be further

described in the Restructuring Transactions Exhibit if the choice of transaction has not been made prior to such time.  In the event that the Restructuring Transactions takes any other form, the U.S. federal income tax consequences discussed herein could differ materially from that described.  All holders of Claims and Interests are urged to consult their tax advisor regarding the potential alternative forms of the Restructuring Transactions.

      B.      Consequences to Debtors

The U.S. federal income tax consequences of the Plan are dependent upon the Restructuring Transactions.  Pursuant to the Plan, either (a) Intermediate as reorganized pursuant to the Plan, (b) another Reorganized Debtor, or (c) the corporation (or limited liability company or other entity taxed as a corporation for U.S. federal income tax purposes) that is the parent of the Entities holding, owning or acquiring all, or substantially all, of the assets of the Debtors pursuant to the Purchase Transaction (*i.e.*, the Reorganized Parent) will issue or transfer the New Equity Interests to certain holders of Claims in connection with the Restructuring Transaction.  For U.S. federal income tax purposes, each of the Debtors is a member of an affiliated group of corporations, or is a disregarded entity all of whose income, losses and deductions are taken into account by a member of the group, that files a single consolidated U.S. federal income tax return, of which Intermediate is the common parent (the "**Matrix Group**").

The Debtors estimate that, as of December 31, 2023, the Matrix Group had consolidated net operating loss ("**NOL**") carryforwards of approximately $9.5 million for U.S. federal income tax purposes and carryforwards of disallowed business interest expense of at least $147.2 million.  The Debtors expect to have net income from operations for the 2024 tax year, to be offset by available carryforwards, subject to standard income limitations (before taking into account the implementation of the Plan and the tax consequences thereof).  The existence and amount of the Matrix Group's losses and other tax attributes, including its tax basis in assets (collectively, "**Tax Attributes**") remains subject to audit and potential adjustment by the IRS.  In addition, certain trading activity and certain other actions prior to the Effective Date relating to direct and indirect ownership of equity and securities of the Debtors could result in an "ownership change" of the Debtors independent of the Plan which could adversely affect the Debtors' ability to fully utilize the Tax Attributes.  In an attempt to minimize the likelihood of such an ownership change occurring, the Restructuring Support Agreement contains restrictions on transfers of direct and indirect interests in the Debtors.

As discussed below, it is anticipated that the Debtors' Tax Attributes (which, in the Debtors' circumstances, generally meaning tax basis in assets) would be substantially reduced in connection with a Restructure-in-Place Transaction.  In contrast, in the event a Deconsolidation Transaction is consummated, it is anticipated that the tax basis of the Reorganized Group (as defined below) would not be significantly reduced, but certain debtor holding companies (including Matrix Parent) would be left behind and dissolved resulting in the extinguishment of their Tax Attributes.  Alternatively, in the event a Purchase Transaction is consummated, the Debtors expect that the acquiring entities would obtain, as a result of such transaction, a tax basis in all or substantially all of the assets of the Debtors equal to their fair market value, and would not acquire or succeed to any of the other Tax Attributes (other than possibly certain Tax Attributes of certain of the subsidiary corporate Debtors, provided that any such subsidiary is not a "selling" subsidiary pursuant to an election under section 338 of the Tax Code).

Effective for taxable years beginning after December 31, 2022, the Tax Code generally imposes a 15% corporate alternative minimum tax on corporations with book net income (subject to certain adjustments) exceeding on average $1 billion over any three-year testing period.  The Debtors do not believe they are currently subject to the new corporate alternative minimum tax.

<div align="center">

*i.*     ***Cancellation of Debt***

</div>

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, certain tax credits, and tax basis in assets—by the amount of any cancellation of debt ("**COD**") incurred pursuant to a confirmed chapter 11 plan.  Currently, disallowed interest expense carryforwards are not a tax attribute subject to such reduction.  In applying this attribute reduction rule to the tax basis in assets, the tax law limits the reduction in tax basis to the amount by which the tax basis exceeds the debtor's post-emergence liabilities (often referred to as the "liability floor").  The amount of COD incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor.  Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes.  Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group must also be reduced.  Any reduction in Tax Attributes attributable to the COD incurred does not occur until the end of the taxable year in which the Plan goes effective.

The Debtors expect to incur a substantial amount of COD as a result of the implementation of the Plan.  The amount of such COD and resulting reduction in Tax Attributes depends primarily upon the fair market value of the New Equity Interests and other consideration distributed by the Debtors in exchange for the satisfaction and discharge of its debt.

Accordingly, in a Restructure-in-Place Transaction, the Debtors currently expect, based on the midpoint estimated reorganization value (*see* "Valuation Analysis"), that any Tax Attribute carryforwards (other than the carryforwards of disallowed interest expense) would be substantially reduced or potentially eliminated due to the resulting attribute reduction and the aggregate tax basis in their assets would also be substantially reduced (subject to the liability floor).  In contrast, in a Deconsolidation Transaction, because the reduction in tax attributes on account of any COD incurred does not occur until the end of the taxable year in which the Plan goes effective, the tax basis of Matrix Parent in the distributed stock of Mobile Acquisition Corp. should not be reduced (because such stock will not be held at the time of such reduction), thereby insulating the tax basis that Mobile Acquisition Corp. and its subsidiaries have in their assets from reduction under applicable consolidated return regulations.  However, any remaining Tax Attributes of the Old Holding Companies following the Deconsolidation Transaction (including any losses recognized as a result of the transfer not otherwise eliminated by reason of the resulting COD attribute reduction and the existing disallowed business interest expense carryforwards) are expected to be eliminated by reason of the liquidation of such entities and thus would not be available to the Reorganized Debtors.

If the Debtors implement a Purchase Transaction, the Debtors will be treated as having sold all or substantially all of their assets in a fully taxable transaction prior to the end of the taxable year.

<div align="center">34</div>

As a result, the Debtors do not expect the resulting COD attribute reduction to affect the U.S. federal income tax treatment of the Purchase Transaction to the Debtors, including the computation of gain or loss on the taxable asset transfer (*i.e.*, the Debtors expect that the pre-sale tax basis in their assets unreduced on account of any COD incurred would be taken into account in such computation). Following the Purchase Transaction, any remaining Tax Attributes of the Matrix Group (including any losses recognized as a result of the transfer) are expected to be eliminated by reason of the resulting COD attribute reduction or the liquidation of the remaining Debtors for U.S. federal income tax purposes and thus would not be available to the Reorganized Debtors (other than possibly certain of the subsidiary corporate Debtors).

### ii.     *Limitation of NOL Carryforwards and Other Tax Attributes*

Under the Tax Code, any NOL carryforwards, disallowed interest expense carryforwards and certain other tax attributes of a corporation (collectively, "**Pre-Change Losses**") may be subject to an annual limitation if the corporation undergoes an "ownership change" within the meaning of section 382 of the Tax Code. These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the COD arising in connection with the Plan. As discussed above, due in part to the resulting attribute reduction from the incurrence of COD, the Debtors do not expect to have significant Tax Attributes (other than any carryforward of disallowed business interest expense) remaining following the implementation of the Plan to which section 382 would apply. Nevertheless, the following provides a brief description of the operation of section 382 in the event there are any Pre-Change Losses to which section 382 could apply.

Absent a Purchase Transaction (in which event the Tax Attributes of the Matrix Group generally would be unavailable to the Reorganized Debtors due to the nature of the transaction), the issuance of the New Equity Interests pursuant to the Plan is expected to constitute an "ownership change" of the Reorganized Debtors as of the Effective Date. As discussed above, due to the resulting attribute reduction from the incurrence of COD, the Tax Attributes of the Matrix Group (other than any carryforward of disallowed interest expense) are expected to be substantially reduced or potentially eliminated as of the end of the taxable year in which the Plan goes effective. Even though section 382 would apply to disallowed interest expense carryforwards, the Debtors expect to incur substantial business interest expense based on the new debt obligations of the Reorganized Debtors; consequently, the adverse impact of the application of section 382 limitations to existing carryforwards of disallowed interest expense is expected to be significantly mitigated.

### (a)     Annual Limitation

In the event of an "ownership change," the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change will be subject is generally equal to the product of (A) the fair market value of the stock of the corporation (or common parent of the consolidated group) immediately before the "ownership change" (with certain adjustments) multiplied by (B) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (*e.g.*, 3.62% for ownership changes occurring in July 2024). As discussed below, this annual limitation potentially may be increased in the event the corporation (or consolidated group) has an overall "built-in" gain in its assets at the time of the ownership change. For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally

determined immediately after (rather than before) the "ownership change" after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

In addition, if a loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an "ownership change," any built-in gains recognized (or, according to a currently effective IRS notice treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its Pre-Change Losses against such built-in gain in addition to its regular annual allowance. Alternatively, if a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an "ownership change" (taking into account most assets and items of "built-in" income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the actual amount of such gain or loss is greater than the lesser of (1) $10,000,000.00 or (2) fifteen percent (15%) of the fair market value of its assets (with certain adjustments) before the ownership change. On September 9, 2019, the IRS issued proposed regulations that would significantly modify the calculation and treatment of net unrealized built-in gains and losses, which generally would be effective prospectively from 30 days after the time they become final, but would not apply with respect to ownership changes pursuant to chapter 11 cases filed prior to the regulations becoming effective.

If a corporation (or consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the "ownership change," the annual limitation resulting from the "ownership change" is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to the recognition of any built-in gains as of the time of the ownership change).

<div align="center">(b)      Section 382(l)(5) Bankruptcy Exception</div>

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where qualified creditors of a debtor corporation receive, in respect of their claims, at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. Under this exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. A debtor that qualifies for this exception may, if it so desires, elect not to have the exception apply and instead remain subject to the annual limitation described above. The Debtors have not determined whether or not this exception will apply in connection with the Plan, but do not currently expect that the exception would provide any meaningful benefit.

<div align="center">36</div>

### iii. *Treatment of Potential Purchase Transaction*

The U.S. federal income tax consequences to the Debtors of the implementation of the Plan depends in significant part on whether a Purchase Transaction is consummated. If the Plan is implemented as a Purchase Transaction, then pursuant to the Plan and the Acquisition Agreement, and in accordance with the transaction to be set forth in the Restructuring Transactions Exhibit, AcquisitionCo (an indirect subsidiary of a holding company that would become Reorganized Parent) is intended to be treated for U.S. federal income tax purposes as purchasing in a taxable transaction all, or substantially all, of the assets of the Debtors, and the discussion herein assumes the Purchase Transaction would be so treated. Accordingly, AcquisitionCo would obtain a new cost basis in the assets acquired (or treated as acquired for tax purposes) based on the fair market value of such assets on the Effective Date. AcquisitionCo would not succeed to any Tax Attributes of the Matrix Group (such as NOL carryforwards and current year NOLs, existing disallowed business interest expense carryforwards, or tax basis in assets), other than possibly certain of the subsidiary corporate debtors, which may be subject to limitations including under section 382 of the Tax Code, as discussed above.

It has not yet been determined whether the Plan will be implemented as a Purchase Transaction or, if so, the precise form and manner by which such a transaction would be implemented. The Purchase Transaction, if implemented, is expected to be structured as a constructive acquisition of substantially all of the assets of the Debtors, which will principally consist of equity interests in subsidiaries of Matrix Parent that will be treated as disregarded entities for U.S. federal income tax purposes, and also a constructive acquisition of the underlying assets of such entities (which could include stock in corporate subsidiaries), in exchange for an amount (including the assumption of liability) equal to their fair value. Following implementation of a Purchase Transaction, Reorganized Parent and its U.S. subsidiaries, inclusive of any of the acquired corporate subsidiaries, would be expected to file a consolidated U.S. federal income tax return, if applicable. The consideration for the purchase would be specified in the Acquisition Agreement and consistent with the terms of the Plan.

The Matrix Group generally would recognize gain or loss upon the transfer in an amount equal to the difference, if any, between (i) the aggregate fair market value of the assets transferred (or treated as transferred) and (ii) the tax basis in such assets. The determination as to whether to pursue and implement a Purchase Transaction will be based on the terms of the Restructuring Support Agreement and the Debtors' continuing analysis and assessment of the facts, including any resulting tax liability from the recognition of gain (if any) due to the consummation of the Purchase Transaction and a comparison of the Reorganized Debtors' tax profile in a Purchase Transaction as compared with the Reorganized Debtors' tax profile in another Restructuring, and other factors. Based on the midpoint estimated reorganization value and the assumptions therein (*see* "Valuation Analysis), the Debtors do not expect that a Purchase Transaction would result in a material income tax liability, if any. Nevertheless, the actual facts may vary from those projected, estimated or assumed, and if a Purchase Transaction is implemented, the Matrix Group may have more taxable income or gain than expected, and the Matrix Group's ability to utilize applicable Tax Attributes to offset any gain attributable to the transfer may be less than assumed or subject to limitation, which could result in tax consequences different from those expected. In addition, any resulting tax liability may be subject to audit and adjustment by the IRS or other applicable taxing authorities.

A Purchase Transaction, if consummated, is intended to be treated as the Debtors having sold to AcquisitionCo all or substantially all of their assets in a taxable asset acquisition. However, were the transfer of assets to AcquisitionCo in a Purchase Transaction determined not to be a taxable sale but instead treated as a "reorganization" for tax purposes, AcquisitionCo would (directly or indirectly) succeed to the Tax Attributes of the Debtors (including tax basis in assets), subject to the attribute reduction attributable to the substantial COD incurred and other applicable limitations similar to a Restructure-in-Place Transaction or a Deconsolidation Transaction depending on structuring.

> ### iv.    *Deconsolidation of the Debtors*

In the event of a Deconsolidation Transaction, reorganized Mobile Acquisition Corp. and its U.S. subsidiaries would be deconsolidated from the existing Matrix Group and would no longer file a single consolidated U.S. federal income tax return as part of that group. As a result of a Deconsolidation Transaction, any remaining Tax Attributes attributable to the Old Holding Companies would be eliminated. The deconsolidation is not expected to result in material, if any, incremental income to the Debtors. It is contemplated that reorganized Mobile Acquisition Corp. and its U.S. subsidiaries will join in the filing of a new single consolidated U.S. federal income tax return with reorganized Mobile Acquisition Corp. as the common parent.

> ### C.    Consequences to U.S. Holders of Certain Claims

The structure that will be utilized to implement the Restructuring Transactions is currently uncertain. The following discussion assumes the Plan will be implemented through a Restructure-in-Place Transaction (in which event the New Equity Interests would be contributed to Matrix Parent and distributed by Matrix Parent), a Deconsolidation Transaction, or a Purchase Transaction. *See* "Consequences Depend Upon Restructuring Transactions," above. The U.S. federal income tax consequences of the Plan to the Debtors and to certain Holders of Claims could differ materially from that described herein if the Restructuring Transactions take any other form. Accordingly, all holders are urged to consult their own tax advisors regarding the tax consequences of the Plan to them.

Pursuant to the Plan, and in complete and final satisfaction of their Claims, and in accordance with the Restructuring Transactions, each holder of an Allowed First Lien Claim will receive New Equity Interests; and each holder of an Allowed Second Lien Debt Claim will receive New Equity Interests.

> ### i.    *Treatment of Gain or Loss*

In the case of U.S. holders of either Allowed First Lien Debt Claims or Allowed Second Lien Debt Claims, the holder generally should have a fully taxable transaction (in each of the Restructure-in-Place Transaction, Deconsolidation Transaction, and the Purchase Transaction).

In the case of a fully taxable exchange, a U.S. holder of an Allowed Claim should recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of New Equity Interests received in respect of its Claim (other than any consideration attributable to a Claim for accrued but unpaid interest and possibly accrued OID) and (ii) the holder's adjusted tax basis in the Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest

38

and possibly accrued OID). *See* "Character of Gain or Loss," below. For the treatment of distributions in respect of an Allowed Claim for accrued but unpaid interest and possibly OID, see "Distributions in Respect of Accrued But Unpaid Interest or OID," below.

A U.S. holder's tax basis in any New Equity Interests received generally will equal the fair market value of such New Equity Interests on the Effective Date. The U.S. holder's holding period in any New Equity Interests received will begin on the day following the Effective Date.

### ii.      *Character of Gain or Loss*

When gain or loss is recognized by a U.S. holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss is determined by a number of factors, including the tax status of the U.S. holder, whether the Allowed Claim constitutes a capital asset in the hands of the U.S. holder and how long it has been held, whether the Allowed Claim was acquired at a market discount, and whether and to what extent the U.S. holder previously claimed a bad debt deduction.

In addition, a U.S. holder that acquired a Claim from a prior holder at a "market discount" may be subject to the market discount rules of the Tax Code. A U.S. holder that purchased its Claim from a prior holder would be considered to have purchased such Claim with "market discount" if the U.S. holder's adjusted tax basis in its Claim is less than the adjusted issue price of such Claim by at least a statutorily defined *de minimis* amount. Under these rules, gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally would be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. holder, on a constant yield basis) during the U.S. holder's period of ownership, unless the U.S. holder elected to include the market discount in income as it accrued. If a U.S. holder of Claims did not elect to include market discount in income as it accrued and, thus, under these rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

### iii.      *Distributions in Respect of Accrued But Unpaid Interest or OID*

In general, to the extent that any consideration received pursuant to the Plan by a U.S. holder of an Allowed Claim that is received in satisfaction of accrued interest during the U.S. holder's holding period, such amount would be taxable to the U.S. holder as interest income (if not previously included in the U.S. holder's gross income). Conversely, a U.S. holder generally recognizes a deductible loss to the extent any accrued interest or accrued OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current loss with respect to any accrued but unpaid OID. Accordingly, it is also unclear whether, in similar circumstances or by analogy, any U.S. holder of an Allowed Claim would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID with respect to such Claim that is not paid in full.

The Plan provides that, unless otherwise required by law (as reasonably determined by the Debtors or Reorganized Debtors), distributions in respect of Allowed Claims shall be allocated first to the

39

principal amount of such Allowed Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remainder of such Allowed Claims.  *See* section 6.18 of the Plan.  There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.  You are urged to consult your own tax advisor regarding the allocation of consideration and the inclusion and deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

<p align="center">*iv.*        ***Ownership and Disposition of New Equity Interests***</p>

The issuer of New Equity Interests will be treated as a corporation for U.S. federal income tax purposes.  As a result, any distributions made on account of the New Equity Interests will generally constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Parent, as determined under U.S. federal income tax principles. Dividends received by a non-corporate U.S. holder may be eligible for the lower rate applicable to long-term capital gain if certain holding period requirements are satisfied. To the extent that a U.S. holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. holder's basis in its New Equity Interests. Any such distributions in excess of the U.S. holder's basis in its New Equity Interests (determined on a share-by-share basis) generally will be treated as capital gain, which will be treated as long-term capital gain if such U.S. holder's holding period in its New Equity Interests exceeds one year as of the date of the distribution. Subject to applicable limitations, amounts treated as dividends paid to U.S. holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

In general, unless a nonrecognition provision applies to a future disposition, U.S. holders will recognize capital gain or loss upon the sale or exchange of the New Equity Interests in an amount equal to the difference between (i) the holder's adjusted tax basis in the New Equity Interests held and (ii) the sum of the cash and the fair market value of any property received from such disposition. Any such gain or loss generally should be long-term capital gain or loss if the U.S. holder's holding period for its New Equity Interests is more than one year at that time.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. holders.  The deductibility of capital loss is subject to significant limitations.

However, if the New Equity Interests are issued by Intermediate (as in the case of the Restructure-in-Place) or Matrix Parent, Inc. (not currently contemplated), any gain recognized by a U.S. holder upon a disposition of the New Equity Interests received in exchange for its Claim (or any stock or property received for such New Equity Interests in a later tax-free exchange) generally will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions previously claimed as a result of the write-down of the Claim, decreased by any income (other than interest income) recognized by the U.S. holder upon exchange of the Claim, and (ii) with respect to a cash-basis U.S. holder and in addition to clause (i) above, any amounts

<p align="center">40</p>

which would have been included in its gross income if the holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

   D.  <u>Consequences to Non-U.S. Holders of Certain Claims</u>

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to Non-U.S. holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. holders are complex. Each Non-U.S. holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such Non-U.S. holder and the ownership and disposition of the various forms of consideration Non-U.S. holders may receive under the Plan.

   *i.*  ***Treatment of Gain or Loss***

As described above under the discussion applicable to U.S. holders, see "*Consequences to U.S. Holders of Certain Claims*", the Restructuring Transactions are expected to be a taxable transaction for holders of Allowed First Lien Debt Claims and Allowed Second Lien Debt Claims. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (which may be subject to withholding as described below) and assuming the Restructuring Transactions are treated as a taxable exchange for U.S. federal income tax purposes with respect to a Non-U.S. holder, any gain recognized by such Non-U.S. holder on the exchange of its Allowed First Lien Debt Claims or Allowed Second Lien Debt Claims generally will not be subject to U.S. federal income taxation unless (a) such Non-U.S. holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Effective Date occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. holder of a trade or business within the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax with respect to any gain recognized on the exchange in the same manner as a U.S. holder. To claim an exemption from withholding tax, such Non-U.S. holder will be required to provide a properly executed IRS Form W-8ECI (or a successor form). In addition, if such Non-U.S. holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

To the extent that any amounts received by a Non-U.S. holder are attributable to accrued but untaxed interest, such amounts will generally be subject to U.S. federal income tax and withholding at a 30% rate, unless such amounts are exempt from withholding, or subject to a reduced rate, under applicable law or tax treaty.  A Non-U.S. holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from

WEIL:\99859079\1\63808.0003

withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. holder certifies, under penalties of perjury, its status as a Non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.

*ii.*        ***Ownership and Disposition of New Equity Interests***

Any distributions made on account of the New Equity Interests will generally constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Parent, as determined under U.S. federal income tax principles. To the extent that a Non-U.S. holder receives (or is treated as receiving) distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. holder's basis in the New Equity Interests to which the distribution relates. Any such distributions in excess of the Non-U.S. holder's basis in such New Equity Interests (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange of such New Equity Interests.

Except as otherwise described below, dividends paid with respect to the New Equity Interests held by a Non-U.S. holder that are not effectively connected with a Non-U.S. holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. holder certifies, under penalties of perjury, its status as a Non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.

Dividends paid with respect to New Equity Interests held by a Non-U.S. holder that are effectively connected with the Non-U.S. holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. holder.  To claim an exemption from withholding tax, such Non-U.S. holder will be required to provide a properly executed IRS Form W-8ECI (or a successor form).  In addition, a Non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

A Non-U.S. holder generally will not be subject to U.S. federal income tax with respect to any gain recognized on the sale or other taxable disposition of New Equity Interests unless:

- such Non-U.S. holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are met or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. holder's conduct of a U.S. trade or business (and if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. holder in the United States); or

- Reorganized Parent is or has been during a specified testing period a "U.S. real property holding corporation" (a "**USRPHC**") for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of the New Equity Interests. If the second exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. holder, and a Non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Equity Interests under the Foreign Investment in Real Property Tax Act ("**FIRPTA**"). Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the New Equity Interests will generally be required to withhold a tax equal to 15% of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. holder's federal income tax liability and may entitle the Non-U.S. holder to a refund, provided that the Non-U.S. holder properly and timely files a tax return with the IRS.

In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the Tax Code and applicable Treasury Regulations) equals or exceeds 50% of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. holder held such interest. A determination of whether Reorganized Parent will be a USRPHC at a particular time will depend on the relative values of Reorganized Parent's assets at that time.

E.      Withholding on Distributions

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly

43

to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

**The foregoing summary has been provided for informational purposes only. All holders of Claims and Interests are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.**

## VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

### A. Certain Bankruptcy Law Considerations

#### i. *General*

Although the Debtors believe that the Chapter 11 Cases will not be materially disruptive to their business, the Debtors cannot be certain that this will be the case, including if the Effective Date is prolonged. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. It is possible that bankruptcy cases could adversely affect the Debtors' relationships with their key customers, vendors, and employees. The Chapter 11 Cases will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### ii. *Risk of Material Adverse Effect on Operations*

The commencement of the Chapter 11 Cases could adversely affect the relationship between the Debtors and their customers, employees, vendors, lenders, partners and others. There is a risk, due to uncertainty about the Company's future, that: (i) customers could seek alternative providers; (ii) customers' confidence in the Debtors' ability to provide products could erode and, as a result, there could be a significant and precipitous decline in revenues, profitability, and cash flow; (iii) it may be more difficult to attract or replace employees; (iv) employees could be distracted from performance of their duties or more easily attracted to other career opportunities; (v) suppliers, vendors, and service providers could terminate their relationship with the Debtors or require financial assurances or enhanced performance; and (vi) additional involvement by regulatory, taxing, and other authorities may increase the administrative burden on the Debtors and their

44

operations. These factors could adversely affect the Debtors' ability to obtain confirmation of the Plan.

        *iii.*        ***Risk Related to Obtaining First Day Relief***

The Debtors have tried to address potential concerns of key customers, vendors, employees, and other key parties in interest that might arise through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate court orders to ensure a seamless transition between the Debtors' prepetition and postpetition business operations. However, there can be no guaranty that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such relief, and as a result, the Debtors' business might suffer.

        *iv.*        ***Risk of Non-Confirmation of the Plan***

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes on the Plan. Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan or satisfy all of the conditions for confirmation required under the Plan. Even if all voting classes vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for confirmation are not met. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization or otherwise. Non-confirmation of the Plan could result in protracted chapter 11 cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers. In such circumstances, the Debtors may no longer have consent to use Cash Collateral, and even if they do there likely would be a significant strain on liquidity and the Debtors may be forced to seek postpetition financing. There is no guarantee that such funding would be available or on what terms.

        *v.*        ***Severability of the Plan***

The Debtors cannot guarantee that the Bankruptcy Court will approve every provision of the Plan, and certain provisions may be modified or removed, while the rest of the Plan will be confirmed.

        *vi.*        ***Risk of Failing to Satisfy the Vote Requirement***

In the event that the Debtors are unable to get sufficient votes from the Classes that are entitled to vote on the Plan, the Debtors may seek to accomplish an alternative chapter 11 plan or seek to cram down the Plan on non-accepting Classes. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Allowed Claims as those proposed in the Plan.

<div align="center">45</div>

### vii.        *Non-Consensual Confirmation*

If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the Plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If any Class votes to reject the plan, then these requirements must be satisfied with respect to such rejecting Classes.  The Debtors believe that the Plan satisfies these requirements.

### viii.       *Risk Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

### ix.        *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.  Nonoccurrence of the Effective Date could result in substantial changes to the Plan and protracted chapter 11 cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.  In such circumstances, the Debtors may no longer have consent to use Cash Collateral, and even if they do there likely would be a significant strain on liquidity and the Debtors may be forced to seek postpetition financing.  There is no guarantee that such funding would be available or on what terms.

### x.        *Risk of Termination of the Restructuring Support Agreement*

The Restructuring Support Agreement contains certain provisions that give the Debtors, the Consenting Creditors (as defined in the Restructuring Support Agreement), and the Consenting Sponsor (solely as to themselves) the ability to terminate the Restructuring Support Agreement if various conditions are satisfied.  Termination of the Restructuring Support Agreement could result in substantial changes to the Plan and protracted chapter 11 cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.  In such circumstances, the Debtors may no longer have consent to use Cash Collateral, and even if they did, there likely would be a significant strain on liquidity and the Debtors may be

46

forced to seek alternative postpetition financing.  There is no guarantee that such funding would be available or on what terms.

#### xi.  Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  Please refer to section XI.C. hereof, as well as the Liquidation Analysis attached hereto as **Exhibit D**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

#### xii.  Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

#### xiii.  Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article X of the Plan provides for certain releases, injunctions, and exculpations for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### B.  Additional Factors Affecting the Value of Reorganized Debtors

#### i.  Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could reduce the value of distributions substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the Debtors' projections and feasibility analysis, and the variation may be material.

#### ii.  Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections that may differ materially from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or

<div align="center">47</div>

guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed.

The Debtors have prepared financial projections (the "**Financial Projections**") on a consolidated basis based on certain assumptions, as set forth in **Exhibit E** hereto. The Financial Projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the Financial Projections or the ability to achieve forecasted results.

Many of the assumptions underlying the Financial Projections are subject to uncertainties that are beyond the control of the Debtors or Reorganized Debtors including the timing, confirmation, and consummation of the Plan, demand or price for services, inflation, and other unanticipated market and economic conditions. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the Financial Projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material.

        *iii.*        ***Risks Associated with Debtors' Business and Industry and Financial Conditions***

        (a)        Risks Associated with Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

        (b)        Risks Associated with Department of Justice Investigation

The Department of Justice has initiated an investigation (the "**DOJ Investigation**") into certain prepetition conduct of the Debtors for the time period prior to 2023. The outcome of the DOJ Investigation is currently unknown and could have a material impact on the Reorganized Debtors' businesses and financial stability.

        (c)        Risks Associated with the Loss of Key Personnel

The Debtors' operations are dependent on a relatively small group of key management personnel. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors may

experience increased levels of employee attrition. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

<p style="text-align:center">(d)     Risks Associated with Acquisition of Companies, Products, or Technologies</p>

The Debtors have acquired and may continue to acquire companies, products, and technologies that complement their strategic direction. Acquisitions involve significant risks and uncertainties, including: inability to successfully integrate the acquired technology and operations into the Debtors' business and maintain uniform standards, controls, policies, and procedures; inability to realize synergies expected to result from an acquisition; challenges retaining the key employees, customers, resellers and other business partners of the acquired operation; and the internal control environment of an acquired entity may not be consistent with the Debtors' standards and may require significant time and resources to improve.

Acquisitions and divestitures are inherently risky. The Debtors' transactions may not be successful and may, in some cases, harm operating results or their financial condition. In addition, if the Debtors use debt to fund acquisitions or for other purposes, their interest expense and leverage may significantly increase. If the Debtors issue equity securities as consideration in an acquisition, current shareholders' percentage ownership and earnings per share may be diluted.

In addition, from time to time, the Debtors may undertake internal restructurings and other initiatives intended to reduce expenses. These initiatives may not lead to the benefits the Debtors expect, may be disruptive to the Debtors' personnel and operations, and may require substantial management time and attention. Moreover, the Debtors could encounter delays in executing their plans, which could entail further disruption and associated costs. If these disruptions result in a decline in productivity of the Debtors' personnel, negative impacts on operations, or if they experience unanticipated expenses associated with these initiatives, the Debtors' business and operating results may be harmed.

<p style="text-align:center">(e)     Risks Associated with Retaining or Attracting Customers</p>

The Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products and services, including renewals of current contracts. This is particularly important, given that the majority of Mobileum's revenue is derived from recurring, fixed-term customer contracts. Existing customers may decide not to renew or to reduce their contracts with the Debtors or not to purchase additional products or services from the Debtors in the future, which could have a material adverse effect on the Debtors' business and results of operations. In such cases, there can be no assurance that the Debtors will be able to retain their current customers.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products and services the quality of the Debtors' customer

<p style="text-align:center">49</p>

service, the Debtors' ability to update their products and develop new products and services needed by customers, and the Debtors' ability to integrate and manage any acquired businesses. Further, the industry in which the Debtors operate is highly competitive and the Debtors may not be able to compete effectively.

(f)     Risks Associated with Cyberattacks or the Improper Disclosure or Control of Personal Information

The Debtors are dependent on networks and systems to process, transmit and store electronic information and to communicate among the Debtors' locations around the world, and they may be required to store sensitive or confidential client data in connection with the services they provide. As a result, the Debtors are subject to contractual terms and numerous U.S. and foreign laws and regulations designed to protect this information. Furthermore, data privacy is subject to frequently changing rules and regulations, which sometimes conflict among the various jurisdictions and countries in which the Debtors provide services. Although the Debtors have implemented appropriate policies and procedures to reduce the possibility of physical, logical and personnel security breaches, no such measures can completely eliminate the risk of cybersecurity attacks, especially in light of advances in criminal capabilities (including cyber-attacks or cyber intrusions over the internet, malware, computer viruses and the like), discovery of new vulnerabilities or attempts to exploit existing vulnerabilities in interconnected third party systems that are beyond the Debtors' control systems.

Unauthorized disclosure, either actual perceived, of sensitive or confidential client or customer data, whether through systems failure, system intrusion, employee negligence, fraud, or otherwise could damage the Debtors' reputation and cause the Debtors to lose clients. Similarly, unauthorized access to or through the Debtors' information systems or those the Debtors develop for clients, whether by the Debtors' employees or third parties, could result in negative publicity, legal liability and damage to the Debtors' reputation, business, financial condition, results of operations and cash flows.

While the Debtors have not experienced a significant compromise to date, significant data loss or material financial losses related to cyber security attacks that has had an adverse effect on the Debtors' operations, there is no assurance that there may not be a material adverse effect in the future. Although the Debtors maintain cyber liability insurance, such insurance may not adequately or timely compensate the Debtors for all losses they may incur as any of the Debtors' client contracts do not contain limitations of liability for such losses.

(g)     Risks Associated with Accurate Reporting of Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness. Any

50

such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

<div align="center">(h)       Risks Associated with Post-Emergence Indebtedness</div>

On the Effective Date, on a consolidated basis, it is expected that the Reorganized Debtors will have total secured indebtedness of approximately $160 million on account of the Exit Term Loan Facility. The Reorganized Debtors may not be able to generate sufficient revenue to satisfy their obligations under such indebtedness, increasing the risk that they may default on such debt obligations.

The Reorganized Debtors' earnings and cash flow may vary significantly from year to year. Additionally, the Reorganized Debtors' future cash flow may be insufficient to meet their debt obligations and commitments. Any insufficiency could negatively impact the Reorganized Debtors' business. A range of economic, competitive, business, and industry factors will affect the Reorganized Debtors' future financial performance and, as a result, their ability to generate cash flow from operations and to pay their debt. Many of these factors are beyond the Reorganized Debtors' control.

If the Reorganized Debtors do not generate enough cash flow from operations to satisfy their debt obligations, they may have to undertake alternative financing plans, such as:

- refinancing or restructuring debt;

- selling assets;

- reducing or delaying capital investments; or

- seeking to raise additional capital.

It cannot be assured, however, that undertaking alternative financing plans, if necessary, would allow the Reorganized Debtors to meet their debt obligations. An inability to generate sufficient cash flow to satisfy their debt obligations or to obtain alternative financing could materially and adversely affect the Reorganized Debtors' ability to make payments on the Exit Term Loan Facility and their business, financial condition, results of operations, and prospects.

<div align="center">(i)       Obligations Under Exit Term Loan Facility</div>

The Reorganized Debtors' obligations under the Exit Term Loan Facility will be secured by liens on certain of or substantially all of the assets of the Reorganized Debtors (subject to certain exclusions set forth in the Exit Term Loan Facility). If the Reorganized Debtors become insolvent or are liquidated, or if there is an event of default under the Exit Term Loan Facility, the lenders under the Exit Term Loan Facility would be entitled to exercise the remedies available to them under the Exit Term Loan Facility and other remedies available to a secured lender under applicable law, including accelerating the obligations under the Exit Term Loan Facility and/or

<div align="center">51</div>

foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the applicable facility that would be superior to any claim of the holders of unsecured debt.

(j)     Risks Related to Exit Term Loan Facility and Post-Effective Date Indebtedness

The Exit Term Loan Facility is intended to provide the Debtors liquidity to operate their business and carry out their business plan after the Effective Date.  However, there is no assurance that the Reorganized Debtors will be able to meet all of the terms and conditions of the Exit Term Loan Facility, which may hinder the Debtors' ability to consummate the Plan.  There is a risk that the Reorganized Debtors default under the Exit Term Loan Facility and the lenders thereunder take enforcement actions against the Reorganized Debtors, including execution or foreclosure against assets thereof.  The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, their compliance with affirmative and negative covenants, their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond their control.  They may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures.  In addition, if they need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

(k)     Risks Related to the DIP Facility

The DIP Facility is intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases.  If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust or lose access to their financing.  There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise. In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

C.     Factors Relating to Securities to Be Issued Under Plan

i.     *Market for Securities*

There is currently no market for the New Equity Interests, and the Reorganized Debtors are under no obligation to list any securities on any national securities exchange.  There can be no assurance as to the development or liquidity of any market for the New Equity Interests, or that the New Equity Interests will be listed upon any national securities exchange or any over-the-counter market after the Effective Date.  If a trading market does not develop, is not maintained, or remains inactive, holders of the New Equity Interests may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors. Accordingly, holders of these securities may bear certain risk associated with holding securities for an indefinite period of time.

52

Furthermore, persons to whom the New Equity Interests are issued pursuant to the Plan may prefer to liquidate their investments rather than hold such securities on a long-term basis. Accordingly, the market price for such securities could decline and any market that does develop for such securities may be volatile.

<p style="text-align:center;"><em>ii.     <strong>Potential Dilution</strong></em></p>

The ownership percentage represented by the New Equity Interests distributed on the Effective Date under the Plan will be subject to dilution from the New Equity Interests issued pursuant to the subsequent issuances of New Equity Interests, contemplated by the Plan, such as the Management Incentive Plan and any other shares that may be issued post-emergence. In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Equity Interests issuable upon such conversion. The amount and dilutive effect of any of the foregoing could be material.

<p style="text-align:center;"><em>iii.     <strong>Significant Holders</strong></em></p>

Certain holders of First Lien Claims are expected to acquire a significant ownership interest in the New Equity Interests pursuant to the Plan. These holders may, among other things, exercise a controlling influence over the Reorganized Debtors and have the power to elect directors and approve significant transactions.

<p style="text-align:center;"><em>iv.     <strong>Equity Interests Subordinated to Reorganized Debtors' Indebtedness</strong></em></p>

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Equity Interests would rank below all debt claims against the Reorganized Debtors. As a result, holders of the New Equity Interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' debt obligations have been satisfied.

<p style="text-align:center;"><em>v.     <strong>Implied Value Not Intended to Represent Trading Value of New Equity Interests</strong></em></p>

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Equity Interests in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities of creditors receiving New Equity Interests under the Plan, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of securities. The actual market prices of the New Equity Interests are likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market prices of the New Equity Interests to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Equity Interests in the public or private markets.

<p style="text-align:center;">53</p>

vi.      *Certain Holders of Securities May Be Restricted in Their Ability to Transfer or Sell Their Securities*

To the extent that securities issued under the Plan are done so in reliance on the exemption from registration under section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities.  Resales by holders of Claims who 1145 Securities pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law.  Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The securities issued under the Plan will not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representations regarding the right of any holder of such securities to freely resell such securities.

vii.     *No Dividends*

Reorganized Parent does not anticipate paying any dividends on the New Equity Interests as it expects to retain any future cash flows for debt reduction and to support its operations.  In addition, covenants in the documents governing the Reorganized Parent's indebtedness may restrict its ability to pay cash dividends and may prohibit the payment of dividends and certain other payments.  As a result, the success of an investment in the New Equity Interests may depend entirely upon any future appreciation in the value of the New Equity Interests.  There is, however, no guarantee that the New Equity Interests will appreciate in value or even maintain their initial value.

D.      Additional Factors

i.      *Debtors Could Withdraw Plan*

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, including consent rights contained therein, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

ii.     *Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

iii.    *No Representations Outside this Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this

Disclosure Statement.  Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

<div align="center">

*iv.*        ***No Legal or Tax Advice Is Provided by this Disclosure Statement***

</div>

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.  This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

<div align="center">

*v.*        ***No Admission Made***

</div>

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

<div align="center">

*vi.*        ***Certain Tax Consequences***

</div>

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see section VII hereof.

<div align="center">

**IX.**
**VOTING PROCEDURES AND REQUIREMENTS**

</div>

Before voting to accept or reject the Plan, each holder of a Claim or Interest entitled to vote on the Plan (an "**Eligible Holder**") should carefully review the Plan attached hereto as **Exhibit A**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.  **This Solicitation of votes is being conducted to obtain sufficient votes to accept the Plan *before* the Petition Date. This Disclosure Statement has not been approved by the Bankruptcy Court**.

This Article is qualified in its entirety by the *Emergency Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan, (II) Approving Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline, (III) Fixing Deadline to Object to Disclosure Statement and Plan, (IV) Approving Notice and Objection Procedures for Assumption of Executory Contracts and Unexpired Leases, (V) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement to File Statements of Financial Affairs and Schedules of Assets and Liabilities, and (VII) Granting Related Relief* (the "**Solicitation Motion**") to be filed on the Petition Date.

A.        Voting Procedures

Eligible Holders in each Class should provide all of the information requested by the ballot, and should complete and return all ballots received (i) by regular mail, overnight courier, or hand delivery to the Voting Agent at the mailing address provided in the ballot, or (ii) via the customized

<div align="center">55</div>

online balloting portal (the "**E-Ballot Platform**") on the Debtors' case website maintained by the Voting Agent, according to information and instructions provided in the Ballot and website.

**HOLDERS ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM.**

> An Opt-Out Election Form or Ballot, as applicable, will be provided to you.  The Opt-Out Election Form or Ballot, as applicable, will provide you with the option to not grant the releases contained in section 10.6(b) of the Plan.  You must complete and timely return the Opt-Out Election Form or Ballot, as applicable, to the Voting Agent by the Voting Deadline in accordance with the instructions set forth in the Opt-Out Election Form or Ballot, as applicable, for your opt-out to be valid; OTHERWISE, YOU WILL BE DEEMED TO CONSENT TO AND BE BOUND BY THE RELEASES SET FORTH IN THE PLAN.  Please review the additional information set forth in this Disclosure Statement, the Opt-Out Election Form or Ballot, as applicable, the Plan, and any other documents related to the Chapter 11 Cases that you may receive from time to time.  Please be advised that your decision to opt out of the releases in section 10.6(b) does not affect the amount of distribution you will receive under the Plan.

B.      Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

With respect to a class of claims, the Bankruptcy Code deems a class to have accepted the plan if votes to accept the plan are received by creditors holding at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the total claims in that class that cast ballots for acceptance or rejection of the plan.  With respect to a class of interests, a class is considered to accept a plan if votes to accept the plan are received by interest holders holding at least two-thirds

WEIL:\99859079\1\63808.0003

(2/3) in dollar amount of the total interests in that class that cast ballots for acceptance or rejection of the plan.

The Claims in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

- Class 3 – First Lien Claims; and

- Class 4 – Second Lien Debt Claims.

**THE ONLY TWO CLASSES OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE CLASS 3 (FIRST LIEN CLAIMS) AND CLASS 4 (SECOND LIEN DEBT CLAIMS) (THE "VOTING CLASSES" OR "VOTING CLAIMS").**

A.      **Voting Deadline**

Before voting to accept or reject the Plan, each Holder of a Claim in a Voting Class as of the Voting Record Date (each, a "**Voting Holder**") should carefully review the Plan attached to the Disclosure Statement as **Exhibit A**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan

All Voting Holders have been sent a ballot to vote to accept or reject the Plan (the "**Ballot**") together with this Disclosure Statement.  Such Voting Holders should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.  Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating Ballots.

Each Ballot also provides Voting Holders with the ability to opt out of certain of the releases contained in the Plan.  To the extent a Voting Holder wishes to opt out of the identified releases, the Voting Holder must check the box on the Ballot indicating such Voting Holder is electing to opt out of the releases.

The Debtors have engaged Kroll as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.  **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE OF 5:00 P.M. (CENTRAL TIME) ON AUGUST 23, 2024, UNLESS EXTENDED BY THE DEBTORS.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

**Telephone: Toll Free in the U.S. and Canada at (844) 712-2239 or Non U.S./Canada at +1 (646) 777-2539**
**E-mail: MobileumInfo@ra.kroll.com (with "Mobileum Solicitation Inquiry" in the subject line)**

Additional copies of this Disclosure Statement, the Plan, and the Plan Supplement (when filed) are available upon written request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above or at the following address:

**Mobileum, Inc. Ballot Processing Center**
**c/o Kroll Restructuring Administration LLC**
**850 3rd Avenue, Suite 412,**
**Brooklyn, NY 11232**

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED. THE DEBTORS, IN THEIR SOLE DISCRETION, MAY REQUEST THAT THE VOTING AGENT ATTEMPT TO CONTACT SUCH VOTERS TO CURE ANY SUCH DEFECTS IN THE BALLOTS. THE FAILURE TO VOTE DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN. AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.

B.      **Voting Procedures**

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot to Voting Holders Class 3 and Class 4. Voting Holders in Class 3 and Class 4 who have not received a Ballot should contact the Voting Agent.

Voting Holders in Class 3 and Class 4 should provide all of the information requested by the Ballot, and should (i) complete and return all Ballots received by regular mail, overnight courier, or hand delivery to the Voting Agent at the applicable address set forth below or (ii) submit a Ballot electronically via the E-Ballot Platform on the Debtors' restructuring website maintained by the Voting Agent by visiting https://cases.ra.kroll.com/Mobileum, clicking on the "Submit E-Ballot" link, and following the instructions set forth on the website and in the Ballot.

WEIL:\99859079\1\63808.0003

| Kroll's Address for Receipt of Hard Copy Ballots |
| --- |
| **If by Regular Mail, Hand Delivery, or Overnight Courier**<br><br>Mobileum, Inc. Ballot Processing Center<br>c/o Kroll Restructuring Administration LLC<br>850 3rd Avenue, Suite 412<br>Brooklyn, NY 11232<br>**(to arrange hand delivery of your Ballot, please email<br>MobileumBallots@ra.kroll.com (with "Mobileum Ballot Delivery"<br>in the subject line) at least 24 hours prior to your arrival at the<br>Voting Agent address above and provide the anticipated date and<br>time of delivery)** |

VOTING HOLDERS IN CLASS 3 AND CLASS 4 ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM.

1.    **Miscellaneous**

All Ballots must be signed by the Voting Holder, or any person who has obtained a properly completed Ballot proxy from the Voting Holder by the Voting Record Date. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If you return more than one Ballot voting different claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Voting Holders will reflect the principal amount of such Voting Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Voting Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Voting Record Date and the Petition Date including interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only Voting Holders who actually vote will be counted. The failure of a Voting Holder to timely deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such Voting Holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

WEIL:\99859079\1\63808.0003

2.      **Agreements Upon Furnishing Ballots**

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the Voting Holder with respect to such Ballot to accept (i) all of the terms of, and conditions to, the Solicitation, and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Article X therein.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

3.      **Change of Vote**

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan, as applicable.

C.      Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of ballots will be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all ballots submitted by any of their respective Eligible Holders not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular ballot.  The interpretation (including the ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

C.      Notice of Non-Voting Status

Holders of Claims in Class 1, Class 2, Class 5, and Class 6 are Unimpaired and deemed to accept the Plan.  Holders of Interests in Class 7 are Unimpaired and deemed to accept the Plan.[8]  Holders of Interests in Class 8 are Impaired and deemed to reject the Plan.  Accordingly, Holders of Claims and Interests in Classes 1, 2, 5, and 8 will receive a notice informing them of their non-voting status (the "**Notice of Non-Voting Status**").

---

[8]     The Debtors have asked the Bankruptcy Court to waive the bankruptcy notice requirement with respect to Class 6 – Intercompany Claims and Class 7 – Intercompany Interests to relieve the Debtors of the need to serve a Notice of Non-Voting Status or any other type of notice in connection with the Plan on holders of such Claims and Interests.

D.     Opt-Out Form

In addition to receiving a Notice of Non-Voting Status, Holders of Claims and Interests in Classes 1, 2, 5, and 8 will receive a form to complete and return if the party elects to opt out of the releases contemplated by the Plan ("**Opt-Out Election Form**").  To the extent a Holder of Claims and Interests in Class 1, 2, 5, and 8 wishes to elect to opt-out of the releases, such Holder must return the Opt-Out Election Form, with the box checked indicating such Holder is electing to opt-out of the releases, to the Voting Agent **before 5:00 p.m. (Central Time) on August 23, 2024**.

E.     Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

# X.
# CONFIRMATION OF PLAN

A.     Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

B.     Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must (i) be in writing; (ii) conform to the applicable Bankruptcy Rules and the Bankruptcy Local Rules; (iii) set forth the name of the objecting party, the basis for the objection, and the specific grounds thereof; (iv) include proposed language that if included in the Plan would remedy the matters set forth in the objection; and (v) be filed with the Court, together with proof of service.  In addition to being filed with the Court, any such responses or objections must be served on the following parties so as to be received by August 23, 2024 at 5:00 p.m. (Prevailing Central Time):

(a)     **Debtors** at
Mobileum, Inc.,
20813 Stevens Creek Boulevard, Suite 200, Cupertino, CA 95014
Attn:   Mike Salfity (Mike.Salfity@mobileum.com)
        Ripu Singh (Ripu.Singh@mobileum.com)

(b)     **Counsel to Debtors** at
Weil, Gotshal & Manges LLP

700 Louisiana Street, Suite 3700, Houston, Texas 77002
Attn: Gabriel A. Morgan (Gabe.Morgan@weil.com)
    Clifford W. Carlson (Clifford.Carlson@weil.com)

767 Fifth Avenue, New York, New York 10153
Attn: Jeffrey D. Saferstein (Jeffrey.Saferstein@weil.com)
    Alexander W. Welch (Alexander.Welch@weil.com)
    Daphne Papadatos (Daphne.Papadatos@weil.com)
    Eric L. Einhorn (Eric.Einhorn@weil.com)

(c)    **Office of U.S. Trustee** at
Office of the United States Trustee for the Southern District of Texas
515 Rusk Street, Suite 3516, Houston, Texas 77002
Attn:  Ha Nguyen (Ha.Nguyen@usdoj.gov)
    Andrew Jimenez (Andrew.Jimenez@usdoj.gov)

(d)    **Counsel to First Lien Ad Hoc Group** at
Milbank LLP
55 Hudson Yards, New York, New York 10001
Attn:  Evan Fleck, Esq. (EFleck@milbank.com)
    Matthew Brod, Esq. (Mbrod@milbank.com)
    Abigail Debold, Esq. (ADebold@milbank.com)
    Rupsha Basu, Esq. (RBasu@milbank.com)

(e)    **Counsel to First Lien Ad Hoc Group** at
Porter Hedges LLP
1000 Main Street 36th Floor, Houston, Texas 77002
Attn:  John F. Higgins, Esq. (jhiggins@porterhedges.com)

(f)    **Counsel to Crossholder Ad Hoc Group** at
Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W., Washington, DC 20006
Attn:  Scott L. Alberino, Esq. (SAlberino@akingump.com)
    Blaine Scott, Esq. (BScott@akingump.com)

(g)    **Counsel to Consenting Sponsor** at
Simpson Thacher & Bartlett LLP
425 Lexington Ave, New York, New York 10017
Attn:  Sunny Singh, Esq. (Sunny.Singh@stblaw.com)
    Dov Gottlieb, Esq. (Dov.Gottlieb@stblaw.com)

---

**IF AN OBJECTION TO CONFIRMATION IS NOT TIMELY SERVED AND FILED BY AUGUST 23, 2024 AT 5:00 P.M. (PREVAILING CENTRAL TIME), IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

WEIL:\99859079\1\63808.0003

C.      Requirements for Confirmation of Plan

      i.      *Requirements of Section 1129(a) of Bankruptcy Code*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied, including whether:

        (a)      the Plan complies with the applicable provisions of the Bankruptcy Code;

        (b)      the Debtors have complied with the applicable provisions of the Bankruptcy Code;

        (c)      the Plan has been proposed in good faith and not by any means forbidden by law;

        (d)      any payment made or promised by the Debtors, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

        (e)      the Debtors have disclosed, to the extent known, the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

        (f)      with respect to each Class of Claims or Interests, each holder of an Impaired Claim or Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

        (g)      except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims or Interests either accepted the Plan or is not impaired under the Plan;

(h) except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims will be paid in full or receive such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code;

(i) at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(j) confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(k) all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

As provided above, among the requirements for confirmation are that the Plan is (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (C) feasible.

   *ii.*   ***Acceptance of Plan***

Under the Bankruptcy Code, a class accepts a chapter 11 plan if (i) holders of two-thirds (2/3) in amount and (ii) with respect to holders of claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the plan. Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the plan.

If any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each Impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cramdown" provisions set forth in section 1129(b) of the Bankruptcy Code. The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of

64

claims receive more than 100% of the allowed amount of the claims in such class. As to a dissenting class, if any, the test sets different standards that must be satisfied for the plan to be confirmed, depending on the type of claims or interests in such class. The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the plan:

- **Secured Creditors**. Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the Plan, property of a value, as of the effective date of the Plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

> *iii.      Best Interests Test*

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either: (a) accept the plan; or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the

proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

Under the Plan, all holders of Impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  This conclusion is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit D.**

Any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis provided in **Exhibit D** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

   *iv.*    *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the consolidated financial projections for the Reorganized Debtors (collectively with the reserve information, development of schedules, and financial information, the "**Financial Projections**") for fiscal years 2024 through 2027.  The Financial Projections, and the assumptions on which they are based, are attached hereto as **Exhibit E**.  Based upon such Financial Projections, the Debtors conclude they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Moreover, Article VIII hereof sets forth certain risk factors that could impact the feasibility of the Plan.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated on or prior to September 26, 2024 (the "**Emergence Date**").  Any significant delay in the Emergence Date may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk or inability to meet forecasts and the incurrence of higher reorganization expenses.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date or otherwise make such information public.  In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan.

The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by business, industry, regulatory, market and financial uncertainties and contingencies, and a variety of other factors.

Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.  Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

## XI.
## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

A.      Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either (i) a reorganization and continuation of the Debtors' business or (ii) an orderly liquidation of their assets.  The Debtors, however, believe that the Plan, as described herein, enables their stakeholders to realize the most value under the circumstances. In addition, if the Plan is not confirmed pursuant to the terms of the Restructuring Support Agreement, the Consenting Parties have the right to terminate the Restructuring Support Agreement (and all obligations thereunder) either in its entirety or as to themselves only, as applicable.

B.      Sale Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  Holders of Allowed Claims in Class 3 and Class 4 would be entitled to credit bid on any property to which their security interest is attached to the extent of the value of such security interest, and to offset their Claims against the purchase price of the property.  In addition, the security interests in the Debtors' assets held by holders of Claims in Classes 3 and 4 would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363

67

of the Bankruptcy Code would yield a higher recovery for the holders of Claims and Interests under the Plan.

        C.      <u>Liquidation under Chapter 7 of Bankruptcy Code</u>

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit D**.

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

WEIL:\99859079\1\63808.0003

## XII.
## <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 3 and 4 to vote in favor thereof.

Dated: July 23, 2024

        Respectfully submitted,

        Mobileum, Inc., and its undersigned affiliates

        By:      */s/ Ripu Singh*
        Name:  Ripu Singh
        Title:   Chief Operating Officer and
                 Chief Financial Officer

        on behalf of

        Mobileum, Inc.
        Matrix Intermediate, Inc.
        Matrix Holdco, LLC
        Matrix Parent, Inc.
        Mobile Acquisition Corp.
        SIGOS LLC
        UnwiredSoft, Inc.
        We Do Technologies Americas, Inc.
        Convene Networks LLC
        Developing Solutions Inc.
        Phase 3 Innovations Holdings, Inc.

*[Signature Page for Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Mobileum, Inc. and Its Affiliated Debtors]*

**<u>Exhibit A</u>**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **MOBILEUM, INC.,** *et al.*, | § | **Case No.  24-90414 (CML)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| Debtors.[1] | § | |
| | § | |

**JOINT CHAPTER 11 PLAN OF**
**MOBILEUM, INC. AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (*pro hac vice* pending)
Alexander W. Welch (*pro hac vice* pending)
Daphne Papadatos (*pro hac vice* pending)
Eric L. Einhorn (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

Dated:   July 23, 2024
            Houston, Texas

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Mobileum, Inc. (7417); Matrix Intermediate, Inc. (7287); Matrix Holdco, LLC (0039); Matrix Parent, Inc. (9085); Mobile Acquisition Corp. (9591); SIGOS LLC (1763); UnwiredSoft, Inc. (2064); We Do Technologies Americas, Inc. (9338); Convene Networks LLC (2820); Developing Solutions Inc. (6177); and Phase 3 Innovations Holdings, Inc. (1899).  The Debtors' mailing address is 20813 Stevens Creek Boulevard, Suite 200, Cupertino, CA 95014.

Table of Contents

Page

**ARTICLE I.**   DEFINITIONS AND INTERPRETATION. ................................................................. 1
    A.   **Definitions.** ................................................................................................................. 1
    B.   **Interpretation; Application of Definitions and Rules of Construction.** ..................... 15
    C.   **Computation of Time.** ................................................................................................ 16
    D.   **Reference to Monetary Figures.** ................................................................................ 16
    E.   **Reference to the Debtors or the Reorganized Debtors** ............................................... 16
    F.   **Controlling Document.** ............................................................................................... 16
    G.   **Consultation, Information, Notice, and Consent Rights.** ........................................... 17

**ARTICLE II.**   ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS,
                DIP CLAIMS, AND PRIORITY TAX CLAIMS. ................................................ 17
    2.1.   *Administrative Expense Claims.* .................................................................................. 17
    2.2.   *Professional Fee Claims.* ............................................................................................ 17
    2.3.   *Priority Tax Claims.* .................................................................................................... 18
    2.4.   *DIP Claims.* ................................................................................................................. 18
    2.5.   *Restructuring Fees and Expenses.* ............................................................................... 18
    2.6.   *Professional Fee Escrow.* ............................................................................................ 19
    2.7.   *Professional Fee Claims Estimate.* .............................................................................. 19
    2.8.   *Post-Effective Date Fees and Expenses* ...................................................................... 19

**ARTICLE III.**   CLASSIFICATION OF CLAIMS AND INTERESTS. ......................................... 20
    3.1.   *Classification in General.* ........................................................................................... 20
    3.2.   *Formation of Debtor Groups for Convenience Only.* ................................................. 20
    3.3.   *Summary of Classification.* ......................................................................................... 20
    3.4.   *Special Provision Governing Unimpaired Claims.* ..................................................... 20
    3.5.   *Elimination of Vacant Classes.* ................................................................................... 21
    3.6.   *No Waiver.* ................................................................................................................... 21
    3.7.   *Voting Classes; Presumed Acceptance by Non-Voting Classes* .................................. 21

**ARTICLE IV.**   TREATMENT OF CLAIMS AND INTERESTS. ................................................. 21
    4.1.   *Other Secured Claims (Class 1)* ................................................................................. 21
    4.2.   *Priority Non-Tax Claims (Class 2)* ............................................................................. 22
    4.3.   *First Lien Claims (Class 3)* ........................................................................................ 22
    4.4.   *Second Lien Debt Claims (Class 4)* ............................................................................ 22
    4.5.   *General Unsecured Claims (Class 5)* ......................................................................... 23
    4.6.   *Intercompany Claims (Class 6)* .................................................................................. 23
    4.7.   *Intercompany Interests (Class 7)* ............................................................................... 23
    4.8.   *Existing Parent Equity Interests (Class 8)* ................................................................. 24

**ARTICLE V.**   MEANS FOR IMPLEMENTATION. ..................................................................... 24
    5.1.   *Compromise and Settlement of Claims, Interests, and Controversies.* ........................ 24
    5.2.   *Intercreditor Agreements* ............................................................................................ 24
    5.3.   *Continued Corporate Existence; Effectuating Documents; Corporate Action;*
          *Restructuring Transactions.* ....................................................................................... 25
    5.4.   *Intercompany Interests; Corporate Reorganization.* .................................................. 26
    5.5.   *Exit Credit Agreement.* ............................................................................................... 26
    5.6.   *Section 1145 Exemption.* ............................................................................................ 27
    5.7.   *Cancellation of Existing Securities and Agreements.* ................................................. 27
    5.8.   *Cancellation of Liens.* ................................................................................................ 28
    5.9.   *Officers and Boards of Directors* ............................................................................... 28

Table of Contents
(continued)

| | | |
|---|---|---|
| 5.10. | *Management Incentive Plan.* | 29 |
| 5.11. | *Authorization, Issuance, and Delivery of New Equity Interests.* | 29 |
| 5.12. | *Nonconsensual Confirmation.* | 30 |
| 5.13. | *Closing of the Chapter 11 Cases.* | 30 |
| 5.14. | *Notice of Effective Date.* | 30 |
| 5.15. | *Separate Plans.* | 30 |
| 5.16. | *Litigation Trust.* | 30 |
| **ARTICLE VI.** | DISTRIBUTIONS. | 30 |
| 6.1. | *Distributions Generally.* | 30 |
| 6.2. | *Distributions Subject to Intercreditor Agreements.* | 30 |
| 6.3. | *Distribution Record Date.* | 30 |
| 6.4. | *Date of Distributions.* | 31 |
| 6.5. | *Disbursing Agent.* | 31 |
| 6.6. | *Rights and Powers of Disbursing Agent.* | 31 |
| 6.7. | *Expenses of Disbursing Agent.* | 32 |
| 6.8. | *No Postpetition Interest on Claims.* | 32 |
| 6.9. | *Delivery of Distributions.* | 32 |
| 6.10. | *Distributions as of Effective Date.* | 32 |
| 6.11. | *Unclaimed Property.* | 33 |
| 6.12. | *Time Bar to Cash Payments.* | 33 |
| 6.13. | *Manner of Payment under Plan.* | 33 |
| 6.14. | *Satisfaction of Claims.* | 33 |
| 6.15. | *Fractional Stock.* | 33 |
| 6.16. | *Minimum Cash Distributions.* | 34 |
| 6.17. | *Setoffs.* | 34 |
| 6.18. | *Allocation of Distributions between Principal and Interest.* | 34 |
| 6.19. | *No Distribution in Excess of Amount of Allowed Claim.* | 34 |
| 6.20. | *Withholding and Reporting Requirements.* | 34 |
| **ARTICLE VII.** | PROCEDURES FOR DISPUTED CLAIMS. | 35 |
| 7.1. | *Disputed Claims Generally.* | 35 |
| 7.2. | *Objections to Claims.* | 35 |
| 7.3. | *Estimation of Claims.* | 36 |
| 7.4. | *Disallowance of Claims.* | 36 |
| 7.5. | *No Distributions Pending Allowance.* | 36 |
| 7.6. | *Distributions after Allowance.* | 36 |
| 7.7. | *Claim Resolution Procedures Cumulative.* | 36 |
| 7.8. | *Single Satisfaction of Claims and Interests.* | 37 |
| **ARTICLE VIII.** | EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | 37 |
| 8.1. | *General Treatment.* | 37 |
| 8.2. | *Determination of Cure Disputes and Deemed Consent.* | 38 |
| 8.3. | *Payments Related to Assumption or Assignment of Contracts and Leases.* | 38 |
| 8.4. | *Rejection Claims.* | 39 |
| 8.5. | *Survival of the Debtors' Indemnification Obligations.* | 39 |
| 8.6. | *Employee Arrangements.* | 39 |
| 8.7. | *Insurance Policies.* | 40 |

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| 8.8. | *Intellectual Property Licenses and Agreements* | 41 |
| 8.9. | *Assignment.* | 41 |
| 8.10. | *Modifications, Amendments, Supplements, Restatements, or Other Agreements.* | 42 |
| 8.11. | *Reservation of Rights.* | 42 |

**ARTICLE IX.** CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE ............................................................................ 42

| | | |
|---|---|---|
| 9.1. | *Conditions Precedent to the Effective Date.* | 42 |
| 9.2. | *Timing of Conditions Precedent.* | 44 |
| 9.3. | *Waiver of Conditions Precedent.* | 44 |
| 9.4. | *Effect of Non-Occurrence of the Effective Date.* | 44 |

**ARTICLE X.** EFFECT OF CONFIRMATION OF PLAN. .......................................... 44

| | | |
|---|---|---|
| 10.1. | *Vesting of Assets in the Reorganized Debtors.* | 44 |
| 10.2. | *Binding Effect.* | 45 |
| 10.3. | *Discharge of Claims and Termination of Interests.* | 45 |
| 10.4. | *Term of Injunctions or Stays.* | 45 |
| 10.5. | *Injunction.* | 45 |
| 10.6. | *Releases.* | 47 |
| 10.7. | *Exculpation.* | 49 |
| 10.8. | *Retention of Causes of Action/Reservation of Rights.* | 50 |
| 10.9. | *Ipso Facto and Similar Provisions Ineffective.* | 50 |
| 10.10. | *Solicitation of Plan.* | 50 |
| 10.11. | *Corporate and Limited Liability Company Action.* | 50 |

**ARTICLE XI.** RETENTION OF JURISDICTION. ................................................ 51

| | | |
|---|---|---|
| 11.1. | *Retention of Jurisdiction.* | 51 |
| 11.2. | *Courts of Competent Jurisdiction.* | 52 |

**ARTICLE XII.** MISCELLANEOUS PROVISIONS. ............................................... 53

| | | |
|---|---|---|
| 12.1. | *Payment of Statutory Fees.* | 53 |
| 12.2. | *Substantial Consummation of the Plan.* | 53 |
| 12.3. | *Request for Expedited Determination of Taxes.* | 53 |
| 12.4. | *Exemption from Certain Transfer Taxes.* | 53 |
| 12.5. | *Amendments.* | 54 |
| 12.6. | *Effectuating Documents and Further Transactions.* | 54 |
| 12.7. | *Revocation or Withdrawal of the Plan.* | 54 |
| 12.8. | *Severability of Plan Provisions.* | 54 |
| 12.9. | *Governing Law.* | 55 |
| 12.10. | *Time.* | 55 |
| 12.11. | *Dates of Actions to Implement the Plan.* | 55 |
| 12.12. | *Immediate Binding Effect.* | 55 |
| 12.13. | *Deemed Acts.* | 55 |
| 12.14. | *Successor and Assigns.* | 56 |
| 12.15. | *Entire Agreement.* | 56 |
| 12.16. | *Exhibits to Plan.* | 56 |
| 12.17. | *Notices.* | 56 |

WEIL:\99859063\1\63808.0003

Each of Mobileum, Inc.; Matrix Intermediate, Inc.; Matrix Holdco, LLC; Matrix Parent, Inc.; Mobile Acquisition Corp.; SIGOS LLC; UnwiredSoft, Inc.; We Do Technologies Americas, Inc.; Convene Networks LLC; Developing Solutions Inc.; and Phase 3 Innovations Holdings, Inc. (each, a "*Debtor*" and, collectively, the "*Debtors*") propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Article I.A.  Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan, the settlements and transactions contemplated thereby, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.        DEFINITIONS AND INTERPRETATION.

### A.    **Definitions.**

The following terms shall have the respective meanings specified below:

*1.1*        "*1145 Securities*" has the mean set forth in Section 5.6(a).

*1.2*        "*1L/2L Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of March 1, 2022 (as supplemented by that certain Intercreditor Agreement Joinder, dated as of March 15, 2023, by the First Lien Notes Agent and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among each of the Debtors, the Administrative Agents, and each other person party thereto from time to time.

*1.3*        "*Acquisition Agreement*" means a purchase and sale agreement governing a transaction pursuant to the Purchase Transaction.

*1.4*        "*AcquisitionCo*" means, in the event the Purchase Transaction occurs, a subsidiary, taxed as a corporation for U.S. federal income tax purposes and wholly-owned indirectly by Reorganized Parent, that shall acquire (directly or indirectly) all or substantially all of the Debtors' assets and/or membership interests in accordance with the Acquisition Agreement and the Purchase Transaction Documents.

*1.5*        "*Administrative Agents*" means, collectively, the First Lien Term Loan Agent, the Second Lien Agent, and the First Lien Notes Agent.

*1.6*        "*Administrative Expense Claim*" means any Claim for a cost or expense of administration incurred during the Chapter 11 Cases pursuant to section 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for good and other services and leased premises) and (b) Professional Fee Claims.

*1.7*        "*Affiliate*" shall, with respect to an Entity, have the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

1.8        "*Allowed*" means, with reference to any Claim or Interest, (a) any Claim or Interest arising on or before the Effective Date (i) as to which no objection to allowance, priority, or secured status, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed prior to the Effective Date, or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, (b) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, (c) any Claim or Interest as to which the liability of the Debtors or Reorganized Debtors, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (d) any Claim or Interest expressly allowed hereunder; *provided*, *however*, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

1.9        "*Asset*" means all rights, title, and interests of the Debtors in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible property.

1.10        "*Avoidance Action*" means any and all actual or potential Claims and Causes of Action to avoid or recover a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code and applicable non-bankruptcy law.

1.11        "*Backstop Commitments*" means the commitment by the DIP Backstop Parties to backstop the DIP Facility in accordance with the terms set forth in the DIP Term Sheet (as defined in the Restructuring Support Agreement) and Backstop Commitment Letter.

1.12        "*Backstop Commitment Letter*" the Backstop Commitment Letter attached to the Restructuring Term Sheet as Exhibit 3.

1.13        "*Backstop Premium*" means the backstop premium to be paid as consideration to the DIP Backstop Parties on the DIP Closing Date, pursuant to the terms and conditions as set forth in the DIP Term Sheet and Backstop Commitment Letter, for providing the Backstop Commitments.

1.14        "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.15        "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas Houston Division having jurisdiction over the Chapter 11 Cases.

1.16        "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

1.17        "*Business Day*" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.18        "*Cash*" means legal tender of the United States of America.

1.19        "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, proceeding, demand, right, lien, indemnity, contribution, guaranty, suit, obligation,

WEIL:\99859063\1\63808.0003

liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), choate, inchoate, reduced to judgment or otherwise whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim; and any Avoidance Actions.

1.20        "**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court in which this Plan was filed.

1.21        "**Chancery Court Litigation**" means the proceedings pending in the Delaware Court of Chancery styled as *AG Mobile Holdings, L.P. v. H.I.G. Mobile, L.P.*, Case No. 2023-1103-MTZ (Del. Ch.) and any appeals therefrom.

1.22        "**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

1.23        "**Class**" means any group of Claims or Interests classified as set forth in Article III of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.24        "**Collateral**" means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law, and any Security as such term is defined in section 101(49) of the Bankruptcy Code.

1.25        "**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order.

1.26        "**Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.27        "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.28        "**Consenting Creditor Advisors**" means the Consenting First Lien Creditor Advisors and Consenting Second Lien Creditor Advisors.

1.29        "**Consenting Creditor Group Counsels**" means the Consenting First Lien Creditor Group Counsel and the Consenting Second Lien Creditor Group Counsel.

1.30        "**Consenting Creditors**" means the Consenting First Lien Lenders and the Consenting Second Lien Lenders and any subsequent creditor that becomes party to the Restructuring Support Agreement pursuant to the terms thereof.

1.31        "**Consenting First Lien Creditor Advisors**" means, collectively: (i) the Consenting First Lien Lender Group Counsel, (ii) Houlihan Lokey, Inc. as financial advisor to the First Lien Ad Hoc Group, and

(iii) one local legal counsel per other foreign jurisdiction as the Requisite Consenting First Lien Lenders determine reasonably necessary.

1.32       "*Consenting Creditor Consent Rights*" means any applicable consent, approval, and/or consultation right of the Consenting Creditors as set forth in the Restructuring Support Agreement.

1.33       "*Consenting First Lien Creditor Group Counsel*" means Milbank LLP and Porter Hedges LLP, as legal advisors to the Consenting Creditors.

1.34       "*Consenting First Lien Lenders*" means the holders of First Lien Claims that are party to the Restructuring Support Agreement, together with their respective successors and permitted assigns.

1.35       "*Consenting Parties*" means, collectively, the Consenting Creditors and the Consenting Sponsor.

1.36       "*Consenting Second Lien Creditor Advisors*" means, collectively: (i) the Consenting Second Lien Lender Group Counsel and (ii) Greenhill & Co., as financial advisor to the Second Lien Ad Hoc Group.

1.37       "*Consenting Second Lien Creditor Group Counsel*" means Akin Gump Strauss Hauer & Feld LLP, as legal advisor to the Second Lien Ad Hoc Group.

1.38       "*Consenting Second Lien Lenders*" means the holders of Second Lien Debt Claims that are party to the Restructuring Support Agreement, together with their respective successors and permitted assigns.

1.39       "*Consenting Sponsor*" means, collectively, Matrix TopCo, L.P., H.I.G. Technology Partners A, L.P., H.I.G. Europe Middle Market LBO Fund III, L.P., H.I.G. Middle Market LBO Fund III, L.P., H.I.G. Matrix Co-Investors L.P., and H.I.G. Mobile, L.P.

1.40       "*Consenting Sponsor Counsel*" means Simpson Thacher & Bartlett LLP and one local counsel as reasonably necessary as determined by the Consenting Sponsor.

1.41       "*Cure Amount*" means as applicable, (i) the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code or (ii) the payment of Cash by the Debtors in an amount required by section 1124(2) of the Bankruptcy Code to Reinstate a Claim.

1.42       "*Cure Dispute*" means an unresolved objection regarding assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, including objections based on the appropriate Cure Amount or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or any other issue relating to an assumption of an Executory Contract or Unexpired Lease.

1.43       "*D&O Policy*" means, collectively, all insurance policies (including any "tail policy") issued or providing coverage to any of the Debtors for current or former directors', managers', and officers' liability, and all agreements, documents, or instruments related thereto.

1.44       "*Debtor or Debtors*" has the meaning set forth in the introductory paragraph of the Plan.

1.45    "***Debtors in Possession***" means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.46    "***Definitive Documents***" means, collectively: (i) the Plan and the Plan Supplement, including, without limitation, any schedules of assumed or rejected contracts, (ii) the Disclosure Statement and the Solicitation Materials and exhibits related thereto, (iii) the Disclosure Statement Approval Order, (iv) the Confirmation Order, (v) the DIP Documents, including the DIP Orders; (vi) the Exit Credit Agreement and related credit documents, (vii) the New Corporate Governance Documents; (viii) the Management Incentive Plan, if any, (ix) the Litigation Trust Agreement, (x) the Backstop Commitment Letter, and (xi) any other material, documents, instruments, schedules, or exhibits described in, related to, or contemplated in, or necessary to implement, each of the foregoing.

1.47    "***DIP Agent***" means Acquiom Agency Services LLC and Seaport Loan Products LLC,, in their capacities as co-administrative agents, and Acquiom Agency Services LLC, in its capacity as collateral agent under the DIP Credit Agreement, their successors, permitted assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

1.48    "***DIP Backstop Parties''*** means certain First Lien Lenders set forth in Schedule 1 to the Restructuring Support Agreement that have provided the Backstop Commitments.

1.49    "***DIP Claims***" means all Claims held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Credit Agreement, the Backstop Commitment Letter, the DIP Facility, or the DIP Orders, including Claims for all principal amounts outstanding, and any and all fees, premiums, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents, which, for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Orders.

1.50    "***DIP Closing Date***" means the Closing Date as defined in the DIP Credit Agreement.

1.51    "***DIP Commitment***" means the commitment to provide the Debtors new money in Cash in the amounts contemplated under the DIP Orders.

1.52    "***DIP Credit Agreement***" means that certain *Debtor-In-Possession Credit Agreement* dated on or about July 23, 2024, by and among the Debtors, the DIP Agent and the DIP Lenders, as approved by the DIP Orders, as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

1.53    "***DIP Documents***" means the DIP Motion, the DIP Orders, the DIP Credit Agreement, and any related credit documents.

1.54    "***DIP Facility***" or "***DIP Financing***" means a superpriority, senior-secured, priming debtor-in-possession credit facility consisting of (i)(x) $60,000,000 of new-money DIP Loans and (ii)(y) subject to the DIP Term Sheet and paragraph 2(c) of the DIP Orders, a roll-up of First Lien Claims in the aggregate principal amount of $100,000,000, and (ii) the Backstop Premium, which shall be paid in the form of Tranche B Loans (as defined in the DIP Term Sheet) on the DIP Closing Date.

1.55    "***DIP Lenders***" means the lenders from time to time party to the DIP Credit Agreement.

1.56    "***DIP Loans***" means the loans provided under the DIP Facility.

1.57        "*DIP Motion*" means the motion seeking approval by the Bankruptcy Court of the DIP Facility and entry of the DIP Orders, including any declarations and exhibits submitted in support thereof.

1.58        "*DIP Obligations*" has the meaning set forth in the DIP Orders.

1.59        "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

1.60        "*DIP Term Sheet*" means the DIP Term Sheet attached as Exhibit 1 to the Restructuring Term Sheet.

1.61        "*Disallowed*" means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of the Plan not to be Allowed.

1.62        "*Disbursing Agent*" means any Entity (including any applicable Debtor or Reorganized Debtor, as applicable, if it acts in such capacity) in its capacity as a disbursing agent under Article VI of the Plan.

1.63        "*Disclosure Statement*" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.64        "*Disputed*" means with respect to a Claim, (a) any Claim, which is disputed under Section 7.1 of the Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (b) any Claim, proof of which was required to be timely and proper but as to which no such Proof of Claim was filed; (c) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent, or disputed, and as to which no request for payment or Proof of Claim has been filed; or (d) any Claim that is otherwise disputed by any of the Debtors or the Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

1.65        "*Distribution Record Date*" means the date that is fifteen (15) days prior to the anticipated Effective Date of the Plan, or such other time as agreed between the Debtor and the Requisite Consenting First Lien Lenders.

1.66        "*Effective Date*" means the date on which: (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent specified in Article IX have been satisfied or waived in accordance with the terms of the Plan.  Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

1.67        "*Employee Arrangements*" means all employment or employee related arrangements, agreements, programs, and policies, and all compensation and benefits plans, severance, policies, award letters, key employee retention agreements, and compensatory programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans (including equity and equity-based plans), welfare benefits plans, and life and accidental death and dismemberment insurance plans.

1.68        "*Entity*" means an individual, corporation, partnership, limited liability partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government unit (as defined in section 101(27) of the Bankruptcy Code) or any political subdivision thereof, or other person (as defined in section 101(41) of the Bankruptcy Code) or other entity.

WEIL:\99859063\1\63808.0003

1.69        "*Estate or Estates*" means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.70        "*Exculpated Parties*" means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: the Debtors and their Estates.

1.71        "*Executory Contract*" means a contract to which one or more Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.72        "*Existing Parent Equity Interests*" means Interests in Intermediate as of the Petition Date.

1.73        "*Exit Administrative Agent*" means the agent to the Exit Credit Agreement in its capacities as administrative agent and collateral agent thereunder.

1.74        "*Exit Credit Agreement*" means that certain Credit Agreement to be entered into by the Reorganized Debtors, the Exit Administrative Agent and the Exit Facility Lenders in accordance with the Exit Facility Term Sheet (as defined in the Restructuring Support Agreement).

1.75        "*Exit Facility Documents*" means, collectively, the Exit Credit Agreement and all other loan documents, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, amended and restated, modified, or supplemented from time to time).

1.76        "*Exit Facility Lenders*" means the lenders who are time to time party to the Exit Credit Agreement.

1.77        "*Exit Term Loan Facility*" the senior-secured, first lien term loan facility on the terms set forth in the Exit Credit Agreement.

1.78        "*Exit Term Loans*" means the loans to be provided under the Exit Term Loan Facility.

1.79        "*Final DIP Order*" means the order of the Bankruptcy Court approving the DIP Motion on a final basis.

1.80        "*Final Order*" means as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment was appealed or from which certiorari could be sought, or any request for new trial, reargument, or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; provided, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.81        "*First Lien Ad Hoc Group*" means the ad hoc group of First Lien Lenders represented by the Consenting First Lien Creditor Advisors.

7

1.82 "*First Lien Administrative Agent*" means, collectively, the First Lien Term Loan Agent and the First Lien Notes Agent.

1.83 "*First Lien Claims*" means the First Lien Debt Claims and the First Lien Notes Claims.

1.84 "*First Lien Credit Agreement*" means that certain *First Lien Credit Agreement*, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented, or modified from time to time prior to the date hereof, by and among, Holdings, Matrix Parent, the First Lien Lenders, and the First Lien Term Loan Agent.

1.85 "*First Lien Debt Claims*" means any Claim arising from or in connection with the First Lien Term Loans and First Lien Revolving Loans under the First Lien Credit Agreement, including any accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto, less the amount of any First Lien Term Loans and/or First Lien Revolving Loans converted into Rolled-Up DIP Loans.

1.86 "*First Lien Lenders*" means the lenders who are from time to time party to the First Lien Credit Agreement.

1.87 "*First Lien Lender Group*" means the ad hoc group of First Lien Lenders represented by the Consenting First Lien Lender Advisors.

1.88 "*First Lien Notes Agent*" means the notes agent for the Noteholders under the Note Purchase Agreement.

1.89 "*First Lien Notes Claims*" means any Claim arising from or in connection with the notes issued under the Note Purchase Agreement, including any accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto, less the amount of any indebtedness under the Note Purchase Agreement converted into Rolled-Up DIP Loans.

1.90 "*First Lien Revolving Loans*" means revolving credit facility loans arising under the First Lien Credit Agreement in the aggregate principal amount of $53 million.

1.91 "*First Lien Term Loan Agent*" means the administrative and collateral agent under the First Lien Credit Agreement.

1.92 "*First Lien Term Loans*" means term loans arising under the First Lien Credit Agreement in the aggregate principal amount of approximately $381 million.

1.93 "*General Unsecured Claims*" means any Claim that is not an Other Secured Claim, Priority Tax Claim, Priority Non-Tax Claim, Administrative Expense Claim, DIP Claim, First Lien Claim, Second Lien Debt Claim, an Intercompany Claim, a Section 510(b) Claim, or a Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code, or other Claim paid in full prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court.

1.94 "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.95 "*H.I.G.*" means H.I.G. Capital, L.L.C., a Delaware limited liability company.

1.96 "*Holdings*" means Matrix Holdco, LLC, a Delaware limited liability company.

WEIL:\99859063\1\63808.0003

1.97      "***Impaired***" means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.98      "***Indemnification Obligation*** has the meaning set forth in <u>Section 8.5</u>.

1.99      "***Intercompany Claim***" means any Claim against a Debtor held by another Debtor.

1.100      "***Intercompany Interest***" means an Interest in a Debtor other than Intermediate.

1.101      "***Intercreditor Agreements***" means, collectively, the Pari Passu Intercreditor Agreement and the 1L/2L Intercreditor Agreement.

1.102      "***Intermediate***" means Matrix Intermediate, Inc., a Delaware corporation.

1.103      "***Interests***" means any (i) equity in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instruments evidencing an ownership interest, or equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, including, without limitation, equity-based employee incentives, grants, stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, or other instruments issued to employees of the Debtors, to acquire any such interests in a Debtor that existed immediately before the Effective Date, and (ii) Section 510(b) Claim against a Debtor.

1.104      "***Interim DIP Order***" means the order of the Bankruptcy Court approving the DIP Motion on an interim basis.

1.105      "***Insured Claim***" means any Claim or portion of a Claim that is, or may be, insured under any insured policy.

1.106      "***Lien***" has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.107      "***Litigation Proceeds Term Sheet***" means that certain Litigation Proceeds Term Sheet agreed upon by and between the Debtors, the Consenting Creditors, and the Consenting Sponsor, including as Exhibit 5 to the Restructuring Term Sheet.

1.108      "***Litigation Trust***" means the trust established for the benefit of the Litigation Trust Beneficiaries on the Effective Date pursuant to the terms herein and the Litigation Trust Agreement, whereby the parties thereto shall contribute the Trust Causes of Action held for the benefit of the Litigation Trust Beneficiaries.

1.109      "***Litigation Trust Agreement***" means that certain Litigation Trust Agreement to be entered into by the Consenting Sponsor, the Reorganized Debtors, as applicable, and the Consenting Creditors which shall govern (i) the management of the Litigation Trust and the respective rights, powers, and obligations of the Litigation Trust Beneficiaries and (ii) be consistent with the Litigation Proceeds Term Sheet.

1.110      "***Litigation Trust Beneficiaries***" means the beneficiaries of the Litigation Trust.

1.111      "***Local Bankruptcy Rules***" means the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas.

1.112      "***Management Incentive Plan***" has the meaning set forth in <u>Section 5.10</u> of the Plan.

9

1.113     "***Management Services Agreements***" means, collectively: (i) that certain Professional Services Agreement, dated March 1, 2022, by and between Mobile Acquisition Corp. and H.I.G., and (ii) that certain Transaction Services Agreement, dated March 1, 2022, by and between the Mobile Acquisition Corp. and H.I.G..

1.114     "***Matrix Parent***" means Matrix Parent, Inc., a Delaware corporation.

1.115     "***Mobile Acquisition Corp.***" means Mobile Acquisition Corp., a Delaware corporation.

1.116     "***Mobileum***" means Mobilem Inc., a Delaware corporation.

1.117     "***New Board***" means the board of directors or managers of Reorganized Parent.

1.118     "***New Corporate Governance Documents***" means the certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement, or other similar organizational or formation documents, as applicable, of any of the Reorganized Debtors..

1.119     "***New Equity Interests***" means the shares of common stock of Reorganized Parent to be issued, transferred, or distributed (a) on the Effective Date, (b) under the Management Incentive Plan, (c) as otherwise permitted pursuant to the Plan and the New Corporate Governance Documents.

1.120     "**Noteholders**" means the holders from time to time party to the Note Purchase Agreement.

1.121     "***Note Purchase Agreement***" means that *Note Purchase Agreement*, dated as of March 15, 2023 as amended, restated, amended and restated, supplement, or modified from time to time prior to the date hereof, by and among, Holdings, Matrix Parent, the Noteholders and the First Lien Notes Agent.

1.122     "***Other Secured Claim***" means a Secured Claim, other than an Administrative Expense Claim, a DIP Claim, a Priority Tax Claim, a First Lien Claim, or a Second Lien Debt Claim.

1.123     "***Pari Passu Intercreditor Agreement***" means that certain Pari Passu Intercreditor Agreement, dated as of March 15, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof) by and among each of the Debtors, First Lien Term Loan Agent, the First Lien Notes Agent, and each other person party thereto from time to time.

1.124     "***Person***" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

1.125     "***Petition Date***" means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

1.126     "***Plan***" means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.127     "***Plan Documents***" means any of the documents, other than the Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement.

1.128    "***Plan Supplement***" means a supplemental appendix to the Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and Bankruptcy Rules, which shall include, but not be limited to: (a) the New Corporate Governance Documents; (b) the Exit Credit Agreement; (c) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (d) the Restructuring Transactions Exhibit; (e) the Schedule of Retained Causes of Action, (f) the Schedule of Rejected Contracts, if applicable, (g) the Litigation Trust Agreement; (h) the Schedule of Excluded Parties; *provided, that,* through the Effective Date, the Debtors shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the Restructuring Support Agreement and subject to the consent rights thereunder.

1.129    "***Prerequisite Condition***" shall have the meaning ascribed to such term in Section 9.2 of the Plan.

1.130    "***Priority Non-Tax Claim***" means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.131    "***Priority Tax Claim***" means any Secured Claim or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.132    "***Professional***" means an Entity (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code that are not Restructuring Fees and Expenses.

1.133    "***Professional Fee Claims***" means all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.

1.134    "***Professional Fee Claims Estimate***" means the aggregate unpaid Professional Fee Claims as estimated in accordance with Section 2.7 of the Plan.

1.135    "***Professional Fee Escrow***" means an escrow account established and funded pursuant to Section 2.6 of the Plan.

1.136    "***Proof of Claim***" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

1.137    "***Pro Rata Share***" means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interest in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.138    "***Purchase Transaction***" means the transactions so defined in the Restructuring Transactions Exhibit (including any amendments thereto), pursuant to which AcquisitionCo acquires substantially all of the assets of the Debtors in the event the Debtors elect to pursue the Purchase Transaction.

1.139        "*Purchase Transaction Documents*" means (i) the Acquisition Agreement, and (ii) any other documents setting forth the definitive terms of the Purchase Transaction, in each case in form and substance reasonably acceptable to the Requisite Consenting First Lien Lenders and the Debtors.

1.140        "*Purchase Transaction Election Date*" means the date that is seven (7) days prior to the date the Confirmation Hearing.

1.141        "*Reinstate, Reinstated, or Reinstatement*" means leaving a Claim Unimpaired under the Plan.

1.142        "*Related Fund*" means, with respect to any holder of Allowed Claims, any Affiliates (including at the institutional level) of such holder or any fund, account (including any separately managed accounts) or investment vehicle that is controlled, managed, advised or sub-advised by such holder, an Affiliate of such holder, or by the same investment manager, advisor or subadvisor as such holder.

1.143        "*Related Parties*" means with respect to a Person, that Person's current and former Affiliates, and such Person's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, limited and general partners, predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, advisory board members, financial advisors, partners, limited partners, general partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, investment managers, investments advisors (including, with respect to the Consenting Sponsor, H.I.G.), representatives, and other professionals, and such Person's respective heirs, executors, estates, and nominees, each in their capacity as such; *provided*, *however*, the Entities or individuals, as applicable, listed on the Schedule of Excluded Parties shall not constitute Related Parties nor Released Parties.

1.144        "*Released Parties*" means, collectively: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Consenting Creditors; (iv) the Consenting Sponsor; (v) the DIP Agent; (vi) the DIP Lenders; (vii) the DIP Backstop Parties and (viii) with respect to each of the foregoing Persons in clauses (i) through (vii), all Related Parties; *provided*, *however*, the Entities or individuals, as applicable, listed on the Schedule of Excluded Parties shall not constitute Related Parties nor Released Parties.  Notwithstanding the foregoing, any Person that opts out of the releases set forth in Section 10.6(b) of the Plan shall not be deemed a Released Party thereunder.

1.145        "*Releasing Parties*" means, collectively, and in each case solely in their capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Consenting Creditors; (iv) the Consenting Sponsor; (v) the DIP Agent; (vi) the DIP Lenders; (vii) the DIP Backstop Parties; (viii) the Released Parties; (ix) with respect to each of the foregoing Persons in clauses (i) through (viii), all Related Parties; (x) the Holders of all Claims or Interests that vote to accept the Plan; (xi) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth herein; (xii) the Holders of all Claims or Interests that vote, or are deemed, to reject the Plan or that are presumed to accept the Plan but do not opt out of granting the releases set forth herein; and (xiii) the Holders of all Claims and Interests and all Other Beneficial Owners that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out.

1.146        "*Reorganized Debtors*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date (including, after the closing of the Purchase Transaction, if applicable, AcquisitionCo).

WEIL:\99859063\1\63808.0003

1.147          "*Reorganized Parent*" means from and after the Effective Date, the Entity identified as the Reorganized Parent in the Restructuring Transactions Exhibit, which could be (i) Intermediate as reorganized pursuant to the Plan, (ii) another Reorganized Debtor or (iii) the corporation (or limited liability company or other Entity taxed as a corporation for U.S. federal income tax purposes, as the case may be) that is the parent of the Entities holding, owning or acquiring all, or substantially all, of the assets of the Debtors pursuant to the Purchase Transaction.

1.148          "*Requisite Consenting First Lien Lenders*" shall have the meaning ascribed to such term in the Restructuring Support Agreement.

1.149          "*Requisite Consenting Second Lien Lenders*" shall have the meaning ascribed to such term in the Restructuring Support Agreement.

1.150          "*Restructuring Fees and Expenses*" means all reasonable and documented fees, costs and expenses of (i) each of the Consenting Creditor Advisors, in each case, (A) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the Restructuring Support Agreement, this Plan, and/or any of the other Definitive Documents or Plan Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing and, to the extent applicable, (B)(x) consistent with any engagement letters or fee reimbursement letters entered into between the Debtors, on the one hand, and the applicable Consenting Creditor Advisors, on the other hand (as supplemented and/or modified by this Agreement), or (y) as provided in the DIP Orders and/or the Confirmation Order; *provided*, *however*, the Restructuring Fees and Expenses of the Second Lien Lender Advisors shall be capped at $2.5 million for all fees and expenses incurred following the parties execution of the Restructuring Support Agreement, and (ii) the Consenting Sponsor Counsel, in an amount not to exceed $750,000, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the Restructuring Support Agreement and/or any of the other Definitive Documents or Plan Documents, and/or the transactions contemplated thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing.

1.151          "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of July 23, 2024, by and among the Debtors and the Consenting Parties, including all exhibits, annexes, and schedules attached thereto (as may be amended, supplemented or modified from time to time and including in accordance with the terms thereof).

1.152          "*Restructuring Term Sheet*" means the Restructuring Term Sheet attached as Exhibit A to the Restructuring Support Agreement.

1.153          "*Restructuring Transactions*" means one or more transactions premised on a debt-for-equity exchange pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, in each case, with the reasonable consent of the Requisite Consenting First Lien Lenders, including: (i) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree, including the documents comprising the Plan Supplement; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, amalgamation, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) with the reasonable consent of the Requisite Consenting First Lien Lenders, such other transactions that are required to effectuate the Restructuring

Transactions Exhibit in a tax efficient manner for the Debtors and Reorganized Debtors, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (v) the execution, delivery, and filing, if applicable, of the Definitive Documents and Plan Documents; (vi) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order or rule; and (vii) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

1.154    "***Restructuring Transactions Exhibit***" means the summary of transaction steps to complete the restructuring contemplated by the Plan included in the Plan Supplement.

1.155    "***Rolled-Up DIP Loans***" means subject to the DIP Term Sheet and paragraph 2(c) of the DIP Orders, the $100,000,000 of First Lien Claims rolled-up into the DIP Facility pursuant to the DIP Documents.

1.156    "***RWI Policy***" means the representations and warranties policy no. ET111-003-478 issued to Matrix Parent with a policy term of March 1, 2022 to March 1, 2025.

1.157    "***Schedule of Excluded Parties***" means the Schedule of Excluded Parties to be included in the Plan Supplement.

1.158    "***Schedule of Rejected Contracts***" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time.

1.159    "***Schedule of Retained Causes of Action***" means a schedule of Causes of Action to be retained by the Reorganized Debtors as set forth in the Plan Supplement and which, for the avoidance of doubt, will include all Causes of Action, including the Causes of Action, underlying the Superior Court Litigation and Chancery Court Litigation, against the Parties listed in the Schedule of Excluded Parties.

1.160    "***Schedules***" means any schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

1.161    "***Second Lien Ad Hoc Group***" means the ad hoc group of Second Lien Lenders represented by the Consenting Second Lien Creditor Advisors.

1.162    "***Second Lien Agent***" means the administrative agent and collateral agent for the Second Lien Lenders pursuant to the Second Lien Credit Agreement.

1.163    "***Second Lien Credit Agreement***" means that certain Second Lien Credit Agreement, dated as of March 1, 2022, as amended, restated, amended and restated, supplemented, or modified from time to time prior to the date hereof, by and among, Holdings, Matrix Parent, the Second Lien Lenders and the Second Lien Agent.

1.164    "***Second Lien Debt Claims***" means any Claim arising from or in connection to the second lien term loans under the Second Lien Credit Agreement, including any accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto.

1.165    "***Second Lien Lenders***" means the lenders from time to time party to the Second Lien Credit Agreement.

1.166     "***Section 510(b) Claims***" mean any Claim (i) arising from the rescission of a purchase or sale of an Interest of any Debtor or an affiliate of any Debtor (including the Existing Parent Equity Interests); (ii) for damages arising from the purchase or sale of such Interest; or (iii) for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such a Claim.

1.167     "***Secured Claim***" means a Claim (a) secured by a Lien on Collateral to the extent of the value of such Collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code exceeds the value of the Claim, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code; *provided*, *that*, nothing in this definition shall alter the terms of any subordination pursuant to the Intercreditor Agreements or section 510 of the Bankruptcy Code.

1.168     "***Securities Act***" has the meaning set forth in <u>Section 5.6(a)</u>.

1.169     "***SIR***" means self-insured retention or similar deductible.

1.170     "***Solicitation Materials***" means materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan.

1.171     "***Subsequent Condition***" shall have the meaning ascribed to such term in <u>Section 9.2</u> herein.

1.172     "***Superior Court Litigation***" means the proceedings pending in the Delaware Superior Court styled as *Matrix Parent, Inc. v. Audax Management Co.*, Case No. N23C-10-212 MAA CCLD (Del. Super.) and any appeals therefrom.

1.173     "***Tax Code***" means the Internal Revenue Code of 1986, as amended from time to time.

1.174     "***Tranche B Loans***" has the meaning set forth in the DIP Term Sheet.

1.175     "***Trust Causes of Action***" means all right and interest that the parties to the Litigation Trust Agreement hold or may hold in connection with the alleged manipulation of revenue at the Debtors by certain Debtor personnel, including the Superior Court Litigation.

1.176     "***Unexpired Lease***" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.177     "***Unimpaired***" means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.178     "***U.S. Trustee***" means the United States Trustee.

B.     **Interpretation; Application of Definitions and Rules of Construction**.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not

limit or otherwise affect the provisions hereof.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified herein, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;  (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (6) any docket number references in the Plan shall refer to the docket number of any document filed with the Bankruptcy Court in the Chapter 11 Cases; (7) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (8) except as otherwise provided herein, any reference to a document or agreement that is to be issued or entered into that is dependent on an election to be made pursuant to the Plan or an event occurring shall be deemed to be followed by the words "if applicable"; (9) any immaterial effectuating provisions may be interpreted by the Debtors, or after the Effective Date, the Reorganized Debtors, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, subject to the reasonable consent of the Requisite Consenting First Lien Lenders; *provided*, that any effectuating provision that has an economic impact will not be considered "immaterial"; and (10) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.  To the extent that the treatment, allowance, or disallowance of any Claim herein is interpreted as a claim objection, the Plan shall be deemed a Claim objection to such Claim.

C.     **Computation of Time**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day but shall be deemed to have been completed as of the required date.

D.     **Reference to Monetary Figures**.

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

E.     **Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

F.     **Controlling Document**.

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or the Confirmation Order).  In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*,

*that*, if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan.

      G.      **Consultation, Information, Notice, and Consent Rights**.

      Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (without enhancement or expansion thereof), including any Consenting Creditor Consent Rights, with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents and Plan Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.  Any and all consent rights of the Requisite Consenting First Lien Lenders, the Requisite Consenting Second Lien Lenders, and the Consenting Sponsor referenced in the Plan or the Restructuring Support Agreement, to the extent given, not given, or otherwise withheld, may be communicated by email transmission by counsel to the consenting party.

**ARTICLE II.    ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS.**

      2.1.      *Administrative Expense Claims*.

      Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to different treatment, each holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim) shall receive, in full and final satisfaction of such Claim, (i) Cash in an amount equal to such Allowed Administrative Expense Claim on the Effective Date or as soon as practicable thereafter or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code and as agreed to by the Debtors and the Requisite Consenting First Lien Lenders; *provided*, *however*, Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders, course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

      2.2.      *Professional Fee Claims*.

      (a)      All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall (i) file, on or before the date that is forty-five (45) days after the Effective Date (unless extended by the Reorganized Debtors), their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claims.

      (b)      The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

2.3.    ***Priority Tax Claims***.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, on the earlier of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtor or the Reorganized Debtors, as applicable, (i) Cash in an amount equal to such Allowed Priority Tax Claim or (ii) such other treatment reasonably acceptable to the Debtors or Reorganized Debtors (as applicable) consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code and as agreed to by the Requisite Consenting First Lien Lenders; *provided that*, with the consent of the Requisite Consenting First Lien Lenders, the Debtors and the Reorganized Debtors, as applicable, reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium.

2.4.    ***DIP Claims***.

Subject to the DIP Term Sheet and paragraph 2(c) of the DIP Orders, on the Effective Date, each holder of an Allowed DIP Claim shall receive, in full and final satisfaction of such Allowed DIP Claim:   (a)(i) in exchange for the principal amount of such Allowed DIP Claim, excluding any such principal amount on account of the Tranche B Loans, Exit Term Loans, (ii) New Equity Interests in exchange for the amount of such holder's Allowed DIP Claim on account of the such holder's principal amount of Tranche B Loans, subject to dilution by the Management Incentive Plan, and (iii) payment in full in cash of all accrued and unpaid interest and other obligations on account of the DIP Loans (excluding the obligations to pay the principal amount of the DIP Loans paid pursuant to clauses (i) and (ii) hereof), or (b) such other treatment as agreed to by the Debtors and such DIP Lender. On the Effective Date, the DIP Facility and all DIP Documents shall be deemed cancelled, all Liens granted to secure the Allowed DIP Claims shall be automatically terminated and of no further force and effect, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders, and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders.  The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable (and at the Debtors' or Reorganized Debtors' sole cost and expense), or the Debtors or the Reorganized Debtors shall be permitted to file any applicable releases or terminations.

2.5.    ***Restructuring Fees and Expenses***.

The Restructuring Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date activities, after the Effective Date), shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval.   All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Fees and Expenses.  On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Fees and Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

WEIL:\99859063\1\63808.0003

2.6.     ***Professional Fee Escrow***.

(a)     As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Claims Estimate, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the DIP Loans, Exit Term Loans, or otherwise).  The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors, their Estates, or the Reorganized Debtors, and (ii) shall be held in trust for the Professionals; *provided*, *that*, funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors.  Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; *provided*, *that*, the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow, but subject to any order of the Bankruptcy Court capping the amount of any such fees.

(b)     If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow from the Debtors' Estates or Reorganized Debtors, as applicable, without any further action or order of the Bankruptcy Court, subject to any order of the Bankruptcy Court capping the amount of any such fees.

(c)     Any objections to Professional Fee Claims shall be served and filed no later than twenty-one (21) days after filing of the final applications for compensation or reimbursement.

2.7.     ***Professional Fee Claims Estimate***

Each Professional shall estimate in good faith its unpaid Professional Fee Claim and other unpaid fees and expenses incurred in rendering services to the Debtors, before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors no later than five (5) Business Days prior to the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

2.8.     ***Post-Effective Date Fees and Expenses***

(a)     Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash all reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan incurred by the Debtors or the Reorganized Debtors, as applicable.

(b)     Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE III.        CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1.        *Classification in General*.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Section 3.7 herein.

### 3.2.        *Formation of Debtor Groups for Convenience Only*.

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making distributions in respect of Claims and Interests under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

### 3.3.        *Summary of Classification*.

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, DIP Claims, and Restructuring Fees and Expenses have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Priority Non-Tax Claims | Unimpaired | No (Presumed to Accept) |
| 3 | First Lien Claims | Impaired | Yes |
| 4 | Second Lien Debt Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Unimpaired | No (Presumed to Accept) |
| 6 | Intercompany Claims | Unimpaired / Impaired | No (Presumed to Accept / Deemed to Reject) |
| 7 | Intercompany Interests | Unimpaired / Impaired | No (Presumed to Accept / Deemed to Reject) |
| 8 | Existing Parent Equity Interests | Impaired | No (Deemed to Reject) |

### 3.4.        *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in the Plan, nothing under the Plan shall affect, diminish, or impair the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against,

any such Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired (including, for the avoidance of doubt, any Claim that is Reinstated) by the Plan.  Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim that is otherwise Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

3.5.     *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan of such Debtor for purposes of voting to accept or reject such Debtor's Plan, and disregarded for purposes of determining whether such Debtor's Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.6.     *No Waiver.*

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

3.7.     *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

**ARTICLE IV.     TREATMENT OF CLAIMS AND INTERESTS.**

4.1.     *Other Secured Claims (Class 1)*

(a)     *Classification*:  Class 1 consists of the Other Secured Claims.  To the extent that Other Secured Claims are secured by different Collateral or different interests in the same Collateral, such Claims shall be treated as *separate* subclasses of Class 1 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(b)     *Treatment*:  The legal, equitable, and contractual rights of the holders of Other Secured Claims are unaltered by the Plan.  On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the sole option of the Debtors or Reorganized Debtors (as applicable), with the consent of the Requisite Consenting First Lien Lenders, each such holder shall receive (i) payment in full in Cash, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)     *Impairment and Voting*:  Class 1 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

Bankruptcy Code.  Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

### 4.2.     *Priority Non-Tax Claims (Class 2)*

(a)     *Classification*:  Class 2 consists of Priority Non-Tax Claims.

(b)     *Treatment*:  The legal, equitable, and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan.  On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors or Reorganized Debtors (as applicable), with the consent of the Requisite Consenting First Lien Lenders, each such holder shall receive (i) payment in full in Cash, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)     *Impairment and Voting*:  Class 2 is Unimpaired, and the holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

### 4.3.     *First Lien Claims (Class 3)*

(a)     *Classification*:  Class 3 consists of First Lien Claims.

(b)     *Allowance*:  The First Lien Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code in the aggregate amount of $506.6 million.  Holders of First Lien Claims and the First Lien Administrative Agent shall not be required to file proofs of Claim on account of their First Lien Claims.

(c)     *Treatment*:  On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed First Lien Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed First Lien Claim, each such holder shall receive, in accordance with the Restructuring Transactions, its Pro Rata Share of 96.5% of the New Equity Interests subject to dilution by any New Equity Interests issued on account of the Management Incentive Plan and the Tranche B Loans.

(d)     *Impairment and Voting*:  Class 3 is Impaired, and the holders of First Lien Claims in Class 3 are entitled to vote to accept or reject the Plan.

### 4.4.     *Second Lien Debt Claims (Class 4)*

(a)     *Classification*:  Class 4 consists of Second Lien Debt Claims.

(b)     *Treatment*:  On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed Second Lien Debt Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Second Lien Debt Claim, each such holder shall receive in accordance with the Restructuring Transactions its Pro Rata Share of 3.5% of the New Equity

Interests subject to dilution by the Management Incentive Plan and the New Equity Interests issued on account of the Tranche B Loans.

(c)    *Impairment and Voting.*  Class 4 is Impaired, and the holders of Second Lien Debt Claims are entitled to vote to accept or reject the Plan.

### 4.5.    *General Unsecured Claims (Class 5)*

(a)    *Classification*:  Class 5 consists of General Unsecured Claims.

(b)    *Treatment*:  The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on and after the Effective Date the Reorganized Debtors shall continue to pay each Allowed General Unsecured Claim or dispute each General Unsecured Claim in the ordinary course of business.

(c)    *Impairment and Voting*:  Class 5 is Unimpaired, and the holders of General Unsecured Claims in Class 5 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

### 4.6.    *Intercompany Claims (Class 6)*

(a)    *Classification*:  Class 6 consists of Intercompany Claims.

(b)    *Treatment*:  Except as provided for in Section 5.2 of this Plan, on or as soon as reasonably practicable after the Effective Date, all Intercompany Claims will be adjusted, Reinstated, or discharged, as determined by the Debtors or the Reorganized Debtors, as applicable, in their sole discretion, or as provided in the Restructuring Transactions Exhibit.

(c)    *Impairment and Voting*:  Class 6 is either (i) Unimpaired, and the holders of Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or (ii) Impaired, and such holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

### 4.7.    *Intercompany Interests (Class 7)*

(a)    *Classification*:  Class 7 consists of Intercompany Interests.

(b)    *Treatment*:  Except as provided for in Section 5.2 of this Plan, on or as soon as reasonably practicable after the Effective Date, all Intercompany Interests will be adjusted, Reinstated, or discharged as determined by the Debtors or the Reorganized Debtors, as applicable, in their sole discretion, or as provided in the Restructuring Transactions Exhibit; *provided*, *however*, Section 510(b) Claims will be cancelled, released, or extinguished pursuant to Section 4.8.

(c)    *Impairment and Voting*:  Class 7 is either (i) Unimpaired, and holders of Intercompany Interests in Class 7 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or (ii) Unimpaired, and such holders of Intercompany Interests

WEIL:\99859063\1\63808.0003

are conclusively deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

4.8.    ***Existing Parent Equity Interests (Class 8)***

(a)    *Classification*:  Class 8 consists of Existing Parent Equity Interests.

(b)    *Treatment*:  On the Effective Date, Existing Parent Equity Interests shall be cancelled, released, and extinguished and will be of no further force and effect.

(c)    *Impairment and Voting*:  Class 8 is Impaired and its holders are not receiving or retaining any property under the Plan; accordingly, the holders of Existing Parent Equity Interests in Class 8 are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Existing Parent Equity Interest are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing Parent Equity Interests.

**ARTICLE V.    MEANS FOR IMPLEMENTATION.**

5.1.    ***Compromise and Settlement of Claims, Interests, and Controversies.***

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Claim or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest, including pursuant to the transactions set forth in the Restructuring Transactions Exhibit.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise, settlement and transactions are in the best interests of the Debtors, their Estates, and holders of Allowed Claims and Allowed Interests, and is fair, equitable, and within the range of reasonableness.  Subject to the provisions of this Plan governing distributions, all distributions made to holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.  As consideration for, among other things, the releases provided pursuant to this Plan, the Consenting Parties have agreed pursuant to the Restructuring Support Agreement, for the benefit of the Debtors and the Debtors' Estate, to make contributions to enable the implementation of this Plan, such contributions being fundamentally necessary to the implementation of this Plan.  The contributions of the Consenting Parties include, but are not limited to, the following: (i) certain Consenting First Lien Lenders have agreed to backstop the DIP Facility and (ii) the Consenting Sponsor has agreed to enter into the Litigation Trust Agreement including the distribution of litigation proceeds as detailed therein in exchange for the releases set forth in Section 10.6.

5.2.    ***Intercreditor Agreements***

Except as expressly provided in Article IV herein, all rights, entitlements, and distributions shall be subject to the Intercreditor Agreements, the priorities and payment waterfalls of which shall be incorporated, preserved, and enforced by the Plan, the Debtors, the Consenting Creditors, and, as applicable, the Reorganized Debtors, pursuant to section 510 of the Bankruptcy Code.

5.3.    ***Continued Corporate Existence; Effectuating Documents; Corporate Action; Restructuring Transactions***.

(a)    Except as otherwise provided in the Plan, or the Plan Documents, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the respective certificate of incorporation, certificate of formation, bylaws or operating agreement (or other analogous formation, constituent, or governance documents) in effect before the Effective Date or the New Corporate Governance Documents or other applicable corporate governance documents, except to the extent such certificate of incorporation, certificate of formation, bylaws or operating agreement (or other analogous formation, constituent, or governance documents) are amended by the Plan or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law).

(b)    Notwithstanding anything herein to the contrary, on or about the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall take all actions set forth in and contemplated by the Restructuring Transactions Exhibit, and enter into any transaction, including the Purchase Transaction, if applicable, and may take all actions as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary or appropriate to effectuate the Plan, including the Restructuring Transactions.

(c)    Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) the assumption of Executory Contracts and Unexpired Leases as provided herein, (ii) the selection of managers, directors, or officers for the Reorganized Debtors, (iii) the distribution of the New Equity Interests, (iv) the entry into or execution of the Exit Credit Agreement and the Exit Facility Documents as applicable, in each case, including any other definitive documentation related thereto, (v) implementation of, and performance under, the Management Incentive Plan in accordance with <u>Section 5.10</u> hereof, and (vi) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.  For the avoidance of doubt, the foregoing does not extend to any such actions required under applicable law by AcquisitionCo and any affiliate of AcquisitionCo (or any equity holder therein) prior to the closing of the Purchase Transaction.

(d)    The Confirmation Order shall and shall be deemed to, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, authorize and direct parties, as applicable, among other things, to perform all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions (other than, in the event of the Purchase Transaction, any such actions required under applicable law by AcquisitionCo and any affiliate of AcquisitionCo (or any equity holder therein) prior to the closing of the Purchase Transaction).

(e)    Each officer, director, or manager of the Debtors is (and each officer, director, or manager of the Reorganized Debtors shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors or the Reorganized Debtors) except

for those expressly required pursuant to the Plan.  For the avoidance of doubt, the foregoing does not extend to any actions required under applicable law by AcquisitionCo and any affiliate of AcquisitionCo prior to the closing of the Purchase Transaction.

(f)　　All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan or the Restructuring Transactions shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors or by any other stakeholder, and with like effect as though such action had been taken unanimously by the stockholders, directors, managers, or officers, as applicable, of the Debtors or Reorganized Debtors.

(g)　　In the event the Debtors, on or before the Purchase Transaction Election Date, elect to pursue the Purchase Transaction, the Debtors shall implement the Purchase Transaction as set forth herein and in the Restructuring Transactions Exhibit.

### 5.4.　　*Intercompany Interests; Corporate Reorganization.*

To the extent Reinstated under the Plan, on the Effective Date, the Intercompany Interests (a) shall be Reinstated for the ultimate benefit of the holders of Claims that receive New Equity Interests under the Plan, and their holders shall receive no recovery or distribution, and (b) without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or stockholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Reinstated Intercompany Interests shall be deemed to be in full force and effect.

### 5.5.　　*Exit Credit Agreement*.

(a)　　On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the Exit Facility Documents without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the holders of Claims or Interests.  The Exit Facility Documents shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan, or the Confirmation Order.  The financial accommodations to be extended pursuant to the Exit Facility Documents (and other definitive documentation related thereto) are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

(b)　　Confirmation of the Plan shall be deemed approval of the Exit Term Loan Facility and the Exit Facility Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and authorization of the Reorganized Debtors to enter into, execute, and deliver the Exit Facility Documents.

(c)　　On the Effective Date, all Liens and security interests granted pursuant to the Exit Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

(d)     The Reorganized Debtors and the Persons granted Liens and security interests under the Exit Facility Documents are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

5.6.     ***Section 1145 Exemption***.

(a)     The offer and sale of the New Equity Interests (including New Equity Interests issued on account of the Backstop Premium) to holders of Allowed First Lien Claims and Allowed Second Lien Debt Claims (collectively, the "**1145 Securities**") shall be exempt, pursuant to section 1145(a) of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act of 1933, as amended (the "**Securities Act**"), and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(b)     The 1145 Securities offered or sold by the Reorganized Debtors under the Plan pursuant to section 1145(a) of the Bankruptcy Code will be unrestricted securities as set forth in section 1145(c) of the Bankruptcy Code and, generally, may be sold without registration under the Securities Act by the recipients thereof, subject to: (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 2(a)(11) of the Securities Act, (ii) compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the U.S. Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iii) the restrictions, if any, on the transferability of such 1145 Securities, including any restrictions on the transferability under the terms of the Reorganized Debtors' organizational documents; (iv) any applicable procedures of DTC and (v) any other applicable regulatory approvals and requirements.

5.7.     ***Cancellation of Existing Securities and Agreements***.

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan and the DIP Documents, including with respect to Executory Contracts or Unexpired Leases that shall be assumed by the Reorganized Debtors, or any contract, instrument, or other agreement or document created in connection with the Plan, on the Effective Date, all agreements, instruments, notes, certificates, mortgages, security documents, and any other instruments or documents evidencing any Claim or Interest (other than Intercompany Interests that are not modified by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no further force or effect, without any further act or action of any person under any applicable agreement, instrument, document, law, regulation, order, or rule, and the obligations of the Debtors thereunder shall be deemed automatically fully satisfied, released, and discharged.     Notwithstanding such cancellation and discharge, the First Lien Credit Agreement, the Note Purchase Agreement, the Second Lien Credit Agreement, and the Intercreditor Agreements shall continue in effect solely (i) to the extent necessary to allow the holders of Allowed First Lien Claims and Second Lien Debt Claims to receive distributions under the Plan, (ii) to the extent necessary to allow the Debtors, the Reorganized Debtors, and/or the Administrative Agents to make post-Effective Date distributions or take such other action pursuant to the Plan on account of Allowed First Lien Claims and Allowed Second Lien Debt Claims, and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims,

and (iii) to appear in the Chapter 11 Cases, *provided*, *however*, that nothing in the foregoing shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or lease to the extent such Executory Contract or lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

> 5.8. ***Cancellation of Liens***.

(a)     Except as otherwise specifically provided herein, including pursuant to Section 5.5(a) of the Plan, all notes, instruments, certificates evidencing debt of the Debtors and Existing Parent Equity Interests will be cancelled and obligations of the Debtors thereunder will be discharged and of no further force or effect, except, where applicable, for the purpose of allowing the applicable agents and trustees to receive distributions from the Debtors under the Plan and to make any further distributions to the applicable holders on account of their Claims.

(b)     Upon the full payment or other satisfaction of its Allowed Other Secured Claim, or promptly thereafter, any Lien securing any Other Secured Claim shall be deemed released and the holder of such Allowed Other Secured Claim shall deliver to the Debtors or the Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

(c)     After the Effective Date and following the (i) distributions to holders on account of Allowed DIP Claims, Allowed First Lien Claims and Allowed Second Lien Debt Claims, and (ii) payment of the Restructuring Fees and Expenses (including, without limitation, attorneys' and financial advisors' reasonable and documented fees and expenses), any Lien securing such Claims shall be deemed released and the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the First Lien Claims and the Second Lien Debt Claims, including, without limitation, the preparation and filing, in form, substance, and content acceptable to the Requisite Consenting First Lien Lenders and Requisite Consenting Second Lien Lenders, as applicable, of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the Administrative Agents, the First Lien Lenders, the Noteholders, and the Second Lien Lenders, including, without limitation, UCC-3 termination statements.

> 5.9. ***Officers and Boards of Directors***.

(a)     On or after the Effective Date (and in the event of the Purchase Transaction, in accordance with the Acquisition Agreement), the members of the New Board shall be appointed to serve pursuant to the terms of the applicable New Corporate Governance Documents.  The current chief executive officer of Mobileum shall serve as a member of the New Board.  The composition of each board of directors or board of managers of a Reorganized Debtor, as applicable, and, to the extent applicable, the officers of each Reorganized Debtor, shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)     The selection of the initial members of the board of directors or board managers of the Reorganized Parent, as applicable, shall be subject to the New Corporate Governance Documents

and express provisions of the Plan (and in the event of the Purchase Transaction, in accordance with the Acquisition Agreement). The initial New Board will have five (5) members, comprised of (i) the chief executive officer of Mobileum, and (ii) four (4) additional members selected by certain First Lien Lenders as set forth in the Restructuring Support Agreement and the New Corporate Governance Documents, in each case selected in consultation with the First Lien Lender Group and the Debtors. Additionally, the Second Lien Ad Hoc Group shall have the ability to designate one (1) observer to the New Board.

(c)     The officers of the respective Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on the Effective Date. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

(d)     Except to the extent that a member of the board of directors or a member of the board of managers, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or board of managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager will be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

5.10.     ***Management Incentive Plan.***

No later than 60 days following the Effective Date, the New Board shall implement an equity-based management incentive plan under which ten percent (10%) of the New Equity Interests issued on the Effective Date will be reserved for issuance of awards to employees, non-employee directors and other service providers of the Reorganized Debtors (the "**Management Incentive Plan**"), on terms and conditions (including with respect to participants, forms of awards, individual allocations, and vesting conditions) to be determined by the New Board in consultation with the Reorganized Debtors' chief executive officer.

5.11.     ***Authorization, Issuance, and Delivery of New Equity Interests.***

On the Effective Date, Reorganized Parent is authorized to transfer, issue or cause to be issued and shall transfer or issue the New Equity Interests for distribution in accordance with the terms of the Plan without the need for any further board, stockholder or other corporate action. All of the New Equity Interests transferrable or issuable under the Plan (or in the event of a Purchase Transaction, received pursuant to the Acquisition Agreement), when so transferred or issued, shall be duly authorized, validly issued, fully paid, and non-assessable. To the extent applicable, Reorganized Parent's New Corporate Governance Documents shall have provided for sufficient shares of authorized New Equity Interests to effectuate the issuance of New Equity Interests contemplated by and in connection with the Plan, including the Management Incentive Plan, and Reorganized Parent shall issue or reserve for issuance a sufficient number of shares of New Equity Interests to effectuate all such issuances. Each holder of New Equity Interests shall be deemed, without further notice or action, to have agreed to be bound by the New Corporate Governance Documents, as the same may be amended form time to time following the Effective Date in accordance with their terms. The New Corporate Governance Documents shall be binding on all Entities receiving New Equity Interests (and their respective successors and permitted assigns), whether received pursuant to the Plan (or in the event of a Purchase Transaction, received pursuant to the Acquisition

Agreement) or otherwise and regardless of whether such Entity executes or delivers a signature page to any New Corporate Governance Document.

5.12. ***Nonconsensual Confirmation***.

To the extent all Classes entitled to vote to accept or reject the Plan have not voted to accept the Plan, the Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

5.13. ***Closing of the Chapter 11 Cases***.

After an Estate has been fully administered, the Reorganized Debtors shall be authorized, but not directed, to submit an order to the Bankruptcy Court under certification of counsel to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

5.14. ***Notice of Effective Date***.

As soon as practicable, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

5.15. ***Separate Plans***.

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

5.16. ***Litigation Trust.***

On the Effective Date, pursuant to the terms hereof and of the Litigation Trust Agreement, the Debtors or Reorganized Debtors (as applicable) shall be authorized to execute, deliver, and enter into the Litigation Trust Agreement.

**ARTICLE VI.    DISTRIBUTIONS.**

6.1. ***Distributions Generally.***

The Disbursing Agent shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

6.2. ***Distributions Subject to Intercreditor Agreements.***

Except as expressly provided in Article IV of this Plan, distributions under the Plan to holders of First Lien Claims and Second Lien Debt Claims shall be made subject to and in accordance with the Intercreditor Agreements.

6.3. ***Distribution Record Date***.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or

Interests.  The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

6.4.     ***Date of Distributions***.

Except as otherwise provided in this Plan (including payments made in the ordinary course of the Debtors' business) or as paid pursuant to a prior Bankruptcy Court order, on the Effective Date or, if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, or as otherwise determined in accordance with the Plan and Confirmation Order, including, without limitation, the treatment provisions of Article IV of the Plan, each holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class provided in the Plan; *provided* that the Reorganized Debtors may implement periodic distribution dates to the extent they determine them to be appropriate; *provided, further,* that the Reorganized Debtors may make distributions of New Equity Interests following the Effective Date, including to holders of Disputed Claims that become Allowed Claims; *provided*, *that*, any holder as of the Distribution Record Date may send a written notice to the Disbursing Agent that the distributions in respect of such holder's Allowed Claims shall be made to one or more of its Affiliates, designees or Related Funds.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII; *provided* that any New Equity Interest that is issuable to holders of Allowed Claims but is withheld from distribution on account of a holder of a Disputed Claim shall not be issued until such time such Disputed Claim is resolved and the New Equity Interests are to be distributed.  Except as specifically provided in the Plan, holders of Allowed Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

6.5.     ***Disbursing Agent***.

All distributions under the Plan shall be made by the applicable Reorganized Debtor, as Disbursing Agent, on or after the Effective Date or as otherwise provided herein.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agents directly related to distributions hereunder shall be reimbursed by the Reorganized Debtors.

6.6.     ***Rights and Powers of Disbursing Agent***.

(a)     From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No holder of a Claim or Interest or other party in interest shall have or pursue any Claim or Cause of Action vested in a Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)      Powers of Disbursing Agent.   The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(c)      Expenses Incurred on or After the Effective Date.   Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 6.7.      *Expenses of Disbursing Agent*.

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable and documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 6.8.      *No Postpetition Interest on Claims*.

Except as otherwise specifically provided for in the Plan, the Confirmation Order, the DIP Orders, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 6.9.      *Delivery of Distributions*.

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders of Allowed Claims; *provided*, *that*, any holder as of the Distribution Record Date may send a written notice to the Disbursing Agent that the distributions in respect of such holder's Allowed Claims shall be made to one or more of its Affiliates, designees or Related Funds; *provided further*, that such holder and relevant Affiliate, designee, or Related Fund comply with all applicable withholding and reporting requirement set forth in Section 6.20 of the Plan.  In the event that any distribution to any holder is returned as undeliverable, no further distributions shall be made to such holder unless and until such Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders of undeliverable distributions and, if located, assist such holders in complying with Section 6.20 of the Plan.

### 6.10.      *Distributions as of Effective Date*.

Distributions to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

WEIL:\99859063\1\63808.0003

6.11.     ***Unclaimed Property***.

One year from the later of (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date of a distribution on an Allowed Claim, all distributions payable on account of such Claim that are undeliverable or otherwise unclaimed shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

6.12.     ***Time Bar to Cash Payments***.

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check shall be made to the applicable Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued, prior to the expiration of the ninety (90) day period.

6.13.     ***Manner of Payment under Plan***.

Except as otherwise specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

6.14.     ***Satisfaction of Claims***.

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, release, settlement, and discharge of and exchange for such Allowed Claims.

6.15.     ***Fractional Stock***.

No fractional New Equity Interests shall be distributed.  If any distributions of New Equity Interests pursuant to the Plan would result in the issuance of a fractional share of New Equity Interests, then the number of shares of New Equity Interests to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down).  The total number of shares of New Equity Interests to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this <u>Section 6.15</u>.  No consideration shall be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Equity Interests.  Fractional shares of New Equity Interests that are not distributed in accordance with this section shall be returned to, and the ownership thereof shall vest in, the Reorganized Debtors.

6.16. ***Minimum Cash Distributions***.

The Disbursing Agent shall not be required to make any distribution of Cash less than one hundred dollars ($100) to any holder of an Allowed Claim; *provided*, *however*, that if any distribution is not made pursuant to this Section 6.16, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

6.17. ***Setoffs***.

(a)      The Debtors and the Reorganized Debtors, or such Entity's designee as instructed by such Debtor or Reorganized Debtor, as applicable, may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made pursuant to the Plan on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors or the Reorganized Debtors or its successors may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable nonbankruptcy law; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

(b)      In no event shall any holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor, unless (i) the Debtors or the Reorganized Debtors, as applicable, have consented or (ii) such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding the foregoing, this paragraph does not create any new rights to setoff or recoupment that did not exist under any applicable law or agreement in existence prior to the Effective Date.

6.18. ***Allocation of Distributions between Principal and Interest***.

Except as otherwise provided in the Plan and subject to Section 6.8 herein or as otherwise required by law (as reasonably determined by the Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

6.19. ***No Distribution in Excess of Amount of Allowed Claim***.

Notwithstanding anything in the Plan to the contrary, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

6.20. ***Withholding and Reporting Requirements***.

(a) *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash issuance or distribution that is subject to withholding, and subject to Section 6.20(b) of the Plan, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any

advance payment of the withholding tax) or (ii) pay the withholding tax using its own funds and retain such withheld property. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall reasonably cooperate with the relevant recipients to minimize any such withholding to the extent permitted by applicable law.

(b)      *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Entity designated by the Reorganized Debtors (which Entity shall subsequently deliver to the Disbursing Agent any applicable Internal Revenue Service ("**IRS**") Form W-8 or Form W-9 received) an appropriate IRS Form W-9 or (if the payee is a foreign Entity) an appropriate IRS Form W-8 and any other forms or documents reasonably requested by any Reorganized Debtor to reduce or eliminate any withholding required by any federal, state, or local taxing authority.  If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other Entity designated by the Reorganized Debtors or Disbursing Agent and such party fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

## ARTICLE VII.      PROCEDURES FOR DISPUTED CLAIMS.

### 7.1.      *Disputed Claims Generally*.

Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in the Plan or Confirmation Order, holders of Claims, other than Claims arising from the rejection of an Executory Contract or Unexpired Lease. need not file proofs of Claim with the Bankruptcy Court, and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims as if the Chapter 11 Cases had not been commenced.  The holders of Claims other than Claims arising from the rejection of an Executory Contract or Unexpired Lease and Section 510(b) Claim shall not be subject to any Claims resolution process in the Bankruptcy Court.  Except for proofs of Claim in respect of Claims arising from the rejection of an Executory Contract or Unexpired Lease, any filed Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn.  The Debtors and the Reorganized Debtors, as applicable, shall be permitted to seek the classification of any Claim as a Section 510(b) Claim by filing an objection to or other pleading with respect to such Claim with the Bankruptcy Court and shall not be required to commence an adversary proceeding to effect such classification.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

### 7.2.      *Objections to Claims*.

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to object to Claims.  After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim or Interest.  Any objections to Claims shall be served and filed on or before the later of (i) two (2) years

after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court.  The expiration of such period shall not limit or affect the Debtors' or the Reorganized Debtors' rights to dispute Claims other than through an objection to a Claim and/or to proof of such Claim.

### 7.3.    *Estimation of Claims*.

The Debtors or the Reorganized Debtors, as applicable, may (i) determine, resolve, and otherwise adjudicate all contingent, unliquidated, and Disputed Claims in the Bankruptcy Court and (ii) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any Claim, including, without limitation, at any time during litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on the Allowed amount of such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Allowed amount of such Claim, the Debtors or the Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.

### 7.4.    *Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

### 7.5.    *No Distributions Pending Allowance*.

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Disputed Claim becomes an Allowed Claim.

### 7.6.    *Distributions after Allowance*.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan, including the treatment provisions provided in Article IV of the Plan.

### 7.7.    *Claim Resolution Procedures Cumulative*.

All of the Claims, objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled,

compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

        7.8.      ***Single Satisfaction of Claims and Interests.***

        In no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim or Interest exceed 100 percent of the underlying Allowed Claim or Interest plus applicable interest required to be paid hereunder, if any.

## ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

        8.1.      ***General Treatment.***

        (a)      As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, and subject to Section 8.6 of the Plan, all Executory Contracts and Unexpired Leases which have not expired by their own terms on or prior to the Confirmation Date, shall, subject to the reasonable consent of the Requisite Consenting First Lien Lenders, be deemed assumed, except for any Executory Contract or Unexpired Lease, in each case, with the reasonable consent of the Requisite Consenting First Lien Lenders, that (a) previously has been assumed, assumed or assigned, or rejected pursuant to a Final Order of the Bankruptcy Court, (b) is the subject of a separate (i) assumption motion filed by the Debtors, or (ii) rejection motion filed by the Debtors under section 365 of the Bankruptcy Code before the Confirmation Date, (c) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, or (d) is the subject of a pending Cure Dispute.

        (b)      Subject to (i) satisfaction of the conditions set forth in Section 8.1(a) herein, (ii) resolution of any disputes in accordance with Section 8.2 herein with respect to the Executory Contracts or Unexpired Leases, and (iii) the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each Executory Contract and Unexpired Lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor or assignee in accordance with its terms, except as modified by the provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment, or applicable law.

        (c)      To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

        (d)      The Debtors reserve the right, on or before the Effective Date, to amend the Schedule of Rejected Contracts, to add or remove any Executory Contract or Unexpired Lease; *provided*, the Debtors or Reorganized Debtors, as applicable, may amend the Schedule of Rejected Contracts to add or delete any Executory Contracts or Unexpired Leases after such date to the extent agreed with the relevant counterparties and entry of an order of the Bankruptcy Court.

8.2.     ***Determination of Cure Disputes and Deemed Consent***.

(a)     The Debtors shall file, as part of the Plan Supplement, the Schedule of Rejected Contracts.

(b)     Prior to the Confirmation Hearing, the Debtors shall serve a notice on parties to Executory Contracts and Unexpired Leases to be assumed or assumed and assigned, as applicable, reflecting the Debtors' intention to assume or assume and assign, as applicable, such contract or lease in connection with the Plan and setting forth the proposed Cure Amount (if any).  If a counterparty to any Executory Contract or Unexpired Lease that the Debtors or Reorganized Debtors, as applicable, intend to assume or assume and assign (i.e., it is not listed on the Schedule of Rejected Contracts ) or the proposed Cure Amount is not listed on such a notice, the proposed Cure Amount for such Executory Contract or Unexpired Lease shall be deemed to be Zero Dollars ($0).

(c)     If there is a Cure Dispute pertaining to assumption or assumption and assignment of an Executory Contract or Unexpired Lease, such dispute shall be heard by the Bankruptcy Court prior to such assumption or assumption and assignment, as applicable, being effective, *provided*, *however*, before the Effective Date, the Debtors (or, after the Effective Date, the Reorganized Debtors), with the reasonable consent of the Requisite Consenting First Lien Lenders, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)     Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the notice of the proposed assumption or assumption and assignment, as applicable, of such Executory Contract or Unexpired Lease or the relevant Cure Amount within ten (10) days of the service of the notice described above, (i) shall be deemed to have assented to (A) such Cure Amount and the nature thereof, (B) assumption or assumption and assignment, as applicable, of the applicable Executory Contract or Unexpired Lease notwithstanding any provision thereof that purports to (1) prohibit, restrict, or condition the transfer or assignment of such contract or lease, or (2) terminate or permit the termination of a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan, and (ii) shall be forever barred, estopped, and enjoined from challenging the validity of such assumption or assumption and assignment, as applicable, or the Allowed amount of such Cure Amount thereafter.

8.3.     ***Payments Related to Assumption or Assignment of Contracts and Leases***.

Subject to resolution of any Cure Dispute, all Cure Amounts shall be satisfied promptly, or otherwise as soon as practicable following the Effective Date, by the Reorganized Debtors.  Assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of the assumption or assumption and assignment, as applicable.  Any proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such contract or Unexpired Lease.

8.4.    *Rejection Claims*.

In the event that the rejection of an Executory Contract or Unexpired Lease results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim for such Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Reorganized Debtors no later than thirty (30) days after the later of (i) the Effective Date or (ii) the effective date of rejection of such Executory Contract or Unexpired Lease.  Any such Claims, to the extent Allowed, shall be classified in Class 5 (General Unsecured Claims).

8.5.    *Survival of the Debtors' Indemnification Obligations*.

(a)    Except as otherwise provided in the Plan or the Confirmation Order, and subject to the Schedule of Retained Causes of Action, to the fullest extent permitted by applicable law, any and all obligations of the Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, memorandum and articles of association, or other organizational documents or agreements to indemnify all current officers, directors, agents or employees, in each case solely in their capacity as such, employed by the Debtors on and/or after the Petition Date with respect to all past, present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors (collectively, the "**Indemnification Obligations**") shall not be discharged, impaired, or otherwise affected by the Plan; *provided*, that, the Debtors or the applicable Reorganized Debtors, as applicable, shall not indemnify any such officers, directors, agents, or employees of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission for which indemnification is barred under applicable law or that is excluded under the terms of the foregoing organizational documents or applicable agreements governing the Debtors' Indemnification Obligations.  The Reorganized Debtors shall not indemnify any Persons for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence or willful misconduct.  Except as otherwise provided in the Plan, all such Indemnification Obligations shall be deemed and treated as Executory Contracts that are assumed by the Debtors under the Plan.

8.6.    *Employee Arrangements*.

(a)    Unless otherwise listed on the Schedule of Rejected Contracts, all Employee Arrangements that exist as of the Petition Date shall be assumed on the Effective Date as Executory Contracts pursuant to sections 365 and 1123 of the Bankruptcy Code; *provided*, *that*, to the extent an Employee Arrangement of an insider (as defined in the Bankruptcy Code) has not been disclosed to the Requisite Consenting First Lien Lenders prior to the Effective Date (an "**Undisclosed Employment Arrangement**") and the assumption of such Undisclosed Employment Arrangement would not reasonably be expected to result in material liability to the Reorganized Debtors (as determined by the Requisite Consenting First Lien Lenders acting in good faith), then such Undisclosed Employment Arrangement will be assumed pursuant to this Plan as if it had been disclosed to the Requisite Consenting First Lien Lenders prior to the Effective Date.  For the avoidance of doubt, neither the assumption nor the rejection of any Employee Arrangements shall trigger any applicable change of control, immediate vesting, termination, or similar provisions therein, including, without limitation, any right to severance pay in connection with a change in control.

(b)    Notwithstanding Section 8.6(a), any Employee Arrangement(s) providing for equity-based awards, as well as any equity-based awards or other Interest (or right to obtain or receive any equity-based award or other Interest) granted to or contractually promised to a current or former

employee, officer, director or contractor under an Employee Arrangement or otherwise, shall not be honored or assumed and will be deemed cancelled in consideration of approval of the Plan as of the Effective Date. For the avoidance of doubt, if an Employee Arrangement assumed under this Plan provides in part for an award or potential award of equity-based awards or other Interests or consideration based on the value of Interests (whether vested or unvested) such Employee Arrangement shall be assumed in all respects other than the provisions of such arrangement relating to such equity-based awards or Interest awards, which provisions shall be deemed cancelled and inoperative as of the Effective Date.

(c)     As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under all applicable workers' compensation programs and in accordance with all applicable workers' compensation Laws in states in which the Reorganized Debtors operate. Any Claims arising under workers' compensation programs shall be deemed withdrawn once satisfied without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law, with respect to any such workers' compensation programs; *provided, further,* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state Law.

(d)     On the Effective Date the Management Services Agreements shall be deemed rejected and terminated, with the effect that any remaining or unperformed obligations of the parties shall be cancelled without consideration or recourse. Any obligations or amounts due and owing by the Debtors to H.I.G. from and after January 1, 2023 shall be waived by H.I.G. for no additional consideration, and deemed forever discharged.

8.7.     *Insurance Policies*.

(a)     All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as Executory Contracts and shall be assumed by the applicable Debtors or the Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms, and all such insurance policies shall vest in the Reorganized Debtors. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in any D&O Policy. The Debtors and the Reorganized Debtors shall preserve and not terminate or otherwise reduce or in any way alter or interfere with the coverage under the RWI Policy.

(b)     In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(c)     In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

(d)      In the event that the Debtors determine that an Allowed Claim is covered in full or in part under one of the Debtors' insurance policies, no distributions under the Plan shall be made on account of such Allowed Claim unless and until, and solely to the extent that, (i) the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, and (ii) an insurer authorized to issue a coverage position under such insurance policy, or the agent of such insurer, issues a formal determination, which the Debtors in their sole discretion do not contest, that coverage under such insurance policy is excluded or otherwise unavailable for losses arising from such Allowed Claim.  Any proceeds available pursuant to one of the Debtors' insurance policies shall reduce the Allowed amount of a Claim on a dollar-for-dollar basis.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  If an applicable insurance policy has a SIR, the holder of an Insured Claim shall have an Allowed General Unsecured Claim or a Section 510(b) Claim, as applicable, against the applicable Debtor's Estate solely up to the amount of the SIR that may be established upon the liquidation of the Insured Claim.  Such SIR shall be considered satisfied pursuant to the Plan through allowance of the General Unsecured Claim or Section 510(b) Claim, as applicable, solely in the amount of the applicable SIR, if any; *provided*, however that nothing herein obligates the Debtors or the Reorganized Debtors to otherwise satisfy any SIR under any insurance policy.  Any recovery on account of the Insured Claim in excess of the SIR established upon the liquidation of the Claim shall be recovered solely from the Debtors' insurance coverage, if any, and only to the extent of available insurance coverage and any proceeds thereof.  Nothing in this Plan shall be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an insurance policy.

8.8.      *Intellectual Property Licenses and Agreements*.

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors (with the reasonable consent of the Requisite Consenting First Lien Lenders) in accordance with the Plan.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.9.      *Assignment*.

To the extent provided under the Bankruptcy Code or other applicable law, any Executory Contract or Unexpired Lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such Executory Contract or Unexpired Lease (including, without limitation, those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such Executory Contract or Unexpired Lease or that terminates or modifies such Executory Contract or Unexpired Lease or allows the counterparty to such Executory Contract or Unexpired Lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

8.10.    ***Modifications, Amendments, Supplements, Restatements, or Other Agreements***.

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each Executory Contract and Unexpired Lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

8.11.    ***Reservation of Rights***.

(a)    Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)    Except as otherwise provided in the Plan, nothing in the Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-Executory Contract or any unexpired or expired lease.

(c)    Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-Executory Contract or any unexpired or expired lease.

(d)    If there is a Cure Dispute or a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection under the Plan, the Debtors or Reorganized Debtors, as applicable, shall have sixty (60) days following entry of a Final Order resolving such Cure Dispute to alter their treatment of such contract or lease by filing a notice indicating such altered treatment.

**ARTICLE IX.    CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE**.

9.1.    ***Conditions Precedent to the Effective Date***.

(a)    The effectiveness of the Plan will be subject to the satisfaction or waiver in writing of customary conditions to effectiveness, as well as such other conditions as may be agreed by the Debtors and the Requisite Consenting First Lien Lenders, including, but not limited to, the conditions precedent to effectiveness set forth at <u>Section 9.1(b)</u> (as applicable); *provided*, *that*, any new conditions that would reasonably have a material and adverse effect on (i) the Consenting Sponsor, the Litigation Trust Agreement, the Litigation Proceeds Term Sheet, or any agreements related thereto, shall also require the agreement of the Consenting Sponsor, and (ii) the treatment, recoveries, rights, and obligations consistent with the Restructuring Term Sheet of the holders of Second Lien Debt Claims shall require the consent of the Requisite Consenting Second Lien Lenders.

(b)    The following are conditions precedent to the Effective Date of the Plan:

42

(i)        the Definitive Documents and Plan Documents will contain terms and conditions consistent with the Plan and the Restructuring Support Agreement or otherwise approved by the Debtors and the Requisite Consenting First Lien Lenders, and the Consenting Sponsor (as applicable) in accordance with the consent rights under the Restructuring Support Agreement and shall be executed and delivered by the parties thereto;

(ii)       the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

(iii)      the DIP Facility shall be in full force and effect and there shall be no Event of Default (as defined in the DIP Credit Agreement) continuing;

(iv)      all conditions precedent to the effectiveness of the Exit Credit Agreement shall have been satisfied or waived in accordance with the terms thereof, and the Exit Credit Agreement shall be in full force and effect and binding on all parties thereto;

(v)       the New Equity Interests shall have been issued by Reorganized Parent;

(vi)      the Professional Fee Escrow shall have been established and funded in Cash;

(vii)     the Bankruptcy Court shall have entered the Confirmation Order in a form and substance reasonably acceptable to the Requisite Consenting First Lien Lenders, and such order shall not have been reversed, stayed, amended, modified (other than with the consent of the Requisite Consenting First Lien Lenders), dismissed, or vacated;

(viii)    no court of competent jurisdiction (including the Bankruptcy Court) or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, or prohibiting the consummation of any of the Restructuring Transactions;

(ix)      the Debtors shall have implemented the Restructuring Transactions in a manner consistent in all material respects with the Plan and the Restructuring Support Agreement (and subject to, and in accordance with, the consent rights set forth therein);

(x)       all Restructuring Fees and Expenses and any other professional fees and other amounts required to be paid on account of Consenting Creditors' and the Consenting Sponsor's fees and expenses pursuant to the Restructuring Support Agreement, in any Definitive Document or Plan Document, or in any order of the Bankruptcy Court related thereto shall have been paid in full and in Cash, including for the avoidance of doubt all accrued and unpaid fees and expenses of advisors to the First Lien Lender Group, Second Lien Ad Hoc Group and the Consenting Sponsor (subject to the limitations set forth in the Restructuring Support Agreement and herein);

(xi)      in the event of a Purchase Transaction, all conditions precedent to the closing of such sale under the Acquisition Agreement, other than the effectiveness of the Plan, shall have been satisfied or waived in accordance with the terms thereof; and

(xii)     all governmental and third-party approvals and consents necessary, if any, in connection with the transactions contemplated by the Plan shall have been obtained, not

be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

9.2.     *Timing of Conditions Precedent.*

Notwithstanding when a condition precedent to the Effective Date occurs, for the purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the conditions precedent to the Effective Date; *provided*, *that* to the extent a condition precedent (the "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the applicable Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

9.3.     *Waiver of Conditions Precedent.*

(a)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent of the Plan may be waived in writing by the Debtors with the prior written consent of the Requisite Consenting First Lien Lenders, and, as applicable, the Requisite Consenting Second Lien Lenders and the Consenting Sponsor; *provided*, *however*, that waiver of the conditions precedent in Section 9.1(b)(vi) shall require the consent of the affected Professionals.  If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.15 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(c) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

9.4.     *Effect of Non-Occurrence of the Effective Date*.

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the Consenting Creditors, the Administrative Agents or any other Entity.

## ARTICLE X.     EFFECT OF CONFIRMATION OF PLAN.

10.1.     *Vesting of Assets in the Reorganized Debtors*.

Except as otherwise provided herein, or in any agreement, instrument, or other documents incorporated into the Plan (including with respect to the transactions contemplated by the Restructuring Transactions Exhibit), on the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.  In addition, all rights, benefits, and protections provided to any of the Debtors or their Estates pursuant to the Plan, the

Plan Supplement, or the Confirmation Order including, but not limited to, the release, exculpation, and injunction provisions provided in <u>Article X</u> of the Plan, shall vest in each respective Reorganized Debtor unless expressly provided otherwise by the Plan or the Confirmation Order.  On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

<div align="center">10.2.    <b><i>Binding Effect</i></b>.</div>

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan, (b) deemed to accept or reject the Plan, (c) failed to vote to accept or reject the Plan, or (d) voted to reject the Plan.

<div align="center">10.3.    <b><i>Discharge of Claims and Termination of Interests</i></b>.</div>

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents or Plan Documents, the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

<div align="center">10.4.    <b><i>Term of Injunctions or Stays</i></b>.</div>

Unless otherwise provided herein or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

<div align="center">10.5.    <b><i>Injunction</i></b>.</div>

**Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold,**

<div align="center">45</div>

**or may hold Claims or Interests that have been released pursuant to <u>Section 10.6(a)</u> or <u>Section 10.6(b)</u>, shall be discharged pursuant to <u>Section 10.3</u> of the Plan, or are subject to exculpation pursuant to <u>Section 10.7</u>, and all other parties in interest are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to <u>Section 10.7</u> with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or that otherwise indicates that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan or otherwise Disallowed; *provided* that such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.**

**Subject in all respects to <u>Section 11.1</u>, no Entity or person may commence or pursue a Claim or Cause of Action of any kind against any Released Party or Exculpated Party that arose or arises from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors, the DIP Facility, the Restructuring Support Agreement, the Definitive Documents, the Plan Documents, DIP Documents, Exit Term Loan Facility, First Lien Credit Agreement, Note Purchase Agreement, Second Lien Credit Agreement, Intercreditor Agreements, and any and all related agreements, instruments, and/or other documents, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Support Agreement, or any Restructuring Transaction, the Definitive Documents, the Plan Documents, the DIP Documents, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the DIP Documents, Exit Facility Documents, the Backstop Commitment Letter, the Restructuring Support Agreement, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Equity Interests), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim against a Released Party or Exculpated Party that has not been released or enjoined by the Plan and (ii) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against any such Released Party or Exculpated Party. The Bankruptcy Court shall have sole**

and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible and as provided for in <u>Section 11.1</u>, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

        10.6.    ***Releases***.

        (a)    <u>**Releases by the Debtors**</u>.

**Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally and irrevocably, released and discharged by the Debtors, the Reorganized Debtors and the Estates, and each of their successors and assigns, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors (which includes, for the avoidance of doubt, all claims and Causes of Action asserted or assertable in the Superior Court Litigation and Chancery Court Litigation), the Restructuring Support Agreement, the Definitive Documents, the Plan Documents, DIP Facility, DIP Credit Agreement, Exit Term Loan Facility, First Lien Credit Agreement, Note Purchase Agreement, Second Lien Credit Agreement, Intercreditor Agreements, Management Services Agreements, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the DIP Documents, Exit Facility Documents, the Backstop Commitment Letter, the Restructuring Support Agreement, the Definitive Documents, the Plan Documents, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Equity Interests), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section 10.6(a) (i) shall only be applicable to the maximum extent permitted by law; (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted fraud (provided that fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances) or (b) releasing any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, any Plan Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; and (iii) for the avoidance of doubt, shall not release**

or be construed as releasing any party listed on the Schedule of Excluded Parties from any claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including without limitation claims and causes of action arising from an act or omission that is judicially determined by a Final Order to have constituted fraud or willful misconduct or asserted or assertable in the Superior Court Litigation and Chancery Court Litigation.

(b)   <u>Releases by Holders of Claims and Interests</u>.

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors (which includes, for the avoidance of doubt, all claims and Causes of Action asserted or assertable in the Superior Court Litigation and Chancery Court Litigation), the Restructuring Support Agreement, the Definitive Documents, the Plan Documents, DIP Facility, DIP Credit Agreement, Exit Term Loan Facility, First Lien Credit Agreement, Note Purchase Agreement, Second Lien Credit Agreement, the Intercreditor Agreements, Management Services Agreements,, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the DIP Documents, Exit Facility Documents, the Backstop Commitment Letter, the Restructuring Support Agreement, the Definitive Documents, the Plan Documents, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Equity Interests), or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section 10.6(b)(i) shall only be applicable to the maximum extent permitted by law; (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted fraud (other than any Claims or Causes of Action that constitute fraud (as judicially determined by a Final Order) that are based on facts, allegations, or circumstances asserted or assertable in the Superior Court Litigation and Chancery Court Litigation) or (b) releasing any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, any Definitive Document, any Plan Document, or any document, instrument, or agreement (including those set forth

in the Plan Supplement) executed to implement the Plan; and (iii) for the avoidance of doubt, shall not release or be construed as releasing any party listed on the Schedule of Excluded Parties from any Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including without limitation claims and causes of action arising from an act or omission that is judicially determined by a Final Order to have constituted fraud or willful misconduct or asserted or assertable in the Superior Court Litigation and Chancery Court Litigation.

10.7.  *Exculpation*.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, from the Petition Date through the Effective Date, of the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors, the DIP Facility, the Restructuring Support Agreement, the Definitive Documents, DIP Credit Agreement, Exit Term Loan Facility, First Lien Credit Agreement, Note Purchase Agreement, Second Lien Credit Agreement, Intercreditor Agreements, and related agreements, instruments, or other documents, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the DIP Documents, Exit Facility Documents, the Backstop Commitment Letter, the Restructuring Support Agreement, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan (including, but not limited to, the New Equity Interests), or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.  The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with all applicable laws with regard to the solicitation and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpations set forth in this <u>Section 10.7</u> (i) shall only be applicable to the maximum extent permitted by law; and (ii) shall not be construed as (a) exculpating any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances) (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (c) for the avoidance of doubt, exculpating the parties listed on the Schedule of Excluded Parties.

10.8.    ***Retention of Causes of Action/Reservation of Rights***.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to this Article X, the Reorganized Debtors shall have, retain, reserve and be entitled to assert, and may enforce all rights to commence and pursue, as appropriate, any and all claims or Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity not released pursuant to the Plan.

10.9.    ***Ipso Facto and Similar Provisions Ineffective.***

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the restructuring.

10.10.    ***Solicitation of Plan***.

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the (i) Debtors and (ii) the Consenting Parties, and (iii) each of the Debtors and Consenting Parties' respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

10.11.    ***Corporate and Limited Liability Company Action***.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of the Employee Arrangements assumed pursuant to Section 8.6(a), subject to Sections 8.6(a)-(c), (b) the selection of the managers, directors, and officers for the Reorganized Debtors, (c) the distribution of the New Equity Interests, (d) the entry into the Exit Facility Documents, (e) the approval of the Restructuring Support Agreement, and (f) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the

Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Collateral holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, but not limited to, (v) the New Corporate Governance Documents, (x) the Exit Credit Agreement, (y) any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this <u>Section 10.11</u> shall be effective notwithstanding any requirements under non-bankruptcy law.

**ARTICLE XI.      RETENTION OF JURISDICTION**.

                  **11.1.      *Retention of Jurisdiction*.**

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)      to hear and determine motions and/or applications for the assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired Leases, including resolution of all Cure Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)      to determine any motion, adversary proceeding, proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)      to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)      to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)      to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or any counterclaim related thereto;

(f)      to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)      to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)      to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)       to hear and determine all Professional Fee Claims;

(j)       to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)       to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(l)       to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)       to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)       to hear and determine matters concerning securities laws exemptions under section 1145 of the Bankruptcy Code;

(o)       to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(p)       to resolve disputes concerning Disputed Claims or the administration thereof;

(q)       to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any claims bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(r)       to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(s)       to enter a final decree closing the Chapter 11 Cases;

(t)       to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; and

(u)       to hear and determine any rights, claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

For the avoidance of doubt, on and after the Effective Date, the Bankruptcy Court shall not retain exclusive jurisdiction over any matters arising in connection with the Exit Term Loan Facility or any transactions related thereto except to the extent the Bankruptcy Court would have jurisdiction over such matter pursuant to Sections 11.1(d), (e), or (k) of the Plan.

11.2.       ***Courts of Competent Jurisdiction***.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of

jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**ARTICLE XII.     MISCELLANEOUS PROVISIONS**.

      12.1.     *Payment of Statutory Fees*.

      On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's case is entered.

      12.2.     *Substantial Consummation of the Plan*.

      On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

      12.3.     *Request for Expedited Determination of Taxes*.

      The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date, and in the case of any Debtor that is to be dissolved in accordance with the Restructuring Transactions Exhibit, through the completion of its dissolution.

      12.4.     *Exemption from Certain Transfer Taxes*.

      Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation, filing or recording of any Lien, mortgage, deed of trust, or other security interest, (c) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed, bill of sale, assignment or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan and Restructuring Transactions Exhibit (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of Collateral under the Exit Facility Documents and (e) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing any stamp or similar tax, including any document recording tax, conveyance fee, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, transfer tax, intangible tax, or other stamp or similar taxes.

12.5. *Amendments*.

(a) *Plan Modifications*. Subject to the consent rights set forth in the Restructuring Support Agreement, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Interests pursuant to the Plan, subject to the consent rights set forth in the Restructuring Support Agreement, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b) *Other Amendments*. Subject to the consent rights set forth in the Restructuring Support Agreement, before the Effective Date, the Debtors may make technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

12.6. *Effectuating Documents and Further Transactions*.

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors or managers, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.7. *Revocation or Withdrawal of the Plan*.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors with the consent of the Requisite Consenting First Lien Lenders and Requisite Consenting Second Lien Lenders; *provided, however*, that the Debtors may revoke or withdraw the Plan without such consent in the exercise of the Debtors' fiduciary duty or as otherwise permitted under the Restructuring Support Agreement. If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Entity; (ii) prejudice in any manner the rights of such Debtor or any other Entity; or (iii) constitute an admission of any sort by any Debtor, any of the Consenting Creditors, the Administrative Agents, or any other Entity.

12.8. *Severability of Plan Provisions*.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.

Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

> 12.9. ***Governing Law***.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement,  a Definitive Document, or a Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

> 12.10. ***Time***.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

> 12.11. ***Dates of Actions to Implement the Plan***.

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

> 12.12. ***Immediate Binding Effect***.

Notwithstanding any Bankruptcy Rule providing for a stay of the Confirmation Order or Plan, including Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors, all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim, Interest, or debt has voted on the Plan.

> 12.13. ***Deemed Acts.***

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

12.14.    ***Successor and Assigns***.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

12.15.    ***Entire Agreement***.

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.16.    ***Exhibits to Plan.***

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

12.17.    ***Notices***.

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or addressed as follows:

(a)    if to the Debtors or the Reorganized Debtors:

Mobileum Inc.
20813 Stevens Creek Boulevard, Suite 200
Cupertino, CA 95014
Mike Salfity (mike.salfity@mobileum.com)

with a copy (which will not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Jeffrey D. Saferstein, Esq. (Jeffrey.Saferstein@weil.com)
Alexander W. Welch, Esq. (Alexander.Welch@weil.com)
Daphne Papadatos, Esq. (Daphne.Papadatos@weil.com)
Eric L. Einhorn, Esq. (Eric.Einhorn@weil.com)

and

700 Louisiana Street, Suite 3700
Houston, Texas 77002
Gabriel A. Morgan, Esq. (Gabriel.Morgan@weil.com)
Clifford Carlson, Esq. (Clifford.Carlson@weil.com)

(b)      if to the Consenting First Lien Lenders, to:

        Milbank LLP
        55 Hudson Yards
        New York, NY 10001
        Evan Fleck, Esq. (efleck@milbank.com)
        Matthew Brod, Esq. (mbrod@milbank.com)
        Abigail Debold, Esq. (adebold@milbank.com)
        Rupsha Basu, Esq. (rbasu@milbank.com)

(c)      if to the Consenting Second Lien Lenders, to:

        Akin Gump Strauss Hauer & Feld LLP
        2001 K Street N.W.
        Washington, DC 20006
        Scott L. Alberino, Esq. (salberino@akingump.com)
        Blaine Scott, Esq. (bscott@akingump.com)

(d)      if to the Consenting Sponsor to:

        Simpson Thacher & Bartlett LLP
        425 Lexington Avenue
        New York, NY 10007
        Sunny Singh, Esq. (Sunny.Singh@stblaw.com)
        Dov Gottlieb, Esq. (Dov.Gottlieb@stblaw.com)

After the Effective Date, the Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

WEIL:\99859063\1\63808.0003

Dated:  July 23, 2024
       New York, New York

                                  Respectfully submitted,

                                  By:      _/s/ Ripu Singh_

                                  Name:  Ripu Singh
                                  Title:   Chief Operating Officer and Chief Financial
                                             Officer

                                  On behalf of Mobileum, Inc. and each of its Debtor
                                  affiliates

## Exhibit B

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS DRAFT RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE SUPPORT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and including all exhibits, annexes, and schedules hereto, this "**Agreement**"), dated July 23, 2024, is entered into by and among:

(a)     Mobileum, Inc.; Matrix Intermediate, Inc. ("**Intermediate**"); Matrix Holdco, LLC ("**Holdings**"); Matrix Parent, Inc. ("**Matrix Parent**"); Mobile Acquisition Corp.; SIGOS LLC; UnwiredSoft, Inc.; We Do Technologies Americas, Inc.; Convene Networks LLC; Developing Solutions Inc.; and Phase 3 Innovations Holdings, Inc. (collectively, the "**Debtors**", and each, a "**Debtor**");

(b)     the undersigned beneficial holders, or investment advisors, sub-advisors or managers for the accounts of beneficial holders or beneficial holders, which such accounts or beneficial holders such investment advisors, sub-advisors, or managers have authority to bind or direct (in the event that such investment advisor, sub-advisor, or manager is party to, or an affiliate of a party to, a derivative or participation transaction that transfers economics of ownership to such investment advisor, sub-advisor, or manager, or affiliate thereof), of first lien term loans (the "**First Lien Term Loans**") and revolving credit facility loans (the "**First Lien Revolving Loans**"), in each case arising under that certain First Lien Credit Agreement, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented, or modified from time to time prior to the date hereof, the "**First Lien Credit Agreement**"), by and among, Holdings, Matrix Parent, the lenders from time to time party thereto (the "**First Lien Lenders**"), and the agent to the First Lien Lenders under the First Lien Credit Agreement, plus accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto, (the "**First Lien Debt Claims**", and such undersigned holders of First Lien Debt Claims, the "**Initial Consenting First Lien Lenders**", and together with any First Lien Lenders that subsequently become party to this agreement, solely in their capacity as First Lien Lenders, the "**Consenting First Lien Lenders**");

(c)     the undersigned holders of indebtedness under that certain Note Purchase Agreement, dated as of March 15, 2023 (as amended, restated, amended and restated, supplement, or modified from time to time prior to the date hereof, the "**Note Purchase Agreement**") by and among Holdings, Matrix Parent, as issuer, the other Debtors party thereto as guarantors, the noteholders who are time to time party thereto (the "**First Lien Noteholders**"), and the notes agent for the Noteholder under the Notes Purchase Agreement, plus accrued and unpaid interest, fees,

and other amounts arising and payable with respect thereto (the "**First Lien Notes Claims**", together with the First Lien Debt Claims, the "**First Lien Claims**", and such undersigned holders of First Lien Notes Claims, the "**Initial Consenting First Lien Noteholders**", together with any First Lien Noteholders that subsequently become party to this agreement, solely in their capacity as First Lien Noteholders, the "**Consenting Noteholders**");

(d)     the undersigned beneficial holders, or investment advisors, sub-advisors or managers for the accounts of beneficial holders or beneficial holders, which such accounts or beneficial holders such investment advisors, sub-advisors, or managers have authority to bind or direct (in the event that such investment advisor, sub-advisor, or manager is party to, or an affiliate of a party to, a derivative or participation transaction that transfers economics of ownership to such investment advisor, sub-advisor, or manager, or affiliate thereof), of second lien term loans (the "**Second Lien Term Loans**") arising under that certain Second Lien Credit Agreement, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented, or modified from time to time prior to the date hereof, the "**Second Lien Credit Agreement**"), by and among, Holdings, Matrix Parent, the lenders from time to time party thereto (the "**Second Lien Lenders**"), and the agent to the Second Lien Lenders under the Second Lien Credit Agreement, plus accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto, (the "**Second Lien Debt Claims**", and such undersigned holders of Second Lien Debt Claims, the "**Initial Consenting Second Lien Lenders**", and together with any Second Lien Lenders that subsequently become party to this agreement, solely in their capacity as Second Lien Lenders, the "**Consenting Second Lien Lenders**", and with the Consenting First Lien Lenders and Consenting Noteholders, the "**Consenting Creditors**");[1] and

(e)     (i) Matrix TopCo, L.P. ("**TopCo**") and (ii) H.I.G. Technology Partners A, L.P., H.I.G. Technology Partners B, L.P., H.I.G. Europe Middle Market LBO Fund III, L.P., H.I.G. Middle Market LBO Fund III, L.P., H.I.G. Matrix Co-Investors L.P., and H.I.G. Mobile, L.P. (collectively, the "**H.I.G. Parties**" and, together with TopCo, the "**Consenting Sponsor**" and, the Consenting Sponsor together with the Consenting Creditors, the "**Consenting Parties**").

The Debtors, each of the Consenting Parties, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are collectively referred to herein as the "**Parties**" and each, individually as a "**Party**."  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below).  The terms of the Restructuring Term Sheet are hereby incorporated by reference and included in the terms of this Agreement.  In the event of any inconsistencies between this Agreement and the Restructuring Term Sheet, the Restructuring Term Sheet shall govern.

---

[1] For the avoidance of doubt, all Claims and Causes of Action against any Debtor held by the Consenting Creditors shall be voted in favor of, or released pursuant to, the Plan in accordance with and subject to the terms and conditions of this Agreement.

WEIL:\99859062\1\63808.0003

## RECITALS

**WHEREAS**, the Parties have negotiated in good faith at arm's-length and agreed to consummate and support a restructuring of the Company's capital structure (the "**Restructuring**") pursuant to the Restructuring Transactions[2] on the terms set forth in this Agreement and as specified in the Restructuring Term Sheet;

**WHEREAS**, the Debtors will implement the Restructuring Transactions through commencement by the Debtors of voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court;

**WHEREAS**, as of the date hereof, the Initial Consenting First Lien Lenders, in the aggregate, hold, own, or control approximately: 88.4% of the aggregate outstanding principal amount of First Lien Debt Claims, including (i) 98.9% of the aggregate outstanding principal amount of the First Lien Term Loans and (ii) 16% of the aggregate outstanding principal amount of the First Lien Revolving Loans;

**WHEREAS**, as of the date hereof, the Initial Consenting First Lien Noteholders, in the aggregate, hold, own, or control approximately 100% of the aggregate outstanding principal amount of First Lien Notes Claims;

**WHEREAS**, as of the date hereof, the Initial Consenting Second Lien Lenders, in the aggregate, hold, own, or control approximately 77% of the aggregate outstanding principal amount of Second Lien Debt Claims;

**WHEREAS**, as of the date hereof, TopCo holds 100% of the Interests in Intermediate and the H.I.G. Parties hold 59.9% of the interests in TopCo;

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters set forth in this Agreement, including the Plan;

**WHEREAS**, certain Consenting Creditors or their affiliates have committed to provide a superpriority senior-secured, priming debtor-in-possession term loan facility (the "**DIP Facility**" or "**DIP Financing**") consisting of (i)(x) $60,000,000 of new money DIP Loans (the "**New Money DIP Loans**") and (ii)(y) subject to the DIP Term Sheet and paragraph 2(c) of the DIP Orders, a roll up of $100,000,000 in principal amount of First Lien Claims held by DIP Lenders (as defined below) (the "**Rolled-Up DIP Loans**" and, together with the New Money DIP Loans, the "**DIP-to-Exit Term Loans**"), to the Debtors pursuant to the terms and subject to the conditions of the DIP Credit Agreement (as defined below), $160,000,000 of which will convert, on a dollar-for-dollar basis, to Exit Term Loans (as defined in the Exit Facility Term Sheet) upon the Effective Date subject to the terms and conditions set forth in this Agreement and the DIP Credit Agreement and (ii) the Backstop Premium (as defined in the Restructuring Term Sheet), which shall be in the form of the Tranche B Loans (as defined in the DIP Term Sheet);

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Restructuring Term Sheet (as defined below).

WEIL:\99859062\1\63808.0003

**WHEREAS**, certain Consenting Creditors or their affiliates that are parties to the Backstop Commitment Letter (in such capacity, the "**DIP Backstop Parties**") will, severally and not jointly, commit to backstop the DIP Facility, in accordance with the terms of Restructuring Term Sheet and the Backstop Commitment Letter (each such commitment, a "**Backstop Commitment**"); and

**WHEREAS**, the Company and the Consenting Parties have agreed to contribute their respective interests in the Audax Litigation (as defined in the Litigation Proceeds Term Sheet) to the Litigation Trust on the terms and conditions set forth in the Litigation Proceeds Term Sheet.

**NOW, THEREFORE**, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, on a several but not joint basis, agree as follows:

1.      **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)      "**Agreement**" has the meaning set forth in the preamble to this Agreement.

(b)      "**Alternative Restructuring**" means any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of all or any material portion of assets, financing (debt or equity) other than a refinancing of the DIP Facility that pays all DIP Obligations in full in cash in accordance with the terms of the DIP Documents, plan proposal, recapitalization, restructuring of the Debtors, or other transaction of similar effect, other than the Restructuring; provided that any Alternative Restructuring that is implemented pursuant to a valid amendment of this Agreement shall not be an Alternative Restructuring.

(c)      "**Backstop Commitment**" has the meaning set forth in the recitals to this Agreement.

(d)      "**Business Day**" means any day, other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

(e)      "**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

(f)      "**Consenting Claims**" means all Claims against any Debtor held by or on behalf of or in the control of Consenting Creditors from time to time.

(g)      "**Consenting Creditor Advisors**" means the Consenting First Lien Creditor Advisors and Consenting Second Lien Creditor Advisors.

(h)      "**Consenting Creditor Group Counsels**" means the Consenting First Lien Creditor Group Counsel and the Consenting Second Lien Creditor Group Counsel.

(i)      "**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

(j)      "**Consenting Creditor Related Fund**" means any fund managed, advised or sub-advised by a Consenting Creditor or any of its affiliates.

(k)      "**Consenting First Lien Creditor Advisors**" means collectively (i) Consenting First Lien Creditor Group Counsel, (ii) Houlihan Lokey, Inc., as financial advisor to the First Lien Ad Hoc Group, (iii) Porter Hedges LLP, as local Texas counsel to the First Lien Ad Hoc Group, and (iv) one local legal counsel per other foreign jurisdiction as the Requisite Consenting First Lien Lenders determine reasonably necessary.

(l)      "**Consenting First Lien Creditor Group Counsel**" means Milbank LLP, as legal advisor to the First Lien Ad Hoc Group.

(m)      "**Consenting Second Lien Creditor Advisors**" means collectively (i) Consenting Second Lien Creditor Group Counsel, and (ii) Greenhill & Co., as financial advisor to the Second Lien Ad Hoc Group.

(n)      "**Consenting Second Lien Creditor Group Counsel**" means Akin Gump Strauss Hauer & Feld LLP, as legal advisor to the Second Lien Ad Hoc Group.

(o)      "**Consenting Creditor Termination Event**" has the meaning set forth in Section 8.02.

(p)      "**Consenting Parties**" has the meaning set forth in the preamble to this Agreement.

(q)      "**Consenting Sponsor**" has the meaning set forth in the preamble to this Agreement.

(r)      "**Consenting Sponsor Counsel**" means Simpson Thacher & Bartlett LLP and one local legal counsel as reasonably necessary as determined by the Consenting Sponsor.

(s)      "**Consenting Sponsor Termination Event**" has the meaning set forth in Section 8.04.

(t)      "**Debtors**" has the meaning set forth in the preamble to this Agreement.

(u)      "**Debtors Advisors**" means Weil, Evercore Group, L.L.C., and FTI Consulting, Inc.

(v)      "**Debtor Termination Event**" has the meaning set forth in Section 8.03.

(w)      "**Definitive Documents**" means, collectively: (i) the Plan and the Plan Supplement, including, without limitation, any schedules of assumed or rejected contracts, (ii) the Disclosure Statement and the Solicitation Materials and exhibits related thereto, (iii) the Disclosure Statement Approval Order, (iv) the Confirmation Order, (v) the DIP Documents, including the DIP

5

Orders; (vi) the Exit Credit Agreement and related credit documents, (vii) the New Corporate Governance Documents; (viii) the Management Incentive Plan, if any, (ix) the Litigation Trust Agreement, (x) the Backstop Commitment Letter, (xi) the First Day Orders, and (xiii) any other material, documents, instruments, schedules, or exhibits described in, related to, or contemplated in, or necessary to implement, each of the foregoing.

(x)     "**DIP Backstop Parties**" has the meaning set forth in the recitals to this Agreement.

(y)     "**DIP Commitments**" has the meaning set forth in the recitals to this Agreement.

(z)     "**DIP Facility**" or "**DIP Financing**" has the meaning set forth in the recitals to this Agreement.

(aa)    "**DIP Loans**" has the meaning set forth in the recitals to this Agreement.

(bb)    "**Direct Interest**" has the meaning set forth in <u>Section 6(h)</u>.

(cc)    "**Disclosure Statement Approval Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and solicitation procedures in connection thereto.

(dd)    "**Effective Date Milestone**" has the meaning set forth in <u>Exhibit C</u>.

(ee)    "**Evercore**" means Evercore Group, L.L.C.

(ff)    "**Fiduciary Out Determination**" means the board of directors, board of managers, or such similar governing body of any Debtor reasonably determines in good faith after consultation with outside counsel that proceeding with any of the Restructuring Transactions, or any of the Debtors obligations hereunder would be inconsistent with the exercise of its fiduciary duties under applicable Law.

(gg)    "**First Day Orders**" means any interim or final orders of the Bankruptcy Court granting the relief requested in the first-day pleadings that the Debtors determine are necessary or desirable to file in the Chapter 11 Cases.

(hh)    "**First Lien Ad Hoc Group**" means the ad hoc group of First Lien Lenders represented by the Consenting First Lien Creditor Advisors.

(ii)    "**First Lien Credit Agreement**" has the meaning set forth in the preamble to this Agreement.

(jj)    "**First Lien Debt Claims**" has the meaning set forth in the preamble to this Agreement.

(kk)    "**First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

(ll)    "**First Lien Notes Claims**" has the meaning set forth in the preamble to this Agreement.

(mm)    "**First Lien Revolving Loans**" has the meaning set forth in the preamble to this Agreement.

(nn)    "**First Lien Term Loans**" has the meaning set forth in the preamble to this Agreement.

(oo)    "**Holdings**" has the meaning set forth in the preamble to this Agreement.

(pp)    "**Indirect Interest**" has the meaning set forth in <u>Section 6(h)</u>.

(qq)    "**Initial Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

(rr)    "**Initial Consenting Noteholders**" has the meaning set forth in the preamble to this Agreement.

(ss)    "**Initial Consenting Second Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

(tt)    "**Intermediate**" has the meaning set forth in the preamble to this Agreement.

(uu)    "**Joinder Agreement**" has the meaning set forth in <u>Section 4.02</u>.

(vv)    "**Matrix Parent**" has the meaning set forth in the preamble to this Agreement.

(ww)    "**Milestones**" means the "Milestones" set forth in <u>Exhibit C</u>.

(xx)    "**Minority Shareholder**" means Audax Management Company, LLC and its affiliates.

(yy)    "**New Money DIP Loans**" has the meaning set forth in the recitals to this Agreement.

(zz)    "**Outside Date**" means the date that is six (6) months following the Petition Date.

(aaa)    "**Party**" or "**Parties**" has the meaning set forth in the preamble to this Agreement.

(bbb)    "**Permitted Transferee**" has the meaning set forth in <u>Section 4.02</u>.

(ccc)    "**Qualified Marketmaker**" has the meaning set forth in <u>Section 4.02</u>.

(ddd)    "**Qualified Marketmaker Joinder Date**" has the meaning set forth in Section 4.02.

(eee)    "**Restructuring**" has the meaning set forth in the recitals to this Agreement.

(fff)    "**Restructuring Fees and Expenses**" means all reasonable and documented fees, costs, and expenses of each of the (i) Consenting First Lien Creditor Advisors, (ii) Consenting Second Lien Creditor Advisors; *provided*, however, such payment shall be capped at $2.5 million for all fees and expenses incurred following the parties' execution of the RSA, and (iii) Consenting Sponsor Counsel (the payment of such Consenting Sponsor Counsels' fees shall not exceed $750,000), in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of this Agreement, the Plan, the Definitive Documents, and the transactions contemplated hereby and thereby.

(ggg)    "**Restructuring Term Sheet**" means the term sheet attach hereto as Exhibit A (as may be amended, supplemented, or otherwise modified from time to time pursuant to this Agreement.

(hhh)    "**Rolled-Up DIP Loans**" has the meaning set forth in the recitals to this Agreement.

(iii)    "**Second Lien Ad Hoc Group**" means the ad hoc group of Second Lien Lenders represented by Akin Gump Strauss Hauer & Feld LLP, as counsel, and Greenhill & Co., as financial advisor.

(jjj)    "**Second Lien Credit Agreement**" has the meaning set forth in the preamble to this Agreement.

(kkk)    "**Second Lien Debt Claims**" has the meaning set forth in the preamble to this Agreement.

(lll)    "**Second Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

(mmm)"**Second Lien Term Loans**" has the meaning set forth in the preamble to this Agreement.

(nnn)    "**Securities Act**" means the U.S. Securities Act of 1933, as amended and any rules and regulations promulgated thereby.

(ooo)    "**Support Effective Date**" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Debtors, (ii) Initial Consenting First Lien Lenders holding at least 66.7% of the aggregate outstanding principal of First Lien Claims, (iii) Initial Consenting Second Lien Lenders holding at least 66.7% of the aggregate outstanding principal of Second Lien Claims, and (iv) the Consenting Sponsor.

(ppp)    "**Support Period**" means the period commencing on the Support Effective Date and ending on the Termination Date.

(qqq) "**Termination Date**" means the date on which termination of this Agreement is effective as to a Party in accordance with <u>Section 8</u> of this Agreement.

(rrr)   "**Transfer**" has the meaning set forth in <u>Section 4.02</u>.

(sss)   "**Weil**" means Weil, Gotshal & Manges LLP, as legal advisors to the Debtors.

2.   **Passage of Time**

With respect to any Milestone or other reference of time herein, if the last day of such period falls on a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure, such Milestone or other reference of time shall be extended to the next day that is not a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure; *provided*, for the avoidance of doubt, that any Milestone with respect to a hearing date shall be subject to the Bankruptcy Court's availability; *provided*, *however*, that any such hearing date shall not be extended by more than three (3) Business Days without the consent of the Requisite Consenting First Lien Lenders.

3.   **Restructuring.**

Section 3.01   <u>Confirmation of the Plan</u>.  Subject to the terms of this Agreement, the Parties will use their commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable after the Petition Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement. Each Party shall use its commercially reasonable efforts to cooperate fully and coordinate amongst each other and with the Debtors in connection therewith. Further, each of the Parties shall take such action (including executing and delivering any other agreements) as may be reasonably necessary or as may be required by order of the Bankruptcy Court, to carry out the purpose and intent of this Agreement (including, without limitation, to provide any information reasonably necessary, or information requested from federal, state, or local regulators, to obtain required regulatory approvals necessary for confirmation of the Plan or consummation of the Restructuring).

Section 3.02   <u>Definitive Documents.</u> Each of the Definitive Documents shall (a) contain terms and conditions consistent in all material respects with this Agreement, including the Restructuring Term Sheet, and (b) otherwise be in form and substance reasonably acceptable to the Debtors and the Requisite Consenting First Lien Lenders; *provided*, *that*, notwithstanding anything to the contrary in this Agreement, the following Definitive Documents shall be consistent in all respects with this Agreement and otherwise in form and substance acceptable to the Debtors and the Requisite Consenting First Lien Lenders:  (i) the DIP Orders; (ii) the DIP Documents; (iii) the Plan, (iv) the Disclosure Statement, (v) the New Corporate Governance Documents, (vi) the Backstop Commitment Letter, (vii) the Restructuring Transactions Exhibit; (viii) the Schedule of Excluded Parties, and (ix) the Exit Credit Agreement and any related credit documents; *provided*, *further*, that the New Corporate Governance Documents shall be consistent in all respects with this Agreement and otherwise in form and substance acceptable solely to the Requisite Consenting First Lien Lenders in their sole discretion; *provided, further,* that notwithstanding anything to the contrary in this Agreement, (a) the Litigation Trust Agreement

and any agreements related thereto (to the extent that the Consenting Sponsor is a party) or that have an effect on the Consenting Sponsor's treatment, releases, settlements, rights, and obligations as set forth in this Agreement shall be in form and substance reasonably acceptable to the Debtors, Requisite Consenting First Lien Lenders, and the Consenting Sponsor, and (b) any Definitive Document to the extent it materially affects the treatment, economic recoveries, rights, or obligations of the holders of Second Lien Debt Claims as set forth in this Agreement (including the Restructuring Term Sheet and Governance Term Sheet attached thereto) shall be in form and substance reasonably acceptable to the Requisite Consenting Second Lien Lenders.

4.     **Agreements of the Consenting Creditors.**

        Section 4.01   <u>Support.</u>   Each Consenting Creditor, with respect to each of its respective Consenting Claims, hereby covenants and agrees, severally and not jointly, during the Support Period, that it shall:

        (a)     cooperate (to the extent reasonably practicable and subject to the terms hereof) with the Debtors and use its commercially reasonable efforts to support and consummate the Restructuring, including, for the avoidance of doubt, using its commercially reasonable efforts to obtain any necessary federal, state, and local regulatory approvals required to obtain confirmation of the Plan or consummate the Plan and the Restructuring contemplated thereby and herein by the Effective Date Milestone, on a timeline consistent with the Milestones;

        (b)     timely vote, cause to be voted, or direct to be voted all of its Claims (or Claims under its control or direction) entitled under the Plan to vote to accept or reject the Plan, to accept the Plan and not change or withdraw (or cause to be changed or withdrawn) any such vote; *provided* that each Consenting Creditor shall use commercially reasonable best efforts to vote, cause to be voted, or direct to be voted within five (5) Business Days following receipt of the Solicitation Materials all of its Claims (or Claims under its control or direction) entitled under the Plan to vote to accept or reject the Plan, to accept the Plan; *provided*, *further*, that each Consenting Creditor may change or withdraw its vote (i) if the Debtors withdraw the Plan or modify the Plan in a manner inconsistent with this Agreement or (ii) following termination of this Agreement;

        (c)     support and not object to approval of and entry of orders regarding the Definitive Documents, and confirmation and consummation of the Plan and the Restructuring, in each case consistent with the terms and conditions, and within the timeframes contemplated by, this Agreement (including the Restructuring Term Sheet); *provided*, *that*, nothing in this Agreement shall require a Consenting Creditor to file any motion or pleading;

        (d)     grant and, if applicable, not opt-out of the release of third-party claims pursuant to the Plan and Confirmation Order;

        (e)     not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, DIP Financing, acceptance, confirmation, or implementation of the Plan, or the Restructuring, (ii) propose, support, vote for, encourage, seek, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with any entity regarding, any Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency,

or making or supporting any press release, press report or comparable public statement, or filing with respect to any Alternative Restructuring, or (iii) otherwise take any action that would be reasonably likely to interfere with, delay or postpone the consummation of the Restructuring;

(f)     not direct any administrative agent, collateral agent, or indenture trustee (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement, and if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement, such Consenting Creditor, following written notification (email notice being sufficient) from the Debtors to such Consenting Creditor, will use commercially reasonable efforts to direct such administrative agent, collateral agent, or indenture trustee to cease, desist, and refrain from taking any such action, and to take such action as may be necessary to effect the Restructuring;

(g)     complete, enter into, and effectuate the Definitive Documents (as applicable) as contemplated herein and subject to the terms and conditions of this Agreement;

(h)     timely vote (or cause or direct to be voted) its Claims against any Alternative Restructuring;

(i)     promptly inform Weil (which may be through the Consenting Creditor Advisors) and Consenting Sponsor Counsel of the occurrence of any Consenting Creditor Termination Event, Debtor Termination Event, or Consenting Sponsor Termination Event that the Consenting Creditors or their advisors are aware of;

(j)     act in good faith consistent with this Agreement;

(k)     comply with, and not take any actions inconsistent with transactions contemplated by the Litigation Proceeds Term Sheet;

(l)     to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Plan and Restructuring Transactions (as determined by the Debtors and the Requisite Consenting First Lien Lenders in good faith), negotiate in good faith appropriate additional or alternative provisions to address any such impediment; and

(m)     refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement or would be reasonably likely to interfere with the Restructuring, including: (i) encouraging another Person (including the Minority Shareholder) to undertake any action prohibited by this Agreement; or (ii) commencing, encouraging, or soliciting any discussions or proposals with the Minority Shareholder in relation to an Alternative Restructuring.

Section 4.02   Transfers.  Each Consenting Creditor agrees that during the Support Period, it shall not sell, assign, loan, issue, pledge, hypothecate, transfer, participate, or otherwise dispose of ("**Transfer**"), directly or indirectly, in whole or in part, any Claims, option thereon, or right or interest therein or any other Claims against the Debtors (including any beneficial ownership as defined in Rule 13d-3 under the Exchange Act or by granting any proxies, depositing any Claims into a voting trust or entering into a voting agreement with respect to such Claims), and any purported Transfer shall be void and without effect unless the transferee thereof:

(a)     is a Consenting Creditor and the transferee provides notice of such Transfer (including the amount and type of Claims transferred) to Weil within three (3) Business Days following the consummation of such Transfer;

(b)     is a Consenting Creditor Related Fund and the transferee provides notice of such Transfer (including the amount and type of Claims transferred) to Weil within three (3) Business Days following the consummation of such Transfer; *provided*, *that*, upon such Transfer such transferee shall be deemed to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (which obligations may be enforced against such transferee by the Parties); or

(c)     before such Transfer, agrees in writing for the benefit of the Parties to become, effective prior to or upon the consummation of such Transfer, a Consenting Creditor for all purposes hereunder and to be bound by all of the terms of this Agreement applicable to a Consenting Creditor (including with respect to any and all Claims it already may hold before such Transfer) by executing a joinder agreement in the form attached hereto as **Exhibit B** (a "**Joinder Agreement**") and delivering an executed copy of such Joinder Agreement to Weil and the Consenting Creditor Group Counsels within two (2) Business Days following such execution. Each Consenting Creditor agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

(d)     Notwithstanding anything to the contrary in this Agreement, a Consenting Creditor may Transfer Claims to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker be or become an entity identified in Section 4.02(a) through (c) hereof (a "**Permitted Transferee**"); *provided, that*, (i) any such Qualified Marketmaker may only subsequently Transfer the right, title or interest to such Claims to a transferee that is or becomes a Permitted Transferee at the time of such Transfer and (ii) any transferee satisfies Section 26.03 of this Agreement, and (iii) the Transfer documentation between such Consenting Creditor and such Qualified Marketmaker shall contain a covenant providing for the requirement in the preceding clause (i); *provided*, *further*, that if a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any Claims that it acquires that are not Consenting Claims (*i.e.*, received by such Qualified Marketmaker from a holder that is not a Consenting Creditor) without such Transfer being subject to this Section 4.02.

(e)     If at the time of a proposed Transfer of any Claims to a Qualified Marketmaker, such Claims: (i) may be voted or consent solicited with respect to the Restructuring, then the proposed transferor must first vote or consent such Claims in accordance with Section 4.01, or (ii) have not yet been and may yet be voted or consent solicited with respect to the Plan and/or the Restructuring and such Qualified Marketmaker does not Transfer such Claims to a Permitted Transferee before the third Business Day before the expiration of an applicable voting or consent deadline (such date, the "**Qualified Marketmaker Joinder Date**"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first Business Day immediately after the Qualified Marketmaker Joinder Date, become a Consenting Creditor with respect to such Claims in accordance with the terms hereof; *provided*, *further*, that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Creditor with respect

to such Claim at such time as such Claim has been Transferred by such Qualified Marketmaker to a transferee that is a Permitted Transferee in accordance with this Agreement.

For these purposes, "**Qualified Marketmaker**" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Claims, or enter with customers into long and/or short positions in Claims, in its capacity as a dealer or market maker in such Claims, (ii) is in fact regularly in the business of making a market in claims, interest, or securities of issuers or borrowers, and (iii) is acting solely in such capacity in connection with a trade otherwise permitted under this Agreement.

Section 4.03   <u>Additional Claims</u>.   To the extent any Consenting Creditor (i) acquires additional Claims entitled to vote on the Plan or (ii) Transfers any Claims, then, in each case, each such Consenting Creditor shall promptly notify Weil and Consenting Creditor Group Counsels and each such Consenting Creditor hereby agrees that such additional Claims other than with respect to any Claims acquired by such Consenting Creditor in its capacity as a Qualified Marketmaker, and subject to <u>Section 4.02(e)</u>, shall be subject to this Agreement, and that for the duration of the Support Period, it shall vote (or cause or direct to be voted) any such additional Claims entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with <u>Section 4.01(a)</u> hereof.

Section 4.04   <u>Forbearance</u>.

(a)   Each Consenting Creditor agrees to forbear solely during the Support Period applicable to such Consenting Creditor from the exercise of (or direction of any agent or trustee to exercise) any and all rights (including any right of set-off) and remedies in contravention of this Agreement, including under the First Lien Credit Agreement, the Note Purchase Agreement, or Second Lien Credit Agreement, as applicable, any agreement contemplated thereby or executed in connection therewith, as applicable, and under applicable U.S. or foreign law or otherwise, in each case, with respect to any breaches, defaults, events of default or potential defaults by the Debtors, whether at law, in equity, by agreement or otherwise, which are or become available to them in respect of the First Lien Claims, Second Lien Debt Claims, or any other Claims.  Additionally, during the Support Period, the Consenting Creditors agree not to support, join, or otherwise assist any person in litigation against the Debtors in connection with the Chapter 11 Cases, Restructuring, the First Lien Claims, the Second Lien Debt Claims, or any other Claims; *provided*, that the foregoing will not limit any of the Consenting Creditors' rights to enforce any rights under this Agreement or right to appear as a party in interest and filing papers in any matter to be adjudicated in the Chapter 11 Cases to the extent not inconsistent with the terms of this Agreement.

(b)   Each Consenting Creditor further agrees that if any applicable administrative agent, collateral agent, or indenture trustee takes any action inconsistent with any such Consenting Creditor's obligations under this <u>Section 4.04</u>, such Consenting Creditor, following written notification (email notice being sufficient) from the Debtors to such Consenting Creditor, shall use commercially reasonable efforts to direct and cause such administrative agent, collateral agent, or indenture trustee (as applicable) to cease and refrain from taking such actions. For the avoidance of doubt, the foregoing forbearance shall not be construed to impair the ability of the Consenting Creditors to take any remedial action, subject to the terms of the First Lien Credit Agreement, Note Purchase Agreement, or Second Lien Credit Agreement, as applicable, at any

13

time after the Termination Date (unless the Termination Date occurs solely as a result of the occurrence of the Effective Date).

Section 4.05  <u>Additional Provisions Regarding Consenting Creditor Commitments</u>.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall: (a) affect the ability of any Consenting Creditor to consult with any other Consenting Creditor, the Debtors, or any other party in interest in the Chapter 11 Cases (including any official committee or the United States Trustee); (b) impair or waive the rights of any Consenting Creditor to assert or raise any objection permitted under this Agreement in connection with the Restructuring; (c) prevent any Consenting Creditor from enforcing this Agreement or any Definitive Document, or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, such documents; (d) prevent any Consenting Creditor from taking any customary perfection step or other action as is necessary to preserve or defend the validity or existence of its Claims and Interests (including, without limitation, the filing of proofs of claim); or (e) require any Consenting Creditor to incur any expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Creditor; *provided*, that nothing in the foregoing <u>clause (e)</u> shall serve to limit, alter, or modify any Consenting Creditor's express obligations under the terms of this Agreement.

5.    **Agreements of the Debtors.**

The Debtors agree during the Support Period to use commercially reasonable efforts to do all things in furtherance of the Restructuring, including:

(a)    to (i) act in good faith and use commercially reasonable efforts to support and successfully complete solicitation of the Plan, (ii) pursue any necessary federal, state, and local regulatory approvals to enable confirmation of the Plan, including, without limitation, approvals from any regulatory body whose approval or consent is determined by the Debtors to be necessary to consummate the Restructuring Transactions, and (iii) do all things reasonably necessary and appropriate in furtherance of confirming the Plan and consummating the Restructuring in accordance with and within the time frames contemplated by this Agreement and the Plan;

(b)    complete, enter into, and effectuate the Definitive Documents within the timeframes contemplated herein;

(c)    to provide draft copies of all material motions, applications, and other documents relating to the Plan, the Disclosure Statement, any proposed amended version of the Plan or Disclosure Statement, and all first day pleadings that the Debtors intend to file with the Bankruptcy Court to the Consenting Creditor Group Counsels and Consenting Sponsor Counsel, if practicable, at least three (3) calendar days before the date of filing of any such pleading or other document (and, if not practicable, as soon as practicable before filing) and, without limiting any approval rights set forth in this Agreement, shall consult in good faith with Consenting Creditor Group Counsels and Consenting Sponsor Counsel regarding the form and substance of any such proposed filing;

WEIL:\99859062\1\63808.0003

(d)      subject to any confidentiality obligations, provide a copy of any written proposal for an Alternative Restructuring (or a written summary of any oral proposal for an Alternative Restructuring) received by the Debtors to the Consenting Creditor Group Counsels and the Consenting Sponsor Counsel on a "professional eyes only" basis within one (1) Business Day of delivery to the board of directors, board of managers, or similar governing body of the Debtors of such proposal and, in any event, three (3) Business Days after the Debtors' or their advisors' receipt of such proposal; *provided*, *that*, the Debtors will make commercially reasonable efforts to share any proposal for an Alternative Restructuring, including seeking any necessary waivers or modifications of any confidentiality provisions;

(e)      promptly inform each of the Consenting Creditor Group Counsels and Consenting Sponsor Counsel of the occurrence of any Consenting Creditor Termination Event, Debtor Termination Event, or Consenting Sponsor Termination Event that the Debtors or their advisors are aware of;

(f)      from the Support Effective Date through and including the Effective Date, pay in full and in cash all Restructuring Fees and Expenses when properly incurred and invoiced in accordance with the relevant engagement letters and/or fee arrangements, and continue to pay such amounts as they come due, and otherwise in accordance with the applicable engagement letters and/or fee arrangements of the Consenting Creditor Advisors and Consenting Sponsor Counsel (and not terminate such engagement letters and/or fee arrangements or seek to reject them in the Chapter 11 Cases);

(g)      not, without the prior written consent of the Requisite Consenting First Lien Lenders (with email from the Consenting First Lien Creditor Group Counsel being sufficient) (which consent shall not be unreasonably withheld): (i) enter into or amend, adopt, restate, supplement, or otherwise modify any employee benefit, deferred compensation, incentive, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans or agreements, including offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any of its executive officers or (ii) increase the base salary, target bonus opportunity, or other benefits payable by the Debtors or their subsidiaries to any of their executive officers;

(h)      comply with, and not take any actions inconsistent with transactions contemplated by the Litigation Proceeds Term Sheet;

(i)      not directly or indirectly prepare, commence, or support any third party in connection with an avoidance action or other legal proceeding that challenges the amount, validity, allowance, character, enforceability, liens or encumbrances securing, or priority of any First Lien Claims or Second Lien Debt Claims;

(j)      to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Plan and Restructuring Transactions (as determined by the Debtors and the Requisite Consenting First Lien Lenders in good faith), negotiate in good faith appropriate additional or alternative provisions to address any such impediment; and

(k)     not directly or indirectly take any action that would be inconsistent with this Agreement or would be reasonably likely to interfere with the Restructuring (including encouraging another Person to undertake any action prohibited by this Agreement).

6.     **Agreements of the Consenting Sponsor**

Section 6.01   The Consenting Sponsor agrees that, during the Support Period, it shall:

(a)     (i) act in good faith to support and successfully complete solicitation of the Plan and the Restructuring Transactions, (ii) pursue, at the sole cost of the Debtors, any necessary federal, state, and local regulatory approvals to enable confirmation of the Plan, including, without limitation, approvals from any regulatory body whose approval or consent is determined by the Debtors to be necessary to consummate the Restructuring Transactions and whose approval can only be obtained by the Consenting Sponsor, and (iii) do all things reasonably necessary and appropriate in furtherance of confirming the Plan and consummating the Restructuring in accordance with and within the time frames contemplated by this Agreement and the Plan;

(b)     complete, enter into, and effectuate the agreed Definitive Documents (to which the Consenting Sponsor is a party) within the timeframes contemplated herein;

(c)     grant and, if applicable, not opt-out of the release of third-party claims pursuant to the Plan and Confirmation Order;

(d)     promptly inform Weil and Consenting Creditor Group Counsels of the occurrence of any Consenting Creditor Termination Event, Debtor Termination Event, or Consenting Sponsor Termination Event that the Consenting Sponsor or its advisors are aware of;

(e)     refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement or would be reasonably likely to interfere with the Restructuring (including encouraging another Person to undertake any action prohibited by this Agreement);

(f)     to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Plan and Restructuring Transactions (as determined by the Debtors and the Requisite Consenting First Lien Lenders in good faith), negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(g)     not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, DIP Financing, or acceptance, confirmation, or implementation of the Plan or the Restructuring Transactions, (ii) propose, support, vote for, encourage, seek, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with any entity regarding, any Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, or making or supporting any press release, press report or comparable public statement, or filing with respect to any Alternative Restructuring, or (iii) otherwise take any action that would interfere with, delay or postpone the consummation of the Restructuring;

16

(h)     comply with, and not take any actions inconsistent with transactions contemplated by the Litigation Proceeds Term Sheet; and

(i)     for the duration of the Support Period, not (i) Transfer, in whole or in part, directly or indirectly (including for this purpose, by granting, issuing or Transferring a right or option to acquire, including any put option or entering into a contract to Transfer), any portion of its right, title, or interests in any of its shares, stock, or other equity interests in either (A) any of the Debtors (a "**Direct Interest**") or (B) any entity (including TopCo or other upper-tier entity) that directly owns or indirectly owns (through the entity's ownership of another entity or a chain of entities) equity interests in any of the Debtors (an "**Indirect Interest**"), other than any such Transfer entered into pursuant to the Plan; (ii) permit (to the extent within its control) direct or indirect Transfers of any Direct Interests or Indirect Interests; (iii) claim or cause to be claimed any worthlessness deduction with respect to a Direct Interest or Indirect Interest in any of the Debtors for any tax year ending on or before the Plan Effective Date; or (iv) take any action that would cause the deconsolidation of any entity within the U.S. federal consolidated tax group that includes any Debtor, other than any such deconsolidation effected pursuant to the Plan, in the case of each of (i), (ii), (iii), and (iv), if such action could adversely affect the taxes or tax attributes of the Debtors, including under section 382 of the Internal Revenue Code of 1986 (as amended).

Section 6.02   <u>Additional   Provisions   Regarding   Consenting   Sponsor Commitments</u>. Notwithstanding anything to the contrary herein, nothing in this Agreement shall: (a) affect the ability of the Consenting Sponsor to consult with any Consenting Creditor, the Debtors, or any other party in interest in the Chapter 11 Cases (including any official committee or the United States Trustee); (b) impair or waive the rights of the Consenting Sponsor to assert or raise any objection permitted under this Agreement in connection with the Restructuring; (c) prevent the Consenting Sponsor from enforcing this Agreement or any Definitive Document, or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, such documents; or (d) require the Consenting Sponsor to incur any expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities, or other obligations to the Consenting Sponsor; provided, that nothing in the foregoing clause (d) shall serve to limit, alter, or modify the Consenting Sponsor's express obligations under the terms of this Agreement.

7.     **Additional Provisions Regarding Debtors' Commitments.**

Section 7.01   Notwithstanding anything to the contrary in this Agreement but subject to <u>Section 26</u> hereof, each Debtor and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) consider, respond to, and facilitate any unsolicited Alternative Restructuring proposals received by the Debtors; (b) provide access to non-public information concerning any Debtor to any Entity and enter into confidentiality agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to an Alternative Restructuring proposal; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Debtor, any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions. If any

Debtor receives an Alternative Restructuring proposal, then such Debtor shall (subject to confidentiality restrictions), within three (3) Business Days of receiving such proposal, (i) provide to the Consenting Parties and their counsel all documentation received in connection with such Alternative Restructuring proposal (or, if such proposal was not made in writing, a reasonably detailed summary of such Alternative Restructuring proposal), including the identity of the Person or group of Persons involved and reasonable updates as to the status and progress of such Alternative Restructuring proposal, and (ii) respond promptly to reasonable information requests and questions from counsel to the Consenting Parties relating to such Alternative Restructuring proposal, and promptly notify the Consenting Parties of any commitments made, or documents signed, in respect of such Alternative Restructuring; *provided*, *that*, the Debtors will make commercially reasonable efforts to share such documentation and information, including seeking any necessary waivers or modifications of any confidentiality provisions.

Section 7.02   Nothing in this Agreement shall: (a) impair or waive the rights of any Debtor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Debtor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

8.   **Termination of Agreement.**

Section 8.01   <u>Generally</u>.

(a)   This Agreement will automatically terminate upon the Effective Date (as to all Parties).

(b)   This Agreement will terminate three (3) Business Days following the receipt of written notice, delivered in accordance with <u>Section 22</u> hereof, to the other Parties (as applicable) from (i) the Requisite Consenting First Lien Lenders at any time after the occurrence of any Consenting Creditor Termination Event (as defined below), (ii) the Debtors (which for the avoidance of doubt, may be delivered by Weil on behalf of any or all entities constituting the Debtors) at any time after the occurrence of any Debtor Termination Event (as defined below), (iii) the Requisite Consenting Second Lien Lenders, who may only terminate this Agreement as to themselves, at any time after the occurrence of any Consenting Creditor Termination Event, or (iv) the Consenting Sponsor, who may only terminate this Agreement as to itself, at any time after the occurrence of any Consenting Sponsor Termination Event (as defined below).  No Party may terminate this Agreement based on a Consenting Creditor Termination Event, Debtor Termination Event, or Consenting Sponsor Termination Event, as applicable, caused by such Party's failure to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's prior failure to perform or comply in all material respects with the terms and conditions of this Agreement).

(c)   Each of the dates and time periods in this <u>Section 8</u> may be extended by mutual agreement (which may be evidenced by e-mail confirmation, including from respective counsel) among the Debtors, the Requisite Consenting First Lien Lenders, and, solely with respect to a Consenting Sponsor Termination Event and the Outside Date, the Consenting Sponsor, as applicable.

WEIL:\99859062\1\63808.0003

Section 8.02    A "**Consenting Creditor Termination Event**" will mean any of the following:

(a)    the Debtors withdraw or modify the Plan or Disclosure Statement or file any motion or pleading with the Bankruptcy Court that is in any material respect inconsistent with this Agreement or the Plan and such withdrawal, modification, motion, or pleading has not been revoked before the earlier of (i) three (3) Business Days after the Debtors receive written notice from the Requisite First Lien Creditors or Requisite Second Lien Creditors, as applicable, that such withdrawal, modification, motion, or pleading is materially inconsistent with this Agreement or the Plan and (ii) entry of an order of the Bankruptcy Court approving such withdrawal, modification, motion, or pleading;

(b)    (i) any Definitive Document filed by the Debtors in its Chapter 11 Cases or any related order entered by the Bankruptcy Court is materially inconsistent with the terms and conditions set forth in this Agreement, including the consent rights set forth in Section 3.02 hereof, or is otherwise not in accordance with this Agreement or any of the terms or conditions of this Agreement or (ii) any of the Definitive Documents is waived, amended, supplemented, or otherwise modified in a manner that is inconsistent in any material respect with the terms and conditions set forth in this Agreement, including the consent rights set forth in Section 3.02 hereof, without the prior written consent of the Requisite Consenting First Lien Lenders (or such parties as may be required by the terms of Section 3.02 hereof or such Definitive Document, if then effective), in each case, which has not been cured (if curable) within five (5) Business Days of written notice from the Requisite First Lien Creditors or Requisite Second Lien Creditors, as applicable;

(c)    the failure of the Debtors to meet any of the Milestones;

(d)    the breach in any material respect by the Debtors or the Consenting Sponsor of any of the representations, warranties, covenants, or other obligations of the Debtors or the Consenting Sponsor set forth in this Agreement, which breach has not been cured (if curable) within five (5) Business Days of written notice from the Requisite Consenting First Lien Lenders or Requisite Consenting Second Lien Lenders, as applicable;

(e)    with respect to the Consenting First Lien Lenders only, the breach in any material respect by the Consenting Second Lien Lenders of any of the representations, warranties, covenants, or other obligations of the Consenting Second Lien Lenders set forth in this Agreement, which breach has not been cured (if curable) within five (5) Business Days of written notice from the Requisite Consenting First Lien Lenders; *provided*, that the Requisite Consenting First Lien Lenders shall not have the right to terminate this Agreement if the non-breaching Consenting Second Lien Lenders still constitute holders of 66 2/3% of the Second Lien Debt Claims and 50% of the number of holders of Second Lien Debt Claims;

(f)    with respect to the Consenting First Lien Lenders only, if the Requisite Consenting Second Lien Lenders give notice of termination of this Agreement pursuant to Section 8.02 hereof;

WEIL:\99859062\1\63808.0003

(g)      with respect to the Consenting First Lien Lenders only, termination of this Agreement as to the Consenting Sponsor;

(h)      with respect to the Consenting First Lien Lenders only, the acceleration of obligations outstanding under the DIP Credit Agreement;

(i)      the public announcement by the Debtors of their intention not to support the Restructuring Transactions;

(j)      the Debtors enter into a definitive agreement with respect to an Alternative Restructuring or publicly announce their intention to enter into a definitive agreement with respect to an Alternative Restructuring;

(k)      one or more Debtors have made the Fiduciary Out Determination;

(l)      if the Debtors give notice of termination of this Agreement pursuant to Section 8.03 hereof;

(m)      with respect to the Consenting First Lien Lenders only, termination of the Backstop Commitment Letter;

(n)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment or non-appealable order enjoining the consummation of or rendering illegal the Restructuring, and such ruling, judgment or order has not been reversed or vacated within ten (10) Business Days after such issuance;

(o)      the Debtors file any motion or application seeking authority to assume or reject any executory contract or unexpired lease, in either case without the prior written consent of the Requisite Consenting First Lien Lenders, which filing is not withdrawn after five (5) Business Days' written notice from the Requisite Consenting First Lien Lenders or Requisite Consenting Second Lien Lenders, as applicable;

(p)      without the prior consent of the Required Consenting First Lien Lenders, any of the Debtors' foreign subsidiaries or controlled affiliates (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except as provided in this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (iii) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (iv) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, (v) makes a general assignment or arrangement for the benefit of creditors, or (vi) takes corporate action expressly authorizing any of the foregoing;

(q)      the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file or solicit acceptances of a plan of reorganization (including the Plan);

(r)     the Debtors fail to timely file a formal objection, after consultation in good faith with the Requisite Consenting First Lien Lenders, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(s)     any order approving the Plan or the Disclosure Statement is reversed, dismissed, vacated, modified or amended in a manner that is inconsistent in any material respect with this Agreement;

(t)     any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(u)     the Debtors fail to pay the Restructuring Fees and Expenses of the Consenting Creditor Advisors and Consenting Sponsor Counsel in accordance with this Agreement;

(v)     the Debtors file or support another party in filing (i) a motion or pleading challenging the amount, validity, or priority of any claims held by any Consenting Creditor against the Debtors (or any liens securing such claims) or (ii) a motion or pleading asserting (or seeking standing to assert) any purported claims or causes of action against any of the Consenting Creditors; which event remains uncured for a period of five (5) Business Days after written notice from the Requisite Consenting First Lien Lenders or Requisite Consenting Second Lien Lenders, as applicable;

(w)     the Debtors fail to timely file a formal objection, after consultation in good faith with the Requisite Consenting First Lien Lenders, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases; or

(x)     the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases, (iii) appointing a trustee for the Chapter 11 Cases, or (iv) denying the confirmation of the Plan or any material provision thereof, including any provisions in the Plan relating to the release by the Debtors of the Consenting First Lien Creditors, which (1) order in each case has not been reversed, stayed, vacated, or amended by the later of (a) entry of the Confirmation Order, as applicable, and (b) five (5) Business Days after the Requisite Consenting First Lien Lenders provide written notice to the other Parties that such order is materially inconsistent with this Agreement or (2) with respect to (iv), the Debtors file an amended plan within seven (7) Business Days of such order with the consent of the Requisite Consenting First Lien Lenders.

Section 8.03    A "**Debtor Termination Event**" will mean any of the following:

(a)     the Consenting Creditors entitled to vote on the Plan will have failed to timely vote their Claims in favor of the Plan or at any time change their votes to constitute rejections to the Plan, in either case in a manner inconsistent with this Agreement; *provided*, that this termination event will not apply if sufficient Consenting First Lien Claims or Consenting

Second Lien Debt Claims, as applicable, have timely voted (and not withdrawn) their Claims to accept the Plan in amounts necessary for each applicable impaired class under the Plan to "accept" the Plan consistent with section 1126 of the Bankruptcy Code;

(b)     the breach in any material respect by either the Consenting First Lien Claims or Consenting Second Lien Debt Claims of any of the representations, warranties, undertakings, commitments, or covenants of the Consenting First Lien Claims or Consenting Second Lien Debt Claims, as applicable, that remains uncured for a period of ten (10) Business Days after receipt by the Consenting First Lien Claims or Consenting Second Lien Debt Claims, as applicable, of notice of such breach, *provided*, that a Debtor shall not have the right to terminate this Agreement if (i) such terminating Debtor is also in material breach of any of the representations, warranties, or covenants of such terminating Debtor set forth in this Agreement or (ii) with respect to a breach by the Consenting First Lien Lenders or Consenting Second Lien Lenders, if the non-breaching Consenting First Lien Lenders or Consenting Second Lien Lenders, as applicable, still constitute holders of 66 2/3% of the First Lien Claims or Second Lien Debt Claims, as applicable, and 50% of the number of holders of First Lien Claims or Second Lien Debt Claims, as applicable;

(c)     termination of the Backstop Commitment Letter;

(d)     if the Requisite Consenting First Lien Lenders or Requisite Consenting Second Lien Lenders give notice of termination of this Agreement pursuant to Section 8.02 hereof;

(e)     one or more of the Consenting First Lien Lenders or Consenting Second Lien Lenders file or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement or the Plan and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the earlier of (i) three (3) Business Days after the filing or supporting party receives written notice from the Debtors or Weil that such Alternative Restructuring, modification, motion, or pleading is inconsistent with this Agreement and the Plan, and (ii) entry of an order of the Bankruptcy Court approving such Alternative Restructuring, modification, motion, or pleading; *provided*, that a Debtor shall not have the right to terminate this Agreement if the non-filing or non-supporting Consenting First Lien Lenders or Consenting Second Lien Lenders, as applicable still constitute holders of 66 2/3% of the First Lien Claims or the Second Lien Debtors, as applicable, and 50% of the number of holders of First Lien Claims or Second Lien Debt Claims, as applicable;

(f)     upon written notice to the other Parties hereto that one or more Debtors have made a Fiduciary Out Determination;

(g)     the DIP Lenders (i) do not provide the DIP Financing or the DIP Facility, or (ii) terminate the Debtors' use of Cash Collateral (as defined in the DIP Orders) pursuant to the DIP Orders;

(h)     the acceleration of obligations outstanding under the DIP Credit Agreement;

(i)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the

consummation of or rendering illegal the Restructuring, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the Confirmation Date and (ii) ten (10) Business Days after the Debtors provide written notice to the other Parties that such ruling, judgment, or order is materially inconsistent with this Agreement;

(j)      any order approving the Plan or the Disclosure Statement is reversed, dismissed, vacated, modified or amended in a manner that is inconsistent in any material respect with this Agreement;

(k)      any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(l)      any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable; or

(m)      the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases, or (iii) appointing a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (a) the Confirmation Date and (b) three (3) Business Days after the Debtors provide written notice to the other Parties that such order is materially inconsistent with this Agreement.

Section 8.04    A "**Consenting Sponsor Termination Event**" will mean:

(a)      the breach in any material respect by the Debtors or the Consenting First Lien Lenders of any of the representations, warranties, covenants, or other obligations of the Debtors or Consenting First Lien Lenders, respectively, set forth in this Agreement, including the Litigation Proceeds Term Sheet, Litigation Trust Agreement and/or any agreement related thereto, that could reasonably have an adverse effect on the treatment, releases, settlements, rights, and obligations applicable to the Consenting Sponsor, which breach has not been cured (if curable) within ten (10) Business Days of written notice from the Consenting Sponsor;

(b)      the Debtors or Consenting First Lien Lenders terminate this Agreement;

(c)      the Debtors withdraw or modify the Plan or Disclosure Statement or file any motion or pleading with the Bankruptcy Court that is in any material respect inconsistent with the Litigation Proceeds Term Sheet, Litigation Trust Agreement, and/or any agreement related thereto, or that could reasonably have an adverse effect on the treatment, releases, settlements, rights, and obligations applicable to the Consenting Sponsor and such withdrawal, modification, motion, or pleading has not been revoked before the earlier of (i) three (3) Business Days after the Debtors receive written notice from the Consenting Sponsor and (ii) entry of an order of the Bankruptcy Court approving such withdrawal, modification, motion, or pleading;

(d)      (i) any Definitive Document filed by the Debtors in its Chapter 11 Cases or any related order entered by the Bankruptcy Court is materially inconsistent with the terms and conditions set forth in the Litigation Proceeds Term Sheet, Litigation Trust Agreement, and/or any agreement related thereto, or that could reasonably have an adverse effect on the treatment, releases, settlements, rights, and obligations applicable to the Consenting Sponsor or (ii) any of

23

the Definitive Documents is waived, amended, supplemented, or otherwise modified in any manner materially inconsistent with the terms and conditions set forth in the Litigation Proceeds Term Sheet, Litigation Trust Agreement, and/or any agreement related thereto, or that could reasonably have a material adverse effect on the treatment, releases, settlements, rights, and obligations applicable to the Consenting Sponsor without the prior written consent of the Consenting Sponsor, in each case, which has not been cured (if curable) within five (5) Business Days of written notice from the Consenting Sponsor;

(e)    if the Debtors fail to achieve the Effective Date before the Outside Date, *provided*, that such failure is not caused by the action or inaction of the Consenting Sponsor;

(f)    the public announcement by the Debtors of their intention not to support the Restructuring Transactions;

(g)    the Debtors enter into a definitive agreement with respect to an Alternative Restructuring or publicly announce their intention to enter into a definitive agreement with respect to an Alternative Restructuring;

(h)    the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file or solicit acceptances of a plan of reorganization (including the Plan);

(i)    any order approving the Plan or the Disclosure Statement is reversed, dismissed, vacated, modified or amended in a manner that is inconsistent in any material respect with this Agreement;

(j)    any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(k)    one or more of the Debtors have made the Fiduciary Out Determination; or

(l)    the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases, or (iii) appointing a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (a) the Confirmation Date and (b) five (5) Business Days after the Consenting Sponsor provides written notice to the other Parties that such order is materially inconsistent with this Agreement.

Section 8.05    Mutual Termination.  This Agreement may be terminated by mutual written agreement of the Debtors and the Consenting Parties.  The Debtors will deliver written notice of any such termination to all Parties in accordance with Section 22 hereof.

Section 8.06    Effect of Termination.  Upon the termination of this Agreement in accordance this Section 8, this Agreement will be void and of no further force or effect and each Party will, except as provided in this Section 8.06 and in Section 16, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and will have all the rights and remedies that it would have had and will be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available

24

to it under applicable law, the First Lien Credit Agreement, the Note Purchase Agreement, the Second Lien Credit Agreement, and any ancillary documents or agreements thereto; *provided*, that in no event will any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder before the date of such termination.   Upon any termination of this Agreement, each Consenting Creditor and the Consenting Sponsor will be deemed to have automatically revoked and withdrawn its participation in the Restructuring, without any further action and irrespective of the expiration or availability of any "withdrawal period" or similar restriction, whereupon any such consents will be deemed, for all purposes, to be null and void *ab initio* and will not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, and the Debtors agree not to accept any such consents and to take all action necessary or reasonably required to allow the Consenting Creditors to arrange with their custodian and brokers to effectuate the withdrawal of such consents, including the reopening or extension of any withdrawal or similar periods, but solely to the extent that the Debtors have continued use of Cash Collateral.

Section 8.07   No Waiver. If the Restructuring is not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights as if the Parties had not entered this Agreement.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the Agreement's terms.

Section 8.08   Automatic Stay.   The Debtors acknowledge that, after the commencement of the Debtors' Chapter 11 Cases, the giving of notice of default or termination by any other Party pursuant to this Agreement shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code, and the Debtors hereby waive, to the fullest extent permitted by law, the applicability of the automatic stay as it relates to any such notice being provided; *provided*, *that*, nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

## 9.   **Additional Documents.**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and will exercise commercially reasonable efforts with respect to, the negotiation, drafting and execution and delivery of the Definitive Documents.   In the case of any conflict or inconsistency between the Restructuring Term Sheet and any form of or term sheet for a Definitive Document attached as an exhibit hereto, the terms of the Restructuring Term Sheet shall control.

## 10.   **Representations and Warranties.**

Section 10.01  Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or such later date that such Party first becomes bound by this Agreement) and solely with respect to the Debtors, subject to any limitations or approvals arising from or required by the commencement of the Chapter 11 Cases:

(a)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(b)     the execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any provision of law, rule or regulation applicable to it or its charter or bylaws (or other similar governing documents) or (ii) in the case of the Consenting Creditors, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party;

(c)     the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except such filings that may be necessary in connection with the Chapter 11 Cases and such filings as may be necessary or required for disclosure to any applicable regulatory body whose approval or consent is determined by the Debtors to be necessary to consummate the Restructuring Transactions; and

(d)     this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court.

Section 10.02  Each Consenting Creditor severally (and not jointly) represents and warrants to the other Parties that as of the date hereof (or such later date that such Party first becomes bound by this Agreement), such Consenting Creditor:

(a)     is not a Qualified Marketmaker with respect to the First Lien Claims or Second Lien Debt Claims, as applicable, set forth below its name on the signature page to this Agreement;

(b)     does not own or control any other "claims", "equity security" or "security" in respect of the Debtors (including as such terms are defined in section 101 of the Bankruptcy Code) other than as set forth below its name on the signature page to this Agreement;

(c)     is not a party to any other agreement, arrangement, or understanding with respect to the subject matter hereof with another Consenting Creditor;

(d)     (i) is the beneficial or record owner of the First Lien Claims or the Second Lien Debt Claims, as applicable, set forth below its name on the applicable signature page of this Agreement, (ii) has, with respect to such beneficial ownership of such First Lien Claims or the Second Lien Debt Claims, as applicable, (A) sole investment or voting discretion with respect to such First Lien Claims or the Second Lien Debt Claims, as applicable, (B) full power and authority to vote on and consent to matters concerning such First Lien Claims or the Second Lien Debt

26

Claims, as applicable, and (C) full power and authority to bind or act on the behalf of, such beneficial owners, or (iii) has the full power and authority to direct the beneficial owner of First Lien Claims or the Second Lien Debt Claims, as applicable, to vote on and consent to matters concerning such First Lien Claims or the Second Lien Debt Claims, as applicable.

11.    **Disclosure; Publicity.**

The Debtors will submit drafts to the Consenting Creditor Group Counsels and Consenting Sponsor Counsel of any press releases that constitute disclosure of the existence of or terms of this Agreement or any amendment to the terms of this Agreement at least three (3) Business Days before making any such disclosure (if practicable, and if three (3) Business Days before is not practicable, then as soon as practicable), and will afford them a reasonable opportunity to comment on such documents and disclosures and will consider any such reasonable comments in good faith; *provided*, *that*, in no event shall such document be provided later than 24 hours in advance of any such disclosure.  Except as required by law, no Party or its advisors will disclose to any person (including, for the avoidance of doubt, any other Party), other than to Weil, the principal amount or percentage of any Claims, Interests, or any other securities of the Debtors held by any Consenting Creditor without such Consenting Creditor's prior written consent; *provided*, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party will afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and will take all reasonable measures to limit such disclosure, and (ii) the foregoing will not prohibit the disclosure of the aggregate percentage or aggregate principal amount of First Lien Claims or Second Lien Debt Claims, as applicable, held by all the Consenting First Lien Lenders or Consenting Second Lien Lenders collectively.  Notwithstanding the provisions in this <u>Section 11</u>, if consented to in writing by a Consenting Creditor, any Party hereto may disclose such Consenting Party's individual holdings.

12.    **Amendments and Waivers.**

Except as otherwise expressly set forth herein, this Agreement, including the exhibits hereto, may not be waived, modified, amended or supplemented except in a writing signed by the (i) Debtors, the (ii) Requisite Consenting First Lien Lenders, (iii) to the extent any such waiver, modification, amendment, or supplement would materially and adversely affect the treatment, economic recoveries, rights, or obligations of the Consenting Second Lien Lenders, the Requisite Consenting Second Lien Lenders, and (iv) to the extent any such waiver, modification, amendment, or supplement relates to or affects the Litigation Proceeds Term Sheet, Litigation Trust Agreement, and/or any agreement related thereto, or could reasonably have a material adverse effect on the treatment of the Consenting Sponsor as set forth herein, the Consenting Sponsor.  Notwithstanding anything herein to the contrary, for the avoidance of doubt, no amendment, modification, waiver, or supplement of (x) this <u>Section 12</u> or (y) the definition of "Requisite Consenting First Lien Lenders" or "Requisite Consenting Second Lien Lenders" shall be effective without the consent of each Consenting First Lien Creditor or Consenting Second Lien Creditor, as applicable; *provided*, that such Consenting Creditor is not in material breach of this Agreement.

13.     **Effectiveness.**

This Agreement will become effective and binding (i) as to the Debtors, Initial Consenting First Lien Lenders, Initial Consenting Second Lien Lenders, and the Consenting Sponsor, on the Support Effective Date, (ii) as to any Consenting Creditor that enters into a Joinder Agreement on or following the Support Effective Date, upon delivery to the Debtors of such validly completed Joinder Agreement; and (iii) as to any Permitted Transferee, upon delivery of a validly completed Joinder Agreement; *provided*, that signature pages executed by Consenting Creditors will be delivered to (a) the Debtors and each of the Consenting Parties in a redacted form that removes such Consenting Creditor's holdings of the First Lien Claims or Second Lien Claims, as applicable, and (b) Weil and Evercore in an unredacted form (to be held by Weil and Evercore on a professionals' eyes only basis).

14.     **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY (BOROUGH OF MANHATTAN), NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RESTRUCTURING CONTEMPLATED HEREBY.   NOTWITHSTANDING THE FOREGOING, DURING THE PENDENCY OF THE CHAPTER 11 CASES, ALL PROCEEDINGS CONTEMPLATED BY THIS SECTION 14 SHALL BE BROUGHT IN THE BANKRUPTCY COURT.

15.     **Remedies/Specific Performance.**

All remedies that are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party (and for the avoidance of doubt, it is agreed by the other Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party will be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach); *provided*, that in connection with any remedy for specific performance, injunctive or other equitable relief asserted in connection with this Agreement, each Party agrees to waive the requirement for the securing or

posting of a bond in connection with any remedy and to waive the necessity of proving the inadequacy of money damages. All rights, powers, and remedies provided under this Agreement or otherwise available at law or in equity will be cumulative and not alternative, and the exercise of any remedy, power, or remedy by any Party will not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Person.

16.    **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 8 hereof, Sections 8.07, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25 and 26 (and, to the extent applicable to the interpretation of such surviving sections, Section 1) will survive such termination and will continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

17.    **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and will not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

18.    **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns. The rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person except as expressly permitted herein. If any provision of this Agreement, or the application of any such provision to any Person or circumstance, will be held invalid or unenforceable in whole or in part, such invalidity or unenforceability will attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

19.    **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement will be solely for the benefit of the Parties and no other Person or entity will be a third-party beneficiary hereof.

20.    **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements or agreements with respect to shared or common interest heretofore executed between the Debtors

WEIL:\99859062\1\63808.0003

and any Consenting Creditor (or the Consenting Creditor Group Counsels) will continue in full force and effect in accordance with the terms thereof.

21.    **Counterparts.**

This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by electronic mail, which will be deemed to be an original for the purposes of this Section 22.

22.    **Notices.**

All notices hereunder will be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and electronic mail addresses:

(1)    If to the Debtors, to:

Mobileum, Inc.
20813 Stevens Creek Boulevard, Suite 200
Cupertino, CA 95014
Attention:   Mike Salfity, Chief Executive Officer (mike.salfity@mobileum.com)

with a copy (which will not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:   Jeffrey D. Saferstein, Esq. (Jeffrey.Saferstein@weil.com)
             Alexander W. Welch, Esq. (Alexander.Welch@weil.com)
             Daphne Papadatos, Esq. (Daphne.Papadatos@weil.com)
             Eric L. Einhorn, Esq. (Eric.Einhorn@weil.com)

and

700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attention:   Gabriel A. Morgan, Esq. (Gabriel.Morgan@weil.com)
             Clifford Carlson, Esq. (Clifford.Carlson@weil.com)

(2)    If to the Consenting First Lien Lenders, to the addresses or electronic mail addresses set forth below the Consenting First Lien Lender's signature, with a copy (which will not constitute notice) to:

Milbank LLP
55 Hudson Yards

New York, NY 10001
Attention:   Evan Fleck, Esq. (efleck@milbank.com)
             Matthew Brod, Esq. (mbrod@milbank.com)
             Abigail Debold, Esq. (adebold@milbank.com)
             Rupsha Basu, Esq. (rbasu@milbank.com)


(3)      If to the Consenting Second Lien Lenders, to the addresses or electronic mail addresses set forth below the Consenting Second Lien Lender's signature, with a copy (which will not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.
Washington, DC 20006
Attention:   Scott L. Alberino, Esq. (salberino@akingump.com)
             Blaine Scott, Esq. (bscott@akingump.com)

(4)      If to the Consenting Sponsor, to the addresses or electronic mail addresses set forth below the Consenting Sponsor's signature, with a copy (which will not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10007
Attention:   Sunny Singh, Esq. (Sunny.singh@stblaw.com)
             Dov Gottlieb, Esq. (Dov.Gottlieb@stblaw.com)

Any notice given by delivery, mail, or courier will be effective when received.  Any notice given by electronic mail will be effective upon confirmation of transmission.

23.   **Reservation of Rights; No Admission.**

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties (i) to protect and preserve its rights, remedies and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries), (ii) purchase, sell, or enter into any transactions in connection with the First Lien Claims or Second Lien Claims, (iii) enforce any right under the First Lien Claims or Second Lien Claims, subject to the terms hereof, (iv) consult with other Consenting Creditors, other holders of First Lien Claims or Second Lien Claims, or any other Party regarding the Restructuring (and not any other Alternative Restructuring), or (v) enforce any right, remedy, condition, consent or approval requirement under this Agreement or in any of the Definitive Documents.  Without limiting the foregoing, if this Agreement is terminated in accordance with its terms for any reason (other than consummation of the Restructuring), the Parties each fully and expressly reserve any and all of their respective rights, remedies, claims, defenses and interests, subject to underline Sections 7, 14, and 15 in the case of any claim for breach of this Agreement arising before termination.  Each of the Parties denies any and all wrongdoing or

31

liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

24.    **Relationship Among Parties.**

It is understood and agreed that no Consenting Creditor has any duty of trust or confidence in any kind or form with any other Consenting Creditor, and, except as expressly provided in this Agreement, there are no commitments between them as a result of this Agreement. In this regard, it is understood and agreed that any Consenting Creditor may acquire First Lien Claims, Second Lien Claims, or other debt or equity securities of the Debtors without the consent of the Debtors or any other Consenting Creditor, subject to applicable securities laws and the terms of this Agreement; *provided*, that no Consenting Creditor will have any responsibility for any such acquisition to any other entity by virtue of this Agreement.  The Consenting Creditors have no agreement, arrangement, or understanding to act together and are not otherwise acting in concert or acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and do not constitute a "group" within the meaning of Section 13(d)(3) of the Exchange Act and Rule 13d-5 under the Exchange Act or any similar law, rule or regulation.

25.    **No Solicitation; Representation by Counsel; Adequate Information.**

Section 25.01  This Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

Section 25.02  Each Party acknowledges that it has had an opportunity to receive information from the Debtors and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel will have no application and is expressly waived.

Section 25.03  Each Consenting Creditor acknowledges, agrees, and represents to the other Parties that it (i) is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act, (ii) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, (iii) understands that (a) any securities to be acquired by it pursuant to the Restructuring have not been registered under the Securities Act and (b) that some or all of such securities will be offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iv) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

26.    **Fiduciary Duties.**

To the extent any of the Debtors or any directors, officers, managers, or members of the Debtors, each in its capacity as a director, officer, manager, or member of the Debtors, take

WEIL:\99859062\1\63808.0003

any action or to refrain from taking any action pursuant to its or their fiduciary duties under applicable law (as determined by them after consultation with legal counsel), such action (or inaction) shall not give rise to any Claims or Causes of Action for monetary damages for any Party.

27.    **Miscellaneous.**

    When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (iv) the word "or" shall not be exclusive and shall be read to mean "and/or."  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

    *[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

WEIL:\99859062\1\63808.0003

**Debtors Signature Page to**
**the Restructuring Support Agreement**

**MOBILEUM, INC.**

By: _____
Name: Ripu Singh
Title:  Chief Operating Officer and Chief Financial Officer

**MATRIX INTERMEDIATE, INC.**

By: _____
Name: Ripu Singh
Title:  Chief Operating Officer and Chief Financial Officer

**MATRIX HOLDCO, LLC**

By: _____
Name: Ripu Singh
Title:  Chief Operating Officer and Chief Financial Officer

**MATRIX PARENT, INC.**

By: _____
Name: Ripu Singh
Title:  Chief Operating Officer and Chief Financial Officer

**MOBILE ACQUISITION CORP.**

By: _____
Name: Ripu Singh
Title:  Chief Operating Officer and Chief Financial Officer

**SIGOS LLC**

By: _____
Name: Ripu Singh
Title:  Chief Operating Officer and Chief Financial Officer

**UNWIREDSOFT, INC.**

By: _____
Name: Ripu Singh
Title:  Chief Operating Officer and Chief Financial Officer

**WE DO TECHNOLOGIES AMERICAS, INC.**

By: _____

Name: Ripu Singh

Title:   Chief Operating Officer and Chief Financial Officer


**CONVENE NETWORKS LLC**

By: _____

Name: Ripu Singh

Title:   Chief Operating Officer and Chief Financial Officer


**DEVELOPING SOLUTIONS INC.**

By: _____

Name: Ripu Singh

Title:   Chief Operating Officer and Chief Financial Officer


**PHASE 3 INNOVATIONS HOLDINGS, INC.**

By: _____

Name: Ripu Singh

Title:   Chief Operating Officer and Chief Financial Officer

*[Signature Page to the Restructuring Support Agreement Intentionally Omitted]*

**<u>Exhibit A</u>**

**Restructuring Term Sheet**

## MOBILEUM, INC.

## RESTRUCTURING TERM SHEET

### July 23, 2024

This restructuring term sheet (together with all annexes, exhibits, and schedules attached hereto, the "**Restructuring Term Sheet**") presents the principal terms of a proposed financial restructuring (the "**Restructuring**") of the existing capital structure of Mobileum, Inc., Matrix Intermediate, Inc., Matrix Holdco, LLC; Matrix Parent, Inc.; Mobile Acquisition Corp.; SIGOS LLC; UnwiredSoft, Inc.; We Do Technologies Americas, Inc.; Convene Networks LLC; Developing Solutions Inc.; and Phase 3 Innovations Holdings, Inc. (collectively, the "**Company**" or the "**Debtors**"), which Restructuring will be implemented pursuant to a prepackaged joint chapter 11 plan of reorganization (the "**Plan**") in voluntary cases (the "**Chapter 11 Cases**") commenced by the Debtors in the United Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**" and, the date upon which such Chapter 11 Cases are commenced, the "**Petition Date**"). This is the Restructuring Term Sheet referred to in, and appended to, the Restructuring Support Agreement dated as of July 23, 2024, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time, and including all exhibits, annexes, and schedules thereto, the "**RSA**" and the parties thereto, the "**Parties**"). Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in **Annex 1** hereto.

**THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

**THIS RESTRUCTURING TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS. NO BINDING OBLIGATIONS WILL BE CREATED BY THIS RESTRUCTURING TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE DOCUMENTS ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES OR APPROVED BY THE BANKRUPTCY COURT, AS APPLICABLE.**

| INTRODUCTION | |
|---|---|
| **Debtors/Company** | Mobileum, Inc.; Matrix Intermediate, Inc.; Matrix Holdco, LLC; Matrix Parent, Inc.; Mobile Acquisition Corp.; SIGOS LLC; UnwiredSoft, Inc.; We Do Technologies Americas, Inc.; Convene Networks LLC; Developing Solutions Inc.; and Phase 3 Innovations Holdings, Inc. |
| **Claims and Interests to be Restructured** | **First Lien Debt Claims**: consisting of approximately $381 million in principal amount of first lien term loans and a revolving credit facility in the aggregate principal amount of $53 million with a $10 million letter of credit sub facility, in each case arising under the First Lien Credit Agreement, plus accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto, less the amount of any first lien term loans and/or revolving credit facility loans converted into Rolled-Up DIP Loans (the "**First Lien Debt Claims**").[1] |
| | **First Lien Notes Claims**: consisting of approximately $32 million in principal amount of indebtedness under the Note Purchase Agreement plus accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto less the amount of any indebtedness under the Note Purchase Agreement converted into Rolled-Up DIP Loans (the "**First Lien Notes Claims**" and together with the First Lien Debt Claims, the "**First Lien Claims**"). |
| | **Second Lien Debt Claims**: consisting of approximately $163 million in principal amount second lien term loans under the Second Lien Credit Agreement, plus accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto (the "**Second Lien Debt Claims**"). |
| | **General Unsecured Claims**: consisting of any prepetition Claim against the Debtors that is not an Other Secured Claim, Priority Tax Claim, Priority Non-Tax Claim, Administrative Expense Claim, DIP Claim, First Lien Claim, Second Lien Debt Claim, Intercompany Claim, a Section 510(b) Claim or a Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code, or other Claim paid in full prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court (the "**General Unsecured Claims**"). |
| | **Existing Parent Equity Interests**: consisting of Interests in Intermediate as of the Petition Date (the "**Existing Parent Equity Interests**"). |

---

[1] For the avoidance of doubt, all Claims and Causes of Action against any Debtor held by the Consenting Creditors shall be voted in favor of, or released pursuant to, the Plan in accordance with and subject to the terms and conditions of this Agreement.

WEIL:\99859064\1\63808.0003

| TRANSACTION OVERVIEW & IMPLEMENTATION | |
|---|---|
| **Implementation** | The Restructuring Transactions will be implemented pursuant to prepackaged Chapter 11 Cases, for which solicitation will commence prior to the Petition Date. The Plan will be filed and prosecuted with the support of the Consenting Parties, subject to the terms and conditions set forth in the RSA, and provide for, among other things, the discharge and cancellation of the First Lien Claims, Second Lien Debt Claims, and Existing Parent Equity Interests, in each case in exchange for the treatment set forth herein and in the RSA, which shall be incorporated into the Plan. |
| **Annexures and Exhibits** | <ul><li>**Annex A**: Certain Defined Terms</li><li>**Exhibit 1**: DIP Term Sheet</li><li>**Exhibit 2**: Exit Facility Term Sheet</li><li>**Exhibit 3**: Backstop Commitment Letter</li><li>**Exhibit 4**: Governance Term Sheet</li><li>**Exhibit 5**: Litigation Proceeds Term Sheet</li></ul> |
| **DIP Facility** | During the Chapter 11 Cases, the Company will fund the Restructuring and ongoing operations through (i) available and unencumbered Cash, (ii) Cash Collateral, and (iii) DIP financing, in each case subject to the terms and conditions set forth in RSA. Pursuant to the terms set forth in the DIP Term Sheet, attached as Exhibit 1 (including all exhibits, annexes, and schedules thereto, the "**DIP Term Sheet**"), the DIP Lenders, in consideration for providing the Backstop Premium, have committed to provide a superpriority, senior-secured, priming debtor-in-possession term-loan facility (the "**DIP Facility**" and the loans thereunder, the "**DIP Loans**"), consisting of (i) $60,000,000 of new-money DIP Loans (the "**New Money DIP Loans**"), (ii) subject to the DIP Term Sheet and paragraph 2(c) of the DIP Orders, a roll-up of First Lien Claims in the aggregate principal amount of $100,000,000 (the "**Rolled-Up DIP Loans**" and together with the New Money DIP Loans, the "**DIP-to-Exit Term Loans**"), and (iii) the Backstop Premium, which shall be paid in the form of Tranche B Loans (as defined in the DIP Term Sheet). The terms of the DIP Facility shall be in accordance with the DIP Term Sheet. |

| | |
|---|---|
| **Use of Cash Collateral** | The Company will be authorized to use cash collateral (as defined in section 363(a) of the Bankruptcy Code) of the First Lien Lenders, Noteholders, and Second Lien Lenders with the consent of the First Lien Term Loan Administrative Agent, acting at the direction of the Requisite First Lien Lenders, and deemed consent of the Second Lien Lenders, pursuant to the 1L/2L Intercreditor Agreement, and Noteholders, pursuant to the Pari Passu Intercreditor Agreement, subject to the following terms and conditions and such other terms and conditions that are mutually acceptable to the Company and the Requisite First Lien Lenders:<br><br>• Adequate Protection Lien.<br><br>    ○ The First Lien Term Loan Administrative Agent (on behalf of itself and the First Lien Lenders) shall receive a replacement security interest in and lien on (the "**First Lien Debt AP Liens**") all assets and property of the Debtors, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate only to (i) the DIP Liens (as defined in the DIP Orders), (ii) Prepetition Permitted Senior Liens (as defined in the DIP Orders) and (iii) the Carve-Out (as defined in the DIP Orders). The First Lien Debt AP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the DIP Orders.<br><br>    ○ The Second Lien Administrative Agent (on behalf of itself and the Second Lien Lenders) shall receive a replacement security interest in and lien on (the "**Second Lien Debt AP Liens**") all assets and property of the Debtors, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate only to (i) the DIP Liens, (ii) Prepetition Permitted Senior Liens, (iii) the Carve-Out, (iv) the First Lien Debt AP Liens, and (v) the liens securing the prepetition First Lien Claims. The Second Lien Debt AP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the DIP Orders.<br><br>• 507(b) Claim.<br><br>    ○ The First Lien Term Loan Administrative Agent (on behalf of itself and the First Lien Lenders) shall receive an administrative expense claim pursuant to Bankruptcy Code section 507(b) with priority over all other administrative expenses (the "**First Lien 507(b) Claim**"), subject to the DIP Superpriority Claims (as defined in the DIP Orders) and the Carve Out.<br><br>    ○ The Second Lien Administrative Agent (on behalf of itself and the Second Lien Lenders) shall receive an administrative expense claim pursuant to Bankruptcy Code section 507(b) with priority over all other administrative expenses, subject to the DIP Superpriority Claims (as defined in the DIP Orders), the Carve Out, and the First |

|  | Lien 507(b) Claim. |
|---|---|
|  | • <u>Adequate Protection Payments</u>. The Debtors' prompt payment of, whether incurred prior to or following the Petition Date, all reasonable fees and expenses of the (i) First Lien Term Loan Administrative Agent (in accordance with the First Lien Credit Agreement) and the First Lien Ad Hoc Group, including but not limited to fees and expenses of the First Lien Lender Advisors, (ii) First Lien Notes Agent (in accordance with the Note Purchase Agreement) to the extent provided herein, and (iii) Second Lien Administrative Agent (in accordance with the Second Lien Credit Agreement) and the Second Lien Ad Hoc Group, including but not limited to fees and expenses of the Second Lien Lender Advisors, each as and to the extent provided herein. |
|  | • <u>Financing Reporting</u>. Financial reporting as set forth in the DIP Term Sheet. |
| **Backstop Commitments** | Certain Consenting Creditors holding First Lien Claims (collectively, in their capacity as such, the "**DIP Backstop Parties**"), have committed to backstop the New Money DIP Loans, severally and not jointly, on terms and in the amount(s) set forth in the Backstop Commitment Letter attached hereto as <u>Exhibit 3</u> (the "**Backstop Commitments**"), in exchange for the Backstop Premium, which Backstop Premium shall be paid, initially, in the form of Tranche B Loans (as defined in the DIP Term Sheet) on the DIP Closing Date (as defined in the DIP Term Sheet). |
| **Exit Term Loan Facility** | On the Effective Date, the Debtors and DIP Lenders will enter into a senior-secured, first-lien term-loan facility (the "**Exit Term Loan Facility**" and the loans thereunder, the "**Exit Term Loans**") comprised of the DIP-to-Exit Term Loans in an aggregate principal amount of up to $160,000,000 on the terms set forth in the Exit Facility Term Sheet attached hereto as <u>Exhibit 2</u> (the "**Exit Facility Term Sheet**"). |
| **New Equity Interests** | On the Effective Date, Reorganized Parent will issue New Equity Interests to the Backstop Parties, holders of Allowed First Lien Claims, and holders of Allowed Second Lien Claims, as set forth herein. |
| **No Substantive Consolidation** | The Plan will be implemented without any substantive consolidation. |
| **Subordination Agreements** | All subordination agreements, including but not limited to the Intercreditor Agreements, shall be honored pursuant to section 510(a) of the Bankruptcy Code and in accordance with the terms of their subordination. |
| **TREATMENT OF CLAIMS AND INTERESTS** ||
| **Administrative Expense Claims and Priority Tax Claims** | On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed Administrative Expense Claim or an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim or an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Claim, (i) Cash in an amount equal to such Allowed Claim on the Effective Date or as soon as practicable thereafter or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code and as agreed to by the Debtors and the Requisite Consenting First Lien Lenders. |

WEIL:\99859064\1\63808.0003

| | |
|---|---|
| **DIP Claims** | Subject to the DIP Term Sheet and paragraph 2(c) of the DIP Orders, the DIP Claims (including all accrued and unpaid interest, fees, premiums, and other obligations on account of the DIP Loans) shall be Allowed in full.  On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed DIP Claim, each holder shall receive (a)(i) Exit Term Loans in a principal amount equal to the amount of such Allowed DIP Claim on account of such holder's principal amount of DIP Loans (excluding any such principal amount on account of the Tranche B Loans), (ii) New Equity Interests in exchange for the amount of such holder's Allowed DIP Claim on account of such holder's principal amount of Tranche B Loans, subject to dilution by the Management Incentive Plan, and (iii) payment in full in cash of all accrued and unpaid interest and other obligations on account of the DIP Loans (excluding obligations to pay the principal amount of the DIP Loans paid pursuant to clauses (i) and (ii) above) or (b) such other treatment as agreed to by the Debtors and such DIP Lender. |
| **Class 1**<br><br>**Other Secured Claims** | On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the sole option of the Debtors, with the consent of the Requisite Consenting First Lien Lenders, or the Reorganized Debtors, each such holder shall receive (i) payment in full in Cash, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code (iii)  such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.<br><br>**Unimpaired – Presumed to Accept.** |
| **Class 2**<br><br>**Priority Non-Tax Claims** | On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the sole option of the Debtors, with the consent of the Requisite Consenting First Lien Lenders, or the Reorganized Debtors, each such holder shall receive (i) payment in full in Cash, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.<br><br>**Unimpaired – Presumed to Accept.** |
| **Class 3**<br><br>**First Lien Claims** | On as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed First Lien Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed First Lien Claim, each such holder shall receive, in accordance with the Restructuring Transactions, its Pro Rata Share of 96.5% of the New Equity Interests subject to dilution by the Management Incentive Plan and New Equity Interests issued on account of the Tranche B Loans.<br><br>**Impaired – Entitled to Vote.** |

WEIL:\99859064\1\63808.0003

| **Class 4**<br>**Second Lien Debt Claims** | On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed Second Lien Debt Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Second Lien Debt Claim, each such holder shall receive, in accordance with the Restructuring Transactions, its Pro Rata Share of 3.5% of the New Equity Interests subject to dilution by the Management Incentive Plan and New Equity Interests issued on account of the Tranche B Loans.<br><br>**Impaired - Entitled to Vote.** |
|---|---|
| **Class 5**<br>**General Unsecured Claims** | The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on and after the Effective Date, the Reorganized Debtors shall continue to pay each Allowed General Unsecured Claim or dispute each General Unsecured Claim in the ordinary course of business.<br><br>**Unimpaired – Presumed to Accept.** |
| **Class 6**<br>**Intercompany Claims** | On or as soon as reasonably practicable after the Effective Date, all Intercompany Claims will be adjusted, Reinstated, or discharged, in each case, to the extent determined to be appropriate by the Reorganized Debtors, in their sole discretion.<br><br>**Unimpaired – Presumed to Accept / Impaired – Deemed to Reject.** |
| **Class 7**<br>**Intercompany Interests** | On or as soon as reasonably practicable after the Effective Date, all Intercompany Interests will be adjusted, Reinstated, or discharged as determined by the Reorganized Debtors, in their sole discretion.<br><br>**Unimpaired – Presumed to Accept / Impaired Deemed to Reject.** |
| **Class 8**<br>**Existing Parent Equity Interests** | On the Effective Date, Existing Parent Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect.<br><br>**Impaired – Deemed to Reject.** |
| **GENERAL PROVISIONS** ||
| **Executory Contracts and Unexpired Leases** | As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure amount, all Executory Contracts and Unexpired Leases to which any of the Debtors are parties, and which have not expired by their own terms on or prior to the Confirmation Date shall, subject to the reasonable consent of the Requisite Consenting First Lien Lenders, be deemed assumed, except for any Executory Contract or Unexpired Lease, in each case, with the reasonable consent of the Requisite Consenting First Lien Lenders, that (a) previously has been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (b) is the subject of a separate (i) assumption motion filed by the Debtors or (ii) rejection motion filed by the Debtors under section 365 of the Bankruptcy Code before the Confirmation Date, (c) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, or (d) is the subject of a pending Cure Dispute. |

WEIL:\99859064\1\63808.0003

| Governance | **Organizational and Governance Matters** |
|---|---|
| | Terms and conditions of the New Corporate Governance Documents of Reorganized Parent shall be consistent with those set forth on the Governance Term Sheet attached hereto as **Exhibit 4**, and otherwise subject to the consent rights set forth in the RSA.  The New Corporate Governance Documents of Reorganized Parent will become effective as of the Effective Date.<br><br>**Board of Reorganized Parent**<br><br>The Board of Reorganized Parent will have 5 members, comprised of (i) the Reorganized Debtors' chief executive officer and (ii) 4 members appointed by certain First Lien Lenders as set forth in the Governance Term Sheet, in each case selected in consultation with the First Lien Ad Hoc Group and the Company (the "**New Board**").  Additionally, the Second Lien Ad Hoc Group shall have the ability to designate one (1) observer to the New Board. |
| **Management Incentive Plan** | No later than 60 days following the Effective Date, the New Board shall implement an equity-based management incentive plan under which ten percent (10%) of the New Equity Interests issued on the Effective Date will be reserved for issuance of awards to employees, non-employee directors and other service providers of the Reorganized Debtors (the "**Management Incentive Plan**"), on terms and conditions (including with respect to participants, form of awards, individual allocations, and vesting conditions) to be determined by the New Board in consultation with the Reorganized Debtors' chief executive officer. |
| **Litigation Trust Agreement** | The Reorganized Debtors, the Consenting Sponsor and the Consenting Creditors shall enter into a Litigation Trust Agreement, which shall incorporate and be consistent with the terms and conditions of the Litigation Proceeds Term Sheet attached hereto as **Exhibit 5**. |
| **Employment Agreements** | Pursuant to the Plan, unless otherwise listed on the Schedule of Rejected Contracts, all Employment Agreements and severance plans that exist as of the Petition Date will be assumed; *provided*, *that*, to the extent an Employment Agreement or severance plan of an insider (as defined in the Bankruptcy Code) has not been disclosed to the Requisite Consenting First Lien Lenders prior to the Effective Date (an "**Undisclosed Employment Agreement**") and the assumption of such Undisclosed Employment Agreement would not reasonably be expected to result in material liability to the Reorganized Debtors (as determined by the Requisite Consenting First Lien Lenders acting in good faith), then such Undisclosed Employment Agreement will be assumed pursuant to the Plan as if it had been disclosed to the Requisite Consenting First Lien Lenders prior to the Effective Date. Notwithstanding the foregoing, pursuant to the Plan, any Employment Agreements or other plans, programs or arrangements  providing for equity-based awards, as well as any equity-based awards or any other Interest (or right to obtain or receive any equity-based award or other Interest) granted or contractually promised to a current or former employee, officer, director or contractor under an Employment Agreement or otherwise, shall not be honored or assumed and will be deemed cancelled in consideration of approval of the Plan as of the Effective Date. |

| | |
|---|---|
| **Management Services Agreements** | Pursuant to the Plan, on the Effective Date each of (i) that certain Professional Services Agreement, dated March 1, 2022, by and among Mobile Acquisition Corp., a Delaware corporation, and H.I.G. Capital, L.L.C., a Delaware limited liability company ("**H.I.G.**"), and (ii) that certain Transaction Services Agreement, dated March 1, 2022, by and among the Mobile Acquisition Corp. and H.I.G. (collectively, the "**Management Services Agreements**"), shall be deemed rejected and terminated, with the effect that any remaining or unperformed obligations of the parties shall be cancelled without consideration or recourse. Any obligations or amounts due and owing by the Company to H.I.G. from and after January 1, 2023 shall be waived by H.I.G. for no additional consideration, and deemed forever discharged. |
| **Cancellation of Notes, Instruments, Certificates and Other Documents** | On the Effective Date, all notes, instruments, certificates evidencing debt of the Debtors and Existing Parent Equity Interests will be cancelled and obligations of the Debtors thereunder will be discharged and of no further force or effect, except for the purpose of allowing the applicable agents and trustees to receive distributions from the Debtors under the Plan and to make any further distributions to the applicable holders on account of their Claims and Interests. |
| **Vesting of Assets** | On the Effective Date, pursuant to sections 1141(b)–(c) of the Bankruptcy Code, all assets of the Debtors will vest in the Reorganized Debtors free and clear of all liens, Claims, and encumbrances. |
| **Survival of Indemnification Obligations and D&O Insurance** | Subject to the Schedule of Retained Causes of Action, any obligations of the Debtors pursuant to their corporate charters, bylaws, limited liability company agreements or other organizational documents to indemnify current officer, directors, agents and/or employees with respect to all past, present and future actions, suits and proceedings against the Debtors or such directors, officers, agents and/or employees, based upon any act or omission for or on behalf of the Debtors shall not be discharged or impaired by the Plan. All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations therein shall not be a disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.<br><br>In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors and officers of the Debtors who served in such capacity at any time before the Effective Date and all other individuals covered by such insurance policies shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors and/or officers remain in such positions after the Effective Date. |
| **Survival of R&W Insurance** | The Company and the Reorganized Debtors shall preserve and shall not terminate or otherwise reduce or in any way alter or interfere with the coverage under the representations and warranties policy no. ET111-003-478 issued to Matrix Parent, Inc. with a policy term of March 1, 2022 to March 1, 2025 (the "**RWI Policy**"). |
| **Pursuit of Audax Litigation and RWI Policy** | The Consenting Sponsor shall be permitted to continue pursuing recoveries under the Audax Litigation and the RWI Policy in accordance with the terms set forth in the Litigation Proceeds Term Sheet. The Company and Consenting Lenders agree (i) not to interfere with the pursuit of such recoveries, including after the Petition |

9

| | |
|---|---|
| | Date, and (ii) not to assert that the automatic stay applies to any such action by the Consenting Sponsor. |
| **Conditions to Effectiveness** | Effectiveness of the Plan will be subject to the satisfaction or waiver in writing of customary conditions to effectiveness, as well as such other conditions as may be agreed by the Debtors and the Requisite Consenting First Lien Lenders, including the below (as applicable); *provided*, that notwithstanding anything to the contrary in this Restructuring Term Sheet, any new conditions that would reasonably have a material and adverse effect on (a) the Consenting Sponsor, the Litigation Trust Agreement, the Litigation Proceeds Term Sheet, or any agreements related thereto, shall also require the agreement of the Consenting Sponsor, and (b) the treatment, recoveries, rights, and obligations consistent with the Restructuring Term Sheet of the holders of Second Lien Debt Claims shall require the consent of the Requisite Consenting Second Lien Lenders: |

<div style="margin-left: 2em;">

i. the Definitive Documents will contain terms and conditions consistent with this Restructuring Term Sheet and the RSA or otherwise approved by the Debtors, the Requisite Consenting First Lien Lenders, and the Consenting Sponsor, as applicable, in accordance with the consent rights under the RSA;

ii. the RSA shall not have been terminated and shall remain in full force and effect;

iii. the DIP Facility shall be in full force and effect and there shall be no Event of Default (as defined in the DIP Credit Agreement) continuing;

iv. the Definitive Documents shall be duly executed and delivered by the applicable parties thereto;

v. the Debtors will have implemented the Restructuring and all transactions contemplated by this Restructuring Term Sheet in a manner consistent with the RSA (and subject to, and in accordance with, the consent rights set forth therein), this Restructuring Term Sheet, and the Plan;

vi. all Restructuring Fees and Expenses and any other professional fees and other amounts required to be paid on account of Consenting Creditors' and the Consenting Sponsor's fees and expenses pursuant to the RSA, in any Definitive Document, or in any order of the Bankruptcy Court related thereto shall have been paid in full and in Cash, including for the avoidance of doubt all accrued and unpaid fees and expenses of advisors to the First Lien Ad Hoc Group, Second Lien Ad Hoc Group, and the Consenting Sponsor (subject to the limitations set forth in the RSA and in the Plan);

vii. the Bankruptcy Court shall have entered the Confirmation Order and such Confirmation Order will not have been stayed, modified (other than with the consent of the Requisite Consenting First Lien Lenders), or vacated on appeal; and

viii. all regulatory or governmental approvals, authorizations, consents, rulings or documents, including Bankruptcy Court approval, necessary to effectuate and implement the Plan will have been obtained.

</div>

The conditions to effectiveness may be waived, in whole or in part, in writing (including by email) by the Debtors, the Requisite Consenting First Lien Lenders,

WEIL:\99859064\1\63808.0003

| | |
|---|---|
| | and, as applicable, the Requisite Consenting Second Lien Lenders and the Consenting Sponsor. |
| **Releases and Exculpations** | Subject to the Schedule of Retained Causes of Action and Schedule of Excluded Parties, the Plan shall contain customary release and exculpation provisions, which shall, for the avoidance of doubt, include releases for current officers and directors and each of the Consenting Parties and exclude releases for any current or former officer, director, or equityholder affiliated with Audax Management Company, LLC and any defendant in the Audax Litigation. |
| **Discharge and Injunction** | The Plan will contain customary discharge and injunction provisions. |
| **Compromise and Settlement** | The Plan will contain provisions for the compromise and settlement of Claims stating that, except as provided herein, the allowance, classification and treatment of Allowed Claims and Interests and their respective distributions take into account and conform to the relative priority and rights of such Claims and Interests in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. |
| **Tax Structure** | The Restructuring and related transactions will be implemented in a tax-efficient manner in accordance with the Restructuring Transactions Exhibit and otherwise as determined in good faith by the Requisite Consenting First Lien Lenders, subject to the reasonable consent of the Debtors. |
| **Restructuring Transaction** | On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, shall take all actions consistent with the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan. |
| **Retention of Jurisdiction** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other purposes. |

| Restructuring Fees and Expenses | The Debtors shall pay all reasonable and documented fees, costs and expenses of (1) each of the First Lien Lender Advisors and Second Lien Advisors, in each case, (i) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the RSA and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing and, to the extent applicable, (ii)(A) consistent with any engagement letters or fee reimbursement letters entered into between the Company, on the one hand, and the relevant First Lien Lender Advisors or Second Lien Lender Advisors, as applicable, on the other hand (as supplemented and/or modified by this Agreement), or (B) as provided in the DIP Orders and/or the Confirmation Order; *provided*, *however*, the Restructuring Fees and Expenses of the Second Lien Lender Advisors shall be capped at $2.5 million for all fees and expenses incurred following the parties' execution of the RSA; and (2) Simpson Thacher & Bartlett LLP, as counsel to the Consenting Sponsor, in an amount not to exceed $750,000, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the RSA and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing (collectively, the "**Restructuring Fees and Expenses**"). |
|---|---|
| Securities Exemptions | The solicitation of votes on the Plan is being made only to holders of First Lien Claims and Second Lien Debt Claims who are "accredited investors" within the meaning of Rule 501(a) of Regulation D of the Securities Act of 1933 (as amended, the "**Securities Act**") under Section 4(a)(2) of the Securities Act. |
|  | The issuance and distribution under the Plan of the New Equity Interests will be exempt from registration under the Securities Act or applicable securities laws pursuant to Section 1145(a) of the Bankruptcy Code. |
| Definitive Documents | The Definitive Documents will contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Restructuring Term Sheet and the RSA, subject to the consent rights set forth in the RSA. |

**Annex A**

| Certain Defined Terms | |
|---|---|
| **"1L/2L Intercreditor Agreement"** | That certain Intercreditor Agreement, dated as of March 1, 2022 (as supplemented by that certain Intercreditor Agreement Joinder, dated as of March 15, 2023, by the First Lien Notes Agent and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among each of the Debtors, the First Lien Term Loan Administrative Agent, the Second Lien Administrative Agent, and the First Lien Notes Agent, and each other person party thereto from time to time. |
| **"Acquisition Agreement"** | A purchase and sale agreement governing a transaction pursuant to the Purchase Transaction. |
| **"AcquisitionCo"** | In the event the Purchase Transaction occurs, a subsidiary, taxed as a corporation for U.S. federal income tax purposes and wholly-owned indirectly by Reorganized Parent, that shall acquire (directly or indirectly) all or substantially all of the Debtors' assets and/or membership interests in accordance with the Acquisition Agreement and the Purchase Transaction Documents. |
| **"Administrative Expense Claim"** | Any Claim for a cost or expense of administration incurred during the Chapter 11 Cases pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for good and other services and leased premises) and (b) Professional Fee Claims. |
| **"Allowed"** | With reference to any Claim or Interest, (a) any Claim or Interest arising on or before the Effective Date (i) as to which no objection to allowance, priority, or secured status, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed prior to the Effective Date, or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, (b) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, (c) any Claim or Interest as to which the liability of the Debtors or Reorganized Debtors, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (d) any Claim or Interest expressly allowed hereunder; provided, however, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. |

| **Certain Defined Terms** |  |
|---|---|
| **"Audax Litigation"** | The proceedings pending in the Delaware Superior Court styled *Matrix Parent, Inc. v. Audax Management Co.*, Case No. N23C-10-212 MAA CCLD (Del. Super.) and any appeals therefrom. |
| **"Avoidance Action"** | Has the meaning set forth in the DIP Orders. |
| **"Backstop Premium"** | The backstop premium to be paid to the Backstop Parties, pursuant to the terms and conditions to be set forth in the Backstop Commitment Letter, as consideration for providing the Backstop Commitments. |
| **"Bankruptcy Rules"** | The Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases. |
| **"Cash"** | Legal tender of the United States of America. |
| **"Cash Collateral"** | "Cash collateral" as set forth in section 363(a) of the Bankruptcy Code. |
| **"Cause of Action"** | Any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, proceeding demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), choate, inchoate, reduced to judgment or otherwise whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and any Avoidance Actions. |
| **"Claim"** | A "claim," as defined in section 101(5) of the Bankruptcy Code, as against any Debtor. |
| **"Confirmation Date"** | The date on which the Bankruptcy Court enters the Confirmation Order. |
| **"Confirmation Order"** | The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code. |

| **Certain Defined Terms** | |
|---|---|
| **"Consenting Creditors"** | The holders of First Lien Claims and Second Lien Claims that are party to the RSA, together with their respective successors and permitted assigns and any subsequent creditor that becomes party to the RSA pursuant to the terms thereof. |
| **"Consenting First Lien Lenders"** | Has the meaning set forth in the RSA. |
| **"Consenting Parties"** | The Consenting Creditors and the Consenting Sponsor. |
| **"Consenting Second Lien Lenders"** | Has the meaning set forth in the RSA. |
| **"Consenting Sponsor"** | Matrix Topco, L.P., H.I.G. Technology Partners A, L.P., H.I.G. Technology Partners B, L.P., H.I.G. Europe Middle Market LBO Fund III, L.P., H.I.G. Middle Market LBO Fund III, L.P., H.I.G. Matrix Co-Investors L.P., and H.I.G. Mobile, L.P. |
| **"Cure"** | The payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code. |
| **"Cure Dispute"** | An unresolved objection regarding assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, including objections based on the appropriate Cure Amount or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or any other issue relating to an assumption of an Executory Contract or Unexpired Lease. |
| **"Definitive Documents"** | Has the meaning set forth in the RSA. |
| **"DIP Agent"** | Acquiom Agency Services LLC and Seaport Loan Products LLC, in their capacities as co-administrative agents, and Acquiom Agency Services LLC, in its capacity as collateral agent under the DIP Credit Agreement, their successors, permitted assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement. |
| **"DIP Claims"** | All Claims held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Term Sheet, the Backstop Commitment Letter, DIP Credit Agreement, the DIP Facility, or the DIP Orders, including Claims for all principal amounts outstanding, and any and all fees, premiums interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents, which, for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Orders. |
| **"DIP Commitment"** | Has the meaning set forth in the RSA. |

| **Certain Defined Terms** | |
|---|---|
| **"DIP Credit Agreement"** | That certain Debtor in Possession Credit Agreement to be entered into by and among the Debtors, the DIP Agent and the DIP Lenders, consistent with the terms of the DIP Term Sheet and as approved by the DIP Orders, as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms. |
| **"DIP Documents"** | The DIP Motion, the DIP Orders, and the DIP Credit Agreement and any related credit documents. |
| **"DIP Lender"** | Any lender having a DIP Commitment and/or holding outstanding DIP Loans. |
| **"DIP Motion"** | The motion seeking approval by the Bankruptcy Court of the DIP Facility and the DIP Orders, including any declarations and exhibits submitted in support thereof. |
| **"DIP Orders"** | Collectively, the Interim DIP Order and the Final DIP Order. |
| **"Disclosure Statement"** | The disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code. |
| **"Effective Date"** | The date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms of the Plan and the transactions contemplated by the Plan have been consummated. |
| **"Employment Agreement"** | As to an employee, officer, director, or individual independent contractor, all employment and compensation agreements, in each case, existing as of the Effective Date, including any employment, services, separation, retention, incentive, bonus, or similar or related agreements, arrangements, plans, programs, policies or practices, in each case, as in effect as of the Effective Date. |
| **"Entity"** | An individual, corporation, partnership, limited liability partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government unit (as defined in section 101(27) of the Bankruptcy Code) or any political subdivision thereof, or other person (as defined in section 101(41) of the Bankruptcy Code) or other entity. |
| **"Estate(s)"** | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |
| **"Exculpated Parties"** | Each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: the Debtors and their Estates. |
| **"Executory Contract"** | A contract to which one or more Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code. |
| **"Exit Administrative Agent"** | Means the agent to the Exit Credit Agreement, in its capacities as administrative agent and collateral agent thereunder. |

| **Certain Defined Terms** | |
|---|---|
| **"Exit Credit Agreement"** | That certain Credit Agreement to be entered into by the Reorganized Debtors, the Exit Administrative Agent and the Exit Facility Lenders in accordance with the Exit Facility Term Sheet. |
| **"Exit Facility Lenders"** | The lenders who are time to time party to the Exit Credit Agreement. |
| **"Final DIP Order"** | The Final Order entered in the Chapter 11 Cases authorizing the Company's entry into the DIP Facility. |
| **"Final Order"** | An order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that (i) is in full force and effect, (ii) is not stayed, and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of certiorari; *provided*, however, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order. |
| **"First Day Orders"** | Any orders of the Bankruptcy Court with respect to the First Day Pleadings that have not been reversed, modified, or amended. |
| **"First Day Pleadings"** | The first days pleadings that the Debtors determine are necessary or desirable to file in the Chapter 11 Cases. |
| **"First Lien Ad Hoc Group"** | The ad hoc group of First Lien Lenders represented by the First Lien Lender Advisors. |
| **"First Lien Administrative Agent"** | Collectively the First Lien Term Loan Administrative Agent and the First Lien Notes Agent. |
| **"First Lien Credit Agreement"** | That certain First Lien Credit Agreement, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented, or modified from time to time prior to the date hereof, by and among, Holdings, Matrix Parent, the First Lien Lenders, and the First Lien Term Loan Administrative Agent. |
| **"First Lien Lender Advisors"** | Milbank LLP, as legal advisors to the First Lien Ad Hoc Group, Houlihan Lokey, Inc., as the investment banker to the First Lien Ad Hoc Group, and Porter Hedges LLP, as local Texas counsel to the First Lien Ad Hoc Group. |
| **"First Lien Lenders"** | The lenders who are from time to time party to the First Lien Credit Agreement. |
| **"First Lien Notes Agent"** | The notes agent for the Noteholders under the Note Purchase Agreement. |
| **"First Lien Term Loan Administrative Agent"** | The administrative agent and collateral agent under the First Lien Credit Agreement. |
| **"Governmental Unit"** | Has the meaning set forth in section 101(27) of the Bankruptcy Code. |

| **Certain Defined Terms** | |
|---|---|
| **"Holdings"** | Matrix Holdco, LLC, a Delaware limited liability company. |
| **"Intercompany Claim"** | Any Claim against a Debtor held by another Debtor. |
| **"Intercompany Interest"** | An Interest in a Debtor other than Intermediate. |
| **"Intercreditor Agreements"** | The Pari Passu Intercreditor Agreement and the 1L/2L Intercreditor Agreement. |
| **"Intermediate"** | Matrix Intermediate, Inc., a Delaware corporation. |
| **"Interest"** | Any (i) equity in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instruments evidencing an ownership interest, or equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, including, without limitation, equity-based employee incentives, grants, stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, or other instruments issued to employees of the Debtors, to acquire any such interests in a Debtor that existed immediately before the Effective Date, and (ii) Section 510(b) Claim against a Debtor. |
| **"Interim DIP Order"** | The interim order entered in the Chapter 11 Cases authorizing the Company's entry into the DIP Facility. |
| **"Litigation Proceeds Term Sheet"** | Means that certain Litigation Proceeds Term Sheet agreed upon by and between the Debtors, the Consenting First Lien Lenders, and the Consenting Sponsor, included as **Exhibit 5**. |
| **"Litigation Trust Agreement"** | An agreement to be entered into by the Debtors, the Consenting Sponsor, and the Consenting Creditors which shall (i) govern the management and administration of the Litigation Trust and the respective rights, powers and obligations of the Litigation Trust Beneficiaries; and (ii) be consistent with the Litigation Proceeds Term Sheet, a substantially final version of which shall be filed with the Plan Supplement. |
| **"Litigation Trust Beneficiaries"** | The beneficiaries of the Trust Causes of Action assigned and transferred to the Litigation Trust on the Effective Date. |
| **"Matrix Parent"** | Matrix Parent, Inc., a Delaware corporation. |
| **"Matrix TopCo"** | The non-Debtor, Matrix Topco, L.P., a Delaware corporation |
| **"New Corporate Governance Documents"** | The certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement, or other similar organizational or formation documents, as applicable, of any of the Reorganized Debtors. |

| Certain Defined Terms | |
|---|---|
| **"New Equity Interests"** | The shares of common stock of Reorganized Parent to be issued or distributed (a) on the Effective Date, (b) upon implementation of the Management Incentive Plan, or (c) as otherwise permitted pursuant to the Plan and the New Corporate Governance Documents. |
| **"Noteholders"** | The holders from time to time party to the Note Purchase Agreement. |
| **"Note Purchase Agreement"** | That certain Note Purchase Agreement, dated as of March 15, 2023 (as amended, restated, amended and restated, supplement, or modified from time to time prior to the date hereof, by and among, Holdings, Matrix Parent, the Noteholders and the First Lien Notes Agent. |
| **"Other Secured Claim"** | A Secured Claim, other than an Administrative Expense Claim, a DIP Claim, a Priority Tax Claim, a First Lien Claim, or a Second Lien Debt Claim. |
| **"Pari Passu Intercreditor Agreement"** | That certain Pari Passu Intercreditor Agreement, dated as of March 15, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof) by and among each of the Debtors, First Lien Term Loan Administrative Agent, the First Lien Notes Agent, and each other person party thereto from time to time. |
| **"Person"** | An individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, government unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity. |
| **"Petition Date"** | The date on which the Chapter 11 Cases are commenced. |
| **"Plan"** | The chapter 11 plan of reorganization of the Debtors implementing the Restructuring, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code, the terms hereof, and the terms of the RSA. |

| Certain Defined Terms | |
|---|---|
| **"Plan Supplement"** | A supplemental appendix to the Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and Bankruptcy Rules, which shall include, but not be limited to: (a) the New Corporate Governance Documents; (b) the Exit Credit Agreement; (c) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (f) the Restructuring Transactions Exhibit; (d) the Schedule of Retained Causes of Action, (e) the Schedule of Rejected Contracts, if applicable, (f) the Litigation Trust Agreement, and (g) Schedule of Excluded Parties; *provided*, *that*, through the Effective Date, the Debtors shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the RSA and subject to the consent rights thereunder. |
| **"Priority Tax Claim"** | Any Secured Claim or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code |
| **"Priority Non-Tax Claim"** | Any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code. |
| **"Professional"** | An Entity (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code that are not Restructuring Fees and Expenses. |
| **"Professional Fee Claim"** | All Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court that are not Restructuring Fees and Expenses. |
| **"Pro Rata Share"** | The proportion that an Allowed Claim or Interest in a particular class bears to the aggregate amount of Allowed Claims or Interest in that class, or the proportion that Allowed Claims or Interests in a particular class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular class and other classes entitled to share in the same recovery as such class under the Plan. |
| **"Purchase Transaction"** | The transactions so defined in the Restructuring Transactions Exhibit (including any amendments thereto), pursuant to which AcquisitionCo acquires substantially all of the assets of the Debtors in the event the Debtors elect to pursue the Purchase Transaction, in each case in form and substance acceptable to the Requisite Consenting First Lien Lenders and the Debtors. |

| **Certain Defined Terms** | |
|---|---|
| **"Purchase Transaction Documents"** | (i) the Acquisition Agreement, and (ii) any other documents setting forth the definitive terms of the Purchase Transaction, in each case in form and substance acceptable to the Requisite Consenting First Lien Lenders and the Debtors. |
| **"Reinstated"** | Leaving a Claim Unimpaired under the Plan. |
| **"Reorganized Debtors"** | Each of the Debtors as reorganized on the Effective Date in accordance with the Plan. |
| **"Reorganized Parent"** | From and after the Effective Date, the entity identified as the Reorganized Parent in the Restructuring Transactions Exhibit, which could be (i) Intermediate as reorganized pursuant to the Plan, (ii) another Reorganized Debtor or (iii) the corporation (or limited liability company or other entity taxed as a corporation for U.S. federal income tax purposes) that is the parent of the Entities holding, owning or acquiring all, or substantially all, of the assets of the Debtors pursuant to the Purchase Transaction. |
| **"Related Parties"** | Means with respect to a Person, that Person's current and former Affiliates, and such Person's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, advisory board members, financial advisors, limited partners, general partners, attorneys, accountants, investment bankers, consultants, investment managers, investment advisors (including, in the case of the Consenting Sponsor, H.I.G. Capital, LLC), representatives, and other professionals, and such Person's respective heirs, executors, estates, and nominees, each in their capacity as such; *provided*, *however*, the entities or individuals, as applicable, listed on the Schedule of Excluded Parties shall not constitute Related Parties nor Released Parties.<br><br>The Plan shall include a third-party beneficiary provision that expressly authorizes Related Parties to enforce the Releases. |
| **"Released Parties"** | Means, collectively: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Consenting Creditors; (iv) the Consenting Sponsor; (v) the DIP Agent; (vi) the DIP Lenders; (vii) the DIP Backstop Parties; and (viii) with respect to each of the foregoing Persons in clauses (i) through (vii), all Related Parties; *provided*, *however*, the entities or individuals, as applicable, listed on the Schedule of Excluded Parties shall not constitute Related Parties nor Released Parties. Notwithstanding the foregoing, any Person that opts out of the releases set forth in section 10.6(b) of the Plan shall not be deemed a Released Party thereunder. |

| Certain Defined Terms | |
|---|---|
| **"Releasing Parties"** | Means collectively, and in each case solely in their capacity as such, (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Consenting Creditors; (iv) the Consenting Sponsor; (v) the DIP Agent; (vi) the DIP Lenders; (vii) the DIP Backstop Parties; (viii) the Released Parties, (ix) with respect to each of the foregoing Persons in clauses (i) through (viii), all Related Parties; (x) the Holders of all Claims or Interests that vote to accept the Plan; (xi) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth therein; (xii) the Holders of all Claims or Interests that vote, or are deemed, to reject the Plan or that are presumed to accept the Plan but do not opt out of granting the releases set forth therein; and (xiii) the Holders of all Claims and Interests and all Other Beneficial Owners that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out. |
| **"Requisite Consenting First Lien Lenders"** | As of the date of determination, Consenting First Lien Lenders holding over 50% in aggregate principal amount of First Lien Claims held by the Consenting First Lien Lenders as of such date. |
| **"Requisite Consenting Second Lien Lenders"** | As of the date of determination, Consenting Second Lien Lenders holding over 50% in aggregate principal amount of Second Lien Claims held by the Consenting Second Lien Lenders as of such date. |
| **"Requisite First Lien Lenders"** | The "Requisite Lenders" as defined by the First Lien Credit Agreement. |

| Certain Defined Terms | |
|---|---|
| **"Restructuring Transactions"** | One or more transactions premised on a debt-for-equity exchange pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, in each case, with the reasonable consent of the Requisite Consenting First Lien Lenders, including: (i) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree, including the documents comprising the Plan Supplement; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, amalgamation, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) with the reasonable consent of the Requisite Consenting First Lien Lenders, the transactions set forth in the Restructuring Transactions Exhibit; (v) the execution, delivery, and filing, if applicable, of the Definitive Documents and Plan Documents; (vi) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order or rule; and (vii) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. |
| **"Restructuring Transactions Exhibit"** | The summary of transaction steps to complete the restructuring contemplated by the Plan included in the Plan Supplement. |
| **"Schedule of Excluded Parties"** | The schedule of excluded parties to be filed with the Plan Supplement. |
| **"Schedule of Rejected Contracts"** | The schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time. |
| **"Schedule of Retained Causes of Action"** | The schedule of retained causes of action to be filed with the Plan Supplement. |
| **"Second Lien Ad Hoc Group"** | The ad hoc group of Second Lien Lenders represented by the Second Lien Lender Advisors. |
| **"Second Lien Administrative Agent"** | The administrative agent and collateral agent for the Second Lien Lenders pursuant to the Second Lien Credit Agreement. |

| Certain Defined Terms | |
|---|---|
| "**Second Lien Credit Agreement**" | That certain Second Lien Credit Agreement, dated as of March 1, 2022 (as amended, restated, amended and restated, supplement, or modified from time to time prior to the date hereof, by and among, Holdings, Matrix Parent, the Second Lien Lenders and the Second Lien Administrative Agent. |
| "**Second Lien Lenders**" | The lenders from time to time party to the Second Lien Credit Agreement. |
| "**Second Lien Lender Advisors**" | Akin Gump Strauss Hauer & Feld LLP, as legal advisors to the Second Lien Ad Hoc Group, and Greenhill & Co., as the investment banker to the Second Lien Ad Hoc Group. |
| "**Section 510(b) Claim**" | Any Claim against any Debtor (i) arising from the rescission of a purchase or sale of an Interest of any Debtor or an affiliate of any Debtor (including the Existing Parent Equity Interests); (ii) for damages arising from the purchase or sale of such Interest; or (iii) for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such a Claim. |
| "**Secured Claim**" | A Claim (a) secured by a lien on collateral to the extent of the value of such collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code exceeds the value of the Claim, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| "**Secured Lenders**" | A lender that is a holder of a Secured Claim. |
| "**Solicitation Materials**" | Any materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan. |
| "**Unexpired Lease**" | A lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code. |
| "**Unimpaired**" | With respect to a Claim, Interest, or class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |

## __Exhibit 1__

**DIP Term Sheet**

## Mobileum – DIP Term Sheet

**Summary of Terms and Conditions for
Senior Secured Superpriority Debtor-In-Possession Financing**

*This term sheet (this "**DIP Term Sheet**") describes the terms of a debtor-in-possession financing ("**DIP Facility**") to be used to fund working capital of **Matrix Parent, Inc.**, a **Delaware corporation** (the "**Borrower**"), Matrix Intermediate, Inc. ( "**Intermediate**"), **Matrix Holdco, LLC**, a **Delaware corporation** ("**Holdings**") and each of its subsidiaries (the "**Subsidiaries**") during the pendency of the cases to be filed under chapter 11 ("**Chapter 11 Cases**") of the United States Bankruptcy Code (the "**Bankruptcy Code**").*

*Capitalized terms used but not defined herein shall have the meanings assigned to them in the Prepetition First Lien Credit Facility (as defined below) or the Restructuring Support Agreement (the "**RSA**") to which this DIP Term Sheet is attached, as applicable.*

**THIS DIP TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

**THIS DIP TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN.  THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.  EXCEPT AS SET FORTH IN THE RSA, NO BINDING OBLIGATIONS WILL BE CREATED BY THIS DIP TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE DOCUMENTS ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES OR APPROVED BY THE BANKRUPTCY COURT, AS APPLICABLE.**

| | |
|---|---|
| **Guarantors** | The Borrower's direct parent, Holdings, indirect parent, Intermediate, and each of the Borrower's direct and indirect Subsidiaries that are debtors in the Chapter 11 Cases (collectively, the "**Guarantors**" and together with the Borrower, the "**Loan Parties**" or the "**Debtors**"), shall be required to provide an unconditional guaranty (collectively, the "**Guarantees**") of all amounts owing under the DIP Facility. |
| **Fronting Lender** | Jefferies Finance LLC, as fronting lender for some or all of the Loans (in such capacity, the "**Fronting Lender**"). |
| **Administrative and Collateral Agent** | Acquiom Agency Services LLC ("**Acquiom**") and Seaport Loan Products LLC ("**Seaport**"), as co-administrative agents (in such capacity, the "**Administrative Agent**") and Acquiom as collateral agent (in such capacity, the "**Collateral Agent**" and, together with the Administrative Agent, the "**Agents**"). |

| | |
|---|---|
| **Lenders** | The financial institutions that are lenders under the DIP Facility from time to time (collectively, the "***Lenders***").  Participation in the New Money Loans (as defined below) will be offered to each of the existing First Lien Creditors on a pro rata basis. |
| **Prepetition Facilities** | The Borrower is party to (i) a first lien revolving credit and term loan facility pursuant to that certain First Lien Credit Agreement, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "***Prepetition First Lien Credit Facility***"), among the Borrower, Holdings, the lenders from time to time party thereto (the "***First Lien Lenders***") and Jefferies Finance LLC ("***Jefferies Finance***"), in its capacity as administrative agent (the "***Prepetition First Lien Agent***"), (ii) a first lien secured notes facility pursuant to that certain Note Purchase Agreement, dated as of March 15, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "***Prepetition First Lien Notes Facility***" and together with the Prepetition First Lien Credit Facility, the "***Prepetition First Lien Facilities***"), among the Borrower, as issuer, the noteholders from time to time party thereto (the "***First Lien Noteholders***", together with the First Lien Lenders, the "***First Lien Creditors***"), and Wilmington Trust, National Association, as notes agent and (iii) a second lien term loan facility pursuant to that certain Second Lien Term Credit Agreement, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "***Prepetition Second Lien Term Facility***" and, together with the Prepetition First Lien Facilities, the "***Prepetition Facilities***"), among the Borrower, Holdings, the lenders from time to time party thereto (the "***Second Lien Lenders***") and Jefferies Finance LLC, in its capacity as administrative agent (the "***Prepetition Second Lien Agent***"). |
| **Amount** | The DIP Facility shall be comprised of: |
| | (i) a new money term loan (the "***New Money Loans***", and the commitment of the Lenders to make the New Money Loans, the "***New Money Commitment***") in an aggregate amount of up to $60,000,000; |
| | (ii) upon entry of the Interim DIP Order (as defined below) or at such later date as the Backstop Parties (as defined below) may agree in writing, roll-up loans (the "***Rollup Loans***" and, collectively with the New Money Loans, the "***Tranche A Loans***", and the commitment of the Lenders to the roll-up of their loans under the applicable Prepetition First Lien Credit Facility, as set forth herein, together with the New Money Commitment, the "***Commitment***") in an aggregate principal amount equal to $100,000,000 at a ratio of approximately $1.67 for each $1 of New Money Loans committed to be funded by the Lenders (the "***Rollup***"); and |
| | (iii) upon entry of the Interim DIP Order the Tranche B Loans referenced below. |
| | An amount equal to $40,000,000 shall be made available upon entry of an interim order of the Bankruptcy Court, in the form attached hereto as <u>Annex III</u> (the "***Form of Interim DIP Order***") and otherwise in form and substance satisfactory to the Required DIP Lenders (as defined below) in their sole |

discretion, approving the financing (the "***Interim DIP Order***" and the date the Bankruptcy Court enters the Interim DIP Order, the "***Interim DIP Order Entry Date***") and may be drawn upon satisfaction of the other conditions to borrowing contained in the DIP Facility. Upon entry of an order of the Bankruptcy Court, in form and substance satisfactory to the Required DIP Lenders in their sole discretion, approving the DIP Facility on a final basis (the "***Final DIP Order***" and, together with the Interim DIP Order, the "***DIP Orders***" and the date the Bankruptcy Court enters the Final DIP Order, the "***Final DIP Order Entry Date***") the Borrower shall be permitted to draw the remaining $20,000,000 of the New Money Loans. The Rollup Loans and the Tranche B Loans shall be deemed to have been advanced on a cashless basis.

The DIP Loans are provided for working capital purposes in accordance with the Budget and for the other purposes listed under "Use of Proceeds" below.

|                          |                                                                                                                                                                                                                                                                                                                                                                            |
| ------------------------ | -------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| **Backstop Commitment**  | Pursuant to the Backstop Commitment Letter, dated as of July 23, 2024, certain First Lien Creditors (in such capacities, the "***Backstop Parties***") will, in the allocations set forth on Schedule I to the Backstop Commitment Letter, (a) provide their pro rata share of the Tranche A Loans and (b) provide any Tranche A Loans not provided by the other First Lien Creditors. |

The Backstop Parties will receive, in the allocations set forth in Schedule I to the Backstop Commitment Letter, a backstop premium (the "***Backstop Premium***") earned upon execution of the Backstop Commitment Letter in an amount equal to 15% of each Backstop Party's New Money Commitment amount, which Backstop Premium will, initially, be paid in the form of loans issued on the Interim DIP Order Entry Date under a separate "Tranche B" under the DIP Facility (the "***Tranche B Loans***" and, together with the Tranche A Loans, collectively the "***DIP Loans***"), *provided* that any portion of the "Tranche B" DIP Loans outstanding immediately prior to the Effective Date shall be converted on the Effective Date into 10% of the new common shares of the Reorganized Company and issued to the Backstop Parties in proportion to their respective backstop allocation amounts, subject to dilution by new common shares issued pursuant to the MIP.

|             |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |
| ----------- | -------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| **Budget**  | On Friday of the third full calendar week following the Interim DIP Order Entry Date, the Loan Parties shall provide an update to the initial budget attached hereto as Annex IV (the "***Initial Budget***") in the form of a 13-week forecast for the next 13 weeks of the Loan Parties, broken down by week, which shall include the anticipated uses of the DIP Facility for such period (such updated cash flow forecast and each subsequent 13-week forecast, the "***Budget***"), and thereafter on the first Friday of each month thereafter (or more frequently to accommodate changes in business operating activity) an updated 13-week projection for the subsequent 13-week period (which in each case must be satisfactory to the Required DIP Lenders in their sole discretion, which approval may be delivered by Milbank LLP as counsel to the Required DIP Lenders by e-mail correspondence (the most recently delivered approved Budget, the "***Approved Budget***"); *provided*, that the most recently delivered subsequent Budget shall be deemed accepted five (5) business days following the delivery thereof to the Lenders, in the event the Required DIP Lenders (or Milbank acting at the direction of the Required DIP Lenders) shall have failed to reject the same on or |

before such date; *provided*, further, that, for the avoidance of doubt, until the conditions for the most recently delivered subsequent Budget are met the prior Approved Budget shall remain in full force and effect for all purposes. Additionally, commencing on Friday of the third full week following the Interim DIP Order Entry Date, and thereafter on each Friday (or such later date as the Required DIP Lenders agree in their sole discretion), the Loan Parties shall deliver, or cause to be delivered, to the Lenders a written variance report reconciling actual cash receipts and disbursements for the week ended the preceding Friday measured against the Initial Budget and the Approved Budget then in effect, which report shall include a reasonably detailed explanation of all material variances (determined on a line-item-by-line-item basis) between actual and budgeted receipts and disbursements (such report, the "***Variance Report***").

**Priority and Liens**       All obligations under the DIP Facility shall, subject to the Carve-Out (as defined in the DIP Orders), at all times:

(i)       pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status having priority over any and all other claims, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113, and 1114, and any other provision of the Bankruptcy Code;

(ii)       pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all unencumbered now owned or after acquired assets of the Loan Parties that are not otherwise subject to any lien;

(iii)       pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all now owned or after acquired assets of the Loan Parties that are subject to (x) any valid, perfected and non-avoidable lien in existence on the petition date or (y) any valid lien in existence on the petition date that is perfected subsequent to the petition date by Section 564(b) of the Bankruptcy Code, in each case other than the encumbrances under the Prepetition Facilities; and

(iv)       pursuant to Section 364(d) of the Bankruptcy Code, be secured by a perfected first priority priming lien on all now owned or after acquired assets of the Loan Parties pledged under the Prepetition Facilities (including, without limitation, all of the outstanding shares of capital stock of each subsidiary Guarantor and any direct subsidiary of the Loan Parties).

The assets described above, collectively, together with (a) the proceeds of all claims and causes of avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents (the "***Avoidance Actions***"), (b) the proceeds of any exercise of the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code and (c) all assets or property that were not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date,

excluding all claims and causes of avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents, the "**_Collateral_**".

All of the liens described herein with respect to the assets of the Loan Parties shall be effective and perfected by the Interim DIP Order and the Final DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

| | |
|---|---|
| **DIP Closing Date** | The date on or after the entry of the Interim DIP Order on which the conditions precedent, which conditions precedent shall be usual and customary for facilities of this type, shall have been satisfied or waived by the Required DIP Lenders (the date of such closing, the "**_DIP Closing Date_**"). |
| **Maturity** | The DIP Loans shall be repaid in full, and the Commitment shall terminate, on the earliest to occur (the "**_Maturity Date_**") of (i) the date that is six months from the Petition Date, (ii) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Loan Parties to a Chapter 7 liquidation or the dismissal of the bankruptcy case of any Loan Party, (iii) the acceleration of the DIP Loans and the termination of the Commitment under the DIP Facility, (iv) the sale of all or substantially all of the Loan Parties' assets and (v) the consummation of a chapter 11 plan of reorganization for the Loan Parties. |
| **Payment of Obligations** | All obligations of the Borrower owed to the Lenders arising from the DIP Loans, including all Tranche B Loans, related fees and premiums and other liabilities and obligations, shall be paid in cash, except solely in connection with the conversion of Tranche A Loans into takeback indebtedness and the conversion of Tranche B Loans into new common shares, in each case, as provided in this DIP Term Sheet and pursuant to the Plan. |

The DIP Loans held by Lenders shall be converted (the "**_Conversion_**") into the Exit Term Loans in accordance with the terms of the RSA and the Plan, in each case, as amended or otherwise modified from time to time in accordance with the terms thereof; _provided_, that, if the RSA has been validly terminated with respect to any Lender, the Conversion shall occur with respect to such Lender's DIP Loans only if the Plan as in effect on the Effective Date provides for treatment, economic terms and recoveries of the DIP Loans, First Lien Claims and Second Lien Claims held by such Lender that is the same as the treatment, economic terms and recoveries provided therefor in the Restructuring Support Agreement as in effect immediately prior to the action, event, or circumstance that gave rise to the right to terminate the Restructuring Support Agreement as to such Lender..

The DIP Loan Documents shall provide that any amendment, waiver or modification, or any amendment, waiver or modification that has the effect of amending, waiving or modifying, the Conversion provisions described above shall require the consent of each Lender adversely affected thereby.

| | |
|---|---|
| **Use of DIP Loan Proceeds** | To (i) effectuate the Rollup, (ii) pay (a) fees and other expenses due and payable under the DIP Facility and (b) other amounts in accordance with the Budget (subject to Permitted Variances) and (iii) fund the Carve-Out. Subject to the terms of the DIP Orders, including the Challenge Period (as defined in the DIP Orders), no portion of the Debtors' cash collateral and other cash (collectively, the "***Cash Collateral***"), the DIP Loans or the Collateral may be used to investigate, commence or prosecute any action, proceeding or objection with respect to or related to (1) the claims, liens or security interests of the Agents or the Lenders, (2) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are subjects of the Release (as defined below) or (3) certain stipulations to be made by the Loan Parties and approved by the Interim DIP Order, as set forth in the Form of Interim DIP Order. The First Lien Creditors and Second Lien Lenders will receive adequate protection with respect to any diminution in value of their prepetition collateral as set forth in the Form of Interim DIP Order. |
| **Interest Rate** | The interest rate, default rate and fees are appended as Annex II hereto. |
| **Mandatory Prepayments** | The DIP Loans will be subject to mandatory prepayments customary for DIP financings and otherwise consistent with the Prepetition First Lien Credit Facility to be included in the definitive DIP Loan Documents (as defined below) (including, without limitation, prepayments with the proceeds of incurrence of debt (other than under the DIP Facility), sales of assets, proceeds of litigation (including the H.I.G. Litigation (as defined in the DIP Credit Agreement)) and casualty events by the Borrower or any of its subsidiaries; net of taxes and out-of-pocket expenses incurred in connection with such litigation; *provided* that such prepayment shall be reduced in an amount necessary to ensure that liquidity shall not be less than $33.3 million after giving effect to such prepayment. Mandatory prepayments may be declined at the election of each Lender. |
| **Voluntary Prepayments** | The DIP Loans may be permanently prepaid in full by the Borrower at any time, subject to payment of the Exit Premium. |
| **Representations** | The DIP Facility shall contain representations and warranties substantially similar to those set forth in the Prepetition First Lien Credit Facility and others that are customary or appropriate in the context of the proposed DIP Facility (including, without limitation, existence, qualification and power, compliance with laws, authorization, governmental authorizations, binding effect, delivery of financial statements and no material adverse effect, subsidiaries, litigation, use of proceeds, ownership of property, liens, environmental compliance, taxes, ERISA, margin regulations, disclosure, intellectual property, intellectual property licenses, super-priority obligations, sanctions, anti-corruption laws, PATRIOT ACT and Anti-Terrorism Laws, Budget, employee matters and no defaults and excluding any representations and warranties that cannot be made as a result of the commencement of the Chapter 11 Cases or the events and circumstances giving rise thereto) and customary representations with respect to the Budget, the Chapter 11 Cases and the DIP Orders, in each case, subject to customary thresholds, qualifications and carve-outs to be mutually agreed. |

| | |
|---|---|
| **Affirmative Covenants** | The DIP Facility shall contain affirmative covenants substantially similar to those set forth in the Prepetition First Lien Credit Facility and others customary or appropriate in the context of the proposed DIP Facility, including, without limitation: |
| | (i) delivery of financial statements and reports on a monthly basis (which statements shall not be required to be compliant with GAAP), the Budgets and the Variance Reports, 13-week cash flow projections delivered on a weekly basis, closing certificates, KPI reports on a monthly basis (in form consistent with current KPI reporting), upon request and subject to mutually convenient times (a) bi-weekly calls with legal and financial advisors and relevant members of management and (b) monthly calls with legal and financial advisors, relevant members of management and the Lenders, and other information reasonably requested by Agents or Lenders, including updates with respect to litigation and government investigation matters, |
| | (ii) certain documents filed by the Borrower or any other Guarantor with the Bankruptcy Court in the Chapter 11 Cases, (iii) notices, (iv) payment of taxes, (v) preservation of existence, (vi) maintenance of properties, (vii) maintenance of insurance, (viii) compliance with laws and contractual obligations, (ix) books and records, (x) inspection rights and lender meetings, (xi) use of proceeds, (xii) covenant to guarantee obligations and give security, (xiii) compliance with environmental laws, (xiv) further assurances, (xv) maintenance of rating, (xvi) no litigation, (xvii) post-closing obligations, (xviii) sanctions and anti-corruption, (xix) PATRIOT Act and Anti-Terrorism Laws, (xx) cash management and |
| | (xxi) compliance in all material respects with the orders of the Bankruptcy Court. |
| **Negative Covenants** | The DIP Facility shall contain negative covenants substantially similar to those set forth in the Prepetition First Lien Credit Facility and others customary or appropriate in the context of the proposed DIP Facility, including, without limitation, regarding: (i) liens, (ii) investments, (iii) indebtedness, (iv) fundamental changes, (v) dispositions, (vi) restricted payments, (vii) changes in nature of business, (viii) transactions with affiliates, (ix) burdensome agreements, (x) minimum liquidity, (xi) accounting changes, (xii) holding company, (xiii) certain covenants related to the Chapter 11 Orders, (xiv) prepayments etc. of junior indebtedness and (xv) amendment, modification or waiver of conditions or provisions contained in the Prepetition First Lien Facilities. |
| | In addition, the Debtors shall comply with each of the following Milestones set forth in the RSA (the "***Milestones***"). |
| **Financial Covenants** | Financial covenants shall be: |
| | (i) commencing with the first full week after the Interim DIP Order Entry Date, compliance with the Approved Budget shall be tested on a bi-weekly basis based on the operating receipts (actual vs. budget) and operating disbursements (actual vs. budget) for the period commencing on the Saturday prior to the Petition Date and ending on the immediately preceding Friday (each such date, a "Testing |

Date"). For the avoidance of doubt, assuming a Petition Date of July 22, 2024, the initial testing period shall be for the week ending July 12, 2024, through the week ending August 2, 2024 and the testing shall be provided on or before August 9, 2024. The Debtors shall not permit (a) the cumulative operating receipts during the period commencing on the Saturday prior to the date that is four weeks prior to such Testing Date and ending on such Testing Date (the "Budget Testing Period") to be less than 80% of the projected operating receipts for such period and (b) the cumulative operating disbursements during the Budget Testing Period to be more than 115% of the projected disbursements for such period (the "Permitted Variance"); provided that, solely for purposes of the budgeted operating receipts test and the budgeted operating disbursements test for the first Budget Testing Period, the initial two weeks of aggregate operating receipts and aggregate operating disbursements, respectively, in the Budget shall be deemed to refer to the actual operating receipts or actual operating disbursements (as applicable) for the initial two weeks of such Budget Testing Period. For the avoidance of doubt, Intercompany cash in transit shall be excluded from the operating receipts and operating disbursements testing; and

(ii) commencing with the first full week after the Interim DIP Order Entry Date, the Borrower will not permit, as of the week ended the preceding Friday and on a bi-weekly basis thereafter, minimum liquidity to be less than $15,000,000.

| | |
|---|---|
| **Conditions to All Borrowings** | The obligation of each of the Lenders to make the DIP Loans shall be subject to the satisfaction (or waiver by Required DIP Lenders) of the conditions precedent to be set forth in the loan documentation incorporating the terms and conditions outlined in this DIP Term Sheet (the "***DIP Loan Documents***") and limited to those the conditions precedent usual and customary for facilities of this type. |
| **Carve-Out** | See paragraph 4 of the DIP Order. |
| **Events of Default** | The DIP Facility shall contain events of default customary or appropriate in the context of the proposed DIP Facility (the "***Events of Default***"), subject to certain cure periods and thresholds, including, without limitation:  (i) the filing by any party of a plan of reorganization that does not either (a) propose to repay all obligations under the DIP Facility in full, immediately upon its effectiveness or (b) have the consent of each affected Lender, in each case, which is not withdrawn, dismissed or denied within five business days after such filing; (ii) the entry of an order approving any disclosure statement in support of a plan of reorganization that does not either (a) propose to repay all obligations under the DIP Facility in full, immediately upon its effectiveness or (b) have the consent of each affected Lender; (iii) the violation of any term, provision or condition in the Interim DIP Order or Final DIP Order (other than a violation by any of the Lenders); (iv) any adverse deviation of more than the Permitted Variance from the amount set forth under the Budget for any Budget Period; (v) appointment of a trustee or examiner; (vi) dismissal of the Chapter 11 Cases; (vii) invalidation or impairment of liens or security interests of the Agents; and (viii) the failure to comply with the Affirmative or Negative Covenants (including the Milestones). |

| | |
|---|---|
| **Required DIP Lenders** | "***Required DIP Lenders***" shall mean the Lenders holding more than 50% of the outstanding DIP Loans and DIP Commitments. |
| **Remedies** | As set forth in the DIP Orders. |
| **Release** | The Loan Parties will provide customary releases for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations related to or arising out of the DIP Loans and the Prepetition First Lien Facility (the "***Release***"). |
| **Indemnity** | The Loan Parties shall, jointly and severally, be obligated to indemnify and hold harmless the Agents, each of the Lenders, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys and representatives from and against all losses, claims, liabilities, damages, and expenses (limited in the case of professional fees to the reasonable and documented out-of-pocket fees and disbursements of counsel) in connection with any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated in this Term Sheet. |
| **Expenses** | The Borrower shall pay promptly following written demand (i) all reasonable and documented out-of-pocket expenses of the Agents and the First Lien Ad Hoc Group associated with the preparation, execution, delivery and administration of the DIP Loan Documents and any amendment or waiver with respect thereto (limited in the case of professional fees to the reasonable and documented out-of-pocket expenses of and fees payable to Houlihan Lokey and Milbank LLP and other Designated Advisors (as defined in the DIP Loan Documents) and conflicts counsel where applicable)) and (ii) all reasonable and documented out-of-pocket expenses of the Agents and the First Lien Ad Hoc Group (limited in the case of professional fees to one primary legal counsel and one counsel in each relevant jurisdiction to the Agents and the reasonable and documented out-of-pocket expenses of and fees payable to Houlihan Lokey and Milbank LLP and other Designated Advisors (as defined in the DIP Loan Documents) and conflicts counsel where applicable)) in connection with the enforcement of the DIP Loan Documents or protection of rights thereunder. |
| **Governing Law** | The DIP Loan Documents will provide that the Loan Parties will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State of New York; and shall waive any right to trial by jury.<br><br>New York law shall govern the DIP Loan Documents except to the extent preempted by federal bankruptcy laws. |

**Annex I**

**Interest, Premium and Fees**

| | |
|---|---|
| Interest Rates: | All amounts outstanding under the DIP Facility will bear interest, at the Debtor's option, as follows:<br><br>(i)      at the Adjusted Term SOFR Rate (which in no event shall be less than 1.00%) plus 6.00% per annum; or<br><br>(ii)     at the Base Rate (which in no event shall be less than 2.00%) plus 5.00% per annum.<br><br>As used herein, the terms "Adjusted Term SOFR Rate" and "Base Rate" and will have the meanings substantially similar to those set forth in the Prepetition First Lien Credit Facility. |
| Interest Payment Date: | One-month interest periods; provided that the Rollup Loans shall bear interest as of the date in which a portion of the New Money Loans are funded following entry of the Interim DIP Order regardless of whether such Rollup Loans are issued after such date.<br><br>In the case of Base Rate Loans, monthly (on the first business day of each calendar month) and on the date such Base Rate Loan shall be converted or paid in full in cash.<br><br>In the case of Term SOFR Rate Loans, on the last day of each relevant interest period (and, in case of any interest period that is longer than one month, each date that falls on the one-month anniversary of the beginning of such interest period) and on the date such Term SOFR Rate Loan shall be converted or paid in full. |
| Default Interest: | During the continuance of an Event of Default, the loans and all other outstanding obligations will bear interest at an additional 2.00% per annum above the interest rate otherwise applicable. |
| Exit Premium: | 3.0% of the principal amount of the DIP Loans prepaid or Commitments reduced, as applicable, payable upon any reduction of the Commitments or repayment of loans, other than in the event of a mandatory prepayment arising from Extraordinary Receipts or the conversion of Tranche A Loans to take-back indebtedness and equitization of Tranche B Loans, in each case, at emergence in accordance with the Plan. |
| Agency Fees | As agreed with the Agents. |
| Nature of Fees: | Non-refundable under all circumstances. |

**Annex II**

**Form of Interim DIP Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|                                      |     |                                          |
|--------------------------------------|-----|------------------------------------------|
|                                      | §   |                                          |
| In re:                               | §   | Chapter 11                               |
|                                      | §   |                                          |
| **MOBILEUM, INC.,** *et al.,*        | §   | Case No. 24-[●] ([●])                    |
|                                      | §   |                                          |
|                                      | §   | **(Jointly Administered)**               |
|                            Debtors.[1] | §   | **(Emergency Hearing Requested)**        |
|                                      | §   |                                          |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "**DIP Motion**")[2] of Mobileum, Inc. and each of its above-captioned affiliates (collectively, the "**Debtors**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "**Bankruptcy Code**"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "**Complex Case Rules**" and, together

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Mobileum, Inc. (7417); Matrix Intermediate, Inc. (7287); Matrix Holdco, LLC (0039); Matrix Parent, Inc. (9085); Mobile Acquisition Corp. (9591); SIGOS LLC (1763); UnwiredSoft Inc. (2064); We Do Technologies Americas, Inc. (9338); Convene Networks LLC (2820); Developing Solutions Inc. (6177); and Phase 3 Innovations Holdings, Inc. (1899).  The Debtors' mailing address is 20813 Stevens Creek Boulevard, Suite 200, Cupertino, CA 95014.

[2]  Capitalized terms used but not defined herein are given the meanings ascribed to such terms in the DIP Motion or DIP Credit Agreement (as defined herein).

with the Local Rules, the "**Bankruptcy Local Rules**"), seeking entry of this interim order (this "**Interim Order**") and the Final Order (as defined herein and, together with this Interim Order, the "**DIP Orders**") among other things:

- authorizing the Borrower to obtain postpetition financing ("**DIP Financing**") under a senior secured, superpriority, priming debtor-in-possession facility (the "**DIP Facility**") subject to the terms and conditions set forth in this Interim Order and pursuant to that certain Debtor-in-Possession Credit Agreement attached hereto in substantially final form as **Exhibit 1** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**") by and among Matrix Intermediate, Inc., a Delaware corporation, Matrix Holdco LLC, a Delaware limited liability company, the Borrower, the DIP Guarantors (as defined below), the financial institutions or other entities from time to time party thereto as "Lenders" (the "**DIP Lenders**"), and Acquiom Agency Services ("**Acquiom**") and Seaport Loan Products LLC ("**Seaport**"), as co-administrative agents for the Lenders (in such capacities, each a "**Co-Administrative Agent**" and together, the "**Administrative Agent**"), and Acquiom, as collateral agent (in such capacity, the "**Collateral Agent**" and, together with the Administrative Agent, together with its successors and permitted assigns, the "**DIP Agent**" and, together with the DIP Lenders, the "**DIP Secured Parties**"), consisting of (i) new money term loans (the "**New Money DIP Term Loans**") in an aggregate principal amount of $60 million, of which $40 million will be available immediately upon entry of this Interim Order and the remainder will be available upon entry of the Final Order (subject to certain conditions), (ii) $100 million of DIP Roll-Up Loans (as defined below), which will be deemed rolled up and converted into DIP Obligations (as defined below) upon entry of the Interim Order (as defined below) in accordance with paragraph 2(b) hereof and subject to paragraph 2(c) hereof (the "**DIP Roll-Up Loans**"), and (iii) the Backstop Premium, which will be paid in Tranche B Loans and which loans will be deemed made upon entry of the Interim Order (the loans to be made available under the foregoing clauses (i), (ii), and (iii), the "**DIP Loans**" and the commitments therefor, the "**DIP Commitments**");

- authorizing the Borrower to incur, and the Guarantors (as defined in the DIP Credit Agreement) to jointly and severally guarantee (such Debtors, in this capacity, the "**DIP Guarantors**" and, together with the Borrower, the "**DIP Loan Parties**") the DIP Loans and all extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, commitment fees or premiums and administrative agency fees), costs, expenses and other liabilities and obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable pursuant to the DIP Documents (as defined below) (collectively, the "**DIP Obligations**");

- authorizing the DIP Loan Parties to execute, deliver and perform pursuant to the terms of the DIP Credit Agreement and all other documents and instruments required to be delivered in connection with the DIP Facility (in each case, as amended, restated,

amended and restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof and hereof, together with the DIP Credit Agreement, the "**DIP Documents**");

- subject to the Carve-Out (as defined below) and otherwise solely to the extent set forth herein, granting to the DIP Agent, for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code;

- granting to the DIP Agent, for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on the DIP Collateral (as defined below), on the terms described herein;

- authorizing the DIP Agent, acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement, the "**Required DIP Lenders**"), to take all commercially reasonable actions required to implement the terms of this Interim Order;

- waiving (a) the Debtors' right to surcharge the Prepetition Collateral (as defined below) and the DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code; *provided*, *that*, the foregoing waiver shall be without prejudice to any provisions of the Final Order with respect to costs or expenses incurred following the entry of such Final Order;

- waiving the equitable doctrine of "marshaling" and other similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) with respect to the Prepetition Collateral (including the Cash Collateral (as defined below)) for the benefit of any party other than the Prepetition Secured Parties (as defined below); *provided*, *that*, the foregoing waiver shall be without prejudice to any provisions of the Final Order;

- authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral solely in accordance with the DIP Orders and the DIP Documents;

- authorizing the Debtors to pay the DIP Obligations as they become due and payable in accordance with the DIP Documents;

- subject to the restrictions set forth in the DIP Documents and the DIP Orders, authorizing the Debtors to use Prepetition Collateral and provide adequate protection to the Prepetition Secured Parties (as defined below) for any diminution in value of their respective interests in the applicable Prepetition Collateral (as defined below) (including Cash Collateral), for any reason provided for in the Bankruptcy Code (collectively, the "**Diminution in Value**");

3

- vacating and modifying the automatic stay to the extent necessary to permit the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the DIP Orders and the DIP Documents;

- waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

- scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facility and use of Cash Collateral on the terms of a proposed order (the "**Final Order**") to be filed with the Court prior to the Final Hearing.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Bo Yi in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**Yi Declaration**"), and the *Declaration of Mike Salfity in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**"), the available DIP Documents, and the evidence submitted and arguments made at the interim hearing held on July 24, 2024 (the "**Interim Hearing**"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Bankruptcy Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise is fair and reasonable, in the best interests of the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the DIP Loan Parties' entry into the DIP Documents is a

4

sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.      *Petition Date*.  On July 23, 2024 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**").

B.      *Debtors in Possession*.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.      *Jurisdiction and Venue*.  This Court has core jurisdiction over these cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012.  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order approving the relief sought in the DIP Motion consistent with Article III of the United States Constitution.  Venue for these cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. § 1408.  The predicates for the relief sought herein are sections 105, 361, 362, 363(b), 363(c), 363(e), 364(c), 364(d), 364(e), 503, and 507 of the Bankruptcy Code, Bankruptcy Rules

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

WEIL:\99860437\1\63808.0003

2002, 4001, 6003, 6004, and 9014, and Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1.

D. *Committee Formation*.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in these cases (a "**Creditors' Committee**").

E. *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate and sufficient notice of the DIP Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules, and no other or further notice was required under the circumstances.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

F. *Cash Collateral*.  As used herein, the term "**Cash Collateral**" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the Prepetition Secured Parties or DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

G. *Debtors' Stipulations*.  Subject to the provisions and limitations contained in paragraph 17 hereof, the Debtors admit, stipulate and agree that:

(i) *Prepetition First Lien Loans*.  Pursuant to that certain First Lien Credit Agreement, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition First Lien Credit Agreement**" and, collectively with the other "Loan Documents" (as defined in the Prepetition First Lien Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated,

6

supplemented, waived, or otherwise modified prior to the Petition Date, the "**Prepetition First Lien Loan Documents**") by and among (a) Matrix Holdco, LLC ("**Holdings**"), (b) Matrix Parent, Inc., as parent borrower (the "**Prepetition First Lien Borrower**"), (c) the subsidiary guarantors party thereto (the "**Prepetition First Lien Loan Subsidiary Guarantors**" and, together with Holdings, the "**Prepetition First Lien Loan Guarantors**" and the Prepetition First Lien Loan Guarantors together with the Prepetition First Lien Borrower, the "**Prepetition First Lien Loan Parties**"), (d) Jefferies Finance LLC, as administrative and as collateral agent (the "**Prepetition First Lien Loan Agent**"), and (e) the lenders party thereto from time to time (the "**Prepetition First Lien Lenders**" and, together with the Prepetition First Lien Loan Agent, the "**Prepetition First Lien Loan Secured Parties**"), the Prepetition First Lien Loan Parties incurred "Obligations" (as defined in the Prepetition First Lien Credit Agreement, the "**Prepetition First Lien Loan Obligations**") owing to the Prepetition First Lien Loan Secured Parties on a joint and several basis;

(ii)     *Prepetition First Lien Notes.*     Pursuant to that certain Note Purchase Agreement, dated as of March 15, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition First Lien Note Purchase Agreement**" and, collectively with the other "Notes Documents" (as defined in the Prepetition First Lien Note Purchase Agreement) and any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "**Prepetition First Lien Notes Documents**" and, together with the Prepetition First Lien Loan Documents, the "**Prepetition First Lien Documents**") by and among (a) Holdings, (b) Matrix Parent, Inc., as issuer (the "**Prepetition First Lien Issuer**"), (c) the subsidiary guarantors party thereto (the "**Prepetition First Lien Notes Subsidiary Guarantors**" and, together with Holdings,

the "**Prepetition First Lien Notes Guarantors**", and the Prepetition First Lien Notes Guarantors together with the Prepetition First Lien Issuer, the "**Prepetition First Lien Notes Parties**", and the Prepetition First Lien Notes Parties together with the Prepetition First Lien Loan Parties, the "**Prepetition First Lien Credit Parties**"), (d) Wilmington Trust National Association, as notes agent (the "**Prepetition First Lien Notes Agent**" and, together with the Prepetition First Lien Loan Agent, the "**Prepetition First Lien Agents**"), and (e) the holders party thereto from time to time (the "**Prepetition First Lien Noteholders**" and, together with the Prepetition First Lien Notes Agent, the "**Prepetition First Lien Notes Secured Parties**", and the Prepetition First Lien Notes Secured Parties together with the Prepetition First Lien Loan Secured Parties, the "**Prepetition First Lien Secured Parties**"), the Prepetition First Lien Notes Parties incurred "Obligations" (as defined in the Prepetition First Lien Note Purchase Agreement, the "**Prepetition First Lien Notes Obligations**" and, together with the Prepetition First Lien Loan Obligations, the "**Prepetition First Lien Obligations**") owing to the Prepetition First Lien Notes Secured Parties on a joint and several basis;

(iii)     *Pari Passu Intercreditor Agreement.*  Pursuant to (and to the extent set forth in) that certain Pari Passu Intercreditor Agreement, dated as of March 15, 2023 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "**Prepetition Pari Intercreditor Agreement**"), by and among the Prepetition First Lien Credit Parties and the Prepetition First Lien Agents, the Prepetition First Lien Agents agreed, among other things, to: (a) consent to, or not oppose, certain actions taken, or rights asserted, by the Prepetition First Lien Loan Secured Parties or the Prepetition First Lien Notes Secured Parties, as applicable, and (b) refrain from taking certain actions with respect to the Shared Collateral (as defined in the Prepetition Pari Intercreditor Agreement, the "**Pari Passu Collateral**");

(iv)    *Prepetition Second Lien Loan*.  Pursuant to that certain Second Lien Credit Agreement, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Second Lien Credit Agreement**" and, collectively with the other "Loan Documents" (as defined in the Prepetition Second Lien Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "**Prepetition Second Lien Loan Documents**", and the Prepetition Second Lien Loan Documents together with the Prepetition First Lien Documents, the "**Prepetition Loan Documents**") by and among (a) Holdings, (b) Matrix Parent, Inc., as parent borrower (the "**Prepetition Second Lien Borrower**"), (c) the subsidiary guarantors party thereto (the "**Prepetition Second Lien Loan Subsidiary Guarantors**" and, together with Holdings, the "**Prepetition Second Lien Loan Guarantors**" and the Prepetition Second Lien Loan Guarantors together with the Prepetition Second Lien Borrower, the "**Prepetition Second Lien Loan Parties**", and the Prepetition Second Lien Loan Parties together with the Prepetition First Lien Credit Parties, the "**Prepetition Loan Parties**"), (d) Jefferies Finance LLC, as administrative and collateral agent (the "**Prepetition Second Lien Agent**" and, together with the Prepetition First Lien Agents, the "**Prepetition Agents**"), and (e) the lenders party thereto from time to time (the "**Prepetition Second Lien Lenders**", together with the Prepetition First Lien Lenders and Prepetition First Lien Noteholders, the "**Prepetition Lenders**", and, the Prepetition Second Lien Lenders together with the Prepetition Second Lien Agent, the "**Prepetition Second Lien Secured Parties**", and the Prepetition Second Lien Secured Parties together with the Prepetition First Lien Secured Parties, the "**Prepetition Secured Parties**"), the Prepetition Second Lien Loan Parties incurred "Obligations" (as defined

in the Prepetition Second Lien Credit Agreement, the "**Prepetition Second Lien Obligations**" and, together with the Prepetition First Lien Obligations, the "**Prepetition Secured Obligations**") owing to the Prepetition Second Lien Secured Parties on a joint and several basis;

(v)     *1L/2L Intercreditor Agreement*.  Pursuant to (and to the extent set forth in) that certain Intercreditor Agreement, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "**Prepetition 1L/2L Intercreditor Agreement**"), by and among the Prepetition Loan Parties and the Prepetition Agents, the parties thereto agreed, among other things, to: (a) consent to, or not oppose, certain actions taken, or rights asserted, by the Prepetition First Lien Secured Parties or Prepetition Second Lien Secured Parties, as applicable, and (b) refrain from taking certain actions with respect to the Collateral (as defined therein);

(vi)     *Prepetition First Lien Loan Obligations*.  As of the Petition Date, the Prepetition First Lien Loan Parties were justly and lawfully indebted and liable to the Prepetition First Lien Loan Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for Loans (as defined in the Prepetition First Lien Credit Agreement) in the aggregate principal amount of not less than $433 million, plus accrued and unpaid interest thereon and any fees, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees), costs, charges, indemnities, and other Prepetition First Lien Loan Obligations incurred under the Prepetition First Lien Loan Documents;

(vii)     *Prepetition First Lien Notes Obligations*.  As of the Petition Date, the Prepetition First Lien Notes Parties were justly and lawfully indebted and liable to the Prepetition First Lien Notes Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for Notes (as defined in the Prepetition First Lien Note Purchase Agreement)

in the aggregate principal amount of not less than $32 million, plus accrued and unpaid interest thereon and any fees, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees), costs, charges, indemnities, and other Prepetition First Lien Notes Obligations incurred under the Prepetition First Lien Notes Documents;

(viii)   *Prepetition Second Lien Obligations*.   As of the Petition Date, the Prepetition Second Lien Loan Parties were justly and lawfully indebted and liable to the Prepetition Second Lien Secured Parties without defense, challenge, objection, claim, counterclaim, or offset of any kind, for Loans (as defined in the Prepetition Second Lien Credit Agreement) in the aggregate principal amount of not less than $163 million, plus accrued and unpaid interest thereon and any fees, expenses and disbursements (including any attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees), costs, charges, indemnities, and other Prepetition Second Lien Obligations incurred under the Prepetition Second Lien Loan Documents;

(ix)   *Validity of Prepetition Secured Obligations*.   The Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan Parties, as applicable, enforceable in accordance with the respective terms of the relevant documents, and no portion of the Prepetition Secured Obligations or any payment made to the Prepetition Secured Parties or applied to or paid on account of the Prepetition Secured Obligations prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action (including any avoidance actions under chapter

11

5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law;

(x)    *Validity, Perfection and Priority of Prepetition First Liens*.  As of the Petition Date, pursuant to the Prepetition First Lien Documents, the Prepetition First Lien Credit Parties granted to the Prepetition First Lien Agents, for the benefit of the Prepetition First Lien Secured Parties, a first priority security interest in and continuing lien on (the "**Prepetition First Liens**") substantially all of their respective assets and property, including a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the Collateral (as defined in the Prepetition First Lien Documents), which, for the avoidance of doubt, includes Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "**Prepetition First Lien Collateral**" but, for the avoidance of doubt, not including any Excluded Property (as defined in the Prepetition First Lien Documents)), junior, subject and subordinate only to the senior liens permitted by the Prepetition First Lien Documents, solely to the extent such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid and non-avoidable liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (the "**Prepetition First Lien Permitted Senior Liens**"); *provided*, *that*, with respect to the Pari Passu Collateral, the Prepetition First Liens of the Prepetition First Lien Loan Agent are *pari passu* with the Prepetition First Liens of the Prepetition First Lien Notes Agent as and to the extent set forth in the Prepetition Pari Intercreditor Agreement.

(xi)    *Validity, Perfection and Priority of Prepetition Second Liens*.  As of the Petition Date, pursuant to the Prepetition Second Lien Loan Documents, the Prepetition Second

12

Lien Loan Parties granted to the Prepetition Second Lien Agent, for the benefit of the Prepetition Second Lien Secured Parties, a second priority security interest in and continuing lien on (the "**Prepetition Second Liens**" and, together with the Prepetition First Liens, the "**Prepetition Liens**") substantially all of their respective assets and property, including a valid, binding, properly perfected, enforceable, non-avoidable second priority security interest in and continuing lien on the Collateral (as defined in the Prepetition Second Lien Loan Documents), which, for the avoidance of doubt, includes Cash Collateral, and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "**Prepetition Second Lien Collateral**" but, for the avoidance of doubt, not including any Excluded Property (as defined in the Prepetition Second Lien Loan Documents) and, the Prepetition Second Lien Collateral together with the Prepetition First Lien Collateral, the "**Prepetition Collateral**"), junior, subject and subordinate only to (i) the Prepetition First Liens and (ii) the senior liens permitted by the Prepetition Second Lien Loan Documents, solely to the extent such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid and non-avoidable liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (the "**Prepetition Second Lien Permitted Senior Liens**" and, together with the Prepetition First Lien Permitted Senior Liens, the "**Prepetition Permitted Senior Liens**");[4]

(xii)    *Waiver of Challenge.*    None of the Prepetition Liens are subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, subordination, recharacterization, avoidance or other cause of action (including any avoidance actions under

---

[4]    For the avoidance of doubt, no reference to the "Prepetition Permitted Senior Liens" shall refer to or include the Prepetition Liens.

WEIL:\99860437\1\63808.0003

chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law;

(xiii)   *No Control*.  None of the Prepetition Secured Parties control (or have in the past controlled) any of the Debtors or their respective properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of any Debtor by virtue of any actions taken with respect to, in connection with, related to or arising from any Prepetition Loan Documents;

(xiv)   *No Claims or Causes of Action*.  No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties and each of their respective Representatives (as defined below), in each case, in their capacity as such, under or relating to any agreements by and among the Debtors and any Prepetition Secured Party that is in existence as of the Petition Date; and

(xv)   *Release*.  Subject to the provisions of paragraph 17 hereof (including, without limitation, the Challenge Period, as defined herein) each of the Debtors and each of their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present and future subsidiaries and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties (upon entry of the Final Order), the DIP Secured Parties, and each of their respective Representatives (solely in such capacity and, as it relates to Representatives of the Prepetition Secured Parties, upon entry of the Final Order) (collectively, the "**Released Parties**"), from any and all liability to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature and description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen

14

or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, in contract or tort, in each case arising out of or related to the Prepetition Loan Documents (upon entry of the Final Order), the DIP Facility, the DIP Documents, the DIP Roll-Up Loans, the negotiation thereof and the transactions and agreements reflected thereby, that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter may have against any of the Released Parties for or by reason of any act, omission, matter, or cause arising at any time on or prior to the date of this Interim Order; *provided*, *that*, the release set forth in this section shall not release (i) any claims against or liabilities of a Released Party that a court of competent jurisdiction determines has resulted from such Released Party's bad faith, fraud, gross negligence, or willful misconduct or (ii) any DIP Lenders from honoring its obligations to the Debtors under the DIP Documents.

H.   *Findings Regarding DIP Financing and Use of Cash Collateral.*

(i)   Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the DIP Loan Parties to obtain financing pursuant to the DIP Documents.

(ii)   The Debtors have demonstrated an immediate and critical need to obtain the DIP Financing and to use Prepetition Collateral (including Cash Collateral) in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to satisfy other working capital and operational needs, to fund administrative expenses of these chapter 11 cases, and to fund the Debtors' restructuring efforts.  Access to sufficient working capital and liquidity under the DIP Documents and other financial accommodations provided under the DIP Documents, as well as through the use of Cash Collateral and other Prepetition Collateral, is

15

necessary for the avoidance of immediate and irreparable harm to the Debtors' estates and for maintenance of the value of the assets of the Debtors' estates to maximize the recovery to all creditors of the estates.

(iii)    The Debtors are unable to obtain adequate credit on an unsecured basis allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents.  The Debtors are also unable to obtain secured credit without granting to the DIP Secured Parties the DIP Liens and the DIP Superpriority Claims (each as defined below) and incurring the Adequate Protection Obligations (as defined herein) on the terms and subject to the conditions set forth in this Interim Order and in the DIP Documents.

(iv)    The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated by the Prepetition Collateral and acquire equipment, inventory and other personal property, all of which constitutes Prepetition Collateral and the Prepetition Secured Parties' Cash Collateral under section 363(a) of the Bankruptcy Code.  The Debtors desire and need to use the Prepetition Secured Parties' Cash Collateral for general corporate purposes.

(v)    Based on the DIP Motion, the First Day Declaration, the Yi Declaration and the record and argument presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms of the adequate protection granted to the Prepetition Secured Parties as provided in paragraphs 12–14 of this Interim Order (collectively, the "**Adequate Protection**"), and the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are consistent with the Bankruptcy Code, including section 506(b) thereof, are fair and reasonable, and reflect the DIP

16

Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties under the circumstances.

(vi)     This Interim Order, the DIP Financing, the Adequate Protection, and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the Debtors, the DIP Loan Parties, the DIP Secured Parties, the Prepetition Loan Parties, and the Prepetition Secured Parties (each of whom acted in good faith in negotiating such documents), and all of the loans and other financial accommodations extended by the DIP Secured Parties to the DIP Loan Parties under, in respect of, or in connection with, the DIP Financing and the DIP Documents (including the granting of the Adequate Protection Liens (as defined below) and other adequate protections provided herein), shall be deemed to have been extended by the DIP Secured Parties in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and their respective successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(vii)    The Prepetition Secured Parties and the DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of this Interim Order, the DIP Facilities and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facilities or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing.  Accordingly, without limiting any other right to indemnification, the Prepetition

17

Secured Parties and the DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the Prepetition Loan Documents and the DIP Documents, as applicable, including, without limitation, Section 10.05 of the DIP Credit Agreement.

(viii)   The Prepetition Secured Parties are entitled to the Adequate Protection as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to the Court, the terms of the proposed Adequate Protection are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral, including Cash Collateral.

(ix)   To the extent their consent is required, the requisite Prepetition Secured Parties have consented or are deemed to have consented to the entry of this Interim Order, the use of Prepetition Collateral, including Cash Collateral, the incurrence of the DIP Loans as set forth in this Interim Order, the granting of the DIP Liens and DIP Superpriority Claims as set forth in this Interim Order, and the priming of the Prepetition Liens on the Prepetition Collateral by the DIP Liens, in each case, on the terms set forth in this Interim Order and the DIP Documents; *provided*, *that*, nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order or (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering Prepetition Collateral (whether senior or junior) other than as contemplated by this Interim Order.

(x)   The Debtors have prepared and delivered to the DIP Secured Parties an initial budget (the "**Initial Budget**"), attached hereto as **Schedule 1**.  The Initial Budget reflects,

18

among other things, the Debtors' anticipated operating receipts, operating disbursements, non-operating disbursements, net operating cash flow, and liquidity for each calendar week covered thereby.  The Initial Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement.  Each subsequent budget, once approved by the Required DIP Lenders in accordance with the DIP Credit Agreement, shall modify, replace, supplement or supersede, as applicable, the Initial Budget for the periods covered thereby (the Initial Budget and each subsequent approved budget, an "**Approved Budget**").

(xi)     Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to the proceeds, product, offspring, or profits of any of the Prepetition Collateral; *provided*, *that*, the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after the entry of the Final Order.

I.     *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Bankruptcy Local Rule 4001-1(b). Absent the relief granted in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Financing and continued use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Order and the DIP Documents, are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.  The DIP Motion and this Interim Order comply with the requirements of Bankruptcy Local Rule 4001-1(b).

J.     *Prepetition Permitted Senior Liens; Continuation of Prepetition Liens*.  Nothing herein constitutes a finding or ruling by this Court that any alleged Prepetition Permitted Senior

19

Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Secured Parties, or the other Prepetition Secured Parties, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Senior Lien.  For the avoidance of doubt, the right of a seller of goods to reclaim goods under section 546(c) of the Bankruptcy Code does not constitute a Prepetition Permitted Senior Lien, and such right is expressly subject to the DIP Liens (as defined herein) and Prepetition Liens.  The Prepetition Liens and the DIP Liens are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens.

K.     *Intercreditor Agreements.*  Pursuant to section 510 of the Bankruptcy Code, the Prepetition Pari Intercreditor Agreement and the Prepetition 1L/2L Intercreditor Agreement and any other applicable intercreditor or subordination provisions contained in any of the other Prepetition Loan Documents (collectively, the "**Intercreditor Agreements**") shall (i) remain in full force and effect, (ii) continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties with respect to replacement liens, administrative expense claims and superpriority administrative expense claims or amounts payable in respect thereof), and (iii) not be deemed to be amended, altered or modified by the terms of this Interim Order or the DIP Documents, unless expressly set forth herein or therein.

L.     *DIP Roll-Up Loans.* Upon entry of the Interim Order or on such later date (the "**Issuance Date**") as agreed in writing by the Backstop Commitment Parties (as defined in that certain *Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility Backstop Commitment Letter*, by and among the Debtors (except Intermediate) and the Backstop

20

Commitment Parties signatory thereto (the "**Backstop Commitment Letter**")), but subject to the provisions of paragraphs 2 and 17 of this Interim Order, $100 million in the aggregate of the Prepetition First Lien Obligations held by the DIP Lenders (or affiliates thereof) shall be rolled up and converted into an equivalent principal amount of DIP Roll-Up Loans deemed to be made under the DIP Credit Agreement.  The Prepetition First Lien Secured Parties that are also DIP Lenders (or affiliates thereof) would not have consented to extend the DIP Financing or other financial accommodations to the Debtors without the inclusion of the DIP Roll-Up Loans in the DIP Obligations.  Thus, the roll-up is consideration for, and solely on account of, the agreement of the DIP Lenders to extend the New Money DIP Term Loans.

Based upon the DIP Motion, the foregoing findings and conclusions, and the overall record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. *Motion Granted*.  The DIP Motion is granted on an interim basis on the terms and conditions set forth in this Interim Order.  All objections to the Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby overruled on the merits.

2. *Authorization of the DIP Financing and the DIP Documents.*

(a) The DIP Loan Parties are hereby authorized to execute, deliver, enter into and perform all of their obligations under the DIP Documents and this Interim Order and perform such other acts as may be necessary, appropriate or desirable in connection therewith.  The Borrower is hereby authorized to borrow up to $40 million (upon entry of this Interim Order) and $20 million (upon entry of the Final Order) of New Money DIP Term Loans and, subject to paragraph 2(c) of this Interim Order, convert Prepetition First Lien Obligations in an amount equal to the Roll-Up Amount into the DIP Roll-Up Loans pursuant to the DIP Credit Agreement, and

21

the DIP Guarantors are hereby authorized to guarantee the Borrower's obligations, in each case, on account of the DIP Loans, subject to any limitations set forth in the DIP Documents. The proceeds of the DIP Loans may be used for all purposes permitted under the DIP Documents and this Interim Order, subject to and in accordance with the Approved Budget (subject to the Permitted Variances).

(b)     On the Issuance Date, but subject to paragraph 2(c) of this Interim Order, $100 million (the "**Roll-Up Amount**") in the aggregate of the Prepetition First Lien Obligations held by the DIP Lenders (or affiliates thereof) shall be deemed rolled up and converted into an equivalent principal amount of DIP Roll-Up Loans deemed to be made under the DIP Credit Agreement, subject to the provisions of paragraph 17 hereof (the "**Roll-Up**"). The Debtors are authorized to take such acts as shall be necessary or desirable to effect the Roll-Up and conversion of the Prepetition First Lien Obligations beneficially owned by the DIP Lenders (or affiliates thereof) in the Roll-Up Amount.

(c)     If, prior to the entry of the Final Order, all DIP Obligations other than the Rolled-Down Prepetition Loans (defined below) are repaid in full in cash by the DIP Loan Parties with proceeds from an alternative debtor-in-possession financing facility, then one-third (1/3) of the DIP Roll-Up Loans will no longer be part of the DIP Facility or constitute DIP Obligations pursuant to this Interim Order and shall be deemed to be Prepetition First Lien Obligations *nunc pro tunc* to entry of the Interim Order (the "**Rolled-Down Prepetition Loans**"). The Rolled-Down Prepetition Loans shall be deemed to constitute Prepetition First Lien Obligations held by the holders of the applicable DIP Roll-Up Loans immediately prior to such conversion being reversed for all purposes under the Prepetition First Lien Documents, and the interest rate on the Rolled-Down Prepetition Loans amounts will revert to the interest rate in effect on all amounts that were

22

not "rolled-up" under the Prepetition First Lien Documents, as though the Roll-Up had never occurred; *provided*, *that*, upon entry of the Final Order, the provisions of this paragraph 2(c) shall be deemed null and void and shall have no further effect.

(d)    In furtherance of the foregoing and without further approval of this Court, each DIP Loan Party is authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents, execute or record pledge and security agreements, mortgages, financing statements and other similar documents, if any, and to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable in connection with the DIP Financing, including, without limitation:

(i)    the execution and delivery of, and performance under, each of the DIP Documents;

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as acceptable to the DIP Secured Parties, it being understood that no further approval of this Court shall be required for any such amendments, waivers, consents or other modifications or the payment of any fees, including attorneys', accountants', appraisers' and financial advisors' fees, and other expenses, charges, costs, indemnities and other like obligations in connection therewith,  that do not shorten the maturity of the DIP Facility, increase the aggregate DIP Commitments, increase the rate of interest or fees payable thereunder, or release any DIP Liens.  Updates, modifications, and supplements to the Approved Budget shall not require any further approval of this Court; and

(iii)    the non-refundable payment to any of the DIP Secured Parties of any fees in connection with the DIP Facility, including any amendment fees, premiums, servicing

fees, audit fees, liquidator fees, structuring fees, administrative agent's, collateral agent's or security trustee's fees, upfront fees, closing fees, commitment premiums, exit fees, closing date fees, prepayment fees or agency fees), and any amounts due in respect of any indemnification and expense reimbursement obligations (including, without limitation, but subject to paragraph 16 of this Interim Order, reasonable and documented fees and expenses of professionals retained by, or on behalf of, any of the DIP Secured Parties (limited in the case of professional fees to those of Milbank LLP, Houlihan Lokey, Inc., Porter Hedges LLP, and ArentFox Schiff LLP, and one local legal counsel per other foreign jurisdiction as the Required DIP Lenders determine to be reasonably necessary) in each case, as provided in the DIP Documents (collectively, the "**DIP Fees and Expenses**")), without the need to file retention or fee applications; the payment of the foregoing amounts shall be irrevocable when paid and shall be deemed to have been approved upon entry of this Interim Order, whether any such obligations arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law.  Upon entry of this Interim Order, the Backstop Premium set forth in the Backstop Commitment Letter (as defined in the DIP Credit Agreement) shall be fully earned, non-refundable, and non-avoidable and shall be payable in accordance with and at the times specified in the DIP Documents.

3.      *DIP Obligations*.  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party and their estates in accordance with their

respective terms and this Interim Order, and any successors thereto, including any trustee appointed in these chapter 11 cases, or in any case under chapter 7 of the Bankruptcy Code upon conversion of any of these cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"). Upon execution and delivery of the DIP Documents, the DIP Obligations shall include all loans and any other indebtedness or obligations, contingent or absolute, which may from time to time be owing by any of the DIP Loan Parties to any of the DIP Secured Parties, in such capacities, in each case, under the DIP Documents and this Interim Order, including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts. The DIP Loan Parties shall be jointly and severally liable for the DIP Obligations. Except as permitted hereby, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agent and/or the other DIP Secured Parties shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.    *Carve-Out.*

(a)    *Priority of Carve-Out.*  Each of the DIP Liens, the DIP Superiority Claims, the Prepetition Liens, the Prepetition Permitted Senior Liens, the Prepetition Secured Obligations, the Adequate Protection Obligations, the Adequate Protection Liens, the 507(b)

WEIL:\99860437\1\63808.0003

Claims, and any other liens, claims, or interests that the Prepetition Secured Parties, the DIP Secured Parties, or any of their respective affiliates hold, own or control in relation to the Debtors or their affiliates, shall be subject and subordinate to payment of the Carve-Out (as defined herein). The Carve-Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral and Prepetition Collateral, as set forth in this Interim Order.  For the avoidance of doubt, after delivery of a Termination Notice and the date upon which the DIP Obligations are paid in full, the Carve-Out shall remain in effect as to the Prepetition Secured Obligations and the Adequate Protection Obligations, and the Debtors shall be permitted and required to continue to fund amounts in relation to the Carve-Out in accordance with the terms of this Interim Order.

(b)    *Carve-Out*.  As used in this Interim Order, "**Carve-Out**" means the sum of: (i) all unpaid fees required to be paid to the clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iv) below); (ii) all unpaid reasonable and documented fees and expenses, in an aggregate amount not to exceed $50,000, incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (d) below); (iii) to the extent allowed at any time, whether by interim or final compensation or other order, all accrued and unpaid claims for fees, costs and expenses (including any transaction fees or success fees then earned and payable as of the Carve-Out Trigger Date) incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") or retained by any official committee (the "**Committee**") appointed in the Cases pursuant to sections 328 or 1103 of the Bankruptcy Code (such professionals, collectively, the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**," and such fees, costs, and expenses of Professional Persons other than any such financing

26

transaction fees with respect to the DIP Facility, the "**Professional Fees**"), at any time on or prior to the first business day after delivery of a Carve-Out Notice (as defined herein), whether allowed before or after delivery of a Carve-Out Notice and without regard to whether such fees, costs, and expenses are provided for in the Initial Budget or Budget or were invoiced after the Carve-Out Trigger Date (as defined herein); (iv) any Professional Fees of the Debtors incurred after the first business day following delivery by of the Carve-Out Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, in an aggregate amount not to exceed $3,500,000 (the amount set forth in this clause (iv) being the "**Debtor Post-Carve-Out Cap**"); and (v) any Professional Fees of the Committee incurred after the first business day following delivery by of the Carve-Out Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, in an aggregate amount not to exceed $250,000 (the amount set forth in this clause (v) being the "**Committee Post-Carve-Out Cap**" and, together with the Debtor Post-Carve-Out Cap, the **"Post-Carve-Out Caps"**), *provided*, *that*, nothing herein shall be construed to, impair the ability of any party to object to the allowance of the fees, expenses, reimbursement, or compensation described herein on any grounds.   For purposes of the foregoing, "**Carve-Out Notice**" shall mean a written notice stating that the Post-Carve-Out Caps have been invoked to be delivered by email  by the DIP Agent to the Debtors, their lead restructuring counsel, Weil, Gotshal & Manges LLP ("**Weil**"), the U.S. Trustee, and lead counsel to the Creditors' Committee (if any), and each other Prepetition Agent, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement) under the DIP Facility stating that the Post-Carve-Out Caps have been invoked; *provided*, *that*, the delivery of a Termination Notice or the exercise of remedies in

accordance with paragraphs 7(e) or 7(f) of this Interim Order shall also constitute delivery of the Carve-Out Notice by the DIP Agent to the Debtors.

(c)     *Professional Fees Account.*  On the day on which a Carve-Out Notice is received by the Debtors (such date, the "**Carve-Out Trigger Date**"), the Carve-Out Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to transfer to the Professional Fees Account (as defined herein) cash in an amount equal to all obligations benefiting from the Carve-Out.  On and after the Carve-Out Trigger Date, the DIP Agent shall deposit into a segregated account of the Debtors not subject to the control of the DIP Agent, any DIP Lender, or any Prepetition Secured Party (the "**Professional Fees Account**") any cash swept or foreclosed after delivery of the Carve-Out Notice (including cash received as a result of the sale or other disposition of any assets) until the Professional Fees Account has been fully funded in an amount equal to all obligations benefiting from the Carve-Out, including, without limitation, (i) the Professional Fees of the Debtor Professionals at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Notice to the Debtors (even if such Professional Fees have not yet been allowed) and (ii) the Debtor Post-Carve-Out Cap; *provided*, *that*, the DIP Secured Parties shall retain a residual security interest on any excess amount held in the Professional Fees Account following the payment in full of all Professional Fees and, following such payment in full, any such excess funds remaining in the Professional Fees Account shall be paid directly to the DIP Agent for the benefit of the DIP Lenders, unless (i) the DIP Obligations have been indefeasibly paid in full, in cash and (ii) any unused Commitments under the DIP Facility terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as set forth in this Interim Order and the Intercreditor Agreements.  Notwithstanding anything to the

28

contrary herein or in the DIP Documents, following delivery of a Carve-Out Notice, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Professional Fees Account has been fully funded in an amount equal to all obligations benefiting from the Carve-Out.  For the avoidance of doubt, to the extent that Professional Fees of Professional Persons have been incurred by the Debtors at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Notice but have not yet been allowed, such Professional Fees of the Professional Persons shall constitute Professional Fees benefiting from the Carve-Out upon their allowance, whether by interim or final compensation order and whether before or after delivery of the Carve-Out Notice, and the Debtors shall fund the Professional Fees Account inclusive of the amount of such professional fees and expenses.

(d)      Notwithstanding anything to the contrary herein, (i) the failure of the Professional Fees Account to be funded in an amount equal to the full amount of the Professional Fees benefiting from the Carve-Out shall not affect the priority of the Carve-Out and (ii) in no way shall the Carve-Out, Professional Fees Account, or the Interim Budget, the Budget, or any reporting relating thereto (or any good faith estimate of Professional Fees) be construed as a cap or limitation on the amount of the Professional Fees or the statutory fees due and payable by the Debtors or that may be allowed at any time (whether by interim order, final order, or otherwise).

(e)      *Payment of Professional Fees Prior to the Carve-Out Trigger Date*.  Any payment or reimbursement made prior to the occurrence of the Carve-Out Trigger Date in respect of any Professional Fees shall not reduce the Carve-Out.

(f)      *No Direct Obligation to Pay Professional Fees*.  None of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or

29

reimbursement of any fees or disbursements of any Professional Persons incurred in connection with the chapter 11 cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Persons or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)     *Payment of Carve-Out on or After the Carve-Out Trigger Date*.  Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

5.     *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations, including the DIP Roll-Up Loans and the Backstop Premium, shall constitute allowed superpriority administrative expense claims (the "**DIP Superpriority Claims**") against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) with, subject to the Carve-Out, priority over any and all claims against the DIP Loan Parties (but for the avoidance of doubt, subject and subordinate to the Carve-Out), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.  The DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the DIP

30

Loan Parties and all proceeds thereof (excluding (x) the Carve-Out and amounts held in the Professional Fees Account) and (y) claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, the "**Avoidance Actions**") but, subject to the entry of the Final Order, including any proceeds or property recovered as a result of any Avoidance Actions, whether by judgment, settlement or otherwise (the "**Avoidance Proceeds**"), subject to the Carve-Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

6. *DIP Liens*.  As security for the DIP Obligations, effective and automatically properly perfected on the date this Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Secured Parties, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "**DIP Liens**") are hereby granted to the DIP Agent for the benefit of the DIP Secured Parties (all property identified in clauses (a) and (b) below being collectively referred to as the "**DIP Collateral**," and, together with the Prepetition Collateral, the "**Collateral**"):

(a) *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve-Out) all tangible and intangible prepetition and postpetition property of the DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected, and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected

31

subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than the Avoidance Actions and the Carve-Out (and amounts held in the Professional Fees Account), but including, upon and subject to entry of the Final Order, the Avoidance Proceeds (collectively, the "**Unencumbered Property**").

      (b)    *Liens Priming Certain Prepetition Secured Parties' Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest (subject and subordinate to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition Collateral, regardless of where located (the "**DIP Priming Liens**").  Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (A) senior in all respects to the other Prepetition Liens on the Prepetition Collateral, (B) senior to any Adequate Protection Liens on the Prepetition Collateral, and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens with respect to the Prepetition Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens, but the DIP Priming Liens shall be, for the avoidance of doubt, junior to the Carve-Out.

      (c)    *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the DIP Loan Parties that, on or as of the Petition Date, is subject to Prepetition Permitted Senior Liens, which shall be immediately junior and subordinate to the Prepetition Permitted Senior Liens, but senior to the

32

Prepetition Liens and Prepetition Adequate Protections Liens on all Prepetition Collateral subject to such Prepetition Permitted Senior Liens.

(d)     *No Senior Liens.*  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, or (C) any intercompany liens; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code; *provided*, *however*, such DIP Liens shall be subordinate to the Carve-Out in all respects.

7.     *Protection of DIP Lenders' and Prepetition Secured Parties' Rights.*

(a)     So long as there are DIP Obligations outstanding or the DIP Lenders have outstanding DIP Commitments, the Prepetition Secured Parties shall, subject to the Intercreditor Agreements: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Loan Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral, including in connection with the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, any DIP Collateral to the extent such transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than (x)

33

as may be required by applicable law, to perfect the liens granted pursuant to this Interim Order or (y) as may be required by applicable state or foreign law to complete a previously commenced process of perfection or to continue the perfection of valid and non-avoidable liens or security interests existing as of the Petition Date; and (iv) deliver or cause to be delivered, at the DIP Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Secured Parties or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or disposition permitted by the DIP Documents and this Interim Order.

(b)     To the extent any Prepetition Secured Party has possession of, or control over, any Prepetition Collateral or DIP Collateral, or has been listed as a secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, such Prepetition Secured Party shall be deemed to have such possession or be so listed or have such possession or control as a gratuitous bailee and/or gratuitous agent for the benefit of the DIP Secured Parties, and such Prepetition Secured Party shall comply with the instructions of the DIP Agent, acting at the direction of the Required DIP Lenders, with respect to any of the foregoing.

(c)     Any proceeds of Prepetition Collateral received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise, shall be segregated and held in trust for the benefit of, and forthwith paid over to, the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  The DIP Agent is hereby authorized to make any such endorsements as agent for the applicable Prepetition Secured Parties.  This authorization is coupled with an interest and is irrevocable.

WEIL:\99860437\1\63808.0003

(d)     The DIP Loan Parties shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise permitted by the DIP Documents or an order of the Court.

(e)     Upon the occurrence and during the continuation of an Event of Default that has not been waived by the Required DIP Lenders and following delivery of written notice (a "**Termination Notice**") (including by e-mail) on not less than five (5) business days' notice (such five (5) business day period, the "**DIP Agent Remedies Notice Period**") to the Debtors, Weil, as lead restructuring counsel to the Debtors, lead restructuring counsel to each of the Prepetition Agents, lead counsel to the Creditors' Committee (if any), and the U.S. Trustee (the "**Remedies Notice Parties**"), the DIP Agent may (and any automatic stay otherwise applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order (including this paragraph) is hereby modified), without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Agent to, unless the Court orders otherwise (*provided*, *that*, during the DIP Agent Remedies Notice Period, the Debtors, the Creditors' Committee (if any) and/or any party in interest shall be entitled to seek an emergency hearing with the Court for the purpose of contesting whether, in fact, an Event of Default has occurred and is continuing or to obtain non-consensual use of Cash Collateral, and *provided*, *further*, that if a request for such hearing is made prior to the end of the DIP Agent Remedies Notice Period, then the DIP Agent Remedies Notice Period shall be continued until the Court hears and rules with respect thereto (the "**Continued DIP Agent Remedies Notice Period**")): (a) immediately terminate and/or revoke the Debtors' right under this Interim Order and any other DIP Documents to use any Cash Collateral (subject to the Carve-Out and related provisions), (b) terminate the DIP Facility and any DIP Document as to any

35

future liability or obligation of the DIP Secured Parties but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations; (c) declare all DIP Obligations to be immediately due and payable; and (d) invoke the right to charge interest at the default rate under the DIP Documents.  Upon delivery of such Termination Notice by the DIP Agent, without further notice or order of the Court, the DIP Secured Parties' and the Prepetition Secured Parties' consent to use Cash Collateral and the Debtors' ability to incur additional DIP Obligations hereunder will, subject to the expiration of the DIP Agent Remedies Notice Period or the Continued DIP Agent Remedies Notice Period, as applicable, and unless the Court orders otherwise, automatically terminate, and the DIP Secured Parties will have no obligation to provide any DIP Loans or other financial accommodations.  As soon as reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy of such Termination Notice on the docket.

(f)      Following an Event of Default and the delivery of a Termination Notice, but prior to exercising the remedies set forth in this sentence below or any other remedies (other than those set forth in paragraph 7(e)), the DIP Secured Parties shall be required to file a motion with the Court seeking emergency relief (the "**Stay Relief Motion**") on not less than five (5) business days' written notice to the Remedies Notice Parties (which may run concurrently with the DIP Agent Remedies Notice Period) for a further order of the Court fashioning any appropriate remedy, including modifying the automatic stay in the chapter 11 cases to permit the DIP Secured Parties to, subject to the Carve-Out and related provisions: (a) freeze monies or balances in the Debtors' accounts; (b) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Secured Parties against the DIP Obligations, (c) enforce any and all rights against the DIP Collateral, including, without limitation, foreclosure on all or any portion of the DIP Collateral, occupying the Debtors' premises, sale or disposition of the DIP

36

Collateral; and (d) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Documents, or applicable law.  If the DIP Secured Parties are permitted by the Court to take any enforcement action with respect to the DIP Collateral following the hearing on the Stay Relief Motion, the Debtors shall cooperate with the DIP Secured Parties in their efforts to enforce their security interest in the DIP Collateral, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such DIP Secured Parties from enforcing their security interests in the DIP Collateral.  Until such time that the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility to the extent drawn prior to the occurrence of an Event of Default and Cash Collateral to fund the Carve-Out, meet payroll obligations, and pay necessary expenses to avoid immediate and irreparable harm to the Debtors' estates, including funding operations in accordance with the Approved Budget and the terms of the DIP Documents.

(g)     Other than as expressly provided in this Interim Order, no rights, protections or remedies of the DIP Secured Parties or the Prepetition Secured Parties granted by this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

8.     *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve-Out and the Professional Fees Account, no costs or expenses of administration of these cases or any Successor Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceeding under the Bankruptcy Code, shall be charged against

or recovered from the DIP Collateral or Prepetition Collateral (in each case, including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or the Prepetition First Lien Loan Agent, as applicable, and no consent shall be implied from any action, inaction or acquiescence by any of the DIP Secured Parties or Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties or Prepetition Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise, unless expressly permitted under this Interim Order; *provided*, *that*, the foregoing waiver shall be  without prejudice to any provisions of the Final Order with respect to costs or expenses incurred  following the entry of the Final Order.

9.      *No Marshaling*.  In no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Secured Obligations, or the Prepetition Collateral, as applicable; *provided*, *that*, the foregoing waiver shall be without prejudice to any provisions of the Final Order.  Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties; *provided*, *that*, the foregoing waiver shall be without prejudice to any provisions of the Final Order.

10.      *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Secured Parties or Prepetition Secured Parties pursuant to the provisions of this Interim Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy

Code, whether asserted or assessed by through or on behalf of the Debtors; *provided*, *that*, the foregoing waiver shall be without prejudice to any provisions of the Final Order.

11.     *Use of Cash Collateral.*  The Debtors are hereby authorized, solely on the terms and conditions of this Interim Order, to use all Cash Collateral in accordance with the DIP Documents and Approved Budget (subject to Permitted Variances).

12.     *Adequate Protection of Prepetition Secured Parties.*  Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the Prepetition Collateral (including Cash Collateral) for the aggregate Diminution in Value and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Liens and the use of their Cash Collateral, the Prepetition Secured Parties are granted the following Adequate Protection (collectively, the "**Adequate Protection Obligations**"):

(a)     *First Lien Adequate Protection.*

(i)     *First Lien Adequate Protection Liens.*  The Prepetition First Lien Agents are hereby granted, for the benefit of the applicable Prepetition First Lien Secured Parties, effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition First Lien Secured Parties' Diminution in Value upon all of the DIP Collateral (the "**First Lien Adequate Protection Liens**"), senior to all other liens, but (i) in the case of the Prepetition Collateral, junior, subject, and subordinate only to, in the following order, (A) the Carve-Out and the Professional Fees Account, (B) the Prepetition Permitted Senior Liens, and (C) the DIP Liens, and (ii) in the case of all other DIP Collateral, junior, subject, and subordinate only

39

to, in the following order, (A) the Carve-Out and the Professional Fees Account and (B) the DIP Liens.

(ii)     *Prepetition First Lien Secured Parties' Section 507(b) Claim.*  The Prepetition First Lien Agents, for the benefit of the applicable Prepetition First Lien Secured Parties, are hereby granted an allowed superpriority administrative expense claim against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) on account of the Prepetition First Lien Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "**First Lien 507(b) Claim**") which First Lien 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (subject to the Carve-Out and Professional Fees Account and excluding Avoidance Actions but including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds).  The First Lien 507(b) Claim shall be senior to all other claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, except for, in the following order, (A) the Carve-Out and the Professional Fees Account and (B) the DIP Superpriority Claims.

(iii)     *Prepetition First Lien Secured Parties' Fees and Expenses.*  As further adequate protection, subject to the Carve-Out and the Professional Fees Account, the DIP Loan Parties shall currently pay, in cash, (a) subject to the limitations set forth in the Restructuring Support Agreement and the Plan, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of Paul Hastings LLP, as legal counsel to the Prepetition First Lien Loan Agent, and one local counsel to Prepetition First Lien Loan Agent, (b) subject to the

40

limitations set forth in the Restructuring Support Agreement and the Plan, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition First Lien Notes Agent, Shipman & Goodwin LLP, as legal counsel to the Prepetition First Lien Notes Agent, and one local counsel to the Prepetition First Lien Notes Agent, and (c) all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the legal and financial advisors of the First Lien Ad Hoc Group, including, without limitation, those of Milbank LLP, Houlihan Lokey, Inc., Porter Hedges LLP, any other local legal counsels or other advisors in any foreign jurisdiction, and any other advisors of the First Lien Ad Hoc Group (collectively, the "**First Lien Adequate Protection Fees and Expenses**"), subject to (x) the review procedures set forth in paragraph 16 of this Interim Order and (y) recharacterization of such payments as principal payments under the applicable Prepetition First Lien Documents in the event of a final determination by order of the Court that the Prepetition First Lien Secured Parties are undersecured (solely upon a motion filed by the Debtors, the Creditors' Committee (if any), or any other party in interest);

      (b)    *Second Lien Adequate Protection.*

      (i)    *Second Lien Adequate Protection Liens.* The Prepetition Second Lien Agent is hereby granted, for the benefit of the Prepetition Second Lien Secured Parties, effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition Second Lien Secured Parties' Diminution in Value upon all of the DIP Collateral (the "**Second Lien Adequate Protection Liens**" and, together with the First Lien Adequate Protection Liens, the "**Adequate Protection Liens**"), senior to all other liens, but (i) in the case of

41

the Prepetition Collateral, junior, subject, and subordinate only to, in the following order, (A) the Carve-Out, (B) the Prepetition Permitted Senior Liens, (C) the DIP Liens, (D) the First Lien Adequate Protection Liens, and (E) the Prepetition First Liens, and (ii) in the case of all other DIP Collateral, junior, subject, and subordinate only to, in the following order, (A) the Carve-Out, (B) the DIP Liens, and (C) the First Lien Adequate Protection Liens.

(ii)    *Prepetition Second Lien Secured Parties' Section 507(b) Claim.* The Prepetition Second Lien Agent, for the benefit of the Prepetition Second Lien Secured Parties, is hereby granted an allowed superpriority administrative expense claim against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) on account of the Prepetition Second Lien Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "**Second Lien 507(b) Claim**" and, together with the First Lien 507(b) Claim, the "**507(b) Claims**") which Second Lien 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (subject to the Carve-Out and the Professional Fees Account and excluding Avoidance Actions but including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds).  The Second Lien 507(b) Claim shall be senior to all other claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, except for, in the following order, (A) the Carve-Out and the Professional Fees Account, (B) the DIP Superpriority Claims, and (C) the First Lien 507(b) Claim.

(iii)    *Prepetition Second Lien Secured Parties' Fees and Expenses*.  As further adequate protection, subject to the Carve-Out, the Professional Fees Account, and the

42

limitations set forth in the Restructuring Support Agreement and the Plan, the DIP Loan Parties shall currently pay, in cash, (a) all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of Paul Hastings LLP, as legal counsel to the Prepetition Second Lien Agent, and one local counsel to the Prepetition Second Lien Agent and (b) all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the legal and financial advisors of an ad hoc group of Prepetition First Lien Noteholders and Prepetition Second Lien Lenders (the "**Crossholder Ad Hoc Group**"), including, without limitation, those of Akin Gump Strauss Hauer & Feld LLP, Greenhill & Co., any other local legal counsels or other advisors in any foreign jurisdiction, and any other advisors of the Crossholder Ad Hoc Group (collectively, the "**Second Lien Adequate Protection Fees and Expenses**"), subject to (x) the review procedures set forth in paragraph 16 of this Interim Order and (y) recharacterization of such payments as principal payments under the applicable Prepetition Second Lien Loan Documents in the event of a final determination by order of the Court that the Prepetition Second Lien Secured Parties are undersecured (solely upon a motion filed by the Debtors, the Creditors' Committee (if any), or any other party in interest).

13.  *Maintenance of Collateral*.  The DIP Loan Parties shall continue to maintain and insure the Prepetition Collateral and the DIP Collateral in the amounts and for the risks, and by the entities, as required under the Prepetition Loan Documents and the DIP Documents, as applicable.

14.  *Perfection of DIP Liens and Adequate Protection Liens*.

(a)  Without in any way limiting the validity of the automatic perfection of the DIP Liens and the Adequate Protection Liens under the terms of this Interim Order, the DIP Secured Parties and the Prepetition Secured Parties are hereby authorized, but not required to, execute in the name of the DIP Loan Parties or the Prepetition Loan Parties (as applicable), as their

43

true and lawful attorneys (with full power of substitution, to the maximum extent permitted by law) and to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar perfection instruments in any jurisdiction, or take possession of certificated securities, or take any other similar action in a manner not inconsistent herewith to document, validate or perfect the liens and security interests granted to them hereunder (the "**Perfection Actions**").  All such Perfection Actions shall be deemed to have been taken on the date of entry of this Interim Order.  The automatic stay shall be modified to the extent necessary to permit the DIP Secured Parties and the Prepetition Secured Parties to take any Perfection Action.  For the avoidance of doubt, the DIP Liens and the Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order, whether or not the DIP Secured Parties or the Prepetition Secured Parties take such Perfection Actions.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agent and each applicable Prepetition Agent, be filed or recorded in the filing or recording offices in addition to or in lieu of any financing statements, mortgages, notices of lien or similar instruments, and all filing and recording offices are hereby authorized and directed to accept a certified copy of this Interim Order for filing and/or recording, as applicable.

15.    *Preservation of Rights Granted Under this Interim Order.*

(a)    Other than the claims and liens expressly granted or permitted by this Interim Order, including the Carve-Out and the Professional Fees Account, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in or permitted under this Interim Order, the DIP Liens

44

and the Adequate Protection Liens shall not be: (i) junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties; or (iv) junior to any intercompany liens or security interests of the DIP Loan Parties.

(b)     The occurrence and continuance of any Event of Default under and as defined in the DIP Credit Agreement that has not been cured within the applicable time period, if any, as provided in the DIP Credit Agreement shall, after written notice by the DIP Agent (acting at the direction of Required DIP Lenders) to the Borrower, counsel to the Borrower, the U.S. Trustee, and lead counsel to the Creditors' Committee (if any) constitute an event of default under this Interim Order.  Notwithstanding any order that may be entered dismissing any of the chapter 11 cases under section 1112 of the Bankruptcy Code or converting these cases to a Successor Case: (A) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, the Adequate Protection Liens, and the Prepetition Liens shall continue in full force and effect, shall maintain their priorities as provided in this Interim Order, and shall remain binding on all parties in interest until all DIP Obligations, Adequate Protection Obligations, and Prepetition Secured Obligations have been indefeasibly paid in full; (B) the other rights granted by this Interim Order, including with respect to the Carve-Out, shall not be affected; and (C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

<div align="center">45</div>

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacatur, or stay shall not affect (i) the validity, priority, or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur, or stay; or (ii) the validity, priority, and enforceability of the DIP Liens, the Prepetition Liens, the Adequate Protection Liens, and the Carve-Out.  Notwithstanding any such reversal, modification, vacatur or stay, the DIP Obligations, DIP Liens, Adequate Protection Obligations, Adequate Protection Liens, DIP Superpriority Claims, and the 507(b) Claims incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under sections 364(e) and 363(m) of the Bankruptcy Code.

(d)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the 507(b) Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by this Interim Order and the DIP Documents, as well as the Carve-Out, shall survive, and shall not be modified, impaired or discharged by the entry of an order (i) converting or dismissing any of these cases, or terminating the joint administration of these cases, (ii) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents), or (iii) confirming a chapter 11 plan in any of the cases; *provided*, *however*, that nothing herein is intended, nor shall it be construed, to limit or supersede

46

any order confirming a chapter 11 plan in any of the cases that provides for the modification, impairment, or discharge of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, or the 507(b) Claims on the effective date of any such plan.  The terms and provisions of this Interim Order and the DIP Documents shall continue in full force and effect in these cases and in any Successor Cases until all DIP Obligations, Adequate Protection Obligations, and Prepetition Secured Obligations are indefeasibly paid in full in cash and the DIP Commitments have been terminated.  Any confirmation order entered in these cases shall not discharge or otherwise affect in any way the joint and several obligations of the DIP Loan Parties to the DIP Secured Parties under the DIP Facility and the DIP Documents, other than after (x) the payment in full and in cash of all DIP Obligations and the termination of the DIP Commitments or (y) the occurrence of the effective date of such confirmed plan (solely in accordance with the terms of such plan).

16.     *Payment of Fees and Expenses*.  The DIP Loan Parties are authorized and directed to pay the DIP Fees and Expenses, the First Lien Adequate Protection Fees and Expenses, and the Second Lien Adequate Protection Fees and Expenses.  Subject to the review procedures set forth in this paragraph 16, payment of the DIP Fees and Expenses, the First Lien Adequate Protection Fees and Expenses, and the Second Lien Adequate Protection Fees and Expenses shall not be subject to allowance or review by the Court.  Professionals for the DIP Secured Parties, the First Lien Ad Hoc Group, the Crossholder Ad Hoc Group, or the Prepetition Agents shall not be required to comply with the U.S. Trustee fee guidelines, however, any time that such professionals seek payment of fees and expenses from the Debtors prior to confirmation of a chapter 11 plan, each such professional shall provide summary copies of its invoices (including aggregate amounts of fees and expenses and, in the case of legal counsel and other advisors that charge fees based on hourly rates, such professional's applicable rates and total amount of time on a per-professional

47

basis), which are not required to contain time detail and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, to Weil, lead restructuring counsel to the Debtors, lead restructuring counsel to any statutory committee, and the U.S. Trustee (together, the "**Review Parties**"); *provided, however*, that (i) the provision of such invoices shall not constitute a waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law; and *provided*, *further*, that the Review Parties shall have the right to request additional details regarding the services rendered and expenses incurred by such professionals (each an "**Information Request**").  Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) calendar days after receipt (the "**Review Period**"), which shall not be extended by the delivery of an Information Request.  If no written objection is delivered to the applicable professional and the Debtors by 12:00 p.m., prevailing Eastern Time, on the last date of the Review Period, the Debtors shall pay such invoices within five (5) business days.  If an objection to a professional's invoice is delivered to the applicable professional and the Debtors within the Review Period, the Debtors shall promptly pay the undisputed amount of the invoice without the necessity of filing formal fee applications, regardless of whether the invoiced amount arose or was incurred before or after the Petition Date, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay, on or prior to the Closing Date (as defined in the DIP Credit Agreement) any costs, fees, expenses (including reasonable and documented legal fees and

48

expenses) and other compensation contemplated by the DIP Documents, whether arising before or after the Petition Date, which costs, fees and expenses shall not be subject to the Review Period. No attorney or advisor to any DIP Secured Party, the First Lien Ad Hoc Group, the Crossholder Ad Hoc Group, or the Prepetition Agents shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to (i) the DIP Secured Parties in connection with the DIP Facility and (ii) Prepetition Secured Parties in connection with these cases are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors or any other person.

17.     *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon the Debtors in all circumstances and for all purposes.   The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in these cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (a) such committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) by no later than (i) the earlier of (w) one business day before the hearing approving a sale of substantially all of the Debtors' assets or confirming a plan of reorganization, (x) as to the Creditors' Committee (if any) only, the earlier of (1) 60 calendar days after the appointment of the Creditors' Committee (if any) and (2) one business day before the hearing approving a sale of substantially all of the Debtors' assets or confirming a plan of

49

reorganization, (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) 60 calendar days after entry of this Interim Order, or (B) the date that is 30 calendar days after their appointment, and (z) for all other parties in interest, the earlier of (1) 30 calendar days after entry of this Interim Order and (2) one business day before the hearing approving a sale of substantially all of the Debtors' assets or confirming a plan of reorganization; and (ii) any such later date as (x) has been agreed to in writing (which may be by email) by the applicable Prepetition First Lien Agent with respect to the Prepetition First Lien Obligations or the Prepetition First Liens and the Debtors or (y) has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (i)-(ii), the "**Challenge Period**"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations or the Prepetition Liens, or (B) asserting or prosecuting any Avoidance Action or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Challenges**") against any Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (collectively, the "**Representatives**") in connection with or related to the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; *provided*, *however*, that any pleadings filed in connection with a Challenge shall set forth with specificity the basis for such Challenge and any Challenges not so

50

specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred.  If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge then: (1) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest; (2) the obligations of the Prepetition Loan Parties under the Prepetition Loan Documents shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise, except as provided in the Intercreditor Agreements), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in these cases and any Successor Case(s); (3) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual (other than as provided in the Intercreditor Agreements), or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in these cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in these cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any chapter 7 or chapter 11 trustee

51

or examiner, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives (in their capacities as such) shall be deemed forever waived, released and barred.  If any Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Interim Order vests or confers on any person or entity (each as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges with respect to the Prepetition Loan Documents, Prepetition Secured Obligations, or Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay confirmation of any plan of reorganization in these cases.  The Court may fashion any appropriate remedy following a successful Challenge, including, without limitation, unwinding or disallowance of all or a portion of the DIP Roll-Up Loans, if appropriate.

18.     *Limitation on Use of DIP Financing Proceeds and Collateral*.  Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party, in connection with (a) the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective

52

Representatives (in their capacities as such), or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Obligations, Adequate Protection Liens, or 507(b) Claims or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Secured Obligations and/or liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under the DIP Orders, the DIP Documents or the Prepetition Loan Documents in respect of the Prepetition Secured Obligations, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to sections 105, 502, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (*provided*, *that*, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and DIP Collateral (including Cash Collateral) may be used by the Creditors' Committee (if any) to investigate, but not to prosecute, (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $50,000 (the "**Investigation Cap**"), (b) attempts to prevent, hinder, or otherwise delay or interfere with the Prepetition Secured Parties' or the DIP Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Obligations, Prepetition Collateral, DIP Obligations, DIP Collateral, as applicable, and the liens, claims and rights granted to such parties under the DIP Orders, in each case other than in accordance with this Interim Order; (c) attempts to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties or the DIP Secured Parties under this Interim Order, the Prepetition Loan Documents or the DIP Documents, as applicable, other than in accordance with this Interim Order; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens and claims permitted by the DIP

53

Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, or 507(b) Claims; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are authorized by the Court, expressly permitted under this Interim Order, or expressly permitted under the DIP Documents (including the Approved Budget, subject to Permitted Variances), in each case unless all DIP Obligations, Prepetition Secured Obligations, Adequate Protection Obligations, and claims granted to the DIP Secured Parties and Prepetition Secured Parties under this Interim Order, have been paid in full in cash or otherwise as agreed to in writing by the DIP Secured Parties.

19. *Binding Effect; Successors and Assigns*. Subject to paragraph 17 hereof, the DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in these cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties, the Debtors, and their respective successors and assigns; *provided*, *that*, the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee or chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

20.     *Exculpation*.  Nothing in this Interim Order, the DIP Documents, the Prepetition Loan Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party or Prepetition Secured Party, any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  The DIP Secured Parties and Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtors.

21.     *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral or Prepetition Collateral (including Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents or Prepetition Loan Documents, as applicable, none of the DIP Secured Parties or the Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code).  Furthermore, nothing in this Interim Order shall in any way be construed or

55

interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective Representatives.

22.    *Master Proofs of Claim.*   Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of these chapter 11 cases or any Successor Cases, neither the Prepetition Agents, nor any other Prepetition Secured Parties shall be required to file proofs of claim in these cases or any Successor Cases in order to assert claims for payment of any of the Prepetition Secured Obligations, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts payable under the Prepetition Loan Documents or this Interim Order.   Subject paragraph 17 hereof, the Debtors' stipulations, admissions and acknowledgments of the claim and liens in respect of the Prepetition Secured Obligations set forth in this Interim Order is deemed to constitute timely proofs of claim in respect of all indebtedness, secured status and claims arising under the Prepetition Loan Documents and this Interim Order. Nonetheless, in order to facilitate the processing of claims, each Prepetition Agent is authorized, but not directed or required, to file a master proof of claim in the Debtors' lead case In re Mobileum, Inc., *et al*., Case No. 24-[●] ([__]), on behalf of the applicable Prepetition Secured Parties (each, a "**Master Proof of Claim**"), which shall be deemed to have been filed against each Debtor.  The provisions of this paragraph 22 and the filing of Master Proofs of Claim, if any, are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan filed in these cases.  Any Master Proof of Claim shall not be required to include any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided

56

upon written request to counsel to the applicable Prepetition Agent.  The DIP Secured Parties shall not be required to file proofs of claim with respect to the DIP Obligations.

23.     *Insurance*.  To the extent that any Prepetition Agent is listed as a loss payee under the insurance policies of any of the DIP Loan Parties, the DIP Agent shall also be deemed to be a loss payee under such insurance policies until the indefeasible payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the DIP Commitment and shall act in that capacity and distribute any proceeds recovered or received in respect of such insurance policies in accordance with the lien priorities set forth in this Interim Order.

24.     *Credit Bidding*.  Subject to the lien priorities set forth herein, the terms of the Intercreditor Agreements, and any successful Challenge, (a) the DIP Agent shall have the right to credit bid, up to the full amount of the DIP Obligations in any sale of the DIP Collateral and (b)  subject to section 363(k) of the Bankruptcy Code and entry of the Final Order, each of the Prepetition Agents shall have the right, consistent with the provisions of the Prepetition Loan Documents, as applicable (and providing for the DIP Obligations to be indefeasibly repaid in full in cash and the termination of the DIP Commitments), to credit bid, up to the full amount of the applicable Prepetition Secured Obligations, in the sale of the applicable Prepetition Collateral, in each case, without the need for further Court order authorizing the same, whether any such sale is effectuated through section 363(k), 1123, or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

25.     *Effectiveness*.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal

WEIL:\99860437\1\63808.0003

Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

26. *Governing Order*.  Notwithstanding the relief granted in any other order by this Court, (i) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be consistent with and subject to this Interim Order, including compliance with the Approved Budget (subject to Permitted Variances) and all other terms and conditions hereof, and (ii) to the extent there is any inconsistency between the terms of the DIP Documents or the Prepetition Loan Documents and this Interim Order, this Interim Order shall control.

27. *Headings*.  Paragraph headings used herein are for convenience only and shall not affect the construction of, or to be taken into consideration in interpreting, this Interim Order.

28. *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Documents and except with respect to the DIP Loan Parties, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral, receives any DIP Collateral or any proceeds of the DIP Collateral, or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations and termination of all DIP Commitments, such person or entity shall be deemed to have received, and shall hold, any such DIP Collateral or any payment on account or proceeds thereof in trust for the benefit of the DIP Secured Parties and shall immediately turn over such collateral or its proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

29. *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

30.     *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

31.     *Necessary Action*.  The Debtors, the DIP Secured Parties and the Prepetition Secured Parties are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this Interim Order.  The automatic stay is modified to permit affiliates of the Debtors who are not debtors in these cases to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

32.     *Retention of Jurisdiction*.  This Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

33.     *Final Hearing*.  A final hearing to consider the relief requested in the DIP Motion on a final basis shall be held on [●], 2024 at [●] [a.m.][p.m.] (Prevailing Central Time).

34.     *Objections*.  Any objections or responses to the DIP Motion shall be filed on or prior to [●], 2024 at [●] [a.m.][p.m.] (Prevailing Central Time).  Any party objecting to the relief sought at the Final Hearing shall file and serve (via mail and e-mail) written objections, which objections shall be served upon (a) the Debtors and counsel thereto, Weil, Gotshal & Manges LLP, 767 5th Ave, New York, New York 10153, Attn: Jeffrey Saferstein (jeffrey.saferstein@weil.com), Alexander Welch (alexander.welch@weil.com), Daphne Papadatos (daphne.papadatos@weil.com), and Eric Einhorn (eric.einhorn@weil.com), (b) the DIP Agent, and counsel thereto, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, New York 10019, Attn: Jeffrey R. Gleit (jeffrey.gleit@afslaw.com) and Brett Goodman

59

(brett.goodman@afslaw.com), (c) counsel to the First Lien Ad Hoc Group, Milbank LLP, 55 Hudson Yards, New York, New York 10001, Attn: Evan R. Fleck (efleck@milbank.com), Matthew L. Brod (mbrod@milbank.com), and Abigail L. Debold (adebold@milbank.com), (d) the Office of the United States Trustee for the Southern District of Texas; (e) if appointed, the Creditors' Committee, and counsel thereto; (f) the Prepetition First Lien Loan Agent, and counsel thereto, Paul Hastings LLP, 600 Travis Street, 58th Floor, Houston, Texas 77002, Attn: Seth B. Chandler (sethchandler@paulhastings.com), and Paul Hastings LLP, 200 Park Avenue, New York, NY 10166, Attn: Sam Lawand (samlawand@paulhastings.com); (g) the Prepetition First Lien Notes Agent, and counsel thereto, Shipman & Goodwin LLP, One Constitution Plaza, Hartford, Connecticut 06103, Attn: Marie C. Pollio (mpollio@goodwin.com); and (h) the Prepetition Second Lien Agent, and counsel thereto, Paul Hastings LLP, 600 Travis Street, 58th Floor, Houston, Texas 77002, Attn: Seth B. Chandler (sethchandler@paulhastings.com), and Paul Hastings LLP, 200 Park Avenue, New York, NY 10166, Attn: Sam Lawand (samlawand@paulhastings.com).

35.    The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) on the parties having been given notice of the Interim Hearing and to any party that has filed with this Court a request for notices in these cases.

Dated: _____, 2024
         Houston, Texas

_____
UNITED STATES BANKRUPTCY JUDGE

60

**<u>Exhibit 1</u>**

**DIP Credit Agreement**

INTENTIONALLY OMITTED

**<u>Schedule 1</u>**

**Initial Budget**

INTENTIONALLY OMITTED

**Annex III**

**Initial Budget**

**Cash Flow Forecasts - PrePack Bankruptcy**

| ($ in thousands) | | Petition Date-> | | | EoM | | | | | | Proposed Effective Date-> | | | | | | | Totals for 15 weeks ending |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week No.** | -1 | 0 | 1 | 2 | EoM | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Start | 06-Jul | 13-Jul | 20-Jul | 27-Jul | 01-Aug | 03-Aug | 10-Aug | 17-Aug | 24-Aug | 01-Sep | 07-Sep | 14-Sep | 21-Sep | 28-Sep | 01-Oct | 05-Oct | |
| Week Ending Date | 12-Jul | 19-Jul | 26-Jul | 31-Jul | 02-Aug | 09-Aug | 16-Aug | 23-Aug | 31-Aug | 06-Sep | 13-Sep | 20-Sep | 27-Sep | 30-Sep | 04-Oct | 11-Oct | |
| Act/Fcst | Act. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | |
| Pre/Post-petition week | Pre | Pre | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | 11-Oct |
| **Beginning Cash Balance** | 31,286 | 29,345 | 24,005 | 19,302 | 9,335 | 7,811 | 8,625 | 9,187 | 7,967 | 1,533 | 1,508 | (18,222) | (17,222) | (16,798) | (24,806) | (25,012) | 31,286 |
| Fx Adjustments | 87 | | | | | | | | | | | | | | | | 87 |
| **Total Receipts** | 2,669 | 2,732 | 2,977 | 1,412 | 378 | 2,867 | 3,295 | 3,121 | 3,113 | 2,855 | 3,440 | 3,516 | 4,225 | 1,050 | 2,198 | 3,198 | 43,047 |
| **Total Operating Disbursements** | (2,428) | (5,419) | (4,581) | (7,375) | (1,827) | (2,047) | (2,732) | (4,361) | (9,571) | (2,873) | (2,295) | (2,513) | (3,766) | (10,003) | (2,169) | (858) | (64,818) |
| *Cash in transit (receipts)* | 3,861 | 5,256 | 364 | 1,297 | 3 | 1,032 | 551 | 2,671 | 4,535 | 899 | 2,333 | 993 | 2,132 | 925 | 448 | 1,406 | 28,706 |
| *Cash in transit (disbursements)* | (4,566) | (4,540) | (382) | (1,297) | (3) | (1,039) | (552) | (2,651) | (4,511) | (905) | (2,331) | (996) | (2,167) | (930) | (450) | (1,408) | (28,727) |
| **Total Cash in transit** | (705) | 716 | (19) | - | - | (7) | (1) | 20 | 24 | (6) | 2 | (3) | (35) | (5) | (2) | (2) | (21) |
| **Operating Cash Flow** | (377) | (1,971) | (1,623) | (5,962) | (1,448) | 814 | 562 | (1,220) | (6,434) | (24) | 1,147 | 1,000 | 424 | (8,958) | 27 | 2,338 | (21,706) |
| Restructuring Professional Fees | (1,564) | (3,088) | (3,029) | - | (75) | - | - | - | - | - | (17,110) | - | - | - | (233) | - | (25,099) |
| Other Restructuring Related Disbursements | - | (281) | (52) | (4,005) | - | - | - | - | - | - | (3,768) | - | - | 950 | - | - | (7,156) |
| **Total Restructuring-related disbursements** | (1,564) | (3,369) | (3,080) | (4,005) | (75) | - | - | - | - | - | (20,878) | - | - | 950 | (233) | - | (32,254) |
| **Net Cash Flow** | (1,941) | (5,339) | (4,703) | (9,967) | (1,524) | 814 | 562 | (1,220) | (6,434) | (24) | (19,731) | 1,000 | 424 | (8,008) | (206) | 2,338 | (53,960) |
| *Cumulative Net Cash Flow* | (1,941) | (7,280) | (11,984) | (21,951) | (23,474) | (22,661) | (22,099) | (23,319) | (29,753) | (29,777) | (49,508) | (48,508) | (48,084) | (56,092) | (56,298) | (53,960) | (53,960) |
| **Ending Cash Balance Before DIP loan, New Money** | 29,345 | 24,005 | 19,302 | 9,335 | 7,811 | 8,625 | 9,187 | 7,967 | 1,533 | 1,508 | (18,222) | (17,222) | (16,798) | (24,806) | (25,012) | (22,674) | (22,674) |
| **DIP loan, New Money** | | | | | | | | | | | | | | | | | |
| *Advances* | - | - | 40,000 | - | - | - | - | - | - | 20,000 | - | - | - | - | - | - | 60,000 |
| *Interests paid* | - | - | - | (62) | - | - | - | - | - | (386) | (242) | - | - | (177) | - | - | (866) |
| Cumulative Adjustments for DIP loan, New Money | - | - | 40,000 | 39,938 | 39,938 | 39,938 | 39,938 | 39,938 | 39,938 | 59,552 | 59,310 | 59,310 | 59,310 | 59,134 | 59,134 | 59,134 | 59,134 |
| **Backstop Fee, New Money** | | | | | | | | | | | | | | | | | |
| *Advances* | - | - | 9,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | 9,000 |
| *Interests paid* | - | - | - | (14) | - | - | - | - | - | (87) | (36) | - | - | - | - | - | (137) |
| *Conversion into equity* | - | - | - | - | - | - | - | - | - | - | (9,000) | - | - | - | - | - | (9,000) |
| Cumulative Adjustments for BS Fee, New Money | - | - | (14) | (14) | (14) | (14) | (14) | (14) | (101) | (101) | (137) | (137) | (137) | (137) | (137) | (137) | (137) |
| **Ending Cash Balance After DIP loan, New Money** | 29,345 | 24,005 | 59,302 | 49,259 | 47,735 | 48,549 | 49,111 | 47,891 | 60,984 | 60,960 | 40,951 | 41,951 | 42,375 | 34,191 | 33,985 | 36,323 | 36,323 |

**Notes:**

1. The budget includes an estimated $251,500 payment at the Effective Date under 28 U.S.C. § 1930(a)(6), related to one quarterly fee to the United States Trustee System Fund.

**<u>Exhibit 2</u>**

**Exit Facility Term Sheet**

**Exhibit 2**

**MOBILEUM**
**EXIT FACILITY TERM SHEET**

| | |
|---|---|
| **Borrower** | Reorganized Mobileum, Inc., a Delaware corporation[1] (the "**Borrower**"). |
| **Guarantors** | The Borrower's direct parent ("**Holdings**") and each of the Borrower's direct and indirect material subsidiaries, domestic subsidiaries (collectively, the "**Guarantors**" and together with the Borrower, the "**Loan Parties**"), shall be required to provide an unconditional guaranty, on a joint and several basis, of all amounts owing under the Exit Facility, subject to customary exclusions with respect to excluded subsidiaries; *provided*, that on a post-closing basis the Borrower will deliver a joinder agreement from each foreign subsidiary, pursuant to which such subsidiary shall become a party as a Guarantor, subject to customary exclusions with respect to excluded subsidiaries. Excluded subsidiaries shall include those prohibited by applicable law, immaterial subsidiaries subject to aggregate and individual thresholds to be agreed, and those with respect to which the burden or cost of providing a guarantee are excessive in view of the benefit to the Lenders.  Non-wholly owned U.S. subsidiaries shall be guarantors (other than in the case of (x) bona fide joint ventures and (y) certain joint ventures existing on the closing date to the extent disclosed to, and approved by the Required Lenders). |
| **Exit Term Loan Facility** | Senior secured term loan facility (the "**Exit Term Loan Facility**" or the "**Exit Facility**") comprised of $160 million of term loans (the "**Exit Term Loans**", and the holders thereof referred to as the "**Lenders**")), all of which will be converted on a dollar-for-dollar basis from the loans (the "**DIP Loans**") under the Borrower's debtor-in-possession credit agreement (the "**DIP Credit Agreement**") on the Closing Date (as defined below); *provided* that the principal amount of the Exit Term Loan Facility shall be reduced on a dollar-for-dollar basis for any prepayments or repayments of the DIP Loans made prior to the Closing Date. |
| | Exit Term Loans that are prepaid may not be reborrowed. |
| | The "**Plan**" means the Chapter 11 Plan of Reorganization of the Borrower, Holdings and certain of the Borrower's subsidiaries and other affiliates (collectively, the "**Debtors**") contemplated by the RSA Term Sheet to which this Exit Facility Term Sheet is attached. The reorganization contemplated by the Plan is referred to herein as the "**Reorganization**". |
| **Incremental Facility** | Borrower will have the option to increase and/or add new classes of loans and/or revolving credit facility commitments (the "**Incremental Debt**") in an additional amount not to exceed (a) in the case of Incremental Debt in the form of term loans, (x) a fixed basket equal to the greater of $19 million and 50% of Consolidated EBITDA plus (y) amounts reallocated from the Fixed Revolving Incremental Basket, and (b) in the case of Incremental Debt in the form of revolving credit commitments, a fixed basket equal to $25 million (the "**Fixed Revolving Incremental Basket**"), which may be equal to or senior in right of payment to the Exit Term Loans (any such revolving credit facility may be cash flow-based or asset-based); *provided* that, (i) no default or event of default shall exist or result from the incurrence of such Incremental Debt, (ii) any Incremental Debt shall otherwise be subject to customary terms and conditions substantially similar to the Pre-Existing Facility Documentation (subject to the Documentation Principles), (iii) |

---

[1] [**NTD:** Identity and form of Borrower subject to adjustment based on tax and structuring discussions.]

[reserved], (iv) no Incremental Debt may have an obligor that is not a Loan Party, (v) no Incremental Debt may be secured by assets that are not Collateral and (vi) the Incremental Debt provisions shall include a 50 bps "pricing MFN", with no sunset.

**Use of Proceeds**

Proceeds of the Exit Term Loans shall be deemed to refinance in full all Tranche A Loans (as defined in the DIP Credit Agreement).

**Closing Date**

The date on which the Exit Term Loans are issued under the Exit Term Loan Facility and the Reorganization is consummated pursuant to the Plan (the "**Closing Date**").

**Maturity**

The date that is 5 years after the Closing Date (the "**Maturity Date**").

**Collateral and Guarantees**

The Exit Term Loan Facility will be secured by a perfected first priority (subject to permitted liens) lien on all assets of the Loan Parties, subject to agreed (if any) post-closing perfection requirements, which shall include control agreements and subject to thresholds, exceptions and exclusions to be agreed in each case (the "**Collateral**"); *provided* that, all equity interests held by Loan Parties in joint ventures and foreign subsidiaries shall constitute collateral unless (and solely for so long as) prohibited by law or contract. "Material Real Property" to include any property located in the U.S. with a FMV equal to or greater than $5 million.

**Unrestricted Subsidiaries**

Not permitted.

**Exit Facility Documentation**

The loan documents governing the Exit Term Loan Facility (the "**Exit Facility Documentation**") shall be generally based on the loan documents governing that certain First Lien Credit Agreement dated as of March 1, 2022, among Holdings, Borrower, the Prepetition Agent and the Prepetition Lenders, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, together with any guarantee, security and other ancillary documentation (the "**Pre-Existing Facility Documentation**"), with modifications to reflect (a) this term sheet, (b) the size, revenues, financial performance and strategic objectives of the reorganized company and its structure, (c) terms generally customary for exit facilities of this type, (d) terms to prohibit any transfers of material I.P. from Loan Parties to non-Loan Parties and (e) and other adjustments reasonably satisfactory to the Required Lenders (the terms of this paragraph, the "**Documentation Principles**"). The initial drafts of the Exit Facility Documentation shall be prepared by counsel to the 1L Ad Hoc Group.

**Conditions to Closing**

To be agreed between the Borrower and the Required Lenders but to include the following:

A.  The Reorganization shall have been consummated in all respects in accordance with the Plan (all conditions set forth therein having been satisfied or waived in accordance with its terms), and substantial consummation of the Plan in all material respects in accordance with its terms shall have occurred contemporaneously with the closing of the Exit Term Loans.

B.  Delivery of all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act, in each case at least two (2) business days prior to the Closing Date to the extent requested at least ten (10) business days prior to the Closing Date.

C.  Payment by the Borrower on the Closing Date of (i) the administrative and collateral agency fee due on such date, (ii) the fees of Houlihan Lokey Inc. and Milbank LLP in connection with the transactions hereunder and (iii) all reasonable and out-of-

pocket expenses payable on the Closing Date pursuant to the terms hereof.

| | Interest Rate | Interest shall accrue on the Exit Term Loans at a rate based on the below based on the applicable period and benchmark, and shall be paid in cash or in-kind as follows: |

| Period | PIK Election | SOFR Rate | Base Rate | Floor |
|---|---|---|---|---|
| Commencing on the Closing Date and ending on the last day of the interest period under the Exit Facility in effect on the first anniversary of the Closing Date | Mandatory PIK | 6.00% (S+1.00% cash pay and 5.00% PIK) | 5.00% (ABR+1.00% cash pay and 4.00% PIK) | 1.00% for SOFR, 2.00% for ABR |
| Commencing after such date and ending on the last day of the interest period under the Exit Facility in effect on the second anniversary of the Closing Date | PIK at election of Borrower so long as liquidity as of the most recent month-end does not exceed an amount to be agreed | 6.00% (if Borrower elects PIK, then no less than S+1.00% must be cash pay) | 5.00% (if Borrower elects PIK, then no less than ABR+1.00% must be cash pay) | Same as above |
| Thereafter | None | 6.00% | 5.00% | Same as above |

**Default Interest**

During the continuation of an Event of Default, overdue amounts (including principal, interest and fees) will bear interest at an additional 2.00% per annum above the interest rate otherwise applicable.

**Scheduled Amortization**

1.00% per annum payable quarterly, commencing with the first full calendar quarter-end to occur following the six-month anniversary of the Closing Date.

**Call Protection**

(i) Callable in year one at 102% of par value, (iii) callable in year two at 101% of par value, and (iii) callable in year three and beyond at par value.

Call protection to apply to any voluntary prepayment or any mandatory prepayment from unpermitted debt issuances, and upon any acceleration or insolvency event. For the avoidance of doubt, call protection will not apply to mandatory prepayments other than from unpermitted debt issuance. Customary "Momentive" provision to be included.

**Mandatory Prepayments**

The Exit Term Loans shall be prepaid with:

(i)   100% of the net cash proceeds of certain specified non-ordinary course asset sales and casualty events, in excess of $2 million, subject to the right of the Borrower and its subsidiaries to reinvest the proceeds thereof in their respective businesses within 1 year of receipt of those proceeds (or an additional 6 months if committed to be reinvested within 1 year of receipt);

(ii) 100% of the proceeds of debt incurrences, subject to the call protection described above (other than debt permitted under the Exit Facility Documentation);

(iii) 100% of litigation proceeds (including proceeds received by the Loan Parties with respect to the H.I.G Litigation (as defined in the DIP Credit Agreement)) net of taxes and out-of-pocket expenses incurred in connection with such litigation; *provided* that such prepayment shall be reduced in an amount necessary to ensure that liquidity shall not be less than $33.3M after giving effect to such prepayment.

(iv) in the event liquidity as of the testing date following the six month anniversary of the Closing Date shall be greater than $33.3M, then the lesser of (a) $10M and (b) the amount of such excess liquidity;

(v) commencing in 2026 with respect to the 2025 fiscal year and subject to metrics to be agreed, 100% of the excess cash flow from the preceding fiscal year, with such percentage to be reduced at leverage ratios to be agreed.

The Exit Facility Documentation shall include a customary provision which shall permit the Lenders to decline proceeds of any mandatory prepayment event; *provided* that, any declined proceeds retained by the Borrower may be used to prepay junior debt to the extent permitted by the negative covenants.

|  |  |
|---|---|
| **Voluntary Prepayments** | Voluntary prepayments of the borrowings under the Exit Term Loan Facility will be permitted at any time at par, without premium or penalty, subject to the call protection described above. |
| **Application of Payments** | All voluntary prepayments of the Exit Term Loan Facility and/or any Incremental Term Facility will be made ratably to the Lenders and applied at the discretion of the Borrower to the remaining amortization payments under the Exit Term Loan Facility or the Incremental Debt, as applicable, and may be applied to any of the Exit Term Loans or Incremental Debt, in any case, as directed by the Borrower (and absent such direction, in inverse order of maturity thereof). All mandatory prepayments of the Exit Term Loan Facility and any Incremental Term Facility will be made ratably to the Lenders and applied to the remaining amortization payments in inverse order of maturity. |
| **Representations and Warranties** | Usual and customary for facilities of this type, and to be based on the Pre-Existing Facility Documentation, subject to Documentation Principles. |
| **Covenants** | Usual and customary for facilities of this type, and to be based on the Pre-Existing Facility Documentation, subject to Documentation Principles. |
| **Minimum Liquidity Covenant** | $10 million; no financial maintenance covenant. |
| **Ratings** | Consistent with the Pre-Existing Facility Documentation, subject to Documentation Principles. |
| **Events of Default** | Usual and customary for facilities of this type, and to be based on the Pre-Existing Facility Documentation, subject to Documentation Principles. |
| **Amendments** | Usual and customary for facilities of this type, and to be based the Pre-Existing Facility Documentation, subject to Documentation Principles; *provided* that Amendments that subordinate lenders' liens or that subordinate the Credit Agreement obligations in right of payment, other than in connection with DIP financings, require the consent of all lenders, unless such priming transaction is offered to all lenders on a pro rata basis on the same terms (including any fees payable in connection therewith, to the extent such fees are payable to all lenders generally and are not bona fide arrangement or backstop fees). |

| | |
|---|---|
| **Required Lenders / Voting** | 50.1% of Lenders (the "**Required Lenders**"). |
| **Expenses and Indemnification** | Usual and customary for facilities of this type, and to be based on the Pre-Existing Facility Documentation, subject to Documentation Principles. |
| **Other Provisions** | The Exit Facility Documentation will include customary provisions regarding increased costs, illegality, tax indemnities, waiver of trial by jury and other similar provisions. |
| **Assignment and Participations** | Usual and customary for facilities of this type, and to be based on the Pre-Existing Facility Documentation, subject to Documentation Principles. To include that Lenders may assign to Holdings and its subsidiaries through "open market purchases"; *provided* that (x) any non-cash "open market purchases" must be offered to all lenders on a pro rata basis and (y) any cash "open market purchases" shall have been approved by Lenders representing at least two unaffiliated institutions. |
| **Governing Law** | State of New York. |
| **Administrative Agent and Collateral Agent** | Acquiom Agency Services LLC and Seaport Loan Products LLC, in their capacities as co-administrative agents, and Acquiom Agency Services LLC, in its capacity as collateral agent (the "**Agent**"). |
| **Counsel to the Lenders** | Milbank LLP |

## <u>Exhibit 3</u>

**Backstop Commitment Letter**

July 23, 2024

<u>PERSONAL AND CONFIDENTIAL</u>
Matrix Parent, Inc.
20813 Stevens Creek Boulevard, Suite 200
Cupertino, CA 95014
Attention: Ripu Singh

<div align="center">
<u>Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility<br>Backstop Commitment Letter</u>
</div>

Ladies and Gentlemen:

Matrix Parent Inc. ("<u>Matrix Parent</u>") and certain of its subsidiaries and affiliates (the "<u>Guarantor Debtors</u>", and collectively with Matrix Parent, the "<u>Debtors</u>", "<u>you</u>" or "<u>your</u>") have (i) advised the parties listed on the signature pages hereto as "Backstop Commitment Parties" (each, a "<u>Backstop Commitment Party</u>" and, collectively, the "<u>Backstop Commitment Parties</u>", "<u>we</u>", "<u>us</u>" or "<u>our</u>"), that the Debtors are considering filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et</u> <u>seq.</u> (as amended, the "<u>Bankruptcy Code</u>"), and, in connection with the foregoing and (ii) requested that the Backstop Commitment Parties commit to provide a superpriority senior secured debtor-in-possession term loan credit facility for the Debtors under Sections 364(c) and 364(d) of the Bankruptcy Code (the "<u>DIP Facility</u>") consisting of (x) new money term loans (the "<u>New Money Loans</u>") in an aggregate principal amount of $60 million, of which $40 million will be available upon entry of the Interim DIP Order and $20 million will be available upon entry of the Final DIP Order (y) term loans (the "<u>Roll Up Loans</u>", together with the New Money Loans, the "<u>Tranche A Loans</u>") resulting from the rollup of the participating Lenders' obligations under the Prepetition First Lien Facilities (defined below) in an aggregate principal amount of $100 million approved upon entry of the Interim DIP Order and issued on such date or such later date as agreed in writing by the Backstop Commitment Parties (subject to applicable provisions in the DIP Orders) and (z) term loans issued on account of the Backstop Commitment Premium (the "<u>Tranche B Loans</u>" and, together with the Tranche A Loans, the "<u>DIP Loans</u>") in an aggregate principal amount of $9 million.  The Tranche A Loans shall convert on a dollar-for-dollar basis into an exit facility (the "<u>Exit Conversion</u>", such converted loans, the "<u>Exit Term Loans</u>", and the financing provided by the Exit Term Loans, the "<u>Exit Facility</u>") substantially on the terms set forth in this letter (including all exhibits, annexes, and schedules hereto, this "<u>Backstop Commitment Letter</u>"), as well as the Senior Secured Super-Priority Debtor-In-Possession Term Credit Agreement (the "<u>DIP Credit Agreement</u>")  in form satisfactory to the Majority Backstop Commitment Parties (as defined below) and reflecting the terms of the DIP Term Sheet attached hereto as **Exhibit A** (the "<u>DIP Term Sheet</u>") and the Exit Facility Term Sheet attached hereto as **Exhibit B** (the "<u>Exit Facility Term Sheet</u>"), which terms will be memorialized in a credit agreement that will govern the Exit Facility (the "<u>Exit Facility Credit Agreement</u>"), subject solely to the conditions set forth in the DIP Credit Agreement and the "Conditions to Closing" set forth in the Exit Facility Term Sheet, in each case, that are applicable to the relevant borrowing.  Unless otherwise specified herein, all references to "$" shall refer to U.S. dollars.  Capitalized terms used herein without definition shall have the meaning assigned thereto in the DIP Term Sheet or the Exit Facility Term Sheet, as applicable.

1.     <u>Backstop Commitment.</u>

To provide assurance that the DIP Facility and the Exit Facility shall be available on the terms and conditions set forth herein, in the DIP Credit Agreement and in the Exit Facility Term Sheet, as applicable, each Backstop Commitment Party hereby commits severally and not jointly, (the "<u>Backstop Commitment</u>") to provide, itself or through one or more Related Funds (as defined below) who executes a

WEIL:\99860887\1\63808.0003

Joinder (as defined below), the amount of the New Money Loans and the Exit Term Loans, each as set forth on Schedule 1 hereto (as may be updated from time to time prior to the date that is two business days prior to the DIP Closing Date in order to identify such Related Funds) on the terms set forth in this Backstop Commitment Letter, subject solely to the conditions set forth in the DIP Credit Agreement and the "Conditions to Closing" set forth in the Exit Facility Term Sheet that are applicable to the relevant borrowing.  The Backstop Commitment Parties may, at their option, arrange for the DIP Credit Agreement or the Exit Facility Credit Agreement, if applicable, to be executed by  Jefferies Finance LLC, acting as an initial lender and funding some or all of the Backstop Commitment Party's Backstop Commitment (in such capacity, the "Fronting Lender"), in which case each applicable Backstop Commitment Party will acquire its applicable shares of the DIP Facility and/or Exit Facility, as applicable, by assignment from the Fronting Lender in accordance with the assignment provisions of the DIP Credit Agreement and the Exit Facility Credit Agreement, as applicable; *provided* that any assignment of the DIP Loans shall comply with Section 8 of this letter and shall occur prior to the date which is 5 business days prior to the Effective Date (as defined in the Restructuring Support Agreement).

It is understood and agreed that the aggregate commitments under this Backstop Commitment Letter in respect of New Money Loans are $60,000,000 in total, subject to the Allocation (as defined below), as set forth in Section 2 hereof, and each Backstop Commitment Party hereby agrees and commits to such automatic conversion of the New Money Loans, together with the Roll Up Loans, to Exit Term Loans in accordance with the Plan.

2.      Election Procedures and Allocation.

Each Prepetition First Lien Holder (as defined below) (including the Backstop Commitment Parties) shall have the right to participate (the "Opportunity") in 100.0% of the DIP Facility based on its Pro Rata Share (as defined below) by (i) executing a signature page to the DIP Credit Agreement by no later than July 30, 2024 (the "Election Deadline Date") and (ii) executing a joinder to the Restructuring Support Agreement, dated as of the date hereof (the "Restructuring Support Agreement"), by and among Matrix Parent and certain of its affiliates and certain Prepetition First Lien Holders prior to the Election Deadline Date (or such later time as reasonably agreed by the Majority Backstop Commitment Parties and you) pursuant to which each such participating holder shall be allocated its Pro Rata Share of commitments in respect of the New Money Loans and the Rollup Loans (the "Allocation"); *provided* that any Backstop Commitment Party that is a Prepetition First Lien Holder shall be deemed to participate (for itself and its Related Funds) in the DIP Facility in respect of its Backstop Commitment (subject to any adjustments and rights to assign as set forth herein) upon executing this Backstop Commitment Letter and the Restructuring Support Agreement.

"Prepetition First Lien Facilities" means (i) that certain Note Purchase Agreement, dated as of March 15, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof), by and among Wilmington Trust, National Association (the "Prepetition First Lien Notes Agent"), the Borrower, as issuer and the noteholders party thereto (the "Prepetition First Lien Noteholders"); and (ii) that certain First Lien Credit Agreement dated as of March 1, 2022, among Holdings, Borrower, Jefferies Finance LLC, as administrative agent and collateral agent (the "Prepetition First Lien Agent") and the lenders from time to time party thereto (the "Prepetition First Lien Lenders" and together with the Prepetition First Lien Noteholders, the "Prepetition First Lien Holders")), as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof.

"Pro Rata Share" means with respect to each Prepetition First Lien Holder (x) the aggregate principal amount of outstanding loans or notes held by such Prepetition First Lien Holder, as set forth in the registers for each of the Prepetition First Lien Facilities on the Election Deadline Date (including any

accrued interest, fees, premium (including prepayment premium or make-whole) or other obligations) divided by (y) the aggregate principal amount of outstanding loans or notes held by all Prepetition First Lien Holders (including any accrued interest, fees, premium (including prepayment premium or make-whole) or other obligations) under the Prepetition First Lien Facilities at such time.

"Majority Backstop Commitment Parties" means, at any time, Backstop Commitment Parties having Backstop Commitments outstanding that, taken together, represent at least 50.01% of the sum of the Backstop Commitments outstanding for all the Backstop Commitment Parties at such time.

"Joinder" means a joinder to this letter that is delivered to the Debtors, which joinder shall include (x) from the transferee, the representations and warranties set forth in the second paragraph of Section 3 and (y) from the transferor, the following representation: "The transferor has not engaged in any form of general solicitation or general advertising (within the meaning of Rule 502(c) of the Securities Act) in connection with the underlying assignment giving rise to this joinder."

"Related Fund" means, with respect to any Backstop Commitment Party, (x) any Affiliate or any other Person that is managed, administered, sub-advised or advised by it or its Affiliates or (y) any other designee or vehicle used by any Backstop Commitment Lender to hold loans or commitments on behalf of such Backstop Commitment Party (including with respect to any derivative or participation transactions that transfers the economics of ownership interest to such designee).

Each Backstop Commitment Party shall have the right to assign its Commitments under the DIP Facility to participating Prepetition First Lien Holders in accordance with the Allocation; *provided* that notwithstanding the Allocation, unless you otherwise agree in writing, each Backstop Commitment Party shall retain exclusive control over all rights and obligations with respect to the DIP Facility, including all obligations to fund the DIP Facility and all rights with respect to consents, modifications, supplements, waivers and amendments, until the DIP Closing Date (as defined in the DIP Term Sheet) and the initial funding shall have occurred. Any unsubscribed portion of the Opportunity as of the Election Deadline Date shall be automatically allocated to, and funded by (if applicable), the Backstop Commitment Parties based on their respective percentages set forth set forth on Schedule 1 hereto.

Each of the parties hereto agrees to use its respective commercially reasonable efforts to assist the Administrative Agent in connection with the Allocation. The Backstop Commitment Parties agree that, following the Allocation, Matrix Parent and its affiliates and the Administrative Agent may conclusively rely on the schedule of commitments provided to the Debtors by the financial advisor for the Backstop Commitment Parties, Houlihan Lokey, including the Lenders listed therein and their respective commitments. None of the Debtors nor any of their affiliates nor any of their respective advisors shall be liable with respect to such schedule.

You acknowledge and agree that nothing in this Backstop Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Backstop Commitment Party, the Administrative Agent or its affiliates, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Backstop Commitment Party, the Administrative Agent or its affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in connection with this Backstop Commitment Letter or the transactions contemplated hereby, and agree that no Backstop Commitment Party, the Administrative Agent or affiliates of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge that the transactions contemplated hereby (including the exercise of rights and remedies hereunder) are arms'-length commercial transactions and that we and the Administrative Agent are acting

WEIL:\99860887\1\63808.0003

292 of 351

as principal and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated hereby are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that the Administrative Agent may employ the services of its affiliates in providing certain services hereunder and may exchange with such affiliates information concerning the Debtors and other companies that may be the subject of the transactions contemplated hereby and such affiliates will be entitled to the benefits afforded to the Agents hereunder; *provided*, that any such affiliates receiving information concerning the Debtors and other companies in accordance with this paragraph shall be subject to the same confidentiality obligations provided for in this Backstop Commitment Letter.

3.    Information.

        You hereby represent and warrant that (a) all written information concerning you and your subsidiaries and your and their respective business (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "Projections") and information of a general economic or industry specific nature) (the "Information") that has been or will be made available to us or any of our respective affiliates by or on behalf of you is or will be, when furnished and to the best of your knowledge, complete and correct in all material respects, when taken as a whole, and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to the updates provided for in the penultimate sentence of this Section 3) and (b) the Projections that have been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made and at the time the related Projections are made available to us or any of our affiliates (it being acknowledged that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results, and (iv) no guarantee or assurance can be given that the projected results will be realized).  You agree that if, at any time prior to the entry of the DIP Orders approving the DIP Facility, any of the representations, warranties and covenants in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations, warranties and covenants were being made, at such subsequent time, then you will promptly supplement the Information and the Projections so that such representations, warranties and covenants would be correct in all material respects; *provided*, that for the avoidance of doubt, there will be no requirement to update previously delivered Projections to reflect new assumptions so long as the assumptions were reasonable at the time made and made available to us or any of our affiliates.  The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Backstop Commitment Parties hereunder or the availability of the DIP Facility or the Exit Facility.

        Each Backstop Commitment Party acknowledges, agrees, and represents to you that it (w) is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act of 1933, as amended (the "Securities Act"), (x) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, (y) understands that (1) any new common shares of Reorganized Parent (as defined in the Plan (as defined in the Restructuring Support Agreement)) to be acquired by it have not been registered under the Securities Act and (2) that some or all of such securities may be offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Backstop Commitment Party's representations contained in this letter and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (z) has such

4

knowledge and experience in financial and business matters that such Backstop Commitment Party is capable of evaluating the merits and risks of any new common shares of Reorganized Parent to be acquired by it and understands and is able to bear any economic risks with such investment.

4.    Premium.

As consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties hereunder and under the Restructuring Support Agreement, the Debtors agree to pay (or cause to be paid) to the Backstop Commitment Parties (or, at any Backstop Commitment Party's option and upon joinder to this letter of a Related Fund in accordance with Section 1, its Related Fund), a non-refundable backstop premium equal to $9 million (the "Backstop Commitment Premium"), which shall be allocated to each Backstop Commitment Party, in an amount equal to (1) its percentage set forth on Schedule 1 hereto (the "Backstop Percentage"), *multiplied by* (2) the Backstop Commitment Premium, which shall be fully earned, nonrefundable and non-avoidable on the execution of this Backstop Commitment Letter and payable to each Backstop Commitment Party on the DIP Closing Date (as defined in the DIP Term Sheet) in the form of the Tranche B Loans held by such Lender in accordance with the DIP Credit Agreement. The Tranche B Loans, (a) as and when required by the DIP Credit Agreement will be subject to the Exit Premium (as defined in the DIP Credit Agreement), if applicable, and (b) upon emergence pursuant to a Plan of Reorganization (as defined in the DIP Credit Agreement), shall convert into 10% of the new common shares of the reorganized Parent (subject to dilution as set forth in the Plan).

5.    Payments and Fees

The Debtors agree to pay the out-of-pocket costs and expenses (the "Fronting Expenses") incurred in connection with the initial funding of the New Money Loans by the Fronting Lender and any assignments made by such Fronting Lender(s) to the Backstop Commitment Parties in connection therewith; it being understood and agreed that no fronting or other fee will be charged by the Fronting Lender in connection with the Tranche A Loans.

6.    Conditions.

The Backstop Commitment Parties' Backstop Commitments and agreements hereunder in respect of the DIP Facility are subject solely to the satisfaction (or waiver) of the conditions precedent set forth in the DIP Credit Agreement that are applicable to the relevant borrowing.  Subject to the DIP Orders, there are no conditions (implied or otherwise) to the Backstop Commitments hereunder in respect of the DIP Facility, and there will be no conditions (implied or otherwise) to the availability or the initial funding of the DIP Facility on the DIP Closing Date, including compliance with the terms of this Backstop Commitment Letter or the DIP Credit Agreement, other than those that are expressly stated in the applicable sections of the DIP Credit Agreement relevant to the availability or the initial funding of the DIP Facility on the DIP Closing Date.

7.    Indemnification.

You agree to indemnify and hold harmless each Backstop Commitment Party and the Administrative Agent, their respective affiliates and their and their affiliates' officers, directors, employees, agents, attorneys, accountants, advisors (including investment managers and advisers), consultants, representatives, controlling persons, members and permitted successors and assigns (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("Losses") to which any such Indemnified Person may become subject arising out of or in connection with this Backstop Commitment Letter or any claim, litigation, investigation or proceeding relating to any of the foregoing; *provided* that the foregoing indemnity will not, as to any Indemnified

Person, apply to Losses to the extent (a) they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (i) gross negligence, bad faith, fraud or willful misconduct or (ii) material breach of its obligations under this Backstop Commitment Letter, or (b) they relate to a dispute solely among Indemnified Persons and not arising out of any act or omission of the Debtors or any of their respective subsidiaries (other than any claim, litigation, investigation or proceeding against the Administrative Agent in its capacity or in fulfilling its role as such).

None of you, the other Debtors, any of your or their respective subsidiaries, we nor any other Indemnified Person will be responsible or liable to one another for any indirect, special, punitive or consequential damages which may be alleged as a result of or arising out of, or in any way related to, the DIP Facility, the Exit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility or the Exit Facility, or any ancillary documents and security arrangements in connection therewith; provided that your indemnity and reimbursement obligations under this Section 7 shall not be limited by this sentence.

8.   Assignments, Amendments.

This Backstop Commitment Letter shall not be assignable by you or us without the prior written consent of the other parties hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto, the Indemnified Persons and with respect to Section 2, Section 7 and this Section 8, the Administrative Agent, and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto, the Indemnified Persons and with respect to Section 2 and Section 7 and this Section 8, the Administrative Agent. Notwithstanding anything set forth in Section 1, Section 2 or this Section 8 to the contrary, each Backstop Commitment Party (a) shall assign all or a portion of its Backstop Commitment solely in connection with the Allocation pursuant to Section 2 above (subject to the terms and conditions set forth therein) and (b) may assign its respective Backstop Commitment, in whole or in part, to any Related Fund of any Backstop Commitment Party, or to any other Backstop Commitment Party, and in the case of each of (a) and (b), (i) to the extent such transferee is not already a party hereto, upon the execution by such transferee of a Joinder and (ii) provided that, with respect to any assignment of Tranche B Loans, such assignment assigns the right to receive new common shares of Reorganized Parent proportionally to such underlying Tranche B Loans being assigned. This Backstop Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Backstop Commitment Parties and you.

This Backstop Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Backstop Commitment Letter by facsimile or other electronic transmission (including E-Signature) shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Backstop Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Backstop Commitment Letter. You acknowledge that information and documents relating to the DIP Facility and/or Exit Facility may be transmitted through the internet, e-mail or similar electronic transmission systems and that neither any Backstop Commitment Party nor any Agent, nor any of their respective affiliates, shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

This Backstop Commitment Letter supersedes all prior understandings, whether written or oral, between us with respect to the DIP Facility and the Exit Facility.

9.      Governing Law, Etc.; Jurisdiction.

THIS BACKSTOP COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS BACKSTOP COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF THE DOMESTIC SUBSTANTIVE LAWS OF ANY OTHER STATE), EXCEPT TO THE EXTENT NEW YORK LAW IS SUPERSEDED BY THE BANKRUPTCY CODE.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the non-exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof and the Bankruptcy Court, in any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, or, to the extent applicable, the Bankruptcy Court; *provided* that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility in any New York State court, in any such Federal court or in Bankruptcy Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

10.     Waiver of Jury Trial.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS BACKSTOP COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

11.     Confidentiality.

This Backstop Commitment Letter is delivered to the Debtors on the understanding that neither this Backstop Commitment Letter nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person or entity except (a) you and your officers, directors, employees, legal counsel, accountants, auditors, financial advisors, existing and prospective holders of indebtedness and their respective affiliates, representatives, officers, directors and legal counsel (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (c) the office of the U.S. Trustee, any *ad-hoc* or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis, (d) to the Bankruptcy Court, in a redacted manner in form and substance reasonably satisfactory to the Backstop Commitment Parties, to the extent required to obtain Bankruptcy Court approval in connection with any acts or obligations to be taken pursuant to this Backstop

7

Commitment Letter or the transactions contemplated hereby and (e) you may disclose the aggregate fee amounts contained herein, as part of pro forma information or a generic disclosure of aggregate sources and uses related to fee amounts related to the Transactions to the extent customary or required in offering or marketing materials or in any public or regulatory filing relating to the Transactions.

Each Backstop Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the transactions contemplated hereby or obtained from or on behalf of you or your respective affiliates in the course of the transactions contemplated hereby, except that the Backstop Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants, auditors and advisors involved in the transactions contemplated hereby on a "need to know" basis and who are made aware of and agree to comply with the provisions of this paragraph, in each case on a confidential basis (with the Backstop Commitment Party responsible for such persons' compliance with this paragraph), (b) on a confidential basis to any bona fide prospective Lender, prospective participant or swap counterparty (in accordance with the terms of the DIP Credit Agreement) that agrees to keep such information confidential in accordance with (x) the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for your benefit or (y) other customary confidentiality language in a "click-through" arrangement, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (d) to the extent such information: (i) becomes publicly available other than as a result of a breach of this Backstop Commitment Letter or other confidentiality obligation owed by such Backstop Commitment Party to you or your affiliates or (ii) becomes available to the Backstop Commitment Parties on a non-confidential basis from a source other than you or on your behalf that, to such Backstop Commitment Party's knowledge, is not in violation of any confidentiality obligation owed to you or your affiliates, (e) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (f) as is necessary in protecting and enforcing the Backstop Commitment Parties' rights with respect to this Backstop Commitment Letter and/or the DIP Facility, (g) to the extent independently developed by such Backstop Commitment Party or its affiliates without reliance on confidential information, (h) with respect to the existence and contents of the DIP Credit Agreement, in consultation with you, to the rating agencies or (i) with respect to the existence and contents of this Backstop Commitment Letter and the DIP Facility, to market data collectors or similar service providers in connection with the arrangement, administration or management of the DIP Facility and to industry trade organizations where such information with respect to the DIP Facility is customarily included in league table measurements. The Backstop Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provision in the DIP Credit Agreement upon the effectiveness thereof and, in any event, will terminate one year from the date hereof.

12.     Miscellaneous.

The Backstop Commitment Parties hereby notify the Debtors that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it and its affiliates are required to obtain, verify and record information that identifies Matrix Parent and each other Debtor, which information includes names, addresses, tax identification numbers and other information that will allow the Backstop Commitment Parties and their respective affiliates to identify Matrix Parent and each other Debtor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Backstop Commitment Parties and their respective affiliates.

Absent a change in applicable tax law or a contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), each of the parties hereto agrees (i) the Backstop Commitment Premium and the Termination Premium shall be treated as premiums paid by the Debtors to the relevant Backstop Commitment Party in exchange for the issuance of a put right to Matrix Parent with respect to the DIP Facility and (ii) to not take any tax position inconsistent with the tax treatment described in clause (i).

Each of the parties hereto agrees that this Backstop Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including an agreement to negotiate in good faith the definitive documentation for the DIP Facility and the Exit Facility by the parties hereto in a manner consistent with this Backstop Commitment Letter, it being acknowledged and agreed that the availability of the DIP Facility and Exit Facility is subject to the conditions precedent expressly set forth in Section 6 hereof.

If the foregoing correctly sets forth our agreement, please indicate the Debtors' acceptance of the terms of this Backstop Commitment Letter by returning to the Backstop Commitment Parties executed counterparts of this Backstop Commitment Letter not later than 11:59 p.m., New York City time, on July 23, 2024.  This offer will automatically expire at such time if the Backstop Commitment Parties have not received such executed counterparts in accordance with the preceding sentence.   This Backstop Commitment Letter and the Backstop Commitments and agreements hereunder shall automatically terminate on the earlier of (i) July 31, 2024, unless the Petition Date has occurred by such date or (ii) after the Termination Date (as defined in the Restructuring Support Agreement) or the Restructuring Support Agreement otherwise ceases to be in full force and effect, in each case unless extended (by not more than 30 calendar days) by agreement of you and the Majority Backstop Commitment Parties (which agreement may be evidenced by email of counsel).  Notwithstanding the immediately preceding sentence, Section 4 above, as well as the indemnification, confidentiality, Allocation, information, jurisdiction, governing law and waiver of jury trial provisions contained herein shall remain in full force and effect in accordance with their terms notwithstanding the termination of this Backstop Commitment Letter or the Backstop Commitment Parties' Backstop Commitments hereunder. Your obligations under this Commitment Letter, other than those pursuant to Section 4 and with respect to the Allocation and confidentiality, shall automatically terminate and be superseded by the applicable provisions in the DIP Credit Agreement and the Exit Facility Credit Agreement, in each case, to the extent covered thereby, upon the initial funding on the DIP Closing Date or the occurrence of the Exit Conversion, and you shall be released from all liability in connection therewith at such time.

[Signature Pages follow.]

9

The Backstop Commitment Parties are pleased to have been given the opportunity to assist Matrix Parent and the other Debtors in connection with the DIP Facility.

*Signature page to Backstop Commitment Letter*

Accepted and agreed to as of  <u>July 23</u>, 2024:

**MATRIX INTERMEDIATE INC.**
**MATRIX HOLDCO, LLC,**
**MATRIX PARENT, INC.**
**WE DO TECHNOLOGIES AMERICAS, INC.**
**MOBILE ACQUISITION CORP.**
**MOBILEUM, INC.**
**UNWIREDSOFT, INC.**
**PHASE 3 INNOVATIONS HOLDINGS, INC.**
**SIGOS LLC**
**DEVELOPING SOLUTIONS INC.**
**CONVENE NETWORKS LLC**


By: _____
Name: Ripu Singh
Title:  Chief Operating Officer and Chief Financial
Officer

*Signature page to Backstop Commitment Letter*

**Schedule 1**

<u>Backstop Commitment</u>

INTENTIONALLY OMITTED

**Exhibit A**

<u>DIP Term Sheet</u>

WEIL:\99860887\1\63808.0003

INTENTIONALLY OMITTED

**Exhibit B**

<u>Exit Term Sheet</u>

WEIL:\99860887\1\63808.0003

INTENTIONALLY OMITTED

## Exhibit 4

**Governance Term Sheet**

**Proposed Governance Terms for Reorganized Parent**

This term sheet ("***Term Sheet***") presents certain material terms relating to the corporate governance of Reorganized Parent (the "***Company***"), in connection with the restructuring (the "***Restructuring***") of the debt obligations and equity of the Company and its subsidiaries. Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Joint Chapter 11 Plan of Mobileum, Inc. and its Affiliated Debtors (the "***Plan***").

THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND OTHER APPLICABLE LAW.

| | |
|---|---|
| **Corporate Form:** | Commercially reasonable efforts will be used to cause the Company to be a Delaware limited liability company (taking into account, among other things, the tax consequences of doing so). The reorganized Company shall not initially be a reporting company under the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"). The Company shall be taxed as a corporation. |
| **Capital Structure:** | The capital structure of the Company shall initially consist of one class of common units.  The capital structure shall also reflect the warrant interests contemplated by the Plan. |
| **Board of Directors:** | <u>Number of Directors</u>: The Board of Directors of the Company (the "***Board***") will consist of five directors (each, a "***Director***") as follows: <ul><li>The Chief Executive Officer of the Company (the "***CEO Director***");</li><li>One (1) Director appointed by [KKR] who is not an employee of [KKR] (the "[***KKR] Director***"), for so long as [KKR] owns either (i) at least [7.5]% of the Company's outstanding equity interests or (ii) at least [75]% of the Company's outstanding equity interests that [KKR] held as of the Effective Date;</li><li>One (1) Director appointed by [Brigade] who is not an employee of [Brigade] (the "[***Brigade] Director***"), for so long as [Brigade] owns either (i) at least [7.5]% of the Company's outstanding equity interests or (ii) at least [75]% of the Company's outstanding equity interests that [Brigade] held as of the Effective Date;</li><li>One (1) Director appointed by [Ares][1] who is not an employee of [Ares] (the "[***Ares] Director***" and together with the [KKR] Director and [Brigade] Director, the "***Designated Directors***"), for so long as [Ares] owns either (i) at least [7.5]% of the Company's outstanding equity interests or (ii) at least [75]% of the Company's outstanding equity interests that [Ares] held as of the</li></ul> |

---

[1]   **Note to Draft**: With respect to director appointment rights, "Ares" refers to the funds, investment vehicles, and accounts managed or advised by Ares Management LLC or its affiliates, other than Ivy Hill Asset Management, L.P., which hold [common / outstanding equity interests] in the Company.

1

Effective Date;

- One (1) Director appointed by the holders with director appointment rights (i.e., each of [KKR], [Brigade] and [Ares] for so long as each own either (i) at least [7.5]% of the Company's outstanding equity interests or (ii) at least [75]% of the Company's outstanding equity interests that such holder held as of the Effective Date) (the "***Jointly Appointed Director***"), which Director shall initially be [Tripp Lane].

The Designated Directors shall be appointed in consultation with (a) the Ad Hoc Group of First Lien Lenders and (b) the Company.

Directors not subject to the rights of designation set forth above (including because of the loss of appointment rights) (each, a "***Non-Designated Director***"), if any, shall be appointed by the holders of a majority of the Company's outstanding equity interests present at a meeting at which a quorum is present (<u>provided</u>, that any Initial Additional Director shall initially be appointed by the Board as set forth below).

<u>Increasing Board Size</u>.  The Board may, by an affirmative vote of the majority of the Board increase the number of Directors from five (5) to up to seven (7) Directors. Any newly created director seats shall initially be filled by the Board (the "***Initial Additional Directors***"), and such Director shall thereafter be a Non-Designated Director.

<u>Director Removal/Replacement; Vacancies</u>: Designated Directors may only be removed by, and any vacancy created by the resignation, death, removal or otherwise of such Designated Director may only be filled by, the holder with the right to appoint such Designated Director. The Jointly Appointed Director may only be removed by, and any vacancy created by the resignation, death, removal or otherwise of such Jointly Designated Director may only be filled by, unanimous agreement of the holders with the right to appoint such Jointly Designated Director at the time of such removal or replacement.  The CEO Director shall be automatically removed once such person is no longer CEO.  A Non-Designated Director may only be removed by, and vacancy created by the resignation, death, removal or otherwise of a Non-Designated Director may only be filled by, the affirmative vote of the holders of at least a majority of the outstanding equity of the Company.

<u>Quorum</u>: Majority.

<u>Board Voting</u>: Majority of those present at a meeting or by unanimous written consent.

<u>Chairman/Lead Director</u>: The Chairman / non-executive lead director will be selected by the Board.

<u>Board Fees/Expenses</u>:  Each Director who is not an employee of the Company or of any equity holder, and is independent from the Company and any holder that has a right to designate any director, in each case, [as determined by the NYSE standard for director independence,][3] shall be

---

[3] **Note to Draft**: Under further review.

| | |
|---|---|
| | entitled to reasonable fees and expenses for participating on the Board and, if approved by the Board, any committee of the Board. All other Directors shall be entitled to reimbursement for all reasonable expenses incurred in connection with any Board or committee meeting. |
| | <u>Fiduciary Duties</u>: To the maximum extent permitted by law, there will be a waiver of fiduciary duties for the Directors. The officers of the Company will be subject to the same fiduciary duties as under a Delaware corporation. |
| | <u>Observer Rights</u>: |
| | • Each of [Ares], [KKR] and [Brigade] will have the right to designate two (2) non-voting observer to the Board. |
| | • The Ad Hoc Crossover Group, acting collectively, will have the right to designate one (1) non-voting observer to the Board. |
| **Transfer/Resale Restrictions:** | The new common equity issued by the Company under the Plan will be exempt from registration under the U.S. Securities Act of 1933, as amended (the "***Securities Act***"), pursuant to, and to the fullest extent under, section 1145 of the Bankruptcy Code. |
| | Generally, no restrictions on transfer on the common equity (other than (i) as required by securities laws, including to the extent such transfer would subject the Company to any SEC reporting obligations, (ii) limits on transfers to competitors, (iii) to the extent necessary or appropriate to preserve favorable tax attributes of the Company and (iv) execution of a joinder to the [LLC Agreement]). |
| **Tag-Along Rights:** | All holders of the outstanding equity of the Company will have customary tag-along rights with respect to any transfer by one or more Company equity holders of 30% or more of the outstanding equity of the Company (each, a "***Primary Seller***") in any transaction or series of related transactions (a "***Tag-Along Sale***"), and will have the right to transfer their respective pro rata portion of the common equity at the same price and on the same terms as the Primary Seller. No equity holder exercising its tag-along rights (each, a "***Tag-Along Seller***") shall be required to agree to any restrictive covenants, other than customary confidentiality covenants. |
| | Each Tag-Along Seller shall only be obligated to make or provide (i) customary representations and warranties regarding their legal status and authority, and their ownership of the common equity being transferred and (ii) the same covenants, indemnities and agreements as the Primary Seller makes or provides in connection with a Tag-Along Sale (except that in the case of covenants, indemnities and agreements pertaining specifically to the Primary Seller or their units ("***Individual Reps and Covenants***"), the Tag-Along Seller shall make the comparable covenants, indemnities and agreements pertaining specifically only to itself and its units) <u>provided</u>, that all representations, warranties, covenants and indemnities shall be made by each Primary Seller and each Tag-Along Seller severally and not jointly and any indemnification obligation in respect of breaches of representations and warranties shall be pro rata based on the consideration received by each Primary Seller and each Tag-Along Seller, in each case, in an amount not to exceed the aggregate proceeds actually received by each such Primary |

3

| | |
|---|---|
| | Seller and Tag-Along Seller in connection with any Tag-Along Sale, except that any indemnities or other liabilities in respect of the Individual Reps and Covenants of a Primary Seller or Tag-Along Seller shall be borne solely by such Primary Seller or Tag-Along Seller. |
| **Drag-Along Rights:** | If (a) holders of outstanding equity of the Company propose to sell common equity representing more than 50% of the total outstanding equity of the Company (the "***Dragging Holders***"), in any transaction or series of related transactions, to any purchaser other than to an affiliate of the Dragging Holders, or (b) the Dragging Holders propose to consummate any transaction involving the sale, transfer, lease or other disposition of all or substantially all of the Company's assets or properties or any merger, recapitalization, consolidation or restructuring or any other transaction that would result in a change of control of the Company to any purchaser other than an affiliate of the Dragging Holders, in each case, then each other holder, at the election of the Dragging Holders will be required (on customary terms and conditions) to include the pro rata portion of their common equity in such sale and/or vote their common equity and take any other actions in furtherance thereof on the same terms and conditions applicable to the Dragging Holders (and shall waive all appraisal and related rights related to such sale/transaction). No equity holder that is not a Dragging Holder shall be required to agree to any restrictive covenants, other than customary confidentiality covenants. |
| | The same provisions with respect to the representations, warranties, covenants, indemnities and agreements covered in "Tag-Along Rights" above shall also apply to drag-along rights. |
| **Preemptive Rights:** | Prior to a qualified IPO, any holder (aggregated with all of its affiliates and related funds) of more than two percent (2%) of the outstanding equity of the Company will have customary preemptive rights on all issuances by the Company and its subsidiaries of (i) equity securities, (ii) convertible debt securities and (iii) other securities issued in any private placement or which carry with them a right to receive Company equity securities (subject in each case to customary exceptions to be mutually agreed) (such preemptive rights, collectively, the "***Preemptive Rights***"). Each holder with Preemptive Rights may assign its Preemptive Rights to its affiliates. |
| | With respect to the foregoing ownership threshold required to receive Preemptive Rights, the [LLC Agreement] will provide that an equity holder cannot lose its Preemptive Rights via dilution due to subsequent issuances of common equity and instead will provide that a holder can only lose its Preemptive Rights if it sells an amount of common equity to a third party that would cause it to fail to meet the two percent (2%) ownership threshold following such sale. |
| **Amendments:** | Any amendments to the [LLC Agreement] that by their terms are disproportionally and materially adverse to a particular equity holder, or a particular group of holders, as compared to all other holders will require the prior written consent of such holder or a majority of such affected holders. |
| | Any amendments to any provision related to transfer restrictions, tag-along rights, drag-along rights, preemptive rights, information rights, affiliate transactions or the amendment provision (other than *de minimis* changes |

| | |
|---|---|
| | that affect all holders proportionately), or any waiver of any material provision related to any of the foregoing, shall require the affirmative consent of the holders of at least two-thirds of the outstanding equity of the Company; <u>provided</u>, that any such amendment that adversely affect the Ad Hoc Crossover Group, excluding, in each case, for amendments or waivers regarding administrative or ministerial matters applicable to all holders that have no economic impact on holders that are not material to their interests, shall require the affirmative consent of each Ad Hoc Crossover Group member (so long as such member continues to hold equity interests of the Company).<br><br>Any amendment to the Ad Hoc Crossover Group's collective right to appoint a non-voting observer to the Board shall require the affirmative consent of each Ad Hoc Crossover Group holder (so long as such member continues to hold equity interests of the Company). |
| **Information Rights:** | All holders will be subject to customary confidentiality restrictions. The Company will provide (i) each holder with annual audited and quarterly unaudited financial reports and (ii) with respect to (x) any holder (aggregated with all of its affiliates and related funds) that was a member of the Ad Hoc Group of First Lien Lenders or the Ad Hoc Crossover Group of more than one percent (1%) of the outstanding equity of the Company for so long as such holder holds more than one percent (1%) of the outstanding equity of the Company or (y) any other holder (aggregated with all of its affiliates and related funds) of more than five percent (5%) of the outstanding equity of the Company, access to quarterly earning calls (which may be combined with the quarterly earnings call under the loan documents), each within customary time periods following the end of the relevant reporting period or event, as applicable. |
| **Affiliate Transactions:** | All transactions with affiliates of the Company (including portfolio companies of equity holders) will require approval of a majority of the disinterested Directors (subject to customary exceptions). |
| **Termination:** | Upon the occurrence of a qualified IPO or listing on the NYSE or NASDAQ, the foregoing provisions of the operating agreement shall automatically terminate. |
| **Registration Rights:** | Following a qualified IPO, the equity holders will have customary demand and piggyback registration rights. |
| **Corporate Opportunities:** | The equity holders will be under no obligation to present corporate opportunities to the Company. |
| **Non-Impairment:** | Nothing in the new organizational documents would reasonably be expected to be materially adverse to the lenders under the loan documents in their capacity as such. |
| **Publicity:** | Except as required by law or as otherwise agreed to between the Company and a holder, the Company shall not use the name of a holder or any of its affiliates in any press release or other public statement without such holder's prior written consent. |

5

**<u>Exhibit 5</u>**

**Litigation Proceeds Term Sheet**

**H.I.G. Restructuring Proposal**

| | |
|---|---|
| *Litigation Proceeds* | H.I.G. and its current counsel shall continue to prosecute *Matrix Parent, Inc. v. Audax Management Co.*, Case No. N23C-10-212 MAA CCLD (Del. Super. 2023) and any appeals therefrom (collectively, the "**Audax Litigation**") on behalf of itself and Matrix Parent, Inc. Proceeds of (i) the Audax Litigation and any other proceeds of claims transferred to the Litigation Trust in accordance with this Term Sheet (the "**Audax Proceeds**") and (ii) the RWI Policy ("**RWI Policy Proceeds**" and together with Audax Proceeds, the "**Proceeds**") shall be shared among H.I.G. and Matrix Parent, Inc. (together with any successor, assignee, transferee or restructured entity holding interest in the claims or Litigation Trust described herein or the Proceeds, the "Company") in accordance with the following waterfall:<br><br>• **First**: To repay in full on a pro rata basis:<br><br>   ○ (i) all of H.I.G.'s litigation costs and expenses in connection with (a) pursuing recoveries from the Audax Proceeds based on affirmative claims of the plaintiffs in the Audax Litigation; *provided* that proceeds from only the RWI Policy recovered to pay for expenses pursuant to this clause (a) shall not exceed $8 million; (b) pursuing recoveries under the RWI Policy, including all costs and expenses of Hunton Andrews Kurth LLP as insurance counsel and recovery for any deductible under the RWI Insurance paid for or payable by H.I.G.; and (c) defending the Chancery Suit, including all legal fees and expenses related thereto to the extent not otherwise previously indemnified by the Company or else reimbursed under the Policies;<br><br>   ○ (ii) all of the Company's litigation costs and expenses in connection with (a) pursuing recoveries from the Audax Proceeds based on affirmative claims of the plaintiffs in the Audax Litigation; and (b) defending the Chancery Suit, including all legal fees and expenses related thereto to the extent not otherwise reimbursed under the Policies<br><br>   ○ (iii) any fees and expenses of Milbank LLP incurred in connection with H.I.G.'s prosecution of the Audax Litigation following consummation of the Restructuring (as defined below) as counsel to the former 1L Ad Hoc Group (as defined below).<br><br>• **Second**: Allocated amongst H.I.G. and the Company at a ratio of 50% in favor of H.I.G. and 50% in favor of the Company until the Company has recovered $200 million of the Proceeds, net of any tax obligations arising in connection with any such Proceeds, including any tax obligations of or payable by the |

|  | Company; *provided*, *that*, to the maximum extent permitted by applicable Law, the receipt of Proceeds shall be reported for U.S. federal and state tax purposes as a non-taxable adjustment to purchase price.<br><br>• **Third**: Additional proceeds shall be payable solely to H.I.G. until H.I.G. has recovered an additional $65 million, net of any tax obligations, in excess of its recoveries in the first and second clauses herein.<br><br>• **Fourth**: All remaining proceeds to be allocated amongst H.I.G. and the Company at a ratio of 50% in favor of H.I.G. and 50% in favor of the Company.<br><br>H.I.G. shall pay all go-forward costs of the Audax Litigation. |
|---|---|
| *Releases* | Customary mutual releases and exculpations to be (i) executed by the Company, the lenders party to any restructuring support agreement documenting the terms herein, and H.I.G., in the event of an out-of-court Restructuring or (ii) included in the Company's chapter 11 plan of reorganization in the event of an in-court Restructuring, in each case acceptable to the 1L Ad Hoc Group. |
| *H.I.G. Support and Vote* | H.I.G. agrees to cooperate in the restructuring of the Company (a "**Restructuring**") including cooperating in connection with any operational transition and supporting and voting to accept an in-court or out-of-court Restructuring. |
| *Information Sharing* | Subject to its confidentiality obligations, the Company will agree to share with H.I.G. copies of all restructuring proposals and counterproposals that the Company receives from, or delivers to, its existing lenders or other third parties.   H.I.G. agrees to share documents, factual material, mental impressions, strategies, legal theories, memoranda, interview reports and other information, including privileged or protected materials from other professionals or third parties (including experts) relating in any way to the Audax Litigation. |
| *Restructuring Costs* | The Company shall pay all reasonable and documented fees and out of pocket expenses of H.I.G.'s outside restructuring counsel, Simpson Thacher & Bartlett LLP, in connection with the negotiation, documentation, and implementation of a Restructuring upon the consummation of the Restructuring, in an amount not to exceed $750,000. |
| *Representations and Warranties Insurance* | Proceeds recovered under the representations and warranties policy no. ET111-003-478 issued to Matrix Parent, Inc. with a policy term of March 1, 2022 to March 1, 2025 (the "**RWI Policy**") shall be shared |

2

| | between H.I.G. and the Company in accordance with the waterfall set forth in the "Litigation Proceeds" section. |
|---|---|
| *Matrix Topco, LP Directors and Officers Insurance* | H.I.G. will continue to submit defense costs incurred by or on behalf of H.I.G. Mobile, LP, Matrix Topco, LP, Matrix Topco GP, LLC; H.I.G. Technology Partners, LLC; Nishant Nayyar; Alexander Thorn and Gavin Patterson (collectively the "**Matrix Defendants**") to Federal Insurance Company and Zurich American Insurance Company in connection with the defense of the suit captioned *AG Mobile Holdings, L.P. v. H.I.G. Mobile, LP, Matrix Topco, LP, Matrix Topco GP, LLC; H.I.G. Technology Partners, LLC; Nishant Nayyar; Alexander Thorn and Gavin Patterson*, in the Court of Chancery of the State of Delaware C.A. no. 2023-1103 (the "**Chancery Suit**").<br><br>H.I.G., the Matrix Defendants, and any parties paying on behalf of the Matrix Defendants, including H.I.G. Europe Middle Market Holdings, L.P., H.I.G. Matrix Co-Investors, L.P., H.I.G. Middle Market LBO Fund III, L.P., H.I.G. Technology Partners A, L.P., H.I.G. Technology Partners B, L.P., Co-Investment Tech, Co-Investment MM III, and Co-Investment EE MM, shall retain all existing rights to coverage, including policy proceeds, under the Federal Insurance Company Directors and Officers policy number 8262-8664, or under the excess Directors and Officers policy number MLP 7916992-1 issued by Zurich American Insurance Company (the "**Policies**"), both issued for the terms of March 1, 2023 to March 1, 2024, and extended for an additional twelve months through March 1, 2025.<br><br>Any costs or expenses of the Matrix Defendants or any other officers or directors of the Company, whether in respect of the Chancery Suit or otherwise, shall be fully indemnified by the Company to the extent those costs and expenses are covered by and will be reimbursed in full under the Policies, or else each of the Matrix Defendants and such other officers and directors of the Company covered by the Policies, may seek reimbursement for such costs and expenses directly under the Policies, in each case including upon the effectiveness of any Restructuring. |
| *Litigation Trust & Governance* | H.I.G., the Company, and the 1L Ad Hoc Group will establish a Litigation Trust, on terms consistent with this term sheet and otherwise acceptable to H.I.G., the Company, and the 1L Ad Hoc Group, and each of H.I.G., the Company, the members of the 1L Ad Hoc Group, and any Consenting Creditor (as defined in the RSA) will contribute their respective claims that relate to or arise from the facts underlying the allegations in the Audax Litigation to the Litigation Trust. All Proceeds recovered by the Litigation Trust shall be shared in accordance with the allocation of proceeds waterfall set forth in the "Litigation Proceeds" section herein. |

WEIL:\99858424\1\63808.0003

H.I.G. and its current counsel shall continue to prosecute the Audax Litigation on behalf of the Litigation Trust, including the right to propose, respond to, accept or reject settlement offers, subject to the below. The ad hoc group of lenders represented by Milbank LLP (the **"1L Ad Hoc Group"**), as applicable, and the Company (and with the 1L Ad Hoc Group, the "**Consent Parties**") shall have the following consent rights over settlements of the Audax Litigation:

1. H.I.G. shall not accept nor offer a settlement proposal below $50 million without the Consent Parties' consent; and
2. H.I.G. shall not reject a settlement proposal above $150 million without the Consent Parties' consent.

The Consent Parties must each respond in writing (which may be by e-mail) to H.I.G.'s request for consent within 7 days following receipt of a consent request. The Consent Parties' failure to respond within 7 days shall be treated as consent.

H.I.G. and the Consent Parties shall resolve all disputes related to the Consent Parties' consent rights regarding settlements through a binding, confidential dispute resolution process, to be completed within 30 business days (or such shorter time as may be necessary where there are exigent litigation deadlines), to be determined by an independent arbitrator. The arbitrator will determine whether H.I.G.'s proposed acceptance or rejection of any settlement proposal is reasonable and supported by the viability of the claims and relevant facts and circumstances regarding the Audax Litigation.

WEIL:\99858424\1\63808.0003

**<u>Exhibit B</u>**

**Joinder**

## FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS

This joinder agreement to the Restructuring Support Agreement, dated as of July 23, 2024 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**"), between the Debtors, the Consenting Creditors, and the Consenting Sponsor, each as defined in the Agreement, is executed and delivered by _____ (the "**Joining Party**") as of _____, 2024. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **<u>Annex I</u>** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).

2.  <u>Effectiveness</u>.  Upon (i) delivery of a signature page for this joinder and (ii) written acknowledgement by the Debtors, the Joining Party shall hereafter be deemed to be a "Subsequent Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

3.  <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of Claims set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors, as set forth in <u>Sections 10</u> and <u>25</u> of the Agreement to each other Party to the Agreement.

4.  <u>Governing Law</u>.  This joinder agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Joining Party has caused this joinder to be executed as of the date first written above.

**[JOINING PARTY]**


By:_____
Name:
Title:


| Claims (principal amount) | |
|---|---|
| - First Lien Claims | US$ |
| - Second Lien Claims | US$ |
| - Existing Equity Interests | |
| - Other (please describe) | |


Notice Address:

_____
_____
_____
Fax: _____
Attention: _____
Email: _____


Acknowledged:

**MOBILEUM, INC.**
**(on behalf of the Debtors)**


By:_____
Name:
Title:

## Exhibit C

### Milestones

The Consenting Creditors' support for the Transaction shall be subject to the timely satisfaction of the following milestones (the "**Milestones**"), which may be extended with the prior written consent (email shall suffice, including from respective counsel) of the Debtors and the Requisite Consenting Creditors:

1.    Solicitation.    The Company hereby agrees that, as soon as reasonably practicable, but in no event later than 11:59 p.m. prevailing Central Time on July 23, 2024, the Company shall commence solicitation.

2.    Commencement of the Chapter 11 Cases.  The Debtors hereby agree that they shall commence the Chapter 11 Cases by no later than 11:59 p.m. prevailing Central Time on July 23, 2024.

3.    Filing of the Plan and Disclosure Statement.  The Debtors shall file the Plan, Disclosure Statement, and the motion for approval of the Disclosure Statement and Solicitation Materials by no later than 11:59 p.m. prevailing Central Time on July 23, 2024.

4.    Interim DIP Order.  At or prior to 11:59 p.m. prevailing Central Time on July 25, 2024, t he Bankruptcy Court shall have entered the Interim DIP Order.

5.    Disclosure Statement Approval Order.  At or prior to 11:59 p.m. prevailing Central Time on September 11, 2024, the Bankruptcy Court shall have entered the Disclosure Statement Approval Order.

6.    Final DIP Order.  At or prior to 11:59 p.m. prevailing Central Time on September 11, 2024, the Bankruptcy Court shall have entered the Final DIP Order.

7.    Confirmation Order.  At or prior to 11:59 p.m. prevailing Central Time on September 11, 2024, the Confirmation Order shall have been entered.

8.    Occurrence of the Effective Date.  At or prior to 11:59 p.m. prevailing Central Time on September 26, 2024 (the "**Effective Date Milestone**"), the Effective Date shall have occurred.

**<u>Exhibit C</u>**

**Organizational Structure**



**<u>Exhibit D</u>**

**Liquidation Analysis**

# LIQUIDATION ANALYSIS[1]
## *In re* Mobileum Inc., et. al.

The Debtors, with the assistance of their advisors, including FTI Consulting, Inc. ("FTI"), have prepared a hypothetical liquidation analysis (the "Liquidation Analysis") in connection with the Plan and Disclosure Statement for purposes of evaluating whether the Plan meets the so-called "best interests test" under Section 1129(a)(7) of the Bankruptcy Code. Section 1129(a)(7) of the Bankruptcy Code requires that with respect to each impaired class of claims and equity interests, each such Holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such Holder would receive or retain if the debtors were liquidated under Chapter 7 of the Bankruptcy Code.

A.   Best Interests Test

The "best interests test," when applicable, requires the Court to determine what the Holders of Allowed Claims and Interests in each impaired Class would receive from a hypothetical liquidation of the Debtors' assets and properties in the context of a liquidation under Chapter 7 of the Bankruptcy Code ("Chapter 7"). To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the hypothetical liquidation of the debtor's assets and properties is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that the Plan satisfies the "best interests test," and that the Holders of Allowed Claims in each Impaired Class will receive at least as much under the Plan as they would if the Debtors were liquidated under Chapter 7.

This Liquidation Analysis was prepared for the sole purpose of providing a good-faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with Chapter 7, and it is not intended and should not be used for any other purpose.

B.   Methodology

The first step in determining whether the "best interests test" has been satisfied is to estimate the proceeds that a trustee appointed under Chapter 7 (the "Chapter 7 Trustee") would be likely to generate if the Debtors' estates were liquidated in Chapter 7. The next step in the analysis is to reduce this total hypothetical value by the estimated costs of the Chapter 7 liquidation. These costs include the fees and expenses of the Chapter 7 Trustee, as well as costs incidental to liquidating the Debtors' assets, including such administrative expenses and priority Claims that may exist or may result from the termination of the Debtors' businesses and use of Chapter 7 for the purpose of liquidation. In the third step of the process, the remaining hypothetical value is then reduced by the DIP Claims and any Claims secured by enforceable security interests and liens against the assets of the Debtors' and their estates in a liquidation scenario. Next, any Cash remaining from the hypothetical liquidation is allocated to creditors and shareholders in strict priority in accordance with Section 726 of the Bankruptcy Code. Finally, the Holder's liquidation distribution is compared to the distribution that such Holder is likely to receive if the Plan is confirmed and consummated. If the probable distribution to such Holders in Chapter 7 has a value that is less than the value of the probable distribution under the Plan, the "best interests test" has been satisfied.

C.   Liquidation Analysis

The Liquidation Analysis is based on a number of estimates and assumptions that are inherently

---

[1]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

subject to significant legal, economic, competitive and operational uncertainties and contingencies that are beyond the control of the Debtors or a Chapter 7 Trustee. Further, the actual amounts of Claims against the Debtors' estates could vary materially from the estimates set forth in the Liquidation Analysis, depending on, among other things, the Claims asserted in a Chapter 7 liquidation. Accordingly, no assurances can be made that the values assumed would be realized or the Claims estimates assumed would not change if the Debtors were in fact liquidated, nor can assurances be made that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determination under Section 1129(a) of the Bankruptcy Code.

This Liquidation Analysis has been prepared assuming that the Chapter 11 Cases convert to Chapter 7 on or about August 31, 2024 (the "Liquidation Date"). On the Liquidation Date, the Debtors' operations would be immediately halted with their assets liquidated as quickly as practicably possible. The Debtors assume that the full liquidation will be substantially completed within a four-month period. At the end of that four-month period, the Chapter 7 Trustee would resolve all Claims and other matters involving the Debtors' estates and make additional distributions.

The Liquidation Analysis is based on the Debtors' pro forma unaudited book value estimates as of June 30, 2024, unless otherwise stated (the "Estimated Book Value"). These Estimated Book Values are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date.

The Liquidation Analysis assumes the Debtors would be liquidated in a jointly administered proceeding and that distributions would be made on a consolidated basis. While the Debtors are capable of tracking all intercompany positions, they do not maintain or reconcile all balances in the ordinary course, and doing so would add significant incremental financial burden to the estates. In a Chapter 7 liquidation, with an immediate halting of operations and large reduction in force, the Debtors would not have the appropriate books and records with which to manage a Debtor-by-Debtor wind-down. For these reasons, the liquidation analysis assumes that the wind-down and any distributions would be managed on a consolidated basis.

In connection with the preparation of the Liquidation Analysis, FTI conferred with management and the Debtors' restructuring counsel, and relied on its own professional judgments, from all of which FTI estimated an amount of Claims that will ultimately become Allowed Claims. Such Claims have not been evaluated by the Debtors or Allowed by the Bankruptcy Court and, accordingly, the final amount of Allowed Claims against the Debtors may differ from the Claim amounts used to complete this Liquidation Analysis.

The cessation of business in a liquidation is likely to trigger claims that otherwise would not exist under a Plan absent a liquidation. Included in this Liquidation Analysis are various potential Chapter 11 administration expenses, Claims otherwise satisfied or assumed as part of the Reorganized Debtors' go-forward operations, and various Professional fees. Excluded from the analysis are potential employee Claims (including Worker Adjustment and Retraining Notification Act, "WARN Act" claims and severance claims), rejection and probable breach of Executory Contract Claims, and Claims related to Unexpired Leases and other agreements that have not been rejected as of the date thereof. Defaults under customer and supplier agreements will also likely arise. Such events would create additional significant Claims, some of which may be entitled to priority. Outside of those Claims included in this analysis, no attempt has been made to estimate the additional Claims, including any potential litigation claims, likely to arise in connection with a hypothetical liquidation under Chapter 7.

Solely for the purposes of this Liquidation Analysis, the Debtors have ascribed no value to recoveries or claims that may arise on account of litigation. Although the Debtors are party to certain litigation proceedings, at this time it is uncertain what, if any, recoveries will be available as result of such claims after taking into account, among other things, (i) the costs of funding such litigation, (ii) the prospects of succeeding on the merit, (iii) the Court's determination of damages, if any, and (iv) the ultimate

determination as to apportionment of such liability. Further, pursuant to the Plan, the Debtors have negotiated a settlement with parties, including the Consenting Creditors and Consenting Sponsor regarding the apportionment of costs and proceeds of any successful litigation relating to the Audax Litigation (the "HIG Settlement"). As a result of the HIG Settlement, the Company is entitled to receive repayment of its expenses and a set percentage of proceeds of any litigation recovery. There is no assurance, however, that the Company would retain the benefit of the HIG Settlement in a chapter 7 proceeding. Accordingly, if the Company was to liquidate, the Company's ability to fund the litigation and its entitlement to proceeds, if any, of any litigation, including the Audax Litigation, would be in serious question. Further, even if a value could be ascribed to the litigation claims in the Audax Litigation, any value would be subject to the Company's ability to recover against a defendant, including, but not limited to, such defendant's own solvency or willingness to appeal such a decision. Further, the Debtors have not conducted any analysis as to the value of any additional litigation claims, so any potential recoveries on such claims, if any, would be speculative in nature.[2]

The Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon a Chapter 7 liquidation and any related asset sales. Such tax consequences may be material. In addition, the Liquidation Analysis does not include recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions, which are assumed to have zero value for purposes of the Liquidation Analysis.

D.    Disclaimer

**THE LIQUIDATION ANALYSIS WAS PREPARED SOLELY AS A GOOD-FAITH ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE DEBTORS' ASSETS. THE LIQUIDATION ANALYSIS RELIES ON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT LEGAL, ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE DEBTORS' AND THEIR RESTRUCTURING ADVISORS' CONTROL. ADDITIONALLY, VARIOUS DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE. NEITHER THE CONSENTING FIRST LIEN LENDERS NOR THE CONSENTING SECOND LIEN NOTEHOLDERS SHALL BE DEEMED TO ADOPT ANY OF THE ESTIMATES OR ASSUMPTIONS CONTAINED HEREIN FOR ANY PURPOSE, INCLUDING IN THE EVENT THE PLAN IS NOT CONFIRMED OR THE EFFECTIVE DATE DOES NOT OCCUR.**

**THERE CAN BE NO GUARANTEE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE HYPOTHETICAL LIQUIDATION VALUES OF THE DEBTORS' ASSETS REFLECT THE ACTUAL VALUES THAT WOULD BE REALIZED IF THE DEBTORS WERE TO UNDERGO AN ACTUAL LIQUIDATION, AND SUCH ACTUAL VALUES COULD VARY MATERIALLY FROM THOSE SHOWN HEREIN. NEITHER THE DEBTORS NOR THEIR RESTRUCTURING ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE WOULD OR WOULD NOT APPROXIMATE EITHER THE ASSUMPTIONS ON WHICH THIS LIQUIDATION ANALYSIS IS BASED OR THE RESULTS OF THE LIQUIDATION ANALYSIS REFLECTED HEREIN.**

**THIS ANALYSIS HAS NOT BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS AND HAS NOT BEEN PRODUCED IN ACCORDANCE WITH STANDARDS**

---

[2] No value has been ascribed to the Audax Litigation in terms of value or recoveries. This approach is being taken solely for the purposes of this analysis given the contingent nature of the litigation and is not intended to reflect an expectation that no amount will be received by the Reorganized Debtors with respect to such litigation.

PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.

NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS.   THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE LIQUIDATION ANALYSIS SET FORTH HEREIN.

**Notes to the Liquidation Analysis**

The following notes describe the significant assumptions that were made with respect to assets and wind-down expenses:

**Asset Recovery**

**Note A – Cash**

The cash balance as of August 31, 2024 has been estimated at approximately $61.0 million.  It is assumed that cash and cash equivalents of the Debtors would be 100% collectible and available.  Cash and cash equivalents include all highly liquid investments maturing within three months or less from the date of purchase. Cash held with third parties as security are not deemed recoverable for purposes of this analysis.

**Note B – Accounts Receivable**

The accounts receivable at the Conversion Date are based on the amounts assumed in the Debtors' cash flow forecast. Most of the Debtors receivables are with CSPs, which have reliable payment histories and while accounts receivables are typically more difficult to collect when an entity is liquidating, the Debtors have assumed that the collections will range from 60% on the low-end to 75% on the high-end. This range of recovery reflects the Debtors' historical receivables aging.

The Liquidation Analysis assumes the Debtors will have $54.1 million of receivables on a net book value basis at the Conversion Date, which will result in $32.5 to $40.6 million in collections.

**Note C – Deferred Cost of Revenue**

The Debtors capitalize costs incurred to fulfill its contracts that: (1) relate directly to the arrangement, (2) are expected to generate resources that will be used to satisfy the Debtor's performance obligation under the arrangement and (3) are expected to be recovered through revenue generated under the arrangement. Contract fulfillment costs are expensed as the Debtor transfers the related services to the customer. The amounts capitalized primarily consist of third-party hardware and software costs incurred in advance of revenue recognition. As of June 30, 2024 approx. $3.1 million of deferred cost of revenue amounts are outstanding on the consolidated balance sheet. Given the nature of this asset, we estimate that there are no recoveries on this balance.

**Note D – Inventory**

As of the conversion date, the Debtors believe they do not hold any inventory within the estate itself. Inventory, as classified by the Debtors, consists of various hardware and accessory components relating to Non-Debtor business unit operations. Therefore, the Debtors anticipate no recovery from Inventory.

**Note E – Prepaid Expenses and Other Current Assets**

The encumbered Prepaid Expenses and Other Current Assets covers the Debtors' Prepaid Expenses, Insurance, Commission, & Taxes, as well as Withholding Tax Receivable and Other Current Assets. The Debtors estimate a recovery of 6.3% to 10.4% of the Estimated Book Value would be achieved in the liquidation of these assets for total proceeds of $0.7 million to $1.2 million.

**Note F – Property, Plant and Equipment**

Assets in this category represent the computer equipment & software, buildings, and office furniture & fixtures. Property, Plant, and Equipment are stated at cost, less accumulated depreciation on a straight-line basis over their useful life of 3 to 20 years. The Debtors would seek to sell these properties immediately as of the Liquidation Date in order to generate cash for the balance of the liquidation. Due to the distressed nature of these sales and the accelerated timeline of the sale process, the Debtors estimate significant impairment of recovery proceeds resulting in $0.7 million to $1.4 million reflecting discounts to the appraisal value of 10% to 20%.

**Note G – Right of Use Assets**

The Debtors use accounting standard ASC 842 to reflect their right to use leased assets over the full life of the lease. While the Debtors track Right of Use Assets and reflect these amounts on their balance sheet, these intangible assets are not projected to have any value in a hypothetical liquidation. Therefore, the Debtors estimate no recovery from Right of Use Assets.

**Note H – Deferred Tax Assets**

The Debtors reflect income taxes recoverable in future periods as Deferred Tax Assets on their balance sheet. These intangible assets mainly consist of carryforward amounts of net operating losses and tax credits, capitalized software development costs, and 163(j) interest carryforward amounts. While the Debtors track Deferred Tax Assets and reflect these amounts on their balance sheet, these intangible assets are not projected to have any value in a hypothetical liquidation. Therefore, the Debtors estimate no recovery from Right of Use Assets.

**Note I – Goodwill**

The Debtor's Goodwill is calculated through a comparison of the purchase price of Mobileum's acquisitions with the estimated fair values of the acquisition target's net tangible and identifiable intangible assets as of the acquisition date. The excess of the purchase price over these aggregate fair values is recorded as goodwill, which pertains in part to the value of the assembled workforce and customer intangible assets subsumed into goodwill. The Debtors estimate no recoveries for Goodwill.

**Note J – Intangible Assets**

Assets in this category represent the Debtors' trade names & trademarks, customer relationships, and proprietary technology. These assets reflect book value accounting entries that are projected to have limited value in a hypothetical liquidation. The Debtors estimate recoveries of $10.6 million to $26.5 million with an implied recovery of 4.3% - 10.6%.

**Note K – Other Assets & Deposits**

Assets in this category represent security deposits and other vendor-related deposits that the Debtors maintain. In a hypothetical liquidation scenario, it is likely that the Debtors will be able to collect some of

these deposits from the relevant counterparties. Given this, The Debtors estimate recoveries of $2.1 million to $3.3 million with an implied recovery of 50.0% – 80.0%.

## **Chapter 7 Liquidation Adjustments**

### **Note L - Wind-Down Costs**

The Liquidation Analysis assumes a forced wind-down of the Debtors' operations during a four- month period.   The estimated costs associated with the liquidation of the Debtors include operating expenses and other costs associated with liquidation activities including, but not limited to: (i) collection of accounts receivable, (ii) negotiation of the sale of other tangible and intangible assets, and (iii) the resolution of all employee-related issues.   These costs include salaries, certain general and administrative costs, and Professional fees.  If the aforementioned activities or other activities associated with the liquidation of the assets take longer than the assumed liquidation period, actual administrative costs may exceed the estimate included in the Liquidation Analysis.

a) Operational Costs: As previously mentioned, it is assumed that the Debtors will cease operations upon the Liquidation Date and will maintain minimal staff at the corporate level during the liquidation by the Chapter 7 Trustee. This staff included one member each of the tax, human resources, and executive departments, as well numerous members of the accounting staff.

These estimated expenses are based on an analysis of the run rate of the Debtors' actual corporate general and administrative expenses incurred from July 2023 through June 2024.  As compared to normal going-concern operating expense levels, the liquidation analysis assumes expenses at a reduced headcount and level of spending than ordinary course.  These administrative expenses would be required to principally support asset sales, collection of the remaining receivables and administration of claims.

b) Professional Fees: Chapter 7 Professional fees include legal, appraisal, and accounting fees expected to be incurred during the liquidation period that are not already deducted from liquidation values. Professional fees are assumed to average $0.8 million per month through the liquidation period.

### **Note M – Chapter 7 Trustee Fees**

The Debtors assume they would pay commissions equal to 3% of gross liquidation sale proceeds for Chapter 7 Trustee fees.

### **Note N – Administrative Claims**

Chapter 11 Administrative Claims include assumed remaining accounts payable and accruals upon conversion to a Chapter 7 and any accrued and unpaid fees due to retained Chapter 11 Professionals, excluding the United States Trustee fees.  These estimates are based on the Debtors' projected balance sheet, income statement, and DIP budget Professional fee forecast.  These Administrative Claims are assumed to be approximately $17.8 million.

## **Estimated Claim Amounts**

In preparing the Liquidation Analysis, the Debtors have estimated an amount of Allowed Claims for each Class based upon a review of the Debtors' projected balance sheets as of the Liquidation Date, adjusted as

discussed herein.   The Debtors currently expect the amount of Allowed Claims to generally correspond to the amounts set forth on the Debtors' books and records, but there can be no assurances that this convergence will occur.   Subject to the following paragraphs, the estimate of all Allowed Claims in the Liquidation Analysis is based on the par value of those Claims on the Debtors' books and records.

A liquidation also is likely to trigger certain Claims that otherwise would not exist.   Examples of these kinds of Claims include various potential employee Claims (*e.g.*, for such items as potential WARN Act Claims), Claims related to the rejection of Unexpired Leases and Executory Contracts that have not previously been rejected, and other potential Allowed Claims.   These additional Claims could be significant, and some may be entitled to priority in payment over General Unsecured Claims.   Those priority Claims may need to be paid in full from the liquidation proceeds before any balance would be made available to pay Allowed General Unsecured Claims or to make any distribution in respect of Equity Interests.   No adjustment has been made for these potential Claims.

In sum, the actual amount of Allowed Claims could be materially different from the amount of Allowed Claims estimated in the Liquidation Analysis.   The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.   Nothing contained in this Liquidation Analysis is intended to be, or constitutes, a concession, admission, or allowance of any Claim by the Debtors.   The Debtors reserve all rights to supplement, modify, or amend the analysis set forth herein.

## Distributions

### Note O – DIP Facility Claims

DIP Facility Claims include all amounts outstanding (including accrued interest, post-carve out Professional fees, and the Backstop Premium) pursuant to the DIP Facility as of the Conversion Date. The DIP Facility has superpriority liens on the previously unencumbered assets, including foreign subsidiaries. As such, these claims are forecast to receive a 100% recovery based on the forecast value of those proceeds.

### Note P – Secured Claims

The Debtors' Secured Claims include (i) First Lien Claims pursuant to the First Lien Term Loans ($414.7 million), First Lien Revolver Loans ($57.1 million), and Senior Secured Notes ($34.7 million). And (ii) Second Lien Claims pursuant to the Second Lien Term Loans ($183.9 million).  The First Lien Claims are secured by substantially all the Debtors' assets. It is assumed that the First Lien Claims will receive a recovery of 2.1% to 7.2%, excluding any recovery on applicable deficiency claims.

The Debtors have Second Lien Claims that are junior to the First Lien Claims.   As the value of the encumbered proceeds does not fully repay the First Lien Claims, these Claims are not forecasted to receive any recovery.

### Note Q –Unsecured Claims

The Unsecured Claims include Deficiency Claims for the First Lien Claims and Second Lien Claims as well as General Unsecured Claims.

The Deficiency Claims result from a shortfall of Collateral value when applied to the First Lien Claims.  The estimated deficiency claims presented here are based on the unsecured contribution agreement set forth by the lenders.

To estimate the General Unsecured Claims, the Debtors have estimated the total amounts owed to vendors, certain employees, litigants, taxing authorities and other parties as of the Petition Date. Those amounts have been adjusted by forecast payments pursuant to the DIP budget.

The Liquidation Analysis does not attempt to estimate any additional General Unsecured Claims that would arise as a result of the rejection of additional Executory Contracts and Unexpired Leases that would otherwise be assumed under the Plan, the failure of the Debtors to perform under existing contracts, or any additional potential litigation Claims. The amount of such additional Claims would likely be substantial in amount. Additionally, this Liquidation Analysis does not include any estimates for recovery by the Chapter 7 Trustee on account of certain potential avoidance actions and other Causes of Action.

As the value of the encumbered proceeds does not repay the Secured Claims in full, the Allowed Unsecured Claims are not forecast to receive any recovery.

Since the Debtors do not satisfy all Allowed Unsecured Claims in full, it is not believed that any Equity Interests will receive any proceeds in a liquidation. As such, Equity Interests are excluded from this analysis.

**CONCLUSION**

**BASED ON THIS HYPOTHETICAL LIQUIDATION ANALYSIS VERSUS THE IMPLIED REORGANIZATION VALUE AND ANTICIPATED DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN, THE PLAN SATISFIES THE REQUIREMENTS OF 1129(A)(7) OF THE BANKRUPTCY CODE.**

In addition, the Debtors believe that the present value of distributions from the liquidation proceeds, to the extent available, may be further reduced because such distributions in a Chapter 7 may not occur until after the four-month period assumed in the analysis. Moreover, in the event that litigation becomes necessary to resolve claims asserted in the Chapter 7, distributions to creditors could be further delayed, which both decreases the present value of those distributions and increases administrative expenses that could diminish the liquidation proceeds available to prepetition creditors. THE EFFECTS OF THIS DELAY ON THE VALUE OF DISTRIBUTIONS UNDER THE HYPOTHETICAL LIQUIDATION HAVE NOT BEEN CONSIDERED IN THIS LIQUIDATION ANALYSIS.

**Mobileum, Inc.,** *et al* .
Illustrative Ch. 7 Liquidation Analysis
*USD in 000's*

| Consolidated Net Distributable Assets | Notes | Adj. Book Value | Estimated Recovery % Low | Estimated Recovery % High | Estimated Liquidation Value Low | Estimated Liquidation Value High | Estimated Liquidation Value Midpoint |
|---|---|---|---|---|---|---|---|
| **Gross Liquidation Proceeds** | | | | | | | |
| Current Assets: | | | | | | | |
| Cash & Cash Equivalents | A | $ 60,984 | 100.0% | 100.0% | $ 60,984 | $ 60,984 | $ 60,984 |
| Accounts Receivable | B | 54,107 | 60.0% | 75.0% | 32,464 | 40,580 | 36,522 |
| Deferred Cost of Revenue | C | 3,141 | -% | -% | - | - | - |
| Inventory | D | - | -% | -% | - | - | - |
| Prepaid Expenses & Other Current Assets | E | 11,408 | 6.3% | 10.4% | 719 | 1,184 | 951 |
| **Total Current Assets** | | $ 129,640 | | | $ 94,167 | $ 102,748 | $ 98,458 |
| **Long Term Assets** | | | | | | | |
| Property, Plant and Equipment, net | F | 6,753 | 10.0% | 20.0% | 675 | 1,351 | 1,013 |
| Right of Use Asset, net | G | 5,358 | -% | -% | - | - | - |
| Deferred Tax Assets | H | - | -% | -% | - | - | - |
| Goodwill, net | I | 34,265 | -% | -% | - | - | - |
| Intangible Assets | J | 249,343 | 4.3% | 10.6% | 10,600 | 26,500 | 18,550 |
| Other Assets & Deposits | K | 4,134 | 50.0% | 80.0% | 2,067 | 3,307 | 2,687 |
| **Total Long-Term Assets** | | $ 299,853 | | | $ 13,342 | $ 31,158 | $ 22,250 |
| **Total Estimated Gross Proceeds** | | $ 429,493 | | | $ 107,509 | $ 133,906 | $ 120,708 |
| **Chapter 7 Liquidation Costs** | | | | | | | |
| Wind-Down Costs | L | | | | (6,731) | (6,731) | (6,731) |
| Chapter 7 Trustee Fees | M | | 3.0% | 3.0% | (3,225) | (4,017) | (3,621) |
| Administrative Claims | N | | | | (17,844) | (17,844) | (17,844) |
| **Total Chapter 7 Liquidation Costs** | | | | | $ (27,800) | $ (28,592) | $ (28,196) |
| **Net Estimated Liquidation Proceeds after Liquidation Costs** | | | | | $ 79,709 | $ 105,314 | $ 92,512 |

| Creditor Recovery Waterfall / Use of Proceeds Analysis | | Book Value | Estimated Recovery % Low | Estimated Recovery % High | Estimated Recovery Low | Estimated Recovery High | Estimated Recovery Midpoint |
|---|---|---|---|---|---|---|---|
| **DIP Claims Recovery** | | | | | | | |
| DIP Facility Claims | O | 60,000 | 100.0% | 100.0% | 60,000 | 60,000 | 60,000 |
| DIP Facility Backstop Premium | O | 9,000 | 100.0% | 100.0% | 9,000 | 9,000 | 9,000 |
| **Net Remaining Distributable Value** | | | | | $ 10,709 | $ 36,314 | $ 23,512 |
| **Secured Claims Recovery from Remaining Proceeds** | | | | | | | |
| First Lien Secured Claims | P | 506,415 | 2.1% | 7.2% | 10,709 | 36,314 | 23,512 |
| Revolving Credit Facility Secured Claims | | 57,075 | 2.3% | 7.7% | 1,296 | 4,394 | 2,845 |
| First Lien Term Loan Secured Claims | | 414,661 | 2.3% | 7.7% | 9,413 | 31,920 | 20,667 |
| Senior Secured Notes Claims | | 34,679 | -% | -% | - | - | - |
| Second Lien Term Loan Secured Claims | P | 183,851 | -% | -% | - | - | - |
| **Total Secured Claims Recovery** | | $ 690,266 | 1.6% | 5.3% | $ 10,709 | $ 36,314 | $ 23,512 |
| **Net Remaining Distributable Value** | | | | | $ - | $ - | $ - |
| **Unsecured Claims Recovery from Remaining Proceeds** | | | | | | | |
| First Lien Deficiency Claims | Q | 482,904 | -% | -% | - | - | - |
| Second Lien Deficiency Claims | Q | 183,851 | -% | -% | - | - | - |
| General Unsecured Claims | Q | 4,806 | -% | -% | - | - | - |
| **Total Unsecured Claims Recovery** | | $ 671,560 | -% | -% | $ - | $ - | $ - |
| **Claims Recovery by Type** | | Book Value | Low | High | Low | High | Midpoint |
| DIP Facility Claims | | 69,000 | 100.0% | 100.0% | 69,000 | 69,000 | 69,000 |
| First Lien Secured Claims | | 506,415 | 2.1% | 7.2% | 10,709 | 36,314 | 23,512 |
| Second Lien Secured Claims | | 183,851 | -% | -% | - | - | - |
| General Unsecured Claims | | 4,806 | -% | -% | - | - | - |
| **Total Recovery (All Classes)** | | $ 764,072 | 10.4% | 13.8% | $ 79,709 | $ 105,314 | $ 92,512 |

**Mobileum, Inc.,** *et al* **.**
**Illustrative Ch. 7 Liquidation Analysis - Consolidating View: Low Recovery Scenario**
*USD in 000's*

| Figures shown in 000's of USD | Debtor Entities Total | Matrix Intermediate, Inc. | Matrix Holdco, LLC | Matrix Parent, Inc. | Mobile Acquisition Corp. | Mobileum, Inc. | SIGOS, LLC | UnwiredSoft, Inc. | WeDo Technologies Americas, Inc. | Convene Networks, LLC | Developing Solutions, Inc. | Phase 3 Innovations Holdings, Inc. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Low Recovery Scenario** | | | | | | | |
| **Gross Liquidation Proceeds** | | | | | | | | | | | | |
| *Current Assets* | | | | | | | | | | | | |
| Cash & Cash Equivalents | $ 60,984 | $ 69 | $ - | $ 2,141 | $ - | $ 56,903 | $ 902 | $ 24 | $ 587 | $ - | $ 358 | $ - |
| Accounts Receivable | 32,464 | - | - | - | - | 30,835 | - | - | 1,553 | - | 76 | - |
| Deferred Cost of Revenue | - | - | - | - | - | - | - | - | - | - | - | - |
| Inventory | - | - | - | - | - | - | - | - | - | - | - | - |
| Prepaid Expenses & Other Current Assets | 719 | - | - | 69 | - | 512 | 99 | - | 30 | 0 | 8 | - |
| **Total Current Assets** | **94,167** | **69** | **-** | **2,210** | **-** | **88,250** | **1,001** | **24** | **2,171** | **0** | **443** | **-** |
| *Long Term Assets* | | | | | | | | | | | | |
| Property, Plant and Equipment, net | 675 | - | - | - | - | 654 | 10 | - | 3 | 2 | 7 | - |
| Right of Use Asset, net | - | - | - | - | - | - | - | - | - | - | - | - |
| Deferred Tax Assets | - | - | - | - | - | - | - | - | - | - | - | - |
| Goodwill, net | - | - | - | - | - | - | - | - | - | - | - | - |
| Intangible Assets | 10,600 | - | - | - | - | 7,000 | 1,200 | - | 1,400 | - | 1,000 | - |
| Other Assets & Deposits | 2,067 | - | - | 100 | - | 1,949 | - | - | - | - | 18 | - |
| **Total Long Term Assets** | **13,342** | **-** | **-** | **100** | **-** | **9,603** | **1,210** | **-** | **1,403** | **2** | **1,026** | **-** |
| | | | | | | | | | | | | |
| **Total Gross Liquidation Proceeds** | **$ 107,509** | **$ 69** | **$ -** | **$ 2,310** | **$ -** | **$ 97,853** | **$ 2,210** | **$ 24** | **$ 3,573** | **$ 2** | **$ 1,468** | **$ -** |
| | | | | | | | | | | | | |
| Estimated Gross Proceeds | $ 107,509 | $ 69 | $ - | $ 2,310 | $ - | $ 97,853 | $ 2,210 | $ 24 | $ 3,573 | $ 2 | $ 1,468 | $ - |
| (-) Chapter 7 Liquidation Costs | (27,800) | (6) | - | (2,310) | - | (24,119) | (714) | (7) | (494) | (0) | (150) | - |
| **Net Proceeds after Liquidation Costs** | **$ 79,709** | **$ 63** | **$ -** | **$ -** | **$ -** | **$ 73,733** | **$ 1,496** | **$ 17** | **$ 3,079** | **$ 2** | **$ 1,319** | **$ -** |
| | | | | | | | | | | | | |
| **Creditor Recovery Waterfall / Use of Proceeds** | | | | | | | | | | | | |
| DIP Facility and Backstop Premium Claims | 69,000 | - | - | - | - | 63,087 | 1,496 | 17 | 3,079 | 2 | 1,319 | - |
| *Recovery %* | *100.0%* | | | | | | | | | | | |
| First Lien RCF and Term Loan Facility Claims | 10,709 | 63 | - | - | - | 10,646 | - | - | - | - | - | - |
| *Recovery %* | *2.3%* | | | | | | | | | | | |
| Senior Secured Notes Claims | - | - | - | - | - | - | - | - | - | - | - | - |
| *Recovery %* | *0.0%* | | | | | | | | | | | |
| Second Lien Term Loan Secured Claims | - | - | - | - | - | - | - | - | - | - | - | - |
| *Recovery %* | *0.0%* | | | | | | | | | | | |
| General Unsecured Creditors | - | - | - | - | - | - | - | - | - | - | - | - |
| *Recovery %* | *0.0%* | | | | | | | | | | | |

**Mobileum, Inc.,** *et al* .
Illustrative Ch. 7 Liquidation Analysis - Consolidating View: High Recovery Scenario
*USD in 000's*

| Figures shown in 000's of USD | Debtor Entities Total | Matrix Intermediate, Inc. | Matrix Holdco, LLC | Matrix Parent, Inc. | Mobile Acquisition Corp. | Mobileum, Inc. | SIGOS, LLC | UnwiredSoft, Inc. | WeDo Technologies Americas, Inc. | Convene Networks, LLC | Developing Solutions, Inc. | Phase 3 Innovations Holdings, Inc. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | High Recovery Scenario | | | | | | | |
| **Gross Liquidation Proceeds** | | | | | | | | | | | | |
| Current Assets | | | | | | | | | | | | |
| Cash & Cash Equivalents | $ 60,984 | $ 69 | $ - | $ 2,141 | $ - | $ 56,903 | $ 902 | $ 24 | $ 587 | $ - | $ 358 | $ - |
| Accounts Receivable | 40,580 | - | - | - | - | 38,544 | - | - | 1,941 | - | 95 | - |
| Deferred Cost of Revenue | - | - | - | - | - | - | - | - | - | - | - | - |
| Inventory | - | - | - | - | - | - | - | - | - | - | - | - |
| Prepaid Expenses & Other Current Assets | 1,184 | - | - | 109 | - | 868 | 149 | - | 46 | 0 | 13 | - |
| **Total Current Assets** | **102,748** | **69** | **-** | **2,250** | **-** | **96,314** | **1,051** | **24** | **2,575** | **0** | **466** | **-** |
| Long Term Assets | | | | | | | | | | | | |
| Property, Plant and Equipment, net | 1,351 | - | - | - | - | 1,308 | 19 | - | 5 | 4 | 14 | - |
| Right of Use Asset, net | - | - | - | - | - | - | - | - | - | - | - | - |
| Deferred Tax Assets | - | - | - | - | - | - | - | - | - | - | - | - |
| Goodwill, net | - | - | - | - | - | - | - | - | - | - | - | - |
| Intangible Assets | 26,500 | - | - | - | - | 17,500 | 3,000 | - | 3,500 | - | 2,500 | - |
| Other Assets & Deposits | 3,307 | - | - | 160 | - | 3,118 | - | - | - | - | 29 | - |
| **Total Long Term Assets** | **31,158** | **-** | **-** | **160** | **-** | **21,926** | **3,019** | **-** | **3,505** | **4** | **2,544** | **-** |
| **Total Gross Liquidation Proceeds** | **$ 133,906** | **$ 69** | **$ -** | **$ 2,410** | **$ -** | **$ 118,240** | **$ 4,070** | **$ 24** | **$ 6,080** | **$ 4** | **$ 3,010** | **$ -** |
| | | | | | | | | | | | | |
| Estimated Gross Proceeds | $ 133,906 | $ 69 | $ - | $ 2,410 | $ - | $ 118,240 | $ 4,070 | $ 24 | $ 6,080 | $ 4 | $ 3,010 | $ - |
| (-) Chapter 7 Liquidation Costs | (28,592) | (6) | - | (2,410) | - | (24,428) | (836) | (6) | (651) | (0) | (255) | - |
| **Net Proceeds after Liquidation Costs** | **$ 105,314** | **$ 64** | **$ -** | **$ -** | **$ -** | **$ 93,813** | **$ 3,234** | **$ 17** | **$ 5,429** | **$ 4** | **$ 2,755** | **$ -** |
| **Creditor Recovery Waterfall / Use of Proceeds** | | | | | | | | | | | | |
| DIP Facility and Backstop Premium Claims | 69,000 | - | - | - | - | 57,562 | 3,234 | 17 | 5,429 | 4 | 2,755 | - |
| *Recovery %* | *100.0%* | | | | | | | | | | | |
| First Lien RCF and Term Loan Facility Claims | 36,314 | 64 | - | - | - | 36,250 | - | - | - | - | - | - |
| *Recovery %* | *7.7%* | | | | | | | | | | | |
| Senior Secured Notes Claims | - | - | - | - | - | - | - | - | - | - | - | - |
| *Recovery %* | *0.0%* | | | | | | | | | | | |
| Second Lien Term Loan Secured Claims | - | - | - | - | - | - | - | - | - | - | - | - |
| *Recovery %* | *0.0%* | | | | | | | | | | | |
| General Unsecured Creditors | - | - | - | - | - | - | - | - | - | - | - | - |
| *Recovery %* | *0.0%* | | | | | | | | | | | |

**Mobileum, Inc., *et al*.**

**Illustrative Ch. 7 Liquidation Analysis - Consolidating View: Implied Midpoint Recovery Scenario**

*USD in 000's*

| Figures shown in 000's of USD | Debtor Entities Total | Matrix Intermediate, Inc. | Matrix Holdco, LLC | Matrix Parent, Inc. | Mobile Acquisition Corp. | Mobileum, Inc. | SIGOS, LLC | UnwiredSoft, Inc. | WeDo Technologies Americas, Inc. | Convene Networks, LLC | Developing Solutions, Inc. | Phase 3 Innovations Holdings, Inc. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Implied Midpoint Recovery Scenario** | | | | | | | | | | | | |
| **Gross Liquidation Proceeds** | | | | | | | | | | | | |
| *Current Assets* | | | | | | | | | | | | |
| Cash & Cash Equivalents | $ 60,984 | $ 69 | $ - | $ 2,141 | $ - | $ 56,903 | $ 902 | $ 24 | $ 587 | $ - | $ 358 | $ - |
| Accounts Receivable | 36,522 | - | - | - | - | 34,689 | - | - | 1,747 | - | 86 | - |
| Deferred Cost of Revenue | - | - | - | - | - | - | - | - | - | - | - | - |
| Inventory | - | - | - | - | - | - | - | - | - | - | - | - |
| Prepaid Expenses & Other Current Assets | 951 | - | - | 89 | - | 690 | 124 | - | 38 | 0 | 11 | - |
| **Total Current Assets** | **98,458** | **69** | **-** | **2,230** | **-** | **92,282** | **1,026** | **24** | **2,373** | **0** | **454** | **-** |
| *Long Term Assets* | | | | | | | | | | | | |
| Property, Plant and Equipment, net | 1,013 | - | - | - | - | 981 | 14 | - | 4 | 3 | 11 | - |
| Right of Use Asset, net | - | - | - | - | - | - | - | - | - | - | - | - |
| Deferred Tax Assets | - | - | - | - | - | - | - | - | - | - | - | - |
| Goodwill, net | - | - | - | - | - | - | - | - | - | - | - | - |
| Intangible Assets | 18,550 | - | - | - | - | 12,250 | 2,100 | - | 2,450 | - | 1,750 | - |
| Other Assets & Deposits | 2,687 | - | - | 130 | - | 2,533 | - | - | - | - | 24 | - |
| **Total Long Term Assets** | **22,250** | **-** | **-** | **130** | **-** | **15,765** | **2,114** | **-** | **2,454** | **3** | **1,785** | **-** |
| **Total Gross Liquidation Proceeds** | **$ 120,708** | **$ 69** | **$ -** | **$ 2,360** | **$ -** | **$ 108,046** | **$ 3,140** | **$ 24** | **$ 4,826** | **$ 3** | **$ 2,239** | **$ -** |
| | | | | | | | | | | | | |
| Estimated Gross Proceeds | $ 120,708 | $ 69 | $ - | $ 2,360 | $ - | $ 108,046 | $ 3,140 | $ 24 | $ 4,826 | $ 3 | $ 2,239 | $ - |
| (-) Chapter 7 Liquidation Costs | (28,196) | (6) | - | (2,360) | - | (24,273) | (775) | (7) | (572) | (0) | (202) | - |
| **Net Proceeds after Liquidation Costs** | **$ 92,512** | **$ 63** | **$ -** | **$ -** | **$ -** | **$ 83,773** | **$ 2,365** | **$ 17** | **$ 4,254** | **$ 3** | **$ 2,037** | **$ -** |
| **Creditor Recovery Waterfall / Use of Proceeds** | | | | | | | | | | | | |
| DIP Facility and Backstop Premium Claims | 69,000 | - | - | - | - | 60,325 | 2,365 | 17 | 4,254 | 3 | 2,037 | - |
| *Recovery %* | *100.0%* | | | | | | | | | | | |
| First Lien RCF and Term Loan Facility Claims | 23,512 | 63 | - | - | - | 23,448 | - | - | - | - | - | - |
| *Recovery %* | *5.0%* | | | | | | | | | | | |
| Senior Secured Notes Claims | - | - | - | - | - | - | - | - | - | - | - | - |
| *Recovery %* | *0.0%* | | | | | | | | | | | |
| Second Lien Term Loan Secured Claims | - | - | - | - | - | - | - | - | - | - | - | - |
| *Recovery %* | *0.0%* | | | | | | | | | | | |
| General Unsecured Creditors | - | - | - | - | - | - | - | - | - | - | - | - |
| *Recovery %* | *0.0%* | | | | | | | | | | | |

**<u>Exhibit E</u>**

**Financial Projections**

# FINANCIAL PROJECTIONS

**Introduction**

Pursuant to Section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that Confirmation of the *Joint Prepackaged Plan of Reorganization for Mobileum, Inc. and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (the "Plan") is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors to the Debtors. This confirmation condition is referred to as the "feasibility" of the Plan. In connection with the planning and development of a plan of reorganization, and for the purposes of determining whether the Plan would meet this standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources to operate their business.

For purposes of demonstrating feasibility of the Plan, the Debtors have prepared the consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections" or the "Projections") for Fiscal Years 2024 through 2027. These include actuals from January 2024 to May 2024 and forecasts from June 2024 through December 2027 (the "Projection Period"). The Financial Projections were prepared based on assumptions made by the Debtors' management team ("Management"), in consultation with its advisors, as to the future performance of the Reorganized Debtors, and reflect the Debtors' judgment and expectations regarding its likely future operations and financial position. Although Management has prepared the Financial Projections in good faith based upon information as of the date hereof and believes the assumptions contained herein to be reasonable, there can be no assurance that the assumptions in the Financial Projections will be realized. The Debtors' management continues to monitor the macroeconomy, the industry, and its business results and reserves the right (but is under no obligation) to modify the Financial Projections to reflect, among other things, any revised assumptions regarding the overall industry growth rate, revised assumptions regarding developments in the macroeconomy, and/or revised assumptions based on the Debtors' business results during the Projection Period.

The Financial Projections have been prepared on a consolidated basis, including non-Debtor subsidiaries. The Debtors believe that the Financial Projections contain sufficient detail, as far as is reasonably practicable based on the Debtors' books and records, to provide adequate information in accordance with section 1125 of the Bankruptcy Code.

As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered.

In general, as illustrated by the Financial Projections, the Debtors believe they should have sufficient liquidity to operate their business during the Projection Period. The Debtors believe that Confirmation and Consummation are not likely to be followed by the liquidation or further reorganization of the Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

**Accounting Policies & Disclaimers**

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (THE "AICPA"), THE FINANCIAL ACCOUNTING STANDARDS BOARD (THE "FASB"), OR THE RULES AND REGULATIONS OF THE SEC. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED, REVIEWED, OR SUBJECTED TO ANY PROCEDURES DESIGNED TO PROVIDE ANY LEVEL OF ASSURANCE BY THE DEBTORS' INDEPENDENT PUBLIC ACCOUNTANTS.

WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF MANAGEMENT. THESE UNCERTAINTIES INCLUDE, AMONG OTHER THINGS, THE ULTIMATE OUTCOME AND CONTENTS OF A CONFIRMED PLAN OF REORGANIZATION AND THE TIMING OF THE CONFIRMATION OF SUCH PLAN. CONSEQUENTLY, THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, AS TO THE

ACCURACY OF THE FINANCIAL PROJECTIONS OR THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS AND RELATED INFORMATION OR AS TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE FINANCIAL PROJECTIONS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE FINANCIAL PROJECTIONS AND RELATED INFORMATION, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. HOLDERS OF CLAIMS MUST MAKE THEIR OWN ASSESSMENT AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN MAKING THEIR DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE PLAN.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. THE SIGNIFICANT ASSUMPTIONS USED IN THE PREPARATION OF THE FINANCIAL PROJECTIONS ARE STATED BELOW. THE FINANCIAL PROJECTIONS ASSUME THAT THE DEBTORS WILL EMERGE FROM CHAPTER 11 ON THE ASSUMED EMERGENCE DATE. THE FINANCIAL PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH (1) THE DISCLOSURE STATEMENT, INCLUDING ANY OF THE EXHIBITS THERETO OR INCORPORATED REFERENCES THEREIN, AS WELL AS THE RISK FACTORS SET FORTH THEREIN, AND (2) THE SIGNIFICANT ASSUMPTIONS, QUALIFICATIONS, AND NOTES SET FORTH BELOW.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH OR DISCLOSE THEIR FINANCIAL PROJECTIONS. ACCORDINGLY, THE DEBTORS RESERVE THE RIGHT TO, BUT DISCLAIM ANY OBLIGATION TO, (A) FURNISH UPDATED FINANCIAL PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS AT ANY TIME IN THE FUTURE, (B) INCLUDE UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (C) OTHERWISE MAKE UPDATED INFORMATION OR FINANCIAL PROJECTIONS PUBLICLY AVAILABLE.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS, INCLUDING, WITHOUT LIMITATION, THOSE SET FORTH HEREIN. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS ARE AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS.

**General Assumptions**

(a) The Financial Projections are based upon, and assume the successful implementation of, the Debtors' business plan during the course of the Projection Period.

(b) The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated on or around August 31, 2024 (the "Emergence Date"). Any significant delay in the Emergence Date may have a significant negative effect on the operations and financial performance of the Debtors, including an increased risk or inability to meet sales forecasts and the incurrence of higher reorganization expenses.

(c) The opening post-emergence balance sheet as of August 31, 2024 was prepared utilizing the May 31, 2024, trial balance and projected results of operations and cash flows to the assumed Emergence Date.  Actual balances may vary from those reflected in the opening balance sheet due to variances in projections and potential changes in cash needed to Consummate the Plan. The post-emergence pro forma balance sheets for the Projection Period reflect reorganization adjustments consisting of cancellation of certain pre-petition debt balances as well as entry into new exit financing as a result of Consummation of the Plan.

(d) "Lender EBITDA" and "Lender EBITDA margin" are not financial measures calculated in accordance with GAAP in the United States.  Lender EBITDA should not be regarded as an alternative to operating income, net income or as indicators of operating performance, nor should it be considered in isolation of, or as substitutes for financial measures prepared in accordance with GAAP.  The Debtors believe that operating income is the most directly comparable GAAP financial measure to Lender EBITDA.  Because not all companies use identical calculations, these non-GAAP presentations may not be comparable to other similarly titled measures of other companies, or calculations in the Debtors' debt agreement.

(e) The Financial Projections account for the reorganization and related transactions pursuant to the Plan.  While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the impact on the Financial Projections.  When the Debtors fully implement fresh-start accounting, differences from the depiction presented are anticipated and those differences could be material. Fresh-start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value."  In addition to valuing assets, liabilities, and equity instruments at fair value, the Debtors will have tax professionals analyze any go-forward tax implications as a result of the Restructuring Transactions.

**NOTES TO FINANCIAL PROJECTIONS**

**Basis of Presentation and Summary of Significant Accounting Policies**

Mobileum, Inc. (and together with its debtor and certain non-debtor affiliates, "Mobileum" or the "Company") is the leading global provider of integrated analytics solutions for roaming and network services, security, risk management, customer engagement and experience, and testing and monitoring for global Communication Service Providers ("CSPs"). The Company serves more than 1,000 customers in over 150 countries, including most of the global Tier 1 telecommunications operators, and employs over 1,800 employees and contractors in approximately 60 countries. In the latter half of 2022, the Company began to experience financial difficulties primarily due to: (a) a slowdown of customer spends due to near-term macro uncertainty, resulting in longer than normal sales cycles; (b) talent churn and management turnover due to the tight labor market; and (c) delayed cost controls. Although initiatives taken by the Company's management since the first quarter of 2023 have yielded positive momentum and growth for the Company, the Company continues to grapple with its tightening liquidity occasioned by the foregoing operational challenges, as well as certain additional challenges that have negatively impacted operations. The financial projections reflect the current state and outlook of the industry, while also accounting for the unique challenges faced by the company. The projections have been prepared using accounting policies that are largely consistent with those applied in the Company's historical financial statements and projections.

**Overview**

The Company derives revenue from the sale to global CSPs of various services and products, including but not limited to integrated analytics solutions for roaming and network services, security, risk management, customer engagement and experience, and testing and monitoring solutions. The Company's integrated analytics solutions are provided through a combination of hardware, software, and cloud-based products, as well as maintenance, subscription, implementation services, and managed services for those products.

The Company generates both recurring and non-recurring revenue. The Company's recurring revenues, which comprise approximately 60% of its overall revenue include (i) maintenance services in the form of technical support for installed solutions, software updates and third-party hardware support, (ii) management of Mobileum-installed solutions, and (iii) testing subscriptions, pursuant to which customers purchase test units to be utilized over a certain time period (typically 12 months). The balance of the Company's revenues are comprised of its non-recurring sources of revenue, including (i) perpetual licenses to use Mobileum's software solutions, (ii) one-time software installation and integration performed by Mobileum delivery services teams, and (iii) third-party hardware and software to support the sale of Mobileum's software solutions.

The Company recognizes revenue in accordance with Accounting Standards Codification 606, which provides a five-step model for recognizing revenue from contracts with customers as follows:
1. Identify the contract with a customer;
2. Identify the performance obligations in the contract;
3. Determine the transaction price;
4. Allocate the transaction price to the performance obligations in the contract; and
5. Recognize revenue when or as performance obligations are satisfied.

**Income Statement Assumptions**

i)  ***Revenue:***

   a.  Revenue for fiscal years 2024-2027 is forecasted based on the reconciliation of bottom-up and top-down approaches. Management expects its Recurring Revenue to increase at a Cumulated Annual Growth Rate ("CAGR") of 4.7% over the period while Non-Recurring Revenue is expected to increase at 3.6% CAGR. As a result, Total Revenue is expected to increase from $200.9m in 2024 to $227.7m in 2027.

ii) *Cost of Goods Sold and Operating Expenses:*

    a. *Cost of Goods Sold* ("COGS") which includes Direct COGS, Headcount and Non-headcount Costs is expected to grow broadly in line with revenue resulting in a stable ~63% Gross Profit Margin. Direct COGS is predominantly driven by the expenses related to Third-Party Hardware and Software maintenance. Salaries & Wages, Benefits, as well as expenses related to Consultants & Contractors are the major components flowing into the Headcount Costs. Data Service Costs are the main driver of the Company's Non-headcount Costs.

    b. *Research & Development* ("R&D") costs is a labor-intensive category of costs, as the Company is in constant pursuit of innovation that fuels new products and services, and helps its customers grow revenue and save costs. Hence, the major components of the R&D costs are Salaries & Wages and Benefits. Given the essence of the Software development costs, the Company reflects Software Capitalization as an addback to the R&D to recognize these costs over a longer period of time. The Company R&D costs are expected to grow 10% in 2025 before growing by 5% in 2026 and 2027 as the Company continues to focus on product innovation.

    c. *Sales & Marketing* ("S&M") costs, which are mainly comprised of Headcount Costs, are expected to grow by 5% each year to support the growth in revenue with the Company using primarily a direct sales model to generate new sales. Non-headcount costs are mostly related to marketing campaigns.

    d. *General & Administrative* ("G&A") costs include expenses related to the following functions: finance, human resources, information technology and systems, legal, and compliance. G&A expenses are expected to decrease by 3% driven by a rationalization of headcount costs.

iii) *Other Expenses:*

    a. *Depreciation and Amortization* include: (a) Depreciation of Property, Plant, and Equipment (PP&E) components and Amortization of (b) acquired technology, both using the straight-line method; (c) right-of-use finance lease assets; and (d) intangible assets and goodwill. Intangible assets include Customer Relationships, Corporate Trade Names, and Product Trade Names, all amortized using the straight-line method.

    b. *Other Expenses* include (a) Foreign exchange (gain) loss which represents the net amount of gains or losses the Company experiences due to fluctuations in exchange rates between the time a transaction is recorded and the time it is settled (b) Acquisition and retention costs and (c) Management and director fees.

iv) *Non-operating (Expense) Income:*

    a. *Interest expense* is based on the pro forma capital structure contemplated by the Plan that includes the $60M DIP Facility and the $100M First-Out Term Loan Facility. The assumed interest rate for both the DIP Facility and First-Out Term Loan Facility is SOFR (assumed at 5.3%) + 600 bps (subject to credit spread adjustments) with the PIK period for the first 12 months post Effective Date of August 31. During the PIK period the interest rate will be equal to SOFR + 600bps with SOFR + 100bps cash pay and 500bps PIK.

    b. *Other non-operating expense, net* includes miscellaneous non-operating expenses and is not expected to change over the period.

    c. *Non-recurring items* include one time or non-cash items such as Legal Advisory, Accounting, Audit & Tax Services, Retention Costs, and Stock Compensation. Non-recurring items are projected to show a sustained downward trend, decreasing to $3.0M by 2027.

**Balance Sheet Assumptions**

The Company's Projected Balance Sheet is set forth after giving effect to the proposed restructuring as contemplated by the Plan. The Projected Balance Sheet is adjusted for the Plan and projected income and cash flows over the Projections.  The Projected Balance Sheet has not been prepared in accordance with GAAP and does not consider the impact of fresh-start accounting.  When implemented, the effect of fresh-start accounting will result in changes in asset and liability balances.

The Projected Balance Sheet contains certain pro forma adjustments as a result of the Plan Consummation. The projected cash balances include the effects of anticipated changes in working capital related items.  On the Effective Date, actual cash may vary from cash reflected on the Projected Balance Sheet because of variances in the projections and potential changes in cash needs to Consummate the Plan.

i)  ***Assets:***

   a.  *Cash and cash equivalents* include the consolidated cash balance of the Company and consists primarily of amounts held in deposit with financial institutions.

   b.  *Accounts Receivables,* include billed accounts receivable and are projected on a days-outstanding calculation, generally consistent with the Debtors' historical trends.  These balances may fluctuate considerably throughout the year due to seasonality.

   c.  *Deferred Cost of Revenue* includes COGS expenses that the Company will recognize in future.

   d.  *Unbilled Accounts Receivable* represent revenue that is recognized in advance of the right to invoice.

   e.  *Inventories* include raw materials and goods that are available for sale (e.g., transceivers, power supply kits, optical cables).

   f.  *Prepaid expenses and other current assets* include various amounts that the Company incur in the ordinary course of business including pre-payments for vendors, taxes, insurance, and other miscellaneous expenses.

   g.  *Property and equipment* are stated at cost net of accumulated depreciation or amortization and reflect the Debtors' capital expenditure assumptions during the Projection Period.

   h.  *Right of use assets, net* represent the Company's privilege to use leased items, including Operating lease Right of use assets as well as Finance Leases (Equipment) over the duration of the agreed-upon lease terms adjusted for the accumulated depreciation.

   i.  *Deferred Tax assets* include net operating loss and tax credits carryforwards for federal and state income taxes.

   j.  *Goodwill, net and Intangible assets, net* represent the excess of the purchase price over the fair value of net tangible and identified intangible assets acquired in business combinations. The Company regularly evaluates its business for potential indicators of impairment of goodwill.

   k.  *Other assets and deposits* include various securities, lease, office deposits, bank guarantees, etc.

ii)  ***Liabilities:***

   a.  *Accounts payable* includes general payables to the Company' various trade vendors.  Payables balances are projected on a days-outstanding calculation, generally consistent with the Debtors' historical trends.

   b.  *Accrued liabilities* include amounts due to vendors related to the Company's general operating expenses. These accounts are forecasted to perform in a matter consistent with historical relationships relative to operating expense activity and are forecasted to grow in tandem with operating expenses.

c. *Lease liabilities* include financial obligations for the payments required by lease agreements and are calculated as the present value of the lease payments remaining over the lease term.

d. *Deferred revenue, net of current portion* includes amounts received from customers for services that the company has not yet provided in full and represents amounts to be recognized as revenue beyond the next 12 months period. These accounts are forecasted to perform in a matter consistent with the Revenue trends.

e. *Long-term debt* includes the new $160m First-Out Term Loan Facility.

f. *Deferred tax liabilities* include taxes the Company will pay in the future due to differences between the financial accounting treatment of items and their treatment for tax purposes.

g. *Other long-term liabilities* include the long-term liability related to tax provisions and miscellaneous audit adjustments.

**Cash Flow Statement Assumptions**

i) ***Adjustments to reconcile net income to net cash provided from operating activities:***

a. *Changes in operating assets and liabilities* reflect the ordinary course changes in accounts receivable, accounts payable, accrued expenses, and other current assets and liabilities. Changes in working capital are driven primarily by historical trends and non-cash accruals.

ii) ***Cash flows from investing activities:***

a. *Purchases of property and equipment* are based on the Debtors' capital expenditures plan and include amounts related to maintenance/replacements and other investments in technology.

b. *Proceeds from sale of property, equipment, intangibles and other assets* reflects the net proceeds from the Debtors' contemplated asset sales during the Projection Period.

iii) ***Cash flows from financing activities:***

a. *Net Cash Used in Financing Activities* reflects the pro forma capital structure outlined in the Plan, which includes the $60M DIP Facility and the $100M First-Out Term Loan Facility. Additionally, it accounts for Debt Cancellation, which offsets the cash impact of debt and interest income, contributing to Net Income in 2024 as a result of the restructuring.

EXHIBIT A
NON-GAAP UNAUDITED PROJECTED INCOME STATEMENT

| $ in '000s | Fiscal Year End 2024 | Fiscal Year End 2025 | Fiscal Year End 2026 | Fiscal Year End 2027 |
|---|---|---|---|---|
| **Revenue:** | | | | |
| Recurring Revenue | 116,260 | 123,235 | 128,319 | 133,452 |
| Non-recurring Revenue | 84,651 | 88,883 | 91,550 | 94,296 |
| **Total Revenue** | $ 200,910 | $ 212,118 | $ 219,868 | $ 227,748 |
| | | | | |
| **COGS** | (73,931) | (77,391) | (81,020) | (84,825) |
| | | | | |
| **Operating Expenses:** | | | | |
| Research & Development | (29,796) | (32,656) | (34,243) | (35,908) |
| Sales & Marketing | (26,583) | (27,844) | (29,165) | (31,134) |
| General & Administrative | (33,480) | (32,462) | (31,495) | (31,574) |
| **Lender EBITDA** | $ 37,120 | $ 41,766 | $ 43,946 | $ 44,307 |
| | | | | |
| Depreciation and Amortization | (95,672) | (95,139) | (95,139) | (95,139) |
| Other Expenses | (7,371) | (3,200) | (3,200) | (3,200) |
| **Operating Income (Loss)** | $ (65,923) | $ (56,573) | $ (54,393) | $ (54,032) |
| | | | | |
| Interest Expense, net | (45,776) | (18,775) | (19,010) | (19,010) |
| Other Expense, net | 1,740 | 3,500 | 3,500 | 3,500 |
| Non-recurring Items | (12,000) | (4,800) | (3,000) | (3,000) |
| Income Tax Expense (benefit) | (1,371) | (2,019) | (2,019) | (2,019) |
| Restructuring Related Disbursements | 490,932 | (332) | (438) | - |
| **Net Income** | $ 367,602 | $ (78,999) | $ (75,359) | $ (74,561) |

EXHIBIT B
NON-GAAP UNAUDITED PROJECTED BALANCE SHEET

| *$ in '000s* | Fiscal Year End 2024 | Fiscal Year End 2025 | Fiscal Year End 2026 | Fiscal Year End 2027 |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and Cash Equivalents | $ 36,438 | $ 52,114 | $ 65,406 | $ 76,972 |
| Accounts Receivable | 63,128 | 69,738 | 72,286 | 74,876 |
| Deferred Cost of Revenue | 6,195 | 6,364 | 6,596 | 6,832 |
| Unbilled Accounts Receivable | 35,327 | 37,121 | 35,729 | 36,060 |
| Inventory | 1,983 | 2,021 | 2,107 | 2,196 |
| Prepaid expenses and other current assets | 23,196 | 22,978 | 23,172 | 23,750 |
| **Total Current Assets** | $ 166,265 | $ 190,335 | $ 205,295 | $ 220,686 |
| Property, plant and equipment, net | 21,900 | 19,089 | 16,398 | 13,707 |
| Right of use asset, net | 6,029 | 2,431 | 1,077 | 1,077 |
| Deferred tax assets | 2,632 | 2,632 | 2,632 | 2,632 |
| Goodwill, net | 485,767 | 414,496 | 343,226 | 271,955 |
| Intangible assets, net | 107,111 | 94,093 | 81,316 | 68,538 |
| Other assets and deposits | 7,181 | 7,181 | 7,181 | 7,181 |
| Intercompany Receivable | - | - | - | - |
| **Total Non-Current Assets** | $ 630,620 | $ 539,923 | $ 451,831 | $ 365,092 |
| **Total Assets** | $ 796,885 | $ 730,259 | $ 657,125 | $ 585,777 |
| **Liabilities** | | | | |
| Accounts Payable | 4,192 | 9,065 | 12,189 | 14,055 |
| Accrued Liabilities | 54,324 | 52,525 | 52,044 | 52,739 |
| Short-term lease liability | 295 | 295 | 295 | 295 |
| Income and other taxes payable | 6,781 | 7,071 | 7,329 | 7,592 |
| Deferred revenue, current portion | 57,762 | 61,868 | 59,548 | 56,937 |
| **Total Current Liabilities** | $ 123,353 | $ 130,824 | $ 131,405 | $ 131,617 |
| Deferred revenue, net of current portion | 8,401 | 8,401 | 8,401 | 8,401 |
| Long-term lease liability | 4,952 | 1,354 | - | - |
| Long-term debt | 162,581 | 168,080 | 168,080 | 168,080 |
| Deferred tax liabilities | 10,542 | 10,542 | 10,542 | 10,542 |
| Other long-term liabilities | 4,501 | 7,501 | 10,501 | 13,501 |
| **Total Non-Current Liabilities** | $ 190,977 | $ 195,879 | $ 197,524 | $ 200,524 |
| **Total Liabilities** | $ 314,330 | $ 326,703 | $ 328,929 | $ 332,142 |
| **Total Shareholders' Equity** | $ 482,555 | $ 403,556 | $ 328,196 | $ 253,636 |
| **Total Liabilities & Shareholders' Equity** | $ 796,885 | $ 730,259 | $ 657,126 | $ 585,777 |

9

EXHIBIT C
NON-GAAP UNAUDITED PROJECTED STATEMENT OF CASH FLOWS

| $ in '000s | Fiscal Year End 2024 | Fiscal Year End 2025 | Fiscal Year End 2026 | Fiscal Year End 2027 |
|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | |
| **Net Income** | $ 367,602 | $ (78,999) | $ (75,359) | $ (74,561) |
| **Adjustments to reconcile net income to net cash provided from operating activities:** | | | | |
| Depreciation and amortization | 95,672 | 95,139 | 95,139 | 95,139 |
| Amortization of debt financing fees | 3,436 | - | - | - |
| Management Fees PIK | 1,750 | 3,000 | 3,000 | 3,000 |
| Interest PIK | 2,581 | 5,499 | - | - |
| Other Adjustments | 1,596 | - | - | - |
| **Changes in assets and liabilities (net of effects of acquisitions and dispositions):** | | | | |
| Accounts receivable | 7,314 | (6,610) | (2,548) | (2,590) |
| Deferred Cost of Revenue | (2,339) | (169) | (233) | (236) |
| Unbilled AR | (5,859) | (1,794) | 1,392 | (331) |
| Inventory | (348) | (38) | (85) | (89) |
| Prepaids & other current assets | (3,432) | 218 | (194) | (577) |
| Right of use assets | 5,005 | 3,598 | 1,354 | - |
| Lease liabilities | (4,966) | (3,598) | (1,354) | - |
| Other assets and deposits | (1,319) | - | - | - |
| Accounts payable | (16,814) | 5,163 | 3,382 | 2,128 |
| Accrued liabilities | 30,487 | (1,798) | (482) | 695 |
| Other Liabilities | (2,837) | - | - | - |
| Deferred revenue | 3,422 | 4,106 | (2,320) | (2,611) |
| **Net Cash Provided from Operating Activities** | $ 480,949 | $ 23,716 | $ 21,692 | $ 19,966 |
| **Cash Flows from Investing Activities** | | | | |
| Proceeds from disposal of property and equipment | 4 | - | - | - |
| Purchase of property and equipment | (1,450) | (2,280) | (2,400) | (2,400) |
| Software Capitalization | (5,590) | (5,760) | (6,000) | (6,000) |
| **Net Cash Used in Investing Activities** | $ (7,036) | $ (8,040) | $ (8,400) | $ (8,400) |
| **Cash Flow From Financing Activities** | | | | |
| Proceeds from borrowings Term loan | 6,102 | - | - | - |
| Proceeds from DIP Loan | 60,000 | - | - | - |
| Debt issuance costs paid | (5,577) | - | - | - |
| Repayments of principal of finance lease liability | (408) | - | - | - |
| Debt Cancellation | (539,390) | - | - | - |
| Repayments of notes payable | (950) | - | - | - |
| **Net Cash Used in Financing Activities** | $ (480,223) | $ - | $ - | $ - |
| **Change in Cash, cash equivalents and restricted cash** | $ (6,310) | $ 15,676 | $ 13,292 | $ 11,566 |
| Effect of foreign exchange rate changes on cash | (1,657) | - | - | - |
| Cash, cash equivalents and restricted cash at Beginning of Period | 44,406 | 36,438 | 52,114 | 65,406 |
| **Cash, cash equivalents and restricted cash at End of Period** | $ 36,438 | $ 52,114 | $ 65,406 | $ 76,972 |

*Note: Debt Cancellation offsets the cash impact of debt and interest income that flows to Net Income in 2024 as a result of the restructuring.*

10

**<u>Exhibit F</u>**

**Valuation Analysis**

## VALUATION ANALYSIS

**THE ANALYSIS SET FORTH HEREIN REPRESENTS ESTIMATED DISTRIBUTABLE VALUE FOR THE REORGANIZED DEBTORS AND DOES NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE ESTIMATED VALUE OF THE NEW REORGANIZED DEBTOR EQUITY SET FORTH HEREIN DOES NOT PURPORT TO BE OR CONSTITUTE (I) AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE OF THE REORGANIZED DEBTORS, (II) AN OPINION AS TO THE FAIRNESS FROM A FINANCIAL POINT OF VIEW OF THE CONSIDERATION TO BE RECEIVED UNDER THE PLAN, THE TERMS AND PROVISIONS OF THE PLAN, OR ANY RESTRUCTURING TRANSACTION CONTEMPLATED UNDER THE PLAN OR OTHERWISE DESCRIBED THEREIN, OR (III) AN APPRAISAL OF THE ASSETS OF THE REORGANIZED DEBTORS.**

**THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED FROM ANY FUNDED INDEBTEDNESS OR SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE IN RESPECT OF THE SOLICITATION OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.**

## I.    INTRODUCTION

Solely for the purposes of the Plan and the Disclosure Statement, the Debtors directed their investment banker, Evercore, to prepare this analysis estimating the going-concern value of the Reorganized Debtors. This analysis has been prepared for the Debtors' sole use and is based on, among other things, information that the Debtors provided to Evercore. The analysis herein reflects the combined assets and operations of all Debtors.

Based on the financial projections prepared by the Debtors attached to the Disclosure Statement as Exhibit E (the "Financial Projections") and subject to the disclaimers and the descriptions of Evercore's methodology set forth herein, and solely for purposes of the Plan, Evercore estimates the total enterprise value of the Reorganized Debtors to be between approximately $290 million and $350 million as of an assumed Plan Effective Date on or around August 31, 2024 (the "Assumed Effective Date"), with a midpoint of approximately $320 million.[1] After deducting estimated pro forma projected funded net debt of approximately $119 million as of the Assumed Effective Date, the range of the Reorganized Debtors' total equity value is estimated to be between approximately $171 million and $231 million with a midpoint of approximately $201 million. The implied total enterprise value for the Reorganized Debtors should be considered as a whole, and the underlying analyses should not be considered indicative of the values of any individual operation of the Reorganized Debtors.

---

[1] Consistent with the approach taken in the Liquidation Analysis, no value has been ascribed to the Audax Litigation in terms of value or recoveries. This approach is being taken solely for purposes of this analysis given the contingent nature of the litigation and is not intended to reflect an expectation that no amount will be received by the Reorganized Debtors with respect to such litigation.

In preparing the estimated total enterprise value range for the Reorganized Debtors, Evercore, among other things: (a) reviewed certain historical financial information of the Debtors beginning in 2023;[2] (b) met with certain members of the Debtors' senior management to discuss the Debtors' operations, financial profile, and future business prospects; (c) reviewed publicly available financial data and considered the market values of public companies deemed generally relevant to the operating and financial profiles of the Debtors; (d) considered certain industry information relevant to the Debtors' operating businesses; (e) prepared discounted cash flow analyses based on the Financial Projections, utilizing various discount rates and assumptions in the calculation of terminal values; and (f) conducted such other analyses as Evercore deemed appropriate.

Although Evercore conducted a review and analysis of the Debtors' businesses, operating assets and liabilities, and business plans, Evercore relied on the accuracy and completeness of certain financial information beginning in 2023 and other information provided by the Debtors and other firms retained by the Debtors in addition to certain publicly available information as to which Evercore does not have independent knowledge.

Evercore has relied on the Debtors' representation and warranty that the Financial Projections (a) were prepared in good faith, (b) were based on fully disclosed assumptions that are reasonable in light of the circumstances under which they were made, (c) reflect the Debtors' best currently available estimates, and (d) reflect the good faith judgments of the Debtors. Evercore does not offer an opinion as to the attainability of the Financial Projections. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and, as a result, the actual total enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein.

Evercore did not conduct an independent verification of the Financial Projections used in this valuation analysis and did not conduct an independent evaluation or appraisal of the Debtors' assets in connection with this valuation. Evercore also did not conduct an independent investigation into any of the legal, tax, pension, or accounting matters affecting the Debtors, and therefore makes no representations as to their impact on the Debtors' financial statements.

## II. VALUATION METHODOLOGIES

The following is a brief summary of certain financial analyses performed by Evercore to arrive at a range of estimated total enterprise values for the Reorganized Debtors. The following summary does not purport to be a complete description of all of the analyses undertaken to support Evercore's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, and the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

---

[2]   Given the irregularities and disputes regarding the Company's historical financials, Evercore was not able to rely upon them in conducting its valuation, nor has Evercore conducted an assessment of their accuracy or with respect to any particular disputed figures, basis, or assumptions. Accordingly, this valuation does not account for, among other things, the Company's historical financial information prior to 2023, nor should this valuation be relied on as any determination or opinion as to the validity of the Company's financial accounting or records more generally.

In performing this analysis, Evercore applied the following valuation methodologies as applicable to the operations and financial profile of the Debtors: (a) the discounted cash flow methodology; and (b) the select public company trading multiples methodology.

(a) ***Discounted Cash Flow Methodology.*** Evercore's application of the discounted cash flow methodology involved deriving the unlevered free cash flows that the Debtors' operations would generate assuming their Financial Projections are realized. To determine the enterprise value range, these cash flows and an estimated terminal value at the end of the projection period were discounted to derive their present value as of the Assumed Effective Date, using the estimated weighted average cost of capital of the Reorganized Debtors. The terminal value was calculated using various assumptions to provide a range, serving to emphasize the variability of this value.

(b) ***Select Public Company Trading Multiples Methodology.*** Evercore's application of the public company trading multiples methodology involved identifying a group of companies whose businesses and operating characteristics are generally relevant to the Reorganized Debtors' go-forward operations, although no selected company is either identical or directly comparable to the business of the Reorganized Debtors' go-forward operations or historical performance. From a review of this select public company group, Evercore then developed a range of valuation multiples to apply to the Financial Projections to derive a range of implied enterprise values for the Reorganized Debtors' operations.

In conducting this analysis, Evercore did not consider any one analysis or factor to the exclusion of any other analyses or factors. Accordingly, Evercore believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation. This analysis includes numerous valuation methodologies. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to total enterprise value.

## III.   VALUATION CONSIDERATIONS

This valuation is based upon information available to, and analyses undertaken by, Evercore as of July 21, 2024, and reflects, among other factors discussed below, the current financial market conditions and the inherent uncertainty today as to the achievement of the Financial Projections. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. For purposes of this valuation, Evercore has assumed that no material changes that would affect the value of the Reorganized Debtors' occur between the date of this Disclosure Statement and the Assumed Effective Date. Events and conditions subsequent to the date hereof, including but not limited to updated Financial Projections, as well as other factors, could have a substantial impact upon the Reorganized Debtors' value. Neither Evercore nor the Debtors has any obligation to update, revise, or reaffirm this valuation analysis.

This valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, achieving the forecasts reflected in the Financial Projections, the minimum amount of cash required to operate the Debtors' businesses, market conditions, and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of the Reorganized Debtors.

Further, the valuation of new securities to be issued upon the Assumed Effective Date is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of

such securities at issuance will depend upon, among other things: (a) prevailing interest rates; conditions in the financial markets; (b) the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (c) other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the chapter 11 cases or by other factors not possible to predict. Accordingly, the total enterprise value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value of the Reorganized Debtors or their securities. Such trading value may be materially different from the total enterprise value ranges associated with this valuation analysis. As further described in the Disclosure Statement, the Reorganized Debtors are anticipated to remain a private company and will not be required to and will not file reports with the U.S. Securities and Exchange Commission or any other entity or party. There can be no assurance that any trading market will develop for the New Reorganized Debtor Equity. The estimates of value for the Reorganized Debtors do not necessarily reflect the values that may be attainable in public or private markets. Furthermore, in the event that the actual distributions in the chapter 11 cases differ from those the Debtors assumed in their recovery analysis, the actual recovery of Holders of Claims in Impaired Classes could be significantly higher or lower than estimated by the Debtors.

The estimate of total enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of the Debtors' businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Reorganized Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

The estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any Holders of Allowed Claims entitled to vote on the Plan as to how such person should vote or otherwise act with respect to the Plan. The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan. Because valuation estimates are inherently subject to uncertainties, none of the Debtors, Evercore or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.