**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **MOBILEUM, INC.,** *et al.,* | § | **Case No. 24-90414 (CML)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |
| | § | |

**EMERGENCY MOTION OF DEBTORS FOR INTERIM**
**AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN**
**POSTPETITION FINANCING AND (B) USE CASH COLLATERAL,**
**(II) GRANTING (A) LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE STATUS AND (B) ADEQUATE PROTECTION**
**TO CERTAIN PREPETITION LENDERS, (III) MODIFYING AUTOMATIC STAY,**
**(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 10:00 A.M. (CENTRAL TIME) ON JULY 24, 2024.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Mobileum, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Mobileum, Inc. (7417); Matrix Intermediate, Inc. (7287); Matrix Holdco, LLC (0039); Matrix Parent, Inc. (9085); Mobile Acquisition Corp. (9591); SIGOS LLC (1763); UnwiredSoft, Inc. (2064); We Do Technologies Americas, Inc. (9338); Convene Networks LLC (2820); Developing Solutions Inc. (6177); and Phase 3 Innovations Holdings, Inc. (1899).  The Debtors' mailing address is 20813 Stevens Creek Boulevard, Suite 200, Cupertino, CA 95014.

**Preliminary Statement[2]**

1.      The Debtors commenced these chapter 11 cases to implement a restructuring transaction with their prepetition secured lenders, the terms and conditions of which are set forth in the Restructuring Support Agreement and Plan (each as defined below).   In connection with negotiating the Restructuring Support Agreement, the Debtors and an hoc group of Prepetition First Lien Lenders (the "**First Lien Ad Hoc Group**") reached an agreement on the terms of a senior secured, superpriority, and priming debtor-in-possession term loan credit facility (the "**DIP Facility**") and use of cash collateral ("**Cash Collateral**"), which will provide the Debtors with additional funds necessary to finance these chapter 11 cases.   In particular, the DIP Facility and the use of Cash Collateral will allow the Debtors to ensure the orderly continuation and operation of their businesses, maintain business relationships with vendors, suppliers, and customers, make payroll, satisfy other working capital and operational needs, and fund the expenses of these chapter 11 cases.

2.      The DIP Facility is the product of extensive arm's-length negotiations between the Debtors and the First Lien Ad Hoc Group.   In connection with the Debtors' efforts to obtain postpetition financing, the Debtors, through their proposed investment banker, Evercore Group L.L.C. ("**Evercore**"), solicited offers for debtor-in-possession financing from nineteen (19) potential capital providers, in addition to the First Lien Ad Hoc Group.   Notwithstanding such outreach, only one offer for debtor-in-possession financing was received—the offer received from the First Lien Ad Hoc Group.   The Debtors, along with the assistance of their advisors, determined that the First Lien Ad Hoc Group proposal was the best financing option available for several key reasons, including: (i) the First Lien Ad Hoc Group's proposal was the only DIP financing offer

---

[2] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed below.

received by the Debtors, (ii) the proposed DIP Facility provides the Debtors with sufficient funds to finance these chapter 11 cases on appropriate terms, (iii) the inclusion of the consensual use of Cash Collateral will allow the Debtors to access additional liquidity, and (iv) the financing package is being provided in conjunction with the broader agreement reached with the First Lien Ad Hoc Group, as reflected in the Restructuring Support Agreement and other transaction documents.

3.      The DIP Facility, which is backstopped by certain members of the First Lien Ad Hoc Group and open to participation for all Prepetition First Lien Secured Parties, consists of, among other things, (i) a new money term loan facility in the aggregate principal amount of up to $60 million, $40 million of which will be funded upon entry of the Interim Order, (ii) subject to paragraph 2(b) and 2(c) of the Interim Order, a Roll-Up of $100 million of Prepetition First Lien Obligations, and (iii) the Backstop Premium, which will be paid in Tranche B Loans under the DIP Credit Agreement and convert to 10% of the New Equity Interests (as defined in the Plan) on the effective date of the Plan.

4.      As detailed herein, and as a result of hard fought, arm's-length negotiations, the Roll-Up is subject to the Roll-Down mechanic provided in the Interim Order.  Specifically, if the DIP Obligations other than the Rolled-Down Prepetition Loans are repaid in cash with the proceeds from an alternative debtor-in-possession financing facility prior to entry of the Final Order, then one-third (1/3) of the Roll-Up will be unwound, and the corresponding DIP Roll-Up Loans will revert back to Prepetition First Lien Obligations.  This mechanic was heavily negotiated between the parties and represents a significant concession by the DIP Lenders, as it allows the Debtors to potentially refinance the DIP Facility without having to bear the full cost of the Roll-Up.  Although this provides for an interim Roll-Up of the full Roll-Up amount, when paired with the Roll-Down, it is, in effect, similar to a lower initial Roll-Up frequently approved by this Court.

5.      As described above, the DIP Facility is open for participation to all holders of Prepetition First Lien Obligations until the Election Deadline Date (as defined in that certain *Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility Backstop Commitment Letter*, by and among the Debtors (except Intermediate) and the Backstop Commitment Parties signatory thereto (the "**Backstop Commitment Letter**")).   Although the Debtors are seeking approval of the Roll-Up upon entry of the Interim Order, as a result of the syndication process, the Roll-Up will be effective either upon entry of the Interim Order or a later date agreed to in writing by the Backstop Commitment Parties (as defined in the Backstop Commitment Letter) (the "**Issuance Date**").   The potential delayed effectiveness of the Roll-Up provides for administrative convenience and obviates the need for the DIP Secured Parties to adjust entitlements after the Election Deadline Date.

6.      Furthermore, pursuant to the DIP Credit Agreement, the DIP Lenders will receive $1.67 of DIP Loans for every $1 of new money funded, up to $160 million total.   Holders of Prepetition First Lien Obligations that are providing the backstop (the "**Backstop Parties**") are initially obligated to provide one-hundred percent (100%) of the DIP Obligations in exchange for (i) the Backstop Premium and (ii) the Roll-Up.   However, in addition to such consideration being subject to the Roll-Down (as discussed herein), holders of Prepetition First Lien Obligations that are not Backstop Parties (the "**Non-Backstop Parties**") have the opportunity to participate in the new money financing and obtain the benefit of the Roll-Up on a pro rata basis based on the amount funded.   Accordingly, every dollar funded by a Non-Backstop Party will reduce the Backstop Parties' initial DIP Obligations on a pro-rata basis.

7.      As discussed in greater detail herein and in the DIP Declaration (as defined below), several reasons justify the relief requested herein:

- Immediate access to DIP Financing is critical to ensure they are adequately capitalized during these chapter 11 cases;

- The Debtors' proposed interim draw of $40 million is necessary to ensure a smooth entry into these chapter 11 cases and for the Debtors to avoid immediate and irreparable harm to their estates;

- Negotiations with the proposed DIP Lenders were conducted at arm's length and in good faith.  The Debtors further believe the DIP Facility provides sufficient liquidity with customary budget restrictions, all at rates and fees that are reasonable under the circumstances;

- The Debtors believe alternative financing is not available to the Debtors in the marketplace on superior terms.  Prepetition, the Debtors solicited potential financing from several sources, including from third-party lenders, from the Crossholder Group and from the First Lien Ad Hoc Group.  Only the First Lien Ad Hoc Group expressed willingness to provide debtor-in-possession financing; and

- The Debtors expect their vendors, customers, and employees will be highly focused on whether these chapter 11 cases are appropriately funded to maximize the greatest possibility of success.

8.     Accordingly, the DIP Facility and the use of Cash Collateral are in the best interests of the Debtors and their estates and should be approved.

9.     Additional information regarding the DIP Facility is set forth in the *Declaration of Bo Yi in Support of Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Claims with Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**DIP Declaration**") and the *Declaration of Mike Salfity in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**"), each filed contemporaneously herewith.

**Relief Requested**

10. By this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex Case Procedures**"), the Debtors request entry of an interim order (the "**Interim Order**"), substantially in the form attached hereto as **Exhibit A**:

(a) authorizing the Debtors to obtain postpetition financing ("**DIP Financing**") under a senior secured, superpriority, priming debtor-in-possession facility (the "**DIP Facility**") subject to the terms and conditions set forth in the Interim Order and pursuant to that certain Debtor-in-Possession Credit Agreement attached to the Interim Order in substantially final form as Exhibit 1 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**") by and among, Matrix Intermediate, Inc., a Delaware corporation ("**Intermediate**"), Matrix Holdco LLC, a Delaware limited liability company ("**Holdings**"), the Borrower (as defined below), the DIP Guarantors (as defined below), the financial institutions or other entities from time to time party thereto as "Lenders" (the "**DIP Lenders**"), and Acquiom Agency Services ("**Acquiom**") and Seaport Loan Products LLC ("**Seaport**"), as co-administrative agents for the Lenders (in such capacities, each a "**Co-Administrative Agent**" and together, the "**Administrative Agent**"), and Acquiom, as collateral agent (in such capacity, the "**Collateral Agent**" and, together with the Administrative Agent, together with its successors and permitted assigns, the "**DIP Agent**" and, together with the DIP Lenders, the "**DIP Secured Parties**"), consisting of (i) new money term loans (the "**New Money DIP Term Loans**") in an aggregate principal amount of $60 million, of which $40 million will be available immediately upon entry of the Interim Order and the remainder will be available upon entry of the Final Order (subject to certain conditions), (ii) subject to paragraph 2(c) of the Interim Order, $100 million of DIP Roll-Up Loans (as defined below), which will be deemed rolled up and converted into DIP Obligations (as defined below) on the Issuance Date (the "**DIP Roll-Up Loans**"), and (iii) the Backstop Premium, which will be paid in Tranche B Loans (as defined below) and which loans will be deemed made upon entry of the Interim Order (the loans to be made available under the foregoing clauses (i), (ii) and (iii), the "**DIP Loans**" and the commitments therefor, the "**DIP Commitments**");

(b) authorizing the Borrower to incur, and the Guarantors (as defined in the DIP Credit Agreement) to jointly and severally guarantee (such Debtors, in this capacity,

the "**DIP Guarantors**" and, together with the Borrower, the "**DIP Loan Parties**") the DIP Loans and all extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, commitment fees or premiums and administrative agency fees), costs, expenses and other liabilities and obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable pursuant to the DIP Documents (as defined below) (collectively, the "**DIP Obligations**");

(c)  authorizing the DIP Loan Parties to execute, deliver and perform pursuant to the terms of the DIP Credit Agreement and all other documents and instruments required to be delivered in connection with the DIP Facility (in each case, as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof and the Interim Order, together with the DIP Credit Agreement, the "**DIP Documents**");

(d)  subject to the Carve-Out (as defined below) and otherwise solely to the extent set forth in the Interim Order, granting to the DIP Agent, for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code (the "**DIP Superpriority Claims**");

(e)  granting to the DIP Agent, for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable, and automatically perfected liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on the DIP Collateral (as defined below), on the terms described in the Interim Order;

(f)  authorizing the DIP Agent, acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement, the "**Required DIP Lenders**"), to take all commercially reasonable actions required to implement the terms of the Interim Order;

(g)  waiving (i) the Debtors' right to surcharge the Prepetition Collateral (as defined below) and the DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code and (ii) any "equities of the case" exception under section 552(b) of the Bankruptcy Code; *provided*, *that*, the foregoing waiver shall be without prejudice to any provisions of the Final Order with respect to costs or expenses incurred following the entry of such Final Order;

(h)  waiving the equitable doctrine of "marshaling" and other similar doctrines (i) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (ii) with respect to the Prepetition Collateral (including the Cash Collateral (as defined below)) for the benefit of any party other than the Prepetition Secured Parties (as defined below); *provided*, *that*, the foregoing waiver shall be without prejudice to any provisions of the Final Order;

(i)  authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral solely in accordance with the DIP Orders and the DIP Documents;

(j)  authorizing the Debtors to pay the DIP Obligations as they become due and payable in accordance with the DIP Documents;

(k)  subject to the restrictions set forth in the DIP Documents and the DIP Orders, authorizing the Debtors to use Prepetition Collateral and provide adequate protection to the Prepetition Secured Parties (as defined below) for any diminution in value of their respective interests in the applicable Prepetition Collateral (as defined below) (including Cash Collateral), for any reason provided for in the Bankruptcy Code (collectively, the "**Diminution in Value**");

(l)  vacating and modifying the automatic stay to the extent necessary to permit the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the DIP Orders and the DIP Documents;

(m) waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and, upon entry, the Final Order; and

(n)  scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facility and use of Cash Collateral on the terms of a proposed order (the "**Final Order**") to be filed with the Court prior to the Final Hearing.

