**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **MOBILEUM, INC.,** *et al.,* | § | **Case No. 24-90414 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

**NOTICE OF FILING
OF PLAN SUPPLEMENT IN CONNECTION WITH
JOINT CHAPTER 11 PLAN OF MOBILEUM, INC. AND ITS AFFILIATED DEBTORS**

**PLEASE TAKE NOTICE THAT**:

1.       On July 23, 2024, Mobileum, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), with the support of their lenders and other financial stakeholders, (i) began solicitation of votes on the *Joint Chapter 11 Plan of Mobileum, Inc. and Its Affiliated Debtors* (Docket No. 14) (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "**Plan**")[2] and (ii) each commenced with this Bankruptcy Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

2.       On July 26, 2024, the Bankruptcy Court entered the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan, (II)*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Mobileum, Inc. (7417); Matrix Intermediate, Inc. (7287); Matrix Holdco, LLC (0039); Matrix Parent, Inc. (9085); Mobile Acquisition Corp. (9591); SIGOS LLC (1763); UnwiredSoft, Inc. (2064); We Do Technologies Americas, Inc. (9338); Convene Networks LLC (2820); Developing Solutions Inc. (6177); and Phase 3 Innovations Holdings, Inc. (1899).  The Debtors' mailing address is 20813 Stevens Creek Boulevard, Suite 200, Cupertino, CA 95014.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

*Approving Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline, (III) Fixing Deadline to Object to Disclosure Statement and Plan, (IV) Approving Notice and Objection Procedures for Assumption of Executory Contracts and Unexpired Leases, (V) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement to File Statements of Financial Affairs and Schedules of Assets and Liabilities, and (VI) Granting Related Relief* (Docket No. 82) (the "**Disclosure Statement Order**").*

3.      In accordance with the Plan and Disclosure Statement Order, the Debtors hereby file certain exhibits to the Plan Supplement (as defined in the Plan, and as in accordance with the Restructuring Support Agreement, the "**Plan Supplement**"):

| | |
|---|---|
| **Exhibit A** | **New Corporate Governance Documents** |
| **Exhibit B** | **Required Disclosures Under Section 1129(a)(5)** |
| **Exhibit C** | **Restructuring Transactions Exhibit** |
| **Exhibit D** | **Schedule of Retained Causes of Action** |
| **Exhibit E** | **Litigation Trust Agreement** |
| **Exhibit F** | **Schedule of Excluded Parties** |

4.      As defined in the Plan, the Plan Supplement means a supplemental appendix to the Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms of the Plan and the Bankruptcy Code and Bankruptcy Rules, which shall include, but not be limited to: (a) the New Corporate Governance Documents; (b) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (c) the Restructuring Transactions Exhibit; (d) the Schedule of Retained Causes of Action; (e) the Schedule of Rejected Contracts, if applicable, (f) the Litigation Trust

Agreement; and (g) the Schedule of Excluded Parties; *provided*, that, through the Plan Effective Date, the Debtors shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the Restructuring Support Agreement and subject to the consent rights thereunder.

5.     The documents contained in the Plan Supplement are integral to, and are considered part of, the Plan.  These documents have not yet been approved by the Bankruptcy Court.  If the Plan is confirmed, the documents contained in this Plan Supplement will be approved by the Bankruptcy Court pursuant to the Confirmation Order.

6.     The Plan Supplement documents attached hereto are not final and remain subject to (i) further review, negotiation, and modifications, and (ii) final documentation in a manner consistent with the Plan and the Restructuring Support Agreement.  The Debtors reserve all rights to amend, supplement, and/or otherwise modify the Plan Supplement, and any of the documents contained therein at any time before the Plan Effective Date, or any such other date as may be permitted by the Plan or by order of the Bankruptcy Court, in accordance with the terms of the Plan and the Restructuring Support Agreement.  If material amendments or modifications are made to any of these documents, the Debtors will file a blackline of each such document so amended or modified with the Bankruptcy Court marked to reflect the same.

7.     A hearing to consider confirmation of the Plan is currently scheduled to begin on **Wednesday, September 11, 2024 at 1:00 p.m. (Central Time)** before the Bankruptcy Court (the "**Confirmation Hearing**").  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice other than adjournments announced in open court or in the filing of a notice or a hearing agenda in these Chapter 11 Cases.

8.      Copies of the exhibits contained in this Plan Supplement, and all documents filed in these Chapter 11 Cases, including the Plan and Disclosure Statement, are available free of charge by visiting https://cases.ra.kroll.com/Mobileum.  You may also obtain copies of filings by visiting the Bankruptcy Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: August 16, 2024
      Houston, Texas

_/s/  Gabriel A. Morgan_
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
         Clifford.Carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Jeffrey D. Saferstein (admitted *pro hac vice*)
Alexander W. Welch (admitted *pro hac vice*)
Daphne Papadatos (admitted *pro hac vice*)
Eric L. Einhorn (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Jeffrey.Saferstein@weil.com
         Alexander.Welch@weil.com
         Daphne.Papadatos@weil.com
         Eric.Einhorn@weil.com


*Proposed Attorneys for Debtors*
*and Debtors in Possession*

### <u>Certificate of Service</u>

I hereby certify that on August 16, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Gabriel A. Morgan*
Gabriel A. Morgan

## Exhibit A

**New Corporate Governance Documents**

> **THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT REMAINS SUBJECT TO ONGOING REVIEW AND NEGOTIATION BY THE DEBTORS AND THE REQUISITE CONSENTING FIRST LIEN LENDERS. THE RIGHTS OF ALL PARTIES ARE EXPRESSLY RESERVED.**

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT[1]

OF

[REORGANIZED GRANDPARENT, LLC]

Dated as of [●], 2024

---

[1] <u>Note to Draft</u>: The Company has flagged certain material terms that remain open, for the benefit of the reader, in the interest of fulsome disclosure. Not all open points have been flagged in this manner and the Company reserves all rights to further review and revise this Agreement.

# TABLE OF CONTENTS

**Page**

Article I Defined Terms ......................................................................................................... 1

    1.1     Definitions ....................................................................................................... 1

    1.2     Rules of Construction ..................................................................................... 8

Article II Organization .......................................................................................................... 9

    2.1     Formation of the Company ............................................................................. 9

    2.2     Name ................................................................................................................ 9

    2.3     Purpose ............................................................................................................ 9

    2.4     Registered Office; Registered Agent; Principal Office; Other Offices........... 9

    2.5     Interest of Members; Property of Company .................................................... 9

    2.6     Limited Liability ............................................................................................ 9

    2.7     Term............................................................................................................... 10

Article III Contributions of Members ................................................................................ 10

    3.1     Initial Issuance of Units ............................................................................... 10

    3.2     Additional Capital Contributions ................................................................. 10

    3.3     Return of Contributions ................................................................................ 10

    3.4     Interest on Capital Contributions ................................................................. 10

    3.5     Advances by Members.................................................................................. 10

    3.6     Common Interests ........................................................................................ 10

    3.7     Management Incentive Interests ................................................................... 11

    3.8     Transfer Books.............................................................................................. 11

    3.9     Certificate Signature .................................................................................... 12

Article IV Distributions; Distributions in Kind ................................................................. 12

    4.1     Distributions................................................................................................. 12

    4.2     Successors..................................................................................................... 12

    4.3     Limitations on Distributions ........................................................................ 12

    4.4     Reserves ....................................................................................................... 12

Article V Transferability ..................................................................................................... 12

    5.1     Transfer Generally ....................................................................................... 12

    5.2     Tag-Along Rights ........................................................................................ 12

    5.3     Drag-Along Right ......................................................................................... 14

    5.4     Preemptive Rights ........................................................................................ 16

    5.5     Admission of New Members; General Restrictions on Transfer................... 18

    5.6     Resignation .................................................................................................. 19

    5.7     Record of Members ...................................................................................... 19

    5.8     Registration Rights ...................................................................................... 19

    5.9     Mandatory Repurchase of Common Interests............................................... 19

Article VI Governance ........................................................................................................ 19

    6.1     Board of Directors ....................................................................................... 19

    6.2     Appointment of Directors ............................................................................ 20

    6.3     Designation Right ........................................................................................ 20

    6.4     Removal of Directors ................................................................................... 21

    6.5     Vacancies ..................................................................................................... 21

    6.6     Authority and Duties of the Board and Board Committees ........................... 21

| | | | |
|---|---|---|---|
| 6.7 | Meetings; Telephonic Meetings | | 22 |
| 6.8 | Quorum; Acts of the Board and Board Committees | | 22 |
| 6.9 | Observer Rights | | 23 |
| 6.10 | Related Party Transactions | | 23 |
| 6.11 | Qualified IPO; Conversion to a Corporation | | 23 |
| 6.12 | Officers | | 24 |
| 6.13 | Officers as Agents; Duties of Officers | | 24 |
| 6.14 | Powers of Members | | 24 |
| 6.15 | Confidentiality | | 25 |
| 6.16 | Regulated Holders | | 25 |

Article VII Powers, Duties and Restrictions of the Company and the Members; Other Provisions Relating to the Members .... 26

| | | | |
|---|---|---|---|
| 7.1 | Powers of the Company | | 26 |
| 7.2 | Compensation of the Members and Directors | | 26 |
| 7.3 | Cessation of Status as a Member | | 26 |
| 7.4 | Other Activities of the Members | | 26 |

Article VIII Books, Records and Accounting; Information Rights .... 27

| | | | |
|---|---|---|---|
| 8.1 | Books of Account; Access | | 27 |
| 8.2 | Deposits of Funds | | 27 |
| 8.3 | Information Rights | | 27 |
| 8.4 | Information Rights of the Company | | 29 |
| 8.5 | Tax Matters | | 29 |

Article IX Term and Dissolution .... 29

| | | | |
|---|---|---|---|
| 9.1 | Term | | 29 |
| 9.2 | Dissolution | | 29 |
| 9.3 | Application and Distribution of Assets | | 30 |
| 9.4 | Termination of the LLC | | 30 |

Article X Representations and Warranties of Members .... 30

| | | | |
|---|---|---|---|
| 10.1 | Authority | | 30 |
| 10.2 | Binding Obligations | | 30 |
| 10.3 | No Conflict | | 30 |
| 10.4 | Purchase Entirely for Own Account | | 30 |
| 10.5 | No Registration | | 31 |
| 10.6 | Investment Experience | | 31 |
| 10.7 | Accredited Investor | | 31 |
| 10.8 | Restricted Securities | | 31 |
| 10.9 | Nonreliance | | 31 |

Article XI General Provisions .... 31

| | | | |
|---|---|---|---|
| 11.1 | Exculpation and Indemnification | | 31 |
| 11.2 | Entire Agreement; Amendments; Waiver | | 33 |
| 11.3 | Avoidance of Provisions | | 34 |
| 11.4 | Binding Agreement | | 34 |
| 11.5 | Notices | | 34 |
| 11.6 | Governing Law | | 34 |
| 11.7 | Consent to Jurisdiction; WAIVER OF JURY TRIAL | | 34 |
| 11.8 | Construction | | 35 |

11.9      Severability ........................................................................................ 35
11.10    Counterparts, Electronic Copies ..................................................... 35
11.11    Survival .............................................................................................. 35
11.12    Termination ........................................................................................ 35
11.13    Special Power of Attorney ............................................................... 35
11.14    Further Assurance ............................................................................. 36
11.15    Use of Name and Trade Marks ....................................................... 36
11.16    Non-Impairment ................................................................................ 36

ANNEX I          REGISTRATION RIGHTS

SCHEDULE I COMPETITORS

EXHIBIT A       CERTIFICATE OF FORMATION
EXHIBIT B       INTERESTS OF MEMBERS
EXHIBIT C       FORM OF JOINDER AGREEMENT

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
OF [REORGANIZED GRANDPARENT], LLC

This Amended and Restated Limited Liability Company Agreement of [Reorganized Grandparent, LLC] (the "Company") is made as of [●], 2024 (the "Effective Date"), by and among the Members listed on the signature pages hereto.  Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Section 1.1.

Recitals[2]

WHEREAS, on [●] 2024, the Member[s] formed the Company as a limited liability company pursuant to the Act, by causing to be filed a Certificate of Formation of the Company, attached hereto as Exhibit A (the "Certificate"), with the office of the Secretary of State of the State of Delaware;

WHEREAS, [●] is party to the limited liability company agreement of the Company, dated as of [●] 2024, (the "Original Agreement");

WHEREAS, [Mobileum, Inc.], along with each of its Affiliates (the "Debtors"), commenced voluntary reorganization cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 in the United States Bankruptcy Court, Southern District of Texas, pursuant to a Restructuring Support Agreement by and between the Debtors (as defined in the RSA), the Consenting Sponsor (as defined in the RSA), and the Consenting Creditors (as defined in the RSA), dated July 23, 2024 (the "RSA"), which sets forth the plan of reorganization (the "Plan");

WHEREAS, the Company was formed for the purpose of reorganizing [Mobileum, Inc.] and its affiliates, and in connection therewith and pursuant to the Plan and the Confirmation Order (as applicable), the Company will issue Common Interests to holders of [First Lien Debt Claims and Second Lien Debt Claims] (as defined in the RSA) (collectively, the "Transaction");

WHEREAS, the Company shall elect to be classified as an association taxable as a corporation for U.S. federal and, where applicable, state and local income tax purposes, effective as of the date of its formation; and

WHEREAS, the Member[s] desire[s] to amend and restate the Original Agreement in its entirety and pursuant to the Plan, this Agreement shall become effective as of the date hereof.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Member[s] hereby agree as follows:

**Article I**
**Defined Terms**

1.1    Definitions.   The following terms shall have the following meanings as used in this Agreement:

"Accelerated Acquirer" shall have the meaning set forth in Section 5.4(g).

---

Note to Draft: Recitals to be revised in accordance with transaction structure.

"<u>Act</u>" shall mean the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 <u>et</u> <u>seq.</u>, as amended and in effect from time to time and any successor statute.

"<u>Ad Hoc Crossover Group</u>" shall mean the Members that were members of the ad hoc group of lenders, collectively with their Affiliates and Related Funds, represented by Akin Gump Strauss Hauer & Feld LLP, as counsel, and Greenhill & Co., as financial advisor in connection with the Chapter 11 Cases.

"<u>Ad Hoc Group of First Lien Lenders</u>" shall have the meaning ascribed to it in the Plan.

"<u>Additional Capital Contribution</u>" shall have the meaning set forth in <u>Section 3.2(a)</u>.

"<u>Affiliate</u>" shall mean, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, including a Related Fund of such Person; <u>provided</u> that for purposes of this Agreement, no Member shall be deemed an Affiliate of the Company or any of its Subsidiaries.  For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" shall mean this Amended and Restated Limited Liability Company Agreement, including all annexes and exhibits hereto, as amended, restated or supplemented from time to time in accordance with the terms hereof.

"<u>Ares Director</u>" shall have the meaning set forth in <u>Section 6.2(a)(ii)</u>.

"<u>Ares Member</u>" shall mean the funds, investment vehicles and accounts managed or advised by Ares Management LLC or its Affiliates, other than Ivy Hill Asset Management, L.P., which hold Common Interests.

"<u>Available Cash</u>", at the time of any proposed distribution, shall mean the excess, as determined by the Board, of (a) all unrestricted cash and cash equivalents then held by the Company to the extent not otherwise required to pay the Company's expenses that have then accrued and are due and owing and all outstanding and unpaid current obligations of the Company as of such time over (b) the amount of reserves established by the Company in accordance with <u>Section 4.4</u>.

"<u>Bankruptcy</u>" shall have the meaning ascribed thereto in Sections 18-101(1) and 18-304 of the Act.

"<u>Board</u>" shall have the meaning set forth in <u>Section 6.1(a)</u>.

"<u>Brigade Director</u>" shall have the meaning set forth in <u>Section 6.2(a)(iii)</u>.

"<u>Brigade Member</u>" shall mean [Brigade Capital Management, LP], collectively with its Affiliates and Related Funds.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday or another day on which commercial banks in New York are required or permitted under applicable laws or regulations to close.

"<u>Capital Contribution</u>" shall mean, at any date, the amount of all capital contributions contributed by a Member to the Company in its capacity as such at or prior to such date, which may be in the form of cash or property.

2

"CEO Director" shall have the meaning set forth in Section 6.2(a)(i).

"Certificate" shall have the meaning set forth in the recitals.

"Chairman" shall have the meaning set forth in Section 6.8(c).

"Chapter 11 Cases" shall have the meaning set forth in the recitals.

"Chief Executive Officer" shall mean the chief executive officer of the Company.

"Common Director" shall have the meaning set forth in Section 6.3(a).

"Common Interests" shall mean the limited liability company interest(s) of a Member in the Company representing the rights of a Member to distributions (liquidating or otherwise) and any and all of the other benefits to which such Member may be entitled as provided in this Agreement and in the Act, together with the obligations of such Member to comply with all the provisions of this Agreement and of the Act.

"Company" shall have the meaning set forth in the preamble.

"Company Confidential Information" shall have the meaning set forth in Section 6.15.

"Compelled Members" shall have the meaning set forth in Section 5.3(a).

"Competitor" shall mean any Person set forth on Schedule I and its Affiliates, provided that Schedule I may be modified by the Board in good faith from time to time to add Persons who are engaged, whether directly or indirectly, in the business of providing roaming, testing, network and customer experience analytics, risk and fraud management, revenue and business assurance, or security solutions to communication service providers, or to remove Persons who are no longer engaged in such business. Notwithstanding the foregoing, no Member, nor any Affiliate of a Member, shall be deemed to be a Competitor unless such Person is set forth on Schedule I or directly or indirectly controls a Person set forth on Schedule I .

"Confirmation Order" shall have the meaning ascribed to it in the Plan.

"Covered Persons" shall have the meaning set forth in Section 11.1(a).

"D&O Insurance Policy" shall have the meaning set forth in Section 11.1(d).

"Designated Director" shall have the meaning set forth in Section 6.2(a)(iv).

"Designating Members" shall mean, collectively, the Members that have a right to designate a Designated Director pursuant to Section 6.2, provided, that once a Member ceases to own either (i) at least seven and one half percent (7.5%) of the outstanding Common Interests or (ii) at least seventy-five percent (75%) of the Common Interests that such holder held as of the Effective Date, it shall no longer be a Designating Member.

"Designation Right" shall have the meaning set forth in Section 6.3(a).

"Director" shall have the meaning set forth in Section 6.1(a).

"Drag-Along Notice" shall have the meaning set forth in Section 5.3(b).

3

"<u>Drag-Along Sale</u>" shall have the meaning set forth in <u>Section 5.3(a)</u>.

"<u>Drag-Along Transaction</u>" shall have the meaning set forth in <u>Section 5.3(a)</u>.

"<u>Effective Date</u>" shall have the meaning set forth in the preamble.

"<u>Exchange Act</u>" shall mean the Securities Exchange Act of 1934, as amended and any successor statute and the rules and regulations of the SEC thereunder, in each case as in effect from time to time.

"<u>Excluded Issuances</u>" shall mean any issuance of any equity interests (including Common Interests and any securities that are convertible into, or exercisable or exchangeable for, such equity interests) (a) to Persons who are, or who are becoming, employees, managers, directors or consultants of the Company or any of its Subsidiaries in connection with any bona fide management incentive plans or other bona fide compensation arrangement approved by the Board and adopted in accordance with this Agreement, and any equity interests issued thereunder, including the MIP and any MIP Awards, (b) as consideration for an acquisition, merger, joint venture or joint venture partnership or similar transaction duly approved by the Board; provided, however, that such acquisition, merger, joint venture, joint venture partnership or similar transaction is not with an Affiliate of the Company or any Related Fund or Affiliate, (c) pursuant to conversion or exchange rights included in securities issued by the Company on or after the Effective Date in accordance with this Agreement, (d) in connection with an equity interest split, division, dividend or similar transaction or reorganization duly approved by the Board or (e) issued by the Company or a Subsidiary of the Company, to the Company or another wholly owned direct or indirect Subsidiary of the Company, as applicable.

"<u>Exempt Person</u>" shall mean, with respect to any Person, any Affiliate of such Person and such Person's or such Person's Affiliates' respective Representatives, in each case, who (a) has a reasonable need to know the contents of the Company Confidential Information or Member Confidential Information, as the case may be, (b) is informed of the confidential nature of the Company Confidential Information or Member Confidential Information and (c) agrees to keep such information confidential in accordance with the terms of this Agreement.

"<u>Exit Credit Agreement</u>" shall have the meaning set forth in the RSA.

"<u>Fair Market Value</u>" shall mean (i) in the case of Publicly Traded Securities, the average closing price on the applicable trading exchange or quotation system on each trading day during the five (5) trading day period ending on the trading day prior to the measurement date, (ii) in the case of equity securities other than Publicly Traded Securities, the fair market value per equity security, as determined on a reasonable basis and in good faith by the Board, but without regard for any liquidity or minority discounts, or (iii) in the case of any other asset or property, the fair market value of such asset or property, as determined on a reasonable basis and in good faith by the Board.

"<u>Fiscal Year</u>" shall mean the fiscal year of the Company, which shall end on December 31 of each year, unless changed by the Board.

"<u>GAAP</u>" shall mean United States generally accepted accounting principles.

"<u>Governmental Authority</u>" shall mean the government of any nation, state, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

4

"Initial Capital Contribution" shall have the meaning set forth in Section 3.1.

"Initial MIP Pool" shall have the meaning set forth in Section 3.7.

"Interested Member" shall mean, with respect to any actual or potential Related Party Transaction, a Member (i) that is or would be a party to such Related Party Transaction or (ii) any Subsidiary or Affiliate (including any Related Fund or portfolio company thereof) of which, or any director, manager, officer or employee of such Member or Subsidiary or Affiliate thereof, or any family member or family trust of any of the foregoing, that is or would be a party to such Related Party Transaction.

"Jointly Appointed Director" shall have the meaning set forth in Section 6.2(a)(v).

"KKR Director" shall have the meaning set forth in Section 6.2(a)(iv).

"KKR Member" shall mean [KKR Credit Advisors (US), LLC], collectively with its Affiliates and Related Funds.

"Listing Rules Member" shall have the meaning set forth in Section 5.3(i).

"Listing Rules Subject Sale" shall have the meaning set forth in Section 5.3(i).

"Liquidator" shall have the meaning set forth in Section 9.2(b).

"Member" shall mean any Person (together with its Affiliates and Related Funds holding Common Interests) (i) listed on the signature pages hereto and automatically admitted to the Company as a member pursuant to the Plan and the Confirmation Order whose interests are recorded as such on the books and records of the Company or (ii) hereafter admitted to the Company as an additional or substitute member of the Company as provided in this Agreement, each in its capacity as a member of the Company, and shall have the same meaning as the term "member" under the Act, but does not include any Person who has ceased to be a member of the Company from and after the date such Person has ceased to be a Member.

"Member Confidential Information" shall have the meaning set forth in Section 6.15.

"Member List" shall have the meaning set forth in Section 5.7.

"MIP" shall have the meaning set forth in Section 3.7.

"MIP Award" shall have the meaning set forth in Section 3.7.

"NASDAQ" shall mean the NASDAQ National Market.

"New Securities" shall have the meaning set forth in Section 5.4(a).

"Notice of Acceptance" shall have the meaning set forth in Section 5.4(b).

"NYSE" shall mean the New York Stock Exchange.

"Observer" shall have the meaning set forth in Section 6.9(a).

"Offered Preemptive Securities" shall have the meaning set forth in Section 5.4(a).

"Original Agreement" shall have the meaning set forth in the recitals.

"Other Indemnitors" shall have the meaning set forth in Section 11.1(e).

"Percentage Interest" shall mean, with respect to a Member, the ratio of the number of Common Interests held by the Member at any time to the total number of Common Interests issued and outstanding at such time, expressed as a percentage.

"Permitted Transfer" shall mean, with respect to any Member: (i) a Transfer of Common Interests or any portion thereof to any Affiliate of such Member; (ii) a Transfer of Common Interests or any portion thereof in connection with a contractually required distribution-in-kind to such Member's limited partners or members pursuant to the express written terms of a partnership investment between the applicable Member and its applicable limited partners or members; and (iii) a Transfer of Common Interests to a broker that will hold the shares in an account for the benefit of such Member or its Affiliates that is acting on a non-principal basis.

"Permitted Transferee" shall mean any Person to whom a Member may Transfer its Common Interests or any portion thereof pursuant to a Permitted Transfer.

"Person" shall mean any individual, partnership, joint stock company, corporation, entity, association, trust, limited liability company, joint venture, unincorporated organization and any government, governmental department or agency or political subdivision of any government.

"Plan" shall have the meaning set forth in the recitals.

"Potential Purchaser" shall mean, with respect to any Member, any Person or group of Persons other than an Affiliate of such Member or the Company or any of its Subsidiaries.

"Preemptive Offer" shall have the meaning set forth in Section 5.4(a).

"Preemptive Percentage" shall have the meaning set forth in Section 5.4(a).

"Preemptive Right" shall have the meaning set forth in Section 5.4(a).

"Preemptive Rightholder" shall mean (i) any Member that holds more than two percent (2%) of the issued and outstanding Common Interests at the time of the proposed sale or issuance pursuant to Section 5.4 and (ii) any Member that held more than two percent (2%) of the issued and outstanding Common Interests as of the Effective Date and has not Transferred to an unaffiliated third party a number of Common Interests that would have caused it to hold two percent (2%) or less of the issued and outstanding Common Interests as of the Effective Date.

"Proxy Holder" shall have the meaning set forth in Section 11.13.

"Publicly Traded Securities" shall mean securities that are registered under the Securities Act, are freely tradable and listed for trading on a national securities exchange.

"Qualified IPO" shall mean (i) the first underwritten public offering, led by a nationally recognized underwriting firm, of at least twenty percent (20)% of the common equity (or equivalent equity security) of the Company (or its successor) pursuant to an effective registration statement filed under the Securities Act, or (ii) a direct listing or other similar transaction on the NYSE or NASDAQ with respect to the common equity of the Company (or its successor), in each case of clause (i) or (ii), that results in the common equity of the Company (or its successor) being registered under the Securities Exchange Act of 1934 and listed on the NYSE or NASDAQ; and either (a) results in proceeds of at least $100,000,000 (net of underwriters'

discounts and selling commissions) or (b) is otherwise approved by Members holding a majority in Percentage Interest of the Common Interests, underlined provided that a Qualified IPO shall not include an offering made in connection with a business acquisition or combination pursuant to a registration statement on Form S-4 or any similar form, or an employee benefit plan pursuant to a registration statement on Form S-8 or any similar form.

"Qualified Marketmaker" means a Person that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers equity interests, in its capacity as a dealer or market maker in equity interests and (ii) is, in fact, regularly in the business of making a market in equity interests.

"Quarterly Financials" shall have the meaning set forth in Section 8.3(a)(ii).

"Regulated Holder" means any person that is a bank holding company, or any affiliate or subsidiary of any bank holding company, as such terms are defined in the U.S. Bank Holding Company Act and its implementing regulations and rules, 12 U.S.C. § 1841 et seq.  For the avoidance of doubt, Barclays shall be a Regulated Holder.

"Related Fund" shall mean, with respect to any Member, any fund, account or investment vehicle that is controlled, managed, advised or sub-advised by (i) such Member, (ii) an Affiliate of such Member, (iii) the same investment manager, advisor or sub-advisor of such Member or (iv) an Affiliate of the investment manager, advisor or sub-advisor of such Member.

"Related Party Transaction" means any transaction, agreement or other arrangement between the Company or any Subsidiary of the Company, on the one hand, and any Affiliate of the Company, Member, any Affiliate of any Member (including any portfolio company thereof), any director, manager, officer or employee of any Member or Subsidiary or Affiliate thereof, or any family member or family trust of any of the foregoing, on the other hand.

"Reorganization" shall have the meaning set forth in Section 6.11.

"Representatives" shall have the meaning set forth in Section 6.15.

"RSA" shall have the meaning set forth in the recitals.

"Sale of the Company" shall mean any of the following: (a) a merger, consolidation, share exchange, business combination or other sale of the Company or its Subsidiaries into or with any other Person or Persons, or a transfer of units in a single transaction or a series of transactions, in which in any case the Members of the Company or the members of its Subsidiaries immediately prior to such merger, consolidation, share exchange, business combination or other sale or first of such series of transactions possess less than a majority of the voting power of the Company's or its Subsidiaries' any successor entity's issued and outstanding capital securities immediately after such transaction or series of such transactions; or (b) a single transaction or series of transactions, pursuant to which a Person or Persons who are not direct or indirect wholly owned Subsidiaries of the Company acquire all or substantially all of the Company's or its Subsidiaries' assets determined on a consolidated basis.

"SEC" shall mean the United States Securities and Exchange Commission.

"Secure Site" shall have the meaning set forth in Section 8.3(a).

"<u>Securities Act</u>" shall mean the Securities Act of 1933, as amended and any successor statute and the rules and regulations of the SEC thereunder, in each case as in effect from time to time.

"<u>Selling Members</u>" shall have the meaning set forth in <u>Section 5.3(a)</u>.

"<u>Subject Purchaser</u>" shall have the meaning set forth in <u>Section 5.4(a)</u>.

"<u>Subsidiary</u>" shall mean, with respect to any Person, any corporation fifty percent (50%) or more of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation is at the time owned by such Person, directly or indirectly through one or more Subsidiaries, and any other Person, including but not limited to a joint venture, a general or limited partnership or a limited liability company, in which such Person, directly or indirectly through one or more Subsidiaries, at the time owns at least fifty percent (50%) or more of the ownership interests entitled to vote in the election of managing partners, managers or trustees thereof (or other Persons performing such functions) or acts as the general partner, managing member, trustee (or Persons performing similar functions) of such other Person.  For the avoidance of doubt, "Subsidiary" shall include any Person that is included in the Company's consolidated group for purposes of preparing the Company's consolidated financial statements in accordance with GAAP.

"<u>Tag-Along Notice</u>" shall have the meaning set forth in <u>Section 5.2(b)</u>.

"<u>Tag-Along Offered Interests</u>" shall have the meaning set forth in <u>Section 5.2(a)</u>.

"<u>Tag-Along Purchaser</u>" shall have the meaning set forth in <u>Section 5.2(a)</u>.

"<u>Tag-Along Record Date</u>" shall have the meaning set forth in <u>Section 5.2(b)</u>.

"<u>Tag-Along Rightholder</u>" shall have the meaning set forth in <u>Section 5.2(a)</u>.

"<u>Tag-Along Rightholder's Offer</u>" shall have the meaning set forth in <u>Section 5.2(b)</u>.

"<u>Tag-Along Sale</u>" shall have the meaning set forth in <u>Section 5.2(a)</u>.

"<u>Tag-Along Seller</u>" shall have the meaning set forth in <u>Section 5.2(a)</u>.

"<u>Transaction</u>" shall have the meaning set forth in the recitals.

"<u>Transfer</u>" shall mean, (i) when used as a verb, to sell, transfer, assign, encumber or otherwise dispose of, directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise and (ii) when used as a noun, a direct or indirect, voluntary or involuntary, sale, transfer, assignment, encumbrance or other disposition by operation of law or otherwise.

"<u>Transferor</u>" and "<u>Transferee</u>" shall mean a Person who makes or receives a Transfer, respectively; <u>provided</u>, <u>however</u>, that a transfer to a Qualified Marketmaker that acquires equity interests with the purpose and intent of acting as a Qualified Marketmaker for such equity interests shall not be deemed a "Transfer" or a "Transferee" hereunder in respect of such equity interests if (i) such Qualified Marketmaker subsequently transfers such equity interests (by purchase, sale, assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a Transferee; (ii) the Transferee is either a Permitted Transferee or is to a Person who is permitted to acquire such equity interests in compliance with this Agreement; and (iii) the Transfer otherwise is a Permitted Transfer under <u>Article V</u> of this Agreement.

1.2     Rules of Construction.  Unless the context otherwise requires, definitions in this Agreement apply equally to both the singular and plural forms of the defined terms.  The terms "include" and "including" and other words of similar import shall be deemed to be followed by the phrase "without limitation".  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section or subsection.  The headings appear as a matter of convenience only and shall not affect the interpretation of this Agreement.  All section, subsection, clause and exhibit references not attributed to a particular document shall be references to such parts of this Agreement.  All equity percentage calculations set forth in this Agreement shall exclude therefrom any equity interests in the Company (including interests convertible into or exercisable or exchangeable for such equity interests) that constitute Excluded Issuances, in addition to any other equity interests to be excluded from such calculations pursuant to the terms of this Agreement.

## Article II
## Organization[3]

2.1     Formation of the Company.  The Company was formed as a limited liability company under the Act by the filing of the Certificate with the Secretary of State of the State of Delaware on [●], 2024.  The Company shall accomplish all filing, recording, publishing and other acts necessary or appropriate for compliance with all requirements for operation of the Company as a limited liability company under this Agreement and the Act and under all other applicable laws of the State of Delaware and such other jurisdictions in which the Company engages in, or determines that it may conduct, business.

2.2     Name.  The name of the Company shall be "[Reorganized Grandparent, LLC]", or such other name or names as the Board may designate from time to time and reflect in a filing with the Secretary of State of the State of Delaware in accordance with the Act.

2.3     Purpose.  Subject to any limitations on the activities of the Company otherwise specified in this Agreement, the purpose and business of the Company shall be to (a) engage in any and all activities as the Board may reasonably determine to be necessary or advisable to the carrying out of the foregoing purpose and business of the Company and (b) conduct any other business or activity that may be conducted by a limited liability company organized pursuant to the Act.

2.4     Registered Office; Registered Agent; Principal Office; Other Offices.  The registered office of the Company shall be the office of the initial registered office named in the Certificate or such other registered office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by the Act.  The registered agent of the Company shall be [The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801] or such other Person or Persons as the Board may designate from time to time in the manner provided by the Act.  The Company shall maintain there the records required to be maintained under Section 18-305 of the Act.  In addition, the Company may maintain such other offices as the Board may deem advisable at any other place or places within or without the State of Delaware.