## <u>Summary of Terms of DIP Financing<br>and Use of Cash Collateral</u>

11.  In accordance with Bankruptcy Rules 4001(b)–(d) and the Complex Case Procedures, as incorporated by Bankruptcy Local Rule 1075-1, the below chart summarizes the significant terms of the Interim Order and the DIP Credit Agreement.[3]

| MATERIAL TERMS[4] | | Location |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Matrix Parent, Inc. (the "**Borrower**") | DIP Credit Agreement, Preamble |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each of the Debtors other than the Borrower (each a "**Guarantor**") | DIP Credit Agreement, § 1.01 |

---

[3]  The following summary of the terms of the DIP Facility is subject entirely to the express terms of the DIP Credit Agreement or Interim Order, as applicable.  If there are any inconsistencies between the summary below and the DIP Credit Agreement, then the DIP Credit Agreement shall control.  If there are any inconsistencies between the summary below and the Interim Order, then the Interim Order shall control.  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 herein.

Furthermore, the DIP Credit Agreement has not yet been finalized as of the time of filing of this Motion. Accordingly, the summaries reflect the current state of the relevant provisions and are subject to change.

[4]  Capitalized terms used but not defined in this table shall have the meanings ascribed in the DIP Credit Agreement.

| MATERIAL TERMS[4] | | Location |
|---|---|---|
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Each DIP Lender that is a signatory to the DIP Credit Agreement and any DIP Lender that holds Loans or has a DIP Commitment (as defined below) and includes each lender that becomes a party to the DIP Credit Agreement as a DIP Lender pursuant to an Assignment and Assumption or an amendment or agreement relating to additional DIP Commitments under the DIP Credit Agreement. | DIP Credit Agreement, § 1.01 |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Acquiom Agency Services ("**Acquiom**") and Seaport Loan Products LLC ("**Seaport**"), as co-administrative agents for the Lenders (in such capacities, each a "**Co-Administrative Agent**" and together, the "**Administrative Agent**"), and Acquiom, as collateral agent (in such capacity, the "**Collateral Agent**" and, together with the Administrative Agent, together with its successors and permitted assigns, the "**DIP Agent**"). | DIP Credit Agreement, Preamble |
| **DIP Facility and Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility consists of (i) new money term loans (the "**New Money DIP Term Loans**") in an aggregate principal amount of $60 million, of which $40 million will be available immediately upon entry of the Interim Order and the remainder will be available upon entry of the Final Order (subject to certain conditions), (ii) subject to the "roll-down" terms in paragraph 2(c) of the Interim Order, $100 million of DIP Roll-Up Loans (as defined in the Interim Order), which will be deemed rolled up and converted into DIP Obligations (as defined in the Interim Order) on the Issuance Date (the "**DIP Roll-Up Loans**") and (iii) the Tranche B Loans (as defined below) which loans will be deemed made upon entry of the Interim Order (the loans to be made available under the foregoing clauses (i), (ii) and (iii), the "**DIP Loans**" and the commitments therefor, the "**DIP Commitments**"). | Interim Order, Preamble |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Initial Budget</u>:  The Debtors have prepared and delivered to the DIP Agent a 13-week cash flow forecast, a copy of which is attached as <u>Schedule 1</u> to the Interim Order (the "**Initial Budget**").<br><br><u>Subsequent Budget</u>:  On Friday of the second full calendar week following the date of entry of the Interim DIP Order, and on the first Friday of each month thereafter, the Loan Parties shall provide to the Administrative Agent and the Ad Hoc Committee Advisors an updated 13-week forecast for the subsequent 13 weeks of the Loan Parties, broken down by week, which shall include the anticipated uses of the Loans for such period (a "**Proposed Budget**"), which Proposed Budget shall modify and supersede any prior Budget upon the approval of the Required Lenders in their reasonable discretion (such approval not to be unreasonably withheld or delayed, and which approval may be delivered by the Ad Hoc Committee Advisors by e-mail correspondence) (initially, the Initial Budget and, subsequently, each such approved Proposed Budget, the "**Budget**"); *provided, that,* the most recently delivered Proposed Budget shall be deemed approved five (5) Business Days following delivery thereof to the Administrative Agent and the Ad Hoc Committee Advisors, in the event the Required Lenders shall have failed to reject the same on or before such date; *provided, further, that,* for the avoidance of doubt, until the conditions for the most recently delivered Proposed Budget are met the prior approved Budget shall remain in full force and effect for all purposes. | DIP Credit Agreement, § 6.01(h) |
| **Interest Rate** | The DIP Loans comprising (i) each Term Benchmark Rate Loan shall bear interest on the outstanding principal amount thereof for each | DIP Credit Agreement, |

| MATERIAL TERMS[4] | | Location |
|---|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | Interest Period at a rate *per annum* equal to the sum of (A) the Benchmark Rate applicable to the currency in which such Term Benchmark Rate Loan is incurred for such Interest Period *plus* (B) the Applicable Rate for Term Benchmark Rate Loans and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable date of Borrowing or conversion date, as the case may be, at a rate *per annum* equal to the sum of (A) the Base Rate *plus* (B) the Applicable Rate for Base Rate Loans.<br><br>Applicable Rate: a percentage *per annum* equal to (i) for Term Benchmark Rate Loans, 6.00% and (ii) for Base Rate Loans, 5.00%<br><br>Default Rate: If an Event of Default (as defined in the DIP Credit Agreement) exists and is continuing, the Borrower shall pay interest on all outstanding Obligations hereunder (after the expiration of any applicable grace period), which shall include all Obligations following an acceleration pursuant to Section 8.02 of the DIP Credit Agreement (including an automatic acceleration) at a fluctuating interest rate *per annum* at all times equal to the 2.00% *per annum* in excess of the interest rate otherwise payable hereunder for Base Rate Loans to the fullest extent permitted by applicable Laws. | § 2.08 |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary fees for financings of this type.<br><br>Backstop Premium: As consideration for providing the Backstop Commitments (as defined in the Backstop Commitment Letter), the Borrower agrees to pay to the Administrative Agent for ratable distribution to the backstop commitment parties (the "**Tranche B Lenders**"), a fee equal to each such Tranche B Lender's Tranche B Loan Amount which shall be fully earned and payable upon entry of the Interim Order, which shall be paid in the form of an increased amount of Loans (such Loans, the "**Tranche B Loans**") of such Tranche B Lender in accordance with this Section 2.01(c) (the "**Backstop Premium**").<br><br>Administration Agent Fee: The Borrower agrees to pay to the Administrative Agent for its own account an annual agent fee equal to $25,000.<br><br>Annual Online Electronic Data Room Fee: The Borrower agrees to pay to the Administrative Agent for its own account an annual data room fee equal to $1,600.<br><br>Exit Premium: 3.0% of the amount prepaid or permanently reduced, payable upon any voluntary reduction of the New Money Commitments, voluntary prepayment of loans, or mandatory prepayment from certain asset sales or unpermitted debt incurrences, other than in the event of conversion to take-back indebtedness at emergence in accordance with an Approved Plan. | DIP Credit Agreement, § 2.09 |

| MATERIAL TERMS[4] | | Location |
|---|---|---|
| **Maturity Date; Duration for Use of DIP Collateral** Bankruptcy Rule 4001(c)(1)(B) | The earliest of (a) January 23, 2025 (b) the effective date of the Plan, (c) the date that the Bankruptcy Court orders the conversion of the Chapter 11 Cases of any Loan Party to a Chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Loan Party, (d) the acceleration of the Loans and (e) the sale of all or substantially all of the Loan Parties' assets; *provided, that,* if such day is not a Business Day, the Maturity Date shall be the Business Day immediately following such day; *provided, further,* that the DIP Credit Agreement includes certain milestones that must be adhered to if not extended by agreement. | DIP Credit Agreement, § 1.01 |
| **Prepayments** Bankruptcy Rule 4001(c)(1)(B) | <u>Voluntary Prepayments</u>. The Borrower may, upon irrevocable written notice by the Borrower to the Administrative Agent (a "**Prepayment Notice**"), at any time or from time to time voluntarily prepay Loans; *provided* that<br><br>• Any prepayment of a Term Benchmark Rate Loan shall be accompanied by all accrued interest thereon. Each prepayment of any outstanding Tranche pursuant to Section 2.05(a) of the DIP Credit Agreement shall be applied to the Tranche A Loans, until paid in full and then to the Tranche B Loans.<br><br>• In the event that all or any portion of the Loans is repaid or prepaid as a result of any voluntary prepayments or payments made following acceleration of the Loans prior to the Maturity Date, such repayments or prepayments will be made together with the Exit Premium. If the Loans are accelerated or otherwise become due prior to the Maturity Date, in each case, as a result of an Event of Default (including the acceleration of claims by operation of law), the amount of principal of and premium on the Loans that becomes due and payable shall equal 100% of the principal amount of the Loans plus (so long as such Loans are not converted to take-back indebtedness in accordance with the Plan) the Exit Premium, as if such acceleration or other occurrence were a voluntary prepayment of the Loans accelerated or otherwise becoming due.<br><br><u>Mandatory Prepayments</u>.<br><br>• <u>Asset Sale Prepayments</u>: If (x) the Borrower or any Subsidiary Disposes of any property or assets pursuant to Section 7.05(g), (v), or (w) (solely to the extent the Budget contemplates the proceeds of such Disposition be applied as a prepayment) of the DIP Credit Agreement or any Casualty Event occurs, which results in the receipt by the Borrower or such Subsidiary of Net Cash Proceeds in excess of $300,000, the Borrower shall prepay, on or prior to the date which is five (5) Business Days after the date of the realization or receipt by such Loan Party of such Net Cash Proceeds in an aggregate principal amount equal to 100% of such Net Cash Proceeds plus the Exit Premium; *provided, that,* the Borrower may reinvest all or any portion of any Net Cash Proceeds realized or received with respect to such | DIP Credit Agreement, § 2.05 |