2.5     Interest of Members; Property of Company.  Common Interests held by a Member shall be personal property of such Member for all purposes.  All real and other property owned by the Company shall be deemed property of the Company that is owned by the Company as an entity, and no Member shall own such property in an individual capacity.  No Member shall be entitled to interest on or with respect to

---

[3] Note to Draft: To be conformed based on final structure.

any Capital Contribution.  Except as provided in this Agreement, no Member shall be entitled to withdraw any part of such Member's Capital Contribution or to receive distributions from the Company.

2.6     Limited Liability.  Except as otherwise expressly required by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and no Member shall be obligated personally for any such debt, obligation or liability solely by reason of being a Member of the Company.

2.7     Term.  The term of the Company commenced on the date of filing of the Certificate, and shall be perpetual unless the Company is earlier dissolved and its existence terminated in accordance with the provisions of this Agreement.

### Article III
### Contributions of Members

3.1     Initial Issuance of Units.  Pursuant to the Plan and the Confirmation Order, each Member shall be deemed to have made the initial Capital Contributions (the "Initial Capital Contributions") to hold the Common Interests set forth on Exhibit B opposite such Member's name.

3.2     Additional Capital Contributions.

(a)     Subject to Sections 5.4 and without limitation to Section 3.2(b), in addition to the Initial Capital Contributions, Members may from time to time make Capital Contributions to the Company (each, an "Additional Capital Contribution" and, for the avoidance of doubt, any Initial Capital Contribution shall not be deemed to be an Additional Capital Contribution) at such times and in such amounts as the Board may determine to accept from the Members.  Except as required by law, no Member shall be required to make any Additional Capital Contributions to the Company.

(b)     Additional Capital Contributions shall be made in cash or, with the approval of the Board, in other property.  The value assigned to any non-cash Additional Capital Contribution shall be equal to the Fair Market Value thereof.

3.3     Return of Contributions.  No Member shall be entitled to the return of any part of its Capital Contributions except as specified in this Agreement.  An unrepaid Capital Contribution is not a liability of the Company or of any Member.  A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

3.4     Interest on Capital Contributions.  No Member shall be entitled to interest on, or with respect to, any Capital Contribution.

3.5     Advances by Members.  If the Company does not have sufficient funds to pay its obligations, any Member(s) that may agree to do so, with the consent of the Board, may advance all or part of the funds required to, or on behalf of, the Company.  An advance described in this Section 3.5 constitutes a loan from such Member(s) to the Company, and shall not constitute a Capital Contribution.

3.6     Common Interests.

(a)     The Company shall have one class of Common Interests, which shall constitute limited liability company interests under the Act.  All Common Interests are identical to each other and accord the holders thereof the same obligations, rights and privileges as are accorded to each other holder thereof, except for any specific obligations, rights and privileges expressly set forth in this Agreement.

(b)      Common Interests shall be issued in non-certificated form; provided, that the Board may cause the Company to issue certificates to a Member representing the Common Interests held by such Member.  If any Common Interests certificate is issued, then such certificate shall bear the following restrictive legends (in addition to any legend restrictions required under applicable state securities laws):

> "THE RIGHTS, POWERS, PREFERENCES, RESTRICTIONS (INCLUDING TRANSFER RESTRICTIONS) AND LIMITATIONS OF THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS CERTIFICATE ARE SET FORTH IN, AND THIS CERTIFICATE AND THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED HEREBY ARE ISSUED IN ACCORDANCE WITH AND SHALL IN ALL RESPECTS BE SUBJECT TO, THE TERMS AND PROVISIONS OF THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF [REORGANIZED GRANDPARENT, LLC], DATED AS OF [●] 2024, AS THE SAME MAY BE AMENDED AND/OR RESTATED FROM TIME TO TIME IN ACCORDANCE WITH ITS TERMS (THE "AGREEMENT").  THE TRANSFER, SALE, ASSIGNMENT, ENCUMBRANCE OR DISPOSITION IN ANY MANNER, WHETHER DIRECT OR INDIRECT, VOLUNTARY OR INVOLUNTARY, BY OPERATION OF LAW OR OTHERWISE, OF THIS CERTIFICATE AND THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED HEREBY ARE RESTRICTED AS DESCRIBED IN THE AGREEMENT."

In addition, unless counsel to the Company has advised the Company that such legend is not necessary, each certificate evidencing Common Interests issued by the Company shall bear a legend in substantially the following form:

> "THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED PURSUANT TO THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS, AND SUCH SECURITIES MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF UNLESS THEY ARE REGISTERED AND QUALIFIED IN ACCORDANCE WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL APPLY."

(c)      Subject to the requirements of Section 5.4, the Company is hereby authorized to issue additional Common Interests from time to time, subject to the prior authorization of the Board in accordance with the terms of this Agreement.

3.7      Management Incentive Interests.  The Company shall reserve for issuance a number of Common Interests equal to ten percent (10%) of the Common Interests issued and outstanding on the Effective Date (calculated on a fully-diluted basis) (the "Initial MIP Pool") for awards to Persons who are, or who are becoming, employees, managers, directors or consultants of the Company or any of its subsidiaries, to be issued pursuant to a management incentive plan to be approved by the Board (the "MIP", and any awards issued thereunder, the "MIP Awards").  Any MIP Awards shall be issued pursuant to the

terms and conditions of the MIP and the applicable award agreements thereunder, including with respect to form of awards and vesting conditions.[4]

3.8     <u>Transfer Books</u>.  The Company shall maintain books for the purpose of registering the Transfer of Common Interests.  If Common Interests are represented by certificates, in connection with a Transfer in accordance with this Agreement of any certificated Common Interests, the endorsed certificate(s) evidencing the Common Interests shall be delivered to the Company for cancellation, and the Company shall thereupon issue a new certificate to the Transferee evidencing the Common Interests that were Transferred and, if applicable, the Company shall issue a new certificate to the transferor evidencing any Common Interests registered in the name of the transferor that were not Transferred.

3.9     <u>Certificate Signature</u>.  If Common Interests are represented by certificates, each such certificate shall be executed by manual or electronic signature of an officer on behalf of the Company.

**Article IV**
**Distributions; Distributions in Kind**

4.1     <u>Distributions</u>.  Subject to the provisions of <u>Section 3.7</u> and <u>Section 4.3</u>, the Company shall distribute Available Cash to the Members pro rata in accordance with the respective number of Common Interests held by such Member from time to time as determined by the Board.

4.2     <u>Successors</u>.  For purposes of determining the amount of any distributions, each Member shall be treated as having made the Capital Contributions and as having received the distributions made to or received by its predecessors in respect of any of such Member's Common Interests.

4.3     <u>Limitations on Distributions</u>.

(a)     Anything to the contrary herein notwithstanding, no distribution pursuant to this Agreement shall be made if such distribution would result in a violation of the Act.

(b)     In the event that a distribution is not made as a result of the application of <u>paragraph (a)</u> of this <u>Section 4.3</u>, all amounts so retained by the Company shall continue to be subject to all of the debts and obligations of the Company.  The Company shall make such distribution as soon as such distribution would not be prohibited pursuant to this <u>Section 4.3</u>.

4.4     <u>Reserves</u>.  The Company may establish reserves in such amounts and for such time periods as the Board determines is reasonably necessary or prudent for estimated accrued Company expenses, obligations and liabilities (including amounts owed, restricted or reserved by or in connection with, to the extent applicable, any agreement or any other instrument to which the Company or any of its direct or indirect Subsidiaries is a party governing indebtedness of the Company or any of its Subsidiaries) and any contingent or unforeseen Company liabilities.  When such reserves are no longer necessary, the balance shall be distributed to the Members in accordance with this <u>Article IV</u>.

**Article V**
**Transferability**

---

[4] <u>Note to Draft</u>: The Company's position remains that, per the term sheet, the terms and conditions of the MIP and the MIP Awards (including with respect to participants, form of awards, individual allocations, and vesting conditions) shall be determined by the Board in consultation with the Chief Executive Officer.

5.1   <u>Transfer Generally</u>.  No Member shall be permitted to Transfer all or any portion of its Common Interests except pursuant to, and in compliance with, this <u>Article V</u>.  No Transfer of any Common Interests in the Company shall be effective until such time as all requirements of this <u>Article V</u> in respect thereof have been satisfied and, if consents, approvals or waivers are required by the Board, all of same shall have been confirmed in writing by the Board.  Subject to <u>Section 5.2</u>, <u>Section 5.3</u>, and <u>Section 5.5</u>, a Member may Transfer all or a portion of its Common Interest in the Company without the consent of the Board or any other Member.  For the avoidance of doubt, a Member may Transfer its Common Interests or any portion thereof to a Permitted Transferee without the consent of the Board or any other Member and without such Transfer being treated as a Tag-Along Sale pursuant to <u>Section 5.2</u> or a Drag-Along Sale pursuant to <u>Section 5.3</u>; provided, that such Transfer is made in accordance with <u>Section 5.5</u>.

5.2   <u>Tag-Along Rights</u>.

(a)   Without limiting the other terms and conditions hereof, if at any time one or more Members (a "<u>Tag-Along Seller</u>") propose to Transfer thirty percent (30%) or more of the outstanding Common Interests (but less than one hundred percent (100%) of the Common Interests), in a single transaction or series of related transactions (other than any Drag-Along Transaction or any Permitted Transfer, a "<u>Tag-Along Sale</u>", and the purchaser involved in such transaction(s), (the "<u>Tag-Along Purchaser</u>"), then each other Member (other than Affiliates of a Tag-Along Seller) (each, a "<u>Tag-Along Rightholder</u>") shall have the right to make an offer to sell to such Tag-Along Purchaser, at the same price and upon the same terms and conditions set forth in the Tag-Along Notice (as defined below), a number of Common Interests held by such Tag-Along Rightholder (the "<u>Tag-Along Offered Interests</u>") equal to the product obtained by multiplying (i) the total number of Common Interests owned by such Tag-Along Rightholder at the Tag-Along Record Date (as defined below) by (ii) a fraction, the numerator of which is the number of Common Interests intended to be sold by the Tag-Along Seller in such Tag-Along Sale and the denominator of which is the total number of Common Interests owned by such Tag-Along Seller at the Tag-Along Record Date.

(b)   The Tag-Along Seller shall give written notice to the Company of each proposed Transfer by it that gives rise to the rights of the Tag-Along Rightholders set forth in this <u>Section 5.2</u>, at least thirty (30) days prior to the proposed consummation of such Transfer and the Company, within three (3) Business Days after receiving notice from such Tag-Along Seller, shall give notice of such Transfer to each Tag-Along Rightholder.  The close of business on the tenth (10th) Business Day following the date that each notice is given by the Company shall be deemed to be the "<u>Tag-Along Record Date</u>".  The notice provided by the Tag-Along Seller, and forwarded by the Company, shall set forth in reasonable detail, based on information available to the Tag-Along Seller, the name of such Tag-Along Seller, the number of Common Interests that will be held by such Tag-Along Seller as of the Tag-Along Record Date and the number of Common Interests proposed to be sold by such Tag-Along Seller, the name of and contact information for the proposed Tag-Along Purchaser (including any material relationships with the Company or any Tag-Along Seller), a representation that the Tag-Along Purchaser has been informed of the tag-along rights provided in this <u>Section 5.2</u> and has agreed to purchase the Common Interests in accordance with the terms hereof, the proposed amount and form of consideration and terms and conditions of payment offered by such Tag-Along Purchaser, the percentage (or a reasonable estimate of the minimum and maximum percentage) of its Common Interests that such Tag-Along Rightholder may sell to such Tag-Along Purchaser (determined in accordance with <u>Section 5.2(a)</u>) and the per share purchase price (or a reasonable estimate of the maximum and minimum per share purchase price) (the "<u>Tag-Along Notice</u>").  The tag-along rights provided by this <u>Section 5.2</u> must be exercised by any Tag-Along Rightholder wishing to sell Tag-Along Offered Interests no later than the Tag-Along Record Date, which exercise shall be by delivery of a written irrevocable offer (the "<u>Tag-Along Rightholder's Offer</u>") to the Tag-Along Seller and the Company indicating such Tag-Along Rightholder's wish to have its Tag-Along Offered Interests included in the Tag-Along Sale and specifying the number of Tag-Along Offered Interests (up to the maximum number of Tag-

13

Along Offered Interests as determined in accordance with <u>Section 5.2(a)</u>) it wishes to sell; <u>provided</u> that any Tag-Along Rightholder may waive its tag-along rights under this <u>Section 5.2</u> with respect to such Tag-Along Sale prior to the expiration of such ten (10) Business Day period by giving written notice thereof to the Tag-Along Seller, with a copy to the Company (and failure to deliver a Tag-Along Rightholder's Offer by the Tag-Along Record Date will be deemed to be a waiver of such Tag-Along Rightholder's tag-along rights under this <u>Section 5.2</u> with respect only to such Tag-Along Sale). Subject to the other terms herein, delivery of the Tag-Along Rightholder's Offer will constitute an irrevocable binding commitment by such Tag-Along Rightholder to sell the number of Tag-Along Offered Interests specified in such Tag-Along Rightholder's Offer on the terms set forth in the Tag-Along Notice.

(c) The Tag-Along Seller shall use reasonable best efforts to obtain the inclusion in the proposed Tag-Along Sale of the entire number of Tag-Along Offered Interests that the Tag-Along Rightholders timely elect to have included in such Tag-Along Sale. If the Tag-Along Seller is unable to obtain such inclusion of all such Tag-Along Offered Interests, then (i) the number of Tag-Along Offered Interests to be sold in such Tag-Along Sale shall be allocated on a pro rata basis among the Tag-Along Seller and each Tag-Along Rightholder who shall have timely elected to participate in such Tag-Along Sale in proportion to the total number of Common Interests offered and eligible to be sold in the Tag-Along Sale by each such Member or (ii) the Tag-Along Seller shall be permitted to sell its Common Interests in such Tag-Along Sale <u>provided</u> that it purchases, for the same price and upon the same terms, from each Tag-Along Rightholder who shall have timely elected to participate in such Tag-Along Sale the number of Common Interests that such Tag-Along Rightholder could have included in such Tag-Along Sale.

(d) Each Tag-Along Rightholder shall make or provide the same representations and warranties regarding their legal status and authority, and their ownership of the Common Interests being Transferred and covenants (except that no Tag-Along Rightholder shall be required to agree to any restrictive covenants other than customary confidentiality covenants that are also agreed to by the Tag-Along Seller(s)), indemnities and agreements as the Tag-Along Seller makes or provides in connection with the Tag-Along Sale (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Tag-Along Seller(s) or its Common Interests, the Tag-Along Rightholders shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining specifically to itself and its Common Interests); <u>provided</u>, that all representations, warranties, covenants, indemnities and agreements shall be made by each Tag-Along Seller and each Tag-Along Rightholder severally and not jointly and any indemnification obligation in respect of breaches of representations and warranties shall be *pro rata* based on the consideration received by each Tag-Along Seller and each Tag-Along Rightholder, in each case, in an amount not to exceed the aggregate proceeds actually received by each such Tag-Along Seller and Tag-Along Rightholder in connection with any Tag-Along Sale, except that any indemnities or other liabilities in respect of the representations, warranties, covenants, indemnities and agreements pertaining specifically to a Tag-Along Seller or Tag-Along Rightholder shall be borne solely by such Tag-Along Seller or Tag-Along Rightholder.

(e) If (i) the Tag-Along Seller has not consummated the Tag-Along Sale within forty-five (45) days of the delivery to the Company of the related Tag-Along Notice (for any reason other than the failure of a Tag-Along Rightholder to sell its Common Interests under this <u>Section 5.2</u>) or (ii) the terms and conditions of the Tag-Along Sale shall change, in any respect, from those in the Tag-Along Notice, then the Tag-Along Notice and any Tag-Along Rightholder's Offer shall be null and void and it shall be necessary for a separate Tag-Along Notice to be furnished and the terms and provisions of this <u>Section 5.2</u> separately complied with, in order to subsequently consummate such proposed Tag-Along Sale pursuant to this <u>Section 5.2</u>; <u>provided</u>, <u>however</u>, that the Tag-Along Notice and the Tag-Along Rightholder's Offers shall not be null and void if the Tag-Along Seller receives the unanimous written consent of each of the Tag-Along Rightholders agreeing to an extension and/or revised terms. Notwithstanding any other provision of this <u>Section 5.2</u>, there shall be no liability on the part of any Tag-Along Seller to any other

Member arising from the failure of any Tag-Along Seller to consummate the Tag-Along Sale for any reason and the decision to consummate such Tag-Along Sale shall be in the sole discretion of the Tag-Along Seller.

5.3     Drag-Along Right.

(a)     If one (1) or more Members holding a majority of the outstanding Common Interests (such Members, the "Selling Members") propose to consummate a Drag-Along Transaction with a Potential Purchaser in a bona fide transaction, the Selling Members may, at their option, require the other Members (the "Compelled Members") to sell to the Potential Purchaser the same portion of its own Common Interests as is being sold by the Selling Members in such transaction, or otherwise participate in such transaction, on the same terms and conditions upon which the Selling Members propose to enter into such sale (a "Drag-Along Sale"), subject to the other provisions of this Section 5.3.  "Drag-Along Transaction" means: (a) any merger, recapitalization, consolidation or restructuring or any other transaction that would result in a change of control of the Company; (b) a sale or other disposition of all or substantially all of the assets of the Company and its Subsidiaries (together as a whole); or (c) the sale of at least fifty percent (50%) of the outstanding Common Interests in a single transaction or series of related transactions.  Notwithstanding the foregoing, any Transfers solely among Members, on one hand, and Affiliates of such Members, on the other hand, shall be excluded from the definition of "Drag-Along Transaction".

(b)     The Selling Members shall provide a written notice (the "Drag-Along Notice") of such Drag-Along Sale to each of the Compelled Members, with a copy to the Company, not later than ten (10) Business Days prior to the proposed consummation of the Drag-Along Sale by the Potential Purchaser. The Drag-Along Notice shall contain written notice of the exercise of the rights of the Selling Members pursuant to Section 5.3(a), setting forth the applicable form of consideration, the name and address of the Potential Purchaser, and price per Common Interest, to be paid by the Potential Purchaser and all other material terms and conditions of the Drag-Along Sale and a copy of the definitive purchase agreement or similar document providing for the Drag-Along Sale.

(c)     At the closing of the Drag-Along Sale, the Potential Purchaser shall remit to each Compelled Member the total consideration due such Compelled Member in respect of the Common Interests sold by such Compelled Member in the Drag-Along Sale, less a pro rata portion of any amounts to be held in escrow or subject to an earn-out or similar provision and of the expenses (including reasonable documented legal expenses) incurred by the Selling Members in connection with such sale for the benefit of and on behalf of all the Selling Members and Compelled Members.

(d)     If the Selling Members shall not have completed the Drag-Along Sale on the later of (i) the date that is one hundred twenty (120) calendar days following delivery of the Drag-Along Notice and (ii) the fifth Business Day following the expiration or termination of all waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and receipt of all requisite consents or approvals under any other applicable regulatory regimes, to the extent applicable to such Drag-Along Sale, then no Member shall have any obligation with respect to the Drag-Along Sale set forth in such Drag-Along Notice; provided that the provisions of this Section 5.3 shall apply to any subsequent Drag-Along Sale.

(e)     Except as expressly provided in this Section 5.3, the Selling Members shall have no obligation to any Compelled Member to consummate any Drag-Along Sale (it being understood that any and all such decisions shall be made by the Selling Members in their sole discretion).  In the event that the Drag-Along Sale is not consummated by the Selling Members, the Compelled Members shall not be entitled to sell or otherwise dispose of any of their Common Interests directly to any third party or parties pursuant to such Drag-Along Sale (it being understood that all such sales and other dispositions shall be made only on the terms and pursuant to the procedures set forth in this Article V).

(f)     In furtherance of, and not in limitation of, the foregoing, in connection with any Drag-Along Sale, each Member will (i) to the fullest extent permitted by law, raise no objections in its capacity as a Member against the Drag-Along Sale or the process pursuant to which it was arranged, (ii) waive all dissenters rights, appraisal rights and similar rights in connection with the Drag-Along Sale, (iii) vote or provide its written consent with respect to all of its Common Interests in favor of the transaction pursuant to which the Transfer is effected and (iv) execute all documents containing terms and conditions consistent with the provisions of this Section 5.3 which are also executed by the Selling Members and are reasonably necessary to effect the transaction.  The Compelled Members shall make or provide (A) customary representations and warranties regarding their legal status and authority, and their ownership of the Common Interests being sold pursuant to the Drag-Along Sale, and (B) the same covenants (other than non-competes and restrictive covenants), indemnities and agreements the Selling Members make or provide in connection with the Drag-Along Sale (except that in the case of covenants, indemnities and agreements pertaining specifically to the Selling Members, the Compelled Members shall make the comparable covenants, indemnities and agreements pertaining specifically to them).  All such representations, warranties, covenants, indemnities and agreements (and any and all obligations with respect thereto) shall be made by each Compelled Member severally and not jointly and severally, and the liability of any Compelled Member shall be capped at the proceeds actually received in such Drag-Along Sale by such Compelled Member.  For the avoidance of doubt, no Compelled Member shall be required to enter into noncompetition, non-solicitation or similar restrictive covenants in connection with any Drag-Along Sale.

(g)     Notwithstanding anything in this Section 5.3 to the contrary, if the Selling Members or any of their respective Representatives, directly or indirectly, receive any consideration from the Potential Purchaser or any of the Potential Purchaser's Affiliates in connection with, or pursuant to oral or written agreements entered into substantially contemporaneously with, a Drag-Along Sale (including any payment for non-compete covenants, consulting arrangements or advisory or transaction services) other than (i) the consideration that is received by the Compelled Members on a pro rata basis as part of the Drag-Along Sale in accordance with Section 5.3(h) and (ii) consideration that is received by any Member for bona fide services rendered to the Company for periods commencing following the closing of a Drag-Along Sale on an arm's-length basis, then the Selling Members shall cause each of the Compelled Members to receive their pro rata share, determined by reference to the respective amounts of consideration otherwise payable to each Member (including the Selling Members) as part of the Drag-Along Sale, of such consideration.

(h)     All Members shall receive the same type and amount of consideration per share of Common Interests in connection with a Drag-Along Sale (or if any Member is given an option as to the form of consideration to be received, all other Members shall be given the same option on the same terms).

(i)     Notwithstanding anything in this Section 5.3 to the contrary, a Member may elect to have this Section 5.3(i) apply to a Drag-Along Transaction, and if a Member makes such election by providing notice to the Company of such election, the maximum amount payable to such Member that elects to have this provision apply to such Member (a "Listing Rules Member") pursuant to a sale or other disposition of such Listing Rules Member's Common Interests and over which the applicable Listing Rules Member does not have sole discretion as to whether to enter into and consummate the applicable sale (including a Drag-Along Sale) (a "Listing Rules Subject Sale") shall be either (a) the minimum amount that would result in such Listing Rules Subject Sale constituting a significant transaction under the UK Listing Rules minus one pound Sterling (£1.00) or (b) such other amount as such Listing Rules Member notifies to the Company in writing from time to time; provided that Barclays is hereby deemed to be a Listing Rules Member for purposes of this section and is not required to provide notification to the Company of its election as such.

5.4     Preemptive Rights.

(a)      If the Company or any Subsidiary shall propose to issue and sell Common Interests, other equity securities of the Company or any Subsidiary, securities convertible into or exchangeable therefor, or any other security issued in any private placement or which carry with them a right to receive Company equity securities (collectively, the "Underline New Securities"), or enter into any contracts relating to the issuance or sale of any New Securities to any Person (the "Subject Purchaser"), in each case, other than with respect to Excluded Issuances, Preemptive Rightholder shall have the right (a "Preemptive Right") to purchase such Preemptive Rightholder's pro rata portion (based on ownership of Common Interests and determined without regard to Members not eligible for such Preemptive Right) of the New Securities at the same price and on the same other terms proposed to be issued and sold (the "Preemptive Percentage").  The Company shall offer to sell to any such Preemptive Rightholder its Preemptive Percentage of such New Securities (the "Offered Preemptive Securities") and to sell to any such Preemptive Rightholder such of the Offered Preemptive Securities as shall not have been subscribed for by the other Preemptive Rightholders as hereinafter provided, at the price and on the terms described above, which shall be specified by the Company in a written notice delivered to any such Preemptive Rightholder which such notice shall also state (x) the number of New Securities proposed to be issued and (y) the portion of the New Securities available for purchase by such Preemptive Rightholder and shall be given to such Preemptive Rightholder at least fifteen (15) days prior to any issuance giving rights under this Section 5.4 (the "Preemptive Offer").  The Preemptive Offer shall by its terms remain open for a period of at least twenty (20) days from the date of receipt thereof and shall specify the date on which the Offered Preemptive Securities will be sold to accepting Members (which shall be at least twenty (20) but not more than one hundred and fifty (150) days from the date of the Preemptive Offer).  The failure of any Preemptive Rightholder to respond to the Preemptive Offer during the twenty (20) day period shall be deemed a waiver of such Preemptive Rightholder's Preemptive Right in connection with the sale of such Offered Preemptive Securities.

(b)      Each such Preemptive Rightholder shall have the right, during the period of the Preemptive Offer, to purchase any or all of its Preemptive Percentage of the Offered Preemptive Securities at the purchase price and on the terms stated in the Preemptive Offer.  Notice by any Preemptive Rightholder of its acceptance, in whole or in part, of a Preemptive Offer shall be in writing (a "Notice of Acceptance") signed by such Preemptive Rightholder and delivered to the Company prior to the end of the specified period of the Preemptive Offer, setting forth the Offered Preemptive Securities such Preemptive Rightholder elects to purchase.

(c)      Each such Preemptive Rightholder shall have the additional right to offer in its Notice of Acceptance to purchase any of the Offered Preemptive Securities not accepted for purchase by any other Preemptive Rightholders, in which event such Offered Preemptive Securities not accepted by such other Preemptive Rightholders shall be deemed to have been offered to and accepted by the Members exercising such additional right under this paragraph (c) pro rata in accordance with their respective Preemptive Percentage (determined without regard to those Preemptive Rightholders not electing to purchase their full respective Preemptive Percentage under the foregoing paragraph (a)) on the same terms and conditions as those specified in the Preemptive Offer, but in no event shall any such electing Preemptive Rightholder be allocated a number of New Securities in the Company in excess of the maximum number of Offered Preemptive Securities such Member has elected to purchase in its Notice of Acceptance.

(d)      At the closing of the purchase or issuance of New Securities subscribed for by the Members under this Section 5.4 the Company shall deliver certificates (if the Company has elected to issue certificates) representing the New Securities or shall provide or cause to be provided, upon request, confirmation of such Member's updated holdings, and such New Securities shall be issued free and clear of all liens and the Company shall so represent and warrant, and further represent and warrant that such New Securities shall be, upon issuance thereof to the Members that elected to purchase New Securities and after payment therefor, duly authorized, validly issued, fully paid and non-assessable.  Each Preemptive Rightholder purchasing the New Securities shall deliver at the closing payment in full in immediately

17

available funds for the New Securities purchased by it.  At such closing, all of the parties to the transaction shall execute (including the Company in respect of any Common Interests in the event that any Member fails to do so within a reasonable time) such additional documents as are otherwise necessary or appropriate.

(e)     In its discretion, the Board may impose other reasonable and customary terms and procedures, such as setting a closing date, rounding the number of New Securities covered by this <u>Section 5.4</u> to the nearest whole number or dollar of New Security, as applicable, and requiring customary closing deliveries in connection with any Preemptive Offer.

(f)     <u>Sale to Subject Purchaser</u>.  In the case of any Preemptive Offer, if Notices of Acceptance given by the Members do not cover in the aggregate all of the Offered Preemptive Securities, the Company may, during the period of ninety (90) days following the date of expiration of such Preemptive Offer, sell to any other Person or Persons all or any part of the New Securities not covered by a Notice of Acceptance, but only on terms and conditions that are no more favorable to such Person or Persons or less favorable to the Company than those set forth in the Preemptive Offer.  If such sale is not consummated within such ninety (90) day period for any reason, then the restrictions provided for herein shall again become effective, and no issuance and sale of New Securities may be made thereafter by the Company without again offering the same in accordance with this <u>Section 5.4</u>.  The closing of any issuance and purchase pursuant to this <u>Section 5.4</u> shall be held at a time and place as the parties to the transaction may agree.

(g)     <u>Preemptive Rights Exception</u>.  Notwithstanding anything to the contrary herein, if the Board, acting in good faith, determines that it would be in the best interests of the Company to issue New Securities which would otherwise be required to be offered to the Members under this <u>Section 5.4</u> prior to making such offer, the Company may issue such New Securities to a Person (an "<u>Accelerated Acquirer</u>") without first complying with the procedures set forth in <u>Section 5.4(a)</u>; <u>provided</u>, <u>however</u>, that within ten (10) Business Days after the closing of such issuance, the Company shall provide to each Preemptive Rightholder: (i) written notice of such issuance and the Preemptive Offer required by <u>Section 5.4(a)</u> and (ii) the Preemptive Right to purchase such Member's Preemptive Percentage of the New Securities that such Member would have been entitled to purchase pursuant to the procedures set forth in <u>Section 5.4(a)</u>, <u>Section 5.4(b)</u>, and <u>Section 5.4(c)</u> had this <u>Section 5.4(g)</u> not been invoked, subject to such eligible Member's delivery of a Notice of Acceptance pursuant to <u>Section 5.4(b)</u> prior to the later of the end of the specified period of the Preemptive Offer and five (5) Business Days after receipt of notice of the Preemptive Offer, and which shall be on the same terms and conditions provided in the provisions of this <u>Section 5.4</u> relating to the Preemptive Right, the closing of such purchase to take place as soon as reasonably practicable.  If one or more Members exercise the election to make a purchase, the Company shall give effect to each such exercise by (i) requiring that the Accelerated Acquirer (in which case the Accelerated Acquirer hereby agrees to) sell down a portion of its New Securities, (ii) issuing additional New Securities to such Member or (iii) a combination of (i) and (ii), so long as such action effectively provides such Member with the same number of New Securities and the same consideration and fees, as applicable, that such Member would have been entitled to had this <u>Section 5.4(g)</u> not been invoked.

(h)     Any Preemptive Rightholder shall be entitled to assign its Preemptive Right under this <u>Section 5.4</u> to an Affiliate of such Preemptive Rightholder, and apportion its Preemptive Rights under this <u>Section 5.4</u> in any such proportion as such Preemptive Rightholder deems appropriate in accordance with this Agreement, so long as such Affiliate, if it is not a Member, executes and delivers a joinder to this Agreement, in substantially the form attached hereto as <u>Exhibit C</u>, in connection with and as a condition to exercise of a Preemptive Right assigned to it.

5.5     <u>Admission of New Members; General Restrictions on Transfer</u>.

(a)      Any Person acquiring one or more Common Interests from the Company or from any Member in accordance with this Agreement shall, unless such acquiring Person is already a Member as of immediately prior to such acquisition, be admitted to the Company as a Member only upon execution of a joinder to this Agreement substantially in the form attached hereto as <u>Exhibit C</u> (and any other documents or instruments as reasonably requested by the Company or as may be necessary or appropriate to effect such Person's admission as a Member).

(b)      Notwithstanding anything to the contrary contained in this Agreement, no Transfer of Common Interests shall be made if such Transfer or issuance (i) would result in any circumstances that the Board determines could require the Company to file reports under the Exchange Act, (ii) would violate any state or U.S. federal securities laws, (iii) would require the Company to register as an investment company under the Investment Company Act of 1940, as amended, or (iv) would require the Company to register as an investment adviser under state or U.S. federal securities laws.

(c)      If any Member purports to Transfer Common Interests to any Person in a transaction that would violate the provisions of this <u>Article V</u> or that would violate the Act or any applicable federal or state securities law, such Transfer shall be void *ab initio* and of no effect.

(d)      No Transfer of Common Interests may be made to any Competitor of the Company without the approval of the Board, other than in a Drag-Along Sale in accordance with <u>Section 5.3</u>.

5.6      <u>Resignation</u>.  No Member shall have the right or power to resign, withdraw or retire from the Company, except upon a Transfer of all of such Member's Common Interests in compliance with and subject to, the provisions of this <u>Article V</u>.

5.7      <u>Record of Members</u>.  The Company shall be responsible for maintaining, at the Company's principal place of business, an up-to-date list of all Members ("<u>Member List</u>"), which shall reflect the name of each Member and the number Common Interests and Percentage Interest held by such Member.  The Company shall be required to update the Member List and <u>Exhibit B</u> of this Agreement from time to time so as to accurately reflect the information contained thereon upon (a) the resignation of a Member, (b) the admission of a new Member or (c) any change in the number of Common Interests owned by a Member. The Company shall provide any Member's individual holding of Common Interests, as well as the total amount of outstanding Common Interests, at any time to such Member upon request.

5.8      <u>Registration Rights</u>.  The Members shall have the registration rights set forth on <u>Annex I</u>, which is hereby made part of this Agreement as if it was set forth in full in this <u>Section 5.8</u>.

5.9      <u>Mandatory Repurchase of Common Interests</u>.  Notwithstanding any provisions hereof to the contrary, in the event that a Member determines in its sole discretion that (i) the holding of any rights, interests or obligations with respect to the Company or this Agreement will or could be unlawful or a breach of any federal or state banking laws or any other applicable laws, whether U.S. or foreign, or (ii) there has been, is, or could be, an act, matter, event or circumstance related to the Company that results in or could result in damage to the reputation of the Member or any of its Affiliates, upon prior written notice to the Company, the Member shall have the right to require the Company to repurchase its rights, interests and obligations with respect to this Company or this Agreement for $1.00.  In connection with a Sale of the Company, the Company shall cause the terms of the Common Interests to include provisions which give effect to the Member's rights provided in this <u>Section 5.9</u>.