| MATERIAL TERMS[4] | Location |
|---|---|
| | Disposition or Casualty Event in the business within twelve (12) months following receipt of such Net Cash Proceeds.<br><br>• <u>Indebtedness</u>: If any Loan Party or any of their Subsidiaries incurs or issues any Indebtedness after the Closing Date (other than Indebtedness permitted under Section 7.03 of the DIP Credit Agreement), the Borrower shall prepay an aggregate principal amount of Loans in an amount equal to 100% of all proceeds therefrom together with the Exit Premium immediately upon receipt thereof.<br><br><u>Term Lender Opt-Out</u>.<br><br>• With respect to any prepayment of Loans and, unless otherwise specified in the documents therefor, any Lender, at its option, may decline to accept all (but not less than all) of its share of any such prepayment (any such Lender, a "**Declining Lender**") by providing written notice to the Administrative Agent no later than five (5) Business Days after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment. On any Prepayment Date, an amount equal to the Prepayment Amount minus the portion thereof allocable to Declining Lenders, in each case for such Prepayment Date, shall be paid to the Administrative Agent by the Borrower and applied by the Administrative Agent ratably to prepay Loans under the applicable Tranches owing to such applicable Lenders (other than Declining Lenders) in the manner described in Section 2.05(b) for such prepayment. The remaining amount thereof may be retained by the Borrower (such amounts retained by the Borrower, "**Declined Amounts**"). | |
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary for financings of this type, including, among other things:<br><br>• the Petition Date shall have occurred;<br><br>• All of the pleadings related to the "first day orders" shall be in form and substance satisfactory to the Required Lenders;<br><br>• the Court shall have entered the Interim Order within two (2) Business Days of the Petition Date, which shall not have been vacated, reversed, modified, amended, or stayed; and<br><br>• delivery of the Initial Budget. | DIP Credit Agreement, §§ 4.01, 4.02 |
| **Superpriority Expense Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(i) | Subject to the Carve Out, the DIP Agent is granted, pursuant to Bankruptcy Code sections 364(c)(1), 503, and 507, an allowed superpriority administrative expense claim in each of these chapter 11 cases for all DIP Obligations, including the DIP Roll-Up Loans and the Backstop Premium. | Interim Order, ¶ 5 |
| **Collateral and Priority**<br>Bankruptcy Rule | As security for the DIP Obligations, effective and automatically properly perfected on the date the Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the | Interim Order, ¶ 6 |

| MATERIAL TERMS[4] | Location |
|---|---|
| 4001(c)(1)(B)(i),<br>4001(c)(1)(B)(ii) | DIP Agent of, or over, any Collateral, without any further action by the DIP Secured Parties, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "**DIP Liens**") are hereby granted to the DIP Agent for the benefit of the DIP Secured Parties (all property identified below being collectively referred to as the "**DIP Collateral**," and, together with the Prepetition Collateral, the "**Collateral**"):<br><br>• Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve-Out) all tangible and intangible prepetition and postpetition property of the DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected, and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than the Avoidance Actions and the Carve-Out (and amounts held in the Professional Fees Account), but including, upon and subject to entry of the Final Order, the Avoidance Proceeds (collectively, the "**Unencumbered Property**").<br><br>• Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior priming security interest (subject and subordinate to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition Collateral, regardless of where located (the "**DIP Priming Liens**"). Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (A) senior in all respects to the other Prepetition Liens on the Prepetition Collateral, (B) senior to any Adequate Protection Liens on the Prepetition Collateral, and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code. The Prepetition Liens with respect to the Prepetition Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens, but the DIP Priming Liens shall be, for the avoidance of doubt, junior to the Carve-Out.<br><br>• Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the DIP Loan Parties that, on or as of the Petition Date, is subject to Prepetition Permitted Senior Liens, which shall be immediately junior and subordinate to the Prepetition Permitted Senior Liens, but senior to the Prepetition Liens and Prepetition Adequate | |

| MATERIAL TERMS[4] | | Location |
|---|---|---|
| | Protections Liens on all Prepetition Collateral subject to such Prepetition Permitted Senior Liens.<br><br>• The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in the Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, or (C) any intercompany liens; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code; *provided*, *however*, such DIP Liens shall be subordinate to the Carve-Out in all respects. | |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary affirmative covenants for financings of this type, including stipulations to, among other things:<br><br>• deliver certain financial statements to DIP Agent;<br><br>• deliver cash flow forecasts and variance reports to DIP Agent;<br><br>• preserve and keep in full force the legal existence of the Debtors;<br><br>• maintain and preserve the Debtors' properties and adequate insurance on properties; and<br><br>• continue paying obligations and taxes and comply with applicable law in all material respects.<br><br>Usual and customary negative covenants for financings of this type, including stipulations to, among other things, not:<br><br>• create, incur, assume, or otherwise become or remain liable with respect to any indebtedness except as permitted;<br><br>• create, incur, assume, or permit existence of any liens on any property or assets, except as permitted;<br><br>• pay or make certain restricted payments, except as permitted;<br><br>• enter into or cause to exist certain burdensome agreements;<br><br>• make or own any investment, except as permitted; and<br><br>• make any disposition of assets, except as permitted. | DIP Credit Agreement, Article 6, Article 7 |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary events of default for financings of this type, subject to customary grace periods and thresholds, including but not limited to:<br><br>• the failure to pay principal, interest and other amounts when and as required by the DIP Credit Agreement; | DIP Credit Agreement, § 8.01 |

| MATERIAL TERMS[4] | Location |
|---|---|
| | • any representation or warranty being incorrect when made by or on behalf of any Loan Party in connection with any DIP Documents in a material respect;<br><br>• failure to satisfy the Milestones;<br><br>• the Restructuring Support Agreement is terminated in accordance with its terms; and<br><br>• the occurrence of a Change of Control. | |
| **Milestones**<br>Bankruptcy Rule<br>4001(c)(1)(B)(vi) | The DIP Credit Agreement contains the following milestones (collectively, the "**Milestones**"):<br><br>• no later than 11:59 p.m. prevailing Central Time on July 25, 2024, the Bankruptcy Court shall have entered the Interim DIP Order;<br><br>• no later than 11:59 p.m. prevailing Central Time on September 11, 2024, the Bankruptcy Court shall have entered the Final DIP Order;<br><br>• no later than 11:59 p.m. prevailing Central Time on September 11, 2024, the Bankruptcy Court shall have entered the Confirmation Order;<br><br>• no later than 11:59 p.m. prevailing Central Time on September 11, 2024, the Bankruptcy Court shall have entered the Disclosure Statement Order; and<br><br>• the effective date of the Plan of Reorganization shall have occurred not later than 11:59 p.m. prevailing Central Time on September 26, 2024. | DIP Credit Agreement, § 8.01(y) |
| **Carve Out**<br>Bankruptcy Rule<br>4001(b)(1)(B)(iii) | "**Carve-Out**" means the sum of:<br><br>(i) all unpaid fees required to be paid to the clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iv) below);<br><br>(ii) all unpaid, reasonable and documented fees and expenses, in an aggregate amount not to exceed $50,000, incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (d) below);<br><br>(iii) to the extent allowed at any time, whether by interim or final compensation or other order, all accrued and unpaid claims for fees, costs and expenses (including any transaction fees or success fees then earned and payable as of the Carve-Out Trigger Date) incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") or retained by any official committee (the "**Committee**") appointed in the Cases pursuant to sections 328 or 1103 of the Bankruptcy Code (such professionals, collectively, the "**Committee Professionals**" and, together with the Debtor | Interim Order, ¶ 4 |

| MATERIAL TERMS[4] | Location |
|---|---|
| Professionals, the "**Professional Persons**," and such fees, costs, and expenses of Professional Persons other than any such financing transaction fees with respect to the DIP Facility, the "**Professional Fees**"), at any time on or prior to the first business day after delivery of a Carve-Out Notice (as defined herein), whether allowed before or after delivery of a Carve-Out Notice and without regard to whether such fees, costs, and expenses are provided for in the Initial Budget or Budget or were invoiced after the Carve-Out Trigger Date (as defined herein); <br><br> (iv) any Professional Fees of the Debtors incurred after the first business day following delivery by of the Carve-Out Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, in an aggregate amount not to exceed $3,500,000 (the amount set forth in this clause (iv) being the "**Debtor Post-Carve-Out Cap**"); and <br><br> (v) any Professional Fees of the Committee incurred after the first business day following delivery by of the Carve-Out Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, in an aggregate amount not to exceed $250,000 (the amount set forth in this clause (v) being the "**Committee Post-Carve-Out Cap**" and, together with the Debtor Post-Carve-Out Cap, the "**Post-Carve-Out Caps**"), *provided*, that nothing herein shall be construed to, impair the ability of any party to object to the allowance of the fees, expenses, reimbursement, or compensation described herein on any grounds. | |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral** Bankruptcy Rule 4001(c)(1)(B) | Use of Proceeds. The proceeds of the Loans shall be applied (a) in accordance with the Budget (subject to the Permitted Variances), (b) to effectuate the roll up of the Prepetition First Lien Obligations pursuant to Section 2.01(b) and (c) of the DIP Credit Agreement to satisfy the Borrower's obligations in respect of the Backstop Commitment Letters. <br><br> Limitations on Use. The proceeds of the Loans may not be used, whether directly or indirectly: <br><br> • in any manner that causes or would reasonably be expected to cause such Loan or the application of such proceeds to violate the Regulations of the Board, including Regulation T, Regulation U and Regulation X, or any other regulation thereof, or to violate the Securities Exchange Act; <br> • for any purpose that is prohibited under the Bankruptcy Code or the DIP Order; <br> • for the payment of fees, expenses, interest or principal with respect to the Prepetition First Lien Obligations, the Prepetition Second Lien Obligations and the Prepetition First Lien Note Obligations; or <br> • to make any distributions under a plan of reorganization in the Chapter 11 Cases. <br><br> Moreover, proceeds of the Loans (including the Carve-Out) may not be used for certain enumerated purposes that are contrary to the rights and interests of the Prepetition Secured Parties and DIP Secured Parties (e.g., for investigations and litigation against such parties, | DIP Credit Agreement, § 5.07 <br><br> Interim Order, ¶ 18 |

| MATERIAL TERMS[4] | | Location |
|---|---|---|
| | incurring indebtedness without prior consent of the DIP Agent, etc.). | |
| **Parties with an Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition Secured Parties and DIP Secured Parties | Interim Order, ¶ F |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iv) | Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the Prepetition Collateral (including Cash Collateral) for the aggregate Diminution in Value and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Liens and the use of their Cash Collateral, the Prepetition Secured Parties are granted the following Adequate Protection (collectively, the "**Adequate Protection Obligations**"):<br><br>First Lien Adequate Protection.<br><br>• *First Lien Adequate Protection Liens*. The Prepetition First Lien Agents are hereby granted, for the benefit of the applicable Prepetition First Lien Secured Parties, effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition First Lien Secured Parties' Diminution in Value upon all of the DIP Collateral (the "**First Lien Adequate Protection Liens**"), senior to all other liens, but (i) in the case of the Prepetition Collateral, junior, subject, and subordinate only to, in the following order, (A) the Carve-Out and the Professional Fees Account, (B) the Prepetition Permitted Senior Liens, and (C) the DIP Liens, and (ii) in the case of all other DIP Collateral, junior, subject, and subordinate only to, in the following order, (A) the Carve-Out and the Professional Fees Account and (B) the DIP Liens.<br><br>• *Prepetition First Lien Secured Parties' Section 507(b) Claim*. The Prepetition First Lien Agents, for the benefit of the applicable Prepetition First Lien Secured Parties, are hereby granted an allowed superpriority administrative expense claim against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) on account of the Prepetition First Lien Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "**First Lien 507(b) Claim**") which First Lien 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (subject to the Carve-Out and Professional Fees Account and excluding Avoidance Actions but including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds). The First Lien 507(b) Claim shall be senior to all other claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified | Interim Order, ¶ 12 |