**Article VI**
**<u>Governance</u>**

19

6.1    <u>Board of Directors</u>.

(a)    Except for situations in which the approval of any Member is required by this Agreement, management of the Company shall be vested in the Board.  To the fullest extent permitted by applicable law, the Members shall have no voting rights other than as expressly set forth in this Agreement.  "<u>Board</u>" means all the Persons elected and serving from time to time as a member of the Board in accordance with <u>Section 6.1(b)</u> and <u>Section 6.2</u>.  Each member of the Board is referred to as a "<u>Director</u>".  There is no limit on the number of terms a Director may serve on the Board and a Director need not be a resident of the State of Delaware or a Member of the Company.

(b)    Subject to the provisions of <u>Section 6.13</u> to the extent applicable, (i) this Agreement is not intended to, and does not, create or impose any fiduciary duty on any Director, and each of the Members and the Company hereby waive any and all fiduciary duties that, absent such waiver, may be implied by applicable law and, in doing so, acknowledge and agree that the duties and obligations of each such Director to the Company are only as expressly set forth in this Agreement, and (ii) the provisions of this Agreement, to the extent that they restrict the duties and liabilities of any Director otherwise existing at law or in equity, are agreed by the Members and the Company to replace such other duties and liabilities of any such Director.  Each Director's liability to the Company, any Member, any other Director or any other Person for breach of duties (including fiduciary duties) to the Company, any Members, any other Directors or any other Person by reason of or arising from or relating to the operations, business or affairs of, or any action taken or failure to act on behalf of, the Company, shall be limited to the fullest extent permitted by Delaware law, except to the extent that it is determined by a final, non-appealable order of a court of competent jurisdiction that any of the foregoing was caused by a bad faith violation of the implied contractual covenant of good faith and fair dealing or actual fraud or willful misconduct, or, with respect to any criminal action or proceeding against a Director, that such Director had reasonable cause to believe such Director's conduct was unlawful.

6.2    <u>Appointment of Directors</u>.

(a)    Subject to <u>Section 6.2(b)</u>, the Board shall consist of five (5) Directors, of which:

(i)    one (1) Director shall be the Chief Executive Officer of the Company (the "<u>CEO Director</u>"), who initially shall be [●];

(ii)    one (1) Director who is not an employee of the Ares Member shall be appointed by the Ares Member, for so long as the Ares Member owns either (i) at least seven and one half (7.5%) of the outstanding Common Interests or (ii) at least seventy-five percent (75%) of the Common Interests that the Ares Member held as of the Effective Date; (the "<u>Ares Director</u>"), who initially shall be [●];

(iii)    one (1) Director who is not an employee of the Brigade Member shall be appointed by the Brigade Member, for so long as the Brigade Member owns either (i) at least seven and one half (7.5%) of the outstanding Common Interests or (ii) at least seventy-five percent (75%) of the Common Interests of the Company that the Brigade Member held as of the Effective Date; (the "<u>Brigade Director</u>"), who initially shall be [●];

(iv)    one (1) Director who is not an employee of the KKR Member shall be appointed by the KKR Member, for so long as the KKR Member owns either (i) at least seven and one half (7.5%) of the outstanding Common Interests or (ii) at least seventy-five percent (75%) of the Common Interests of the Company that the KKR Member held as of the Effective Date; (the "<u>KKR</u>

Director" and together with the Ares Director and Brigade Director, the "Designated Directors"), who initially shall be [●];

(v)    one (1) Director shall be appointed by the Designating Members (the "Jointly Appointed Director"), who initially shall be [Tripp Lane];

(b)    At any time, the Board my increase the number of Directors, acting by written consent, from five (5) to up to seven (7) Directors. Any vacancy created by the expansion of the Board pursuant to the preceding sentence shall initially be filled by the affirmative vote of the majority of the Directors. Thereafter, each Director appointed pursuant to this Section 6.2(b) shall be a Common Director.

6.3    Designation Right.

(a)    Each right of an individual Member to designate or nominate a Director shall be deemed a "Designation Right." Any Director not subject to a Designation Right or in accordance with Section 6.2(a) shall be subject to appointment by a majority vote of the holders of the issued and outstanding Common Interests (each such Director a "Common Director").

(b)    Termination of Designation Right.  If a Designation Right terminates in accordance with the terms hereof, or a Member with a Designation Right irrevocably waives such Designation Right, then the Director position that had related to such Designation Right shall instead become a Common Director position; provided that the Director serving pursuant to such Designation Right at the time of its termination shall continue to serve in such position until his/her successor is duly elected pursuant to either Section 6.2, or Section 6.3(a), as applicable.

6.4    Removal of Directors.

(a)    General.  Each Director shall hold office from the time of his or her appointment until his or her resignation or removal.  If the person then serving as Chief Executive Officer resigns, is removed or otherwise replaced as the Chief Executive Officer, then such person shall automatically, and without any action by the Board or Members, cease to be Director and the newly appointed Chief Executive Officer shall automatically be appointed as the CEO Director.

(b)    Designated Directors.  Designated Directors may only be removed by, and any vacancy created by the resignation, death, removal or otherwise (other than pursuant to Section 6.3(b)) of such Designated Director may only be filled by, the holder with the right to appoint such Designated Director.

(c)    Jointly Appointed Director.  The Jointly Appointed Director may only be removed by, and any vacancy created by the resignation, death, removal or otherwise (other than pursuant to Section 6.3(b)) of such Jointly Appointed Director may only be filled by, unanimous agreement of the holders with the right to appoint such Jointly Appointed Director at the time of such removal or replacement.

(d)    Common Directors.  Common Directors may only be removed by, and vacancy created by the resignation, death or removal of a Common Director may only be filled by, the affirmative vote of the holders of at least a majority of the issued and outstanding Common Interests.

6.5    Vacancies.  Any Director may resign at any time upon written notice to the Company.  Any such resignation shall take effect at the time specified therein or, if the time be not specified, upon receipt by the Company thereof, and the acceptance of such resignation, unless required by the terms thereof, shall not be necessary to make such resignation effective.  In the event that any Director resigns, is removed from

the Board or dies, a successor Director shall be elected in accordance with <u>Section 6.2</u> or <u>Section 6.3(a)</u>, as applicable, to fill such vacancy.

      6.6    <u>Authority and Duties of the Board and Board Committees</u>.

      (a)    Except as set forth in this Agreement, the Board, acting as a body in accordance with the affirmative votes required by this Agreement (and no Director, individually), shall have the right, power and authority to oversee the business and affairs of the Company and to do all things necessary to manage the business of the Company, and the Board is hereby authorized to take any action of any kind and to do anything and everything the Board deems necessary or appropriate in accordance with the provisions of this Agreement and applicable law.

      (b)    The Board may from time to time designate one or more committees.  To the extent authorized by the Board and permitted by this Agreement and applicable law, a committee shall have and may exercise specific powers of the Board in the management of the business and affairs of the Company.

      6.7    <u>Meetings; Telephonic Meetings</u>.

      (a)    The Board and any committee thereof may hold regular or special meetings within or outside of the State of Delaware.  Regular meetings of the Board shall be held at least quarterly, and regular or special meetings of the Board or any committee thereof may otherwise be held from time to time, in each case at such time and at such place as may be determined by the Chairman, if appointed, or a majority of all the Directors serving on the Board or on such committee, as applicable; <u>provided</u> that at least seventy-two (72) hours advance notice of any such meeting shall be provided to each Director serving on the Board or such committee.  Any Director may call a special meeting of the Board or of a committee thereof, as applicable, on notice of not less than forty-eight  (48) hours' advance notice to all the other Directors serving on the Board or such committee.  Any notice of a regular or special meeting of the Board or a committee thereof shall be given in writing to each applicable Director, at the address provided by such Director to the Board or at such other address that such Director shall have advised the Company to use for the purpose of delivering notice, or via electronic mail.  Any such notice provided shall be deemed to be given when delivered in accordance with this <u>Section 6.7(a)</u>.  Each notice of a regular or special meeting of the Board shall set forth the time, date, location and agenda for the meeting in reasonable detail and attach the relevant papers to be discussed at the meeting and all available data and information relating to matters to be discussed at the meeting.

      (b)    Any Director that is entitled to notice of a meeting of the Board or any committee thereof may waive such notice in writing, whether before or after the time of such meeting.  Attendance by a Director at a meeting of the Board or any committee thereof shall constitute a waiver of notice of such meeting by such Director, except when such Director attends such meeting for the express purpose of objecting, at the beginning of such meeting, to the transaction of any business at such meeting because such meeting is called or convened in violation of this Agreement or any applicable law.

      (c)    Directors may participate in and hold a meeting of the Board by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other.  Participation in a meeting by such means shall constitute presence in Person at the meeting, except where a Director participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

      6.8    <u>Quorum; Acts of the Board and Board Committees</u>.

(a)    At all meetings of the Board, a majority of the Directors then serving on the Board shall constitute a quorum for the transaction of business by the Board.  At all meetings of any committee of the Board, a majority of the Directors then serving on such committee shall constitute a quorum for the transaction of business by such committee.  Each Director, whether in respect of matters brought before the Board or any committee thereof, shall have one (1) vote in respect of each matter submitted for consideration and approval.  Except as otherwise provided in this Agreement or required by applicable law, the approval of a majority of the Directors present at any meeting of the Board at which a quorum is present shall be required for any act of the Board.  Except as otherwise provided in this Agreement or required by the Board or applicable law, the scope of authority of any committee of the Board (including the form of charter of any such committee) and the Directors whose approval is required for any act of any committee of the Board shall be specified by the Board in resolutions establishing such committee approved in accordance with Section 6.6(b).  If a quorum shall not be present at any meeting of the Board or any committee thereof, the Directors present at such meeting may adjourn the meeting from time to time, with notice of the time and place of the adjourned meeting provided to any Director who is not in attendance at the meeting, until a quorum shall be present.

(b)    Any action required or permitted to be taken at any meeting of the Board or any action that may be taken at a meeting of a committee of the Board may be taken without a meeting if the action is taken in writing (including by electronic transmission) by all of the Directors of the Board or of such committee, as the case may be, who are entitled to vote on such action and the writing or writings are filed with the minutes of proceedings of the Board or such committee.

(c)    The Board may from time to time select from the Directors a chairman of the Board or a non-executive lead director (the "Chairman") who shall preside at all meetings of the Board.

6.9    Observer Rights.

(a)    Each Designating Member may designate two (2) non-voting observers, for so long as such Designating Member holds a Designation Right, and the Ad Hoc Crossover Group (acting together) may designate one (1) non-voting observer to the Board, for so long the Ad Hoc Crossover Group holds at least [twenty-five] percent  ([25]%) of the Company's outstanding equity interests that Ad Hoc Crossover Group held as of the Effective Date (each, an "Observer"), which Observer will be entitled (i) to attend all meetings of the Board and all committees and subcommittees thereof and (ii) to participate in the discussion of matters addressed at such meetings (including telephonically or by other virtual means), if the Observer elects.  Subject to such restrictions as the Board may establish (which may include a requirement that the Observer enter into a customary confidentiality agreement with the Company in form and substance satisfactory to the Board), the Observer shall receive copies of all materials provided to the members of the Board and all committees and subcommittees thereof in connection with such meetings at the same time and in the same manner as such materials are provided to such members.  Notwithstanding the foregoing, (x) the Board or any committee thereof may restrict any Person's attendance as an Observer at any portion of a meeting if the Board or any committee thereof makes a good-faith determination that such Person has a bona fide conflict of interest with respect to the subject matter of such portion of the meeting or that the attendance by such Person at such portion of the meeting would cause the Company to lose the benefit of protection in respect of what would otherwise be attorney-client or work product privileged communications, and (y) the failure of any Observer to attend any meeting of the Board or any committee thereof shall not prevent any such meeting from proceeding or otherwise affect the validity of such meeting or any actions taken at such meeting.  An Observer shall receive reimbursement from the Company with respect to meetings of the Board or committees or subcommittees thereof for reasonable and documented out-of-pocket travel expenses incurred by such Observer in connection with attendance at any and all such meetings to the same extent, and on the same general terms, as other members of the Board receive such reimbursement.

(b)    Each of the Designating Members and the Ad Hoc Crossover Group may, from time to time in their sole discretion and by providing the Company with prior written notice thereof, remove the applicable individual serving as such Members' Observer and appoint a new individual to serve as an Observer in place of such removed Observer.  The termination of any Member's or group of Members' right to appoint an Observer shall not affect the right of any other Members or group of Members to appoint an Observer.

6.10    <u>Related Party Transactions</u>.  Notwithstanding anything to the contrary in this Agreement or any agreement related to any Related Party Transaction, without the approval of a majority of the Directors then serving on the Board excluding (x) each Designated Director that was appointed by an Interested Member or (y) any other Director that is an employee or consultant of an Interested Member, none of the Company nor any Subsidiary of the Company shall (i) enter into any Related Party Transaction, (ii) amend, modify, supplement or waive any provision of any agreement related to any Related Party Transaction, or (iii) terminate any agreement related to any Related Party Transaction.

6.11    <u>Qualified IPO; Conversion to a Corporation</u>.

(a)    In connection with a Qualified IPO, the Board may cause the Company to reorganize into a corporation or use any other structure or means to effect such a Qualified IPO or listing, including by the conversion, recapitalization, reorganization or exchange of securities of the Company or any portion of the Company or any Subsidiary of the Company into one or more corporations, limited liability companies, limited partnerships or other business entities (such conversion, a "<u>Reorganization</u>"), in each case without the need to obtain approval from the holders of the outstanding Common Interests; <u>provided</u> that the Company shall not consummate any Reorganization unless the Board reasonably expects the Qualified IPO to be consummated.  The Members shall take all actions reasonably requested by the Board in connection with the consummation of such Reorganization, including consenting to, voting for and waiving any dissenters rights, appraisal rights or similar rights and participating in any exchange or other transaction required in connection with such Reorganization.  No Member shall have any right to vote, consent to or approve any Reorganization.  The Company shall pay any and all reasonable and documented organizational, legal and accounting expenses and filing fees incurred by the Company or the Members in connection with such Reorganization and the Board may select, on behalf of the Company, any accounting firm, legal counsel, underwriters or any other providers in connection with such Reorganization[; <u>provided</u>, <u>however</u>, that the Company shall only be required to pay for one counsel to represent the interests of all of the Members].

(b)    In connection with any Reorganization involving a Transfer of Common Interests or other securities, each Member agrees to the Transfer of its Common Interests or securities in accordance with the terms of conversion or exchange, as applicable, as provided by the Board, and to execute in the name and on behalf of such Member any agreement, certificate, instrument or document to be delivered by the Member in connection with any such Reorganization as determined by the Board.

(c)    Each of the Members shall take all necessary or desirable actions reasonably requested by the Board in connection with the consummation of a Qualified IPO, including compliance with the requirements of all laws and regulatory bodies that are applicable or that have jurisdiction over such Qualified IPO.

6.12    <u>Officers</u>.  The Board may appoint such other officers and agents of the Company as it may from time to time deem necessary and may assign any title to such officer or agent as it deems appropriate. Such officers and agents shall have such terms of employment, shall receive such compensation and shall exercise such powers and perform such duties as the Board shall from time to time determine.  Any number of offices may be held by the same Person.  The Board shall have the authority to remove any officers or

agents with or without cause.  Unless the Board decides otherwise, if the title of the designated officer is one commonly used for officers of a business corporation formed in the State of Delaware, the assignment of such title shall constitute the delegation to such officer of the authorities and duties that are normally associated with that office.

6.13     Officers as Agents; Duties of Officers.  The officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Board not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of the officers taken in accordance with such powers shall bind the Company.  Persons dealing with the Company are entitled to rely conclusively on the power and authority of any officer of the Company and any bona fide instrument designating such officer and the delegated authority.  Each officer of the Company shall owe the same fiduciary duties to the Company and the Members that such individual would owe to a corporation and its stockholders thereof under the laws of the State of Delaware.

6.14     Powers of Members.  Except as otherwise specifically provided by this Agreement or as required by the Act, no Member shall have the power to act for or on behalf of or to bind, the Company.  For the avoidance of doubt, with respect to actions taken by Members pursuant to this Agreement, the Members may act without a meeting by written consent signed by the holders of Common Interests having not fewer than the minimum number of votes that would be necessary to authorize or take such action at a meeting.

6.15     Confidentiality.  No Member shall, (a) without the Company's prior written consent, disclose to any Person other than an Exempt Person of such Member any confidential, non-public information of the Company or any Member obtained from the Company or one of its Affiliates concerning, without limitation, the following:  (i) any dealings between the Company or any of its Subsidiaries, on the one hand, and any material customer or vendor or any employee, director, officer, Director or Member of the Company or such Subsidiary, on the other hand; (ii) any financial information or results of operations of the Company or any of its Subsidiaries; or (iii) any business plans, pricing information, customer information or regulatory information of the Company or any of its Subsidiaries (collectively, "Company Confidential Information"), or (b) disclose to any Person other than an Exempt Person of such Member any confidential, non-public information obtained from the Company or one of its Affiliates (including the Members) relating to another Member (including the Member List and Exhibit B) (the "Member Confidential Information") without such Member's prior written consent; provided, however, that, notwithstanding anything to the contrary in the foregoing, neither Company Confidential Information nor Member Confidential Information shall include, with respect to any Person, any information that:  (i) is or becomes generally available to the public other than as a result of a disclosure directly or indirectly by any Person or any of its Affiliates or any of their respective directors, officers, managers, partners, members, shareholders, employees, attorneys, advisors, agents or other representatives (collectively, "Representatives") in breach of this Section 6.15; (ii) is disclosed by another Person not known by the recipient to be under a confidentiality agreement or obligation to the Company or such other Member not to disclose such information; or (iii) is independently developed by such Person or any of its Affiliates or any of their respective Representatives without derivation from, reference to or reliance upon any Company Confidential Information or Member Confidential Information, as the case may be; provided further that, notwithstanding anything to the contrary in this Agreement, any Member may disclose any Company Confidential Information or Member Confidential Information, as the case may be, (A) to the extent required by any applicable law, statute, rule or regulation or any request, order or subpoena issued by any court or other governmental or self-regulatory entity; provided that, to the extent permitted by law, the Member required to make such disclosure shall provide to the Board prompt notice of such disclosure; provided further that to the extent such Member or its Representatives are subject to examination by a regulatory or self-regulatory authority, bank examiner or auditor, notice to the Board shall not be required where disclosure is in connection with a routine audit or examination by, or a blanket document request

from, such auditor or a regulatory or governmental or self-regulatory entity that does not reference the Company, its Subsidiaries or this Agreement, (B) as part of such Member's normal reporting, rating or review procedure (including normal credit rating or pricing process) or in connection with such Member's or its Affiliates' normal fund raising, marketing, informational or reporting activities or (C) to any bona fide prospective purchaser of the equity or assets of such Member or its Affiliates or the Common Interests held by such Member or prospective merger partner of such Member or its Affiliates, in each case other than a Competitor unless approved by the Board; <u>provided</u> that in the case of this clause (C) prior written notice of any disclosure of Company Confidential Information or Member Confidential Information is given to the Company and such prospective purchaser or merger partner agrees in writing prior to such disclosure to be bound by the provisions of this <u>Section 6.15</u> (which agreement shall be enforceable by the Company and in form and substance reasonably acceptable to the Company).  Each Member shall be responsible for any breach of this <u>Section 6.15</u> by any of its Representatives and agrees to use commercially reasonable efforts to cause its Representatives to treat all Company Confidential Information and Member Confidential Information in the same manner as such Member would generally treat its own confidential, non-public information.

6.16   <u>Regulated Holders</u>.  Notwithstanding anything to the contrary in this Agreement, any portion of a Regulated Holder's Common Interests in excess of 4.99% of the total outstanding Common Interests (excluding, for purposes of calculating this percentage, portions of any Common Interests that are non-voting securities pursuant to this Agreement) shall be automatically deemed to be, and subject to the restrictions of, a nonvoting security for purposes of the U.S. Bank Holding Company Act and 12 C.F.R. Part 225 (Subpart A) and shall not be entitled to vote or consent on any matter other than matters permissible for nonvoting securities pursuant to 12 C.F.R. § 225.2(q)(2).

## Article VII
### Powers, Duties and Restrictions of the Company and the Members;
### Other Provisions Relating to the Members

7.1   <u>Powers of the Company</u>.  In furtherance of the purposes set forth in <u>Section 2.3</u> and subject to the provisions of <u>Article VI</u>, the Company shall possess the power to do anything not prohibited by the Act, by other applicable law or by this Agreement, including but not limited to the following powers:  (a) to undertake any of the activities described in <u>Section 2.3</u>; (b) to make, perform and enter into any contract, commitment, activity or agreement relating thereto; (c) to open, maintain and close bank and money market accounts, to endorse, for deposit to any such account or otherwise, checks payable or belonging to the Company from any other Person, and to draw checks or other orders for the payment of money on any such account; (d) to hold, distribute and exercise all rights (including voting rights), powers and privileges and other incidents of ownership with respect to assets of the Company; (e) to borrow funds, issue evidences of indebtedness and refinance any such indebtedness in furtherance of any or all of the purposes of the Company; (f) to employ or retain such agents, employees, managers, accountants, attorneys, consultants and other Persons necessary or appropriate to carry out the business and affairs of the Company, and to pay such fees, expenses, salaries, wages and other compensation to such Persons; (g) to bring, defend and compromise actions, in its own name, at law or in equity; and (h) to take all actions and do all things necessary or advisable or incident to carry out the purposes of the Company, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the Company's business, purposes or activities.

7.2   <u>Compensation of the Members and Directors</u>.  The Members shall not be entitled to any compensation for their services hereunder.  Each Director who is not an employee of any Member or such

Member's Affiliates, and is independent from the Company[5] as determined by the NYSE standard for director independence, shall be entitled to a reasonable fee be paid by the Company in an amount determined by the Board and shall be reimbursed for the reasonable and documented out-of-pocket expenses, if any, incurred in connection with attendance at each meeting of the Board and at each meeting of a committee of the Board of which they are members, as determined by the Board. All other Directors may be reimbursed for all reasonable and documented out-of-pocket expenses incurred in connection with each meeting of the Board or each meeting of a committee of the Board, as determined by the Board.

7.3    <u>Cessation of Status as a Member</u>.  A Member shall cease to be a member of the Company (a) upon the Bankruptcy or involuntary dissolution of such Member, <u>provided</u> that thereafter such Person shall only be entitled to the economic rights of an assignee of Common Interests under the Act, or (b) upon the Transfer of all of such Member's Common Interests.

7.4    <u>Other Activities of the Members</u>.  Notwithstanding any duty otherwise existing at law or in equity, each of the Members and its Affiliates may engage in other business interests and may engage in any business or trade, profession, employment or activity whatsoever (regardless of whether any such activity competes, directly or indirectly, with the business or activities of the Company or any of its Subsidiaries), for its own account, or in partnership or participation with, or as an employee, officer, director, stockholder, member, manager, trustee, general or limited partner, agent or representative of, any other Person, and no Member or Director shall be required to devote its entire time (business or otherwise), or any particular portion of its time (business or otherwise) to the business of the Company or any of its Subsidiaries.  Neither the Company nor any Member nor Director, nor any Affiliate of any of the forgoing, by virtue of this Agreement, shall have any rights in and to any such independent venture or the income or profits derived therefrom.  Notwithstanding any duty otherwise existing at law or in equity, no Member, Representative of such Member, or Director shall have any obligation hereunder to present any business opportunity to the Company, even if the opportunity is one that the Company might reasonably have pursued or had the ability or desire to pursue, in each case, if granted the opportunity to do so and, to the fullest extent permitted by law, no Member shall be liable to the Company or any other Member (or any Affiliate thereof) for breach of any fiduciary or other duty relating to the Company (whether imposed by applicable law or otherwise), by reason of the fact that such Member pursues or acquires such business opportunity, directs such business opportunity to another Person or fails to present such business opportunity or information regarding such business opportunity, to the Company.  The foregoing provisions of this <u>Section 7.4</u> shall not limit the duties of any Member (or Affiliate thereof) in its capacity as an officer or employee of the Company.

## Article VIII
## Books, Records and Accounting; Information Rights

8.1    <u>Books of Account; Access</u>.  The Board shall cause to be entered in appropriate books, kept at the Company's principal place of business, all transactions of or relating to the Company.  The books and records of the Company shall be made and maintained, and the financial position and the results of operations recorded, at the expense of the Company, in accordance with such method of accounting as is determined by the Board.  Each Member, for any purpose reasonably related to such Member's interest as a Member in the Company, shall have access to and the right, at such Member's sole cost and expense, to inspect and copy such books and records and to discuss the affairs, finances and accounts of the Company and its Subsidiaries with the officers, employees and the other Representatives of the Company and its Subsidiaries during normal business hours; <u>provided</u> that the inspecting Member shall be responsible for

---

[5] <u>Note to Draft</u>: The Company's position remains that directors who receive compensation should be independent not only from the Company but also from key stakeholders in order to receive compensation.

any out-of-pocket costs or expenses incurred by the Company in making any books and records available for inspection.

    8.2    <u>Deposits of Funds</u>.  All funds of the Company shall be deposited in its name in such checking, money market or other account or accounts as the Board may from time to time designate; withdrawals shall be made therefrom on such signature or signatures as the Board shall determine.

    8.3    <u>Information Rights</u>.

    (a)    Each Member who agrees to such customary confidentiality restrictions as the Company reasonably request shall have the right to receive the following information (which right the Company may satisfy by providing access to each Member to a confidential, secure datasite (which website shall have a system of email notification of new postings and may require confirmation by viewers of the site of the confidentiality obligations set forth in <u>Section 6.15</u>, a "<u>Secure Site</u>")), and each Member may share and discuss such information (along with any other information provided to Members pursuant to this Agreement and otherwise made available to Members via the Secure Site) with its Affiliates (other than Competitors), directors, officers, partners, managers, employees and advisors as well as any bona fide prospective purchaser of Common Interests or indebtedness for borrowed money incurred by the Company or its Subsidiaries and held by such Member that (x) is not a Competitor and (y)(i) has entered into, and delivered to the Company, a confidentiality agreement regarding the treatment of such information (and for the avoidance of doubt, at its election, the Company may share and discuss such information with any prospective purchaser of Common Interests) or (ii) has entered into, and delivered to such Member, a confidentiality agreement regarding the treatment of such information containing provisions at least as restrictive as those of a similar confidentiality agreement with the Company and provides that the Company shall be a third party beneficiary with full enforcement rights thereunder:

    (i)    [within one hundred twenty (120) days of the end of each Fiscal Year beginning on or after the Fiscal Year ending December 31, 2024, copies of annual consolidated financial statements of the Company and its Subsidiaries as of the end of such Fiscal Year, which financial statements shall (A) be prepared in accordance with GAAP, and (B) be audited by a nationally recognized accounting firm approved by the Board; and

    (ii)    as soon as available and, in any event, within sixty (60) days after the end of each of the first three quarters of each such Fiscal Year or such earlier date as the Company or any of its Subsidiaries may be required to deliver such information to the Company's lenders under any credit agreement, indenture or similar agreement with respect to indebtedness for borrowed money of the Company or any of its Subsidiaries, consolidated balance sheets of the Company and its Subsidiaries as of the end of such period, and consolidated statements of income and cash flows of the Company and, if applicable, its Subsidiaries for the period then ended prepared in accordance with GAAP, except as otherwise noted therein, and subject to the absence of footnotes and to year-end adjustments (collectively, the "<u>Quarterly Financials</u>").][6]

    (b)    The Company shall host, and (i) each Member holding more than five percent (5%) of the Common Interests of the Company or (ii) any Member of (A) the Ad Hoc Crossover Group or (B) the Ad Hoc Group of 1L Lenders holding more than one percent (1%) of the Common Interests of the Company, shall have access to, quarterly conference calls with senior officers of the Company to discuss

---

[6] <u>Note to Draft</u>: Timeline and other requirements with respect to delivery of financial statements to match timelines and requirements under the Exit Credit Agreement.

the financial results of the previous fiscal quarter. Each such call shall be held in accordance with, and may be combined with, the rights provided for under the Exit Credit Agreement.

(c)    During the term of the Company's existence, there shall be maintained in the Company's principal office or at the office of the Company's agents and representatives all records required to be kept pursuant to the Act, including (whether or not so required) a current list of the names, addresses and Common Interests held by each of the Members (including the dates on which each of the Members became a Member), copies of federal, state and local information or income tax returns for each of the Company's tax years, copies of this Agreement and each of the Company's organizational documents, including all amendments thereto and restatements thereof, and correct and complete books and records of account of the Company. Prior to any termination of the Company's existence, the Company shall use all reasonable efforts to ensure that, for a period of six (6) years after any such termination, such information, to the extent still in existence and available, may be obtained by a Member's request in writing to a legal advisor or agent of the Company to be designated prior to any such termination, with the cost (as reasonably determined by such legal advisor or agent) of accessing and providing such information being borne by the requesting Member.

(d)    The rights of each Member granted pursuant to Sections 8.3(a) through 8.3(c) of this Agreement shall be freely Transferable by such Member in connection with any Transfer of its Common Interests otherwise permitted in accordance with Article V.

(e)    The Company shall provide to each Director and, subject to the limitations set out in Section 6.9, each Observer, copies of any materials distributed or made available to any other Directors or Observers. A Director or Observer shall be entitled to share and discuss with directors, officers and employees of the Member or Members that appointed such Director or Observer any materials or other information obtained by such person in such capacity.

(f)    Promptly following any request therefor, the Company shall use its reasonable efforts to furnish to any Member information and documentation reasonably requested by such Member for purposes of such Member's compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT ACT of 2001 and 31 C.F.R. § 1010.230, and/or other due diligence related to regulatory requirements and/or reputational risk.

8.4    Information Rights of the Company. The Company may from time to time (including in connection with the admission of a new Member), but a Member may be compelled to answer no more frequently than once per calendar quarter, reasonably request of any or all Members (at the expense of the Company) information needed by the Company to comply with applicable law.

8.5    Tax Matters. The Company shall elect to be treated as a corporation for U.S. federal and, where applicable, state and local income tax purposes, effective as of the Company's date of formation.

## Article IX
## Term and Dissolution

9.1    Term. The legal existence of the Company shall be perpetual, unless the Company is sooner dissolved as a result of an event specified in the Act or pursuant to a provision of this Agreement.

9.2    Dissolution.

(a)    The Company shall be dissolved and its affairs wound up upon the first to occur of the following:

(i)     The entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act;

(ii)    Approval of the dissolution of the Company by the Board;

(iii)   The resignation, expulsion, Bankruptcy or dissolution of the last remaining Member or the occurrence of any other event which terminates the continued membership of the last remaining Member in the Company, unless the business of the Company is continued without dissolution in accordance with the Act; and

(iv)    The occurrence of any other event that causes the dissolution of a limited liability company under the Act, unless the Company is continued without dissolution in accordance with the Act.

(b)     Upon dissolution of the Company, the business of the Company shall continue for the sole purpose of winding up its affairs.  The winding up process shall be carried out by the Members unless the dissolution is caused by an event of withdrawal by the sole remaining Member, in which case the Board shall appoint a liquidating trustee.  Otherwise, a liquidating trustee may be appointed for the Company by vote of a majority in Percentage Interest of the Members holding Common Interests (the Members or such liquidating trustee appointed by the Board or the Members is referred to herein as the "Liquidator").  In winding up the Company's affairs, every effort shall then be made to dispose of the assets of the Company in an orderly manner, having regard to the liquidity, divisibility and marketability of the Company's assets.  The Liquidator shall not be entitled to be paid by the Company any fee for services rendered in connection with the liquidation of the Company, but the Liquidator (whether one or more Members or a liquidating trustee) shall be reimbursed by the Company for all third-party costs and expenses incurred by it in connection therewith and shall, to the fullest extent permitted by law, be indemnified by the Company with respect to any action brought against it in connection therewith by applying, *mutatis mutandis*, the provisions of Section 11.1.

9.3     Application and Distribution of Assets.  Upon a windup of the Company, the Company shall distribute its assets as follows:

(a)     first, to creditors of the Company, including Members and Directors who are creditors, to the extent permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for the payment thereof) and including any contingent, conditional and unmatured liabilities of the Company, taking into account the relative priorities thereof;

(b)     second, to the Members and former Members in satisfaction of liabilities under the Act for distributions to such Members and former Members; and

(c)     third, subject to Section 3.7, to Members holding Common Interests in accordance with their Percentage Interests of Common Interests.

9.4     Termination of the LLC.  Subject to Section 2.7, the separate legal existence of the Company shall terminate upon a Reorganization or when all assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Members in the manner provided for in this Article IX and a certificate of cancellation of the Certificate shall have been filed in the manner required by Section 18-203 of the Act.

**Article X**
**Representations and Warranties of Members**

Each Member severally, but not jointly, represents and warrants as of the Effective Date to the Company and the other Members that:

10.1    Authority.  Each such Member that is a corporation or a limited liability company or a partnership is an entity duly formed and validly existing under the laws of the jurisdiction of its formation and the execution, delivery and performance by such Member of this Agreement have been duly authorized by all necessary corporate, limited liability company or partnership action, as applicable.  Each such Member that is an individual is an individual with full legal capacity under the laws of his jurisdiction of domicile and has the capacity to execute, deliver and perform this Agreement, and this Agreement has been duly executed and delivered by such Member.

10.2    Binding Obligations.  This Agreement has been duly and validly executed and delivered by such Member and constitutes the binding obligation of such Member, enforceable against such Member in accordance with its terms.