| MATERIAL TERMS[4] | Location |
|---|---|
| in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, except for, in the following order, (A) the Carve-Out and the Professional Fees Account and (B) the DIP Superpriority Claims.<br><br>• *Prepetition First Lien Secured Parties' Fees and Expenses.* As further adequate protection, subject to the Carve-Out and the Professional Fees Account, the DIP Loan Parties shall currently pay, in cash, (a) subject to the limitations set forth in the Restructuring Support Agreement and the Plan, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition First Lien Loan Agent and the legal and financial advisors of the Prepetition First Lien Loan Agent, including, without limitation, those of Paul Hastings LLP, any other local legal counsels or other advisors in any foreign jurisdiction, and any other advisors of the Prepetition First Lien Loan Agent, (b) subject to the limitations set forth in the Restructuring Support Agreement and the Plan, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition First Lien Notes Agent and the legal and financial advisors of the Prepetition First Lien Notes Agent, including, without limitation, those of Shipman & Goodwin LLP, any other local legal counsels or other advisors in any foreign jurisdiction, and any other advisors of the Prepetition First Lien Notes Agent, and (c) all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the legal and financial advisors of the First Lien Ad Hoc Group, including, without limitation, those of Milbank LLP, Houlihan Lokey, Inc., Porter Hedges LLP, any other local legal counsels or other advisors in any foreign jurisdiction, and any other advisors of the First Lien Ad Hoc Group (collectively, the "**First Lien Adequate Protection Fees and Expenses**"), subject to (x) the review procedures set forth in paragraph 16 of the Interim Order and (y) recharacterization of such payments as principal payments under the applicable Prepetition First Lien Documents in the event of a final determination by order of the Court that the Prepetition First Lien Secured Parties are undersecured (solely upon a motion filed by the Debtors, the Creditors' Committee (if any), or any other party in interest).<br><br>Second Lien Adequate Protection.<br><br>• *Second Lien Adequate Protection Liens.*  The Prepetition Second Lien Agent is hereby granted, for the benefit of the Prepetition Second Lien Secured Parties, effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition Second Lien | |

| MATERIAL TERMS[4] | Location |
|---|---|

Secured Parties' Diminution in Value upon all of the DIP Collateral (the "**Second Lien Adequate Protection Liens**" and, together with the First Lien Adequate Protection Liens, the "**Adequate Protection Liens**"), senior to all other liens, but (i) in the case of the Prepetition Collateral, junior, subject, and subordinate only to, in the following order, (A) the Carve-Out, (B) the Prepetition Permitted Senior Liens, (C) the DIP Liens, (D) the First Lien Adequate Protection Liens, and (E) the Prepetition First Liens, and (ii) in the case of all other DIP Collateral, junior, subject, and subordinate only to, in the following order, (A) the Carve-Out, (B) the DIP Liens, and (C) the First Lien Adequate Protection Liens.

- *Prepetition Second Lien Secured Parties' Section 507(b) Claim*. The Prepetition Second Lien Agent, for the benefit of the Prepetition Second Lien Secured Parties, is hereby granted an allowed superpriority administrative expense claim against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) on account of the Prepetition Second Lien Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "**Second Lien 507(b) Claim**" and, together with the First Lien 507(b) Claim, the "**507(b) Claims**") which Second Lien 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (subject to the Carve-Out and the Professional Fees Account and excluding Avoidance Actions but including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds). The Second Lien 507(b) Claim shall be senior to all other claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, except for, in the following order, (A) the Carve-Out and the Professional Fees Account, (B) the DIP Superpriority Claims, and (C) the First Lien 507(b) Claim.

- *Prepetition Second Lien Secured Parties' Fees and Expenses*. As further adequate protection, subject to the Carve-Out, the Professional Fees Account, and the limitations set forth in the Restructuring Support Agreement and the Plan, the DIP Loan Parties shall currently pay, in cash, (a) all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition Second Lien Agent and the legal and financial advisors of the Prepetition Second Lien Agent, including, without limitation, those of Paul Hastings LLP, any other local legal counsels or other advisors in any foreign jurisdiction, and any other advisors of the Prepetition Second Lien Agent and (b) all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the legal and financial advisors of an ad hoc group of Prepetition First Lien Noteholders and Prepetition Second

| MATERIAL TERMS[4] | Location |
|---|---|
| | Lien Lenders (the "**Crossholder Ad Hoc Group**"), including, without limitation, those of Akin Gump Strauss Hauer & Feld LLP, Greenhill & Co., any other local legal counsels or other advisors in any foreign jurisdiction, and any other advisors of the Crossholder Ad Hoc Group (collectively, the "**Second Lien Adequate Protection Fees and Expenses**"), subject to (x) the review procedures set forth in paragraph 16 of the Interim Order and (y) recharacterization of such payments as principal payments under the applicable Prepetition Second Lien Loan Documents in the event of a final determination by order of the Court that the Prepetition Second Lien Secured Parties are undersecured (solely upon a motion filed by the Debtors, the Creditors' Committee (if any), or any other party in interest). | |
| **Determination Regarding Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains stipulations of fact by the Debtors, including those related to the validity and enforceability of the Debtors' prepetition secured obligations. | Interim Order, ¶ G |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Final Order, the DIP Agent, for the benefit of the DIP Secured Parties, will receive a lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. | Interim Order, ¶ 6 |

| MATERIAL TERMS[4] | | Location |
|---|---|---|
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | The Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon all parties in interest unless the Creditors' Committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter before the end of the Challenge Period asserting a Challenge and there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge.<br><br>The "**Challenge Period**" means: (i) the earlier of (w) one business day before the hearing approving a sale of substantially all of the Debtors' assets or confirming a plan of reorganization, (x) as to the Creditors' Committee (if any) only, the earlier of (1) 60 calendar days after the appointment of the Creditors' Committee (if any) and (2) one business day before the hearing approving a sale of substantially all of the Debtors' assets or confirming a plan of reorganization, (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) 60 calendar days after entry of the Interim Order, or (B) the date that is 30 calendar days after their appointment, and (z) for all other parties in interest, the earlier of (1) 30 calendar days after entry of the Interim Order and (2) one business day before the hearing approving a sale of substantially all of the Debtors' assets or confirming a plan of reorganization; and (ii) any such later date as (x) has been agreed to in writing (which may be by email) by the applicable Prepetition First Lien Agent with respect to the Prepetition First Lien Obligations or the Prepetition First Liens and the Debtors or (y) has been ordered by the Court for cause upon a motion filed and served within any applicable period. | Interim Order, ¶ 17 |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to permit (i) the DIP Secured Parties and Prepetition Secured Parties to take any Perfection Action and (ii) affiliates of the Debtors who are not debtors in these cases to take all actions as are necessary or appropriate to implement the terms of the Interim Order.<br><br>Moreover, pursuant to the Interim Order, upon the occurrence and during the continuation of an Event of Default that has not been waived by the Required DIP Lenders and following delivery of written notice (a "**Termination Notice**") (including by e-mail) on not less than five (5) business days' notice (such five (5) business day period, the "**DIP Agent Remedies Notice Period**") to the Debtors, Weil, as lead restructuring counsel to the Debtors, lead restructuring counsel to each of the Prepetition Agents, lead counsel to the Creditors' Committee (if any), and the U.S. Trustee (the "**Remedies Notice Parties**"), the DIP Agent may (and any automatic stay otherwise applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order (including this paragraph) is hereby modified), without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Agent to, unless the Court orders otherwise (*provided*, *that*, during the DIP Agent Remedies Notice Period, the Debtors, the Creditors' Committee (if | Interim Order, ¶¶ 7(e), 7(f), 14(a), 31 |

| MATERIAL TERMS[4] | Location |
|---|---|

any) and/or any party in interest shall be entitled to seek an emergency hearing with the Court for the purpose of contesting whether, in fact, an Event of Default has occurred and is continuing or to obtain non-consensual use of Cash Collateral, and *provided*, *further*, that if a request for such hearing is made prior to the end of the DIP Agent Remedies Notice Period, then the DIP Agent Remedies Notice Period shall be continued until the Court hears and rules with respect thereto (the "**Continued DIP Agent Remedies Notice Period**")): (a) immediately terminate and/or revoke the Debtors' right under this Interim Order and any other DIP Documents to use any Cash Collateral (subject to the Carve-Out and related provisions), (b) terminate the DIP Facility and any DIP Document as to any future liability or obligation of the DIP Secured Parties but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations; (c) declare all DIP Obligations to be immediately due and payable; and (d) invoke the right to charge interest at the default rate under the DIP Documents. Upon delivery of such Termination Notice by the DIP Agent, without further notice or order of the Court, the DIP Secured Parties' and the Prepetition Secured Parties' consent to use Cash Collateral and the Debtors' ability to incur additional DIP Obligations hereunder will, subject to the expiration of the DIP Agent Remedies Notice Period or the Continued DIP Agent Remedies Notice Period, as applicable, and unless the Court orders otherwise, automatically terminate, and the DIP Secured Parties will have no obligation to provide any DIP Loans or other financial accommodations. As soon as reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy of such Termination Notice on the docket.

Following an Event of Default and the delivery of a Termination Notice, but prior to exercising the remedies set forth in this sentence below or any other remedies (other than those set forth in paragraph 7(e) of the Interim Order, the DIP Secured Parties shall be required to file a motion with the Court seeking emergency relief (the "**Stay Relief Motion**") on not less than five (5) business days' written notice to the Remedies Notice Parties (which may run concurrently with the DIP Agent Remedies Notice Period) for a further order of the Court fashioning any appropriate remedy, including modifying the automatic stay in the chapter 11 cases to permit the DIP Secured Parties to, subject to the Carve-Out and related provisions: (a) freeze monies or balances in the Debtors' accounts; (b) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Secured Parties against the DIP Obligations, (c) enforce any and all rights against the DIP Collateral, including, without limitation, foreclosure on all or any portion of the DIP Collateral, occupying the Debtors' premises, sale or disposition of the DIP Collateral; and (d) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Documents, or applicable law. If the DIP Secured Parties are permitted by the Court to take any enforcement action with respect to the DIP Collateral following the hearing on the Stay Relief Motion, the Debtors shall cooperate with the DIP Secured Parties in their efforts to enforce their security interest in the DIP Collateral, and shall

| MATERIAL TERMS[4] | Location |
|---|---|
| | not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such DIP Secured Parties from enforcing their security interests in the DIP Collateral.  Until such time that the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility to the extent drawn prior to the occurrence of an Event of Default and Cash Collateral to fund the Carve-Out, meet payroll obligations, and pay necessary expenses to avoid immediate and irreparable harm to the Debtors' estates, including funding operations in accordance with the Approved Budget and the terms of the DIP Documents. | |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit** Bankruptcy Rule 4001(c)(1)(B)(v) | The Interim Order does not provide for a waiver of any entity's authority or right to file a plan, request the use of cash collateral, or request authority to obtain credit; however, there are limitations imposed on the Debtor's rights to do any of the foregoing. | N/A |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | Without in any way limiting the validity of the automatic perfection of the DIP Liens and the Adequate Protection Liens under the terms of the Interim Order, the DIP Secured Parties and the Prepetition Secured Parties are hereby authorized, but not required to, execute in the name of the DIP Loan Parties or the Prepetition Loan Parties (as applicable), as their true and lawful attorneys (with full power of substitution, to the maximum extent permitted by law) and to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar perfection instruments in any jurisdiction, or take possession of certificated securities, or take any other similar action in a manner not inconsistent herewith to document, validate or perfect the liens and security interests granted to them hereunder (the "**Perfection Actions**").  All such Perfection Actions shall be deemed to have been taken on the date of entry of the Interim Order.  The automatic stay shall be modified to the extent necessary to permit the DIP Secured Parties and the Prepetition Secured Parties to take any Perfection Action.  For the avoidance of doubt, the DIP Liens and the Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination, at the time and on the date of entry of the Interim Order, whether or not the DIP Secured Parties or the Prepetition Secured Parties take such Perfection Actions.