10.3    No Conflict.  The execution, delivery and performance by such Member of this Agreement will not, with or without the giving of notice or the lapse of time or both, (a) violate any provision of law to which such Member is subject, (b) violate any order, judgment or decree applicable to such Member or (c) conflict with or result in a breach or default under, any term or condition of its certificate of incorporation or bylaws, certificate of limited partnership or partnership agreement, certificate of formation or limited liability company agreement, as applicable or, except where such conflict, breach or default would not reasonably be expected to, individually or in the aggregate, have an adverse effect on such Member's ability to satisfy its obligations hereunder.

10.4    Purchase Entirely for Own Account.  The Common Interests to be acquired by such Member will be acquired for investment for such Member's own account, not as a nominee or agent and not with a view to the resale or distribution of any part thereof; such Member has no present intention of selling, granting any participation in or otherwise distributing the same; and such Member does not have any contract, undertaking, agreement or other arrangement with any Person to sell, transfer or grant participation to such Person or to any third Person, with respect to any of the Common Interests.

10.5    No Registration.  Such Member understands that the Common Interests, at the time of issuance, will not be registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Member's representations as expressed herein or otherwise made pursuant hereto.

10.6    Investment Experience.  Such Member confirms that the Member has such knowledge and experience in financial and business matters that such Member is capable of evaluating the merits and risks of an investment in the Common Interests and of making an informed investment decision and understands that (a) this investment is suitable only for an investor that is able to bear the economic consequences of losing its entire investment, (b) the acquisition of Common Interests hereunder is a speculative investment that involves a high degree of risk of loss of the entire investment and (c) there are substantial restrictions on the transferability of and there will be no public market for, the Common Interests.

10.7    Accredited Investor.  Such Member is an "accredited investor" within the meaning of Regulation D, Rule 501(a) promulgated by the SEC under the Securities Act.

10.8    Restricted Securities.  Such Member understands that the Common Interests may not be sold, transferred or otherwise disposed of without registration under the Securities Act or an exemption therefrom, and that in the absence of either an effective registration statement covering such Common

Interests or an available exemption from registration under the Securities Act, the Common Interests must be held indefinitely. In particular, such Member is aware that the Common Interests may not be sold pursuant to Rule 144 promulgated by the SEC under the Securities Act unless all of the conditions thereof are met.

10.9    Nonreliance. No promise, agreement, statement or representation that is not expressly set forth in this Agreement or in any other agreement by and among any of the Company, the Members or their respective Affiliates has been made to such Member by any other Member or any other Member's Affiliates, counsel, agent or any other Person with respect to the terms set forth in this Agreement, and such Member is not relying upon any such promise, agreement, statement or representation of any other Member or any other Member's Affiliates, counsel, agent or any other Person.

## Article XI
## General Provisions

11.1    Exculpation and Indemnification.

(a)    Unless specifically set forth herein, to the fullest extent permitted by applicable law, no Member, officer, Director, employee or agent of the Company and no officer, director, employee, Representative, agent or Affiliate of any Member (collectively, the "Covered Persons") shall be liable to the Company or any other Person who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's fraud, gross negligence or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(b)    To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by a Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's fraud, gross negligence or willful misconduct with respect to such acts or omissions as determined by a final, non-appealable judgment of a court of competent jurisdiction. To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon demand by such Covered Person and receipt by the Company of an undertaking by or on behalf of such Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 11.1.

(c)    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities or any other facts pertinent to the existence and amount of assets of the Company from which distributions to any Member might properly be paid.

(d)    The Company has obtained or will obtain directors' and officers' liability insurance for the Directors and officers of the Company, if any (a "D&O Insurance Policy"), with coverage under

such D&O Insurance Policy naming each Director and officer as an insured in such a manner as to provide such Director the same rights and benefits, subject to the same limitations, as are accorded to the Directors or officers of the Company most favored by such D&O Insurance Policy.  The Company shall use its commercially reasonable efforts to maintain a D&O Insurance Policy at all times that are no less favorable to the Directors than the D&O Insurance Policy entered into pursuant to the first sentence of this Section 11.1(d).

(e)     The rights conferred on any Covered Person by this Section 11.1 shall not be exclusive of any other rights which such Covered Person may have or hereafter acquire under any statute, provision of this Agreement or any other agreement or otherwise.  The Company hereby acknowledges that a Covered Person may have certain rights to indemnification, advancement of expenses and/or insurance provided by companies for which such Covered Person serves as a director, officer or employee (collectively, the "Other Indemnitors").  The Company hereby agrees that it (i) is the indemnitor of first resort (*i.e.*, its obligations to a Covered Person are primary and any obligation of the Other Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by or on behalf of such Covered Person are secondary), (ii) shall be required to advance the full amount of expenses incurred by or on behalf of such Covered Person and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent not prohibited by applicable law and as required by the terms of this Agreement (or any other agreement between the Company and such Person), without regard to any rights such Covered Person may have against the Other Indemnitors and (iii) irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of a Covered Person with respect to any claim for which a Covered Person has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of a Covered Person against the Company.  The Company and any Covered Person agree that the Other Indemnitors are express third-party beneficiaries of the terms of this Section 11.1(e).

(f)     The Company's obligation, if any, to indemnify any Covered Person who was or is serving at its request as a director, officer or employee of another company, corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise shall be reduced by any amount such Covered Person may collect as indemnification from such other company, corporation, partnership, limited liability company, joint venture, trust, organization or other enterprise.

(g)     Any repeal or modification of the foregoing provisions of this Section 11.1 shall not adversely affect any right or protection hereunder of any Covered Person in respect of any act or omission occurring prior to the time of such repeal or modification.  The rights provided hereunder shall inure to the benefit of any Covered Person and such person's heirs, executors and administrators.

11.2     Entire Agreement; Amendments; Waiver.

(a)     This Agreement (including the exhibits and annexes attached hereto) contains (i) the sole and entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter and (ii) shall not be assigned by operation of law or otherwise, except as set forth in this Agreement.

(b)     Subject to the proviso hereafter, this Agreement may only be modified, amended or supplemented with the approval of a majority of the issued and outstanding Common Interests; provided, however, that, notwithstanding anything in this Agreement to the contrary, (i) without the consent of any Member, the Board may amend Exhibit B from time to time so as to accurately reflect the information

33

contained thereon upon (A) the withdrawal of a Member, (B) the admission of a new Member and (C) any changes to Percentage Interests and the number of Common Interests held by Members as a consequence thereof, (ii) that any amendment to this Agreement that would affect any Member or group of Members of the Company in a manner that is disproportionate and materially adverse to the effect on any other Member or group of Members of the Company shall require the prior written consent of such Member or, with respect to a group of Members, a majority of such Members, (iii) any amendment to or waiver of any material provision of <u>Section 5.5</u> (*General Restrictions on Transfer*), <u>Section 5.2</u> (*Tag-Along Rights*), <u>Section 5.3</u> (*Drag-Along*), <u>Section 5.4</u> (*Preemptive Rights*), <u>Section 8.3</u> (*Information Rights*), <u>Section 6.10</u> (*Related Party Transactions*) or this <u>Section 11.2(b)</u> (*Amendments*) (other than *de minimis* amendments that affect all holders proportionately), shall require the affirmative consent of the holders of at least two-thirds of the outstanding Common Interests; <u>provided</u>, that any such amendment that adversely affects the Ad Hoc Crossover Group, excluding, in each case, for amendments or waivers regarding administrative or ministerial matters applicable to all Members that have no economic impact on Members that are not material to their interests, shall require the affirmative consent of each Member that is an Ad Hoc Crossover Group member (so long as such Member continues to hold equity interests of the Company), (iv) any amendment to the Ad Hoc Crossover Group's collective right to appoint an Observer pursuant to <u>Section 6.9(a)</u> shall require the affirmative consent of each Member that is an Ad Hoc Crossover Group member (so long as such Member continues to hold equity interests of the Company), (v) any amendment to this Agreement or any limited liability company agreement, charter, bylaws or comparable organizational document of the Company or any material Subsidiary of the Company that does not and would not be reasonably expected to adversely affect any Member in any material respect may be made by the Board, without the consent of any Member, to the extent permitted by law, and (vi) without any limitation to the requirements of <u>Section 5.4</u> and clauses (ii) and (iii) of this <u>Section 11.2(b)</u>, any amendment to this Agreement that may be necessary in order to effectuate the MIP with respect to the Initial MIP Pool, to the extent such amendment does not and would not be reasonably expected to adversely affect any Member in any material respect, may be made by the Board without the consent of any Member.

(c)    No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

11.3    <u>Avoidance of Provisions</u>.  No party hereto shall avoid the provisions of this Agreement by making one or more Transfers to one or more Affiliates and then disposing of all or any portion of such party's interest in any such Affiliate.

11.4    <u>Binding Agreement</u>.  The covenants and agreements herein contained shall inure to the benefit of and shall be binding upon the parties hereto and their respective Representatives, successors in interest and permitted assigns.

11.5    <u>Notices</u>.  Unless otherwise provided in this Agreement, any and all notices contemplated by this Agreement shall be deemed adequately given if in writing and delivered in hand, or upon receipt when sent by telecopy or electronic transmission, including electronic mail.  All such notices to Members shall be addressed to the last address of record on the books of the Company; all such notices to the Company shall be addressed to the Company at the address set forth in <u>Section 2.4</u> or at such other address as the Company may have designated by notice given in accordance with the terms of this subsection.

11.6    <u>Governing Law</u>.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

11.7    Consent to Jurisdiction; WAIVER OF JURY TRIAL.

(a)    The Company and each Member (i) irrevocably submits to the exclusive jurisdiction of the Chancery Court of the State of Delaware and the United States District Court for the District of Delaware (and the appropriate appellate courts), for the purposes of any suit, action or other proceeding arising out of this Agreement and (ii) agrees to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware or if such suit, action or other proceeding may not be brought in such court for jurisdictional reasons, in the Chancery Court of the State of Delaware.  Notwithstanding the foregoing, any party hereto may commence an action, suit or proceeding with any governmental body anywhere in the world for the sole purpose of seeking recognition and enforcement of a judgment of any court referred to in the first sentence of this Section 11.7(a).  The Company and each Member further (x) agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth on the Member List (or in the case of the Company, at the Company's principal office in Delaware) shall be effective service of process for any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction in this Section 11.7(a) and (y) irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in (A) the Chancery Court of the State of Delaware, or (B) the United States District Court for the District of Delaware, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(b)    THE COMPANY AND EACH MEMBER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, INVOLVING OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR SUCH MEMBER'S OWNERSHIP OF COMPANY COMMON EQUITY.  THE COMPANY AND EACH MEMBER (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE COMPANY OR ANY MEMBER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE COMPANY OR SUCH MEMBER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT THE COMPANY AND EACH MEMBER HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.7(b).

11.8    Construction.  The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent and to, the fullest extent permitted by law, the parties intend that no rule of strict construction will be applied against any party.

11.9    Severability.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted.  In the case of any such invalidity or unenforceability, the parties hereto agree to use all reasonable best efforts to achieve the purpose of such provision by a new legally valid and enforceable stipulation.

11.10    Counterparts, Electronic Copies.  This Agreement may be executed in multiple counterparts, including by electronic transmission or portable document format (.pdf), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.11    Survival.  The provisions of Section 2.6, Section 5.8, Section 6.1(b), Section 6.15 and this Article XI (other than Section 11.13) shall survive the termination of this Agreement for any reason or the dissolution of the Company.  Subject to the Act, all other rights and obligations of the Members shall cease upon the earlier of the termination of this Agreement or dissolution of the Company.

11.12 <u>Termination</u>.

(a)    This Agreement will be automatically effective as of the Effective Date and will continue in effect until the earlier to occur of (i) its termination by the unanimous written consent of all Members of the Company, (ii) a Sale of the Company (iii) the dissolution, liquidation or winding up of the Company and (iv) the consummation of a Drag-Along Sale in which, for whatever reason, all of the Members participate either as Selling Members or Compelled Members.

(b)    <u>Section 3.6(b)</u>, <u>Sections 5.1</u> through <u>5.5</u>, <u>Section 6.15</u>, <u>Section 8.3</u>, <u>Section 8.4</u> and <u>Article X</u> shall automatically terminate upon (i) a Qualified IPO or (ii) the listing of any equity securities of the Company on the NASDAQ, the NYSE or another U.S. national securities exchange.

11.13 <u>Special Power of Attorney</u>.  Each Member grants a majority of the Board and the Company (for the purposes of this <u>Section 11.13</u>, the "<u>Proxy Holder</u>") a special power of attorney (with full power of substitution and resubstitution) irrevocably making, constituting, and appointing such person as the Member's attorney-in-fact, with full power and authority to act in the Member's name and on the Member's behalf to execute, acknowledge and deliver and swear to in the execution, acknowledgment, delivery and filing of any agreements or instruments that a majority of the Board deems necessary or appropriate in connection with a Drag-Along Sale, conducted pursuant to and subject to the terms and conditions set forth in <u>Section 5.4</u>; <u>provided</u>, that the Company shall provide each Member notice of the action it is requesting that such Member to take; <u>provided</u>, <u>further</u>, that such special power of attorney may only be exercised after five (5) Business Days following notice from the Company to such Member in the event such Member has not complied with the Company's request.  Further, each Member grants to the Proxy Holder with respect to such a Drag-Along Sale a special power of attorney (with full power of substitution and resubstitution) irrevocably making, constituting, and appointing such person as the Member's attorney-in-fact, with full power and authority to act in the Member's name and on the Member's behalf to: (a) vote on all matters to be voted on under this Agreement on behalf of such Members, (b) receive all notices on behalf of such Members, (c) execute and deliver, on behalf of such Members, any agreement, consent, assignment, waiver, other document or instrument or any amendment thereto or to take any other action required of such Members under this Agreement, including executing, acknowledging, delivering and swearing to in the execution, acknowledgment, delivery and filing of any agreements or instruments that a majority of the Board deems necessary or appropriate, and (d) take all other actions to be taken by or on behalf of the Members, as a group, and exercise any and all rights that such Members are permitted or required to do or exercise under this Agreement with respect to such a Drag-Along Sale.  The special power granted in this <u>Section 11.13</u> (i) is irrevocable, (ii) is coupled with an interest, and (iii) shall survive a Member's death, incapacity or dissolution.  A duly appointed officer or other person duly designated by a majority of the Board and the Company may exercise the special power of attorney granted in this Section <u>11.13</u> by a facsimile or other electronic signature (including electronic mail with PDF attachment).

11.14 <u>Further Assurance</u>.  Each party to this Agreement agrees to execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents and to do all such other acts and things, as may be required by law or as, in the reasonable judgment of the Board, may be necessary or reasonably advisable to carry out the intent and purpose of this Agreement.

11.15 <u>Use of Name and Trade Marks</u>.

(a)    Except as required by law, each Member shall not use in advertising, publicity or other similar public usage the name of the Company or any other Member or any of their respective Affiliates (other than, if applicable, such Member) or any trade name, trademark, trade device, logo service mark, symbol or abbreviation, contraction or simulation thereof owned or used by the Company or a Member or

any of their respective Affiliates (other than, if applicable, such Member) without the prior written consent of the Company or such other Member, as applicable.

(b)      The Company shall not, without the prior written consent of the Member in question for each instance, use in advertising or publicity or other similar public usage the name of any Member or its Affiliates (other than the Company) or investment managers or any trade name, trademark, trade device, logo service mark, symbol or abbreviation, contraction or simulation thereof owned or used by a Member or its Affiliates (other than the Company) or investment managers except as required by law.

11.16   <u>Non-Impairment</u>.   Notwithstanding anything contained herein to the contrary, nothing contained in this Agreement will effect, limit or impair the rights and remedies of any Member or any of their respective Affiliates, funding or financing sources or any other lenders, if applicable, in their capacities as lenders to the Company or any of its Subsidiaries pursuant to any agreement under which the Company or any of its Subsidiaries has or from time to time will have borrowed money.

[Signature pages follow]

 

IN WITNESS WHEREOF, the Members signatory hereto have entered into this Agreement on the date first above written:

MEMBERS:

*[●]Member*

_____
Name:
Title:

**<u>Annex I</u>**

**Registration Rights**

**REGISTRATION RIGHTS**

1.        <u>Definitions</u>. Capitalized terms used but not defined in this <u>Annex I</u> have the meanings given to such terms in the LLC Agreement.  As used in this <u>Annex I</u>, and solely for the purposes of this <u>Annex I</u>, the following terms have the meanings specified below:

"<u>Affiliated Holders</u>" has the meaning set forth in <u>Section 2(b)(i)</u> of this <u>Annex I</u>.

"<u>beneficially owned</u>," "<u>beneficial ownership</u>" and similar phrases have the same meanings as such terms have under Rule 13d-3 (or any successor rule then in effect) under the Exchange Act, except that in calculating the beneficial ownership of any Holder, such Holder shall be deemed to have beneficial ownership of all securities that such Holder has the right to acquire, whether such right is currently exercisable or is exercisable upon the occurrence of a subsequent event.  For the avoidance of doubt, each Holder shall be deemed to beneficially own all of the Common Interests held by any of its Affiliates.

"<u>Block Sale</u>" means the sale of Common Interests constituting more than [five percent (5%)] of Common Interests then outstanding to one or more purchasers in a registered transaction without a prior marketing process by means of (i) a bought deal, (ii) a block trade or (iii) a direct sale.

"<u>Company Notice</u>" has the meaning set forth in <u>Section 2(a)(iii)</u> of this <u>Annex I</u>.

"<u>Demand Eligible Holder</u>" has the meaning set forth in <u>Section 2(b)(i)</u> of this <u>Annex I</u>.

"<u>Demand Eligible Holder Request</u>" has the meaning set forth in <u>Section 2(b)(i)</u> of this <u>Annex I</u>.

"<u>Demand Notice</u>" has the meaning set forth in <u>Section 2(b)(i)</u> of this <u>Annex I</u>.

"<u>Demand Registration</u>" has the meaning set forth in <u>Section 2(b)(i)</u> of this <u>Annex I</u>.

"<u>Demand Registration Statement</u>" has the meaning set forth in <u>Section 2(b)(i)</u> of this <u>Annex I</u>.

"<u>Effectiveness Period</u>" has the meaning set forth in <u>Section 2(b)(iii)</u> of this <u>Annex I</u>.

"<u>Family Member</u>" means, with respect to any natural Person, such Person's parents, spouse (but not including a former spouse or a spouse from whom such Person is legally separated) and descendants (whether or not adopted) and any trust, family limited partnership or limited liability company that is and remains solely for the benefit of such Person's spouse (but not including a former spouse or a spouse from whom such Person is legally separated) and/or descendants.

"<u>FINRA</u>" means Financial Industry Regulatory Authority, Inc.

"<u>Holder</u>" means each Member of the Company who holds any portion of the Company's then outstanding Common Interests.

"<u>Indemnified Persons</u>" has the meaning set forth in <u>Section 5(a)</u> of this <u>Annex I</u>.

"<u>Initial Public Offering</u>" means the initial firm commitment underwritten public offering of Registrable Securities consummated for cash and registered under the Securities Act or equivalent foreign securities laws (other than a registration statement on Form S-4 or Form S-8 (or any similar or successor form or equivalent foreign form)) pursuant to which Registrable Securities are sold and concurrently listed on a national securities exchange in the United States.

"<u>Initiating Holders</u>" has the meaning set forth in <u>Section 2(b)(i)</u> of this <u>Annex I</u>.

"<u>Issuer Free Writing Prospectus</u>" means an issuer free writing prospectus, as defined in Rule 433 under the Securities Act, relating to an offer of the Registrable Securities.

"<u>LLC Agreement</u>" means that certain Amended and Restated Limited Liability Company Agreement of [Reorganized Grandparent], LLC, dated [●], 2024, to which these Registration Rights are attached as <u>Annex I</u>.

"<u>Losses</u>" has the meaning set forth in <u>Section 5(a)</u> of this <u>Annex I</u>.

"<u>Other Registrable Securities</u>" means Common Interests issued or issuable with respect to, on account of or in exchange for Common Interests, whether by dividend, recapitalization, merger or otherwise held by any other Person who has rights to participate in any public offering of securities by the Company pursuant to a registration rights agreement or other similar arrangement with the Company.

"<u>Piggyback Eligible Holders</u>" has the meaning set forth in <u>Section 2(c)(i)</u> of this <u>Annex I</u>.

"<u>Piggyback Notice</u>" has the meaning set forth in <u>Section 2(c)(i)</u> of this <u>Annex I</u>.

"<u>Piggyback Registration</u>" has the meaning set forth in <u>Section 2(c)(i)</u> of this <u>Annex I</u>.

"<u>Piggyback Registration Statement</u>" has the meaning set forth in <u>Section 2(c)(i)</u> of this <u>Annex I</u>.

"<u>Piggyback Request</u>" has the meaning set forth in <u>Section 2(c)(i)</u> of this <u>Annex I</u>.

"<u>Proceeding</u>" means any action, claim, suit, proceeding or investigation (including a preliminary investigation or partial proceeding, such as a deposition) pending or known to the Company to be threatened.

"<u>Prospectus</u>" means the prospectus or prospectuses included in a Registration Statement (including a prospectus that includes any information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance upon Rule 430A promulgated under the Securities Act or any successor rule thereto), all amendments and supplements to the prospectus, including post-effective amendments, all material incorporated by reference or deemed to be incorporated by reference in such prospectus or prospectuses and any Issuer Free Writing Prospectus.

"<u>Registrable Securities</u>" means any Common Interests issued to or held by any Holder or any Affiliate of any Holder on and as of the Effective Date, all of which Common Interests are subject to the rights provided herein until such rights terminate pursuant to the provisions of this <u>Annex I</u>.  As to any particular Registrable Securities, such securities shall cease to be Registrable Securities when (i) a registration statement registering such Registrable Securities under the Securities Act has been declared effective and such Registrable Securities have been sold, transferred or otherwise disposed of by the Holder thereof pursuant to such effective registration statement, (ii) such Registrable Securities are sold, transferred or otherwise disposed of pursuant to Rule 144, (iii) such securities cease to be outstanding, or (iv) such Registrable Securities as are held by any Holder who, together with its Affiliates, at the time of determination, holds in the aggregate less than [five percent (5%)] of the Company's then outstanding Common Interests; <u>provided</u> that such Common Interests may be sold pursuant to Rule 144(b)(1) under the Securities Act without limitations on volume.

"<u>Registration Date</u>" means the date on which the Company becomes subject to Section 13(a) or Section 15(d) of the Exchange Act in connection with the Common Interests or any other class of equity securities of the Company.

"<u>Registration Expenses</u>" has the meaning set forth in <u>Section 4(a)</u> of this <u>Annex I</u>.

"<u>Registration Statement</u>" means a registration statement of the Company filed with or to be filed with the SEC under the Securities Act and other applicable law, and including any Prospectus, amendments and supplements to each such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"Rule 144" means Rule 144 promulgated by the SEC pursuant to the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC having substantially the same effect as such rule.

"Rule 144A" means Rule 144A promulgated by the SEC pursuant to the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC having substantially the same effect as such rule.

"Rule 158" means Rule 158 promulgated by the SEC pursuant to the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC having substantially the same effect as such rule.

"Rule 405" means Rule 405 promulgated by the SEC pursuant to the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC having substantially the same effect as such rule.

"Rule 424" means Rule 424 promulgated by the SEC pursuant to the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the SEC having substantially the same effect as such rule.

"Selling Expenses" means all underwriting fees, discounts, selling commissions and transfer taxes applicable to the sale of Registrable Securities and related legal and other fees of a Holder or any underwriter not included within the definition of Registration Expenses.

"Shelf" has the meaning set forth in Section 2(a)(i) of this Annex I.

"Shelf Period" has the meaning set forth in Section 2(a)(i) of this Annex I.

"Shelf Registration" means the registration of the Registrable Securities on a Shelf pursuant to Section 2(a)(i) of this Annex I.

"Shelf Takedown Notice" has the meaning set forth in Section 2(a)(iii) of this Annex I.

"Suspension Period" has the meaning set forth in Section 2(e) of this Annex I.

"Trading Market" means any principal national securities exchange in the United States, including, but not limited to, the New York Stock Exchange or The Nasdaq Global Market or, in each case, any successor exchange on which Registrable Securities are (or are to be) listed.

"Underwritten Shelf Takedown" has the meaning set forth in Section 2(a)(ii) of this Annex I.

Unless the context requires otherwise: (a) any pronoun used in this Annex I shall include the corresponding masculine, feminine or neuter forms; (b) references to Sections, paragraphs and clauses refer to Sections, paragraphs and clauses of this Annex I; (c) the terms "include," "includes," "including" or words of like import shall be deemed to be followed by the words "without limitation"; (d) the terms "hereof," "herein" or "hereunder" refer to this Annex I as a whole and not to any particular provision of this Annex I; (e) unless the context otherwise requires, the term "or" is not exclusive and shall have the inclusive meaning of "and/or"; (f) defined terms herein will apply equally to both the singular and plural forms and derivative forms of defined terms will have correlative meanings; (g) references to any law or statute shall include all rules and regulations promulgated thereunder, and references to any form of Registration Statement, law or statute shall be construed as including any legal and statutory provisions consolidating, amending, succeeding or replacing the applicable form of Registration Statement, law or statute; (h) references to any Person include such Person's successors and permitted assigns; and (i) references to "days" are to calendar days unless otherwise indicated.

2.    Registration.  This Annex I, and the rights granted hereunder, shall not be effective and will not vest until a majority of the members of the Board ratify this Annex I.

(a)     <u>Shelf Registration</u>.

(i)     As soon as reasonably practicable after the date on which the Company becomes eligible to use a Registration Statement on Form S-3 to register the resale of Registrable Securities, and upon the request of an eligible Holder beneficially owning at least [five percent (5%)] of the then outstanding Common Interests, the Company shall file a Registration Statement on Form S-3 covering the resale of all Registrable Securities on a delayed or continuous basis (the "<u>Shelf</u>") for such Registrable Securities held by all such requesting Holders; <u>provided</u>, however, that the Company shall not be required to file or cause to be declared effective the Shelf unless Holders request the inclusion in the Shelf of Registrable Securities constituting at least fifteen percent (15.0%) of all Registrable Securities and such Holders otherwise timely comply with the requirements of this <u>Annex I</u> with respect to the inclusion of such Registrable Securities in the Shelf.  The Company shall use its reasonable best efforts to cause the Shelf to become effective as promptly as practicable.  The Company shall use its reasonable best efforts to keep the Shelf continuously effective under the Securities Act until there are no longer any Registrable Securities (the "<u>Shelf Period</u>").

(ii)     Subject to the provisions of <u>Section 2(a)(v)</u> of this <u>Annex I</u>, at any time during which the Shelf is effective (or in connection with its initial effectiveness), any one or more of the eligible Holders of Registrable Securities may request to sell all or any portion of their Registrable Securities in an underwritten offering that is registered pursuant to the Shelf (each, an "<u>Underwritten Shelf Takedown</u>"); <u>provided</u> that in the case of each such Underwritten Shelf Takedown such Holder or Holders will be entitled to make such demand only if (A) the number of Registrable Securities to be sold in such Underwritten Shelf Takedown represents not less than [fifteen percent (15%)] of the outstanding Common Interests in the aggregate and (B) the total offering price of the Common Interests to be sold in such Underwritten Shelf Takedown (including any piggyback securities and before deduction of underwriting discounts) is reasonably expected to exceed, in the aggregate, $[100] million.

(iii)     All requests for Underwritten Shelf Takedowns shall be made by giving written notice to the Company (the "<u>Shelf Takedown Notice</u>").  Each Shelf Takedown Notice shall specify the approximate number of Registrable Securities to be sold in the Underwritten Shelf Takedown and the expected price range (net of underwriting discounts and commissions) of such Underwritten Shelf Takedown.  Subject to <u>Section 2(i)</u> of this <u>Annex I</u> below, within five (5) Business Days after receipt of any Shelf Takedown Notice, the Company shall give written notice of such requested Underwritten Shelf Takedown to all other Holders of Registrable Securities (the "<u>Company Notice</u>") and, subject to the provisions of <u>Section 2(a)(iv)</u> and <u>Section 2(i)</u> of this <u>Annex I</u> below, shall include in such Underwritten Shelf Takedown all Registrable Securities with respect to which the Company has received written requests for inclusion therein within five (5) Business Days after giving the Company Notice.

(iv)     If the managing underwriters for such Underwritten Shelf Takedown advise the Company that in their reasonable view, or, if such managing underwriters are unwilling to so advise the Company, if the Company concludes after consultation with such managing underwriters and the Holder of Registrable Securities proposed to be included in such Underwritten Shelf Takedown that in the Company's reasonable view, the number of Common Interests proposed to be included in such Underwritten Shelf Takedown exceeds the number of Common Interests which can be sold in an orderly manner in such offering within a price range acceptable to the Holders of a majority of the Registrable Securities requested to be included in the Underwritten Shelf Takedown, then the Company shall so advise all Holders of Registrable Securities proposed to be included in such Underwritten Shelf Takedown, and shall include in such Underwritten Shelf Takedown the number of Common Interests which can be so sold in the following order of priority: (A) <u>first</u>, the Registrable Securities requested to be included in such

Underwritten Shelf Takedown, which in the view of such underwriters or the Company, as applicable, can be sold in an orderly manner within the price range of such offering, pro rata among the respective Holders of such Registrable Securities on the basis of the number of Registrable Securities requested to be included therein by each such Holder, (B) <u>second</u>, Other Registrable Securities requested to be included in such Underwritten Shelf Takedown to the extent permitted hereunder, pro rata  among the respective Holders of such Other Registrable Securities on the basis of the number of securities requested to be included therein by each such Holder and (C) <u>third</u>, securities of the Company requested to be included by the Company.

(v)     Other than Block Sales, which shall not be classified as an Underwritten Shelf Takedown solely for the purposes of the limitations under this  <u>Section 2(a)(v)</u> of this <u>Annex I</u>, the Company shall not be obligated to (A) effect an Underwritten Shelf Takedown within one hundred eighty (180) days (or such shorter period specified in any applicable lock-up agreement entered into with underwriters) after the consummation of a previous Underwritten Shelf Takedown or Demand Registration and (B) effect a total of more than two (2) Underwritten Shelf Takedowns while any Registrable Securities remain outstanding; <u>provided</u> that one (1) of such two (2) Underwritten Shelf Takedowns shall be reserved for Holders who beneficially own in the aggregate more than [twenty percent (20%)] of the Company's then outstanding Common Interests.

(vi)     The Holders of a majority of the Registrable Securities requested to be included in an Underwritten Shelf Takedown shall have the right to select the investment banker(s) and manager(s) to administer the offering (which shall consist of one (1) or more reputable nationally recognized investment banks, subject to the Company's approval (which shall not be unreasonably withheld, conditioned or delayed)) and one (1) firm of counsel to represent all of the Holders (along with any reasonably necessary local counsel), in connection with such Underwritten Shelf Takedown; <u>provided</u> that the Company shall select such investment banker(s), manager(s) and counsel (including local counsel) if such Holders of such majority cannot so agree on the same within a reasonable time period.

(vii)     Any Holder whose Registrable Securities were to be included in any such registration pursuant to <u>Section 2(a)(ii)</u> of this <u>Annex I</u> may elect to withdraw any or all of its Registrable Securities therefrom, without prejudice to the rights of any such Holder or Holders to include Registrable Securities in any future registration (or registrations), by written notice to the Company delivered at least three (3) Business Days prior to the effective date of the relevant Underwritten Shelf Takedown.

(viii)     As of the date this <u>Annex I</u> is ratified by a majority of the members of the Board, the Company represents and warrants that it is not a party to, or otherwise subject to, any agreement other than this <u>Annex I</u> granting registration rights to any other Person with respect to any securities of the Company.

(ix)     Notwithstanding any of the foregoing, the Company shall not be obligated to file any Registration Statement pursuant to <u>Section 2(a)</u> of this <u>Annex I</u> without the prior approval of a majority of the members of the Board.

(b)     <u>Demand Registration</u>.  Subject to the terms and conditions of this <u>Annex I</u> (including <u>Section 2(b)(ii)</u>), at any time on or after an Initial Public Offering or the listing of the Common Interests on a Trading Market, if a Shelf Registration has not been effected pursuant to <u>Section 2(a)</u>, upon written notice to the Company (a "<u>Demand Notice</u>") delivered by a Holder or Holders, collectively, beneficially owning more than fifteen percent (15%) of the then outstanding Common Interests in the aggregate, which for the avoidance of doubt shall include any Holder with respect to which there is a director serving on the Board who was appointed by, or is otherwise employed by or affiliated with, such Holder or its Affiliates  (each of the foregoing being referred to as the "<u>Initiating Holders</u>") at any time requesting that the Company effect

the registration (a "Demand Registration") under the Securities Act (other than pursuant to a Registration Statement on Form S-4 or S-8) the number of Registrable Securities included in such Demand Notice, the Company shall promptly (but in any event, not later than five (5) Business Days following the Company's receipt of such Demand Notice) give written notice of the receipt of such Demand Notice to all other Holders that, to its knowledge, hold Registrable Securities (each, a "Demand Eligible Holder"). The Company shall promptly file the appropriate registration statement (the "Demand Registration Statement") and use its reasonable best efforts to effect, at the earliest practicable date, the registration under the Securities Act and under the applicable state securities laws of (1) the Registrable Securities which the Company has been so requested to register by the Initiating Holders in the Demand Notice and (2) all other Registrable Securities which the Company has been requested to register by the Demand Eligible Holders by written request (the "Demand Eligible Holder Request") given to the Company within ten (10) Business Days after the giving of such written notice by the Company, in each case subject to Section 2(b)(v) of this Annex I, all to the extent required to permit the disposition (in accordance with the intended methods of disposition) of the Registrable Securities to be so registered.