A certified copy of the Interim Order may, in the discretion of the DIP Agent and each applicable Prepetition Agent, be filed or recorded in the filing or recording offices in addition to or in lieu of any financing statements, mortgages, notices of lien or similar instruments, and all filing and recording offices are hereby authorized and directed to accept a certified copy of the Interim Order for filing and/or recording, as applicable. | Interim Order, ¶ 14 |

| MATERIAL TERMS[4] | | Location |
|---|---|---|
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Subject to the provisions of paragraph 17 of the Interim Order (including, without limitation, the Challenge Period, as defined herein) each of the Debtors and each of their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present and future subsidiaries and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties (upon entry of the Final Order), the DIP Secured Parties, and each of their respective Representatives (solely in such capacity and, as it relates to Representatives of the Prepetition Secured Parties, upon entry of the Final Order) (collectively, the "**Released Parties**"), from any and all liability to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature and description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, in contract or tort, in each case arising out of or related to the Prepetition Loan Documents (upon entry of the Final Order), the DIP Facility, the DIP Documents, the DIP Roll-Up Loans, the negotiation thereof and the transactions and agreements reflected thereby, that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter may have against any of the Released Parties for or by reason of any act, omission, matter, or cause arising at any time on or prior to the date of the Interim Order; *provided, that*, the release set forth in this section shall not release (i) any claims against or liabilities of a Released Party that a court of competent jurisdiction determines has resulted from such Released Party's bad faith, fraud, gross negligence, or willful misconduct or (ii) any DIP Lenders from honoring its obligations to the Debtors under the DIP Documents. | Interim Order, ¶ G(xv) |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Credit Agreement and Interim Order contain indemnification provisions ordinary and customary for debtor-in-possession financings of this type. | DIP Credit Agreement, § 10.05 Interim Order, ¶ 8 |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Except to the extent of the Carve-Out and the Professional Fees Account, no costs or expenses of administration of these cases or any Successor Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceeding under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or Prepetition Collateral (in each case, including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or the Prepetition First Lien Loan Agent, as applicable, and no consent shall be implied from any action, inaction or acquiescence by any of the DIP Secured Parties or Prepetition Secured Parties, and nothing contained in the Interim Order shall be deemed to be a consent by the DIP Secured Parties or Prepetition Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise, unless expressly permitted under the Interim Order; *provided, **that**, **the foregoing* | Interim Order, ¶ 8 |

| MATERIAL TERMS[4] | | Location |
|---|---|---|
| | waiver shall be  without prejudice to any provisions of the Final Order with respect to costs or expenses incurred  following the entry of the Final Order. | |
| **Section 552(b) Waiver** Bankruptcy Rule 4001(c)(1)(B) | In no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Secured Obligations, or the Prepetition Collateral, as applicable; *provided, that,* the foregoing waiver shall be without prejudice to any provisions of the Final Order.  Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties; ***provided, that,* the foregoing waiver shall be without prejudice to any provisions of the Final Order**. | Interim Order, ¶ 9 |

## **Statement Regarding Significant Provisions**

12.    Pursuant to paragraph 8 of the Complex Case Procedures, the DIP Credit

Agreement and/or DIP Orders contain the following provisions ("**Significant Provisions**"):

| DIP Financing Term | Relief Requested |
|---|---|
| **Sale or Plan Confirmation Milestones** Complex Case Procedures ¶ 8(a) | The DIP Credit Agreement requires the Debtors to comply with the Milestones, including (i) no later than 11:59 p.m. prevailing Central Time on September 11, 2024, the Bankruptcy Court shall have entered the Confirmation Order; (ii) no later than 11:59 p.m. prevailing Central Time on September 11, 2024, the Bankruptcy Court shall have entered the Disclosure Statement Order; and (iii) the effective date of the Plan of Reorganization shall have occurred not later than 11:59 p.m. prevailing Central Time on September 26, 2024.  DIP Credit Agreement, § 8.01(y). <br><br> Justification: These milestones are appropriate given the amount of funding the DIP Lenders are willing to make available to the Debtors to fund these chapter 11 cases and the case calendar proposed by the Debtors in their own business judgment.  The Debtors believe that the DIP Lenders would not have otherwise provided the DIP Loans. |
| **Cross-Collateralization** Complex Case Procedures ¶ 8(b) | The Interim Order does not provide for cross-collateralization. |
| **Roll-ups** <br><br> Complex Case Procedures ¶ 8(c) | Subject to the "roll-down" terms in paragraph 2(c) of the Interim Order, upon the Issuance Date, $100 million (the "**Roll-Up Amount**") in the aggregate of the Prepetition First Lien Obligations held by the DIP Lenders (or affiliates thereof) shall be deemed rolled up and converted into an equivalent principal amount of DIP Roll-Up Loans deemed to be made under the DIP Credit Agreement, subject to the provisions of paragraph 17 of the Interim Order, to the extent the full amount of the New Money DIP Term Loans are actually funded (the "**Roll-Up**"). Interim Order ¶ 2(b). |

| DIP Financing Term | Relief Requested |
|---|---|
| | If, prior to entry of the Final Order, all DIP Obligations other than the Rolled-Down Prepetition Loans are repaid in cash with the proceeds from an alternative debtor-in-possession financing facility, then one-third (1/3) of the Roll-Up is unwound and those DIP Roll-Up Loan amounts revert back to Prepetition First Lien Obligations (the "**Roll-Down**").  Interim Order ¶ 2(c). |
| | Justification: The Roll-Up reflects the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties.  The Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the DIP Loan Parties thereunder without the Roll-Up.  The Debtors and the DIP Secured Parties engaged in arm's-length negotiations.  Moreover, if the Debtors refinance the DIP Obligations (other than the Rolled-Down Prepetition Loans) before entry of the Final Order, one-third (1/3) of the Roll-Up unwinds.  Although this provides for an interim Roll-Up of the full Roll-Up amount, when paired with the Roll-Down, it is, in effect, similar to a lower initial Roll-Up frequently approved by this Court.  This feature benefits the Debtors if they want to try to refinance the DIP Facility.  Moreover, and as described above, as a result of the syndication process, the DIP Roll-Up Loans will not be issued until the Issuance Date.  This benefits the Debtors, as the DIP Roll-Up Loans will not accrue interest until they are issued. |
| **Liens on Avoidance Actions or Proceeds of Avoidance Actions** Complex Case Procedures ¶ 8(d) | Subject to entry of the Final Order, the DIP Lenders will receive a lien on the Avoidance Proceeds.  Interim Order ¶ 6(a). |
| | Justification: The Debtors submit that granting DIP Liens on Avoidance Proceeds is appropriate because the DIP Facility and use of Cash Collateral provide the Debtors with new money to fund the Debtors' reorganization and ensure the Debtors are able to maximize value for their estates. Moreover, the liens were required by the DIP Secured Parties as a condition to extending credit.  The Debtors respectfully submit that granting liens on Avoidance Proceeds is an appropriate under these circumstances because it is subject to a final order and will allow parties in interest the opportunity to object. |
| **Default Provisions and Remedies** Complex Case Procedures ¶ 8(e) | The Interim Order and DIP Credit Agreement provide for certain Events of Default and remedies upon Events of Default, including customary termination events for, among other things, any material default, violation, or breach of the terms of the Interim Order by the Debtors, conversion or dismissal of the Debtors' cases, or appointment of a chapter 11 trustee.  Interim Order ¶¶ 7(e), 7(f); *see also* DIP Credit Agreement § 8.01. |
| | Justification: These Events of Default appropriately balance, in the Debtors' view, the DIP Lenders' need for protection and the Debtors' need for debtor-in-possession financing and continued access to Cash Collateral.  In addition, the DIP Agent must provide five (5) business days' prior written notice prior to exercising its rights under the DIP Documents and, as applicable, file a Stay Relief Motion.  Until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of the Event of Default) or Cash Collateral to |

| DIP Financing Term | Relief Requested |
|---|---|
| | fund operations in accordance with the DIP Credit Agreement. Therefore, the Interim Order does ***not*** provide for the automatic lifting of the stay upon an Event of Default.  Interim Order ¶¶ 7(e), 7(f) |
| **Releases of Claim Against Lender or Others**<br>Complex Case Procedures ¶ 8(f) | Subject to the provisions of paragraph 17 of the Interim Order (including, without limitation, the Challenge Period, as defined herein) each of the Debtors and each of their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present and future subsidiaries and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties (upon entry of the Final Order), the DIP Secured Parties, and each of their respective Representatives (solely in such capacity and, as it relates to Representatives of the Prepetition Secured Parties, upon entry of the Final Order) (collectively, the "**Released Parties**"), from any and all liability to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature and description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, in contract or tort, in each case arising out of or related to the Prepetition Loan Documents (upon entry of the Final Order), the DIP Facility, the DIP Documents, the DIP Roll-Up Loans, the negotiation thereof and the transactions and agreements reflected thereby, that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter may have against any of the Released Parties for or by reason of any act, omission, matter, or cause arising at any time on or prior to the date of the Interim Order; *provided*, *that*, the release set forth in this section shall not release (i) any claims against or liabilities of a Released Party that a court of competent jurisdiction determines has resulted from such Released Party's bad faith, fraud, gross negligence, or willful misconduct or (ii) any DIP Lenders from honoring its obligations to the Debtors under the DIP Documents. Interim Order, ¶ G(xv)<br><br>Justification. The release is appropriate because (i) the Debtors are being provided consideration in the form of the DIP Facility and the Prepetition Secured Parties' consent to the Debtors' use of Cash Collateral, which is essential to the Debtors' ability to maximize value for their estates and (ii) the release complies with the requirements of paragraph 8 of the Complex Case Procedures because the release is subject to the Challenge Period. |
| **Limitations on the Use of Cash Collateral**<br>Complex Case Procedures ¶ 8(g) | Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the DIP Lenders, the DIP Agent, and Prepetition Secured Parties (*e.g.*, for investigations and litigation against such parties).  *See* Interim Order ¶ 18.<br><br>Justification. These limitations are usual and customary.  The Debtors, having engaged in arm's-length negotiations with the DIP Lenders and certain Prepetition Secured Parties, agreed to limit the Debtors' use of Cash Collateral as consideration for, among other things, the provision of new money within the broader context the Debtors' value- |

| DIP Financing Term | Relief Requested |
|---|---|
| | maximizing restructuring process.  These limitations are reasonable given the facts and circumstances of these chapter 11 cases. |
| **Priming Liens**<br>Complex Case Procedures ¶ 8(h) | Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest (subject and subordinate to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition Collateral, regardless of where located (the "**DIP Priming Liens**").  Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (A) senior in all respects to the other Prepetition Liens on the Prepetition Collateral, (B) senior to any Adequate Protection Liens on the Prepetition Collateral, and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens with respect to the Prepetition Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens, but the DIP Priming Liens shall be, for the avoidance of doubt, junior to the Carve-Out.  Interim Order ¶ 6(b).<br><br>Justification. It is appropriate to provide priming liens to the DIP Lenders to secure the DIP Obligations because the Prepetition Secured Parties are deemed to have consented to the priming of their liens.  The Interim Order does not provide for any non-consensual priming liens.  Furthermore, the Prepetition Secured Parties are receiving adequate protection. |

## Jurisdiction

13.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### A.      General Background

14.     On the date hereof (the "**Petition Date**"), the Debtors each commenced with the Court a voluntary case under chapter 11 of title 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

15.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Bankruptcy Local Rules.

16.     The Debtors, together with certain of their non-debtor affiliates (collectively, the "**Company**"), are a leading provider of telecom analytics solutions for roaming and network services, security, fraud management, revenue and business assurance, testing, and customer engagement and experience for global Communication Services Providers ("**CSPs**"). The Company's analytics solutions are provided through a combination of software, cloud-based products, and third party hardware as well as maintenance, subscription, implementation services, and managed services for those products.  Through this suite of innovative products and solutions, the Company is able to drive customer revenues, improve network security, minimize fraud, and ensure active testing and network monitoring.