(i)     Notwithstanding anything herein to the contrary, the Company shall not be required to (A) effect more than one (1) Demand Registration in any six (6) month period, (B) effect a total of more than three (3) Demand Registrations by Holders beneficially owning not less than fifteen percent (15%) of the outstanding shares of the Common Interests in the aggregate, (C) effect a Demand Registration with respect to any Registrable Securities requested to be registered that are already covered by an existing and effective Registration Statement and such Registration Statement may be utilized for the offer and sale of such Registrable Securities requested to be registered, (D) effect a Demand Registration during the period starting with the date thirty (30) calendar days prior to a good faith estimate, with the approval of a simple majority of the Board, of the date of filing of, and ending on the date ninety (90) calendar days after the Effective Date of, a Company initiated Registration Statement; provided that the Company is employing commercially reasonable efforts to cause such Registration Statement to become effective, (E) effect a Demand Registration for a period of up to ninety (90) calendar days after the date of a Demand Notice if, at the time of such request (x) the Company is engaged, or has fixed plans with the approval of a simple majority of the Board to engage, within ninety (90) calendar days of the time of such Demand Notice, in a firm commitment underwritten public offering of securities in which Holders of Registrable Securities may include their Registrable Securities pursuant to pursuant to Section 2(c) of this Annex I or (y) the Company is currently engaged in a self-tender or exchange offer and the filing of a Registration Statement would cause a violation of the Exchange Act and (F) if a Registration Statement filed by the Company shall have previously been initially declared effective by the SEC within the one hundred eighty (180) calendar days preceding the date such Demand Notice is made or if an Underwritten Shelf Takedown shall have been previously made within the one hundred eighty (180) calendar days preceding the date such Demand Notice.

(ii)     The Company shall use its reasonable best efforts to keep the Demand Registration Statement continuously effective under the Securities Act for the period of time necessary for the underwriters or Holders to sell all the Registrable Securities covered by such Demand Registration Statement or such shorter period which will terminate when all Registrable Securities covered by such Demand Registration Statement have been sold pursuant thereto (including, if necessary, by filing with the SEC a post-effective amendment or a supplement to the Demand Registration Statement or the related Prospectus or any document incorporated therein by reference or by filing any other required document or otherwise supplementing or amending the Demand Registration Statement, if required by the rules, regulations or instructions applicable to the registration form used by the Company for such Demand Registration Statement or by the Securities Act, any state securities or "blue sky" laws, or any other rules and regulations thereunder) (the "Effectiveness Period"). A Demand Registration requested pursuant to this

Section 2(b) shall not be deemed to have been effected (A) if the Registration Statement is withdrawn without becoming effective, (B) if the Registration Statement does not remain effective in compliance with the provisions of the Securities Act and the laws of any state or other jurisdiction applicable to the disposition of the Registrable Securities covered by such Registration Statement for the Effectiveness Period, (C) if, after it has become effective, such Registration Statement is subject to any stop order, injunction or other order or requirement of the SEC or other governmental or regulatory agency or court for any reason other than a violation of applicable law solely by any selling Holder and has not thereafter become effective, (D) in the event of an underwritten offering, if the conditions to closing specified in the underwriting agreement entered into in connection with such registration are not satisfied or waived other than by reason of some wrongful act or omission by an Initiating Holder, (E) if the Company does not include in the applicable Registration Statement any Registrable Securities held by a Holder that is required by the terms hereof to be included in such Registration Statement,  or (F) if the Initiating Holders and Demand Eligible Holders have not been able to sell at least seventy-five percent (75%) of the Registrable Securities that they have requested to sell in the Demand Notice or Demand Eligible Holder Request.

(iii)    Notwithstanding any other provision of this Section 2(b), if (A) the Initiating Holders intend to distribute the Registrable Securities covered by a Demand Registration by means of an underwritten offering and (B) the managing underwriters advise the Company and the Initiating Holders that in their reasonable view, or, if such managing underwriters are unwilling to so advise the Company and the Initiating Holders, the Company concludes after consultation with such managing underwriters and the Holders of Registrable Securities proposed to be included in such offering that in the Company's reasonable view, the number of Common Interests proposed to be included in such offering (including Registrable Securities requested by Holders to be included in such offering and any securities that the Company or any other Person proposes to be included that are not Registrable Securities) exceeds the number of Common Interests which can be sold in an orderly manner in such offering within a price range acceptable to the Holders of a majority of the Registrable Securities requested to be included in such Demand Registration, then the Company shall so advise all Initiating Holders and Demand Eligible Holders with Registrable Securities proposed to be included in such underwritten offering, and shall include in such offering the number of Common Interests which can be so sold in the following order of priority:  (1) first, the Registrable Securities requested to be included in such underwritten offering by the Initiating Holders and the Demand Eligible Holders, which in the view of such underwriters or the Company, as applicable, can be sold in an orderly manner within the price range of such offering, pro rata among such Initiating Holders and Demand Eligible Holders on the basis of the number of Registrable Securities requested to be included therein by each such Initiating Holder and Demand Eligible Holder, (2) second, Other Registrable Securities requested to be included in such underwritten offering to the extent permitted hereunder pro rata among the respective Holders of such Other Registrable Securities on the basis of the number of securities requested to be included therein by each such Holder and (3) third, securities of the Company requested to be included by the Company.

(iv)    The determination of whether any offering of Registrable Securities pursuant to a Demand Registration will be an underwritten offering shall be made in the sole discretion of the Holders of a majority of the Registrable Securities included in such underwritten offering, and such Holders of a majority of the Registrable Securities shall have the right to (A) determine the plan of distribution, including the price at which the Registrable Securities are to be sold and the underwriting commissions, discounts and fees and (B) select the investment banker(s) and manager(s) to administer the offering (which shall consist of one (1) or more reputable nationally recognized investment banks, subject to the Company's approval (which shall not be unreasonably withheld, conditioned or delayed)) and one (1) firm of counsel to

represent all of the Holders (along with any reasonably necessary local counsel), in connection with such Demand Registration; <u>provided</u> that the Company shall select such investment banker(s), manager(s) and counsel (including local counsel) if such Holders of such majority cannot so agree on the same within a reasonable time period.

(v)       Any Holder whose Registrable Securities were to be included in any such registration pursuant to this Section 2(b) may elect to withdraw any or all of its Registrable Securities therefrom, without prejudice to the rights of any such Holder or Holders to include Registrable Securities in any future registration (or registrations), by written notice to the Company delivered at least three (3) Business Days prior to the effective date of the relevant Demand Registration Statement. If, pursuant to the preceding sentence, the entire Demand Notice is revoked, then, at the option of the Holder or Holders who revoke such request, either (x) such Holder or Holders shall reimburse the Company for all of its reasonable and documented out-of-pocket expenses incurred in the preparation, filing and processing of the Registration Statement, which out-of-pocket expenses, for the avoidance of doubt, shall not include overhead expenses and which requested registration shall not count as one of the permitted Demand Registrations hereunder or (y) the requested registration that has been revoked will be deemed to have been effected for purposes of  this <u>Section 2(b)</u> of <u>Annex I</u> (for the avoidance of doubt, "or" as used in this clause is exclusive).

(c)       <u>Piggyback Registration</u>.

(i)       If at any time the Company proposes to file a Registration Statement (a "<u>Piggyback Registration Statement</u>"), other than pursuant to a Shelf Registration under <u>Section 2(a)</u> of this <u>Annex I</u> or any Demand Registration under <u>Section 2(b)</u> of this <u>Annex I</u> and other than an Initial Public Offering, for an offering of Common Interests or other equity interests for cash (whether in connection with a public offering of Common Interests by the Company, a public offering of Common Interests by holders of such securities other than Holders, or both, but excluding an offering relating solely to an employee benefit plan, an offering relating to a transaction on Form S-4, an offering on any Registration Statement form that does not permit secondary sales or an offering in connection with any dividend or distribution reinvestment or similar plan),  the Company shall give written notice (the "<u>Piggyback Notice</u>") to all Holders that, to its knowledge, hold at least [one percent (1%)] of the Company's outstanding Common Interests (collectively, the "<u>Piggyback Eligible Holders</u>") of the Company's intention to file a Piggyback Registration Statement reasonably in advance of (and in any event at least ten (10) Business Days before) the anticipated filing date of such Piggyback Registration Statement; <u>provided</u>, that in the case of any Block Sale, such Piggyback Notice shall be given not less than two (2) Business Days before the expected commencement of marketing efforts. The Piggyback Notice shall offer the Piggyback Eligible Holders the opportunity to include for registration in such Piggyback Registration Statement the number of Registrable Securities as they may request, subject to Section 2(c)(ii) of this Annex I (a "<u>Piggyback Registration</u>"). Any Piggyback Notice and the contents thereof shall be kept confidential until the public filing of the Piggyback Registration Statement. Subject to <u>Section 2(c)(ii)</u> of this <u>Annex I</u>, the Company shall use its reasonable best efforts to include in each such Piggyback Registration such Registrable Securities for which the Company has received written requests (each, a "<u>Piggyback Request</u>") from Piggyback Eligible Holders within five (5) Business Days after giving the Piggyback Notice; <u>provided</u>, that in the case of any Block Sale, such Piggyback Request must be received within one (1) Business Days after giving the Piggyback Notice. If a Piggyback Eligible Holder decides not to include all of its Registrable Securities in any Piggyback Registration Statement thereafter filed by the Company, such Piggyback Eligible Holder shall nevertheless continue to have the right to include any Registrable Securities in any subsequent Piggyback Registration Statements or registration statements as may be filed  by the Company with respect to offerings of Common

Interests, all upon the terms and conditions set forth herein. The Company shall use its reasonable best efforts to effect the registration under the Securities Act (other than pursuant to a Registration Statement on Form S-4 or S-8) of all Registrable Securities which the Company has been so requested to register pursuant to the Piggyback Requests, to the extent required to permit the disposition of the Registrable Securities so requested to be registered.

(ii)     If the Piggyback Registration under which the Company gives notice pursuant to Section 2(c)(i) of this Annex I is an underwritten offering, and the managing underwriter or managing underwriters of such offering advise the Company and the Piggyback Eligible Holders that, in their reasonable view, or, if such managing underwriters are unwilling to so advise the Company and the Piggyback Eligible Holders, the Company concludes after consultation with such managing underwriters and the Holders of Registrable Securities proposed to be included in such registration that in the Company's reasonable view, the amount of securities requested to be included in such registration (including Registrable Securities requested by the Piggyback Eligible Holders to be included in such offering and any securities that the Company or any other Person proposes to be included that are not Registrable Securities) exceeds the number of Common Interests which can be sold in an orderly manner in such offering within a price range acceptable to the Company, then the Company shall so advise all Piggyback Eligible Holders with Registrable Securities proposed to be included in such Piggyback Registration, and shall include in such offering the number which can be so sold in the following order of priority: (A) in the case of a Company-initiated registration, (1) first, the securities that the Company proposes to sell, (2) second, the Registrable Securities requested to be included in such Piggyback Registration pro rata among the Piggyback Eligible Holders on the basis of the number of Registrable Securities requested to be included therein by each Piggyback Eligible Holder and (3) third, Other Registrable Securities requested to be included in such Piggyback Registration, pro rata among the Holders thereof on the basis of the number of securities requested to be included therein by each such Holder and (B) in the case of a non-Company initiated registration, (1) first, the securities requested to be included in such offering by the Holders of the Company's securities initiating such registration and the Piggyback Eligible Holders, pro rata among such Holders on the basis of the number of securities requested to be included therein by each such Holder, (2) second, Other Registrable Securities requested to be included in such offering to the extent permitted hereunder pro rata among the respective Holders of such Other Registrable Securities on the basis of the number of securities requested to be included therein by each such Holder and (3) third, securities of the Company requested to be included by the Company. Promptly (and in any event within one (1) Business Day) following receipt of notification by the Company from the managing underwriter of a range of prices at which such Registrable Securities are likely to be sold, the Company shall so advise each Piggyback Eligible Holder requesting registration in such offering of such price. If any Piggyback Eligible Holder disapproves of the terms of any such underwriting (including the price offered by the underwriter(s) in such offering), such Piggyback Eligible Holder may elect to withdraw any or all of its Registrable Securities therefrom, without prejudice to the rights of any such Holder or Holders to include Registrable Securities in any future Piggyback Registration or other registration statement, by written notice to the Company and the managing underwriter(s) delivered on or prior to the effective date of such Piggyback Registration Statement. Any Registrable Securities withdrawn from such underwriting shall be excluded and withdrawn from the registration. For any Piggyback Eligible Holder that is a partnership, limited liability company, corporation or other entity, the partners, members, stockholders, subsidiaries, parents and Affiliates of such Piggyback Eligible Holder, or the estates and Family Members of any such partners or members and retired partners or members and any trusts for the benefit of any of the foregoing Persons, shall be deemed to be a single "Piggyback Eligible Holder," and any pro rata reduction with respect to such "Piggyback Eligible Holder" shall be based upon the

aggregate amount of securities carrying registration rights owned by all entities and individuals included in such "Piggyback Eligible Holder," as defined in this sentence.

(iii)    The Company shall have the right to terminate or withdraw any registration initiated by it under this <u>Section 2(c)</u> prior to the effective date of such Registration Statement, whether or not any Piggyback Eligible Holder has elected to include Registrable Securities in such Registration Statement, without prejudice, however, to the right of the Holders immediately to request that such registration be effected as a registration under <u>Section 2(b)</u> of this <u>Annex I</u> to the extent permitted thereunder and subject to the terms set forth therein.

(iv)    If a Piggyback Registration pursuant to this <u>Section 2(c)</u> involves an underwritten offering, the Company shall have the right, in consultation with subject to the approval of the Holders of a majority of the Registrable Securities included in such underwritten offering (which approval shall not be unreasonably withheld, conditioned or delayed), to (A) determine the plan of distribution, including the price at which the Registrable Securities are to be sold and the underwriting commissions, discounts and fees and (B) select the investment banker or bankers and managers to administer the offering, including the lead managing underwriter.

(v)    No registration effected under this <u>Section 2(c)</u> shall relieve the Company of its obligations to effect any registration of the sale of Registrable Securities upon request under <u>Section 2(a)</u> or <u>Section 2(b)</u> of this <u>Annex I</u> and no registration effected pursuant to this <u>Section 2(c)</u> shall be deemed to have been effected pursuant to <u>Section 2(a)</u> or <u>Section 2(b)</u> of this <u>Annex I</u>.

(d)    Any Demand Notice, Demand Eligible Holder Request, Piggyback Request or Shelf Takedown Notice shall (i) specify the number or class of Registrable Securities and, if applicable, other securities, intended to be offered and sold by the Holder making the request, (ii) express such Holder's bona fide intent to offer such Registrable Securities for distribution, (iii) describe the nature or method of the proposed offer and sale of Registrable Securities (to the extent applicable) and (iv) contain the undertaking of such Holder to provide all such information and materials and take all action as may reasonably be required in order to permit the Company to comply with all applicable requirements in connection with the registration of such Registrable Securities.

(e)    Notwithstanding any other provision of this <u>Section 2</u>, the Company shall have the right but not the obligation to defer the filing of, or suspend the use by the Holders of, any Demand Registration or Shelf Registration for a period of up to sixty (60) days if (i) the Board determines, in its good faith judgment, that the disclosure that would otherwise be required to file or update such Registration Statement would cause the disclosure of material non-public information in a manner that would materially and adversely interfere with any pending material financing, securities offering, acquisition, disposition, merger, recapitalization, consolidation or reorganization or similar transaction involving the Company or any of its subsidiaries of the Company; (ii) if such registration, offering or use would require the inclusion in such Registration Statement of financial statements that are unavailable to the Company for reasons beyond the Company's control, including the pendency of any potential restatement determined in the good faith judgment of the Board to be necessary and in the best interest of the Company, or would render the Company unable to comply with requirements under the Securities Act or Exchange Act; (iii) if the Company is subject to any of its customary suspension or blackout periods, for all or part of such period; (iv) upon issuance by the SEC of a stop order suspending the effectiveness of any registration statement with respect to Registrable Securities or the initiation of proceedings with respect to such registration statement under Section 8(d) or 8(e) of the Securities Act; (v) if the Company believes that any such registration or offering (A) should not be undertaken because it would reasonably be expected to materially interfere with any material corporate development or plan or (B) would require the Company, under applicable securities laws and other laws, to make disclosure of material nonpublic

information that would not otherwise be required to be disclosed at that time and the Company believes in good faith that such disclosures at that time would not be in the Company's best interests; provided that this exception (B) shall continue to apply only during the time that such material nonpublic information has not been disclosed and remains material; (vi) if the Company elects at such time to offer Common Interests to (1) fund a merger, third-party tender offer or other business combination, acquisition of assets or similar transaction or (2) meet rating agency and other capital funding requirements; (vii) if the Company is pursuing a primary underwritten offering of Common Interests pursuant to a registration statement; provided that Holders shall have Piggyback Registration rights with respect to such primary underwritten offering in accordance with and subject to the restrictions set forth in Section 2(c) of this Annex I or (viii) if any other material development would materially and adversely interfere with any such Demand Registration or Shelf Registration (any such period, a "Suspension Period"); provided, however, that in such event, the Initiating Holders will be entitled to withdraw any request for a Demand Registration and, if such request is withdrawn, such Demand Registration will not count as a Demand Registration; and provided, further, that in no event shall the Company declare a Suspension Period for more than an aggregate of one hundred twenty (120) days in any twelve (12) month period. The Company shall give written notice to the Holders of its declaration of a Suspension Period and of the expiration of the relevant Suspension Period. Each Holder shall keep confidential the fact that a Suspension Period is in effect unless otherwise notified by the Company, except (a) for disclosures to the extent required in order to comply with reporting obligations to its limited partners or other direct or indirect investors who are subject to confidentiality arrangements with such Holder, (c) if and to the extent such matters are publicly disclosed by the Company or any of its subsidiaries or any other Person that, to the actual knowledge of such Holder, was not subject to an obligation or duty of confidentiality to the Company or any of its subsidiaries, (d) as required by applicable law (provided, that the Holder gives prior written notice to the Company of such requirement and the contents of the proposed disclosure to the extent it is permitted to do so under applicable law), and (e) for disclosure to any other Holder who is subject to the foregoing confidentiality requirement.

(f)     The Company may require each Holder of Registrable Securities as to which any Registration Statement is being filed or sale is being effected to furnish to the Company such information regarding the distribution of such securities and such other information relating to such Holder and its ownership of Registrable Securities as the Company may from time to time reasonably request in writing (provided that such information shall be used only in connection with such registration) and the Company may exclude from such registration or sale the Registrable Securities of any such Holder who fails to furnish such information within a reasonable time after receiving such request. Each Holder agrees to furnish such information to the Company and to cooperate with the Company as reasonably necessary to enable the Company to comply with the provisions of this Annex I.

(g)     All registration rights granted under this Section 2 shall continue to be applicable with respect to any Holder until such Holder no longer holds any Registrable Securities.

(h)     Notwithstanding anything to the contrary contained herein, (i) no Holder shall be entitled to any piggyback right or to participate as a Demand Eligible Holder under this Section 2 in the event of a Block Sale (including Block Sales off of a Shelf; provided that any registration with respect to a Block Sale shall not constitute a Demand Registration for purposes of determining the number of Demand Registrations effected by the Company under Section 2(b)(ii) of this Annex I) except as set forth in Section 2(h)(iii) below, (ii) no Holder, other than an Affiliated Holder, shall be permitted to request or participate in an underwritten offering (including an Underwritten Shelf Takedown) that is a Block Sale and (iii) an Affiliated Holder effecting an underwritten offering (including an Underwritten Shelf Takedown) that is a Block Sale shall provide prompt notice (but in no event later than twenty-four (24) hours prior to such Block Sale) to the Company and any other Affiliated Holder setting forth the proposed timeline for such offering to permit participation by such other Affiliated Holder in such offering, and such other Affiliated Holder shall be entitled to participate in such offering so long as such participation

of such other Affiliated Holder does not materially delay the proposed timeline of such Block Sale specified in the notice.

(i)      Following the Registration Date, the Company, in connection with any action taken under this <u>Annex I</u>, may, in good faith, reasonably request in writing from any Holder the number of Registrable Securities held by such Holder, and any Holder receiving such a written request shall provide the duly requested information to the Company as promptly as is reasonably practicable.

3.      <u>Registration Procedures</u>.  The procedures to be followed by the Company and each participating Holder to register the sale of Registrable Securities pursuant to a Registration Statement in accordance with this <u>Annex I</u>, and the respective rights and obligations of the Company and such Holders with respect to the preparation, filing and effectiveness of such Registration Statement, are as follows:

(a)      The Company will (i) prepare and file a Registration Statement or a prospectus supplement, as applicable, with the SEC (within the time period specified in <u>Section 2(a)</u> or <u>Section 2(b)</u> of this <u>Annex I</u>, as applicable, in the case of a Shelf Registration, an Underwritten Shelf Takedown or a Demand Registration) which Registration Statement (A) shall be on a form selected by the Company for which the Company qualifies, (B) shall be available for the sale or exchange of the Registrable Securities in accordance with the intended method or methods of distribution, in the case of a Demand Registration Statement, a Shelf or an Underwritten Shelf Takedown, and (C) shall comply as to form in all material respects with the requirements of the applicable form and include and/or incorporate by reference all financial statements required by the SEC to be filed therewith, (ii) use its reasonable best efforts to cause such Registration Statement to become effective and remain effective for the periods provided under <u>Section 2(a)</u> or <u>Section 2(b)</u> of this <u>Annex I</u>, as applicable, in the case of a Shelf Registration Statement or a Demand Registration Statement, respectively, (iii) use its reasonable best efforts to prevent the occurrence of any event that would cause a Registration Statement to contain a material misstatement or omission or to be not effective and usable for resale of the Registrable Securities registered pursuant thereto (during the period that such Registration Statement is required to be effective as provided under <u>Section 2(a)</u> or <u>Section 2(b)</u> of this <u>Annex I</u>), and (iv) cause each Registration Statement and the related Prospectus and any amendment or supplement thereto, as of the effective date of such Registration Statement, amendment or supplement (A) to comply in all material respects with any requirements of the Securities Act and the rules and regulations of the SEC and (B) not to contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. The Company will, (1) at least three (3) Business Days prior to the anticipated filing of a Registration Statement or any related Prospectus or any amendment or supplement thereto furnish to such Holders and the managing underwriter or underwriters of an underwritten offering of Registrable Securities, if applicable, copies of all such documents proposed to be filed, (2) use its reasonable best efforts to address in each such document prior to being so filed with the SEC such comments as such Holder or underwriter reasonably shall propose within three (3) Business Days of receipt of such copies by the Holders and (3) not file any Registration Statement or any related Prospectus or any amendment or supplement thereto to which a participating Holder reasonably objects.

(b)      The Company will use its reasonable best efforts to, as promptly as reasonably practicable (i) prepare and file with the SEC such amendments, including post-effective amendments, and supplements to each Registration Statement and the Prospectus used in connection therewith as (A) may be reasonably requested by any Holder of Registrable Securities covered by such Registration Statement necessary to permit such Holder to sell in accordance with its intended method of distribution or (B) may be necessary under applicable law to keep such Registration Statement continuously effective with respect to the disposition of all Registrable Securities covered thereby for the periods provided under <u>Section 2(a)</u> or <u>Section 2(b)</u> of this <u>Annex I</u>, as applicable, in accordance with the intended method of distribution and, subject to the limitations contained in this <u>Annex I</u>, prepare and file with the SEC such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities held by the Holders, (ii) cause the related Prospectus to be amended or

supplemented by any required prospectus supplement and, as so supplemented or amended, to be filed pursuant to Rule 424, (iii) respond to any comments received from the SEC with respect to each Registration Statement or Prospectus or any amendment thereto and (iv) as promptly as reasonably practicable, provide such Holders true and complete copies of all correspondence from and to the SEC relating to such Registration Statement or Prospectus other than any comments that the Company determines in good faith would result in the disclosure to such Holders of material and non-public information concerning the Company that is not already in the possession of such Holder.

(c)     The Company will comply in all material respects with the provisions of the Securities Act and the Exchange Act (including Regulation M under the Exchange Act) with respect to each Registration Statement and the disposition of all Registrable Securities covered by each Registration Statement.

(d)     The Company will notify such Holders that, to its knowledge, hold Registrable Securities and the managing underwriter or underwriters of an underwritten offering of Registrable Securities, if applicable, as promptly as reasonably practicable: (i)(A) when a Registration Statement, any pre-effective amendment, any Prospectus or any prospectus supplement or post-effective amendment to a Registration Statement or any free writing prospectus is proposed to be filed, (B) when the SEC notifies the Company whether there will be a "review" of such Registration Statement and whenever the SEC  comments on such Registration Statement (in which case the Company shall provide true and complete copies thereof and all written responses thereto to each Holder and underwriter, if applicable, other than information which the Company determines in good faith would constitute material and non-public information that is not already in the possession of such Holder) and (C) with respect to each Registration Statement or any post-effective amendment thereto, when the same has been declared effective; (ii) of any request by the SEC or any other federal or state governmental or regulatory authority for amendments or supplements to a Registration Statement or Prospectus or for additional information  (whether before or after the effective date of the Registration Statement) or any other correspondence with the SEC or any such authority relating to, or which may affect, the Registration Statement; (iii) of the issuance by the SEC or any other governmental or regulatory authority of any stop order, injunction or other order or requirement suspending the effectiveness of a Registration Statement covering any or all of the Registrable Securities or the initiation of any Proceedings for that purpose; (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose; (v) if, at any time, to the Company's knowledge, the representations and warranties of the Company in any applicable underwriting agreement or similar agreement cease to be true and correct in all material respects or (vi) of the occurrence of any event that makes any statement made in such Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or if, as a result of such event or the passage of time, such Registration Statement, Prospectus or other documents requires revisions so that, in the case of such Registration Statement or the Prospectus, as the case may be, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein (in the case of the Prospectus, in light of the circumstances under which they were made) not misleading, or when any Issuer Free Writing Prospectus includes information that may conflict with the information contained in the Registration Statement or Prospectus, or if, for any other reason, it shall be necessary during such time period to amend or supplement such Registration Statement or Prospectus in order to comply with the Securities Act, which shall correct such misstatement or omission or effect such compliance.

(e)     The Company will use its reasonable best efforts to avoid the issuance of or, if issued, obtain the withdrawal of (i) any stop order or other order suspending the effectiveness of a Registration Statement or the use of any Prospectus or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction, at the earliest practicable

moment, or if any such order or suspension is made effective during any Suspension Period, at the earliest practicable moment after the Suspension Period is over.

(f)     During the Effectiveness Period or the Shelf Period, as applicable, the Company will furnish to each Holder and the managing underwriter or underwriters of an underwritten offering of Registrable Securities, if applicable, upon their request, without charge, at least one (1) conformed copy of each Registration Statement and each amendment thereto and all exhibits to the extent requested by such Holder or underwriter (including those incorporated by reference) promptly after the filing of such documents with the SEC.

(g)     The Company will promptly deliver to each Holder and the managing underwriter or underwriters of an underwritten offering of Registrable Securities, if applicable, without charge, as many copies of each Prospectus or Prospectuses (including each form of prospectus) and each amendment or supplement thereto as such Holder or underwriter may reasonably request in order to facilitate the disposition of the Registrable Securities by such Holder or underwriter. The Company consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders and any applicable underwriter in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto. The Company will use its reasonable best efforts to (i) register or qualify the Registrable Securities covered by a Registration Statement, no later than the time such Registration Statement is declared effective by the SEC, under all applicable securities laws (including the "blue sky" laws) of such jurisdictions each underwriter, if any, or any Holder shall reasonably request; (ii) keep each such registration or qualification effective during the period such Registration Statement is required to be kept effective under the terms of this <u>Annex I</u> and (iii) do any and all other acts and things which may be reasonably necessary or advisable to enable such underwriter, if any, and each Holder to consummate the disposition in each such jurisdictions of the Registrable Securities covered by such Registration Statement; <u>provided</u>, <u>however</u>, that the Company will not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph, (B) subject itself to taxation in any such jurisdiction or (C) consent to general service of process (other than service of process in connection with such registration or qualification or any sale of Registrable Securities in connection therewith) in any such jurisdiction.

(h)     The Company will cooperate with each Holder and the underwriter or managing underwriter of an underwritten offering of Registrable Securities, if applicable, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be delivered to a transferee pursuant to a Registration Statement, which certificates shall be free of all restrictive legends indicating that the Registrable Securities are unregistered or unqualified for resale under the Securities Act, Exchange Act or other applicable securities laws, and to enable such Registrable Securities to be in such denominations and registered in such names as each Holder or the underwriter or managing underwriter of an underwritten offering of Registrable Securities, if any, may request in writing.  In connection therewith, if required by the Company's transfer agent, the Company will promptly, after the effective date of the Registration Statement, cause an opinion of counsel as to the effectiveness of the Registration Statement to be delivered to and maintained with such transfer agent, together with any other authorizations, certificates and directions required by the transfer agent which authorize and direct the transfer agent to issue such Registrable Securities without any such legend upon sale by the Holder or the underwriter or managing underwriter of an underwritten offering of Registrable Securities, if any, of such Registrable Securities under the Registration Statement.

(i)     Upon the occurrence of any event contemplated by <u>Section 3(d)(vi)</u> of this <u>Annex I</u>, as promptly as reasonably practicable, the Company will prepare a supplement or amendment, including a post-effective amendment, if required by applicable law, to the affected Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference or to the applicable Issuer Free Writing Prospectus, and file any other required document so that, as thereafter delivered, no Registration Statement nor any Prospectus will contain an untrue

statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus, in light of the circumstances under which they were made) not misleading and no Issuer Free Writing Prospectus will include information that conflicts with information contained in the Registration Statement or Prospectus and such that each selling Holder can resume disposition of such Registrable Securities covered by such Registration Statement or Prospectus.

(j)       Such Holders may distribute the Registrable Securities by means of an underwritten offering; provided that (i) such Holders provide to the Company a Shelf Takedown Notice or Demand Notice of their intention to distribute Registrable Securities by means of an underwritten offering, (ii) the right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein, (iii) each Holder participating in such underwritten offering agrees to enter into an underwriting agreement in customary form and sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Holders entitled to select the managing underwriter or managing underwriters hereunder (provided that any such Holder shall not be required to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties, agreements and indemnities regarding such Holder, such Holder's title to the Registrable Securities, such Holder's intended method of distribution, the accuracy of information concerning such Holder as provided by or on behalf of such Holder, and any other representations required to be made by the Holder under applicable law, and the aggregate amount of the liability of such Holder in connection with such offering shall not exceed such Holder's net proceeds from the disposition of such Holder's Registrable Securities in such offering) and (iv) each Holder participating in such underwritten offering completes and executes all questionnaires, powers of attorney, custody agreements and other documents reasonably required under the terms of such underwriting arrangements. The Company hereby agrees with each Holder that, in connection with any underwritten offering in accordance with the terms hereof, it will negotiate in good faith and execute all indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements, and will procure auditor "comfort" letters addressed to the underwriters in the offering from the Company's independent certified public accountants or independent auditors (and, if necessary, any other independent certified public accountants or independent auditors of any subsidiary of the Company or any business acquired by the Company for which financial statements and financial data are, or are required to be, included in the Registration Statement) in customary form and covering such matters of the type customarily covered by comfort letters as the underwriters reasonably request, dated the date of execution of the underwriting agreement and brought down to the closing under the underwriting agreement.

(k)       The Company will obtain for delivery to the underwriter or underwriters of an underwritten offering of Registrable Securities, an opinion or opinions from counsel for the Company (including any local counsel reasonably requested by the underwriters) dated the most recent effective date of the Registration Statement or, in the event of an underwritten offering, the date of the closing under the underwriting agreement, in customary form, scope and substance, covering the matters customarily covered in opinions requested in sales of securities or underwritten offerings, which opinions shall be reasonably satisfactory to such underwriters and its counsel.

(l)       For a reasonable period prior to the filing of any Registration Statement and throughout the Effectiveness Period or the Shelf Period, as applicable, the Company will make available upon reasonable notice at the Company's principal place of business or such other reasonable place for inspection by a representative appointed by a majority of the Holders covered by the applicable Registration Statement, by any managing underwriter or managing underwriters selected in accordance with this Annex I and by any attorney, accountant or other agent retained by such Holders or underwriter, such financial and other information and books and records of the Company, and cause the officers,

employees, counsel and independent certified public accountants of the Company to respond to such inquiries, as shall be reasonably necessary (and in the case of counsel, not violate an attorney-client privilege in such counsel's reasonable belief) to conduct a reasonable investigation within the meaning of Section 11 of the Securities Act.

(m)     The Company will (i) provide and cause to be maintained a transfer agent and registrar for all Registrable Securities covered by the applicable Registration Statement from and after a date not later than the effective date of such Registration Statement and provide and enter into any reasonable agreements with a custodian for the Registrable Securities and (ii) not later than the effective date of the applicable Registration Statement, provide a CUSIP number for all Registrable Securities.

(n)     The Company will cooperate with each Holder of Registrable Securities and each underwriter or agent participating in the disposition of Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA and in performance of any due diligence investigations by any underwriter.

(o)     The Company will use its reasonable best efforts to comply with all applicable rules and regulations of the SEC, any securities exchange on which the Company's securities are listed, FINRA and any state securities authority, and make available to each Holder, as soon as reasonably practicable after the effective date of the Registration Statement, an earnings statement covering at least twelve (12) months which shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158.

(p)     The Company will use its reasonable best efforts to ensure that any Issuer Free Writing Prospectus utilized in connection with any Prospectus complies in all material respects with the Securities Act, is filed in accordance with the Securities Act to the extent required thereby, is retained in accordance with the Securities Act to the extent required thereby and, when taken together with the related Prospectus, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(q)     In connection with any registration of Registrable Securities pursuant to this Annex I, the Company will use its reasonable best efforts to expedite or facilitate the disposition of Registrable Securities by such Holders, including using reasonable best efforts to cause appropriate officers and employees to be available, on a customary basis and upon reasonable advance notice, to meet with prospective investors in presentations, meetings and road shows but not in connection with more than four offerings in any twelve (12) months.