17.     On July 23, 2024, the Debtors entered into a restructuring support agreement (as may be amended from time to time and including all exhibits thereto, the "**Restructuring Support Agreement**") with (a)(1) an ad hoc group of Prepetition First Lien Lenders (the "**First Lien Ad Hoc Group**") which collectively hold, own, or control approximately 88% of the aggregate outstanding principal amount of loans under the Prepetition First Lien Credit Agreement, and (2) an ad hoc group of Prepetition First Lien Noteholders and Prepetition Second Lien Lenders (the "**Crossholder Ad Hoc Group**") which collectively hold, own, or control approximately (i) 100% of the aggregate outstanding principal amount of notes under the Prepetition First Lien Notes Facility and (ii) 75% of the aggregate outstanding principal amount of loans under the Prepetition Second Lien Credit Agreement (collectively, the "**Consenting Creditors**") and (b) the Debtors' prepetition equity sponsor (the "**Consenting Sponsor**" and,

together with the Consenting Creditors, the "**Consenting Parties**").  Under the Restructuring Support Agreement, each Consenting Party has agreed to support the Company's restructuring pursuant to the *Joint Chapter 11 Plan of Mobileum, Inc. and Its Affiliated Debtors* (as may be modified, amended, or supplemented and including any exhibits, schedules, or supplements thereto, the "**Plan**") filed contemporaneously herewith.

18.    Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the First Day Declaration, filed contemporaneously herewith and incorporated herein by reference.[5]

## B.    Significant Prepetition Indebtedness

19.    As of the Petition Date, the Debtors' significant prepetition indebtedness consisted of the following:

| Facility | Funded Debt | Total Claim | Lien Priority and Collateral |
|---|---|---|---|
| Prepetition First Lien Facility | | | First priority lien, *pari passu* with the Prepetition First Lien Note Purchase Agreement, on substantially all of the assets of the Debtors, subject to certain exceptions and permitted liens |
| *Revolving Credit Facility (drawn amounts)* | $52.5 million | $57.1 million | |
| *First Lien Loan Facility* | $380.8 million | $414.8 million | |
| Prepetition First Lien Note Purchase Agreement | $31.7 million | $34.7 million | First priority lien, *pari passu* with the Prepetition First Lien Facility, on substantially all of the assets of the Debtors, subject to certain exceptions and permitted liens |
| Prepetition Second Lien Facility | $163.2 million | $183.9 million | Second priority lien on substantially all of the assets of |

---

[5]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

| Facility | Funded Debt | Total Claim | Lien Priority and Collateral |
|---|---|---|---|
| | | | the Debtors, subject to certain exceptions and permitted liens |
| **Total Secured Debt** | $628.3 million | $690.5 million | |

a.     Prepetition First Lien Facility

20.     With the exception of Matrix Intermediate, Inc. ("**Intermediate**"), each of the Debtors is an obligor under the Prepetition First Lien Facility (as defined below) pursuant to that certain *First Lien Credit Agreement*, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition First Lien Credit Agreement**"), by and among Matrix Holdco, LLC, ("**Holdings**"), Matrix Parent, Inc. (the "**Borrower**"), the lenders from time to time party thereto (the "**Prepetition First Lien Lenders**") and Jefferies Finance LLC ("**Jefferies**"), in its capacities as administrative agent and collateral agent for the Prepetition First Lien Lenders (in such capacities, the "**Prepetition First Lien Loan Agent**" and, together with the Prepetition First Lien Lenders, the "**Prepetition First Lien Loan Secured Parties**").  Pursuant to the Prepetition First Lien Credit Agreement, the Prepetition First Lien Lenders made available to the Borrower (i) term loans in an aggregate principal amount of $380.8 million (the "**Prepetition First Lien Loan Facility**") and (ii) a revolving credit facility in an aggregate principal amount of $52.5 million with a $10 million letter of credit sub-facility (the "**Revolving Credit Facility**" and, together with the Prepetition First Lien Loan Facility, the "**Prepetition First Lien Facility**").  The Prepetition First Lien Facility is guaranteed by each of the Debtors, other than Intermediate and the Borrower, and the obligations thereunder (the "**Prepetition First Lien Loan Obligations**") are secured by the same collateral (which includes all or substantially all of the assets of the Debtors (other than Intermediate), subject to certain exceptions and permitted liens) as, and on a *pari passu* basis with,

the obligations under the Prepetition First Lien Note Purchase Agreement (as defined below) (the liens on such collateral, the "**Prepetition First Liens**").

21.     As of the Petition Date, the aggregate claim amount outstanding under the First Lien Term Loan Facility is approximately $414.8 million.  As of the Petition Date, the aggregate claim amount outstanding under the Revolving Credit Facility is approximately $57.1 million.  Additionally, as of the Petition Date, there are $0.8 million in issued and outstanding letters of credit (the "**Letters of Credit**") under the Revolving Credit Facility.

b.     Prepetition First Lien Note Purchase Agreement

22.     With the exception of Intermediate, each of the Debtors is an obligor under that certain *Note Purchase Agreement*, dated as of March 15, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition First Lien Note Purchase Agreement**" and, together with the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement, the "**Prepetition Loan Agreements**"), by and among  Holdings, the Borrower, as issuer, the other Debtors party thereto as guarantors, the holders from time to time party thereto (the "**Prepetition First Lien Noteholders**" and, together with the Prepetition First Lien Lenders, the "**Prepetition First Lien Credit Parties**") and Wilmington Trust, National Association, in its capacity as notes agent for the Prepetition First Lien Noteholders (in such capacity, the "**Prepetition First Lien Notes Agent**" and, together with the Prepetition First Lien Loan Agent, the "**Prepetition First Lien Agents**").  The Prepetition First Lien Note Purchase Agreement is guaranteed by each of the Debtors, other than Intermediate and the Borrower, and the obligations thereunder (the "**Prepetition First Lien Notes Obligations**" and, together with the Prepetition First Lien Loan Obligations, the "**Prepetition First Lien Obligations**") are secured by the same collateral (which includes all or substantially all of the assets of the Debtors (other than Intermediate), subject

to certain exceptions and permitted liens) as, and on a *pari passu* basis with, the obligations under the Prepetition First Lien Facility (the liens on such collateral, the "**Prepetition First Lien Notes Liens**").  As of the Petition Date, the Debtors had outstanding indebtedness (including accrued but unpaid interest) of approximately $34.7 million under the Prepetition First Lien Note Purchase Agreement.

c.      <u>Prepetition Second Lien Facility</u>

23.     With the exception of Intermediate, each of the Debtors is an obligor under the Prepetition Second Lien Facility (as defined below) pursuant to that certain *Second Lien Credit Agreement*, dated as of March 1, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Prepetition Second Lien Credit Agreement**"), by and among Holdings, the Borrower, the lenders from time to time party thereto (the "**Prepetition Second Lien Lenders**" and, together with the Prepetition First Lien Credit Parties, the "**Prepetition Lenders**") and Jefferies, in its capacities as administrative agent and as collateral agent for the Prepetition Second Lien Lenders (in such capacities, the "**Prepetition Second Lien Agent**" and, together with the Prepetition First Lien Agents and the Prepetition Lenders, the "**Prepetition Secured Parties**").  Pursuant to the Prepetition Second Lien Credit Agreement, the Prepetition Second Lien Lenders made available to the Borrower term loans in an aggregate principal amount of $163.2 million (the "**Prepetition Second Lien Facility**").  The Prepetition Second Lien Facility is guaranteed by each of the Debtors, other than Intermediate and the Borrower, and the obligations thereunder are secured by the same collateral (which includes all or substantially all of the assets of the Debtors (other than Intermediate), subject to certain exceptions and permitted liens) as, and on a *second lien* basis with, the obligations under the Prepetition First Lien Facility and the Prepetition First Lien Note Purchase Agreement (such collateral, the "**Prepetition Collateral**" and the liens thereon, the "**Prepetition Second Liens**"

and, together with the Prepetition First Lien Loan Liens and the Prepetition First Lien Notes Liens, the "**Prepetition Liens**"). As of the Petition Date, the aggregate claim amount outstanding under the Prepetition Second Lien Facility is approximately $183.9 million.

d.     Intercreditor Agreements

24.     The relative rights and priorities of the Prepetition First Lien Lenders and the Prepetition First Lien Noteholders in the collateral securing the obligations under the Prepetition First Lien Facility and the Prepetition First Lien Note Purchase Agreement are governed by that certain Pari Passu Intercreditor Agreement, dated as of March 15, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Pari Passu Intercreditor Agreement**"), by and among each of the Debtors (other than Intermediate), the Prepetition First Lien Loan Agent, the Prepetition First Lien Notes Agent, and each other person party thereto from time to time.

25.     The relative priorities and rights in the collateral of the Prepetition First Lien Lenders and the Prepetition First Lien Noteholders, on the one hand, and the Prepetition Second Lien Lenders, on the other, are governed by that certain Intercreditor Agreement, dated as of March 1, 2022 (as supplemented by that certain Intercreditor Agreement Joinder, dated as of March 15, 2023, by the Prepetition First Lien Notes Agent and accepted and agreed by the Prepetition First Lien Loan Agent and the Prepetition Second Lien Agent and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**1L/2L Intercreditor Agreement**" and, together with the Pari Passu Intercreditor Agreement, the "**Intercreditor Agreements**"), by and among each of the Debtors (other than Intermediate), the Prepetition First Lien Loan Agent, the Prepetition Second Lien Agent, and the Prepetition First Lien Notes Agent, and each other person party thereto from time to time.

26. The Intercreditor Agreements govern the lenders' rights and obligations with respect to, among other things, priority of interests in the collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

**C.      Need for DIP Financing and Use of Cash Collateral**

27. The Debtors require access to the DIP Facility and the authority to use Cash Collateral throughout the chapter 11 process to ensure they have sufficient liquidity to operate their businesses and administer their estates in the ordinary course for the duration of these chapter 11 cases. Based on the current projections, the Debtors will not have sufficient liquidity to fund ongoing operations and expenses for the estimated duration of the chapter 11 cases, including costs associated with effectuating the transaction contemplated under the Plan. Moreover, all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute Cash Collateral is subject to prepetition security interests in favor of the Prepetition Secured Parties in accordance with the Prepetition Loan Documents.

28. Evercore worked with the Debtors' management team and FTI Consulting, Inc. ("**FTI**"), the Debtors' proposed financial advisor, to analyze the Debtors' cash flows and determine whether incremental DIP financing might be reasonably necessary and, if so, the amount and type of DIP financing that would be appropriate to operate their businesses during a reorganization process. This analysis included, among other things, the assessment of (i) the Debtors' near-term financial projections and (ii) the impact of the chapter 11 cases on the Debtors' liquidity, including with respect to the administrative costs and professional fees projected to be incurred during the pendency of these chapter 11 cases.

29. Based on this analysis, the Debtors and their advisors concluded that the Debtors would require approximately $60 million of new money postpetition financing and access to cash collateral to finance their operations and maintain sufficient liquidity assuming a potential

two (2) month duration for these chapter 11 cases and the need to consummate the Plan.  The Debtors and their advisors continued to update the budget leading up to the Petition Date to account for changes in the Debtors' funding needs resulting from, among other things, the estimated duration and timing of the commencement of these chapter 11 cases, the operating performance of the business after filing, as well as cash generated by the Debtors prepetition.  The Initial Budget reflects the Debtors' need for DIP financing to fund the Debtors' chapter 11 process while maintaining an adequate liquidity cushion.