(r)     Following the listing of the Common Interests on the NYSE or NASDAQ or any successor national securities exchange, the Company will use its reasonable best efforts to maintain such listing until each Holder has sold all of its Registrable Securities.

4.     Registration Expenses.  The Company shall bear all reasonable Registration Expenses in connection with any Demand Registration, Shelf Registration, Shelf Takedown Notice or Piggyback Registration (excluding any Selling Expenses), whether or not any Registrable Securities are sold pursuant to a Registration Statement.

(a)     "Registration Expenses" shall include, without limitation, (i) all registration, qualification and filing fees and expenses (including fees and expenses (A) of the SEC or FINRA, incurred in connection with the listing of the Registrable Securities on the Trading Market and in compliance with applicable state securities or "blue sky" laws (including reasonable documented fees and disbursements of counsel for the underwriters in connection with "blue sky" qualifications of the Registrable Securities)); (ii) printing expenses (including expenses of printing certificates for the Company's shares and of printing prospectuses); (iii) road show expenses of the Company and the underwriters, if any; (iv) messenger, telephone and delivery expenses; (v) reasonable documented fees and disbursements of counsel

(including any local counsel), auditors and accountants for the Company (including the expenses incurred in connection with "comfort letters" required by or incident to such performance and compliance); (vi) the reasonable documented fees and disbursements of underwriters to the extent customarily paid by issuers or sellers of securities (including, if applicable, the fees and expenses of any "qualified independent underwriter" (and its counsel) that is required to be retained in accordance with the rules and regulations of FINRA); (vii) fees and expenses of any special experts retained by the Company; (viii) Securities Act liability insurance, if the Company so desires such insurance, and (ix) reasonable documented fees and disbursements of one counsel (along with any reasonably necessary local counsel) representing all Holders mutually agreed by Holders of a majority of the Registrable Securities participating in the related registration.  In addition, the Company shall be responsible for all of its expenses incurred in connection with the consummation of the transactions contemplated by this Annex I (including expenses payable to third parties and including all salaries and expenses of the Company's officers and employees performing legal or accounting duties), the expense of any annual audit, the expense of any liability insurance it determines to obtain and any underwriting fees, discounts, selling commissions and stock transfer taxes and related legal and other fees applicable to securities sold by the Company and in respect of which proceeds are received by the Company.  Each Holder shall pay any Selling Expenses applicable to the sale or disposition of such Holder's Registrable Securities pursuant to any Demand Registration Statement or Piggyback Registration Statement, or pursuant to any Shelf under which such selling Holder's Registrable Securities were sold, in proportion to the amount of such selling Holder's shares of Registrable Securities sold in any offering under such Demand Registration Statement, Piggyback Registration Statement or Shelf.

(b)     Notwithstanding anything to the contrary contained herein, the Company shall have no obligation to pay any underwriting fees, discounts or selling commissions attributable to the Registrable Securities being sold by the Holders, which underwriting discounts or selling commissions shall be borne by the selling Holders, pro rata  in proportion to the respective amount of Registrable Securities each is selling in such offering.

5.     Indemnification.

(a)     If requested by a participating Holder, the Company shall indemnify and hold harmless each underwriter, if any, engaged in connection with any registration referred to in Section 2 of this Annex I and provide representations, covenants, opinions and other assurances to such underwriter in form and substance reasonably satisfactory to such underwriter and the Company. Further, the Company shall indemnify and hold harmless each Holder, its Affiliates and each of their respective officers and directors and any Person who controls any such Holder (within the meaning of the Securities Act) and any agent thereof (collectively, "Indemnified Persons"), to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, joint or several, costs (including reasonable costs of preparation and reasonable attorneys' fees) and expenses, judgments, fines, penalties, interest, settlements or other amounts, in each case to the extent, but only to the extent, arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, in which any Indemnified Person may be involved, or is threatened to be involved, as a party or otherwise, under the Securities Act or otherwise (collectively, "Losses"), as incurred, arising out of, based upon, resulting from or relating to (i) any untrue or alleged untrue statement of a material fact contained in any Registration Statement under which any Registrable Securities were registered, Prospectus (including in any preliminary prospectus (if used prior to the effective date of such Registration Statement)), or in any summary or final prospectus or free writing prospectus or in any amendment or supplement thereto or in any documents incorporated by reference in any of the foregoing or (ii) the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements made therein (in the case of a Prospectus or preliminary Prospectus, in light of the circumstances under which they were made), not misleading; provided, however, that the Company shall not be liable to any Indemnified Person to the extent that any such Losses arise out of, are based upon or result from an

untrue or alleged untrue statement or omission or alleged omission made in such Registration Statement, such preliminary, summary or final prospectus or free writing prospectus or such amendment or supplement, in reliance upon and in conformity with written information furnished to the Company by or on behalf of such Indemnified Person specifically for use in the preparation thereof.

(b)     In connection with any Registration Statement filed by the Company pursuant to Section 2 of this Annex I in which a Holder has registered for sale its Registrable Securities, each such selling Holder agrees (severally and not jointly) to indemnify and hold harmless, to the fullest extent permitted by law, the Company, its directors and officers, each Person who controls the Company (within the meaning of the Securities Act or the Exchange Act) and each underwriter, if any, from and against any Losses resulting from (i) any untrue statement of a material fact in any Registration Statement under which such Registrable Securities were registered or sold under the Securities Act (including any final, preliminary or summary Prospectus contained therein or any amendment thereof or supplement thereto or any documents incorporated by reference therein) or (ii) any omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus or preliminary Prospectus, in light of the circumstances under which they were made) not misleading, in each case to the extent, but only to the extent, that such untrue statement or omission is contained in any information furnished in writing by or on behalf of such selling Holder to the Company specifically for inclusion in such Registration Statement or Prospectus. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder under the sale of Registrable Securities giving rise to such indemnification obligation less any amounts paid by such Holder pursuant to Section 5(d) of this Annex I and any amounts paid by such Holder as a result of liabilities incurred under the underwriting agreement, if any, related to such sale. The underwriter for any underwritten offer shall provide the Company and any selling Holder with customary indemnifications and agree to contribution.

(c)     Any indemnified Person shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification; provided that any delay or failure to so notify the indemnifying party shall not relieve the indemnifying party of its obligations hereunder except to the extent, if at all, that it is actually and materially prejudiced by reason of such delay or failure and (ii) permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party; provided, however, that any indemnified Person shall have the right to select and employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such indemnified Person unless (A) the indemnifying party has agreed in writing to pay such fees or expenses, (B) the indemnifying party shall have failed to assume the defense of such claim within a reasonable time after receipt of notice of such claim from the indemnified Person and employ counsel reasonably satisfactory to such indemnified Person, (C) the indemnified party has reasonably concluded (based upon advice of its counsel) that there may be legal defenses available to it or other indemnified Persons that are different from or in addition to those available to the indemnifying party or (D) in the reasonable judgment of any such indemnified Person (based upon advice of its counsel) a conflict of interest may exist between such indemnified Person and the indemnifying party with respect to such claims (in which case, if the indemnified Person notifies the indemnifying party in writing that such indemnified Person elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such claim on behalf of such indemnified Person). If the indemnifying party assumes the defense, the indemnifying party shall not have the right to settle such action without the consent of the indemnified Person. If such defense is not assumed by the indemnifying party, the indemnifying party will not be subject to any liability for any settlement made without its prior written consent, but such consent may not be unreasonably delayed, withheld or conditioned. It is understood that the indemnifying party or parties shall not, except as specifically set forth in this Section 5(c), in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees, disbursements or other charges of more than one separate firm admitted to practice in such jurisdiction at any one time.

(d)      If for any reason the indemnification provided for in Section 5(a) and Section 5(b) of this Annex I is unavailable to an indemnified Person (other than as a result of exceptions contained in Section 5(a) and Section 5(b) of this Annex I) or insufficient in respect of any Losses referred to therein, then the indemnifying party shall contribute to the amount paid or payable by the indemnified Person as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and the indemnified Person or Persons on the other hand in connection with the acts, statements or omissions that resulted in such Losses, as well as any other relevant equitable considerations. In connection with any Registration Statement filed with the SEC by the Company, the relative fault of the indemnifying party on the one hand and the indemnified Person on the other hand shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified Person and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The parties hereto agree that it would not be just or equitable if contribution pursuant to this Section 5(d) were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in this Section 5(d). No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. The amount paid or payable by an indemnified Person as a result of the Losses referred to in Section 5(a) and Section 5(b) of this Annex I shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified Person in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 5(d), in connection with any Registration Statement filed by the Company, a selling Holder shall not be required to contribute any amount in excess of the dollar amount of the net proceeds received by such Holder from the sale of Registrable Securities giving rise to such contribution obligation less any amounts paid by such Holder pursuant to Section 5(b) of this Annex I and any amounts paid by such Holder as a result of liabilities incurred under the underwriting agreement, if any, related to such sale. If indemnification is available under this Section 5, the indemnifying parties shall indemnify each indemnified Person to the full extent provided in Section 5(a) and Section 5(b) of this Annex I without regard to the provisions of this Section 5(d).

(e)      The remedies provided for in this Section 5 are not exclusive and shall not limit any rights or remedies which may otherwise be available to any indemnified party at law or in equity.

6.      Facilitation of Sales Pursuant to Rule 144 and Rule 144A.  The Company shall (a) to the extent it shall be required to do so under the Exchange Act, use its reasonable best efforts to timely file the reports required to be filed by it under the Exchange Act or the Securities Act and the rules adopted by the SEC thereunder (including the reports under Sections 13 and 15(d) of the Exchange Act referred to in subparagraph (c)(1) of Rule 144), and (b) take such further action as any Holder may reasonably request and make available information necessary to comply with Rule 144 and Rule 144A, all to the extent required from time to time to enable the Holders to sell Registrable Securities without registration under the Securities Act within the limitations of the exemption provided by Rule 144 and 144A.  Upon the written request of any Holder in connection with that Holder's sale pursuant to Rule 144 or Rule 144A, the Company shall deliver to such Holder a written statement as to whether it has complied with such requirements.

7.      [Reserved]

8.      Discontinued Disposition. Each Holder agrees by its acquisition of Registrable Securities that, upon receipt of a notice from the Company of the occurrence of any event of the kind described in clauses (ii) through (iv) and (vi) of Section 3(d) of this Annex I or the occurrence of a Suspension Period, such Holder will forthwith discontinue disposition of such Registrable Securities under the Registration Statement until such Holder's receipt of the copies of the supplemental Prospectus

or amended Registration Statement or until it is advised in writing by the Company that the use of the applicable Prospectus may be resumed, and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration Statement.  The Company may provide appropriate stop orders to enforce the provisions of this Section 8.  In the event the Company shall give any such notice, the period during which the applicable Registration Statement is required to be maintained effective shall be extended by the number of days during the period from and including the date of the giving of such notice to and including the date when each seller of Registrable Securities covered by such Registration Statement either receives the copies of the supplemented or amended Prospectus or is advised in writing by the Company that the use of the Prospectus may be resumed.

## **Exhibit A**

**Certificate of Formation**

See attached.

**Exhibit B**
**Name and Notice Information of Members, Number of Common Interests and Percentage Interests**

*Last Updated: [●], 2024*

| Name of Member | Notice Information | Number of Common Interests | Percentage Interest |
|---|---|---|---|
| [●] | | | |

**Exhibit C**
**Form of Joinder Agreement**

This Joinder Agreement (this "<u>Joinder Agreement</u>") is made as of **[_____ ___, 20__]** by the undersigned (the "<u>Transferee</u>") in accordance with the Amended and Restated Limited Liability Company Agreement of [Reorganized Grandparent, LLC], dated as of [●], 2024 (as the same may be amended from time to time in accordance with its terms, the "<u>LLC Agreement</u>").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the LLC Agreement.

The Transferee hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, it shall become a party to the LLC Agreement and shall be fully bound by and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party thereto and shall be deemed and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto, as of the date first written above.

The Transferee hereby makes the representations and warranties of a Member set forth in the LLC Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date first written above and hereby authorizes this signature page to be attached to a counterpart of the LLC Agreement.

**[**TRANSFEREE**]**

By: _____
    Name:
    Title:

**Schedule I**
**Competitors**

1. [Keysight
2. Subex
3. Netscout
4. ENEA
5. Tomia
6. Cellusys
7. Syniverse
8. Allot
9. Sandvine]

**<u>Exhibit B</u>**

**Required Disclosures Under Section 1129(a)(5)**

## Required Disclosures Under Section 1129(a)(5)

In accordance with Section 5.9 of the *Joint Chapter 11 Plan of Mobileum, Inc. and Its Affiliated Debtors*, dated July 23, 2024 (Docket No. 14) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented from time to time in accordance with the terms thereof, the "**Plan**")[1] and section 1129(a)(5) of the Bankruptcy Code, to the extent known, the composition of each board of directors or board of managers of a Reorganized Debtor, as applicable, and, to the extent applicable, the officers of each Reorganized Debtor, shall be disclosed prior to the Confirmation Hearing.  The selection of the initial members of the board of directors or board managers of the Reorganized Parent, as applicable, shall be subject to the New Corporate Governance Documents and express provisions of the Plan.  To the extent any such member of the New Board is an "insider" under the Bankruptcy Code, the Debtors will also disclose the nature of any compensation to be paid to such member.

As of the Effective Date, the term of the current members of the board of directors of Matrix Holdco, LLC shall expire and the New Board will be instituted at Reorganized Parent. The initial New Board will have five (5) members, comprised of (i) the chief executive officer of Mobileum Inc., and (ii) four (4) additional members selected by certain First Lien Lenders as set forth in the Restructuring Support Agreement and the New Corporate Governance Documents, in each case selected in consultation with the First Lien Lender Group and the Debtors.  Set out below are the biographies and affiliations of the initial New Board members known as of the date hereof, which disclosure may be amended and/or supplemented at any time prior to the Confirmation Hearing in accordance with the Plan and the Restructuring Support Agreement and subject to the consent rights thereunder. Except as otherwise provided in this **Exhibit B** (as may be further modified, revised or amended), the officers of the respective Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law.

## Biographies/Affiliations of the Members of the New Board

- *Mike Salfity – Chief Executive Officer of Mobileum, Inc.*  Mr. Salfity is a seasoned senior executive with broad experience managing global businesses. Mr. Salfity was appointed as Chief Executive Officer ("**CEO**") of Mobileum, Inc. ("**Mobileum**") in January 2024.  Prior to that, from June 2023 to January 2024, Mr. Salfity served as Interim CEO, and, from January 2023 to June 2023, as Chief Operating Officer of Mobileum.  Since 2022, in addition to his employment with Mobileum, Mr. Salfity concurrently held positions as an operating partner at H.I.G. Capital, LLC, Executive Board Advisor at Exaat Corporation, Board Director at noHold Inc., and lecturer on strategy and leadership at University of Southern California Marshall School of Business.  From 2018 to 2022, Mr. Salfity also served as Chief Product Strategist and Global Head and General Manager of North America for Finastra Corp., a financial software company.  Prior to that, Mr. Salfity held various positions including General Manager and Global Head of Graphics Solution

---

[1] Capitalized terms used but not otherwise defined in this exhibit shall have the meanings ascribed to such terms in the Plan.

Business and Chief Technology Officer at Printing Group, Vice President and General Manager of Enterprise Software Solutions at Hewlett Packard, Inc., and Vice President, Global Software Delivery & Solutions Business Unit at Xerox Corporation.  Mr. Salfity holds a Bachelor of Science degree in Electrical Engineering and Computer Science from California State University, Long Beach, and a master's degree in business administration from the University of Southern California Marshall School of Business.

[*Remainder of page intentionally left blank*]

**<u>Exhibit C</u>**

**Restructuring Transactions Exhibit**

## Restructuring Transactions Exhibit[1]

The Restructuring Transactions will occur pursuant to one of two alternative structures— a "restructuring in place" or a Purchase Transaction—to be determined by the Requisite Consenting First Lien Lenders (subject to the reasonable consent of the Debtors) no later than seven (7) calendar days prior to the Confirmation Hearing.  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the *Joint Chapter 11 Plan of Mobileum, Inc. and Its Affiliated Debtors*, dated July 23, 2024 (as may be amended, supplemented, or modified from time to time in accordance with the Restructuring Support Agreement and, together with all exhibits and schedules thereto) and the *Disclosure Statement for Joint Chapter 11 Plan of Mobileum, Inc. and Its Affiliated Debtors*, as approved by the Bankruptcy Court.

The Restructuring Transactions for the selected structure will occur on or before the Effective Date, in the order indicated and as described below.[2]

**<u>Restructuring-in-Place Transaction.</u>**   Intermediate will be the Reorganized Parent (as defined in the Plan) and, on the Effective Date as described below will convert to a limited liability company (that elects to be treated as a corporation for U.S. federal, and applicable state and local, income tax purposes, as of such date):

1. On the Effective Date:

   a. Intermediate contributes New Equity Interests to Holdings as a contribution to capital.

   b. Holdings contributes the New Equity Interests received from Intermediate to Matrix Parent as a contribution to capital.

   c. Matrix Parent distributes (or causes to be distributed) to:

      i. the holders of Allowed DIP Claims, in full and final satisfaction, settlement, release and discharge of such Claims, (A) in exchange for the principal amount of such Allowed DIP Claims on account of the Tranche A Loans, the Exit Term Loan (which will be issued by Mobileum at the direction of and on behalf of Matrix Parent), (B) New Equity Interests (subject to dilution by any New Equity Interests issued on account of the Management Incentive Plan) in exchange for the principal amount of such holder's Allowed DIP Claim on account such holder's principal amount of Tranche B Loans, and (C) payment in full cash of all accrued and unpaid interest and

---

[1]   This Exhibit may be amended, supplemented, and/or otherwise modified at any time before the Effective Date, or any such other date as may be permitted by the Plan or by order of the Bankruptcy Court, in accordance with the terms of the Plan and the RSA.

[2]   Any common stock and any equity interests in a limited liability company issued on account of the New Equity Interests shall be uncertificated.

other obligations on account of the DIP Loans, in each case, in accordance with <u>Section 2.4</u> of the Plan;

    ii.    the holders of Allowed First Lien Claims, in full and final satisfaction, settlement, release and discharge of their Allowed First Lien Claims and in accordance with <u>Section 4.3</u> of the Plan, their Pro Rata Share of 96.5% of the New Equity Interests (subject to dilution by any New Equity Interests issued on account of the Management Incentive Plan and the Tranche B Loans); and

    iii.    the holders of Allowed Second Lien Debt Claims, in full and final satisfaction, settlement, release and discharge of their Allowed Second Lien Debt Claims and in accordance with <u>Section 4.4</u> of the Plan, their Pro Rata Share of 3.5% of the New Equity Interests (subject to dilution by any New Equity Interests issued on account of the Management Incentive Plan and the Tranche B Loans).

d.    Matrix Parent, the Consenting Sponsor, and the Consenting Creditors enter into the Litigation Trust Agreement.

e.    Existing Parent Equity Interests are cancelled, released, and extinguished and will be of no further force and effect, in accordance with <u>Section 4.8</u> of the Plan.

2.    Effective on the Effective Date immediately after the consummation of the transactions in <u>1(a)–(e)</u> above (*i.e.*, after holders of DIP Claims, First Lien Claims, and Second Lien Debt Claims become the equityholders of Intermediate), Intermediate converts to a Delaware limited liability company pursuant to Section 18-214 of the Limited Liability Company Act of the State of Delaware.

**Purchase Transaction.**    The Reorganized Parent will be an indirect holding company of the acquiring company (AcquisitionCo) and will be a limited liability company (that elects to be treated as a corporation for U.S. federal, and applicable state and local, income tax purposes).

1.    On or before the Effective Date (in no specified order):

a.    Each U.S. subsidiary of Matrix Parent that is a corporation (other than We Do Technologies Americas, Inc.) converts to a limited liability company.[3] Within 75 days thereof, AcquisitionCo may cause (A) any of such converted limited liability companies to elect to be treated as a corporation for U.S. federal (and applicable state and local) income tax purposes, or (B) any subsidiary of Matrix Parent that already is a limited liability company taxed as a corporation for U.S. federal (and

---

[3]    The Requisite Consenting First Lien Lenders (subject to the reasonable consent of the Debtors) may determine to not convert one or more of such entities.

applicable state and local) income tax purposes to elect be treated as a disregarded entity for U.S. federal (and applicable state and local) income tax purposes.[4]

b. AcquisitionCo (a limited liability company that has elected to be taxed as a corporation for U.S. federal, and applicable state and local, income tax purposes) and Matrix Parent enter into the Acquisition Agreement, providing for (among other things) the acquisition of all of the assets of Matrix Parent, representing 100% of the ownership of Mobile Acquisition LLC, by AcquisitionCo (after otherwise giving effect to the Plan), in consideration for (A) New Equity Interests (*i.e.*, the equity interests in Reorganized Parent, the indirect holding company of AcquisitionCo), sufficient to satisfy all Claims entitled to receive New Equity Interests pursuant to the Plan, (B) the assumption of liabilities and obligations of Matrix Parent not otherwise discharged pursuant to the Plan and otherwise satisfied by Matrix Parent on the Effective Date, and (C) in the event AcquisitionCo will be the issuer of the Exit Term Loan,[5] the issuance of the Exit Term Loan by AcquisitionCo at the direction of and on behalf of Matrix Parent (the "**Purchase Consideration**").  The Acquisition Agreement will also provide that, no later than the fifteenth (15th) day of the ninth (9th) month following the Effective Date, AcquisitionCo will determine whether to elect under section 338(h)(10) of the Tax Code to treat the acquisition of any subsidiaries treated as corporations for U.S. federal income tax purposes as an acquisition of the assets of such subsidiaries for U.S. federal income tax purposes and that Intermediate will join in making such elections.

2.  On the Effective Date:

a. Matrix Parent transfers all of its rights and interests in the Audax Litigation causes of action to Mobile Acquisition LLC as a contribution to capital.

b. Intermediate, Holdings, Matrix Parent, and Mobileum LLC enter into a tax matters agreement, whereby, among other things, Holdings agrees to designate a successor parent of the consolidated tax group and file necessary notices with the applicable taxing authorities.

---

[4] In the event an election is made to treat Mobile Acquisition LLC as a corporation for U.S. federal (and applicable state and local) income tax purposes effective as of the date of its conversion to a limited liability company *without* making a subsequent election under Section 338(h)(10) of the Tax Code to treat the acquisition of Mobile Acquisition LLC as an acquisition of its underlying assets, the U.S. federal income tax consequences of the Purchase Transaction structure will be equivalent to a Deconsolidation Transaction (as defined and discussed in the Disclosure Statement).

[5] Alternatively, Mobileum may be the issuer of the Exit Term Loan (or may assume the Exit Term Loan after the Effective Date), in which event the Exit Term Loan would be an obligation of a subsidiary of Mobile Acquisition LLC that effectively travels with Mobile Acquisition LLC.

    c.   In accordance with the Acquisition Agreement, AcquisitionCo transfers the New Equity Interests to Matrix Parent as an advance payment of a portion of the Purchase Consideration.

    d.   Matrix Parent distributes (or causes to be distributed) to:

        i.   the holders of Allowed DIP Claims, in full and final satisfaction, settlement, release and discharge of such Claims: (A) in exchange for the principal amount of such Allowed DIP Claims on account of the Tranche A Loans, either (i) the Exit Term Loan (which will be issued by Mobileum at the direction of and on behalf of Matrix Parent) or (ii) the right to receive the Exit Term Loan (which the Exit Term Loan will be issued by AcquisitionCo, at the direction of and on behalf of Matrix Parent, upon the closing of the Purchase Transaction in <u>2(e)</u> below), (B) New Equity Interests (subject to dilution by any New Equity Interests issued on account of the Management Incentive Plan) in exchange for the principal amount of such holder's Allowed DIP Claim on account such holder's principal amount of Tranche B Loans, and (C) payment in full cash of all accrued and unpaid interest and other obligations on account of the DIP Loans, in each case in accordance with <u>Section 2.4</u> of the Plan;

        ii.   the holders of Allowed First Lien Claims, in full and final satisfaction, settlement, release and discharge of their Allowed First Lien Claims and in accordance with <u>Section 4.3</u> of the Plan, their Pro Rata Share of 96.5% of the New Equity Interests (subject to dilution by any New Equity Interests issued on account of the Management Incentive Plan and the Tranche B Loans); and

        iii.   the holders of Allowed Second Lien Debt Claims, in full and final satisfaction, settlement, release and discharge of their Allowed Second Lien Debt Claims and in accordance with <u>Section 4.4</u> of the Plan, their Pro Rata Share of 3.5% of the New Equity Interests (subject to dilution by any New Equity Interests issued on account of the Management Incentive Plan and the Tranche B Loans).

    e.   Pursuant to the Acquisition Agreement, Matrix Parent sells its assets to AcquisitionCo in exchange for the Purchase Consideration, including, in the event AcquisitionCo will be the issuer of the Exit Term Loan, the issuance of the Exit Term Loan at the direction of and on behalf of Matrix Parent to the holders of Allowed DIP Claims described in <u>2(d)</u> above.

    f.   Mobile Acquisition LLC, the Consenting Sponsor, and the Consenting Creditors enter into the Litigation Trust Agreement.

3.   After the Effective Date (and after executing any necessary documentation for any elections pursuant to Section 338(h)(10) of the Tax Code), Intermediate, Holdings, and Matrix Parent are dissolved in accordance with the Plan.

## <u>Exhibit D</u>

**Schedule of Retained Causes of Action**

**Schedule of Retained Causes of Action**

In accordance with and as provided by section 1123(b) of the Bankruptcy Code, Section 10.8 of the *Joint Chapter 11 Plan of Mobileum, Inc. and Its Affiliated Debtors* (Docket No. 14) (including any exhibits, schedules, and supplements thereto, and as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "**Plan**")[1] and the Confirmation Order, and except as otherwise set forth herein, any and all claims or Causes of Action of the Debtors, whether arising before or after the Petition Date, including, but not limited to, any actions specifically enumerated herein, and such rights to commence, pursue, prosecute, and/or settle such claims or Causes of Action (including, without limitation, any avoidance action, preference, or other claim pursuant to section 362 or chapter 5 of the Bankruptcy Code) (collectively, the "**Retained Causes of Action**") shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors shall retain and may enforce all rights to commence, pursue, prosecute, and/or settle, as appropriate, each of the Retained Causes of Action.

As provided by Section 10.8 of the Plan and the Confirmation Order, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order in these Chapter 11 Cases, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of confirmation or consummation of the Plan.

**No Person or Entity (other than the Released Parties) may rely on the absence of a specific reference in the Confirmation Order, the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**

In accordance with section 1123(b)(3) of the Bankruptcy Code and Section 10.1 of the Plan, except as otherwise provided in the Plan, herein, or in the Confirmation Order, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine, initiate, file, prosecute,

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding and without limiting the generality of Section 10.8 of the Plan, unless otherwise released by the Plan, any and all claims and Causes of Action not expressly released under the Plan including, but not limited to, the following, are expressly reserved by the Reorganized Debtors:

- claims, defenses, cross-claims, indemnification, third-party claims and counterclaims related to litigation and possible litigation relating to any conduct that constitutes fraud;

- claims related to insurance contracts and insurance policies to which any Reorganized Debtor is a party or pursuant to which any Reorganized Debtor or any of its Related Parties has any rights whatsoever, including but not limited to, indemnity, contribution, reimbursement, overpayment of premiums and fees;

- claims related to tax obligations and refunds, including, without limitation, claims against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Reorganized Debtors;

- claims, defenses, cross-claims, indemnification, third-party claims, and counterclaims related to litigation and possible litigation, whether based in tort, contract, equity, or otherwise, including any personal injury claims and wrongful death actions, as well as all claims against or related to all Entities that are party to or that may in the future become party to arbitration, or any other type of adversarial dispute resolution proceeding, whether formal or informal, or judicial or nonjudicial;

- claims related to contracts and leases against vendors, suppliers of goods or services, or any other parties;

- claims related to accounts receivable and accounts payable, including claims for late or denied payments;

- claims related to postings of a security deposit, adequate assurance payment, or any other type of deposit, prepayment, or collateral regardless of whether such posting of a security deposit, adequate assurance payment, or any other type of deposit, prepayment, or collateral is specifically identified herein;

- claims related to liens regardless of whether such lien is specifically identified herein;

- related party claims;

- claims, defenses, appeals, cross-claims, and counterclaims related to any claims or actions asserted by any Governmental Unit;

- claims related to vendor obligations;

- claims related to current or former employee matters (other than those released pursuant to the Plan);

- claims related to environmental matters;

- claims related to avoidance actions, preferences, or other claims pursuant to chapter 5 of the Bankruptcy Code; and

- all other Causes of Action.

Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, consistent with the Litigation Trust Agreement, the Trust Causes of Action shall vest in the Litigation Trust, and shall not be retained by the Reorganized Debtors other than as provided pursuant to the Litigation Trust Agreement. For the avoidance of doubt, the Reorganized Debtors shall not retain any Claims or Causes of Action expressly assigned or contributed to the Litigation Trust pursuant to the Plan, Confirmation Order, or Litigation Trust Agreement. Following the Effective Date, the Litigation Trust shall retain and may enforce all rights to commence, pursue, and settle, as appropriate, any and all Trust Causes of Action and any and all proceeds thereof shall be treated in accordance with the terms of the Plan, the Confirmation Order, and the Litigation Trust Agreement. For the avoidance of doubt, the Audax Parties[2] are not Released Parties, and all Claims and Causes of Action against the Audax Parties shall be retained and contributed to the Litigation Trust, as more fully set forth in the Litigation Trust Agreement.

**The Debtors reserve all rights to amend, supplement, or otherwise modify this <u>Exhibit D</u> to the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.**

---

[2]  "***Audax Parties***" means, collectively, Audax Management Company, LLC, AG Mobile Holdings, L.P., Audax Private Equity Fund V-A, L.P., Audax Private Equity Fund V-B, L.P., AFF Co-Invest L.P., Audax Trust Co-Invest, L.P., Audax PE Co-Invest, A series of Audax Co-Invest Series, LLC, Iveshu Bhatia, Daniel Doran, Timothy Mack, and with respect to each of the foregoing, that Person's Affiliates (excluding, for the avoidance of doubt, the Debtors or Reorganized Debtors), current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), representatives, agents, affiliated investment funds or investment vehicles, limited and general partners, predecessors, participants, successors, and assigns, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, advisory board members, financial advisors, partners, limited partners, general partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, investment managers, investments advisors and other professionals; *provided*, *however*, the Audax Parties shall not include the Consenting Sponsor or the Consenting Sponsor's Related Parties.

**<u>Exhibit E</u>**

**Litigation Trust Agreement**

> **THIS LITIGATION TRUST AGREEMENT REMAINS SUBJECT TO ONGOING REVIEW AND NEGOTIATION BY THE DEBTORS AND EACH OF THE CONSENTING PARTIES.  THE RIGHTS OF ALL PARTIES ARE EXPRESSLY RESERVED.**

## LITIGATION TRUST AGREEMENT

This LITIGATION TRUST AGREEMENT (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof) is made this [●] day of September, 2024 (this "Agreement"), by and among [Matrix Parent, Inc.][1] (together with its affiliated Debtors and any successors-in-interest thereto, collectively the "Company"), Matrix TopCo, L.P., H.I.G. Technology Partners A, L.P., H.I.G. Technology Partners B, L.P., H.I.G. Europe Middle Market LBO Fund III, L.P., H.I.G. Middle Market LBO Fund III, L.P., H.I.G. Matrix Co-Investors L.P., H.I.G. Capital, L.L.C., and H.I.G. Mobile, L.P. (collectively "H.I.G."), the ad hoc group of first lien lenders represented by Milbank LLP (the "Ad Hoc Committee"), any Consenting Creditor (as defined in that certain Restructuring Support Agreement, as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "RSA") and [●][2], as trustee of the Litigation Trust referred to herein (in such capacity, the "Litigation Trustee"), and creates and establishes a litigation trust (the "Litigation Trust") to facilitate the implementation of the Joint Chapter 11 Plan of Mobileum, Inc. and its Affiliated Debtors, dated July 23, 2024 (Docket No. 14) (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms and provisions thereof, the "Plan").  The Company, H.I.G., the Ad Hoc Committee, any Consenting Creditor and the Litigation Trustee are sometimes referred to herein individually as a "Party" and, collectively, as the "Parties."

## RECITALS

WHEREAS, each of the Debtors (as defined in that certain debtor-in-possession credit agreement dated July 25, 2024) filed a voluntary petition for relief (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on July 23, 2024 in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"); and

WHEREAS, the Chapter 11 Cases are continuing and are jointly administered under case number 24-90414; and

WHEREAS, on [●], 2024, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order") with respect to the Company's predecessors in interest (together with the Company, the "Company Parties"); and

WHEREAS, on September [●], 2024, the conditions to effectiveness of the Plan were satisfied and the Plan became effective (the "Effective Date"); and

---

[1]  **Note to Draft**: Subject to final determination of the Company party.

[2]  **Note to Draft**: To be selected by the Debtors, HIG and the Ad Hoc Committee.