30.    The proposed DIP Facility is essential to fund these chapter 11 cases and provides significant benefit to the Debtors and their estates.  Securing a meaningful new money DIP financing commitment at the outset of these chapter 11 cases provides the Debtors with certainty regarding the restructuring process and instills confidence in the Debtors' vendors, customer base (some of whom do not reside in the United States), employees, counterparties, and business partners by assuring them that the Debtors will be able to continue operating "business as usual" and otherwise pay their obligations as they come due after the Petition Date. Furthermore, the proposed DIP Facility will enable the Debtors to effectuate the transactions contemplated by the Restructuring Support Agreement and the Plan (the "**Restructuring Transactions**"), which will permit the Debtors to continue their transformation and achieve key business goals with a deleveraged capital structure with the support of their key stakeholders. Moreover, as the proposed DIP Facility is only one component of the holistic Restructuring Transactions negotiated with the First Lien Ad Hoc Group, it includes a roll up of Prepetition First Lien Obligations, which will provide the Debtors and their stakeholders with clarity regarding the exit capital structure and represents a central part of the recovery sought by the First Lien Ad Hoc Group.  In total, the comprehensive Restructuring Transactions will represent an aggregate

deleveraging of the Debtors' balance sheet from approximately $628 million in total debt to approximately $160 million in total debt upon emergence.  In sum, the proposed DIP Facility paves the path for the Debtors to accomplish the Restructuring Transactions and emerge as a reorganized and stronger enterprise for their customers and stakeholders.

31.     The DIP Credit Agreement provides for an initial borrowing under the DIP Facility in an amount equal to $40 million following entry of the Interim Order.  An immediate infusion of liquidity will help provide confidence to the market and employees and ensure stable access to capital, all of which will maximize the potential value of their assets for the benefit of their estates and creditors.  Importantly, the relief requested in this Motion also reflects an agreement between the Debtors and the affected lenders regarding the use of Cash Collateral during these chapter 11 cases and is, therefore, consensual.

**D.     Efforts to Obtain Postpetition Financing**

32.     As explained in the Yi Declaration, in light of the Debtors' dwindling liquidity and given the limited progress toward a potential out-of-court restructuring, in June 2024 the Debtors determined it appropriate to commence outreach and negotiations around potential DIP financing.  As such, beginning in June 2024, with the assistance of the Debtors' management and other professionals, Evercore commenced a process to secure the requisite DIP financing to fund the Debtors' ongoing business operations and the contemplated costs of the chapter 11 cases. The process for identifying an actionable DIP financing proposal involved engaging with the First Lien Ad Hoc Group as well as a variety of potential third-party capital providers.  In total, Evercore approached nineteen (19) third-party lenders to gauge their interest in providing DIP financing, two (2) of which executed (or were already party to) non-disclosure agreements and received access to a data room before declining to participate.  None of the third-party lenders who were approached were willing to seriously consider this financing in light of a number of factors,

including, among others, (a) the uncertainty whether the unencumbered collateral value would be sufficient to collateralize the size of the DIP financing, (b) the perceived likelihood that the First Lien Ad Hoc Group would provide the financing, and (c) the unwillingness to provide unsecured financing, junior secured financing with administrative priority, or, alternatively, engage in a difficult and costly "priming fight" with the First Lien Ad Hoc Group given the First Lien Ad Hoc Group's stated unwillingness to have their Prepetition Liens primed.  Notably, the unwillingness to provide junior secured financing is supported by the valuation analysis attached as Exhibit F to the *Disclosure Statement for Joint Chapter 11 Plan of Mobileum, Inc. and its Affiliated Debtors*, which suggests that the Debtors' total enterprise value does not exceed the aggregate amount of Prepetition First Lien Obligations.

33.     Accordingly, Evercore turned its primary focus towards developing an actionable DIP financing proposal with the First Lien Ad Hoc Group as part of the ongoing negotiations around the comprehensive Restructuring Transactions.  Throughout the process, Evercore continually informed the Restructuring Committee of the status of the marketing process, including negotiations with the First Lien Ad Hoc Group.  The process was rigorous and marked by hard bargaining.  Ultimately, the First Lien Ad Hoc Group was the only party to offer a potentially actionable proposal, and on or about July 23, 2024, the Debtors and their advisors finalized the terms of the Restructuring Support Agreement and DIP Facility with the First Lien Ad Hoc Group.

### Terms of DIP Facility Are Reasonable Under the Circumstances

34.     As discussed in the DIP Declaration, the obligations, interest rate, fees, and milestones under the DIP Financing are reasonable under the circumstances.  For the reasons set forth herein and in the DIP Declaration, the DIP Financing provides the best financing option available to the Debtors under the circumstances.  Accordingly, the DIP Lenders have acted in

good faith and have agreed to provide the DIP Financing to the Debtors on terms that are reasonable under the circumstances.

## DIP Financing Should Be Approved

35.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  As set forth in the DIP Declaration, the Debtors were unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 364(a)–(b), 503(b)(1).  Having determined that postpetition financing was only available pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with the DIP Lenders to secure the DIP Financing on the terms described herein.  For these reasons, as discussed further below, the Debtors satisfy the necessary conditions under sections 364(c) and (d) for authority to enter into the DIP Financing.

## A.     Entering DIP Financing Is a Sound Exercise of Business Judgment

36.     If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.  *See, e.g.*, *In re Estrada*, Case No. 16-80003-G3-11, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *In re Age Ref., Inc.*, No. 10-50501, 2010 WL 4780670, at *6 (Bankr. W.D. Tex. Mar. 3, 2010) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re N. Bay Gen. Hosp., Inc.*, Case No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (Docket No. 21); (same); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases

consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

37.    The Fifth Circuit has described the business judgment standard as a flexible one, which will be satisfied if a debtor articulates a business justification and the decision furthers the interests of the Debtor and other parties in interest.  *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (in the context of section 363 of the Bankruptcy Code); *see also Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986).  Courts generally will not second-guess a debtor's business decisions when those decisions involve the appropriate level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor.  *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011).  In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

38.    The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a thorough process conducted with the guidance of experienced advisors, and after careful evaluation of alternatives.  Given the nature of

the Debtors' prepetition capital structure and the limited unencumbered asset pool, the First Lien Ad Hoc Group surfaced as the best available financing source that could move quickly to commit to a facility, and enable the Debtors to avoid a potentially costly and protracted priming fight at the outset of these chapter 11 cases.  The Debtors negotiated the DIP Credit Agreement with the First Lien Ad Hoc Group in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the costs of these chapter 11 cases on reasonable terms.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**B.      Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

39.      The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens to the applicable DIP Lenders pursuant to section 364(d) of the Bankruptcy Code.  The Debtors propose to provide the DIP Lenders (i) first priority liens on, and security interests in, certain unencumbered property of the DIP Loan Parties, (ii) first priority, senior priming liens on, and security interests in, the prepetition and postpetition property of the DIP Loan Parties, and (iii) second priority liens on all prepetition and postpetition property of the DIP Loan Parties that is subject to senior prepetition liens permitted under the Prepetition First Lien Facility or Prepetition Second Lien Facility (collectively, the "**DIP Liens**"); *provided*, *however*, the DIP Liens shall be subject to, among other things, the Carve-Out.

40.      The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice

and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

41.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, Courts will consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and (b) of the Bankruptcy Code; (b) the credit transaction benefits the debtor as necessary to preserve estate assets; and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In re Republic Airways Holdings Inc.*, Case No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *Ames Dep't Stores*, 115 B.R. at 40.  However, section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n* (*In re Snowshoe Co., Inc.*), 789 F.2d 1085, 1088 (4th Cir. 1986).

42.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  "Section 364(d) 'does not require that debtors seek alternative financing from every possible lender.  However, the debtor must make an effort to obtain credit without priming a senior lien.'"  *Republic Airways Holdings*, 2016 WL 2616717, at *11 (quoting *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630–31 (Bankr. S.D.N.Y. 1992)).  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

### 1.    Alternative Sources of Financing Are Not Available to Debtors

43.    The Debtors do not believe that alternative financing based on an unsecured or junior secured basis is presently available.  As stated above, Evercore contacted nineteen (19) third-party lenders, in addition to the Ad Hoc Group, to seek proposals for postpetition financing.  No parties except for the Ad Hoc Group submitted DIP financing proposals.  The Court should, therefore, authorize the Debtors to provide the DIP Agent and the DIP Lenders with superpriority administrative expense status for any DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code.

44.    Moreover, the terms of the DIP Financing are fair, reasonable, and adequate under the circumstances. The DIP Financing represents the most favorable (and only) source of postpetition financing and is designed to provide the Debtors with sufficient liquidity for the duration of these chapter 11 cases and, through the DIP Facility's conversion into an exit facility, a significantly deleveraged post-restructuring capital structure.

### 2.     Prepetition Secured Parties Have Consented to DIP Liens and DIP Superpriority Claims

45.     The Prepetition Secured Parties have consented to (or are deemed to consent to) (i) the Debtors' use of Cash Collateral; (ii) the Debtors' entry into the DIP Facility; and (iii) the granting of the DIP Liens and the DIP Superpriority Claims, in each case, upon the terms set forth in the Interim Order and the DIP Documents.

46.     The 1L/2L Intercreditor Agreement contains provisions that address the rights of the Prepetition Secured Parties in the event of insolvency proceedings.  Specifically, under the 1L/2L Intercreditor Agreement, if the First Lien Agent desires to permit the use of cash collateral or obtain DIP financing during a bankruptcy, and such DIP financing is, among other things, (i) senior or *pari passu* with the liens on the Prepetition Collateral, (ii) does not exceed the First Lien DIP Cap (as defined in the 1L/2L Intercreditor Agreement), and (iii) the Prepetition Second Lien Lenders and Prepetition Second Lien Agent retain their lien on the Prepetition Collateral,  then each of the Prepetition Second Lien Lenders and Prepetition Second Lien Agent agree that, among other things, (a) it will not oppose or object to (and thus be deemed to consent to) such DIP Financing, (b) it will subordinate its liens on the Prepetition Collateral to the liens securing, and all obligations relating to, such DIP financing, and (c) it will only seek adequate protection consisting of (x) adequate protection liens with the same priority of its existing liens, if the Prepetition First Lien Lenders are granted adequate protection liens, (y) superpriority administrative claims, if the Prepetition First Lien Lenders are granted superpriority administrative claims, and (z) adequate protection payments in the amount of post-petition interest, fees, costs,

charges, and other expenses, if the Prepetition First Lien Lenders are granted post-petition interest, fees, costs, charges, and other expenses. *See* 1L/2L Intercreditor Agreement § 3.4(a), (c).

47. Moreover, under the Pari Passu Intercreditor Agreement, the Prepetition First Lien Lenders are deemed to consent to the DIP Facility and the adequate protection package proposed under the Interim Order. Specifically, each Prepetition First Lien lender has agreed to not object (and thus are deemed to consent) to any DIP Facility and adequate protection package that the Prepetition First Lien Loan Agent supports so long as, among other things, each Prepetition First Lien lender (i) retains its applicable liens and (ii) is granted comparable adequate protection, including adequate protection liens with the same priority. *See* Pari Passu Intercreditor Agreement § 2.05(b).

### 3. Prepetition Secured Parties Are Adequately Protected

48. Although the Prepetition Secured Parties are deemed to have consented to the DIP Liens, DIP Superpriority Claims, and use of Cash Collateral, they are also adequately protected as contemplated by section 364(d) of the Bankruptcy Code. What constitutes adequate protection is decided on a case-by-case basis. *See Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept.") (quoting *3 Collier on Bankruptcy* ¶ 363.05 (15th ed. rev. 2005)); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis.").