WHEREAS, the Plan provides, among other things, for (a) the creation and establishment of the Litigation Trust, as of the Effective Date, for the benefit of the Litigation Trust Beneficiaries set forth on **Schedule 1** attached hereto (together with their respective successors and permitted assigns, each such holder, a "Litigation Trust Beneficiary," and collectively, the "Litigation Trust Beneficiaries") and (b) the transfer to the Litigation Trust of the Litigation Trust Assets (as defined herein) as set forth herein; and

WHEREAS, the Company, H.I.G., the Ad Hoc Committee and Consenting Creditors (collectively, the "Contributing Parties") agreed under the RSA, to the transfer to the Litigation Trust, pursuant to the RSA, Plan and the terms of this Agreement, of the claims asserted in the lawsuit styled *Matrix Parent, Inc. v. Audax Management Co.*, Case No. N23C-10-212 MAA CCLD (Del. Super. 2023), including any appeals therefrom (the "Superior Court Litigation"); and

WHEREAS, the Contributing Parties further agreed under the RSA to the transfer to the Litigation Trust, pursuant to the RSA, Plan and the terms of this Agreement, of all Claims or Causes of Action that each of the Parties may hold that relate to Mobileum Inc. or its affiliates and that relate to or arise from the facts underlying the allegations in the Superior Court Litigation and only such Claims and Causes of Action (such Claims and Causes of Action, the "Trust Causes of Action") and the proceeds of such Trust Causes of Action (the "Trust Cause of Action Proceeds"); and

WHEREAS, the Contributing Parties agreed under the RSA to the transfer to the Litigation Trust, pursuant to the RSA, Plan and the terms of this Agreement, to the transfer to the Litigation Trust of the proceeds (the "RWI Policy Proceeds" and collectively with the Trust Cause of Action Proceeds and the Trust Causes of Action, the "Litigation Trust Assets" and the proceeds of such Litigation Trust Assets, the "Litigation Trust Proceeds") recovered under the representations and warranties policy no. ET111-003-478 issued to Matrix Parent, Inc. with a policy term of March 1, 2022 to March 1, 2025 (the "RWI Policy"); and

WHEREAS, the Parties agree that the Litigation Trust Proceeds will be distributed to the Litigation Trust Beneficiaries in accordance with this Agreement; and

WHEREAS, the Litigation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671-679 of the Internal Revenue Code of 1986, as amended (the "IRC") and the regulations promulgated thereunder ("Treasury Regulations"), [and as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulations section 301.7701-4(d)] or, in the event not treated as a grantor trust, as a partnership other than a publicly traded partnership taxable as a corporation under section 7704 of the IRC; and

WHEREAS, the Litigation Trust shall not be deemed a successor in interest of any of the Company Parties for any purpose other than as specifically set forth in the Plan, the Confirmation Order or this Agreement, and upon the transfer by the Litigation Trustee of the Litigation Trust Proceeds to the Litigation Trust Beneficiaries, none of the Parties will have a reversionary or further interest in or with respect to the Litigation Trust Assets or the Litigation Trust; and

WHEREAS, in accordance with the Plan and subject to the terms of this Agreement, the Litigation Trustee shall have all powers necessary to implement the provisions of this Agreement

2

and administer the Litigation Trust as provided herein, including, but not limited to, the powers set forth in <u>Section 4</u> of this Agreement.

NOW, THEREFORE, in consideration of the promises and the mutual agreements of the Parties contained herein and in the Plan and Confirmation Order, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

For all purposes of this Agreement, capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**ARTICLE II**
**ESTABLISHMENT OF THE LITIGATION TRUST**

2.1    <u>Establishment of the Litigation Trust and Appointment of the Litigation Trustee</u>.

(a)    The Parties, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby establish a trust on behalf of the Litigation Trust Beneficiaries, which shall be known as the "[MOBILEUM NEWCO] Litigation Trust," on the terms set forth herein, for the primary purpose of administering and distributing (as applicable) the Litigation Trust Proceeds.  In connection with the exercise of the Litigation Trustee's or H.I.G. Representatives' powers hereunder, the Litigation Trustee or H.I.G. Representatives, as applicable, may use this name or such variation thereof as the Litigation Trustee sees fit.

(b)    The Litigation Trustee is hereby appointed as trustee of the Litigation Trust effective as of the Effective Date.

(c)    The Litigation Trustee agrees to accept, administer and hold the Litigation Trust Assets in trust for the Litigation Trust Beneficiaries, subject to the provisions of the Plan, the Confirmation Order and this Agreement.

(d)    The Litigation Trustee and each successor trustee serving from time to time hereunder shall have all the rights, powers, and duties as set forth herein.

(e)    The Litigation Trustee is, and any successor trustee serving from time to time hereunder shall be, a "United States person" as such term is defined in Section 7701(a)(30) of the IRC.

(f)    The Litigation Trustee may serve without bond.

(g)    Subject to the terms of this Agreement, any action by the Litigation Trustee that affects the interests of more than one Litigation Trust Beneficiary, as the Litigation Trustee determines is necessary to effectuate the terms of this Agreement, shall be binding and conclusive on all Litigation Trust Beneficiaries even if such Litigation Trust Beneficiaries have different or

3

conflicting interests; provided, that any such action shall not disproportionately adversely affect any single or group of Litigation Trust Beneficiaries vis a vis any other single or group of Litigation Trust Beneficiaries.

(h)    For the avoidance of doubt, (i) the Litigation Trustee is not and shall not be deemed an officer, director, or fiduciary of any of the Company Parties or their respective subsidiaries except as set forth herein, and (ii) neither the Company, H.I.G. or the H.I.G. Representatives, in their respective capacities as such, is or shall be deemed a fiduciary or agent of the Litigation Trust, and such parties owe no duties or obligations to the Litigation Trust or Litigation Trust Beneficiaries, except as set forth herein.

2.2    Transfer of the Litigation Trust Assets and Cooperation.

(a)    Pursuant to the Plan, as of the Effective Date, the Contributing Parties hereby irrevocably transfer, assign and deliver, and shall be deemed to have transferred, assigned and delivered, to the Litigation Trust, without recourse, all of their respective rights, title and interest in the Litigation Trust Assets, free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise), which shall vest in the Litigation Trust, in trust, and, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the sole benefit of the Litigation Trustee and the Litigation Trust Beneficiaries; *provided* that the Parties may not make any disclosures that may be interpreted as a waiver by any of the Parties of any attorney-client privileges, work-product privileges, accountant-client privileges and any other evidentiary privileges or immunities in respect of records, documents or information related to the Litigation Trust Assets without first providing to the Litigation Trustee and the Litigation Trust Beneficiaries reasonable advance written notice and an opportunity to protect the Litigation Trust's rights with respect to any subsequent disclosure and the terms of any protective order, confidentiality stipulation, or similar agreement relating to such disclosure.

(b)    Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall operate as a waiver of any privileges held and retained by the Company, H.I.G., the Ad Hoc Committee or the Consenting Creditors.

(c)    At the reasonable request and upon reasonable advance written notice of the Litigation Trustee or any H.I.G. Representative (email being sufficient), the Company, H.I.G., the Ad Hoc Committee, any Consenting Creditor, and any party under their respective control shall, at the cost and expense of the Litigation Trust: (i) execute and deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed) and (ii) take, or cause to be taken, such further actions reasonably necessary to: (a) evidence or effectuate the transfer of the Litigation Trust Assets to the Litigation Trust; (b) use commercially reasonable efforts to assist the H.I.G. Representatives in the prosecution of any Causes of Action related to a Trust Causes of Action; and (c) administer the Litigation Trust Assets and distribute the Litigation Trust Proceeds in accordance with the terms hereof. Notwithstanding anything to the contrary herein, nothing contained in this Agreement shall restrict the Company's, H.I.G.'s, the Ad Hoc Committee's, or any Consenting Creditor's respective ability to use any such instruments, documents, books, and records executed and delivered in connection with this Section 2.2(c). In assisting the H.I.G. Representatives in the prosecution of any Trust Causes of Action as provided in this section, and in any communications concerning the same, the Company, H.I.G.,

4

the Ad Hoc Committee, any Consenting Creditor, and any party under their respective control shall be deemed to share the common legal interest of pursuing or defending litigation related to the Trust Causes of Action and maximizing recoveries for the Litigation Trust Beneficiaries, and any privileged communications or documents shared pursuant to providing such assistance shall be subject to the common-interest privilege. The Parties Agree that none of them, or any party under their respective control, shall disclose or provide to any third-parties any documents or communications subject to the common-interest privilege identified herein without the consent of the H.I.G. Representatives.

(d)     The H.I.G. Representatives shall, in good faith, investigate and analyze the merits of each Cause of Action prior to instituting any action or proceeding at law relating to the Trust Causes of Action. Any Cause of Action arising from a Trust Cause of Action and asserted after the Effective Date will be prosecuted in the name of the "[MOBILEUM NEWCO] Litigation Trust."

(e)     Notwithstanding anything to the contrary, the Litigation Trustee and the H.I.G. Representatives are prohibited from publicizing or identifying in publicly available material any of the members of the Ad Hoc Committee or Consenting Creditors except as required by law. In the event that the H.I.G. Representatives must identify a member of the Ad Hoc Committee or Consenting Creditor, the H.I.G. Representatives shall use best efforts to obtain confidential treatment of such identification, including seeking to submit any court filing including such information under seal.

(f)     For all U.S. federal, state and local income tax purposes, all parties (including, without limitation, the Company Parties, the Litigation Trustee and the Litigation Trust Beneficiaries) shall treat the transfer of the Litigation Trust Assets to the Litigation Trust in accordance with <u>Section 7.1</u>.

(g)     The Company's transfer of the Litigation Trust Assets to the Litigation Trust under the Plan shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

2.3     <u>Funding of the Litigation Trust; Payment of Fees and Expenses</u>.

(a)     The Litigation Trust shall be funded with $[●] by [the Company] consistent with the Plan, which shall be used to administer the Litigation Trust Assets and pay the reasonable, documented, out-of-pocket fees, expenses and costs of the Litigation Trust, including, without limitation, reasonable, documented, out-of-pocket fees and expenses incurred by advisors or professionals retained by the Litigation Trustee (collectively, the "<u>Litigation Trust Professionals</u>").

(b)     The Litigation Trustee may incur any reasonable and necessary expenses in connection with the performance of its duties under the Plan, the Confirmation Order and this Agreement, including in connection with retaining Litigation Trust Professionals or entering into agreements pursuant to <u>Section 4.6</u>. All reasonable, documented, out-of-pocket fees, expenses, and costs of the Litigation Trust and of the Litigation Trust Professionals shall be paid solely from the Litigation Trust Assets, and solely be the obligation of the Litigation Trust.

(c)     Any failure or inability of the Litigation Trust to obtain funding for the Litigation Trust will not affect the enforceability of this Agreement.

2.4     Title to the Litigation Trust Assets.  The transfer of the Litigation Trust Assets to the Litigation Trust pursuant to Section 2.2 is being made for the sole benefit, and on behalf, of the Litigation Trust Beneficiaries.  Except as otherwise provided in Section 2.2(a), upon the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trust shall succeed to all of the Company's, the Estate's, H.I.G.'s, Ad Hoc Committee's, Consenting Creditors', and the Litigation Trust Beneficiaries' rights, title and interest in the Litigation Trust Assets, and no other Person shall have any interest, legal, beneficial or otherwise, in the Litigation Trust or the Litigation Trust Assets upon the assignment and transfer of such assets to the Litigation Trust, except as otherwise provided in this Agreement.

2.5     Nature and Purpose of the Litigation Trust.

(a)     Purpose.  The Litigation Trust is organized and established as a trust pursuant to which the Litigation Trustee and/or the H.I.G. Representatives, as applicable, subject to the terms and conditions of this Agreement, shall adminster the Litigation Trust Assets and distribute the Litigation Trust Proceeds on behalf, and for the benefit, of the Litigation Trust Beneficiaries.  The Litigation Trust shall (i) serve as a mechanism for distributing the Litigation Trust Proceeds in a timely fashion for the benefit of the Litigation Trust Beneficiaries in accordance with this Agreement, and (ii) serve as a mechanism for the purpose of administering the Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Litigation Trust.  The primary purpose of the Litigation Trust is to, in an expeditious and orderly manner, monetize and convert the Litigation Trust Assets to Cash and make timely distributions to the Litigation Trust Beneficiaries in accordance with this Agreement. The Litigation Trustee shall be obligated to make continuing reasonable efforts to timely distribute the Litigation Trust Proceeds and not unreasonably prolong the duration of the Litigation Trust.

(b)     Relationship.  This Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust.  The Litigation Trust is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Litigation Trustee or the Litigation Trust Beneficiaries for any purpose be, or deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers, provided however, that if the Litigation Trust is not respected as a "grantor trust" for U.S. federal, state and local income tax purposes, it is intended to be treated as a joint ownership arrangement or partnership solely for such tax purposes.  The relationship of the Litigation Trust Beneficiaries, on the one hand, to the Litigation Trustee, on the other hand, shall be solely that of a beneficiary of a trust and shall not be deemed a principal and agency relationship, and their rights shall be limited to those conferred upon them by this Agreement.

(c)     Relationship to and Incorporation of the Plan.  The principal purpose of this Agreement is to aid in the implementation of the Plan and the Confirmation Order, and therefore this Agreement incorporates the applicable provisions thereof by reference.  To that end and subject to the provisions of the Plan, the Litigation Trustee shall have full power and authority to

take any action consistent with this Agreement, the provisions of the Plan and the Confirmation Order, and to seek any orders from the Bankruptcy Court solely in furtherance of this Agreement. As among the Litigation Trust, the Litigation Trustee, and the Litigation Trust Beneficiaries, if any provisions of this Agreement are found to be inconsistent with the provisions of the Plan or the Confirmation Order, each such document shall have controlling effect in the following rank order: [the Confirmation Order, the Plan, and this Agreement].

2.6     Appointment as Representative. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Litigation Trustee shall be the duly appointed representative of the Estates and, as such, to the extent provided herein, the Litigation Trustee succeeds to the rights and powers of a trustee in bankruptcy solely with respect to the Litigation Trust Assets, subject to the limitations and powers enumerated under Article IV of this Agreement.  To the extent that any of the Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, the Litigation Trust Assets shall be deemed to have been retained by the Company and/or H.I.G., as applicable (in both cases, other than for tax purposes) and the Litigation Trustee shall be deemed to have been designated as a representative of the Company to the extent provided herein pursuant to section 1123(b)(3)(B) of the Bankruptcy Code solely to administer such Litigation Trust Assets on behalf of the Company for the benefit of the Litigation Trust Beneficiaries.  Notwithstanding the foregoing, all Litigation Trust Proceeds shall be distributed to the Litigation Trust Beneficiaries consistent with the provisions of this Agreement.

## ARTICLE III
## LITIGATION TRUST INTERESTS

3.1     Litigation Trust Interests.  On the date hereof, the Litigation Trust shall issue the beneficial interests in the Litigation Trust (the "Litigation Trust Interests") to the Litigation Trust Beneficiaries in accordance with the terms of this Agreement.  The Litigation Trust Beneficiaries shall be entitled to distributions from the Litigation Trust Assets in accordance with the terms of this Agreement including, without limitation, Section 4.5(a) below.  The Litigation Trust Interests will be represented by entries on the books and records of the Litigation Trust.  The Litigation Trust will not issue any certificate or certificates to evidence any Litigation Trust Interests.

3.2     Interests Beneficial Only.  The ownership of the beneficial interests in the Litigation Trust shall not entitle the Litigation Trust Beneficiaries to any title in or to the Litigation Trust Assets as such (which title shall be vested in the Litigation Trust) or to any right to call for a partition or division of the Litigation Trust Assets or to require an accounting.

3.3     Transferability of Litigation Trust Interests.  The Litigation Trust Interests shall not be freely negotiable or transferable except to an Affiliate, or otherwise to the extent provided by operation of law under applicable U.S. federal and state securities laws, provided, however, that any such transfer or disposition of Litigation Trust Interests shall be void ab initio if such transfer or disposition would require the Litigation Trustee to comply with the registration and reporting requirements of the Securities Act of 1933, as amended (the "Securities Act"), the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Trust Indenture Act of 1939, as amended (the "TIA"), or the Investment Company Act of 1940, as amended (the "Investment

Company Act"). Any transfer of Litigation Trust Interests shall be recorded on the books and records of the Litigation Trust. The Litigation Trustee may request from any proposed transferor any information or representations and warranties regarding the transfer of Litigation Trust Interests which the Litigation Trustee deems necessary in order to determine that such transfer would not constitute a violation of applicable federal and state securities laws. The transferor or transferee of Litigation Trust Interests shall be responsible for any reasonable, documented expenses incurred by the Litigation Trustee in connection with the processing of any such transfer.

3.4     Trust Register. The Litigation Trustee shall cause to be kept at its office, or at such other place or places as shall be designated by the Litigation Trustee from time to time, a registry of the Litigation Trust Beneficiaries (the "Trust Register"), which shall be maintained pursuant to such reasonable regulations as the Litigation Trustee may prescribe.

3.5     Exemption from Registration. The Parties hereto intend that the rights of the Litigation Trust Beneficiaries arising in this Litigation Trust shall not be "securities" under applicable laws, but none of the Parties represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If such rights constitute securities, the Parties intend for the exemption from registration provided by section 1145 of the Bankruptcy Code and under applicable securities laws to apply to the issuance of the Litigation Trust Interests to the Litigation Trust Beneficiaries under the Plan. Subject to Section 3.3, the Litigation Trustee may amend this Agreement in accordance with Article IX hereof to make such changes as are deemed necessary or appropriate, with the advice of counsel, to ensure that the Litigation Trust is not subject to registration or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act. The Litigation Trust Interests shall not have consent or voting rights or otherwise confer on the Litigation Trust Beneficiaries any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken by the Litigation Trustee in connection with the Litigation Trust.

3.6     Effect of Death, Dissolution, Incapacity or Bankruptcy of Beneficiary. The death, dissolution, incapacity or bankruptcy of any Litigation Trust Beneficiary during the term of the Litigation Trust shall not (a) operate to terminate the Litigation Trust, (b) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to an accounting, (c) entitle the representatives or creditors of the deceased, dissolved, incapacitated or bankrupt party to take any action in the Bankruptcy Court or elsewhere for the distribution of the Litigation Trust Proceeds or for a partition thereof, or (d) otherwise affect the rights and obligations of any of the Litigation Trust Beneficiaries under this Agreement.

3.7     Change of Wiring Instructions. Any Litigation Trust Beneficiaries may, after the Effective Date, select alternative wire instructions by providing notice to the Litigation Trustee identifying such alternative wire instructions. Such notification shall be effective only upon receipt by the Litigation Trustee. Absent actual receipt of such notice by the Litigation Trustee, the Litigation Trustee shall not recognize any such change of wire instructions.

3.8     Absolute Owners. The Litigation Trustee may deem and treat any Litigation Trust Beneficiary reflected as the owner of a Litigation Trust Interest on the applicable Trust Register as the absolute owner thereof for the purposes of receiving distributions and payments on account thereof, for U.S. federal, state and local income tax purposes and for all other purposes whatsoever.

3.9    No Standing.  Other than as expressly contemplated herein, no Litigation Trust Beneficiary shall have standing to direct the Litigation Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Litigation Trust Assets.

## ARTICLE IV
## RIGHTS, POWERS AND DUTIES OF LITIGATION TRUSTEE AND/OR THE H.I.G. REPRESENTATIVES

4.1    Role of the Litigation Trustee. In furtherance of and consistent with the purpose of the Litigation Trust and the Plan, subject to the terms and conditions contained in this Agreement, the Litigation Trustee shall, subject to Section 4.3 hereof, (i) receive, manage, supervise and protect the Litigation Trust Assets upon its receipt of same on behalf of and for the benefit of the Litigation Trust Beneficiaries; (ii) prepare and file all required tax returns and pay all taxes and all other obligations of the Litigation Trust; (iii) make timely distributions of the Litigation Trust Proceeds to the Litigation Trust Beneficiaries in accordance with Section 4.5; (iv) dissolve the Litigation Trust; and (v) have all such other responsibilities as may be vested in the Litigation Trustee pursuant to the Plan, the Confirmation Order, this Agreement, and all other applicable orders of the Bankruptcy Court.  The Litigation Trustee shall be responsible for all decisions and duties with respect to the powers and responsibilities delegated herein, and such decisions and duties shall be carried out in accordance with this Agreement.  In all circumstances, the Litigation Trustee shall act in the best interests of the Litigation Trust Beneficiaries and in furtherance of the purpose of the Litigation Trust, make timely distributions of any Litigation Trust Assets, and otherwise monetize the Litigation Trust Assets and not unreasonably prolong the duration of the Litigation Trust.

4.2    Fiduciary Duties. The Litigation Trustee shall have fiduciary duties to the Litigation Trust Beneficiaries; *provided*, *however*, that the Litigation Trustee shall not owe fiduciary obligations to any defendants of or adverse parties to the Litigation Trust Beneficiaries in their capacities as such, it being the intent of such fiduciary duties to ensure that the Litigation Trustee's obligations are to maximize the value of the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries.

4.3    Authority to Prosecute and Settle Trust Causes of Action.

(a)    Subject to the provisions of this Agreement, H.I.G. (and, together with its representatives, acting in such capacity the "H.I.G. Representatives") by and through its counsel, Holwell Shuster & Goldberg LLP, and such counsel as it may choose from time to time (which additional counsel retention is subject in all cases to advance authorization not to be unreasonably withheld of the Litigation Trust Beneficiaries) shall have the absolute and exclusive authority to continue to prosecute the Superior Court Litigation and to prosecute, pursue, compromise, settle, or abandon any and all Trust Causes of Action (including any counterclaims asserted against the Litigation Trust) as it determines in the best interest of the Litigation Trust Beneficiaries, consistent with the purposes of the Litigation Trust, including the right to (i) assert and prosecute new Causes of Action or Claims, whether in new proceedings or by amending the existing lawsuits pursuant to the Trust Causes of Action,  (ii) retain, subject to advance authorization not to be unreasonably withheld of the Litigation Trust Beneficiaries in all cases, additional advisors or experts to assist

9

in the prosecution of the Superior Court Litigation or any other Trust Cause of Action, and (iii) propose, respond to, accept or reject settlement offers as set forth herein; provided, however, that the H.I.G. Representatives (1) shall not accept nor offer a settlement proposal in connection with the Superior Court Litigation below $50 million without the consent of the Ad Hoc Committee or, following consummation of the Plan, the Company (each a "Consent Party," and together, the "Consent Parties"); and (2) shall not reject a settlement proposal in connection with the Superior Court Litigation above $150 million without the Consent Parties' consent; and (3) shall not offer, accept or reject any settlement proposal  regarding any Causes of Action relating to Trust Causes of Action (other than the Superior Court Litigation) without the consent, not to be unreasonably withheld, of the Litigation Trust Beneficiaries. The H.I.G. Representatives shall timely request such consent from the Consent Parties where applicable and each Consent Party shall respond in writing (which may be by e-mail) to the H.I.G. Representatives' request for consent within seven (7) days following receipt of a consent request. The Consent Party's failure to respond within seven (7) days shall be treated as consent.

(b)     To the extent a dispute arises between the H.I.G. Representatives and a Consent Party relating to the Consent Party's consent rights regarding settlement of the Superior Court Litigation as set forth in Section 4.3(a)(iii), the H.I.G. Representatives and the applicable Consent Party shall resolve all such disputes through a binding, confidential dispute resolution process, to be completed within thirty (30) Business Days (or such shorter time as may be necessary where there are exigent litigation deadlines), conducted by an independent arbitrator. The arbitrator will determine whether the H.I.G. Representatives' proposed acceptance or rejection of any settlement proposal as set forth in Section 4.3(a)(iii) is reasonable and supported by the viability of the claims and relevant facts and circumstances regarding the Superior Court Litigation.

(c)     Subject to the provisions of this Agreement, the H.I.G. Representatives shall have no liability for the outcome of its decisions as to whether to prosecute, pursue, compromise, settle or abandon any and all Trust Causes of Action except for any damages caused by fraud or willful misconduct as determined by a Final Order issued by a court of competent jurisdiction.

(d)     Notwithstanding anything to the contrary in this Agreement, the Litigation Trustee shall not have the (i) right, power, or authority to prosecute, defend, or settle any Contributed Claims or the Superior Court Litigation or (ii) or any authority that conflicts with Sections 4.3(a)-(c) hereof.

4.4     Liquidation of Litigation Trust Assets.  The Litigation Trustee, in the exercise of its reasonable business judgment, shall, in an expeditious but orderly manner make timely distributions of the Litigation Trust Proceeds in accordance with this Agreement, and not unduly prolong the existence of the Litigation Trust.

4.5     Distributions.

(a)     The Litigation Trustee shall make distributions of the Litigation Trust Proceeds to the Litigation Trust Beneficiaries as follows:

(i)     First, to repay in full on a pro rata basis:

(A)     all of the H.I.G.'s litigation costs and expenses in connection (x) its prosecution, evaluation, settlement or abandonment of the Superior Court Litigation and any Trust Causes of Action, *provided that* the RWI Policy Proceeds applied to repay the litigation costs and expenses described in clause (x) shall not exceed $8 million, (y) pursuing recoveries under the RWI Policy, including all costs and expenses of Hunton Andrews Kurth LLP as insurance counsel and recovery for any deductible under the RWI Insurance paid for or payable by H.I.G., and (z) defending the Chancery Suit (defined herein), including all legal fees and expenses related thereto to the extent not otherwise previously indemnified by the Company or else reimbursed under any applicable insurance policy, including but not limited to the RWI Policy, the Federal Insurance Company Directors and Officers policy number 8262-8664, or under the excess Directors and Officers policy number MLP 7916992-1 issued by Zurich American Insurance Company;

(B)     all of the Company's litigation costs and expenses in connection with (x) pursuing recoveries in the Superior Court Litigation on affirmative claims of the Superior Court Litigation Plaintiffs[3]; and (y) defending the Chancery Suit, including all legal fees and expenses related thereto to the extent not otherwise reimbursed under any applicable insurance policy, including but not limited to the RWI Policy, the Federal Insurance Company Directors and Officers policy number 8262-8664, or under the excess Directors and Officers policy number MLP 7916992-1 issued by Zurich American Insurance Company; and

(C)     any fees and expenses of Milbank LLP as counsel to the Ad Hoc Committee incurred in connection with H.I.G.'s prosecution of the Superior Court Litigation following the Effective Date;

(ii)     Second, allocated amongst H.I.G. and the Company at a ratio of 50% in favor of H.I.G. and 50% in favor of the Company until the Company has recovered $200 million of the Litigation Trust Proceeds, net of any tax obligations arising in connection with any such proceeds, including any tax obligations of or payable by the Company (including tax obligations of any consolidated, combined or unitary tax group of which the Company, or any items of income of the Company, is included); in connection with the receipt of proceeds pursuant to this clause (ii), the Company shall provide H.I.G. and the Litigation Trustee with such person's good faith determination of the amount of taxes, if any, payable by such person (or with respect to such person's share of the Litigation Trust Proceeds);

(iii)     Third, additional proceeds shall be payable solely to H.I.G. until H.I.G. has recovered an additional $65 million, net of any tax obligations, in excess of its recoveries in the first and second clauses herein; and

---

[3]     "Superior Court Litigation Plaintiffs" means, collectively, Matrix Parent, Inc.; H.I.G. Mobile, L.P.; H.I.G. Europe Middle Market LBO Fund, L.P.; H.I.G. Middle Market LBO Fund III, L.P.; H.I.G. Technology Partners A, L.P.; H.I.G. Technology Partners B, L.P.; and H.I.G. Matrix Co-Investors, L.P.

(iv)     Fourth, all remaining proceeds to be allocated amongst H.I.G. and the Company at a ratio of 50% in favor of H.I.G. and 50% in favor of the Company.

(b)     Distributions of the Litigation Trust Proceeds shall be net of any applicable operating expenses incurred by the Litigation Trust, and only to the extent that the Litigation Trust has sufficient Litigation Trust Proceeds available to make such distributions in accordance with and to the extent provided for in this Agreement and after any reserves deemed necessary or appropriate by the Litigation Trustee.

(c)     In the reasonable discretion of the Litigation Trustee, the Litigation Trustee shall distribute at least annually all Cash on hand (including, but not limited to, the net income and the Litigation Trust Proceeds, if any, from any disposition of the Superior Court Litigation, any Cash received on account of or representing Litigation Trust Assets, and treating as Cash for purposes of this Section 4.5 any permitted investments under Section 4.9) in the manner set forth in this Agreement; provided, however, that the Litigation Trustee may retain Litigation Trust Assets reasonably necessary to fund its operation in accordance with Section 2.3 and to satisfy other obligations of the Litigation Trust under the Plan and this Agreement.

(d)     The Litigation Trustee shall make distributions to Litigation Trust Beneficiaries via wire transfer to the bank account of each such Litigation Trust Beneficiary as indicated on the Litigation Trust's records as of the applicable distribution date. Any distribution of Cash by the Litigation Trust shall be made by the Litigation Trustee via wire transfer from a bank account established in the name of the Litigation Trust on or subsequent to the Confirmation Date at a domestic bank selected by the Litigation Trustee (the "Litigation Trust Account"). If any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Litigation Trustee is notified in writing of the then-current bank account of such holder, at which time such distribution shall be made as soon as reasonably practicable after such distribution has become deliverable or has been claimed to such holder without interest.

(e)     Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

4.6     Retention of Counsel and Other Professionals. The Litigation Trustee, without further order of the Bankruptcy Court but subject to advance authorization of the Litigation Trust Beneficiaries in all cases, may employ Litigation Trust Professionals as the Litigation Trustee reasonably deems necessary to aid it in fulfilling its obligations under this Agreement, and on whatever reasonable or customary fee arrangement the Litigation Trustee deems appropriate for the performance of its duties under this Agreement. Litigation Trust Professionals engaged by the Litigation Trustee shall not be required to file applications to receive compensation for services rendered and reimbursement of actual out-of-pocket expenses incurred. Unless an alternative fee arrangement has been agreed to by the Parties, Litigation Trust Professionals retained by the Litigation Trustee shall be compensated from the Litigation Trust Assets.

4.7     Management of Litigation Trust Assets.

(a)     Except as otherwise provided in this Agreement including Section 4.3 hereof, and subject to Treasury Regulations governing grantor trusts and the retained jurisdiction

12

of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Litigation Trustee may control and exercise authority over the Litigation Trust Assets, over the management and disposition thereof, and over the management and conduct of the Litigation Trust, in each case, as necessary or advisable to enable the Litigation Trustee to fulfill the intents and purposes of this Agreement.  No Person dealing with the Litigation Trust will be obligated to inquire into the authority of the Litigation Trustee in connection with the acquisition, management, protection, conservation or disposition of the Litigation Trust Assets.

(b)     In connection with the management and use of the Litigation Trust Assets and except as otherwise expressly limited in the Plan, the Confirmation Order or this Agreement, the Litigation Trustee and H.I.G. Representatives, as applicable, will have, in addition to any powers conferred upon the Litigation Trustee and the H.I.G. Representatives by any other provision of this Agreement, the power to take any and all actions as, in the Litigation Trustee's or H.I.G. Representatives' respective reasonable discretion, are necessary or advisable to effectuate the primary purposes of the Litigation Trust, including, without limitation, the power and authority to, as applicable and as more fully set forth in this Agreement, (i) pay taxes and other obligations owed by the Litigation Trust or incurred by the Litigation Trustee; (ii) engage and compensate, subject to <u>Sections 2.3</u> and <u>4.3</u>, from the Litigation Trust Assets, to the extent provided herein, the Litigation Trust Professionals to assist the Litigation Trustee with respect to the Litigation Trustee's responsibilities; and (iii) act and implement the Plan, this Agreement, and applicable orders of the Bankruptcy Court (including, as applicable, the Confirmation Order).

4.8     <u>Additional Powers of the Litigation Trustee</u>.  In addition to any and all of the powers enumerated above, and except as otherwise provided in the Plan, the Confirmation Order or this Agreement, and subject to the Treasury Regulations governing grantor trusts and the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, the Litigation Trustee shall be empowered to:

(a)     hold legal title to any and all rights in or arising from the Litigation Trust Assets, including, but not limited to, the right to collect any and all money and other property belonging to the Litigation Trust (including any Litigation Trust Assets);

(b)     protect and enforce the rights of the Litigation Trust in and to the Litigation Trust Assets by any method deemed reasonably appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law (whether foreign or domestic) and general principles of equity;

(c)     determine and satisfy any and all liabilities created, incurred or assumed by the Litigation Trust;

(d)     make all payments relating to the Litigation Trust;

(e)     obtain reasonable insurance coverage with respect to the potential liabilities and obligations of the Litigation Trust and the Litigation Trustee under this Agreement (in the form of a directors and officers policy, an errors and omissions policy, or otherwise, all at the sole cost and expense of the Litigation Trust);

(f)     receive, manage, invest, supervise, protect, and liquidate the Litigation Trust Assets, withdraw and make distributions from and pay taxes and other obligations owed by the Litigation Trust from funds held by the Litigation Trustee or the Litigation Trust in the Litigation Trust Account as long as such actions are consistent with the Litigation Trust's status as a "grantor trust" pursuant to sections 671-679 of the IRC and the Treasury Regulations thereunder and are merely incidental to the Litigation Trust's liquidation and dissolution;

(g)     prepare, or have prepared, and file, if necessary, with the appropriate Governmental Unit any and all tax returns, information returns, and other required documents with respect to the Litigation Trust (including, without limitation, U.S. federal, state, local or foreign tax or information returns required to be filed by the Litigation Trust); pay taxes properly payable by the Litigation Trust; and cause all taxes payable by the Litigation Trust to be paid exclusively out of the Litigation Trust Assets;

(h)     request any appropriate tax determination with respect to the Litigation Trust, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(i)     make tax elections by and on behalf of the Litigation Trust, which are deemed by the Litigation Trustee, either independently or with the advice of Litigation Trust Professionals, to be in the best interest of maximizing the liquidation value of the Litigation Trust Assets;

(j)     retain and reasonably compensate Litigation Trust Professionals for services rendered and expenses incurred in the performance of such reviews or audits of the financial books and records of the Litigation Trust as may be appropriate in the Litigation Trustee's reasonable discretion and the preparation and filing of any tax returns or informational returns for the Litigation Trust as may be required;

(k)     take or refrain from taking any and all actions the Litigation Trustee reasonably deems necessary for the continuation, protection, and maximization of the Litigation Trust Assets consistent with the purposes hereof;

(l)     take all steps and execute all instruments and documents the Litigation Trustee reasonably deems necessary to effectuate the Litigation Trust;

(m)     provide for the distributions of the proceeds of any Litigation Trust Proceeds in accordance with the provisions of the Plan, the Confirmation Order and this Agreement;

(n)     take all actions the Litigation Trustee reasonably deems necessary to comply with this Agreement (including all obligations thereunder);

(o)     in the event that the Litigation Trust shall fail or cease to qualify as a "grantor trust" within the meaning of sections 671-679 of the IRC, take any and all necessary actions as it shall reasonably deem appropriate to have such assets treated as held for the Litigation Trust Beneficiaries as joint owners or as held by an entity classified as a partnership for U.S. federal tax purposes; and

14

(p)    exercise such other powers as may be vested in the Litigation Trustee pursuant to the Plan, the Confirmation Order, this Agreement, any order of the Bankruptcy Court or as otherwise determined by the Litigation Trustee to be reasonably necessary and proper to carry out the obligations of the Litigation Trustee in relation to the Litigation Trust.