49.     Pursuant to the DIP Orders, each of the Prepetition Secured Parties is receiving adequate protection in the form of adequate protection liens and superpriority claims to the extent of any Diminution in Value, and the payment of certain fees and expenses.  The proposed adequate protection package is consistent with, and permitted by, the Intercreditor Agreements and appropriately safeguards the Prepetition Secured Parties from the Diminution in Value (if any) of their interests in the Prepetition Collateral.  The Debtors submit that their provision of adequate protection to the Prepetition Secured Parties is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**C.     Debtors Should Be Authorized to Use Cash Collateral**

50.     For the reasons set forth herein, the Debtors require use of Cash Collateral (as well as the DIP Facility) for the continued operation of the Debtors' businesses and smooth entry into these chapter 11 cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

51.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use Cash Collateral because the Prepetition Secured Parties have consented to (or are deemed to consent to) such use and are, moreover, adequately protected as

described above.  Accordingly, the Court should grant the Debtors the authority to use Cash Collateral under section 363(c) of the Bankruptcy Code.

**D.      The Roll-Up Should Be Approved**

52.      As noted above, the DIP Facility provides for a Roll-Up of up to $100 million in the aggregate of the Prepetition First Lien Obligations held by DIP Lenders (or affiliates thereof).  The Debtors submit that the Roll-Up is appropriate under the circumstances of these chapter 11 cases.  This provision was required by the DIP Lenders as a condition to the DIP financing and Restructuring Transactions as a whole, and the Debtors submit that such a roll-up will not unduly advantage any party.  In particular, as discussed, each of the Prepetition First Lien Credit Parties will be afforded the opportunity to become a DIP Lender and participate in the Roll-Up.  Moreover, if the Debtors refinance the DIP Obligations (other than the Rolled-Down Prepetition Loans) before entry of the Final Order, one-third (1/3) of the Roll-Up unwinds.  This feature benefits the Debtors if they want to try to refinance the DIP Facility.

53.      Moreover, the Roll-Down mechanic set forth in the Interim Order provides further credence as to the appropriateness of the Roll-Up.  Specifically, if prior to entry of the Final Order, all DIP Obligations other than the Rolled-Down Prepetition Loans are repaid in cash with the proceeds from an alternative debtor-in-possession financing facility prior to entry of the Final Order, then one-third (1/3) of the Roll-Up will be unwound and such corresponding DIP Roll-Up Loan amounts will revert back to, and be treated as, Prepetition First Lien Obligations.  This mechanic was heavily negotiated between the parties and represents a significant concession by the DIP Lenders, as it allows the Debtors potentially refinance the DIP Facility without having to bear the full cost of the Roll-Up.  Although this provides for an interim Roll-Up of the full Roll-Up amount, when paired with the Roll-Down, it is, in effect, similar to a lower initial Roll-Up frequently approved by this Court.

54.     Additionally, as described above, the DIP Facility is open for participation to all holders of Prepetition First Lien Obligations until the Election Deadline Date (as defined in the Backstop Commitment Letter).  Although the Debtors are seeking approval of the Roll-Up upon entry of the Interim Order, as a  result of the syndication process, the Roll-Up will be effective upon the Issuance Date.   The potential delayed effectiveness of the Roll-Up provides for administrative convenience and obviates the need for the DIP Lenders to adjust entitlements after the Election Deadline Date.

**E.      Debtors Should Be Authorized to Pay Fees Required by DIP Documents**

55.     In consideration for the DIP Lenders' commitments in connection with the DIP Facility, the Debtors have agreed, subject to Court approval, to, among other things, (i) pay certain fees discussed in the table at ¶ 10 above (the "**DIP Fees**") to the DIP Lenders, the DIP Agent, and a fronting lender in exchange for their backstopping, agenting, and fronting of the DIP Facility, including the Backstop Commitments and the reasonable and documented out-of-pocket fees and expenses of the legal and financial advisors of each of the DIP Lenders and the DIP Agent, (including reasonable and documented fees and expenses of  outside counsel), (the "**Out-of-Pocket Expenses**" and, together with the DIP Fees, the "**DIP Fees and Expenses**") and (ii) indemnify the DIP Lenders in accordance with the DIP Credit Agreement..  Specifically, the DIP Fees consist of the following:

- <u>Backstop Premium</u>.   As consideration for providing the Backstop Commitments (as defined in the Backstop Commitment Letter), the Debtors have agreed to pay the DIP Lenders that are backstopping the DIP Facility a fee in the aggregate amount of fifteen percent (15%) of the aggregate Backstop Commitments, which shall be paid in the form of Tranche B Loans under the DIP Credit Agreement and convert into ten percent (10%) of the New Equity Interests (as defined in the Plan) on the effective date of the Plan.

- <u>Exit Premium</u>. As consideration for providing the DIP Facility, the Debtors have agreed to pay the DIP Lenders a fee in the aggregate amount of three percent (3%) of the overall DIP Facility, payable upon the reduction of DIP Commitments or repayment of DIP Loans, other than in the event of conversion to take-back indebtedness at emergence in accordance with the Plan.

- <u>Jefferies Fronting Fees</u>. As consideration for fronting the New Money DIP Term Loans, the Debtors have agreed to reimburse Jefferies for all reasonable and documented out-of-pocket costs and incurred expenses (including, but not limited to, all reasonable and documented fees, and out-of-pocket expenses and disbursements of Paul Hastings LLP, as counsel to Jefferies).

- <u>DIP Agent Fees</u>. In accordance with the Fee Letter, the Debtors have agreed to pay to the DIP Agent certain fees as described therein, including an Annual Administration Fee of $25,000, due and payable annually.

56.    As set forth in the DIP Declaration, the terms of the DIP Documents, including the economic terms embodied by the DIP Fees imposed thereunder, are, under these circumstances, reasonable, and were negotiated at arm's length.  The Debtors believe that such terms are   the Debtors' best—and in fact only—currently available option to maintain their ongoing business operations and fund their chapter 11 cases, particularly given (i) the Debtors' primary assets are its people and systems, rather than hard assets to lend against as collateral, (ii) the Debtors are in a period of transition as it relates to restoration of their reputation and the integration of the systems and processes they have obtained through the recent acquisitions, and (iii) the Debtors are involved in the ongoing Superior Court Litigation and Chancery Court Litigation, each as more fully described in the First Day Declaration.

57.    The Debtors considered the DIP Fees when determining in their sound business judgment whether entry into the DIP Facility constituted the best path forward, and the Debtors determined that paying these fees in order to obtain the DIP Facility—which represents the only offer the Debtors received—is in the best interests of the Debtors' estates.  The DIP Fees

are required by the DIP Lenders, and thus are necessary to receive access to the DIP Facility, which, because of the roll up, conversion to exit financing, and relation to the overall Restructuring Transactions, provide the Debtors with certainty regarding a pathway to a successful reorganization and emergence from these chapter 11 cases.  Moreover, the Backstop Premium enabled the Debtors to obtain the Backstop Commitments, which, among other things, ensures the Debtors have access to the entire proposed DIP Facility and may effectuate the value-maximizing Restructuring Transactions.  Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

**F.      Carve-Out Is Appropriate**

58.     The DIP Financing subjects the DIP Lenders' security interests, superpriority administrative expense claims, and the adequate protection claims and liens to the Carve-Out.  Without the Carve-Out, the Debtors' estates or other parties in interest could be harmed because the services that professionals might otherwise provide in these chapter 11 cases could be restricted.  *See Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").  Additionally, the Carve Out protects against administrative insolvency during the pendency of these chapter 11 cases by ensuring that assets are available to pay U.S. Trustee's fees and professional fees of the Debtors and any statutory committee.  Accordingly, the Debtors submit that the Carve-Out is appropriate.

**G.      DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e)**

59.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights with respect to liens securing those loans,

even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

60.     As explained herein and in the DIP Declaration, negotiations of the DIP Facility were conducted in good faith and at arm's length.  The proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and therefore entitled to all of the protections afforded by that section.

## H.     Modification of Automatic Stay Is Warranted

61.     The relief requested herein contemplates a modification of the automatic stay (if applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (b) permit the DIP Agent, DIP Lenders, and the Prepetition Secured Parties to exercise rights and remedies under certain circumstances.  These provisions were part of the *quid pro quo* for the Debtors' ability to obtain the DIP Financing and use Cash Collateral as provided therein and in the Interim Order.  Notably, the exercise of remedies (including remedies with respect to prepetition claims and collateral) will be subject to five (5) business days' notice to allow the Debtors to contest whether a default has occurred and is occurring.  Moreover, following the delivery of such notice, but prior to exercising certain remedies, the DIP Agent may file a Stay Relief Motion seeking emergency relief from the

automatic stay and until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of the Event of Default) or Cash Collateral to fund operations in accordance with the DIP Credit Agreement.  Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Interim Order is reasonable and should be approved.

62.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Air Methods Corporation*, No. 23-90886 (MI) (Bankr S.D. Tex. Nov. 14, 2023) (Docket No. 225) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Serta Simmons Bedding, LLC*, No. 23-90020 (DRJ) (Bankr S.D. Tex. Mar. 3, 2023) (Docket No. 406) (same); *In re Core Scientific, Inc.*, No. 22-90341 (CML) (Bankr S.D. Tex. Mar. 1, 2023) (Docket No. 608) (same); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. June 17, 2022) (Docket No. 588) (same); *In re Sheridan Holding Co. II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. Oct. 21, 2019) (Docket No. 178) (same).

## I.     Debtors Require Immediate Access to Cash Collateral and DIP Facility

63.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores*, 115 B.R. at 36.

64.     The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly.  The Debtors have an immediate need

for continued access to Cash Collateral, and any disruption to the use of Cash Collateral would destroy value from the Debtors' estates by preventing them from making disbursements necessary to operate in the ordinary course.  Similarly, access to the DIP Financing would provide assurances to employees, vendors, and other stakeholders that the Debtors have the financial wherewithal to continue operating during the pendency of these chapter 11 cases.  Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avoid value-destruction that would lead to immediate and irreparable harm to the Debtors' estates.

**J.      Request for Final Hearing**

65.      Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Order.  The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of any objections by first class mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

**Bankruptcy Rule 6003 Has Been Satisfied**

66.      Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first twenty-one (21) days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm.  As described herein and in the DIP Declaration, the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

**Compliance with Bankruptcy Rule 6004(a) and**
**<u>Waiver of Bankruptcy Rule 6004(h)</u>**

67.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

<u>**Notice**</u>

68.     Notice of this Motion will be provided to any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

<u>**No Previous Request**</u>

69.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Interim Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: July 23, 2024
       Houston, Texas

                                 Respectfully submitted,

                                 */s/ Gabriel A. Morgan*
                                 WEIL, GOTSHAL & MANGES LLP
                                 Gabriel A. Morgan (24125891)
                                 Clifford W. Carlson (24090024)
                                 700 Louisiana Street, Suite 3700
                                 Houston, Texas 77002
                                 Telephone:  (713) 546-5000
                                 Facsimile:  (713) 224-9511
                                 Email:   Gabriel.Morgan@weil.com
                                          Clifford.Carlson@weil.com

                                 -and-

                                 WEIL, GOTSHAL & MANGES LLP
                                 Jeffrey D. Saferstein (*pro hac vice* pending)
                                 Alexander W. Welch (*pro hac vice* pending)
                                 Daphne Papadatos (*pro hac vice* pending)
                                 Eric L. Einhorn (*pro hac vice* pending)
                                 767 Fifth Avenue
                                 New York, New York 10153
                                 Telephone:  (212) 310-8000
                                 Facsimile:  (212) 310-8007
                                 Email:   Jeffrey.Saferstein@weil.com
                                          Alexander.Welch@weil.com
                                          Daphne.Papadatos@weil.com
                                          Eric.Einhorn@weil.com

                                 *Proposed Attorneys for Debtors*
                                 *and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on July 23, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


                                                 _/s/ Gabriel A. Morgan_____
                                                 Gabriel A. Morgan