4.9    <u>Limitations on Power and Authority of the Litigation Trustee</u>.  Notwithstanding anything in this Agreement to the contrary, the Litigation Trustee will <u>not</u> have the authority to do any of the following:

(a)    take any action in contravention of the Plan, the Confirmation Order, or this Agreement;

(b)    possess property of the Litigation Trust or assign the Litigation Trust's rights in specific property for any purpose other than as provided herein;

(c)    cause or permit the Litigation Trust to engage in any trade or business;

(d)    receive transfers of any listed stocks or securities or any readily marketable assets or any operating assets of a going business; *provided, however*, that in no event shall the Litigation Trustee receive any investment that would jeopardize treatment of the Litigation Trust as a "grantor trust" for U.S. federal income tax purposes within the meaning of sections 671-679 of the IRC, or any successor provision thereof;

(e)    receive or retain any operating assets of an operating business, a partnership interest in a partnership that holds operating assets or 50% or more of the stock of a corporation with operating assets; *provided, however*, that in no event shall the Litigation Trustee receive or retain any asset or interest that would jeopardize treatment of the Litigation Trust as a "grantor trust" for U.S. federal income tax purposes under sections 671-679 of the IRC or any successor provision thereof;

(f)    take any other action or engage in any investments or activities that would jeopardize treatment of the Litigation Trust as a "grantor trust" for U.S. federal income tax purposes under sections 671-679 of the IRC, or any successor provision thereof or would cause the Litigation Trust to be treated as a corporation or publicly traded partnership taxable as a corporation under section 7704 of the IRC; or

(g)    commence, continue, prosecute, seek to pursue, or settle any Causes of Action with respect to a Trust Cause of Action or the Superior Court Litigation, which authority shall vest solely with the H.I.G. Representatives as set forth in this Agreement.

4.10    <u>Books and Records</u>.

(a)    The Litigation Trustee shall maintain books and records relating to any income realized from the Litigation Trust Assets and the payment of, costs and expenses of, and liabilities of claims against or assumed by, the Litigation Trust in such detail and for such period of time as may be necessary to enable him/her/it to make full and proper accounting in respect thereof and in accordance with applicable law.  Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Litigation

15

Trust. Nothing in this Agreement requires the Litigation Trustee to file any accounting or seek approval of any court with respect to the administration of the Litigation Trust or as a condition for managing any payment or distribution out of the Litigation Trust Proceeds, except as may otherwise be set forth in the Plan or the Confirmation Order.

(b)    The Litigation Trust Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Litigation Trustee, to inspect and, at the sole expense of such Litigation Trust Beneficiary seeking the same, make copies of the books and records relating to the Litigation Trust on any business day and as often as may be reasonably be desired, in each case for a purpose reasonably related to such Litigation Trust Beneficiary's interest in the Litigation Trust.

4.11    Reports.  The fiscal year of the Litigation Trust shall be the calendar year.  Within 60 days after the end of each calendar year during the term of the Litigation Trust, and within 30 days after the end of each calendar quarter during the term of the Litigation Trust (other than the fourth quarter) and as soon as practicable upon termination of the Litigation Trust, the Litigation Trustee shall make available, upon request of a Litigation Trust Beneficiary, a written report including: (i) financial statements of the Litigation Trust for such period, and, if the end of a calendar year, an unaudited report reflecting the result of such agreed-upon procedures relating to the financial accounting administration of the Litigation Trust as proposed by the Litigation Trustee; (ii) a summary description of any action taken by the Litigation Trust which, in the judgment of the Litigation Trustee, materially affects the Litigation Trust and of which notice has not previously been given to the Litigation Trust Beneficiaries; (iii)  a written report detailing the distributions made by the Litigation Trust to date; and (iv) any other material information relating to the Litigation Trust Assets and the administration of the Litigation Trust deemed appropriate to be disclosed by the Litigation Trustee.  In addition, the Litigation Trust shall provide unaudited financial statements to each Litigation Trust Beneficiary on a quarterly basis.  The H.I.G. Representatives shall provide, upon the reasonable request of a Litigation Trust Beneficiary, a description of the progress of the Superior Court Litigation, the Chancery Court Action and any Causes of Action relating to the Trust Causes of Action.

## ARTICLE V
## THE LITIGATION TRUSTEE GENERALLY

5.1    Independent Litigation Trustee.  The Litigation Trustee, in accordance with the Plan and the Confirmation Order, shall be a professional natural person or financial institution with experience administering litigation trusts.

5.2    Litigation Trustee's Compensation and Reimbursement.

(a)    Compensation.  The Litigation Trustee shall receive compensation from the Litigation Trust as provided on Exhibit A hereto (the "Litigation Trustee Compensation").

(b)    Expenses.  The Litigation Trust will reimburse the Litigation Trustee for all actual, reasonable and documented out-of-pocket expenses incurred by the Litigation Trustee in connection with the performance of the duties of the Litigation Trustee hereunder, including but not limited to, actual, reasonable and documented fees and disbursements of the Litigation

16

Trustee's legal counsel incurred in connection with the review, execution, and delivery of this Agreement and related documents (collectively, the "Litigation Trustee Expenses" and, together with the Litigation Trustee Compensation, the "Litigation Trustee Fees"); *provided* that the reimbursement of any Litigation Trustee Expenses exceeding $[●], in the aggregate, shall require the prior approval of H.I.G. and the Company. For the avoidance of doubt, H.I.G. shall pay all costs related to prosecution and settlement of the Superior Court Litigation and such costs shall not be deemed Litigation Trustee Fees and shall not be paid from the Litigation Trust Assets except as provided for in Section 4.5(a) of this Agreement. No cost incurred in the prosecution, defense, or settlement by H.I.G. in connection with the suit captioned *AG Mobile Holdings, L.P. v. H.I.G. Mobile, LP, Matrix Topco, LP, Matrix Topco GP, LLC; H.I.G. Technology Partners, LLC; Nishant Nayyar; Alexander Thorn and Gavin Patterson*, in the Court of Chancery of the State of Delaware C.A. no. 2023-1103, and any appeals therefrom (the "Chancery Suit"), shall be deemed Litigation Trustee Fees and shall not be reimbursed from the Litigation Trust Assets except as provided in Section 4.5(a).

(c)     Payment. The Litigation Trustee Fees shall be paid to the Litigation Trustee without necessity for review or approval by the Bankruptcy Court or any other Person. Payment of the Litigation Trustee Fees shall be payable from the Litigation Trust Assets.

5.3     Resignation. The Litigation Trustee may resign by giving not less than 90 days' prior written notice thereof to the Litigation Trust Beneficiaries. Such resignation shall become effective on the later to occur of: (a) the day specified in such notice, and (b) the appointment of a successor satisfying the requirements set out in Section 5.1 and the acceptance by such successor of such appointment. If a successor Litigation Trustee is not appointed or does not accept its appointment within 90 days following delivery of notice of resignation by the then current Litigation Trustee, such Litigation Trustee may file a motion with the Bankruptcy Court, upon notice and a hearing, for the appointment of a successor Litigation Trustee satisfying the requirements set out in Section 5.1, during which time the then-serving Litigation Trustee shall be entitled to receive the Litigation Trustee Compensation provided for in Section 5.2(a). Notwithstanding the foregoing, upon the Termination Date, the Litigation Trustee shall be deemed to have resigned, except as otherwise provided for in Section 8.2.

5.4     Removal.

(a)     The Litigation Trustee may be removed from office (i) for willful fraud or willful misconduct, self-dealing, intentional misrepresentation or gross negligence in connection with the affairs of the Litigation Trust, (ii) for such physical or mental disability as substantially prevents the Litigation Trustee from performing the duties of Litigation Trustee hereunder, (iii) upon approval by H.I.G. and the Company, or (iv) for breach of fiduciary duty other than as specified in the foregoing clauses (i) and (ii), and, in each case, upon order and finding of the Bankruptcy Court.

(b)     To the extent there is any dispute regarding the removal of a Litigation Trustee (including any dispute relating to any portion of the Litigation Trustee Fees), the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute. Notwithstanding the foregoing, the Litigation Trustee will continue to serve as the Litigation Trustee after his removal until the earlier of (i) the time when appointment of a successor Litigation

Trustee will become effective in accordance with Section 5.5 or (ii) such date as the Bankruptcy Court otherwise orders.

5.5     Appointment of Successor Litigation Trustee.  In the event of the death or disability (in the case of a Litigation Trustee that is a natural person), dissolution (in the case of a Litigation Trustee that is not a natural person), resignation, incompetency or removal of the Litigation Trustee, the Litigation Trust Beneficiaries shall designate a successor Litigation Trustee satisfying the requirements set forth in Section 5.1 upon approval of H.I.G and the Company.  If the Litigation Trust Beneficiaries are unable to secure both H.I.G.'s and the Company's approval, the Bankruptcy Court will determine the successor Litigation Trustee satisfying the requirements set forth in Section 5.1.  Such appointment shall specify the date on which such appointment shall be effective. Every successor Litigation Trustee appointed hereunder shall execute, acknowledge, and deliver to the Litigation Trust, the retiring Litigation Trustee, the Litigation Trust Beneficiaries and file with the Bankruptcy Court, an instrument accepting such appointment subject to the terms and provisions hereof. The successor Litigation Trustee shall provide a bond or surety to the extent required by the Bankruptcy Court.  Every successor Litigation Trustee appointed hereunder shall, without any further act, deed or conveyance, shall become vested with all rights, powers, trusts and duties of the predecessor Litigation Trustee and the successor Litigation Trustee shall not be personally liable for any act or omission of the predecessor Litigation Trustee. In no event shall the predecessor Litigation Trustee be liable for the acts or omissions of the successor Litigation Trustee.

5.6     Effect of Resignation or Removal.  The death, disability, dissolution, bankruptcy, resignation, incompetency, incapacity or removal of the Litigation Trustee, as applicable, shall not operate to terminate the Litigation Trust created by this Agreement or to revoke any existing agency created pursuant to the terms of this Agreement or invalidate any action theretofore taken by the Litigation Trustee or any prior Litigation Trustee.  In the event of the resignation or removal of the Litigation Trustee, such Litigation Trustee will promptly (a) execute and deliver such documents, instruments and other writings as may be ordered by the Bankruptcy Court or the successor Litigation Trustee to effect the termination of such Litigation Trustee's capacity under this Agreement, (b) deliver to the Bankruptcy Court (if required) or the successor Litigation Trustee all documents, instruments, records and other writings related to the Litigation Trust as may be in the possession of such Litigation Trustee, and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Litigation Trustee.

5.7     Confidentiality.  The Litigation Trustee shall, during the period that the Litigation Trustee serves as Litigation Trustee under this Agreement and for a period of two (2) years following the termination of this Agreement or following such Litigation Trustee's removal or resignation hereunder, hold strictly confidential and not use for personal gain or for the gain of any Entity or Person for whom such Litigation Trustee may be employed any non-public information of or pertaining to any Person to which any of the Litigation Trust Assets relates or of which the Litigation Trustee has become aware in the Litigation Trustee's capacity as Litigation Trustee, until (a) such information is made public other than by disclosure by the Litigation Trust, the Litigation Trustee, or any Litigation Trust Professionals in violation of this Agreement; (b) the Litigation Trust is required by law to disclose such information (in which case the Litigation Trust shall provide the relevant Person reasonable advance notice and an opportunity to protect his, her,

or its rights); or (c) the Litigation Trust obtains a waiver of confidentiality from the applicable Person.

## ARTICLE VI
## LIABILITY AND INDEMNIFICATION

6.1     No Further Liability.  The Litigation Trustee and H.I.G. Representatives, in each case, shall have no liability for any actions or omissions in accordance with this Agreement or with respect to the Litigation Trust unless arising out of such Person's own fraud or willful misconduct as determined by a Final Order issued by a court of competent jurisdiction.  Unless arising out of such Person's own fraud or willful misconduct, as determined by a Final Order issued by a court of competent jurisdiction, in performing its duties under this Agreement, each of the Litigation Trustee and H.I.G. Representatives shall have no liability for any action taken by such Person in accordance with the advice of counsel, including the Litigation Trust Professionals.  Without limiting the generality of the foregoing, the Litigation Trustee and H.I.G. Representatives each may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by such Person to be genuine and shall have no liability for actions taken in reliance thereon.  None of the provisions of this Agreement shall require the Litigation Trustee or H.I.G. Representatives to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers.  Each of the Litigation Trustee and H.I.G. Representatives may rely without inquiry upon writings delivered to such Person pursuant to the Plan or the Confirmation Order that such Person reasonably believes to be genuine and to have been properly given.  Notwithstanding the foregoing, nothing in this Section 6.1 shall relieve the Litigation Trustee or H.I.G. Representatives, respectively, from any liability for any actions or omissions arising out of such Person's fraud or willful misconduct as determined by a Final Order issued by a court of competent jurisdiction.  No termination of this Agreement or amendment, modification or repeal of this Section 6.1 shall adversely affect any right or protection of the Litigation Trustee or H.I.G. Representatives' respective designees, professional agents or representatives that exists at the time of such amendment, modification or repeal.

6.2     Indemnification of the Litigation Trustee

(a)     From and after the Effective Date, each of the Litigation Trustee, the Litigation Trust and the Litigation Trust Professionals (each, a "Litigation Trust Indemnified Party" and, collectively, the "Litigation Trust Indemnified Parties") shall be, and hereby is, indemnified by the Litigation Trust, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, Causes of Action, bonds, covenants, judgments, damages, attorneys' fees, defense costs and other assertions of liability arising out of any such Litigation Trust Indemnified Party's exercise of what such Litigation Trust Indemnified Party reasonably understands to be its powers or the discharge of what such Litigation Trust Indemnified Party reasonably understands to be its duties conferred by the Plan, the Confirmation Order or this Agreement, any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to such Litigation Trust Indemnified Party's own fraud or willful misconduct, as determined by a Final Order issued by a court of competent jurisdiction, on and after the Effective Date).  The foregoing indemnification shall also extend to

19

matters directly or indirectly in connection with, arising out of, based on, or in any way related to: (i) this Agreement; (ii) the services to be rendered pursuant to this Agreement; (iii) any document or information, whether oral or written, referred to herein; or (iv) proceedings by or on behalf of any creditor, in each case except for actions or omissions to act to the extent determined by a Final Order to be due to the Litigation Trust Indemnified Party's own fraud or willful misconduct, as determined by a Final Order issued by a court of competent jurisdiction, on and after the Effective Date. The Litigation Trust shall, on demand, advance or pay promptly, at the election of the Litigation Trust Indemnified Party, solely out of the Litigation Trust Assets, on behalf of each Litigation Trust Indemnified Party, attorneys' fees and other expenses and disbursements to which such Litigation Trust Indemnified Party would be entitled pursuant to the foregoing indemnification provision; *provided,* that any Litigation Trust Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines, by Final Order, that such Litigation Trust Indemnified Party is not entitled to indemnification hereunder due to such Person's own fraud or willful misconduct as determined by a Final Order issued by a court of competent jurisdiction. In any matter covered by the first two sentences of this subsection, any party entitled to indemnification shall have the right to employ such party's own separate counsel, at the Litigation Trust's expense, subject to the foregoing terms and conditions.

(b)     The indemnification provided under <u>Section 6.2(a)</u> shall survive the death, dissolution, resignation or removal, as may be applicable, of the Litigation Trustee or any other Litigation Trust Indemnified Party. Any Litigation Trust Indemnified Party may waive the benefits of indemnification under this <u>Section 6.2</u>, but only by an instrument in writing executed by such Litigation Trust Indemnified Party. Termination or modification of this Agreement shall not affect any indemnification rights or obligations set forth herein.

(c)     The rights to indemnification under this <u>Section 6.2</u> are not exclusive of other rights which any Litigation Trust Indemnified Party may otherwise have at law or in equity, including, without limitation, common law rights to indemnification or contribution. Nothing in this <u>Section 6.2</u> will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party. Further, the Litigation Trust hereby agrees: (i) that the Litigation Trust is the indemnitor of first resort (*i.e.*, in the event any Litigation Trust Indemnified Party has the right to receive indemnification from one or more third party, the Litigation Trust's obligations to such Litigation Trust Indemnified Party are primary); (ii) that the Litigation Trust shall be required to pay the full amount of expenses (including attorneys' fees) actually incurred by such Litigation Trust Indemnified Party in connection with any proceeding as to which the Litigation Trust Indemnified Party is entitled to indemnification hereunder in advance of the final disposition of such proceeding from the Litigation Trust Assets; (iii) that the Litigation Trust irrevocably waives, relinquishes and releases such third parties from any and all claims by the Litigation Trust against such third parties for contribution, subrogation or any other recovery of any kind in respect thereof; and (iv) no Litigation Trust Indemnified Party shall have the obligation to reduce, offset, allocate, pursue or apportion any indemnification advancement, contribution or insurance coverage among multiple parties owing indemnification obligations to such Litigation Trust Indemnified Party prior to the Litigation Trust's satisfaction of its indemnification obligations hereunder. For the avoidance of doubt, each Litigation Trust Indemnified Party shall be entitled, subject to the terms hereof, to

indemnification for any costs and attorneys' fees such Litigation Trust Indemnified Party may incur in connection with enforcing any of its rights under this <u>Article VI</u>.

6.3     <u>Litigation Trust Liabilities</u>.  All liabilities of the Litigation Trust, including, without limitation, indemnity obligations under <u>Section 6.2</u>, will be liabilities of the Litigation Trust as an Entity and will be paid or satisfied solely from the Litigation Trust Assets and paid on a priority basis.  No liability of the Litigation Trust will be payable in whole or in part by any Litigation Trust Beneficiary individually or in the Litigation Trust Beneficiary's capacity as a Litigation Trust Beneficiary, by the Litigation Trustee or H.I.G. Representatives individually or in the Litigation Trustee's and H.I.G. Representatives' respective capacities as Litigation Trustee or H.I.G. Representatives, as applicable, or by any representative, member, partner, shareholder, director, officer, professional, employees, agent, affiliate or advisor of any Litigation Trust Beneficiary, the Litigation Trustee, the H.I.G. Representatives or their respective affiliates.

## ARTICLE VII
## TAX MATTERS

7.1     <u>Intended Tax Treatment</u>.  For all U.S. federal income tax purposes, it is the intention of all parties that the Litigation Trust be classified as a "grantor trust" pursuant to sections 671-679 of the IRC and the Treasury Regulations thereunder or, if it is not so treated, as a partnership other than a publicly traded partnership taxable as a corporation under section 7704 of the IRC. This trust is formed to hold the Litigation Trust Assets and liquidate the Litigation Trust, as provided herein. The Litigation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.  All income of the Litigation Trust shall be treated as subject to tax on a current basis.

7.2     <u>Tax Reporting and Payment</u>.

(a)     The "taxable year" of the Litigation Trust shall be the "calendar year" as such terms are defined in section 441 of the IRC.  The Litigation Trustee shall (a) file tax returns for the Litigation Trust treating the Litigation Trust in accordance with this <u>Section 7.1</u> to the extent permitted by applicable law, report consistently with the foregoing for state and local tax purposes.  The Litigation Trustee will annually, by May 1 of each year, send to each Litigation Trust Beneficiary a separate statement setting forth such Litigation Trust Beneficiary's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the Litigation Trust) as relevant for U.S. federal income tax purposes and will instruct all such Litigation Trust Beneficiaries to use such information in preparing their U.S. federal income tax returns.  The Litigation Trustee shall provide the Litigation Trust Beneficiaries with any other tax information reasonably requested with respect to the preparation of their or their beneficial owners' tax returns. The Litigation Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Litigation Trust that is required by any Governmental Unit.

(b)     Allocations of Litigation Trust taxable income among the Litigation Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time,

and without regard to any restrictions on distributions set forth in the Plan or this Agreement) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value) to the Litigation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust, in the manner set forth in <u>Section 4.5</u> hereof.  Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for purposes of this <u>Section 7.2(b)</u> shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

(c)     The Litigation Trustee shall be responsible for payment, out of the Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets.

7.3     <u>Withholding of Taxes</u>.

(a)     The Litigation Trustee shall deduct and withhold and pay to the appropriate Governmental Unit all amounts required to be deducted or withheld pursuant to the IRC or any provision of any state, local or non-U.S. tax law with respect to any payment or distribution to the Litigation Trust Beneficiaries.  Notwithstanding the above, each Litigation Trust Beneficiary that receives a payment or distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such Litigation Trust Beneficiary by any governmental authority, including income, withholding and other tax obligations, on account of such payment or distribution.  All such amounts withheld and paid to the appropriate Governmental Unit shall be treated as amounts distributed to such Litigation Trust Beneficiaries for all purposes of this Agreement.

(b)     The Litigation Trustee shall be authorized to collect such tax information from the Litigation Trust Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and this Agreement.  As a condition to receive distributions under the Plan, all Litigation Trust Beneficiaries may be required to identify themselves to the Litigation Trustee and provide tax information and the specifics of their holdings, to the extent the Litigation Trustee deems appropriate, including an IRS Form W-9 or, in the case of Litigation Trust Beneficiaries that are not United States persons for U.S. federal income tax purposes, certification of foreign status on an applicable IRS Form W-8.

7.4     <u>Tax Treatment of Receipt of Litigation Trust Assets</u>.  To the maximum extent permitted by applicable law, the receipt of Litigation Trust Proceeds shall be reported for U.S. federal, state and local tax purposes as a non-taxable adjustment to purchase price with respect to the transaction(s) that is(are) the subject of the Trust Causes of Action.

7.5     <u>Foreign Tax Matters</u>.  The Litigation Trustee shall duly comply on a timely basis with all obligations, and satisfy all liabilities, imposed on the Litigation Trustee or the Litigation Trust under non-United States law relating to taxes.  The Litigation Trustee, or any other legal representative of the Litigation Trust, shall not distribute the Litigation Trust Assets or proceeds

thereof without having first obtained all certificates required to have been obtained under applicable non-United States law relating to taxes.

## ARTICLE VIII
## TERMINATION OF LITIGATION TRUST

8.1     Termination.  The Litigation Trust shall be dissolved upon all of the Litigation Trust Proceeds having been distributed pursuant to the Plan and this Agreement (and the Litigation Trust Beneficiaries' agreement that no further Litigation Trust Proceeds are expected); *provided*, *however*, that in no event shall the Litigation Trust be dissolved later than five years from the Effective Date *provided, further*, that notwithstanding anything herein to the contrary, upon mutual agreement of the Litigation Trust Beneficiaries, the term shall be extended by such duration as the Litigation Trust Beneficiaries may agree to allow for the liquidation of the Litigation Trust Assets, to the extent not otherwise liquidated. If at any time the Litigation Trustee determines, in reliance upon the advice of the Litigation Trust Professionals (or any one or more of them), that the expense of administering the Litigation Trust so as to make a final distribution to the Litigation Trust Beneficiaries is likely to exceed the value of the Litigation Trust Assets then remaining in the Litigation Trust, the Litigation Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Litigation Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from U.S. federal income tax under section 501(a) of the IRC, (C) not a "private foundation," as defined in section 509(a) of the IRC and (D) that is unrelated to the Company Parties, the Litigation Trust, the Litigation Trustee, any Litigation Trust Professionals and any insider of any of the foregoing and (iii) dissolve the Litigation Trust (all of the foregoing actions in clauses (i) through (iii) being referred to as the "Dissolution Process").  Such date upon which the Litigation Trust shall finally be dissolved shall be referred to herein as the "Termination Date."

8.2     Continuance of Litigation Trust for Winding Up.  During the Dissolution Process, the Litigation Trustee, solely for the purpose of liquidating and winding up the affairs of the Litigation Trust, shall continue to act as such until its duties have been fully performed.  During the Dissolution Process, the Litigation Trustee shall continue to be entitled to receive the Litigation Trustee Fees called for by Sections 5.2(a) and 5.2(b) subject to Section 2.3.  Upon distribution of all the Litigation Trust Assets, the Litigation Trustee shall retain the books, records and files that shall have been delivered or created by the Litigation Trustee to the extent not otherwise required to be handled by the Litigation Trustee in accordance with Section 2.2.  At the Litigation Trustee's discretion, but subject in all cases to Section 2.2, all of such records and documents may be destroyed no earlier than two (2) years following the Termination Date as the Litigation Trustee deems appropriate (unless such records and documents are necessary to fulfill the Litigation Trustee's obligations hereunder).  Except as otherwise specifically provided herein, upon the Termination Date, the Litigation Trustee shall be deemed discharged and have no further duties or obligations hereunder, except to account to the Litigation Trust Beneficiaries as provided herein, the Litigation Trust Interests shall be cancelled, and the Litigation Trust will be deemed to have dissolved.

## ARTICLE IX
## AMENDMENT AND WAIVER

9.1     Subject to Sections 9.2 and 9.3, and following the provision of reasonable advance notice to the Reorganized Debtors and the Litigation Trust Beneficiaries, the Litigation Trustee may make any amendment, supplement or waiver with respect to any provision of this Agreement upon approval from H.I.G. and the Company; *provided, however*, that in no event shall any Party amend the Agreement in a way that would conflict with Article X of the Plan.  Technical amendments to this Agreement may be made, as necessary to clarify this Agreement or enable the Litigation Trustee to effectuate the terms of this Agreement, by the Litigation Trustee, but only following reasonable advance notice to the Litigation Trust Beneficiaries.

9.2     Notwithstanding Section 9.1, no amendment, supplement or waiver of or to this Agreement shall (a) affect the payments or distributions to be made under this Agreement, (b) adversely affect the U.S. federal income tax status of the Litigation Trust as a "grantor trust" pursuant to sections 671-679 of the IRC, or (c) cause this Litigation Trust to become an association taxable as a corporation for U.S. federal income tax purposes (or to become a publicly traded partnership taxable as a corporation under section 7704 of the IRC), unless each Litigation Trust Beneficiary consents to such amendment, supplement or waiver in writing, and in advance of such amendment supplement or waiver.

9.3     No failure by the Litigation Trustee or H.I.G. Representatives to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof, or of any other right, power, or privilege.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

10.1     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of law that would require or permit application of the law of another jurisdiction).

10.2     Jurisdiction.  The Parties agree that the Bankruptcy Court shall have jurisdiction over the Litigation Trust and the Litigation Trustee, including, without limitation, the administration and activities of the Litigation Trust and the Litigation Trustee to the fullest extent permitted by law.  Each Party hereby irrevocably consents to the jurisdiction of the Bankruptcy Court in any action to enforce, interpret or construe any provision of this Agreement or of any other agreement or document delivered in connection with this Agreement, and also hereby irrevocably waives any defense of improper venue, *forum non conveniens*, or lack of personal jurisdiction to any such action brought in the Bankruptcy Court; *provided however* that nothing in the foregoing shall invalidate, contradict or supersede the mechanism described in Section 4.3(b) relating to a dispute between the H.I.G. Representatives and any Consent Party related to the Consent Party's consent rights regarding settlements.  Each Party hereby irrevocably consents to the service by certified or registered mail, return receipt requested, of any process in any action to enforce, interpret, or construe any provision of this Agreement.

10.3    Severability.  In the event any provision of this Agreement or the application thereof to any person or circumstances shall be determined by Final Order to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

10.4    Notices.  Any notice or other communication required or permitted to be made under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally or by facsimile or electronic communication, sent by nationally recognized overnight delivery service or mailed by first-class mail, to the receiving party's address below:

(a)    if to the Litigation Trustee, to:

[●]
[●]
[●]
Attn: [●]
Email: [●]

(b)    if to any Litigation Trust Beneficiary, to the last known address of such Litigation Trust Beneficiary according to the Litigation Trustee's records;

(c)    if to the Company, to:

Mobileum, Inc.
20813 Stevens Creek Boulevard, Suite 200
Cupertino, CA 95014
Attn: Mike Salfity, Chief Executive Officer
Email: Mike.Salfity@mobileum.com

and a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:    Jeffrey D. Saferstein, Esq. (Jeffrey.Saferstein@weil.com)
              Alexander W. Welch, Esq. (Alexander.Welch@weil.com)
              Daphne Papadatos, Esq. (Daphne.Papadatos@weil.com)
              Eric L. Einhorn, Esq. (Eric.Einhorn@weil.com)

              and

700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attention:    Gabriel A. Morgan, Esq. (Gabriel.Morgan@weil.com)
              Clifford Carlson, Esq. (Clifford.Carlson@weil.com)

(d)     if to H.I.G.:

H.I.G. Capital, L.L.C.
1450 Brickell Ave
31st Floor
Miami, FL 33131
Attn: General Counsel
Email: [●]

and a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Attn: Sunny Singh, Esq. (Sunny.Singh@stblaw.com)
        Dov Gottlieb, Esq. (Dov.Gottlieb@stblaw.com)

(e)     if to the Ad Hoc Committee:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attn:   Evan R. Fleck, Esq. (efleck@milbank.com)
        Matthew L. Brod, Esq. (mbrod@milbank.com)

10.5    Headings.  The headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

10.6    Entire Agreement.  This Agreement and the exhibits attached hereto, together with the Plan and the Confirmation Order, contain the entire agreement between the parties and supersede all prior and contemporaneous agreements, understandings, negotiations or discussions, whether written or oral, between the parties with respect to the subject matter hereof.

10.7    Successors in Interest.  This Agreement shall be binding upon and inure to the benefit of any successor in interest to any one or more of the Parties, including, but not limited to, the Reorganized Debtors (as limited by the Plan and the Confirmation Order), that shall, upon becoming any such successor be subject to and obligated to comply with the terms and conditions hereof, including, specifically, the terms of Section 2.2.

10.8    Limitations.  Except as otherwise specifically provided in this Agreement, the Plan or the Confirmation Order, nothing herein is intended or shall be construed to confer upon or to give any person other than the Parties and the Litigation Trust Beneficiaries any rights or remedies under or by reason of this Agreement and notwithstanding anything in this Agreement, the Parties hereby acknowledge and agree that nothing herein is intended to, does, or shall be construed to prejudice or harm in any way the rights, remedies or treatment (including any releases, exculpation,

26

indemnification, or otherwise) of any Released Party or Exculpated Party, solely in their capacity as a Released Party or Exculpated Party, under the Plan.

10.9    Further Assurances.  From and after the Effective Date, the parties hereto covenant and agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes of this Agreement, and to consummate the transactions contemplated hereby.

10.10    Rules of Interpretation. For purposes of this Agreement, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, subsection or clause contained in this Litigation Trust Agreement; (c) the rules of construction set forth in 11 U.S.C. § 102 will apply; and (d) the term "including" shall be construed to mean "including, but not limited to," "including, without limitation," or words of similar import.

10.11    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument.  A facsimile or electronic mail signature of any party shall be considered to have the same binding legal effect as an original signature.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

[MOBILEUM NEWCO], as a settlor

By: _____
Name: [●]
Title: [●]

[H.I.G.], as a settlor

By: _____
Name: [●]
Title: [●]

[AD HOC COMMITTEE], as a settlor

By: _____
Name: [●]
Title: [●]

[●], as Litigation Trustee

By: _____
Name: [●]
Title: [●]

STATE OF                      )
                                 ss.:
COUNTY OF                )

On _____, 2024 before me, the undersigned, personally appeared _____ (name), _____ (title) of [MOBILEUM NEWCO], personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)


STATE OF                      )
                                 ss.:
COUNTY OF                )

On _____, 2024 before me, the undersigned, personally appeared _____ (name), _____ (title) of [H.I.G.], personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)


STATE OF                      )
                                 ss.:
COUNTY OF                )

On _____, 2024 before me, the undersigned, personally appeared _____ (name), _____ (title) of [AD HOC COMMITTEE], personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

STATE OF                 )

                            ss.:

COUNTY OF          )

        On _____, 2024 before me, the undersigned, personally appeared _____ (name), _____ (title) of _____ (NAME OF LITIGATION TRUSTEE), personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                             _____

                             (signature and office of individual taking acknowledgment)

## **Schedule 1**

**Litigation Trust Beneficiaries**

H.I.G.

The Company

## Exhibit A

**Litigation Trustee Compensation**

## Exhibit F

**Schedule of Excluded Parties**

**Exhibit F**

**Schedule of Excluded Parties**

In accordance with <u>Section 10.6(a)</u> of the *Joint Chapter 11 Plan of Mobileum, Inc. and its Affiliated Debtors*, dated July 23, 2024 (Docket No. 14) (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms and provisions thereof, the "**Plan**")[1], the Debtors hereby disclose the identities of individuals and entities who will not be released under the Plan from any claims obligations, rights, suits, damages, Causes of Action, remedies, or liabilities whatsoever, including, without limitation, claims and causes of action arising from an act or omission that is judicially determined by a Final Order to have constituted fraud or willful misconduct or asserted or assertable in the Superior Court Litigation or Chancery Court Litigation. For the avoidance of doubt, this identification does not limit the effect of any language in the Plan:



---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.



